IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LEIGHTON TECHNOLOGIES LLC, ) | |
| ) | |
| Plaintiff and Counterclaim Defendant, ) | |
| ) | 04 Civ. 02496 (CM)(LMS) |
| v.                                          ) | |
| ) | Hon. Colleen McMahon |
| OBERTHUR CARD SYSTEMS, S.A., ) | |
| ) | |
| Defendant and Counterclaim Plaintiff. ) | |
| ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO**

**DEFENDANT'S MARKMAN BRIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.     PRELIMINARY STATEMENT ......................................................................... 1

II.    CLAIM CONSTRUCTION ................................................................................ 1

    A.    "Electronic Element" ............................................................................ 2

        1.    The '207 and '155 Patents ........................................................ 2

        2.    The '099 and '367 Patents ........................................................ 5

    B.    "Non-Electronic Carrier" ..................................................................... 6

    C.    "Directly" ............................................................................................... 8

    D.    "Comprising The Steps Of" ................................................................. 9

        1.    The Court Should Reject Defendant's Imposition Of An Exact Order .......................................................................... 11

    E.    "Encapsulated By" And "Encapsulating . . . Within" ...................... 14

        1.    The Court Should Reject Defendant's Construction ........... 15

    F.    "Coating . . . With A Layer Of Ink" ................................................. 18

    G.    "Minimal First Ram Pressure" .......................................................... 20

    H.    "First Pressure"/"First Ram Pressure", "Second Pressure", And "Third Pressure" ......................................................................... 21

        1.    The Court Should Reject Defendant's Construction ........... 22

    I.    "Controlled Flow" ................................................................................ 24

        1.    The Court Should Reject Defendant's Construction ........... 25

    J.    "Cooling . . . While Applying A Second Pressure" ........................ 26

        1.    The Court Should Reject Defendant's Construction ........... 27

K.    **"Cooling … In Conjunction With The Concurrent Application Of A Third Pressure"** ............................................................28

1.    **The Court Should Reject Defendant's Construction** ............................28

III.    **CONCLUSION** ................................................................................29

**APPENDIX 1 - SUMMARY OF CLAIM CONSTRUCTIONS AND CROSS-REFERENCE TO INDEPENDENT SUBJECT CLAIMS** .........................................30

## <u>TABLE OF AUTHORITIES</u>

### CASES

*3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365 (Fed. Cir. 2003), *cert. denied*, 124 S. Ct. 2877 (2004)........................................................ 11

*AK Steel Corp. v. Sollac and Ugine,* 344 F.3d 1234 (Fed. Cir. 2003) ........................................... 4

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) ................................................... 9

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003) ...............................................................................................................................5-6

*British Telecomms. PLC v. Prodigy Communs. Corp.,* 189 F. Supp. 2d 101 (S.D.N.Y. 2002) ....................................................................................................... 3

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003) ................. 3, 13

*CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997), cert. denied, 522 U.S. 1109 (1998) .......................................................................................... 3

*Ductmate Indus., Inc. v. Famous Supply Corp.*, 55 F. Supp. 2d 777 (D. Ohio 1999) ....................................................................................................................... 12

*E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364 (Fed. Cir. 2003) .................................... 19, 26

*Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ..................... 9

*Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364 (Fed. Cir. 2003) ....................... 11, 12, 21

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898  (Fed. Cir. 2004), *cert. denied*, 125 S. Ct. 316 (2004) ...................................................................................... 18

*Markman v. Westview Instrs., Inc.*, 52 F.3d 967 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996)........................................................................................... 3

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001)............................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ......................................... 6

### OTHER AUTHORITIES

*Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., McGraw Hill 5th ed 1994) ....................................................................................................... 24

*Webster's Collegiate Dictionary* (10th ed, © 1999; principal © 1993)....... 6, 14, 15, 24, 26, 28, 29

## I.    <u>PRELIMINARY STATEMENT</u>

"Plaintiff's Brief In Support Of Its Claim Construction" ("Opening Brief") articulates the legal standard for claim construction and then strictly follows that standard.  The resulting construction provides meaning to claim terms which wholly comports with the understanding of persons skilled in the art and the intrinsic evidence.

In the quite voluminous "Oberthur Card Systems, S.A. Markman Brief" ("Def. Br."), Defendant states its own version of the law, only then to disregard or misapply it.  Indeed, Defendant

- repeatedly ignores the ordinary meaning of the actual words of the claims;

- improperly limits and twists the ordinary meaning of everyday English words, such as "directly" and "while";

- concocts "main objectives" for the Patents-In-Suit and incorrectly reads these non-existent "main objectives" and preferred embodiments into the claims as limitations; and

- imposes a rigid and exact order in which claim steps must be executed, even though the claims and other intrinsic evidence do not require such an order.

Defendant's violations render its proposed construction at odds with the understanding of persons skilled in the art and the intrinsic evidence.

For the following reasons, the Court should adopt Plaintiff's construction and reject Defendant's in toto.

## II.    <u>CLAIM CONSTRUCTION</u>

Plaintiff provides a "Summary Of Claim Constructions And Cross-Reference To Independent Subject Claims" in Appendix 1 hereto, which is intended to permit the Court to readily ascertain the differences between the parties' constructions.  The tables of Appendix 1

list the parties' constructions side-by-side for each disputed term and also provide the step of the independent Subject Claims[1] in which the disputed term is first recited.

### A.    "Electronic Element"

On pages 14-17 of its Opening Brief, Plaintiff proved beyond question that

**an "*electronic element*" is a device having distinct electrical characteristics and having terminals at which it may be connected to other elements to form a circuit that utilizes a semiconductor device.**

To do so, it analyzed a well-known technical dictionary to ascertain the ordinary meaning of "element" and its modifier "electronic."  Plaintiff then confirmed that the specifications and the prosecution histories of the Patents-In-Suit are wholly consistent with the ordinary meaning.

Defendant's construction divorces a family of closely related patents.  On the one hand, it far too narrowly defines "electronic element" for the '207 and '155 Patents and, on the other hand, it provides no construction for the continuation-in-part '099 and '367 Patents.  For the following reasons, the Court should reject Defendant's construction.

### 1.    The '207 and '155 Patents

Defendant proffers an overly narrow construction of "electronic element" as a "micro-chip and an antenna" for the '207 and '155 Patents.  Def. Br. at 20 and 45.  Its construction is based on the incorrect premise that "electronic element" lacks an ordinary meaning simply because these two words do not exist side-by-side in a dictionary.  Def. Br. at 20-21.  Defendant blindly chooses to ignore the hornbook law it cites and affords absolutely no weight to the ordinary meaning of the constituent words that make up this term.  *See* Def. Br. at 13 ("The proper starting point for any claim construction exercise is the <u>actual language</u> of the claim itself.")(emphasis added).  Defendant's omission is improper and causes its construction to be

---

[1] Capitalized terms herein have the same definition as in the Opening Brief.

overly limiting and counter to the understanding of "electronic element" by persons skilled in the art.  *See e.g. British Telecomms. PLC v. Prodigy Communs. Corp.,* 189 F. Supp. 2d 101, 112 (S.D.N.Y. 2002)(construing "central computer means" based on definitions of "computer" and its modifier "central").

Defendant's construction should also fail because it stems from a fictitious "definition" of "electronic element."  Def. Br. at 21.  Defendant crafts its  "definition" from the following:

> Electronic element 20 may take a wide variety of forms and perform a wide variety of functions.  As shown in FIG. 3A-3C respectively, electronic element 20, 20', 20'' may be provided by a micro-chip 22 including a wire antenna 24 connected thereto, a micro-chip 22' and a circuit board antenna 24', a read/write micro-chip 22'' and a wire coil antenna 24'', or any other suitable electronic element.

