James David Jacobs (JJ-7351)
David Zaslowsky (DZ 5182)
Frank M. Gasparo (FG-2958)
**BAKER & McKENZIE**
805 Third Avenue
New York, New York 10007
(212) 751-5700
Attorneys for Defendant Oberthur Card Systems, S.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **LEIGHTON TECHNOLOGIES LLC,** )<br>)<br>Plaintiff and Counterclaim Defendant, )<br>)<br>v. )<br>)<br>**OBERTHUR CARD SYSTEMS, S.A.,** )<br>)<br>Defendant and Counterclaim Plaintiff. )<br>)<br>)<br>) | 04 Civ. 02496 (CM)(LMS) |

# OBERTHUR CARD SYSTEMS, S.A.

# MARKMAN REPLY BRIEF

# TABLE OF CONTENTS

                                        **Page**

Introduction....................................................................................................................................1

Argument .......................................................................................................................................1

    A.     "non-electronic carrier" ...............................................................................................1

    B.     "electronic element" ...................................................................................................5

    C.     "directly" ...................................................................................................................13

    D.     "plastic core sheets"..................................................................................................13

    E.     "laminator apparatus"...............................................................................................14

    F.     "coating" ...................................................................................................................14

    G.     "milling" ...................................................................................................................17

Conclusion....................................................................................................................................17

## TABLE OF AUTHORITIES

### CASES

*Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ................................................................................................................................ 2

*Tritek Technologies, Inc. v. The United States*, 2004 U.S. Claims LEXIS 142 at *4-*5 (Ct. Cl. 2004) ................................................................................................................ 2

Introduction

In our brief dated November 5, 2004, we set forth the claim constructions that Defendant Oberthur Card Systems, S.A. ("Oberthur") believes the Court should adopt with respect to eleven terms in the patents in suit. On the same day, Plaintiff Leighton Technologies LLC ("Leighton") submitted Plaintiff's Brief In Support Of Its Claim Construction ("Plaintiff's Brief"), in which it set forth a proposed construction of seven terms. Below is our position with respect to each of the definitions that Leighton proposed.

Argument

A.   **"non-electronic carrier"**

Leighton's proposed definition of "non-electronic carrier" should be rejected because it is contrary to the express language in the prosecution history. The inventor explained there why he was adding the term "non-electronic carrier" to the claim and, in so doing, effectively defined the term.

Leighton requests the Court to construe the term "non-electronic carrier" as follows:

> A *"non-electronic carrier"* is a device that holds the electronic element to protect it from physical damage during lamination, where the device is not part of a circuit that utilizes a semiconductor device.

Plaintiff's Brief, p. 18 (emphasis in original). Leighton is incorrect in trying to limit the non-electronic carrier to a "device" and compounds its error in trying to further limit the definition to a "device that holds".

One significant flaw in Leighton's argument is that Leighton's proposed definition is taken primarily from the dictionary. However, as Leighton acknowledges (p. 18), "dictionaries do not contain an entry for the term 'non-electronic carrier'". Lacking a definition for this term, Leighton finds, from three separate dictionaries, definitions for each of the constituent parts of

1

the term -- "non", "electronic" and "carrier" -- and attempts to cobble together a definition for the whole term. As case law makes clear, however, this type of practice is disfavored when it results in words being taken out of context. *See Tritek Technologies, Inc. v. The United States*, 2004 U.S. Claims LEXIS 142 at *4-*5 (Ct. Cl. 2004) (declaring that "[c]laims are written in clauses or phrases. In the English language a term's placement in a clause or phrase gives it meaning."); *see also Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) (explaining that "proper claim construction … demands interpretation of the entire claim in context, not a single element in isolation"). Here, words are definitely taken out of context and Leighton even admits in two places in its brief (p. 19 and p. 20) that the dictionary definition "is not wholly accurate".

