Robert A. Gutkin, Esq. (Pro hac vice)
Blair M. Jacobs, Esq. (Pro hac vice)
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC  20004-2415
Tel:  202-383-0100
Fax:  202-637-3593

Attorneys for Plaintiff
LEIGHTON TECHNOLOGIES LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LEIGHTON TECHNOLOGIES LLC, | ) | 04 Civ. 02496 (CM) |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OBERTHUR CARD SYSTEMS, S.A., | ) | |
| | ) | |
| Defendant and Counterclaim Plaintiff. | ) | |
| _____ | ) | |

**PLAINTIFF LEIGHTON TECHNOLOGIES' MEMORANDUM IN**

**OPPOSITION TO DEFENDANT'S REQUEST TO SET ASIDE**

**MAGISTRATE SMITH'S MARCH 27, 2006 ORDER**

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................................... 1

II.   ARGUMENT ............................................................................................................................. 3

    A.    Oberthur's Argument Fails Because Oberthur Lacks Evidence  That Would Lead
          A Reasonable Person To Believe That A  Crime Or Fraud Has Been Committed Here ................ 3

    B.    The Case Law Is Clear That Without The Requisite Evidence of Intent, Oberthur
          Has Not Demonstrated A Prima Facie Case Of Fraud .................................................................. 7

III.  CONCLUSION ......................................................................................................................... 11

# TABLE OF AUTHORITIES

**Cases**

*Duplan Corp. v. Deering Milliken, Inc.,*
    540 F.2d 1215 (4th Cir. 1976)................................................................................9

*In re John Doe,*
    13 F.3d 633 (1994)..........................................................................................2, 8

*In re Omnicron Group Inc . Securities Litigation,*
    233 F.R.D. 400 (S.D.N.Y. 2006) ....................................................................3, 9

*In re Richard Roe,*
    168 F.3d 69 (2d Cir. 1999)..............................................................................3, 7

*J.P. Stevens & Co. Inc., v. Lex Tex Ltd., Inc.,*
    747 F.2d 1553 (Fed. Cir. 1984)...........................................................................8

*Laser Inds. Ltd. v. Reliant Technologies, Inc.,*
    167 F.R.D. 417 (N.D. Cal. 1996) ........................................................................9

*Marusiak v. Adjustable Clamp Co.,*
    2002 WL 31886834 (N.D. Ill. Dec. 27, 2002) ....................................................8

*Nobelpharma AB v. Implant Innovations, Inc.,*
    141 F.3d 1059 (Fed. Cir. 1998) ...........................................................................8

*United States v. Jacobs,*
    117 F.3d 82 (2d Cir. 1997)...................................................................................2

*United States v. Zolin,*
    491 U.S. 554, 109 S. Ct. 2619 (1991) .................................................................2

*Vardon Golf Co., Inc. v. Karsten Mfg. Corp.,*
    213 F.R.D. 528 (N.D. Ill. 2003) ..........................................................................8

## I.    **INTRODUCTION**

Plaintiff Leighton Technologies LLC ("Leighton") files this Memorandum in Opposition to Defendant Oberthur Card Systems, S.A.'s ("Oberthur") request to set aside Magistrate Judge Smith's March 27, 2006 Order.  Oberthur's Motion is based upon innuendo and supposition, not evidence.  As with the prior Motion before the Magistrate Judge, Oberthur fails to make any showing or provide any evidence that even suggests that communications were made in furtherance of a fraud or crime.  Moreover, Mr. Leighton only communicated with the Patent and Trademark Office ("PTO") through his attorneys, and yet Oberthur has failed to depose three of the four attorneys that were involved in the prosecution of the patents-at-issue.

Magistrate Judge Smith gave full and complete consideration to the same arguments for which Oberthur again seeks the production of every single communication that has ever occurred between Keith Leighton and his patent attorneys, regardless of the substance of the communication.  The Magistrate Judge's ruling on the issue was not clearly erroneous or incorrect as a matter of law because: (1) Oberthur has not produced any evidence showing the requisite intent to defraud; (2) the patents-at-issue, as well as the deposition testimony of Mr. Leighton, are clear in that making smart cards is very different from making conventional plastic cards (the prior art that Oberthur claims Mr. Leighton purposefully hid from the PTO);[1] and (3) Oberthur has yet to take depositions that would afford the opportunity to ask questions regarding the requisite intent to defraud, such as whether information was known, and if so why information was not conveyed to the PTO.  Oberthur may suspect that a fraud or crime has been committed, but it has not garnered evidence that justifies completely disregarding the attorney-client privilege so that Oberthur can proceed on an unfettered fishing expedition.

---

[1] This issue concerning the prior art was also discussed in detail in the recent Summary Judgment papers, and at oral argument.

Oberthur's moving papers do not fully and accurately represent the state of the case law on this issue. To be clear, Oberthur here accuses Mr. Leighton of fraud, deceit and a crime in order to pierce the attorney-client privileges and protections that exist between Mr. Leighton and the attorneys that prosecuted the patents-at-issue on his behalf. Not surprisingly, there is a high burden of proof necessary to establish fraud or a crime before a court will even consider such a request, particularly because a request of this nature raises concerns about the ease with which the attorney-client privilege may be invaded.

The controlling question here is whether the communications that Oberthur seeks (between Mr. Leighton and his patent attorneys) were undertaken to facilitate or conceal the commission of a crime or fraud. To meet its burden, Oberthur must demonstrate a factual basis for a showing that a fraud or crime has been committed and that the communications were in furtherance thereof. *In re John Doe*, 13 F.3d 633, 637 (1994). If a movant is able to demonstrate the requisite factual basis, a court may, in its discretion, engage in an *in camera* review of the disputed evidence. *United States v. Zolin*, 491 U.S. 554, 572, 109 S. Ct. 2619, 2630-2631 (1991). If and when there has been an *in camera* review, a court exercises its discretion again to determine whether the facts are such that the exception applies. *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).