Def. Br. at 21 (quoting '207 Patent, A6, Col. 3:46-52)(emphasis added).

But, the "electronic element" certainly is not defined.  *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003)("In the absence of an express intent to impart a novel meaning to the claim terms, the words are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art.")(emphasis added); *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996)("any special definition given to a word must be clearly defined in the specification")(emphasis added).  Rather, the repeated use of open-ended phrases, such as those emphasized, fatally undermines Defendant's position that the "electronic element" must be a micro-chip and an antenna.[2]

---

[2] Defendant admits that Figures 3A-3C of the '207 Patent are "three examples" of the "electronic element."  Def. Br. at 21.  However, it nevertheless seeks to limit the claims to these preferred embodiments, which is entirely improper.  *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1158 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998).

Defendant also introduces a "red herring" in a strained effort to help its cause. It states "because an RFID card requires both the micro-chip and the antenna in order to work, nowhere in the specification is there a statement that the 'electronic element' can exclude the micro-chip or the antenna." Def. Br. at 22. While RFID cards do require a chip and an antenna, the claims are not limited to RFID cards because they generally recite processes for incorporating an electronic element into a plastic card. Claim Tables at L2. Further, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention," let alone all excluded embodiments. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). Thus, Defendant's diversionary tactics are irrelevant to arriving at a proper construction of the claims.

Defendant's arguments that the chip-antenna combinations of dependent Claims 13-15 of the '207 Patent define the "electronic element" turn the patent laws upside-down. Def. Br. at 22. Indeed, under the doctrine of claim differentiation, a limitation from a dependent claim should not be read into the independent claims. *AK Steel Corp. v. Sollac and Ugine,* 344 F.3d 1234, 1242 (Fed. Cir. 2003). Application of this doctrine requires the "electronic element" to be afforded a broader construction than the chip-antenna combinations in the dependent claims. Defendant's construction violates this fundamental rule.

Plaintiff would be remiss if it did not remark on the conspicuous absence of Defendant's reliance on the prosecution histories of the Patents-In-Suit. Unlike Plaintiff, Defendant chooses to ignore the prior art '201 Patent, which shows numerous types of electronic elements for use in smart cards, such as integrated circuit modules (wherein an encapsulant covers the chip), transistors, diodes, resistors, inductors and capacitors. Opening Brief at 16. At the time of Mr.

Leighton's inventions, one skilled in the art certainly would have known "electronic elements" to include much more than a micro-chip and an antenna.[3]

For the foregoing reasons, the Court should reject Defendant's overly narrow construction for "electronic element" as it relates to the '207 and '155 Patents.

### 2.    The '099 and '367 Patents

Despite Defendant's admission that "the same claim terms in related patents are generally construed to have the same meaning," it nevertheless contends that the term "electronic element" is ambiguous and cannot be defined for the '099 and '367 Patents.  Def. Br. at 13, 49, and 60. Defendant's position is wholly without merit.

Defendant's unwillingness to construe the "electronic element" for the '099 and '367 Patents again ignores the ordinary meaning of the words that make up this term.  For the reasons stated with regard to the very closely related '207 and '155 Patents, Defendant's glaring omission, as well as its other described inadequacies, are fatal to Defendant's proposed construction.

Defendant also entirely disregards the only device actually shown in the figures to be embedded between plastic sheets (an antenna) and the examples expressly described in the specifications (a "microprocessor chip, circuit board, transponder, etc.").  '099 Patent, B7, Col. 4:35-37; B8, Col. 5:13-17; B3, FIG.4.  At the very least, the proper construction needs to cover these preferred embodiments because otherwise it would be "'rarely, if ever correct'."  *Anchor*

---

[3] Defendant tries to find support that the "electronic element" can only be a micro-chip and antenna in the '155 Patent prosecution history, which states that the plastic cards include "electronic elements <u>such as</u> a computer chip embedded therein."  Def. Br. at 45-46 (emphasis added).  This passage, however, does not show that the electronic element is limited to a chip and an antenna, but instead describes that the "electronic element" may consist only of a computer chip.

*Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003)(quoting

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

It follows that the Court should reject Defendant's construction that "electronic element"

is ambiguous and cannot be defined for the '099 and '367 Patents.

### B.    "Non-Electronic Carrier"

On pages 18-21 of its Opening Brief, Plaintiff clearly demonstrated that

**a "*non-electronic carrier*" is a device that holds the electronic element to
protect it from physical damage during lamination, where the device is not
part of a circuit that utilizes a semiconductor device.**

Plaintiff based its construction on the ordinary meaning of "carrier" and its modifier

"non-electronic," taken in view of the '207 Patent prosecution history which prompted the

introduction of this term into the claims.  The construction was then confirmed by the

specifications of the Patents-In-Suit.

Defendant proposes that the "non-electronic carrier" is "a structure without any

substantial electronic function, such as a recess, buffer or protective carrier, that at least partially

protects during lamination the 'electronic element' from damage caused by lamination pressure."

Def. Br. at 22.  This construction is incomplete and inaccurate, and the Court should therefore

reject it.

Defendant yet again refuses to take notice of the ordinary meaning of the words that

make up the disputed term "non-electronic carrier."  Its construction does not account for the

ordinary meaning of "carrier," which contemplates a device for holding something.[4]  Opening

---

[4] Even a non-technical dictionary reveals that "carrier" must hold or carry.  Cohen Decl., Exhibit
Q, *Webster's Collegiate Dictionary* p. 175 [Q4] 10th ed, © 1999; principal © 1993)("**carrier** . . .
**3a** : a container for carrying **b** : a device or machine that carries").

Brief at 18.  Defendant's simplistic recitation of the "carrier" as "a structure" completely disregards this ordinary meaning by omitting the "holding" function.

The lack of a "holding" function also runs counter to '207 Patent prosecution history, which clearly indicates that the "carrier" is for "carrying and protecting the electronic element." Opening Brief at 19-20 (quoting '207 Prosecution History at G79).  A construction overlooking the "holding" function, therefore, is not correct.

Similarly, Defendant fails to consider the ordinary meaning of "non-" and "electronic" when it defines "non-electronic" as "without any substantial electronic function."  Def. Br. at 22. This portion of Defendant's construction is inaccurate because "non-" negates "electronic," rather than merely tempers it, as does Defendant's use of "without any substantial."  Opening Br. at 18.  Also, like its construction for "electronic element," Defendant fails to provide the ordinary meaning of "electronic."  This renders its construction circular and leaves "electronic" without a construed meaning.[5]

Plaintiff also disagrees with Defendant's characterization of "a structure . . . as a recess, buffer or protective carrier . . . ."  Def. Br. at 22.  Indeed, a recess and a buffer are empty spaces and, as such, cannot be structures.  *See e.g.* Opening Brief at 7 and Appendix 2 thereto (describing the recess and buffer zone of the '024 Patent as empty spaces).  Further, Defendant's recitation of the "non-electronic carrier" as a "protective carrier"  is circular and does not attempt to define the disputed term.

---

[5] Unlike Defendant, Plaintiff is consistent in construing the word "electronic" in the disputed terms "electronic element" and "non-electronic carrier."  At the very least, Plaintiff would have expected Defendant to propose that "non-electronic" means "not a micro-chip and an antenna."

Defendant's qualification that the carrier only "at least partially protects" the electronic element departs from the ordinary meaning of "carrier," which provides that the carrier "protects . . . [the electronic element] from physical damage." Opening Br. at 18. It also is inconsistent with the '207 Patent prosecution history, which confirms that the "carrier" is for "protecting the electronic element," not partially protecting it. Opening Brief at 19-20 (quoting '207 Prosecution History at G79). Indeed, prior to the Patents-In-Suit, "partial protection" in the context of heavy lamination pressures on a sensitive electronic element would have done little good. Therefore, a construction that qualifies the protective function in the manner Defendant suggests is not correct.[6]

Therefore, the Court should reject Defendant's construction of "non-electronic carrier."