In this case, the meaning intended by the inventor can be found in the portion of the prosecution history in which the inventor explained why the term was being added to the claim. Interestingly, Leighton relies on selected snippets of this prosecution history in alleged support of its argument. It is, however, this selectiveness that undermines Leighton's argument. Because, by looking at the entirety of the portion of the prosecution history in which the inventor explained his alleged purpose in adding the term "in the absence of a non-electronic carrier", it becomes clear that he intended to exclude all forms of protection for the "electronic element" that was being encapsulated between two core sheets; the inventor did not limit himself to protecting "devices" that "hold".

Set forth below is the relevant portion of the prosecution history in which the inventor seeks to distinguish his invention from the '024 prior art patent. The italicized words are the portions of the prosecution history that Leighton quotes in its brief and the underlined words are those words that Leighton particularly emphasizes in its brief. Words in bold type have been

emphasized by Oberthur.  The line numbers have been added for ease of referring to particular lines of text.

| | |
|---|---|
| 1 | The **'024 patent** claims a lamination process for making an |
| 2 | electronic card which **protects the electronic element** of the |
| 3 | card by first placing it **in a recess** formed within a card layer |
| 4 | so as to avoid damage to the electronic element from |
| 5 | localized pressure applied in the lamination process.  The |
| 6 | **patent then requires** that a **'buffer zone'** be present within |
| 7 | the recess.  Even the broadest of claims of the '024 patent |
| 8 | require a recess and a buffer zone, for and protecting the |
| 9 | electronic element.  **These are required by the '024** |
| 10 | **invention in order to enable the card assembly to be** |
| 11 | **subjected to a full laminating pressure.** |
| 12 | |
| 13 | **No such protective elements are desired or necessary to** |
| 14 | **the invention of the present application.**  Further, *the* |
| 15 | *invention taught by the '024 patent requires that the* |
| 16 | *electronic element* also *be placed in a* <u>protective carrier disk</u> |
| 17 | *(6)*, which is substantially located within the recess. |
| 18 | |
| 19 | *The controlled use of a heat and pressure cycle of* **the** |
| 20 | **present invention** <u>eliminates</u> *the requirement of* **both** *a* |
| 21 | <u>**protective carrier disk**</u> *for the electronic element* **and/or** *a* |
| 22 | *recess or* other **buffer zone** *formed in one or more of the* |
| 23 | *card layers* <u>for carrying and protecting the electronic</u> |
| 24 | <u>element</u>.  The process of the present invention allows the |
| 25 | electronics-containing core to be subjected to the full |
| 26 | laminating pressure **without use of a recess** in a card layer. |
| 27 | Unlike anything shown in the prior art, the electronic element |
| 28 | is placed directly between two (2) plastic sheets. |

Office Action Response, Ex. 6, p. 79 (emphasis added).

When this portion of the prosecution history is read in its entirety, there should be no question about what the inventor intended.  In the first paragraph he explains how the '024 prior art patent "requires" (line 6 and line 9) a recess and a buffer zone.  On line 13, the inventor explains how these protective elements -- *i.e.,* the recess and buffer zone -- are not required by his invention.  Then, on line 14, the inventor states that the '024 prior art patent <u>also</u> uses a protective carrier disk.  Starting on line 19, he repeats that his invention does not need, "both"

3

the protective carrier disk "and/or" the recess or buffer zone. On line 26, the inventor repeats again that his invention works in the absence of a recess.

The import of the inventor's explanation is clear. The '024 prior art patent requires that the electronic element be protected before it could be subjected to the pressures of the lamination process. Specifically, the '024 prior art patent employs a recess, buffer zone and protective disk -- each of which is a structure that offers some protection but does not perform an electronic function. The '207 patent is different because it forbids <u>any</u> structure that protects the "electronic element" – neither a recess, nor a buffer zone nor a protective disk. In short, the prosecution history shows that, by adding the claim term, "in the absence of a non-electronic carrier", the inventor intended to exclude a structure without any substantial electronic function, such as a recess, buffer or protective carrier, that at least partially protects during lamination the "electronic element" from damage caused by lamination pressure. This is the definition that Oberthur requests the Court to adopt.