Oberthur has not come close to satisfying its burden of establishing a factual basis for a showing that a crime or fraud has been committed. Instead, at best, Oberthur lays out a speculative argument for inequitable conduct in order to challenge the validity of the patents. Perhaps most damning to Oberthur's argument is the fact that many depositions essential to determining the factual basis of these allegations have been postponed, at Oberthur's request.

According to case law, mere speculation is insufficient as a matter of law to justify piercing fundamental privileges and protections.

## II.   ARGUMENT

### A.   Oberthur's Argument Fails Because Oberthur Lacks Evidence That Would Lead A Reasonable Person To Believe That A Crime Or Fraud Has Been Committed Here

Oberthur raises no new arguments in requesting this Court to order production of a vast quantity of privileged documents showing all discussions between Mr. Leighton and his patent attorneys, regardless of subject matter. Oberthur makes no attempt to limit its overbroad request to potentially relevant documents that it contends may lead to the production of evidence relating to activities that it alleges to be fraudulent. Instead, Oberthur seeks the production of ***all*** privileged documents and information exchanged between Mr. Leighton and his patent attorneys, likely in hopes of finding documentation that might support inequitable conduct arguments.

Indeed, Oberthur's Memorandum in Support of its Objections is largely dedicated to the problems that Oberthur believed occurred in different aspects of the prosecution of the patents. These are areas that will be covered at trial by patent attorneys and expert testimony skilled in the area of patent office practice. What is at issue here, however, and what Oberthur spends little time on, is proving, through evidence, a prima facie case that fraud or a crime has occurred. Oberthur's entire argument fails because the burden of establishing waiver under the crime-fraud exception "is not satisfied by a showing that the material in question might provide evidence of a crime or fraud." *In re Richard Roe*, 168 F.3d 69, 71 (2d Cir. 1999). Instead, the particular communication that creates the waiver "***must*** have been in furtherance of a fraud or crime and ***must*** have been intended to facilitate the fraud or crime." *In re Omnicron Group Inc . Securities Litigation*, 233 F.R.D. 400, 404-405 (S.D.N.Y. 2006) (citing *Jacobs*, 117 F.3d at 88) (emphasis added). Oberthur has not pointed to any communication that "***must*** " have been in furtherance of

a fraud or crime. Instead, Oberthur appears to be arguing that it will be deprived of an opportunity to locate such information if it is not afforded a broad waiver of privileged communications.

Although Oberthur's lack of evidence is clearly fatal to its Motion, there are additional flaws warranting denial of this Motion. Oberthur purposefully misrepresents the "circumstantial evidence," consisting of Mr. Leighton's alleged admissions in deposition. As the Court is well aware, and as is set forth on the face of the patents-in-suit, ***Mr. Leighton's inventions deal exclusively with the lamination of smart cards, or cards with electronics embedded in them***. Mr. Leighton never claimed to invent a process for laminating all plastic cards and, in fact, he disclosed and discussed at length the difficulties encountered when pre-existing conventional processes attempted to place electronic elements into plastic cards. *See, e.g.,* '367 Patent, col. 2, lns. 4-14 (discussing difficulties with incorporating electronic elements into smart cards using conventional lamination techniques). So called "conventional cards" (without electronics), have been around in some form since the 1950's. Instead, Mr. Leighton invented a specific process for manufacturing smart cards that both meets industry standards and provides an aesthetically pleasing smart card that can accept printing. This concept is clearly communicated in the specifications of each of Mr. Leighton's patents. Mr. Leighton's invention thus has nothing to do with plastic cards that do not have electronics embedded in them. This fact undermines the entire basis for Oberthur's argument here.

All of the testimony relied upon by Oberthur on pages 5-7 of its Memorandum relates to Mr. Leighton's knowledge of processes that ***did not include*** encapsulating an electronic element directly between two plastic core sheets. This background information thus relates to the

manufacturing of conventional cards, not smart cards, and could under no circumstances constitute evidence that Mr. Leighton committed fraud on the PTO.

What Oberthur fails to mention in its Memorandum is that Mr. Leighton testified that his invention was very different than the process used to manufacture conventional plastic cards. While Mr. Leighton acknowledged that he had made conventional plastic cards since 1970, he testified that he had only discovered the process in his patents shortly before filing his provisional application in 1995. *See* Exhibit 1, Leighton Depo., Oct. 9, 2005, p. 17, lns. 5-17 and p. 141, lns. 3-10.

> *__Despite knowing that Mr. Leighton's invention was different than the process used to make conventional cards, Oberthur's counsel continually asked Mr. Leighton during his two days of depositions to ignore his invention, and to instead answer questions based on the lamination of cards that did not include electronic elements:__*

> Q.    Mr. Leighton, let me ask the question again. I ask you to listen very carefully to the question. I am not in the question asking you anything about electronics. A few minutes ago, you defined what you understood a plastic laminated card to be.

> A.    Correct.

> Q.    That's all I'm asking about now. I'm not asking about electronics. I'm not asking about smart cards. I'll ask you again. In 1970, you made a plastic laminated card using the steps i, ii and iii; is that correct?

> Mr. Gutkin:    Misstates testimony.

> The Witness:    No.

> Mr. Gutkin:    Asked and answered.

> Q.    You can answer the question.

> A.    What I did back in 1970 are not the same steps that I have written out here in this document.

*See* Exhibit 2, Leighton Depo., Oct. 9, 2005, p. 22, ln. 18 – p. 23, ln. 15.

> Q.    Is it not correct that your testimony as the cycle – the lamination that you're now describing you did in 1970 doesn't meet step three which is that the

pressure during the cooling phase has to be ten percent greater than the pressure during the heating phase?

Mr. Gutkin:  Vague and ambiguous.  Calls for a legal conclusion.

BY MR. JACOBS:     You can read and answer the question.

A.     What I'm reading here in number three of the process of 20 here, I'm heating ten percent greater, but what I'm doing here is not the same as what I did in 1970.

Q.     Okay, and I'm asking you, sir, the question is:  When is the first time you made a plastic laminated card?  Remember, plastic laminated card; I'm not talking electronics.  When is the first time you made a plastic laminated card in which the pressure during the cooling phase was at least ten percent greater than the pressure during the heating phase?