C.    "Directly"

On pages 21-23 of its Opening Brief, Plaintiff construed "directly" to mean "in immediate physical contact." This was done in strict accordance with its dictionary definition and was confirmed by the intrinsic evidence. In accordance with the patents laws, Plaintiff stopped at this point and proposed a verbatim construction.

Defendant agrees with Plaintiff's ordinary meaning and that the intrinsic evidence does not alter it. Def. Br. at 25-28. However, it nevertheless proposes a different construction -- *i.e.*, there is "nothing between" the electronic element and the first and second plastic core sheets. Def. Br. at 25. Defendant's attempt to couch the ordinary meaning in the negative should fail.

---

[6] Defendant's qualification of "at least partially protect[ing]" the electronic element also obfuscates the meaning of the claims, which completely undermines this claim construction exercise. In particular, the construction is vague and ambiguous because it begs at least the following questions: Does the "non-electronic carrier" protect the electronic element sometimes, but not other times? Does it protect one physical part of the electronic element, but not others? Does it protect the electronic element for a certain period of time, and then cease its protective function? Defendant's construction is unclear and unworkable.

Defendant's improper twist of the dictionary-based definition requires the entire upper and lower surfaces of the "electronic element" to be in full surface contact with the plastic core sheets. *See e.g.* Def. Br. at 27 (Leighton "relinquished any interpretation of the term 'directly' that includes . . . air . . . intervening between the 'electronic element' and either the first or second 'plastic core sheets'"). This goes far beyond the ordinary meaning of "directly." In fact, there is nothing in the specifications or prosecution histories that require full surface contact. Defendant's construction requires that the surfaces of the electronic element and the plastic core sheets be perfectly smooth and planar, which is nowhere taught or remotely suggested in the intrinsic evidence. As such, the Court should construe "directly" in accordance with its dictionary definition, with which the parties both agree.

### D.    "Comprising The Steps Of"

Defendant contends that "'comprising the steps of' means the respective steps [of the independent Subject Claims] must be performed in a precise order" -- *i.e.*, (a), (b), (c), (i), (ii), (iii), (d) and (e). Def. Br. at 28-30. For the following reasons, Plaintiff submits that

> **the steps need not necessarily be performed in the exact order recited in the claims, except that step (c)(iii) must follow step (c)(ii) in Claims 15 and 16 of the '155 and '207 Patents, respectively.**

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003)(quoting *Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001)). To make the determination,

> we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written…. If not, we next look to the rest of the specification to determine whether it "directly or implicitly requires such a narrow construction."

*Altiris*, 318 F.3d at 1369-70 (internal citations omitted).

9

The independent Subject Claims do not require an exact order, with one limited and notable exception -- *i.e.,* two claims use "subsequently" to expressly indicate that one step must follow another.  In particular, step (c) of Claim 16 of the '207 Patent recites "(ii) applying a second pressure . . . [and] (iii) <u>subsequently</u> cooling said core . . . ."  Claim Tables at L3 (emphasis added).  Step (c) of Claim 15 of the '155 Patent recites identical sub-steps.  *Id.*  In these specific instances, Mr. Leighton chose to require step (c)(iii) to occur after step (c)(ii).  The remaining steps of these and the other independent Subject Claims do not use the word "subsequently" or anything remotely similar.  As such, they do not require a specific order.

As further evidence, numerous dependent claims also provide a clear indication of order when it is intended:

- Claim 8 of the '099 Patent recites "A hot lamination process as recited in claim 1 having a further step <u>following step (d)</u> . . . ." B10 (emphasis added).

- Claim 7 of the '367 Patent recites "A process as recited in claim 1 having a further step <u>following step (c)</u> . . . ." D10 (emphasis added).

- Claims 8 and 14 of the '367 Patent recites a "step of coating . . . <u>prior to</u> positioning said overlaminate film . . . ." D10 (emphasis added).

- Claim 22 of the '367 Patent recites "The process according to claim 21, wherein the step of forming a cavity in said core comprises: <u>after step (c)</u>, milling a region . . . ." D10 (emphasis added).

If Mr. Leighton desired to require a particular sequence of steps <u>in all aspects of all of the independent Subject Claims</u>, he knew exactly how to do it.  However, he did not.

The letters and roman numerals do not change this conclusion; they simply separate the steps and enhance readability of the claims.  The other claims in the Patents-In-Suit strongly support and reinforce this conclusion.  For example, Claim 13 of the '367 Patent recites

The process . . . recited in claim 1, having a further step **<u>after said step (c)</u>** comprising:
**<u>(a)</u>**     positioning an overlaminate film . . .;
**<u>(b)</u>**     subjecting said core to a heat and pressure cycle . . . .

10

D10 (emphasis added).  Thus, this claim restarts the lettering at (a), (b) after step (c).  It does not

recite steps (c'), (c") or (c)(1), (c)(2).  *See also* Claim 12 of the '207 Patent and Claim 13 of the

'099 Patent (step (e) includes additional sub-steps (a) and (b)(i)-(iii)).  Clearly, the lettering and

numbering do not require a particular order of steps.

　　　　Further, the specifications describe a preferred, rather than a required, order of steps.

They do not say that one step must precede or follow another.  Nor do the specifications mandate

that steps are required to be executed in a particular sequence and that something detrimental

will happen if they are not.  The specifications simply do not "directly or implicitly" require the

specific order recited in the claims.  *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350

F.3d 1365, 1372 (Fed. Cir. 2003), *cert. denied*, 124 S. Ct. 2877 (2004)("It is true that language in

the specification . . . recurrently recites serial application of the two patterns. . . . Limitations

from the specification, however, cannot be imported into the claims. . . .")

　　　　For these reasons, the Court should find that the steps of the independent Subject Claims

need not necessarily be performed in the exact order recited in the claims, except that step (c)(iii)

must follow step (c)(ii) in Claims 15 and 16 of the '155 and '207 Patents, respectively.

### 1.　The Court Should Reject Defendant's Imposition Of An Exact Order

Defendant's construction requiring a precise sequence of steps hinges on the preamble

"comprising the steps of."  Def. Br. at 28.  In patent parlance, these are magic words which, in a

process claim, "indicate[] that the claim is open-ended and allows for additional steps."

*Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003).  These words have

nothing to do with the sequence of steps in process claims.  Defendant's arguments, therefore,

are inapposite.

Defendant does not cite a single case to support its reliance on these magic words.  This is not surprising since the only case Plaintiff has been able to find which links "comprising the steps of" to the sequence of process steps goes against Defendant.  Specifically, the court in *Ductmate Indus., Inc. v. Famous Supply Corp.*, 55 F. Supp. 2d 777 (D. Ohio 1999) "construe[d] the language *comprising the steps of* . . . to <u>not</u> require . . . the identified steps in exact sequential order."  *Id.* at 784 (underlining added).  If this preamble has any bearing on the order of steps (which Plaintiff submits it does not), it indicates that order is not required.  *Cf. Invitrogen*, 327 F.3d at 1366 (claim preamble recited "a process comprising the following steps in order").

Defendant contends that "[i]f the steps are not followed in the enumerated order, a plastic card is not manufactured that satisfies Leighton's main objective -- manufacturing a plastic card with a sufficiently smooth surface to receive dye sublimation printing."  Def. Br. at 29.  Defendant has concocted this "main objective" to foster yet another "red herring."