The entirety of the portion of the prosecution history quoted above also demonstrates why the Court should reject Leighton's proposed definition, which limits "non-electronic carrier" to a "device" that "holds". Leighton arrives at that definition by quoting selectively from the prosecution history. For example, Leighton begins quoting on line 14 and speaks only about the protective carrier disk, even though the immediately preceding sentence leaves no question that the inventor intended to include also the recess and the buffer zone as structures that the '024 prior art patent uses but not the '207 patent.[1]

---

[1] Although we refer to the prosecution history of the '207 patent, the exact same argument, using exactly the same words, appears in the prosecution history of the '099 patent. Office Action Response ('099 patent), Ex. 7, pp. 79-80.

4

In addition, on the top of page 20 of its brief, Leighton relies on the underlined words in lines 20-24 to argue that the prosecution history shows that the meaning of "non-electronic carrier" is limited to a protective carrier disk for carrying the "electronic element". But that argument ignores the word "both" on line 20 and the words "and/or" on line 21. When all of the words are considered, it is apparent that the inventor was not referring only to the protective carrier disk but to the protective carrier disk, recess and buffer zone.

In sum, neither a recess nor a buffer zone is a "device." In addition, a buffer zone is not capable of "holding" an "electronic element". Therefore, under Leighton's proposed definition that "non-electronic carrier" means a "device" that "holds" an "electronic element", neither the recess nor buffer zone would fit that definition. Because it is undeniable that the inventor intended to include a recess and buffer zone within the definition of the "non-electronic carrier" that he was excluding, Leighton's proposed definition cannot be correct. In contrast, a recess and buffer zone nicely fit within the construction offered by Oberthur -- *i.e.*, a structure without any substantial electronic function, such as a recess, buffer or protective carrier, that at least partially protects during lamination the "electronic element" from damage caused by lamination pressure. For this reason and the other reasons explained above, Oberthur respectfully requests that the Court adopt its construction of "non-electronic carrier".

**B.    "electronic element"**

The term "electronic element" is used a number of times in the Leighton patents. As we will discuss in more detail below, we believe that the word "electronic" is the more important word in the term "electronic element" and that it is wrong for Leighton to concentrate on the dictionary definition of the word "element" in constructing a proposed definition of the term "electronic element". Before addressing that, however, we want to explain the reason behind the very carefully crafted definition proposed by Leighton.

5

Although it is not readily apparent from the proposed definition, Leighton has chosen its language very carefully. Leighton wants the Court to adopt a definition that will allow it to argue that an antenna alone meets the definition of "electronic element". Because, however, a proper reading of the dictionary makes clear that the "electronic element" must also include a micro-chip, Leighton's proposed definition should be rejected.

As Leighton did with the term "non-electronic carrier", Leighton acknowledges that there is no dictionary definition for the term "electronic element" but then seeks to create a definition by combining dictionary definitions of the constituent words. Oberthur believes that, in a natural reading of the term "electronic element", the word "electronic" should drive the definition. An "element" is just a thing, or, more precisely, in the words of the dictionary, "2: a constituent part". *Webster's Ninth New Collegiate Dictionary* (1983). Here, the invention is "directed to a plastic card having at least one electronic element embedded therein . . . ." '207 patent, Ex. 1, col. 2 lines 16-17. That is, a constituent part of the card is an electronic part and it is necessary to look at the intrinsic evidence (and possibly dictionaries) to help understand the types of electronic part(s) intended by the inventor.

Leighton's analysis of "electronic element" approaches the issue from the other direction. Leighton starts with the definition of the word "element", notes that the technical dictionary defines it as "component" and then relies on the technical dictionary definition of "component". Plaintiff's Brief, p. 14. Thus, in Leighton's view, the meaning of "electronic element" is "electronic component". Despite the fact that the technical dictionary defines the term "electronic component", for some unexplained reason, Leighton ignores that definition. Rather, Leighton mixes together definitions of "component" and "electronic" and asks the Court to adopt a definition that virtually ignores the more important word in the term, "electronic".

6

Set forth below are two of the unredacted dictionary definitions utilized by Leighton.