A.     I couldn't recall that.

*See* Exhibit 3, Leighton Depo., Oct. 9, 2005, p. 35, ln. 6 – p. 36, ln. 6.

As can be seen, Oberthur's argument regarding fraud on the PTO is misleading because ***all of the cited evidence concerning the 10% limitation deals exclusively with conventional cards, not the inventions at issue, smart cards with electronic elements***.  Oberthur's counsel framed all of his questions during the depositions in a manner that specifically excluded electronic elements.  There was no testimony that increasing pressure during the cooling cycle was known in the manufacture of cards that contained electronic elements.  Therefore, Oberthur has not come close to meeting its burden of establishing a *prima facie* case that fraud has been committed.

Oberthur's efforts to misrepresent Mr. Leighton's testimony are clear, where on page 7 of the Memorandum, Oberthur makes the following argument:

> The record could not be clearer that in October, 2002 – and indeed for at least twenty years prior thereto – Mr. Leighton had manufactured ***commercial plastic laminated cards*** with a higher cooling pressure.  Nevertheless, without disclosing this prior art, which clearly suggested that a higher cooling pressure should be used to insure that ***plastic laminated cards with electronic elements*** had smooth, defect free surfaces….

Oberthur Mem., p. 7 (emphasis added).

As can be seen, Oberthur takes statements made regarding processes completely different from Mr. Leighton's process, and then argues without evidentiary support, that Mr. Leighton allegedly possessed knowledge that he withheld from the PTO.  Mr. Leighton could not have specifically intended to defraud the PTO by not informing the examiner of something that had nothing to do with his invention, making smart cards.

Oberthur next points to Leighton's alleged failure to notify the Examiner of the co-pending '155 application and that the JP '214 reference had been discovered by the examiner of the '367 patent application.  Here, Oberthur's request fails because no evidence establishing probable cause of the required **_intent_** exists.  Oberthur has taken the depositions of only one of the four attorneys who prosecuted these patent applications and will take depositions of the others in May of 2006.  These other depositions may shed light on why JP '214 was not disclosed during the examination of the co-pending '155 application.  Perhaps it was an administrative oversight?  Perhaps one of the patent attorneys decided that the examiner of the '155 application would not find JP '214 relevant?  The point here is that until these depositions are taken, no evidence regarding the **_intent_** to defraud the PTO exists.  *In re Richard Roe*, 168 F.3d at 71 (*prima facie* case of fraud or crime not shown by showing that requested material "might provide evidence to facilitate the fraud or crime").

### B.    The Case Law Is Clear That Without The Requisite Evidence Of Intent, Oberthur Has Not Demonstrated A Prima Facie Case Of Fraud

A brief examination of the law surrounding this area confirms that Oberthur has not come close to satisfying its high burden.  As described above, the high burden falls upon the party seeking discovery on this basis to prove first, a *prima facie* case of criminal or fraudulent conduct, and second, that the communications were made in furtherance of the fraud.

*In re John Doe*, 13 F.3d at 637. Thus, because Oberthur here alleges fraud on the PTO, it is Oberthur's burden to present a *prima facie* case of fraud "***by clear and convincing evidence*** of a failure to disclose material information or submission of false material information ***with an intent to mislead***." *J.P. Stevens & Co. Inc., v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed. Cir. 1984). Oberthur's speculation and citation to irrelevant testimony does not present a *prima facie* case of fraud because it fails to provide evidence regarding the requisite intent. At best, the facts and evidence that Oberthur has proffered might demonstrate some type of a failure to disclose. This does not satisfy the high of burden of showing a *prima facie* case of criminal or fraudulent conduct. *Vardon Golf Co., Inc. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 535 (N.D. Ill. 2003).

The *Vardon* case reinforces the conclusion that Oberthur's speculation here falls short of demonstrating the required intent to defraud.

> Here, Karsten asserts that the jury's finding in August 2002 that Allen engaged in inequitable conduct before the Patent Office establishes a *prima facie* showing of fraud. Inequitable conduct, however, is distinguishable as a lesser offense than common law fraud, and includes types of conduct less serious than "knowing and willful" fraud. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998). In *Marusiak v. Adjustable Clamp Co.*, the defendant argued that plaintiff committed a fraud against the Patent Office by failing to disclose construction of his prototype in the patent application. 2002 U.S. Dist. LEXIS 24729, No. 01 C 6181, 2002 WL 31886834, at *1 (N.D. Ill. Dec. 27, 2002). The court <u>recognized that a finding of fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct</u>. *Id.* at *2. Furthermore, the Court determined that unless there is clear and independent evidence of deceptive intent together with a clear showing of reliance, there can be no finding of common law fraud. *Id.*

*Id.* (emphasis added).

The "evidence" submitted by Oberthur does not come close to the level of evidence submitted in *Vardon*, as the movant there had already established inequitable conduct on the PTO. Oberthur here seeks a complete waiver of the attorney client privilege in the hope of

possibly establishing inequitable conduct. Even if Oberthur is eventually able to convince a jury that inequitable conduct exists, it does not follow that a fraud or crime was perpetrated.

Indeed, this Court's recent discussion of the crime-fraud exception in *In re Omnicron Inc. Securities Litigation*, 233 F.R.D. at 408, supports the decision of the Magistrate on this motion. There, after thoroughly examining the law surrounding this question, the Court concluded that "a more stringent test" for establishing a *prima facie* showing of fraud "would serve a number of important policy interests." *Id.*

The Court also provided crucial guidance suggesting that Oberthur's motion here is unfounded and premature:

> It bears further emphasis that the Fourth Circuit in *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976) took particular note, we have done, of the timing of the crime-fraud motion. The *Duplan* court pointed out that a motion made during discovery is not the movant's last opportunity to seek to pierce the privilege on that basis. Rather, the party will have the opportunity to do so again at the time of trial, when he may have additional evidence to proffer in support of his contentions....

*Id.* at 407.