Preliminarily, Defendant's conclusion is nothing more than unsupported attorney argument.  However, even if somehow deemed to be "evidence," it would constitute extrinsic evidence which is impermissible in these <u>Markman</u> papers.

That aside, assuming that this phantom "main objective" is found in the Patents-In-Suit, none of the claims require it.  Indeed, the claims do not recite or require a particular surface smoothness.  This is to be compared with application Claims 21 of the '207 and '155 Patents and 23 of the '099 Patent, which generally recited a "plastic card . . . with a variation in overall thickness across the upper and lower surfaces being no greater than approximately 0.0005 inches."  '207 Prosecution History at G49; '155 Prosecution History at H31; '099 Prosecution History at I40.  These application claims were cancelled during prosecution and nothing

remotely similar remains in the claims. Similarly, none of the claims recite or require "dye sublimation printing."

In fact, even the specifications of the Patents-In-Suit do not recite or require this alleged "main objective." Instead, the '207 Patent indicates that a finished card has "numerous advantages . . . including . . . a sufficiently smooth and regular surface such that the card may receive dye sublimation printing. . . ." A5, Col. 2:53-61 (emphasis added). The '099 Patent includes similar verbiage. B7, Col. 3:35-43. The specifications do not impose a requirement of a surface smoothness or dye sublimation printing.

However, even if this phantom "main objective" existed in the specifications, it could not be read into the claims as a limitation. *Brookhill-Wilk 1*, 334 F.3d at 1301 ("Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention."). The Court should decline to require an exact order of steps so that this "main objective" can be achieved, because doing so would read this requirement into the claims.

Defendant also contends that the statement in the '207 Patent prosecution history that the "'024 patent . . . does not suggest a sequence of steps" somehow proves that Mr. Leighton relied on a precise and rigid order of steps to achieve patentability. Def. Br. at 30. This reliance is misplaced because, as the predecessor to the Federal Circuit recognized, "a sequence of steps" is just another way to say that the claims are directed to a "process."[7] *See e.g. In re Musgrave*, 57 C.C.P.A. 1352, 1367 (C.C.P.A. 1970)("All that is necessary . . . to

_____

[7] Interestingly, Plaintiff notes that at no time during the prosecution of any of the four Patents-In-Suit did the Examiner state, either expressly or implicitly, that the claims required ,or any of the prior art disclosed, an exact order of steps. If the claims are to be construed as Defendant suggests, one would think that such a comparison would have been pertinent to patentability.

make a <u>sequence of operational steps</u> a statutory '<u>process</u>' within 35 U.S.C. 101 is that it be in the technological arts . . . .")(emphasis added).

For the foregoing reasons, the Court should reject Defendant's construction requiring all steps of the independent Subject Claims to be performed in the exact order recited.

**E.      "Encapsulated By" And "Encapsulating . . . Within"**

Step (c)(ii) of Claim 1 of the '207 Patent recites that the "electronic element is <u>encapsulated by</u> said core". Claim Tables at L3 (emphasis added). Claim 16 includes a step (c)(ii) of "applying a second pressure . . . for <u>encapsulating</u> said at least one electronic element <u>within</u> said controlled flow plastic". *Id.* (emphasis added).

The ordinary meaning of "encapsulate" is "**1 :** to enclose in or as if in a capsule." *Webster's Collegiate Dictionary* p. 380  [Q9]. A "capsule" is "**6 a :** a compact often sealed and detachable container or compartment." *Id.* at 170 [Q3]. From these definitions,

**"encapsulate" means "to enclose as if in a compartment."**

The specifications are wholly consistent with the ordinary meaning. For example, the '207 Patent discloses that "the ram pressure of laminator 40 is increased to facilitate the flow of the plastic core sheets 30, 32 so that the one or more electronic elements 20 are <u>encapsulated there by</u> . . . ." A6, Col. 4:48-54 (emphasis added). Likewise, it states that "the one or more electronic elements 20 <u>encapsulated in</u> core 33 . . . ." A7, Col. 5:21-24 (emphasis added).

The '207 Patent specification also repeatedly uses the word "embed" to describe the incorporation of the electronic element into the plastic core sheets. *See e.g.* A6, Col. 3:29-34 ("The present invention . . . relates to . . . a hot lamination process for . . . plastic cards that include an electronic element . . . embedded therein."). The use of "embed," which is virtually

14

synonymous with "encapsulate," strongly supports Plaintiff's construction.  *Webster's Collegiate Dictionary* p. 376  [Q8] ("**embed** . . . **1 a :** to enclose closely in").

The '099 Patent includes substantially similar descriptions.  B8, Col. 6:5-10; Col. 6:60-64; B7, Col. 4:11-16.  Therefore, the specifications clearly are consistent with the ordinary meaning.

The prosecution histories of the Patents-In-Suit also are consistent with the ordinary meaning since they do not use "encapsulate" in a varied manner.

For the foregoing reasons, the Court should adopt Plaintiff's construction of "encapsulated by" and "encapsulating . . . within."

## 1.    The Court Should Reject Defendant's Construction

Defendant's construction goes far beyond the ordinary meaning of "encapsulate."  It initially provides that "'the 'core' must fully enclose the 'electronic element' . . . ."  Def. Br. at 31.  Defendant's use of "fully" to qualify "enclose" is improper because the dictionary definition of "encapsulate," "capsule," and "embed" do not use this limiting adverb.

Defendant also adds to the ordinary meaning by requiring that "the electronic element . . . has been placed 'directly' between the 'first and second plastic core sheets' . . . [and] if the 'electronic element' is not placed directly between the 'first and second plastic core sheets'" there cannot be encapsulation.  Def. Br. at 31.  This is unnecessary and improper because the substance of it is found in other parts of the independent Subject Claims.  *See* Claim Tables at L2 (step (b) of positioning the "electronic element . . . directly between said first and second plastic core sheets").

Similarly, the requirement "that even the sides of the 'electronic element' are surrounded by the "first and second plastic core sheets" draws a conclusion of fact based on the result of the "encapsulating."  Def. Br. at 31.  As such, it is improper and unnecessary.

15

Defendant also contends that "if the 'electronic element' . . . has been already encapsulated by other material, the 'first and second plastic core sheets' cannot encapsulate the 'electronic element'". Def. Br. at 31. This construction improperly seeks a conclusion that is within the province of the fact-finder on the issue of infringement, namely, that an electronic element cannot include any kind of encapsulant. Aside from not being appropriate in claim construction, it is also wrong. Indeed, Plaintiff has demonstrated that one type of electronic element, commonly known as an integrated circuit module, may include a chip that is covered with an encapsulant. Opening Brief at 16 (describing electronic elements of the '201 Patent).

Defendant makes much ado over a minor change to Claim 1 of the '207 Application from "encapsulated in said core" to "encapsulated by said core" to conclude that the plastic core sheets must "completely surround and make contact with the 'electronic element' . . . ." Def. Br. at 33-34. In connection with this argument, Defendant posits that there cannot be any "air" between any part of the electronic element and the plastic core sheets. *Id.* This argument is wholly without merit.

There is no substantive difference between "encapsulated in" and "encapsulated by." Indeed, the claims do not draw a distinction between the "by" and "in." *See e.g.* steps (c)(ii) of Claims 1 and 16 of the '207 (using, respectively, "encapsulated by" and "encapsulating . . . within"). Nor do the specifications because they use "by" and "in" interchangeably. *See e.g.* '207 Patent at A6, Col. 4:47-54 ("electronic elements 20 are <u>encapsulated there by</u>") and A7, Col. 5:21-24 ("electronic elements 20<u> encapsulated in</u> core 33").