"Electronic" is defined as follows:

> [ELECTR] Pertaining to *electron devices or* to *circuits or systems utilizing electron devices*, including electron tubes, magnetic amplifiers, transistors, and other devices that do the work of electron tubes.

*Dictionary of Scientific and Technical Terms*, p. 661 (Sybil P. Parker, McGraw Hill 5th ed. 1994) (emphasis added). "Electron device" is defined as follows:

> [ELECTR] A device in which conduction is principally by electrons moving through a vacuum, gas, or *semiconductor*, as in a crystal diode, electron tube, transistor, or selenium rectifier.

*Id.* at p. 660 (emphasis added). Significantly, a micro-chip is a device in which conduction is principally by electrons moving through a semiconductor and, thus, qualifies as an electron device. In contrast, an antenna is not a device in which conduction is principally by electrons moving through a vacuum, gas, or semiconductor -- *i.e.*, an antenna is not an electron device.

In using the dictionary to define "electronic element" the first question for the Court is whether the word "element" should be given a definition from an ordinary dictionary or a technical dictionary. Oberthur will analyze both definitions.

**Ordinary Dictionary Definition of "Element"**

As noted above, the ordinary dictionary definition of "element" is "constituent part". If that definition is used, then the dictionary definition effectively provides that a constituent part of the plastic card manufactured according to Mr. Leighton's inventions ("electronic element" is included in all of the Leighton patents) is (1) an electron device or (2) a circuit that uses an electron device or (3) a system that uses an electron device. A micro-chip is an electron device and, under the circumstances of these inventions, certainly seems to be the type of electron

7

device to which the inventor referred.[2] In addition, the inventor provided examples in the specification of "circuits"[3], but did not refer to "systems". Thus, there is a basis in the specification for applying either of the first two of the dictionary definitions for "electronic".

Accordingly, as applied to Leighton's inventions, there is a reasonable ground for concluding that the "electronic element" is either a micro-chip or a circuit that uses a micro-chip. It is this micro-chip or circuit (including a micro-chip) that must be placed directly between two plastic core sheets in the absence of a non-electronic carrier. Because an antenna is not an "electron device", under no circumstances can an antenna alone meet this definition of "electronic element" when one uses the ordinary dictionary definition of "element".

Therefore, if the Court decides to use the ordinary meaning of the term "element", the appropriate interpretation of the term "electronic element" is:

> A device in which conduction is principally by electrons moving through a vacuum, gas, or semiconductor, or a circuit that uses a device in which conduction is principally by electrons moving through a vacuum, gas, or semiconductor.

**Technical Dictionary Definition No. 1**

Without providing any explanation, Leighton eschews the ordinary dictionary definition of "element" and relies instead on the second definition from a technical dictionary: "2. See component". Thus, according to Leighton, the "electronic element" is an "electronic component". According to the very same dictionary relied on by Leighton, "electronic component" is defined as follows:

> [ELECTR]  A component which is able to amplify or control voltages or currents without mechanical or other nonelectrical command, or to switch currents or voltages without mechanical

---

[2] Mr. Leighton refers throughout his patents to micro-chips. *See, e.g.*, '207 patent, Ex. 1, col. 3, lines 30-36 and lines 46-52. In addition, Leighton explains on page 3 of its brief that an RFID card includes a micro-chip.

[3] '207 patent, Ex. 1, col. 3, lines 46-52.

8

> switches; examples include electron tubes, transistors, and other
> solid-state devices.

Surprisingly, Leighton does not use this definition. Indeed, Leighton does not even mention in its brief that the dictionary on which it relies defines the term "electronic component".

Oberthur submits that the reason for this "oversight" is that this definition does not achieve Leighton's desired result of defining "electronic element" so as to include only an antenna. It is significant that a micro-chip is a solid-state device and thus falls within the definition of "electronic element/component". In contrast, an antenna alone does not meet this definition of "electronic element/component" derived from using the technical dictionary definition of "element", *i.e.*, "component".