The *In re Omnicron* court went on to endorse Magistrate Judge Brazil's statement in *Laser Inds. Ltd. v. Reliant Technologies, Inc.*, 167 F.R.D. 417 (N.D. Cal. 1996) that courts are in a better position to rule on motions such as this *after* having seen the witnesses testify. The Court further agreed with Magistrate Judge Brazil's observation that "judges should exercise considerable caution when they are pressed during the discovery stage of complex litigation to find that a showing of crime or fraud is sufficient to justify penetrating the privilege has been made." *Id.* (quoting *Laser Indus.*, 167 F.R.D. at 436).

This Court should refuse Oberthur's request for the same reasons that the *In re Omnicron* court refused a similar request. Oberthur has outstanding discovery notices that may provide information relevant to issues associated with this Motion. Oberthur's request could be renewed

*after* the depositions and pertinent expert witness reports have been submitted. Alternatively, Oberthur might discover facts that confirm that no fraud or crime was committed in the prosecution of the patents-at-issue. Thus, there may be no need for the present Motion. At this point, however, Oberthur has not satisfied its burden because it has not developed evidence regarding Leighton's intent to mislead the PTO.

Oberthur argues that this case is different from the above-described body of law because Mr. Leighton somehow knew that the withheld prior art was material. Oberthur Mem., p. 15. No evidence is offered to support this contention. Instead, Oberthur contends that "the reasonable inference is that the misrepresentation was intentional." *Id.* It is equally plausible, of course, that the omission that Oberthur refers to was ***not*** intentional, and that Mr. Leighton was not attempting to intentionally deceive the PTO. Oberthur has not asked Mr. Leighton if he was aware of prior art dealing with smart cards, choosing instead to ask questions about prior art that has nothing to do with encapsulating electronic elements in plastic cards. Inferences cannot overcome contrary factual evidence.

Finally, the cases that Oberthur relies upon in its Memorandum are wholly inapposite here. Each of the cases cited in support of Oberthur's position actually involve situations where evidence of withheld facts had been collected by the moving party, such as memoranda discussing the applicability of prior art, and these facts were withheld from the PTO. Oberthur has been unable to locate a single case where discovery was permitted under the crime-fraud exception in the absence of evidence supporting a *prima facie* case of fraud or crime. This case is thus distinguishable from the few cited cases where courts have permitted waiver under the crime-fraud exception.

The Magistrate Judge's March 27, 2006 Order is neither erroneous nor contrary to law. Magistrate Smith's holding was based on a clear recognition that Oberthur has completely failed to present any evidence whatsoever regarding Mr. Leighton's intent to defraud the PTO. Having failed to present any evidence of an intent to defraud, Oberthur cannot meet its burden of demonstrating that Mr. Leighton committed a fraud on the PTO. The Magistrate Judge applied the correct standard of law and her holding should be upheld.

## III.    **CONCLUSION**

For all of the reasons set forth above, Leighton respectfully requests that Oberthur's Motion to Set Aside Magistrate Judge Smith's March 27, 2006 Order be denied.

Dated: April 20, 2006                    SUTHERLAND ASBILL & BRENNAN LLP


                                        ___/s/ Robert A. Gutkin_____
                                        Robert A. Gutkin, Esq. (Pro hac vice)
                                        Blair M. Jacobs (Pro hac vice)
                                        Attorneys for Plaintiff
                                        LEIGHTON TECHNOLOGIES LLC
                                        1275 Pennsylvania Avenue, N.W.
                                        Washington, DC  20004-2415
                                        Tel:  202-383-0751
                                        Fax: 202-637-3593

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing pleading has been made on

counsel for **OBERTHUR CARD SYSTEMS, S.A.** and **OBERTHUR CARD SYSTEMS OF**

**AMERICA CORPORATION**, by sending a copy of this document by Federal Express (and

courtesy copy by email) on April 20, 2006 to the following:

> James David Jacobs (JJ-7351)
> Frank M. Gasparo (FG-2958)
> 1114 Avenue of the Americas
> New York, New York 10036

IT IS HEREBY ALSO CERTIFIED that, pursuant to court order, a courtesy copy of the

foregoing document was sent by Federal Express on April 20, 2006 to the following:

> The Honorable Lisa Margaret Smith
> U.S. Magistrate Judge
> United States District Court for the Southern District of New York
> 300 Quarropas Street, Room 428
> White Plains, NY 10601-41

Dated: April 20, 2006

> _____/s/Robert A. Gutkin_____
> Robert A. Gutkin (pro hac vice)

# Exhibit 1

**1**

```
         *****CONFIDENTIAL DEPOSITION****
     IN THE UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
Leighton Technologies, LLC, )
     Plaintiff-Counterclaim )
     Defendant,            )Case No.
     -vs-                  )04Civ
Oberthur Card Systems, S.A.,)2496(CM)
     Defendant-Counterclaim )
     Plaintiff.            )
               - - - oOo - - -
     Deposition of KEITH R. LEIGHTON, a
witness herein, called by the Defendant-
Counterclaim Plaintiff, as if upon
cross-examination under the statute, and
taken before Luanne Stone, a Notary Public
within and for the State of Ohio, pursuant
to the issuance of notice and subpoena, and
pursuant to the further stipulations of
counsel herein contained, on Sunday, the 9th
day of October, 2005 at 9:00 o'clock A.M.,
at the Renaissance Hotel, the City of
Cleveland, the County of Cuyahoga and the
State of Ohio.
     *****CONFIDENTIAL DEPOSITION*****
```

**2**

```
 1            APPEARANCES:
 2     On behalf of the Plaintiff-
 3     Counterclaim Defendant:
 4     Sutherland, Asbill & Brennan, LLP,
 5     by:
 6     Robert A. Gutkin, Esq.
 7
 8
 9     On behalf of the Defendant-
10     Counterclaim Plaintiff:
11     Baker & McKenzie, by:
12     James David Jacobs
13     Frank M. Gasparo, Esq.
14
15  ALSO PRESENT:
16  Jean-Claude Huot
17
18            - - - oOo - - -
19
20
21
22
23
24
25
```