The '207 Patent prosecution history certainly is dispositive on this issue. There, Mr. Leighton argued that application Claims 1 and 23 (issued as Claims 1 and 16) were patentable over the '024 Patent. '207 Prosecution History at G78-80. These claims recite, respectively,

"encapsulated by" and "encapsulated . . . within." *Id.* at G75 and G78.  However, Mr.

Leighton's remarks did not draw a distinction between the two.  *See* '207 Prosecution History at

G78-80 (discussing patentability of claims together).  That Defendant can make so much out of

so little is indeed a monument to its ingenuity.  But, it is wrong.

    To establish that Mr. Leighton's use of "encapsulated by" disclaimed all "air"

surrounding any part of the electronic element, Defendant half-heartedly contends that

"'encapsulated in said core' arguably includes an 'electronic element' residing in a recess and

being surrounded at least <u>in part</u> by an intervening material, such as air.  The intervening material

(air) encapsulates the 'electronic element.'"  Def. Br. at 33 (emphasis added).  This cannot be

correct.  Neither the specifications of the Patents-In-Suit nor the '024 Patent disclose air that

encapsulates the electronic element.  If the air surrounds the electronic element "in part," it does

not "encapsulate" the electronic element under either Plaintiff's or Defendant's construction.[8]

    For these reasons, the Court should reject Defendant's proposed construction of

"encapsulated by" and "encapsulating."[9]

---

[8] The ordinary meaning of "encapsulate" also does not require the electronic element to make
complete contact with the plastic core sheets in the absence of all air.  It simply means "to enclose
as if in a compartment."  When something is "enclosed" it is not necessarily in full and complete
contact with its surroundings.  As Plaintiff described previously, this would require that the
surfaces of the electronic element and the plastic core sheets be perfectly smooth and planar, which
is nowhere taught or remotely suggested in the intrinsic evidence.  *See supra* pp. 8-9. (discussion
of Defendant's improper modification of the dictionary-based definition of "directly").

[9] However, <u>even if</u> Defendant's arguments on the effect of the change from "in" to "by" are
correct (which they are not), they do not apply to all of the claims.  Indeed, Claim 16 of the '207
Patent and Claim 15 of the '155 Patent recite "encapsulating . . . within."  Defendant ignores the
word "within" and fails to make this distinction in arguing for an all-encompassing construction.

F.    "Coating . . . With A Layer Of Ink"

On pages 24-25 of its Opening Brief, Plaintiff clearly established that **"coating" means "covering."**  It did so based on the ordinary meaning of "coating," which was confirmed using the intrinsic evidence.  Plaintiff even showed that the '099 Patent uses "coating" and "covering" interchangeably.  Opening Br. at 25.

Defendant asks the Court to impart a requirement that the layer of ink "must directly contact" the outer surface of the core.  Def. Br. at 34-35.  Such a limitation, however, is wholly improper.

Despite correctly providing the ordinary meaning of "coat" as "to cover or spread with a finishing, protecting, or enclosing layer," Defendant nevertheless concludes that the "ink is spread on (or makes direct contact with) at least one of the 'outer surfaces' of the 'core'".  Def. Br. at 34.  Defendant's conclusion does not necessarily follow from the ordinary meaning.  Indeed, a layer of ink can cover the core without being in physical contact with it.  For example, the ink could be applied to a plastic sheet which is then laminated to the core.  Defendant's attempt to improperly limit and twist the ordinary meaning of "coat" should therefore fail.

Defendant cites excerpts from the specification of the '207 Patent, which describe a preferred embodiment in which ink is applied so as to directly contact the core.  Def. Br. at 34-35.  However, such a preferred embodiment -- even if it is somehow deemed to be the only embodiment – should not be read into the claims.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004), *cert. denied*, 125 S. Ct. 316 (2004)("Even when the specification describes only a single embodiment, the claims . . . will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'")(citation omitted)

18

Defendant also relies on the specification to show that a purpose of the ink is to hide the electronic element.  Def. Br. at 35.  However, this purpose is not part of the language of the claims and should not be read as a limitation.[10]  *E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003)("The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention.  Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution.").

Finally, Defendant conveniently ignores the prosecution histories of the Patents-In-Suit, which support Plaintiff's construction.  Indeed, the prosecution histories confirm that the layer of ink need not be directly on the core.  For example, on several occasions Mr. Leighton amended his claims to change "printing on" to "coating . . . with".  '207 Prosecution History at G75 and '099 Prosecution Histories at I74 and I77.  With the former "printing on" language, the ink would be in direct contact with the core; in the latter "coating . . . with" language it would not.[11]

In view of the foregoing, the Court should reject Defendant's attempt to unduly limit the step of "coating."

---

[10]  Moreover, the electronic element need not be hidden by ink directly applied to the core and could be hidden in another manner -- *e.g.*, the ink could be applied to a plastic sheet which is then laminated to the core.

[11]  If Mr. Leighton had intended to impose a requirement that the ink must make direct contact with the core, he knew how to use such language.  *See* step (b) of Claim 1 of the '207 Patent (positioning the electronic element "directly" between the core sheets).  Accordingly, Defendant's position should fail.

G.    **"Minimal First Ram Pressure"**

Defendant posits that a "minimal first ram pressure" means "little or no pressure . . . but in no event a ram pressure more than about 10 pounds per square inch." Def. Br. at 35. Plaintiff submits that

> **"minimal first ram pressure" means "little or no pressure and does not include an upper limit."**

Plaintiff agrees with Defendant that the ordinary meaning of "minimal" is "the least possible." Def. Br. at 36. This ordinary meaning is consistent with the patent specifications. For example, the '207 Patent describes the minimal pressure as "little or no ram pressure to book 35." A6, Col. 4:41-44. The '099 Patent specification teaches "preferably applying little or no ram pressure" wherein "a pressure not to exceed about 10 pounds per square inch <u>is believed sufficient for most applications</u>." B8, Col. 5:56-61 (emphasis added).

Plaintiff, however, submits that a cap of 10 pounds per square inch is improper. Indeed, the words of the claims do not provide a specific pressure range. The '207 Patent specification does not even disclose a specific pressure. The '099 Patent specification teaches that "10 pounds per square inch is believed sufficient for most applications." *Id*. It does not indicate a cap on the pressure for all applications as Defendant would have the Court require. Nor does it preclude the use of a higher pressure for other applications. Patents are written to enable those skilled in the art to practice the invention without undue experimentation. Such a skilled artisan would easily determine -- for a given and intended application – what the "minimal ram pressure" would be so that the desired result could be achieved.

The Court should therefore reject Defendant's construction.

H.    **"First Pressure"/"First Ram Pressure", "Second Pressure",
      And "Third Pressure"**

Step (c) of Claims 1 and 16 of the '207 patent recite

| [Claim 1] | [Claim 16] |
|---|---|
| (i) heating said core . . .; | (i) heating said core . . . in the presence of a minimal **first ram pressure** . . .; |
| (ii) applying a **first pressure** to said core . . .; | (ii) applying a **second pressure** . . .; |
| (iii) cooling said core while applying a **second pressure** to said core . . . . | (iii) **subsequently** cooling said core . . . with the concurrent application of a **third pressure** . . . ." |

Claim Tables at L3 (emphasis added).

Plaintiff proposes that the Court construe the "first"/"first ram," "second," and "third"

pressures as follows:

> **The terms "first pressure" and "first ram pressure" include, but are not
> limited to, the very first pressure applied to the core. The labels "first"/"first
> ram," "second," and "third" do not impose a requirement that the pressures
> associated with them need to be applied to the core in a sequential order.
> The only steps that require a specific order are steps (c)(ii) and (c)(iii) of
> Claims 15 and 16 of the '155 and '207 Patents, respectively, because they use
> the word "subsequently" in step (c)(iii).**

The claim language itself requires this construction. The claims include the transitional

phrase "comprising the steps of." Claim Tables at L2. These magic words, as described

previously, "indicate[] that the claim is open-ended and allows for additional steps." *Invitrogen*,

327 F.3d at 1368. Thus, even though step (c)(i) of Claim 1 does not recite a step of applying a

pressure, such a step surely is not precluded. As such, a pressure can certainly be applied prior

to the "first pressure."