Therefore, if the Court decides to use the technical dictionary definition of the term "electronic component", the term "electronic element" should be defined as follows:

> A component which is able to amplify or control voltages or
> currents without mechanical or other nonelectrical command, or to
> switch currents or voltages without mechanical switches; examples
> include electron tubes, transistors, and other solid-state devices.

**Leighton's Misuse of the Technical Dictionary**

Rather than using the technical dictionary definition of "electronic component", Leighton creates its own definition by trying to combine definitions for "electronic" and "component". Leighton uses the following definition of "component":

> Any electric **device**, such as a coil, resistor capacitor, generator,
> line, or electron tube, having distinct electrical characteristics and
> having terminals at which it may be connected to other
> components to form a circuit. Also known as circuit element;
> element.

*Dictionary of Scientific and Technical Terms*, p. 424 (emphasis added).

Leighton asks that the Court adopt the following definition:

9

> **A device having distinct electrical characteristics and having terminals at which it may be connected to other elements to form a** circuit that utilizes a semiconductor device.

Plaintiff's Brief, p. 18 (emphasis added).

The words in bold are taken from the dictionary definition for "component". Thus, the only part of this proposed definition that relates to "electronic" are the words, "circuit that utilizes a semiconductor device". But there is a touch of sleight-of-hand in Leighton's analysis. Leighton relies on the technical dictionary definition of "component", which means a device. Recall, however, that the meaning of "electronic" provides for three possibilities: pertaining to (1) electron devices, (2) circuits utilizing electron devices, or (3) systems utilizing electron devices. When it comes to choosing from these three possibilities, Leighton uses the "circuit" definition. It is this improper mismatching of definitions -- device and circuit -- that allows Leighton to create a definition for the term "electronic element" that, quite remarkably, does not require any electronic devices.

The sleight-of-hand is evident in Plaintiff's Brief as well. Leighton argues that:

> The word 'electronic' modifies 'element' and provides a specific type of circuit of which the 'element' is a part, namely, a circuit that utilizes a semiconductor device, such as a chip.

Plaintiff's Brief, p. 14 (emphasis added). There is no basis for this statement. Contrary to Leighton's contention, the word "electronic" does not "provide a specific type of circuit". Rather, the word "electronic" modifies "element" and, since Leighton is defining "element" as a "device", the word "electronic" describes (not "provides") the type of device. Somehow, Leighton seems to use a dictionary in a way that, when the word "electronic" is added to "element", a circuit is created or formed. There is no justification for the dictionary to work that kind of magic.

10

**Technical Dictionary Definition No. 2**

Assuming for purposes of argument that there was a reason for ignoring the technical dictionary definition of "electronic component", there is a proper way to do what Leighton is asking the Court to do -- define "electronic element/component" by combining the technical dictionary definitions of the constituent words. As the above-quoted technical dictionary definition makes clear, a "component" is essentially "any electric *device*" that is part of a circuit. (Emphasis added). In fact, however, with respect to Mr. Leighton's patents, it is not "any" device because the inventor was more specific in saying that the "element" had to be "electronic". We repeat again that the meaning of "electronic" provides for three possibilities: pertaining to (1) electron *devices*, (2) circuits, or (3) systems. Here, because "electronic" modifies "element/component" and the meaning of component is a "device", it is the first of the three definitions that is relevant. Thus, an electronic element/component is:

> Any device, in which conduction is principally by electrons moving through a vacuum, gas, or semiconductor, and which device has distinct electrical characteristics and having terminals at which it may be connected to other components to form a circuit.

Once again, a micro-chip fits this definition but an antenna does not. Accordingly, an antenna alone does meet the definition of "electronic element" when one uses the technical dictionary definition of "element" as being "component" and defines "electronic component" based on the meanings of the constituent words.

Therefore, if the Court decides to use the technical dictionary definition of the term "element" (*i.e.*, component), and to overlook the technical dictionary definition of "electronic component", the above analysis dictates a construction for the term "electronic element" as follows:

> Any device, in which conduction is principally by electrons moving through a vacuum, gas, or semiconductor, and which

11

>device has distinct electrical characteristics and having terminals at
>which it may be connected to other components to form a circuit.