**3**

```
 1            P R O C E E D I N G S
 2     KEITH R. LEIGHTON, being of lawful
 3  age, having been first duly sworn according
 4  to law as hereinafter certified, deposes and
 5  says as follows:
 6     CROSS-EXAMINATION OF KEITH R. LEIGHTON
 7  BY MR. JACOBS:
 8  Q    Mr. -- Mr. Leighton, have you ever had a
 9  deposition taken before?
10  A    Years ago.  It was --
11  Q    What kind of case was it?
12  A    That was a -- it was an insurance
13  deposition.
14  Q    And you were a plaintiff in that case?
15  A    A defendant, I would say.
16  Q    You were in a car accident?
17  A    No.  This was an insurance case of a
18  home that was burned.  I was the previous
19  owner of the home.
20  Q    And you were a defendant in the case?
21  A    I believe so, yes, a defendant.
22  Q    What was the claim in the case?
23  A    That I'm not sure of.
24  Q    Do you --
25  A    Or to recall this, this is --
```

**4**

```
 1  Q    What was the name of the case?
 2  A    The name of the case?
 3  Q    Yes.
 4  A    I'm not sure who the insurance company
 5  was at that time.  I sold my home, and the
 6  purchaser bought the home, put insurance on
 7  the home, and after I'd left the home,
 8  completely out of the home, the home
 9  suddenly burned to the ground.  So, it was
10  an insurance claim.
11  Q    Where -- where was the case pending?
12  A    That was in West Bloomfield, Michigan.
13  Q    That's the only deposition that you have
14  ever had taken?
15  A    Right, that was.
16  Q    I take it you met with your attorney
17  before this deposition?
18  A    Yes.
19  Q    And he explained some of the ground
20  rules of what goes on in this deposition?
21  A    Correct.
22  Q    You understand, do you not, that I'll be
23  asking you certain questions?
24  A    Uh-huh, right.
25  Q    And you have to answer the questions?
```

17

1  on or about October 17, 1995 you filed your
2  first patent application on the laminated
3  plastic card?
4  A   Yes, correct.
5  Q   Okay. Now, keeping that date in mind,
6  October 17, 1995, did you for the first time
7  use the lamination cycle, as we've
8  previously defined it this morning, prior to
9  January 1, 1995 to make a plastic laminated
10 card?
11     MR. GUTKIN:   Vague and ambiguous.
12     THE WITNESS:   I have made cards since
13 1970, and to be -- the specifics on this,
14 that is not clear. As far as making a radio
15 frequency card, I applied for my patent
16 before I had electronics to produce an ISO
17 standard smart card.
18 BY MR. JACOBS:
19 Q   Let me rephrase the question,
20 Mr. Leighton, and I'm not referring to
21 electronics, and all I'm saying -- well, let
22 me start again. Do you have any difficulty
23 understanding what a plastic laminated card
24 is?
25 A   No, I don't.

18

1  Q   Could you tell us what you understand
2  the term, plastic laminated card, means?
3  A   Yes, I can.
4  Q   Would you do that?
5  A   A plastic laminated card would consist
6  of one or more plastic core sheets with --
7  with or without printing on the core,
8  with -- followed by overlaminate sheets
9  making a sandwich, to define it, in a book
10 of laminating plates, and applied with heat
11 and pressure cycles.
12 Q   All right. When is the first time you
13 used the lamination cycle as we previously
14 defined it to make a plastic laminated card
15 as you just defined it?
16 A   I would say back in 1970.
17 Q   So, the --
18 A   An ordinary plastic card.
19 Q   Right. So, the lamination cycle which
20 you show in claim 20, subpart single i, ii
21 and iii, is as old as 1970; is that correct?
22 A   No.
23     MR. GUTKIN:   Vague and ambiguous.
24 Calls for a legal conclusion.
25 BY MR. JACOBS:

19

1  Q   You can answer the question. The answer
2  is "no"?
3  A   No.
4  Q   What is newer than 1970 in i, ii and
5  iii?
6  A   The ability to make a smooth card to
7  receive dye sublimation printing with
8  surface smoothness at .0005.
9  Q   What -- what in claim 20 that's in
10 Exhibit 102 -- 101, you can refer to it if
11 you like; in fact, I ask you to do that.
12 Please turn to Exhibit 101, claim 20, and
13 looking at subparagraph C, and specifically
14 at subparagraph single i through iii; are
15 you there, sir?
16 A   Yes.
17 Q   All right. What -- and I'm asking you
18 to point out the specific language in i, ii
19 and iii; what language in that -- in those
20 clauses specifically permits you to have the
21 ability to make a smooth card and receive
22 dye sublimation printing with a surface --
23 surface smoothness of 5/10,000; was that the
24 measurement, sir?
25 A   One-half a thousandths.

20

1  Q   Right, .0005 of an inch. Let me repeat
2  the question so it makes -- what in -- what
3  in claim 20 of Exhibit 101 and specifically
4  subparagraphs i, ii and iii, specifically
5  permits you to have the ability to make a
6  smooth card and receive dye sublimation
7  printing with a smoothness of .0005 of an
8  inch?
9      MR. GUTKIN:   Vague and ambiguous.
10 Calls for a legal conclusion.
11 BY MR. JACOBS:
12 Q   You can answer the question.
13 A   In the steps of the claim here, this is
14 pointing out the first lamination process.
15 This is a two-step lamination process.
16 Q   I'm asking you what language in there,
17 sir, specifically permits you to be able to
18 make a smooth plastic laminated -- laminated
19 card with a surface of .0005 of an inch that
20 can receive dye sublimation printing?
21     MR. GUTKIN:   Vague and ambiguous.
22 Calls for a legal conclusion.
23     MR. JACOBS:   What's vague and
24 ambiguous about it?
25     MR. GUTKIN:   Would you like me to