The other claims confirm this construction by specifically requiring a pressure to be

applied. For example, step (c)(i) of Claim 1 of the '367 Patent is identical to the corresponding

lettered step of Claim 1 of the '207 Patent. Claim Tables at L3. Claim 18 of the '367 Patent

recites that "the pressure on said core in step (c)(i) [of Claim 1] is less than 10 p.s.i." D10.

Clearly, then, even though step (c)(i) does not specify a pressure, such a pressure must be applied to meet Claim 18.  The claims, therefore, do not preclude applying a pressure during step (c)(i) of Claim 1, but actually contemplate it.

The labels "first"/"second" and "second"/"third" in steps (c)(ii)-(iii) also do not require an exact order.  This is at least because the word "subsequently" in step (c)(iii) of Claim 16 expressly indicates that this cooling step in which the "third pressure" is applied must follow the preceding step (c)(ii) of "applying the second pressure."  If "second" and "third" imposed a required order, then the word "subsequently" would be superfluous.  *See also supra* pp. 10-11 (many other claims include express language indicating order).

Nothing in the specifications or the prosecution histories requires the "first"/"first ram" pressure to be the very first pressure applied to the core.  Nor do they impose a requirement that the "first"/"first ram," "second," and "third" pressure must occur in a sequential order.

The Court should therefore adopt Plaintiff's construction.

### 1.    The Court Should Reject Defendant's Construction

Defendant again relies heavily on its concocted "main objective" -- *i.e.*, a finished card with a sufficiently smooth surface, to reach a conclusion that the pressures must be applied in an exact order.  Def. Br. at 38 and 40.  However, Plaintiff previously described that this is pure fiction and, as such, it is irrelevant.  *See supra* pp. 12-13.

Defendant's reliance on a "first lamination cycle" to show that Mr. Leighton "emphasizes the time and sequence" of steps is misplaced.  Def. Br. at 38.  Indeed, the "first lamination cycle" relates to laminating the core only.  '207 Patent, A6, Col. 4:41-44.  The '207 Patent discloses a "second lamination cycle" for laminating the overlaminate film to the core.  A6, Col. 5:42-62.

The label "first" thus has nothing to do with the order of the "first"/"first ram," "second," and "third" pressures used for laminating the core.

Defendant posits that there are two mutually exclusive embodiments of the Patents-In-Suit, namely, "an embodiment with no pressure being applied during the first lamination step and an alternative embodiment with a little pressure being applied during the first lamination step." Def. Br. at 39. It states that step (c)(i) of Claim 1 of the '207 Patent relates to the "no pressure" embodiment and Claim 16 relates to the "little pressure" embodiment.

Defendant concludes that because Claim 16 recites a "little pressure," then Claim 1 must exclude all pressure. This conclusion is wrong because it is based on the incorrect assumption that Claims 1 and 16 are mutually exclusive. To the contrary, because Claim 1 is silent as to pressure, it does not require one to be infringed. Indeed, as described above, the transitional phrase "comprising the steps of" and the other claims which specifically contemplate a pressure in step (c)(i) lead to the undeniable conclusion that Claim 1 does not preclude a pressure in step (c)(i).[12] Claim 1 is broader than Claim 16 in this regard; the two are not mutually exclusive.

To impose its rigid and exact order, Defendant again relies on the isolated statement in the '207 Patent prosecution history that "the '024 patent . . . does not suggest a sequence of steps". This reliance remains misplaced because "a sequence of steps" is just another way to say that the claims are directed to a "process." *See supra* pp. 13-14.

---

[12] Defendant's overly limiting construction that the "first"/"first ram" pressures must be the very first pressures applied seeks to impose a phantom limitation on step (c)(i) of Claim 1 of the '207 Patent. Indeed, if its construction were correct, this step would effectively recite "heating said core for a period of time in the absence of any pressure." If Mr. Leighton had intended to impose such a requirement, he knew how to use such language. *See* step (b) of Claim 1 of the '207 Patent (positioning the electronic element "in the absence of a non-electronic carrier"). Accordingly, Defendant's position should fail.

## I.    "Controlled Flow"

Claim 16 of the '207 Patent recites "heating said core . . .  to a temperature which causes <u>controlled flow</u> of said plastic which makes up said first and second plastic core sheets."  Claim Tables at L3 (emphasis added).  Step (c)(ii) of this Claim 16, as well as steps (c)(i)-(ii) of Claim 15 of the '155 Patent, also include "controlled flow."  *Id.*

The ordinary meaning of "flow" is "[FL MECH] [t]he forward continuous movement of a . . . liquid".  Cohen Decl., Exhibit R, *Dictionary of Scientific and Technical Terms* p. 777 [R3] (Sybil P. Parker ed., McGraw Hill 5th ed 1994).  The term "controlled" means "**1 :** RESTRAINED."  *Webster's Collegiate Dictionary* p. 252 [Q7].  In view of these definitions, and in the context of the claims,

**"controlled flow of said plastic" means "restrained movement of said plastic."**

The specifications support this ordinary meaning.  The '207 Patent describes that "[a] heat cycle is applied to the core sheets in the laminator thus liquefying or partially liquefying the sheets."  A5, Col. 2: 34-36.  It further discloses that "the ram pressure of laminator 40 is increased to facilitate the flow of the plastic core sheets 30, 32 so that the one or more electronic elements 20 are encapsulated there by . . . ."  A6, Col. 4:48-54.  The '099 Patent includes a similar description.  B6, Col. 2:66-3:1; B8, Col. 6:5-10.

The prosecution histories are also consistent in that they do not suggest any deviation from this ordinary meaning.

Accordingly, the Court should adopt Plaintiff's construction.

### 1.     The Court Should Reject Defendant's Construction

The most egregious portion of Defendant's construction lies in its conclusion that the "controlled flow" must "allow the outer surfaces of the finished card before dye sublimation printing to assume a smoothness of approximately .0005 inches or better." Def. Br. at 41. It tries to find support from the provisional application of the '207 Patent, which states:

> This invention is a Hot Lamination Method used to make/manufacture a unique plastic Radio Frequency Identification (RF/ID) card .028″ - .032″ thick with a smooth glossy surface flatness of .0005″, capable to receive dye sublimation printing on both sides, to meet the International Standards Organization (ISO[)] format having a contactless read/write silicone computer chip and a wire or circuit board antenna capsulized for the purpose of identifying the individual user and to stop crime due to fraud and counterfeiting.

Cohen Decl., Exhibit S, '207 Provisional Application at S12; Def. Br. at 42.

This construction is just a takeoff of Defendant's concocted "main objective" arguments advanced above. Defendant's proposal should be rejected because it imposes at least two limitations that are not found anywhere in the claims or other intrinsic evidence -- *i.e.*, a particular surface smoothness and dye sublimation printing.[13] *See supra* pp. 12-13 (discussion of lack of support in claims and specifications for non-existent "main objective").

Defendant submits that an alleged purpose of the "controlled flow" – *i.e.*, "to fully enclose the 'electronic element' at the ram pressure and heat applied to the 'core sheets,'" must be part of the construction. Def. Br. at 41-42. The purpose of the "controlled flow" is not embodied in this term itself and is not found in step (c)(i) of Claim 16 of the '207 Patent or

---

[13] To emphasize Defendant's selective use of its "main objective," Plaintiff wonders why Defendant did not also suggest that the claims must include a card that is ".028" - .032" thick with a smooth glossy surface . . . to meet the International Standards Organization (ISO[)] format . . . for the purpose of identifying the individual user and to stop crime due to fraud and counterfeiting." '207 Provisional Application at S12.