\* \* \* \* \*

In sum, Leighton has proposed a definition for "electronic element" which would cover an antenna alone, notwithstanding the fact that an antenna is not an electron[ic] device. Leighton achieves this result by ignoring the ordinary dictionary definition of the word "element" and by ignoring the technical dictionary definition of "electronic component" even after contending that "element" means "component". For the reasons discussed above, Leighton's proposed definition should be rejected.

Should the Court choose to use a dictionary definition for the term "electronic element", one of the following three definitions is suitable depending on whether the Court uses the ordinary dictionary definition of "element" (first), the technical dictionary definition No. 1 (second) or the technical dictionary definition No. 2 (third):

>A device in which conduction is principally by electrons moving
>through a vacuum, gas, or semiconductor or a circuit that uses a
>device in which conduction is principally by electrons moving
>through a vacuum, gas, or semiconductor

or

>A component which is able to amplify or control voltages or
>currents without mechanical or other nonelectrical command, or to
>switch currents or voltages without mechanical switches; examples
>include electron tubes, transistors, and other solid-state devices

or

>Any device, in which conduction is principally by electrons
>moving through a vacuum, gas, or semiconductor, and which
>device has distinct electrical characteristics and having terminals at
>which it may be connected to other components to form a circuit.

12

Regardless of the definition the Court may choose, the above discussion demonstrates that the term "electronic element" should include, at the very least, an electron device (*e.g.*, a micro-chip).

C.    **"directly"**

Both sides agree that the word "directly" should be given its ordinary dictionary definition and they agree on that definition -- *i.e.*, in immediate physical contact. There also seems to be no dispute concerning the different elements that must be in immediate physical contact with one another. That is, on page 22 of its brief, Leighton says, in two separate places, "the electronic element 20 is positioned 'in immediate physical contact' with plastic core sheets 30 and 32." On page 23, Leighton quotes from the portion of the prosecution history which states, "[u]nlike anything shown in the prior art, the electronic unit is placed directly between two (2) plastic sheets".

In our brief (pp. 25-28), we likewise explained that the patent and the prosecution history make abundantly clear that it is the "electronic element" that has to be placed "directly" between the plastic core sheets [30] and [32]. Another way of saying that the "electronic element" must be positioned "directly" between -- i.e., in immediate physical contact with -- the two core sheets is to say that there can be nothing between the electronic element [20] and the first plastic core sheet [30] and nothing between the electronic element [20] and the second plastic core sheet [32]. This last statement is the construction proposed by Oberthur and there seems to be no reason for the Court not to adopt this construction since it is entirely consistent with the construction proposed by Leighton.

D.    **"plastic core sheets"**

For the term "plastic core sheets", Leighton proposes that the Court adopt the following construction: "plastic sheets between which the 'electronic element' is positioned". Oberthur

13

respectfully submits that this term does not need to be construed by the Court. The plain meaning of the term "plastic core sheets" is evident from the term language itself –"plastic core sheets" means core sheets made of plastic.

In the event the Court decides to construe this term, Leighton's definition is too broad. It is not sufficient that the "electronic element" be "positioned" between "plastic core sheets". Rather, as just discussed in the preceding section, both sides agree that the "electronic element" must also be in immediate physical contact with each of the "plastic core sheets". And, there must be the "absence of a non-electronic carrier".

Indeed, Leighton's own brief states (p. 17) in connection with this term that "the electronic element is positioned (in the absence of a non-electronic carrier directly) between the first and second core sheets . . . ." Thus, Leighton's proposed construction is not sufficiently precise and should be rejected. To the extent that this term needs to be defined, a more accurate definition is: "plastic sheets between which the 'electronic element' is 'directly' positioned, in the absence of a 'non-electronic carrier'".

E.   **"laminator apparatus"**

Oberthur does not at this time believe that this term requires any construction beyond the plain meaning of the words.

F.   **"coating"**

Both sides offer a construction for the term "coating". Both sides also agree that the word "coating" should be interpreted in accordance with the ordinary dictionary definition and they in fact provide precisely the same definition: "to cover or spread with a finishing, protecting or enclosing layer".