141

1    A    Before they developed their contact/
2    contactless smart card.
3    Q    That's not the question.  Did you
4    develop your invention prior to going to
5    Motorola in 1990 -- in the first half of
6    1995?
7    A    No.
8    Q    You developed your invention after
9    leaving Motorola in 1995, correct?
10   A    That's correct.
11   Q    So, what is different in your invention
12   than what -- what you saw at Motorola?
13       MR. GUTKIN:    ☐Vague and ambiguous.
14   Lacks foundation.
15       THE WITNESS:  Do you want me to answer
16   that?
17       MR. GUTKIN:    ☐Yeah, yeah.  Unless I
18   instruct you not to answer, he's entitled to
19   an answer.
20       THE WITNESS:  ☐Okay.  My invention
21   could not have been practiced at Motorola.
22   BY MR. JACOBS:
23   Q    I'm asking you why.
24   A    Because they did not have control of
25   their ram to give zero pressures on the

142

1    surface of the plastic before heating it.
2    They had a -- I believe a four-window,
3    daylight window laminator that you cannot
4    control the platens individually.  The
5    bottom platen, if you put electronics in,
6    would pick up about 450 pounds on that
7    delicate chip, and each time the ram would
8    come up, it would pick up an additional 450
9    pounds, and you do that four times, you've
10   got a lot of weight on that chip.  You
11   couldn't do my process on there without
12   having a counterbalance platen that weighed
13   absolutely nothing.
14   Q    So, you view your invention using a
15   counter -- for your invention, do you -- do
16   you -- is it -- let me strike that.  Sorry.
17       Does your invention require the use of
18   a counterbalance platen?
19       MR. GUTKIN:    ☐Calls for a legal
20   conclusion.  You can answer.
21       THE WITNESS:  By using the top platen
22   of the laminator and controlling the ram to
23   where I can raise it to -- raise the
24   temperature in the laminator without making
25   contact to the top of the platen, I can heat

143

1    the plastic and liquefy the plastic before
2    applying ram pressure to encapsulate the
3    electronics.
4    BY MR. JACOBS:
5    Q    Is there anything else in your invention
6    that you did differently than what you saw
7    at Motorola?
8    A    All of it.
9    Q    Well, tell me what else.
10   A    Motorola didn't have a printing press
11   when I worked there.
12       THE VIDEOGRAPHER: ☐Two minutes of tape.
13       THE WITNESS:  ☐I -- in my invention, I
14   had -- on my first patent, I facilitated or
15   printed on a -- the core that I made in the
16   first lamination process.
17       MR. JACOBS:    ☐Why don't we change the
18   tape.
19       THE VIDEOGRAPHER: ☐Off the record.
20       (At this time a short recess was had.)
21       THE VIDEOGRAPHER:    ☐☐Back on the record.
22   BY MR. JACOBS:
23   Q    Before we went off the record,
24   Mr. Leighton, we were discussing what you
25   considered to be the differences between

144

1    your invention and that which you saw at
2    Motorola, and what I'm talking about what
3    you saw at Motorola, I'm also talking about
4    what the things you contributed to Motorola,
5    and you so far, I think, mentioned the fact
6    of a counterbalance platen and printing.
7    A    Yes, Motorola didn't have those
8    capabilities.
9    Q    Right.  What else did you consider
10   different that you saw at Motorola than what
11   you considered to be in your invention?
12       MR. GUTKIN:    ☐By "your invention,"
13   we're still talking about Exhibit 101,
14   correct?
15       MR. JACOBS:    ☐Well, actually, I was
16   talking about all his inventions, but --
17       MR. GUTKIN:    ☐Well, then I'm going to
18   object.  Vague and ambiguous, compound.
19       MR. JACOBS:    That's okay.
20   BY MR. JACOBS:
21   Q    You can answer.
22   A    What I did that's different than
23   Motorola?
24   Q    Yeah.
25   A    Well, step one, I had zero pressure

# Exhibit 2

**1**

```
        *****CONFIDENTIAL DEPOSITION****
         IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
Leighton Technologies, LLC, )
    Plaintiff-Counterclaim   )
    Defendant,               )Case No.
    -vs-                     )04Civ
Oberthur Card Systems, S.A.,)2496(CM)
    Defendant-Counterclaim   )
    Plaintiff.               )
                - - - o0o - - -
    Deposition of KEITH R. LEIGHTON, a
witness herein, called by the Defendant-
Counterclaim Plaintiff, as if upon
cross-examination under the statute, and
taken before Luanne Stone, a Notary Public
within and for the State of Ohio, pursuant
to the issuance of notice and subpoena, and
pursuant to the further stipulations of
counsel herein contained, on Sunday, the 9th
day of October, 2005 at 9:00 o'clock A.M.,
at the Renaissance Hotel, the City of
Cleveland, the County of Cuyahoga and the
State of Ohio.
      *****CONFIDENTIAL DEPOSITION*****
```

**2**

```
 1              APPEARANCES:
 2      On behalf of the Plaintiff-
 3      Counterclaim Defendant:
 4      Sutherland, Asbill & Brennan, LLP,
 5      by:
 6      Robert A. Gutkin, Esq.
 7
 8
 9      On behalf of the Defendant-
10      Counterclaim Plaintiff:
11      Baker & McKenzie, by:
12      James David Jacobs
13      Frank M. Gasparo, Esq.
14
15   ALSO PRESENT:
16   Jean-Claude Huot
17
18              - - - o0o - - -
19
20
21
22
23
24
25
```

**3**

```
 1              P R O C E E D I N G S
 2          KEITH R. LEIGHTON, being of lawful
 3   age, having been first duly sworn according
 4   to law as hereinafter certified, deposes and
 5   says as follows:
 6      CROSS-EXAMINATION OF KEITH R. LEIGHTON
 7   BY MR. JACOBS:
 8   Q   Mr. -- Mr. Leighton, have you ever had a
 9   deposition taken before?
10   A   Years ago.  It was --
11   Q   What kind of case was it?
12   A   That was a -- it was an insurance
13   deposition.
14   Q   And you were a plaintiff in that case?
15   A   A defendant, I would say.
16   Q   You were in a car accident?
17   A   No.  This was an insurance case of a
18   home that was burned.  I was the previous
19   owner of the home.
20   Q   And you were a defendant in the case?
21   A   I believe so, yes, a defendant.
22   Q   What was the claim in the case?
23   A   That I'm not sure of.
24   Q   Do you --
25   A   Or to recall this, this is --
```