Claim 15 of '155 Patent.  As such, the "claim language [should not be limited] to exclude particular devices because they do not serve a perceived 'purpose' of the invention."  *E-Pass Techs.,* 343 F.3d at 1370.

Moreover, the intended use of the plastic that is subject to the "controlled flow" is stated in step (c)(ii) of these claims.  Defendant's construction thus would impose an "encapsulation" limitation in step (c)(i) of these claims when it mandates that the plastic core sheets fully enclose the electronic element.  This limitation is inappropriate for a construction of "controlled flow" and should therefore be rejected.

**J.    "Cooling . . . While Applying A Second Pressure"**

Step (c)(iii) of Claim 1 of the '207 Patent recites "cooling said core <u>while</u> applying a second pressure to said core."  Claim Tables at L3 (emphasis added).  Plaintiff proposes a construction in accordance with the ordinary meaning of "while" -- *i.e.*, "during the time that." *Webster's Collegiate Dictionary* p. 1347  [Q11] (definition 2).  The definition contemplates at least a partial overlap in time of two events -- here, cooling and applying a second pressure.  It does not require any relative start times for them.  Thus, Plaintiff proposes that

> **The phrase "cooling . . . while applying a second pressure" means "cooling during at least a portion of the time that a second pressure is applied."**

The specifications are consistent with the ordinary meaning.  For example, the '207 Patent describes after the heat cycle, "laminator 40 applies a chill cycle to book 35 <u>during which time</u> the ram pressure of the laminator 40 is increased. . . ."  A6, Col 4:66-5:5 (emphasis added).  It does not disclose or even suggest that the chill cycle starts after or at the same time as the ram pressure is applied.

The prosecution histories also are consistent with this meaning in that they do not provide any indication of varied use of the phrase.  As such, the phrase "cooling said core while applying

26

a second pressure" means "cooling said core for at least a portion of the time that a second pressure is applied."

### 1. The Court Should Reject Defendant's Construction

Although Defendant agrees with the ordinary meaning of "while," it again limits and twists this ordinary meaning by imposing an additional restriction that the cooling must occur "later than, or at the same time as, applying the second pressure." Def. Br. at 43. Defendant's position is without support or merit.

Defendant relies on the following excerpts from the '207 Patent specification:

- "[a] cooling cycle is then applied to the core in the laminator, preferably with an associated increase in ram pressure . . . ." A5, Col. 2:37-40.
- "the laminator [40] is then caused to execute a chill cycle, preferably with a corresponding increase in ram pressure." A7, Col. 5:50-51.

This reliance, however, is misplaced because the temporal term "then" relates to the cooling cycle occuring after the heating cycle, rather than the relationship between cooling and applying pressure. *See e.g.* '207 Patent, A5, Col. 2:34-40 ("The laminator ram pressure is . . . increased in combination with the heat . . . . A cooling cycle is then applied . . . .")

The word "preferably" also undercuts Defendant's argument. Indeed, if the preferable increase in ram pressure is not practiced, a cooling step remains. The increase in ram pressure could be applied at a later time. Thus, cooling would start <u>before</u> the application of the second pressure, as opposed to "later than, or at the same time as" applying the second pressure.

Finally, Defendant concedes that the conclusion to be drawn from these excerpts is that "the chill cycle is associated with, or corresponds to, the increase in ram pressure, meaning that <u>they occur at the same time</u>." Def. Br. at 43 (emphasis added). Defendant has not pointed to anything in the claims or the specifications that support a finding that the cooling must occur "later than, or at the same time as, applying the second pressure."

Accordingly, the Court should reject Defendant's peculiar definition of "while."

**K.    "Cooling … In Conjunction With The Concurrent Application
Of A Third Pressure"**

Step (c)(iii) of Claim 16 of the '207 Patent recites "subsequently cooling said core in conjunction with the concurrent application of a third pressure . . . ."  Claim Tables at L3. Plaintiff proposes that the Court construe this step as follows:

> **The phrase "cooling . . . in conjunction with the concurrent application of a third pressure" means that the cooling is performed in combination with the application of a third pressure and the cooling occurs during at least a portion of time that the third pressure is applied.**

The word "conjunction" is synonymous with "combination."  *Webster's Collegiate Dictionary* p. 244 [Q6]. ("conjunction" is "**1 :** the act or an instance of conjoining . . . : COMBINATION").  The word "concurrent" imposes a temporal limitation -- *i.e.,* "operating or occurring at the same time." *Id.* p. 240 [Q5].  Similar to "while" described above, this definition contemplates at least a partial overlap in time of two events -- here, cooling and applying a third pressure.  It does not require that the two events must start and end at the same time.  Therefore, the phrase "cooling … in conjunction with the concurrent application of a third pressure" means that **"**cooling is performed in combination with the application of a third pressure and the cooling occurs for at least a portion of time that the third pressure is applied."

The specifications and prosecution histories are consistent with the proposed construction for the same reasons articulated above for the term "while."

**1.    The Court Should Reject Defendant's Construction**

Defendant's construction seeks to impart an unwarranted limitation that "cooling starts and ends at the same time a third pressure is applied."  Def. Br. 44-45.  This limitation, however,

is not found in Defendant's proffered ordinary meanings of "concurrent" or "conjunction."[14] Rather, it would be found in a definition of "synchronous," which also is not found in the claims. *Webster's Collegiate Dictionary* pp. 1196 [Q10] ("**1:** happening, existing, or arising at precisely the same time  **2:** recurring or operating at exactly the same periods").

Similarly, nothing in any of the specifications supports such a construction.

Defendant argues that the difference between Claim 1 (while) and Claim 16 (conjunction/concurrent) supports its construction. Def. Br. at 44-45. However, it only means that different words are presumed to mean different things. It does not mean that Defendant's construction is correct because, as described, it is not.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court adopt its proposed construction of the claim terms.

Dated: November 29, 2004

<u>/s/   Neil G. Cohen</u>
Neil G. Cohen, Esq. (NC-0648)
General Patent Corporation International
75 Montebello Road
Suffern, NY 10901-3740
Tel.: 845-368-2264
Fax:  845-818-3945
*Attorney for Plaintiff*

Patrick L. Parker, Esq. (PP-5892)
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019-6131
Tel: 212-878-8000
*Attorneys for Plaintiff*

---

[14] Defendant's proffered definition of "conjunction" to mean "**2 :** occurrence together in time or space" cannot be correct in the context of these claims because it is duplicative of the definition of "concurrent," making the claim language redundant. The word "concurrent" would be superfluous if both "conjunction" and "concurrent" were afforded such meanings.