Although the parties obviously agree about the definition of the one word, "coating", it is less clear whether they agree on the construction of the entire claim element -- "*coating* at least

14

one of said outer surfaces of said core *with a layer of ink"*. (Emphasis added). Oberthur believes that the natural reading of this phrase, as reinforced by the specification, is that the ink -- or, more specifically, the coating of the layer of ink -- is applied directly to at least one of the outer surfaces of the core.

Leighton's position on this issue is, however, less clear. It is possible that, when Leighton uses the word "cover" without referring to the remaining words in the claim term, it intends to encompass a situation in which ink is applied to a separate plastic sheet and that sheet is then laminated to the core. Perhaps, in Leighton's view, under such a scenario, the ink that is on the additional plastic sheet that is laminated to the core "covers" the particular outer surface of the core. Such a construction is not what was intended by the inventor. Under this scenario, the outer surface of the core would not be covered with a layer of ink but, rather, would be covered with a layer of plastic. In order for the claim construction to be consistent with the inventor's intent, the construction should make clear that the "ink layer" must directly contact at least one of the "outer surfaces" of the "core".

The specification demonstrates that Oberthur's construction is correct. The specification provides:

> As mentioned, the use of matte finished laminator plates 50, 52 provide surfaces 34, 35 with a slightly roughened or textured quality which will facilitate *the application of a coating thereto* as is discussed below.

'207 patent, Ex. 1, col. 4, lines 54-58 (emphasis added). Because the coating is a "layer of ink", the natural reading of this part of the specification (especially the word "thereto") is that the layer of ink is applied directly to at least one of the outer surfaces [34, 35] of the core. Moreover, the specification describes how the surfaces are given a roughened texture in order to facilitate the application of the ink coating.

15

To the extent that there remained any question as to what the inventor intended, another part of the specification leaves no doubt that he was referring to applying the coating of ink directly to the outer surface of the core. The specification provides:

> Subsequent to the removal of core 33 from laminator 40, and as illustrated in FIG. 8, core 33 is *coated on* at least one of it's upper and lower surfaces 34, 35 *with a layer of printing ink* 36. This may be accomplished using a wide variety of printing techniques …. As shown in FIG. 8, core 33 is fed in the direction indicated with arrow A through a printing press , a lithographic printer, or a similar apparatus 80. *This printing step is performed to coat at least one surface 34, 35 of core 33 with a layer of aesthetically pleasing ink 36*.

'207 patent, Ex. 1, col. 5, lines 6-17 (emphasis added). This discussion by the inventor of "coating" makes it abundantly clear that he was referring to the core being fed through a printing press and at least one of the outer surfaces being coated with ink by that press. Such a press coats the ink directly on the outer surface. Figure 8 in the '207 patent confirms this:



Had the inventor been referring to "covering" the outer surface of the core by laminating another layer of plastic with ink on it, that process would have to take place in a laminator, not in a printing press.

In sum, the parties agree that "coating" means "covering". However, for the reasons set forth above, Oberthur respectfully submits that the claim element, "coating at least one of said outer surfaces of said core with a layer of ink", should be interpreted to mean that the ink layer must directly contact at least one of the "outer surfaces" of the "core".

16

**G.    "milling"**

Oberthur does not at this time believe that this term requires any construction beyond the plain meaning of the words.

## Conclusion

For the reason set forth herein, Oberthur respectfully requests that the Court interpret the Leighton patents in accordance with the specific claim element interpretations set forth in its brief and this reply brief.

Dated:    New York, New York
          November 29, 2004

                                       **BAKER & McKENZIE**

                                       _____/S/_____
                                       **By: James David Jacobs (JJ-7351)**

                                       **Attorneys for Oberthur Card Systems, S.A.**
                                       **805 Third Avenue**
                                       **New York, New York 10022**
                                       **(212) 751-5700**

**Of Counsel:**
**David Zaslowsky**
**Frank M. Gasparo**
**Eunhee Park**
**Jacob Kaplan**