**4**

```
 1   Q   What was the name of the case?
 2   A   The name of the case?
 3   Q   Yes.
 4   A   I'm not sure who the insurance company
 5   was at that time.  I sold my home, and the
 6   purchaser bought the home, put insurance on
 7   the home, and after I'd left the home,
 8   completely out of the home, the home
 9   suddenly burned to the ground.  So, it was
10   an insurance claim.
11   Q   Where -- where was the case pending?
12   A   That was in West Bloomfield, Michigan.
13   Q   That's the only deposition that you have
14   ever had taken?
15   A   Right, that was.
16   Q   I take it you met with your attorney
17   before this deposition?
18   A   Yes.
19   Q   And he explained some of the ground
20   rules of what goes on in this deposition?
21   A   Correct.
22   Q   You understand, do you not, that I'll be
23   asking you certain questions?
24   A   Uh-huh, right.
25   Q   And you have to answer the questions?
```

6 (Pages 21 to 24)

---

**21**

1  explain the objection?
2      MR. JACOBS:  □Yes.
3      MR. GUTKIN:  □You're asking him to
4  interpret the claims in a patent, and you're
5  asking him to specify what within the terms
6  of the patent in the claims allows him to do
7  something.  He's not an attorney.  It's
8  vague and ambiguous.  You know, I'll state
9  the objections briefly, and I'll refrain
10  from explaining because I know it will bog
11  us down, but that's what's vague and
12  ambiguous, and that's why it calls for a
13  legal conclusion.
14      MR. JACOBS:  □All right.  Would the
15  reporter please read back the question?  And
16  I ask Mr. Leighton to answer it.
17      MR. GUTKIN:  □And the objection stands
18  so I don't have to make it again.
19      MR. JACOBS:  □Of course not.
20      (At this time the question was read
21  back.)
22      THE WITNESS:  □□Well, I know how to make
23  plastic cards.  I don't know how to
24  interpret the words, the legal words of a
25  patent.

---

**22**

1  BY MR. JACOBS:
2  Q  Well, let me understand this,
3  Mr. Leighton.  Did you previously testify --
4  well, let me state that differently.  Let me
5  ask it this way, Mr. Leighton.
6      Do you recall testifying a few
7  minutes ago that you produced a
8  plastic laminated card in 1970 using
9  steps i, ii and iii; is that correct?
10  A  No.
11  Q  Okay.  What is incorrect about that?
12  A  I was not incorporating electronics in a
13  plastic card.  This is different than the
14  ordinary lamination process.
15  Q  I --
16  A  I use different temperatures, pressures,
17  and --
18  Q  Mr. Leighton, let me ask the question
19  again.  I ask you to listen very carefully
20  to the question.  I am not in the question
21  asking you anything about electronics.
22      A few minutes ago, you defined
23  what you understood a plastic
24  laminated card to be.
25  A  Correct.

---

**23**

1  Q  That's all I'm asking about now.  I'm
2  not asking about electronics.  I'm not
3  asking about smart cards.  I'll ask you
4  again.
5      In 1970, you made a plastic
6  laminated card using the steps i, ii
7  and iii; is that correct?
8      MR. GUTKIN:  □Misstates testimony.
9      THE WITNESS:  □No.
10      MR. GUTKIN:  □Asked and answered.
11  BY MR. JACOBS:
12  Q  You can answer the question.
13  A  What I did back in 1970 are not the same
14  steps that I have written out here in this
15  document.
16  Q  What did you do in 1970?  Let me restate
17  it.  You made a plastic laminated card in
18  1970, sir?
19  A  Yes.
20  Q  Okay, and in making that card, you
21  formed a core of one or more plastic films?
22  A  Yes.
23  Q  And you put that core in a lamination
24  press, correct?
25  A  Correct.

---

**24**

1  Q  Sir, did you heat said core for a first
2  period of time back in 1970?
3  A  It wasn't required to heat the core for
4  a first period of time back then.
5  Q  Did you, sir, heat the core for a first
6  period of time in 1970?
7      MR. GUTKIN:  □Asked and answered.
8  BY MR. JACOBS:
9  Q  You can answer the question.
10      MR. GUTKIN:  □Vague and ambiguous.
11      THE WITNESS:  □It -- it's a different
12  process entirely.
13  BY MR. JACOBS:
14  Q  Sir, I'm going to ask you, and the
15  question takes a yes or no, or tell me if
16  you can't answer yes or no, why you can't
17  answer yes or no.
18  A  I'm --
19  Q  Now I'm going to ask the question again.
20  Give me a chance.
21  A  Okay, okay.
22  Q  In 1970, you made a plastic laminated
23  card; is that correct?
24  A  That's correct.
25  Q  When you made that card, did you heat

---

# Exhibit 3

**1**

*****CONFIDENTIAL DEPOSITION****
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Leighton Technologies, LLC, )
  Plaintiff-Counterclaim )
  Defendant,              )Case No.
  -vs-                    )04Civ
Oberthur Card Systems, S.A.,)2496(CM)
  Defendant-Counterclaim )
  Plaintiff.              )
          - - - o0o - - -
    Deposition of KEITH R. LEIGHTON, a
witness herein, called by the Defendant-
Counterclaim Plaintiff, as if upon
cross-examination under the statute, and
taken before Luanne Stone, a Notary Public
within and for the State of Ohio, pursuant
to the issuance of notice and subpoena, and
pursuant to the further stipulations of
counsel herein contained, on Sunday, the 9th
day of October, 2005 at 9:00 o'clock A.M.,
at the Renaissance Hotel, the City of
Cleveland, the County of Cuyahoga and the
State of Ohio.
    *****CONFIDENTIAL DEPOSITION*****