## APPENDIX 1

## SUMMARY OF CLAIM CONSTRUCTIONS

## AND

## CROSS-REFERENCE TO INDEPENDENT SUBJECT CLAIMS

| "electronic element" | |
|---|---|
| Plaintiff: a device having distinct electrical characteristics and having terminals at which it may be connected to other elements to form a circuit that utilizes a semiconductor device | Defendant: (1) a micro-chip and an antenna ('207 and '155 Patents) and (2) the term is ambiguous and cannot be defined ('099 and 367 'patents) |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(b) and preamble<br>                     Claim 16(b) | '155 Patent:    Claim 1(b) and preamble<br>                     Claim 15(b) |
| '099 Patent:    Claim 1(b) and preamble | '367 Patent:    Claim 1(b) and preamble<br>                     Claim 20(b) and preamble |

| "plastic core sheets" | |
|---|---|
| Plaintiff: plastic sheets between which the electronic element is positioned | Defendant: [to be provided by Defendant] |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(a), Claim 16(a) | '155 Patent:    Claim 1(a), Claim 15(a) |
| '099 Patent:    Claim 1(a) | '367 Patent:    Claim 1(a), Claim 20(a) |

| "non-electronic carrier" | |
|---|---|
| Plaintiff: a device that holds the electronic element to protect it from physical damage during lamination, where the device is not part of a circuit that utilizes a semiconductor device | Defendant: a structure without any substantial electronic function, such as a recess, buffer or protective carrier, that at least partially protects during lamination the "electronic element" from damage caused by lamination pressure |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(b), Claim 16(b) | '155 Patent:    Claim 1(b), Claim 15(b) |
| '099 Patent:    Claim 1(b) | '367 Patent:    Claim 1(b), Claim 20(b) |

(Appendix 1 – continued)

| "directly" | |
|---|---|
| <u>Plaintiff</u>: in immediate physical contact | <u>Defendant</u>: there is nothing between the "electronic element" and the first plastic core sheet and nothing between the "electronic element" and the second plastic core sheet |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(b), Claim 16(b) | '155 Patent:    Claim 1(b), Claim 15(b) |
| '099 Patent:    Claim 1(b) | '367 Patent:    Claim 1(b), Claim 20(b) |


| "laminator apparatus" | |
|---|---|
| <u>Plaintiff</u>: equipment that is used to unite two or more layers of material, such as the core, by the application of heat and pressure | <u>Defendant</u>: [to be provided by Defendant] |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(c), Claim 16(c) | '155 Patent:    Claim 1(c), Claim 15(c) |
| '099 Patent:    Claim 1(c) | '367 Patent:    Claim 1(c), Claim 20(c) |


| "comprising the steps of" | |
|---|---|
| <u>Plaintiff</u>: the steps need not necessarily be performed in the exact order recited in the claims, except that step (c)(iii) must follow step (c)(ii) in Claims 15 and 16 of the '155 and '207 Patents, respectively | <u>Defendant</u>: the respective steps must be performed in a precise order |
| **Initially recited at:** | |
| '207 Patent:    Claim 1 - preamble<br>                    Claim 16 - preamble | '155 Patent:    Claim 1- preamble<br>                    Claim 15 - preamble |
| '099 Patent:    Claim 1 - preamble | '367 Patent:    Claim 1 - preamble<br>                    Claim 20 - preamble |

(Appendix 1 – continued)

| "encapsulated by" and "encapsulating . . . within" ||
|---|---|
| Plaintiff: to enclose as if in a compartment | Defendant: The "core" must fully enclose the "electronic element" which has been placed "directly" between the "first and second plastic core sheets" so that even the sides of the "electronic element" are surrounded by the "first and second plastic core sheets". That is, if the "electronic element" is not placed directly between the "first and second plastic core sheets" or has been already encapsulated by other material, the "first and second plastic core sheets" cannot encapsulate the "electronic element." |
| Initially recited at: ||
| '207 Patent:   Claim 1(c)(ii)<br>        Claim 16(c)(ii) | '155 Patent:   Claim 1(c)(ii)<br>        Claim 15(c)(ii) |
| '099 Patent:   Claim 1(c)(ii) | '367 Patent:   Claim 1(c)(ii)<br>        Claim 20(c)(ii) |

| "coating…with a layer of ink" ||
|---|---|
| Plaintiff: covering . . . with a layer of ink | Defendant: the ink layer must directly contact at least one of the "outer surfaces" of the "core" |
| Initially recited at: ||
| '207 Patent:   Claim 1(d)<br>        Claim 16 – N/A | '155 Patent:   N/A |
| '099 Patent:   Claim 1(d) | '367 Patent:   N/A |

| "minimal first ram pressure" ||
|---|---|
| Plaintiff: little or no pressure and does not include an upper limit | Defendant: applying little or no pressure to the "core", but in no event a ram pressure more than about 10 pounds per square inch |
| Initially recited at: ||
| '207 Patent:   Claim 1 – N/A<br>        Claim 16(c)(i) | '155 Patent:   Claim 1 – N/A<br>        Claim 15(c)(i) |
| '099 Patent:   N/A | '367 Patent:   N/A |

(Appendix 1 – continued)

| "first pressure", "second pressure" or "first ram pressure", "second pressure", "third pressure" | |
|---|---|
| Plaintiff: The terms "first pressure" and "first ram pressure" include, but are not limited to, the very first pressure applied to the core.  The labels "first"/"first ram," "second," and "third" do not impose a requirement that the pressures associated with them need to be applied to the core in a sequential order.  The only steps that require a specific order are steps (c)(ii) and (c)(iii) of Claims 15 and 16 of the '155 and '207 Patents, respectively, because they use the word "subsequently" in step (c)(iii). | Defendant: The terms "first pressure" and "first ram pressure" mean the very first pressure applied during the heat and pressure cycle. The term "second pressure" means the next pressure applied after the first pressure during the heat and pressure cycle. The term "third pressure" means the next pressure applied after the second pressure during the heat and pressure cycle. |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(c)(ii)-(iii)<br>                     Claim 16(c)(i)-(iii) | '155 Patent:    Claim 1(c)(ii)-(iii)<br>                     Claim 15(c)(i)-(iii) |
| '099 Patent:    Claim 1(c)(ii)-(iii) | '367 Patent:    Claim 1(c)(ii)-(iii)<br>                     Claim 20(c)(ii)-(iii) |

| "controlled flow of said plastic" | |
|---|---|
| Plaintiff: restrained movement of said plastic | Defendant: the "first and second plastic core sheets" at least partially liquefy so to fully enclose the "electronic element" at the ram pressure and heat applied to the "core sheets" and allow the outer surfaces of the finished card before dye sublimation printing to assume a smoothness of approximately .0005 inches or better |
| **Initially recited at:** | |
| '207 Patent:    Claim 1 – N/A<br>                     Claim 16(c)(i) | '155 Patent:    Claim 1 – N/A<br>                     Claim 15(c)(i) |
| '099 Patent:    N/A | '367 Patent:    N/A |

(Appendix 1 – continued)

| "cooling … while applying a second pressure" | |
|---|---|
| Plaintiff: cooling during at least a portion of the time that a second pressure is applied | Defendant: cooling starts later than, or at the same time as, applying a second pressure |
| **Initially recited at:** | |
| '207 Patent:    Claim 1(c)(iii)<br>                     Claim 16 – N/A | '155 Patent:    Claim 1(c)(iii)<br>                     Claim 15 – N/A |
| '099 Patent:    Claim 1(c)(iii) | '367 Patent:    Claim 1(c)(iii)<br>                     Claim 20(c)(iii) |

| "cooling … in conjunction with the concurrent application of a third pressure" | |
|---|---|
| Plaintiff: cooling is performed in combination with the application of a third pressure and the cooling occurs during at least a portion of time that the third pressure is applied | Defendant: cooling starts and ends at the same time a third pressure is applied |
| **Initially recited at:** | |
| '207 Patent:    Claim 1 – N/A<br>                     Claim 16(c)(iii) | '155 Patent:    Claim 1 – N/A<br>                     Claim 15(c)(iii) |
| '099 Patent:    N/A | '367 Patent:    N/A |

| "milling" | |
|---|---|
| Plaintiff: using a machine to remove | Defendant: [to be provided by Defendant] |
| **Initially recited at:** | |
| '207 Patent:    N/A | '155 Patent:    N/A |
| '099 Patent:    Claim 1(e) | '367 Patent:    Claim 1(d)<br>                     Claim 20 – N/A |