**2**

```
 1          APPEARANCES:
 2     On behalf of the Plaintiff-
 3     Counterclaim Defendant:
 4     Sutherland, Asbill & Brennan, LLP,
 5     by:
 6     Robert A. Gutkin, Esq.
 7
 8
 9     On behalf of the Defendant-
10     Counterclaim Plaintiff:
11     Baker & McKenzie, by:
12     James David Jacobs
13     Frank M. Gasparo, Esq.
14
15  ALSO PRESENT:
16  Jean-Claude Huot
17
18          .- - - o0o - - -
19
20
21
22
23
24
25
```

**3**

```
 1          P R O C E E D I N G S
 2     KEITH R. LEIGHTON, being of lawful
 3  age, having been first duly sworn according
 4  to law as hereinafter certified, deposes and
 5  says as follows:
 6     CROSS-EXAMINATION OF KEITH R. LEIGHTON
 7  BY MR. JACOBS:
 8  Q   Mr. -- Mr. Leighton, have you ever had a
 9  deposition taken before?
10  A   Years ago.  It was --
11  Q   What kind of case was it?
12  A   That was a -- it was an insurance
13  deposition.
14  Q   And you were a plaintiff in that case?
15  A   A defendant, I would say.
16  Q   You were in a car accident?
17  A   No.  This was an insurance case of a
18  home that was burned.  I was the previous
19  owner of the home.
20  Q   And you were a defendant in the case?
21  A   I believe so, yes, a defendant.
22  Q   What was the claim in the case?
23  A   That I'm not sure of.
24  Q   Do you --
25  A   Or to recall this, this is --
```

**4**

```
 1  Q   What was the name of the case?
 2  A   The name of the case?
 3  Q   Yes.
 4  A   I'm not sure who the insurance company
 5  was at that time.  I sold my home, and the
 6  purchaser bought the home, put insurance on
 7  the home, and after I'd left the home,
 8  completely out of the home, the home
 9  suddenly burned to the ground.  So, it was
10  an insurance claim.
11  Q   Where -- where was the case pending?
12  A   That was in West Bloomfield, Michigan.
13  Q   That's the only deposition that you have
14  ever had taken?
15  A   Right, that was.
16  Q   I take it you met with your attorney
17  before this deposition?
18  A   Yes.
19  Q   And he explained some of the ground
20  rules of what goes on in this deposition?
21  A   Correct.
22  Q   You understand, do you not, that I'll be
23  asking you certain questions?
24  A   Uh-huh, right.
25  Q   And you have to answer the questions?
```

33

1       MR. GUTKIN:    ☐Incomplete hypothetical.
2  BY MR. JACOBS:
3   Q   You can answer the question, sir.
4   A   I can't determine it until I make tests.
5  I cannot determine the pressures and
6  temperatures on a material until I've made
7  tests.
8   Q   You can't even tell me a range?
9   A   I would start off at roughly, maybe, 80
10  to 90 pounds per square inch surface for the
11  PVC in that range to start.
12  Q   Okay.  That's during the heating phase,
13  correct, 80 to 90 pounds?
14  A   Right.  Whatever I'm doing of it, I try
15  to maintain that pressure during the heating
16  and cooling cycles to maintain it.
17  Q   Okay.  Well, am I correct in drawing
18  from your earlier testimony that, as you
19  enter the cooling phase, you have to
20  increase the ram pressure; is that correct?
21  A   Back in 1970, we maintained that
22  laminating pressure.
23  Q   When you say "that laminating pressure,"
24  you're talking about the ram pressure or --
25  A   The ram pressure, we maintained it.

34

1   Q   You didn't raise it?
2   A   You see, back then, when you have, let's
3  say, ten stainless, or ten platens and ten
4  books containing plastic core sheets and
5  felt pads and stainless steel plates and
6  everything, when you're at a ram pressure,
7  maintaining a ram pressure of a thousand
8  pounds per square inch of ram pressure, and
9  you chill all of that steel and that plastic
10  and everything, it's going to start to
11  shrink; so, in order to prevent daylight
12  openings and exposing air into a hot sheet
13  when it starts to chill down, you have to
14  maintain a pressure per square inch during
15  the chilling cycle of the laminator.
16  Q   So, to do that, you increase the ram
17  pressure; is that correct?
18  A   You have to maintain the ram pressure.
19  You're not going necessarily above it,
20  because you don't want to distort the
21  surface of the plastic --
22  Q   Okay.
23  A   -- during the heating of that particular
24  product.
25  Q   Well, let me ask you a question, sir,

35

1  now.  Let's go back to your claim 20 here,
2  and those steps, the lamination cycle as we
3  defined it.  As -- as I'm hearing your
4  testimony, is it not correct -- strike that
5  question.
6       Is it not correct that your
7  testimony as the cycle -- the
8  lamination that you're now describing
9  you did in 1970 doesn't meet step
10  three which is that the pressure
11  during the cooling phase has to be ten
12  percent greater than the pressure
13  during the heating phase?
14       MR. GUTKIN:    ☐Vague and ambiguous.
15  Calls for a legal conclusion.
16  BY MR. JACOBS:
17  Q   You can read and answer the question.
18  A   What I'm reading here in number three of
19  the process of 20 here, I'm heating ten
20  percent greater, but what I'm doing here is
21  not the same as what I did in 1970.
22  Q   Okay, and I'm asking you, sir, the
23  question is:  When is the first time you
24  made a plastic laminated card?  Remember,
25  plastic laminated card; I'm not talking

36

1  electronics.  When is the first time you
2  made a plastic laminated card in which the
3  pressure during the cooling phase was at
4  least ten percent greater than the pressure
5  during the heating phase?
6   A   I couldn't recall that.
7   Q   You have no idea when you did that the
8  first time?
9   A   No.
10  Q   Was it before 1990?
11  A   Possible, but I don't know that for
12  sure.
13  Q   Was it before 1995?
14  A   I would say it's possible that it would
15  be before 1995, because I've put different
16  objects in plastic.
17  Q   I'm not talking about the objects, sir,
18  now.
19  A   Okay.
20  Q   I'm talking about making a pure plastic
21  laminated card as you defined it a few
22  minutes ago.
23  A   Correct.
24  Q   Do you remember what you said about a
25  plastic laminated card?