# EXHIBIT 19

Robert A. Gutkin, Esq. (Pro hac vice)
Blair M. Jacobs, Esq. (Pro hac vice)
Christina A. Ondrick (Pro hac vice)
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC 20004-2415
Tel: 202-383-0100
Fax: 202-637-3593

Attorneys for Plaintiff
LEIGHTON TECHNOLOGIES LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LEIGHTON TECHNOLOGIES LLC. | ) | 04 Civ. 02496 (CM) |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | **DECLARATION OF KEITH R.** |
| | ) | **LEIGHTON** |
| v. | ) | |
| | ) | |
| OBERTHUR CARD SYSTEMS, S.A., and | ) | |
| OBERTHUR CARD SYSTEMS OF AMERICA | ) | |
| CORP. | ) | |
| | ) | |
| Defendants. | ) | |

I, Keith Leighton, hereby declare under penalty of perjury, as follows:

1.    I am the inventor of US Patent Nos. 5,817,207; 6,036,099; 6,514,367; and 6,214,155.
This declaration is submitted in support of Leighton Technologies Opposition to the
Defendant's Summary Judgment Motion for Invalidity.  The information set forth
herein is based upon my own personal knowledge, and if called as a witness I would
testify thereto.

2.    I am 73 years old and I have a high school diploma from Berkley High School in
Berkley, Michigan, which I received in 1952.  I have been involved in the color
printing industry since 1953, when I first began working for General Motors as a

Plate Maker/Engraver. From 1970 –2000 I continued to work in the field of color printing, as well as working for a number of companies that manufactured plastic cards. Over the course of my career I have developed substantial hands on experience in the lamination of plastic cards, and I have served as a consultant for both the lamination and printing processes used to make such cards. I currently work as a machine operator at Invacare, a company that makes wheelchairs in Elyria, Ohio.

3.    For many years standard plastic cards, and more recently contactless smart cards, have been made using the process of lamination. In general, the lamination of smart cards involves sandwiching electronic elements between layers of plastic and sealing them with heat and pressure.

a.    The first step in the manufacture of a contactless smart card, or any plastic card for that matter that will be laminated involves building "books" made of layers of plastic, electronic elements (in the case of contactless cards), pads, and metal plates all of which sit in a lamination tray. A book may be made up of many layers of cards, similar to the single card layer illustrated at f35 from page 1 of my '155 patent.



The following pictures illustrate the actual assembly of a book being built in a lamination tray. The book contains multiple layers of cards that are separated by pads and plates:











b. The lamination tray containing the book is then placed into the daylight, or opening, in lamination machines similar to the ones set forth below.







c.  Over a set period of time, varying temperatures and pressures are applied to the

book in order to laminate the materials and make a finished contactless smart

card. In my method, I make sure that the plastic in the book is heated so that when

any substantial pressure is applied to the sensitive electronics contained within

each card, they can be safely encapsulated within the plastic.  The electronics at

the center of a contactless card can be extremely fragile.

4.     As background, the following explains how I came to appreciate the problems that are

faced in laminating sensitive electronics into a plastic card using temperature and

pressure.  In early 1995, I was contacted by Motorola and asked to come visit their

facility in San Jose, California to assist them in their production of an employee

identification card to be used by Microsoft employees.  I was told that Bill Sanko, a

business acquaintance and friend of mine, had been in touch with Motorola and had

suggested that I might be able to help them make such a card.

5.     I visited the Motorola facility and was shown the laminating machine that they were

using to make their identification cards.  The laminator was actually designed to make

printed circuit boards and not plastic cards.  The laminator was a dual stack laminator.

It had a separate ram (press) for the heating phase and one for the cooling phase.

6.     As I came to learn once I was at the Motorola facility, the rams on their machine were

designed to exert more pressure during the heating phase of the lamination cycle than

during the cooling phase of the cycle.  Also, because of the weight of the platens

(about 450 pounds), substantial weight or pressure was exerted on the cards by

merely closing the laminator, before the cards could be heated and the plastic

softened.  By closing each of the daylights or openings from the bottom of the

laminator to the top, additional weight was added for each of the platens onto the cards. The cards on the bottom daylight or opening had the greatest amount of weight or pressure exerted upon them before the lamination process could even be started. There was also a delay or dwell time between the two cycles. This meant that after the cards came out of the heating phase of the laminator, they had to sit with no heat and no pressure before they were able to go into the cooling phase of the machine.

7.     These features of the Motorola laminator ultimately made it difficult for me to provide Motorola with a satisfactory yield of cards that worked. In order to activate the heat and subsequently maintain the heat on the platens, and ultimately the card material, the daylights or openings would have to be shut. The application of too much pressure from merely closing the laminator on the material in the bottom daylights or openings, and too much pressure during the heating phase of the lamination cycle did not enable me to obtain the yields that Motorola wanted. There were physical differences in the finished cards based upon which daylight or opening had been used to make the cards. The platens were warped, and there were differences in temperature and pressure between platens and between different lamination cycles. Also, Motorola provided me with electronics to laminate into the plastic cards that were thicker than the ISO card standards. ISO is an international standards organization. Certain types of plastic cards must meet ISO standards in order to be accepted. For example, a card must be a certain thickness in order to go into an ATM machine and to properly read the magnetic stripe that is on the card. The antenna that Motorola provided was much thicker than the ISO standards, as well as being thicker than the chip that sat inside the antenna. The antenna did to some extent act as a

buffer and provide the chip with some protection from the pressure being exerted upon the card when the platens were closed and additional pressure was applied during the heating cycle. Ultimately, I did make a number of cards at Motorola, but Motorola was unhappy with the yield that I obtained using their components and laminator. Motorola did not pay me the bonus provided by our consulting agreement, because they maintained that I did not satisfy the criteria for receiving a bonus. My last day at Motorola was April 5, 1995.

8. I continued to think about the problems I had encountered at Motorola, which had resulted in my inability to make a contactless smart card that satisfied their demands. Over the course of the next several months I came up with a new and different method that I believed would enable me to produce a contactless smart card that was smooth enough to accept dye sublimation printing, but also thin enough to satisfy ISO thickness standards. Because of the sequence of temperature and pressure that I used in my method, I was able to safely embed the sensitive electronics into the card without the use of any protective device around the electronics.

9. In October of 1995 my attorney at the time, Steve Haas, filed a provisional patent application on my method of manufacturing smart cards. I understand that the provisional application subsequently led to the patents that are the basis of this lawsuit.

10. In early 1996, I made a number of cards at a company that I had worked at for approximately 11 years, CSI (which was formerly known as 2B Systems) using the method that had been described in my provisional application. I made the cards on the single stack laminator that was at CSI. The cards were smooth enough to accept

dye sublimation printing, but also thin enough to satisfy ISO thickness standards. Also, I did not use any protective device for the sensitive electronics, inlays of Phillips electronics, inserted into the card.

11.     As I indicated at my deposition, I had previously heard of the company called Oakwood Design. After I left 2B Systems, a company that I worked at from 1970 – 1981, the owner of 2B Systems (which had then changed its name to CSI), invested in the Oakwood company before it went into bankruptcy. CSI apparently had also purchased an Oakwood Design laminator, which later caught fire. I understand from seeing the document that one of the former principals of Oakwood Design, Richard Smith, has submitted a declaration stating that certain of the Oakwood materials attached to the declaration show the inventions in my patents. I have reviewed the Oakwood materials and I do not see any explanation of how to encapsulate electronics, as per my patent to make a contactless smart card. I also understand from seeing the document that one of Oberthur's employees, Barry Mosteller, has similarly attached Oakwood materials to his declaration, and is also claiming that the Oakwood materials attached show the inventions in my patents. The same problems also apply to the Oakwood materials attached to Mr. Mosteller's declaration. In each of their declarations they talk about one of the graphs from the Oakwood materials. I was asked at my deposition about the graph, and I had a hard time understanding the graph because it does not have any numbers or explain any of the abbreviations that are used. However, if I use the abbreviations and explanation provided by both Mr. Mosteller and Mr. Smith, it does not show my inventions. In fact, the graph shows the type of pressure and temperature that did not work at Motorola. The graph shown

in the Oakwood materials, appears to apply substantial pressure before the plastic is given the chance to heat up.

12.    In my inventions, I heat the card material before applying substantial pressure. I do this in order to soften the plastic before the electronics are pressed into the plastic material. If I understand the way in which Mr. Mosteller and Mr. Smith have explained the Oakwood graph, it shows applying a first pressure (which can be called P1) before the plastic has been heated to a first temperature (T1) for a first time period. I know from my experience at Motorola, where I could not avoid putting substantial pressure on the card material before it had a chance to heat up, that making a card in the manner was problematic in terms of obtaining a satisfactory yield. In fact, my experience with these types of problems led me to come up with the different method that I use in my patents.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 6 day of December, 2005, at Cleveland, Ohio.

Keith R. Leighton

# EXHIBIT 20

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    - - - - -

 4    LEIGHTON TECHNOLOGIES, LLC, )

 5                 plaintiff,      )

 6       vs.                      ) Case No.

 7                                ) 04Civ02496(CM)(LMS)

 8    OBERTHUR CARD SYSTEMS, S.A.,)

 9                 defendants.     )

10                    - - - - -

11       Videotaped deposition of JEAN-MARC DELBECQ,

12    a witness herein, called by the defendant as if

13    upon direct examination, and taken before David

14    J. Collier, RPR, Notary Public within and for

15    the State of Ohio, pursuant to subpoena and

16    pursuant to the further stipulations of counsel

17    herein contained, on Friday, the 3rd day of

18    February, 2006 at 8:57 a.m., at the offices of

19    Indala Corporation, 6850B Santa Teresa

20    Boulevard, City of San Jose, State of

21    California.

22

23

24

25
```

Page 69

```
 1    Q     Did there come a time when you were -- I

 2    think the -- satisfied with the process I think

 3    was the word I used.

 4    A     No.  No.

 5    Q     And why were you dissatisfied?

 6    A     Because we could not make it come out

 7    exactly right every time.

 8    Q     What could you not make come out right

 9    every time?

10    A     The surface.  We could not make that a best

11    for printing surface 100 percent of the time.

12    Q     You had a yield problem?

13    A     Yes.

14    Q     And what kind of yield were you getting for

15    good surfaces, surfaces adequate to print on?

16    A     I don't remember.  I don't recall.  It

17    was -- it was not satisfactory.

18    Q     Okay.

19    A     We were losing money.

20              MR. B. JACOBS:    That's not

21    satisfactory.

22              THE WITNESS:    Yeah.

23    Q     But you were --

24    A     We were throwing away parts, basically.

25    Q     You were throwing away parts, but the parts
```

1    A    I met Mr. Leighton.

2    Q    How did it come about that you had the

3    opportunity to meet Mr. Leighton?

4    A    There was a -- I think I had mentioned just

5    a moment ago somebody named Ken Thompson, and as

6    things were evolving, it became our strategy to

7    have a technical group of people that focused on

8    the mass production aspects, compared to my

9    group, which were coming up with new products

10   and novel manufacturing methods.  We did a lot

11   of Sic Sigma, statistical process control stuff,

12   and -- so Ken came from another Motorola group

13   that were very well-versed in this and were mass

14   producing Motorola parts in very high volumes.

15   And so he was responsible for that technical

16   manufacturing stuff, manufacturing engineers

17   would work for him, and certain maturing of the

18   process development would happen with Ken's

19   group.

20           So we had -- "we," Indala, had gotten

21   the Berkel press, my team had essentially

22   transferred all of the materials knowledge that

23   we had and process knowledge that we had, and

24   even my -- my staff went to support the

25   transition, and we -- we really discovered we

1   didn't know enough about base lamination, and so

2   we had -- just basic lamination, and so we had

3   consulted with Caulastics, I mentioned, we had

4   consulted with another company in New Jersey, I

5   think.  We may have -- Ken Thompson may have

6   consulted with a whole bunch of other companies

7   that I wasn't involved in.

8           Somebody recommended Keith.  I don't

9   know how Keith came to Indala, but somebody had

10  recommended Keith as a lamination expert, a

11  lamination consultant, and so Ken Thompson and I

12  met and we talked about the issues that we had

13  and agreed that having a lamination expert come

14  and help us solve some problems would be a very

15  good use of our money and time.

16  Q    When you say "lamination expert," what

17  aspect of the lamination process were you

18  looking for expertise in?

19  A    Well, materials was one.  Transitioning

20  from making sheets this size -- or laminating

21  sheets this size to laminating sheets of this

22  size.  There -- there were -- what's a good,

23  simple way?

24          There are kernels of knowledge.  The

25  cassettes, what they call the cassettes, where

# EXHIBIT 21

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5   LEIGHTON TECHNOLOGIES,            :

                                      :

6              Plaintiffs,            :

                                      :

7              vs.                    :   No. 04-CV-02496

                                      :

8                                     :

    OBERTHUR CARD SYSTEMS, S.A.,      :

9   OBERTHUR CARD SYSTEMS OF          :

    AMERICA CORPORATION,              :

10                                    :

               Defendants.           :

11

12              --oOo--

13

14        VIDEOTAPE DEPOSITION OF

15             KEN THOMPSON

16             VOLUME I

17        _____

18          May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC

          126 East 56th Street, Fifth Floor

24          New York, New York 10022

              212-750-6434

25              REF: 80728

Page 52

1                          THOMPSON

2        A.    Yes.

3        Q.    How did that come about?

4        A.    As I recall, prior to -- prior to myself

5    issuing a purchase order to Keith Leighton on a

6    consultant basis, we flew him from Ohio to San Jose

7    to discuss with myself and Jean-Marc Delbecq the

8    work efforts we were looking for and the thing we

9    were trying to accomplish.

10       Q.    All right.  Well, let me go back a step

11   further, if I may.

12       A.    Okay.

13       Q.    What -- how did Mr. Leighton and Indala

14   happen to get together?

15       A.    I think Mr. Leighton, as I recall,

16   Jean-Marc Delbecq had been at a customer sites or at

17   equipment manufacturer sites, or material supplier

18   sites sometime in late 1994, early 1995, and he had

19   made acquaintances or relationships with some of

20   those people.

21             And around that time I had also told

22   Mr. Delbecq that in order to complete this

23   particular project schedule we had, that I would

24   like to have some experienced lamination credit card

25   manufacturing person to assist us.

1                          THOMPSON

2          So he had in his mind that -- that we were

3    searching for someone, and I believe someone gave

4    him Keith Leighton's name.  I'm not sure if he met

5    Keith Leighton then, or if he was just recommended

6    by someone.

7          So as far as I recall, Jean-Marc Delbecq,

8    through a referral to someone else, had identified

9    Mr. Keith Leighton as a potential candidate to help

10   us out.

11        Q.    You -- you referred to a project schedule.

12   What -- what does that refer to?

13        A.    As I said before, we had -- we were

14   selling at least two laminated card products,

15   APC-161, and AVC-131, and we were trying to develop

16   another -- a new lamination product, which had a

17   hundred percent flat surface, which we were going to

18   call AVC-132.

19          And we had significant customer pull and

20   demand for a product like that; and our competition

21   didn't.  And we wanted to be the first on the market

22   with a product like that.  And our sales people had

23   been in discussions with Microsoft.  And Microsoft

24   had requested products like this, and I believe our

25   sales people committed to delivering the product

1                    THOMPSON

2    prior to us having a product developed.

3            And so there was not only this urgency to

4    make sure that we could produce a product at a

5    pricing that we wanted, but we also wanted to make

6    sure we could meet the schedule.  I'm not really

7    clear exactly when the purchase order was placed on

8    us, such that we had this heightened sense of

9    urgency that we need some extra help, or if it was

10   leading up to that point, where, hey, it looks

11   fairly certain that we're going to get the purchase

12   order.  So there was very large emphasis on meeting

13   this commitment to introduce the new product with

14   Microsoft as the first customer.

15       Q.    And did there come a time when you

16   contacted Mr. Leighton?

17       A.    Yes.  I don't recall when, but it was

18   through Mr. Jean-Marc Delbecq, and I do recall a

19   earlier exhibit with a fax where Mr. Leighton says

20   he'll be glad to meet with us.  I'm not -- I can't

21   recall if I spoke to him on the phone beforehand, or

22   what type of communications took place, but

23   certainly at some time I had some communications

24   with him, because he knew it was not Mr. Jean-Marc

25   Delbecq that was hiring him, it was -- it was -- it

# EXHIBIT 22



Trial Counsel's Eyes Only



Trial Counsel's Eyes Only

L06592

# EXHIBIT 23

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,      )

    vs.             ) Case No.

                  ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP., )

        defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

        Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Tackla & Associates

Page 571

1    really arise because it was such a thin foil;

2    isn't that a fact?

3              MR. GUTKIN:         Object to form.

4    A    That's correct.

5    Q    Okay.  I'm sorry.  Isn't it fair to say

6    that damage based on the thickness was not an

7    issue because it was so thin?

8              MR. GUTKIN:         Object to form.

9    A    While manufacturing I did not experience

10   damaging the foil.

11   Q    Right.  Okay.  It was a very thin foil, you

12   didn't have to worry about crushing it because

13   it was thick?

14   A    It was like going to the grocery store and

15   pull out Reynolds Wrap.

16   Q    Right.

17   A    Same thing.

18   Q    Okay.  Any other materials that you ever

19   laminated in a card other than this gold or

20   silver foil that you mentioned?

21   A    I -- working at CSI, or -- it was called

22   2B System at the time.  I was plant manager.  I

23   was asked by the owner could you laminate

24   butterflies.

25   Q    Okay.  I remember you talked about that

Page 572

1    last -- at your other deposition.

2    A    Yes.

3    Q    Anything else, anything else you'd

4    laminated in cards prior to coming to Motorola?

5    A    No.

6    Q    Now, the gold --

7    A    Not to my recollection.  I mean --

8    Q    The gold or metal foil, those didn't have

9    any -- weren't connected to any chips, is that

10   right, the one that you just mentioned?

11   A    No.  No.

12   Q    There was no electricity running through --

13   A    It was not an electronic thing, although I

14   think it could be, some day be an electronic

15   element.

16   Q    I'm sorry.  That one you're going to have

17   to explain to me.  I thought the layer, the gold

18   or silver layer, was for decorative purposes; is

19   that right?

20   A    That's the purpose that I was using it for,

21   but it could be used as a antenna.

22   Q    Okay.  Was it used as an antenna at the

23   time?

24   A    Not at the time that I made the card.  It

25   was a promotional card.  I could show you that

Tackla & Associates

**EXHIBIT 24**

Page 1

1           *****CONFIDENTIAL DEPOSITION****

2           IN THE UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    Leighton Technologies, LLC, )

5         Plaintiff-Counterclaim    )

6         Defendant,              )Case No.

7         -vs-                    )04Civ

8    Oberthur Card Systems, S.A.,)2496(CM)

9         Defendant-Counterclaim   )

10        Plaintiff.              )

11                - - - oOo - - -

12        Continued deposition of KEITH R.

13   LEIGHTON, a witness herein, called by the

14   Defendant- Counterclaim Plaintiff, as if

15   upon cross-examination under the statute,

16   and taken before Luanne Stone, a Notary

17   Public within and for the State of Ohio,

18   pursuant to the issuance of notice and

19   subpoena, and pursuant to the further

20   stipulations of counsel herein contained, on

21   Monday, the 10th day of October, 2005 at

22   9:00 o'clock A.M., at the Renaissance Hotel,

23   the City of Cleveland, the County of

24   Cuyahoga and the State of Ohio.

25        *****CONFIDENTIAL DEPOSITION****

Page 153

1    were giving him quick talks.  I had just a

2    few minutes to write this agreement.  He

3    wrote it out on this electronic board, and

4    they were about to put me on the airplane to

5    come back to Ohio.

6    Q:    All right.

7    A:    So, we had a quick agreement, quick

8    sketches, and signed an agreement within a

9    period of, oh, 20 minutes.

10   Q:    The top line of handwriting says,

11   "increase cold side ram." What does that

12   mean?

13   A:    We increased the cold side.

14   Q:    What does that mean?

15   A:    When they made a transfer, I -- I'm

16   not sure of the pressures that I had, but I

17   told him what I wanted to do.

18   Q:    And you wanted a higher pressure on

19   the cold side?  Is that correct?  Is that

20   what you told him?

21   A:    I wanted to increase the pressure,

22   yes.

23   Q:    On the cold side?  You wanted to

24   increase the pressure on the cold side; is

25   that what you told Mr. --

# EXHIBIT 25



February 22, 1995

Ken Thompson
Technical Operations Manager
Motorola Indala Corp.
3041 Orchard Parkway
San Jose, Ca. 95118
ph 408 383 4092
fax        7941

Keith Leighton
2817 Fulmer Rd.
Lorain, OH. 44053
ph 216 960 1690
wk    631 7710
fax    960 2335

Kieth

We were pleased to meet with you on February 17th concerning potential work in development of PVC lamination for our products. I would like to outline the results of our discussions along with the next steps.

We have confidence that you can lead our efforts in making flat, printable cards. Jean-Marc and I both were impressed with your background, material knowledge, process control applications, design of experiments, machine knowledge, and industry familiarity. We would like to hire your services in San Jose pending approval of a purchase requisition which we will submit after we have received your proposal.

Here are the steps to completing this process:

1.    Keith to send to Ken Thompson a list of "up front items" required prior to your arrival. This list should include: materials needed, tooling needed, process monitoring equipment required, sources for obtaining the materials, etc. and any other items you may require once you arrive. A thorough list of quantity, type, source, cost, and delivery of materials is essential. Expected man date here in San Jose should also be included. Please estimate the material and equipment cost we will need to successfully complete this project.

2.    Motorola will issue a $500.00 purchase req for this list.

3.    Keith provide Motorola (Ken Thompson) a quote for services. The quote should contain previously discussed terms:
- $1875/wk for 4 weeks
- $1500 bonus for completed process after 4 weeks which produces > 10K cards prior to end of 4th week
- deliverables (see below list of desired deliverables)
- Motorola reserves the right for services cancellation with 1 week notice
- signed Motorola Consultant Agreement
- signed Non Disclosure Agreement
- Keith's disclosures to Motorola

— Motorola Indala Confidential and Proprietary —

Trial Counsel's Eyes Only

L06510



Krone/Inside... Ken Thompson          ☎ 408 366 7941          5/29/96          ☎ 11:05 AM

4.    With all agreements signed, Motorola will issue purchase order to you once requisition is approved. PO will be based on your quote.

As stated before, we would like to see you start ASAP. Prior to starting, we would like to make sure all necessary items are here for you to be as effective as possible.

Regards,

Ken Thompson

cc:   Jean-Marc Delbecq
      Jaime Mastascll
      Brad Kolb
      Harlan Pester

~ Deliverables Attachment Enclosed ~

— Motorola India Confidential and Proprietary — .

Trial Counsel's Eyes Only

L06511

# EXHIBIT 26

```
<DOCUMENT>
<TYPE>10-K405
<SEQUENCE>1
<DESCRIPTION>FORM 10-K405
<TEXT>

<PAGE>
-----------------------------------------------------------------------------
-----------------------------------------------------------------------------
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
------------------------
FORM 10-K

/X/ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934 [FEE REQUIRED]

FOR THE FISCAL YEAR ENDED DECEMBER 31, 1994
OR

/ / TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934 [NO FEE REQUIRED]
FOR THE TRANSITION PERIOD FROM _____ TO _____
COMMISSION FILE NUMBER 1-7221

MOTOROLA, INC.

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

```
<TABLE>
<S>                    <C>
   DELAWARE               36-1115800
   (STATE OF          (I.R.S. EMPLOYER
 INCORPORATION]       IDENTIFICATION NO.)
</TABLE>
```

1303 EAST ALGONQUIN ROAD, SCHAUMBURG, ILLINOIS 60196

(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)

REGISTRANT'S TELEPHONE NUMBER (708) 576-5000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

```
<TABLE>
<CAPTION>
```

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $3 Par Value per Share | New York Stock Exchange Chicago Stock Exchange |
| Liquid Yield Option Notes due 2009 | New York Stock Exchange |
| Liquid Yield Option Notes due 2013 | New York Stock Exchange |
| Rights to Purchase Junior Participating Preferred Stock, Series A | New York Stock Exchange Chicago Stock Exchange |

```
</TABLE>
```

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

two new versions of the InfoTAC -TM- two-way messenger.

GOVERNMENT AND SPACE TECHNOLOGY GROUP (GSTG)

Segment sales declined 3% to $929 million and orders rose 36%. The group
recorded a larger loss than in 1993. GSTG increased its presence in the space
industry while continuing its government and defense business.

Development of the IRIDIUM [REGISTERED TRADEMARK] global wireless personal
communications system continued with all scheduled contractual milestones
achieved during the year. Iridium, Inc., the global consortium of companies
funding the system, completed its planned equity financing activity by raising
an

22

<PAGE>

                    MOTOROLA, INC. AND CONSOLIDATED SUBSIDIARIES
---------------------------------------------------------------------------

additional $733 million in equity commitments. Total capital committed to the
IRIDIUM system from all investors now equals $1.57 billion. Motorola owns about
26% of Iridium, Inc.

The IRIDIUM system is expected to be the first operational global wire-less
telecommunications network enabling subscribers to make or receive telephone
calls over handheld subscriber equipment worldwide. The IRIDIUM system is
expected to become commercially available worldwide by the end of 1998.

GSTG received contracts from the Federal Aviation Administration for the
Portable Emergency Transceiver-2000 (PET-2000) backup ground-to-air radio and
the CM-50/51 linear power amplifier. The transceivers will provide comprehensive
communications if standard ground-to-air communications systems are unavailable
due to power outages, natural disaster or other emergency conditions. The
amplifiers will provide for air traffic control communications beyond normal
ranges.

The Department of Defense awarded a contract for development of the 21st
Century Land Warrior Generation II Soldier system. The Generation II Soldier is
an advanced head-to-toe fighting system with data, communication and protective
equipment designed for ground forces.

The Kansas Turnpike Authority selected the Motorola/Amtech Intellitag
Products joint venture for installation of an electronic toll collection system.
Intellitag [REGISTERED TRADEMARK] 2000 toll collection equipment will record and
process vehicle transactions automatically.

AUTOMOTIVE, ENERGY AND CONTROLS GROUP (AECG)

Sales were 64% higher and orders rose 69%. Operating profits were higher. AECG's
performance was led by strong demand for component and energy products for
Motorola's wireless communications equipment, including quartz and ceramic
components, batteries and chargers, as well as electronic ballasts. The group's
results are reported as part of the "Other Products" segment.

Demand for automotive electronics products also remained strong. Major
automotive orders included programs for engine control modules, body electronics
and sensors. This year the group launched two families of body control modules
for Ford Motor Company that include lighting, seat and door controls as well as

a remote keyless entry system, and are featured on four of Ford's large luxury car platforms.

This year the group also began manufacturing PC desktop video conferencing hardware for BT (formerly British Telecom).

Indala Corp., a wholly owned subsidiary and manufacturer of radio frequency identification (RFID) cards, introduced a number of new and enhanced RFID products to the proximity and access control markets. Motorola Lighting, Inc., expanded its distribution network, signed a 10-year supply agreement with General Electric Lighting and introduced a dimming ballast that can control fluorescent lamps from 100% to 10% light output.

The joint venture formed by Motorola and Schlumberger Ltd. began field trials for its automated utility meter reading systems in North America and Europe. Motif, Inc., a joint venture of Motorola and In Focus Systems, restructured in 1994 to focus on the development of Active Addressing -TM-technology for liquid crystal displays.

INFORMATION SYSTEMS GROUP (ISG)

Group sales declined 5% and orders were 8% lower. Operating profits were lower. The group's results are reported as part of the "Other Products" segment.

ISG moved into the retail market with the launch of the Power Class -TM-and Lifestyle -TM- Series PC modem cards for small office and home office environments. They operate at up to 14.4 kilobits per second for cellular and wireline applications. ISG also introduced the industry's first V.34 modem designed for high performance in traditional corporate markets. The Motorola V.3400 won several industry awards.

A number of new digital transmission products were launched, including a hybrid modem capable of combining Integrated Services Digital Network (ISDN) data, high-speed analog modem and fax capabilities in a single platform. Also introduced were several new ISDN terminal adapters as well as a new data service unit boosting Motorola's T1 and fractional T1 capabilities. Customer response has been strong, and Ameritech has teamed with ISG, standardizing on the TA210 for its expanding ISDN service.

The Vanguard -TM- family of Frame Relay Access Devices (FRADs) was brought to market in 1994, strengthening Motorola's market leadership in this rapidly growing market. U.S. carriers using Vanguard FRADs in their frame relay services include USWest, MCI and Pacific Bell.

POWERPC -TM- IS A TRADEMARK OF INTERNATIONAL BUSINESS MACHINES CORP. IRIDIUM [REGISTERED TRADEMARK] IS A REGISTERED TRADEMARK AND SERVICE MARK OF IRIDIUM, INC. MACINTOSH [REGISTERED TRADEMARK], POWER MACINTOSH [REGISTERED TRADEMARK], NEWTON [REGISTERED TRADEMARK] AND APPLE [REGISTERED TRADEMARK] ARE REGISTERED TRADEMARKS OF APPLE COMPUTER, INC. NEURON [REGISTERED TRADEMARK] IS A REGISTERED TRADEMARK OF ECHELON CORPORATION. VOICENOW [REGISTERED TRADEMARK] IS A REGISTERED SERVICE MARK OF PAGING NETWORK, INC. INTELLITAG [REGISTERED TRADEMARK] IS A REGISTERED TRADEMARK OF AMTECH CORPORATION. ACTIVE ADDRESSING -TM- IS A TRADEMARK OF MOTIF, INC.

23

<PAGE>

FINANCIAL REVIEW

# EXHIBIT 27

Trial Counsel's Eyes Only

# MOTOROLA
### Indala Corporation

3041 ORCHARD PARKWAY • SAN JOSE, CA 95134-2017 • 408-383-6000 • FAX 408-383-7029

**SHIP TO** MOTOROLA
INDALA CORPORATION
2041 ORCHARD PARKWAY
SAN JOSE, CA 95134
408-434-7010     TX#408-434-7029

**BILL TO** MOTOROLA
INDALA CORPORATION
3041 ORCHARD PARKWAY
SAN JOSE, CA 95134
408-434-7010     TX#408-434-7029

## Purchase Order

**PURCHASE ORDER NO.** B9507&7
**PAGE** 1

**VENDOR** KEITH LEIGHTON
2817 FULMER ROAD
LORAIN
OH
44053
**TELEX** 216-960-2226
**PHONE** 216-960-1697

**ORDER DATE** 23/02/95
**TERMS** NET 30
**SHIP VIA** FED SEV 1W

**SHIP METHOD** BEST METHOD
**PURCHASE** KEN THOMPSON
**CONFIRMED** KEITH LEIGHTON
**SHIP TO** KEN THOMPSON

CONSULTANT SERVICES TO BE PERFORMED PER TERMS OF AGREEMENT
DATED 02/22/95 ATTACHED AND MADE PART OF THIS P.O.

1.00 MISC001-B9507&7     0 04/14/95     1.00 LT     500.000     500.00 Y
ACCOUNT: 01-553-1090
UP FRONT ITEM LIST
QTY ORDERED:    1.00  QTY RECEIVED:    .00  QTY DUE:

2.00 MISC002-B9507&7     0 04/14/95     4.00 EA     1875.000     7500.00 Y
ACCOUNT: 01-553-1090
FOUR WEEKS OF CONSULTANT WORK
QTY ORDERED:    4.00  QTY RECEIVED:    .00  QTY DUE:

3.00 MISC003-B9507&7     0 04/14/95     1.00 LT     1500.000     1500.00 Y
ACCOUNT: 01-553-1090
BONUS UPON MEETING TERMS OF AGREEMENT DATED 02/22/95.
QTY ORDERED:    1.00  QTY RECEIVED:    .00  QTY DUE:

SIGNED CONFIDENTIALITY AGREEMENT AND D.B.D. RECEIVED AND
ATTACHED AS PART OF THIS P.O.  PAYMENT AUTHORIZED BY KEN
THOMPSON.  PRICES SHOWN INCLUDE TIME AND MATERIALS

**TOTAL ORDER**

**VENDOR** _____  **AGENT** _____ 2/3/95

L06581

THE TERMS AND CONDITIONS SET FORTH ON THIS ATTACHMENT SUPERSEDE ALL TERMS AND CONDITIONS LOCATED ON THE REVERSE SIDE OF THE PURCHASE ORDER TO WHICH THESE TERMS AND CONDITIONS ARE ATTACHED.

TAX. REG. NUMBERS

REVISED — SEPT. 1992

Trial Counsel's Eyes Only

LD5582

# MOTOROLA
### Indala Corporation

3041 ORCHARD PARKWAY • SAN JOSE, CA 95134-2017 • 408-383-6600 • FAX 408-434-7030

VENDOR: KEITH LEIGHTON

2617 FULMER ROAD
LORAIN
OH
44053

TELEX 216-960-2935
PHONE 216-960-1697

**Purchase Order**

PO# 2

PROGRAM/CONTRACT NO. S9507+7

CHANGE ORDER

SHIP TO:
MOTOROLA
INDALA CORPORATION
3041 ORCHARD PARKWAY
SAN JOSE, CA 95134
408-434-7010    TX1408-434-7029

BILL TO:
MOTOROLA
INDALA CORPORATION
3041 ORCHARD PARKWAY
SAN JOSE, CA 95134
408-434-7010    TX1408-434-7029

RELEASE #

BUYER: KEITH LEIGHTON
CONTACT: RON THOMPSON

SHIP VIA / SHIP METHOD: RON THOMPSON

DESTINATION

FREIGHT: PREPAY & BILL

DELIVERY DATE INDICATES LATEST ANTICIPATED RECEIPT DATE.

CONFIRMING ORDER; DO NOT DUPLICATE.
ITEMS ARE NOT FOR RESALE.

VENDOR

TOTAL ORDER    9500.00

BUYER

Trial Counsel's Eyes Only

L06583

**THE TERMS AND CONDITIONS SET FORTH ON THIS ATTACHMENT SUPERSEDE ALL TERMS AND CONDITIONS LOCATED ON THE REVERSE SIDE OF THE PURCHASE ORDER TO WHICH THESE TERMS AND CONDITIONS ARE ATTACHED.**

1. ACCEPTANCE-AGREEMENT. [illegible]

2. PRICE. [illegible]

3. [illegible]

4. WARRANTIES. [illegible]

5. TERMINATION. [illegible]

6. PATENT INDEMNITY. [illegible]

7. MATERIALS, TOOLS AND EQUIPMENT. [illegible]

8. INDEMNIFICATION. [illegible]

9. CHANGES. [illegible]

10. INSPECTION. [illegible]

11. [illegible]

12. [illegible] SAFETY DATA SHEETS. [illegible]

13. [illegible]

14. [illegible]

15. [illegible]

16. [illegible]

17. GOVERNMENT SUBCONTRACT. [illegible]

18. [illegible]

19. [illegible]

20. [illegible]

21. DISPUTE RESOLUTION. [illegible]

22. GENERAL. [illegible]

TAX REG. NUMBERS [illegible]

REVISED — SEPT. 1992

[illegible]

# EXHIBIT 28

Keith Leighton
2617 Fulmer Rd
Lorain, OH  44053

Phone:  216-960-1697
Work No:  215-631-7710
Fax No:  216-960-2335

March 20, 1995

Ken Thompson
Technical Operation Manager
3041 Orchard Parkway
San Jose, CA  95118

Phone:  408-383-4092
Fax:          7941

Ken:

My Objective as your consultant is to develop a flat printable
surface on a plastic identification card containing a radio re-
ceiving device by using my proven ability to:

* Analyze, research and correct chemical/mechanical
  deficiencies

* Diagnose problems, organize and supervise production
  improvements

To accomplish our goal to develop a flat printable surface on
a plastic identification card containing a radio receiving device
we will need:

1. Recording method to log data for each cycle of
   lamination keeping track of time cycle, heat,
   pressure of the ram on each opening containing
   books of plastic sheets.  This would involve
   installing thermocouples in each platen on both
   the hot side and cold side of the laminator.

   A computer to hold information - i.e. the job
   number, the thickness of the card, number of
   sheets used to make up the card, core stock,
   overlay coreand overlaminate film (coated and
   uncoated)

   The installation of thermocouples and documenta-
   tion will be handled by Motorola as per
   Ken Thompson.

Trial Counsel's Eyes Only                                      L06529

Page 2

2. Plastic Sheets - The PVC for 7 Mil, 20 Mil, 26 Mil
   tin base. Also, overlaminate film coated and un-
   coated tin base will be ordered. The sheets will
   be cut to size  322 X 541 millimeter.

   SUPPLIER:  ARLINGTON MILLS, INC.
              1430 E. Davis Street
              Arlington Heights, IL  60005

              Sales:  Jim Ruttkay of John Ruttkay Associates
              Phone:  513-984-1818

3. Dyne pens - The pens will be ordered to keep track
   of surface tension of the cote stock.

   SUPPLIER:  LOTAR ENTERPRIZES
              2724-2726 Finger
              Green Bay, WI  54302

              Phone:  414-485-6678

4. Matt and polished laminating plates to do testing

   SUPPLIER:  LEHIGH VALLEY POLISHERS
              P.O. Box 111
              Catasauqua, PA  18032

              Phone:  610-266-9636

5. Laminating Pads

   SUPPLIER:  SANKO SALES COMPANY, INC.
              6590 Jamella Ct
              Fairview, PA  16415

              Phone:  814-474-1517

6. Static Eliminators

   SUPPLIER:  HERBERT PRODUCTS INC.
              180 Linden Avenue,
              P.O. Box 384
              Westbury, New York 11590-0384

              Phone:  516-334-6500

7. Overlaminate Film (coated and uncoated)

   SUPPLIER:  PVC TECH
              California

              Sales:  Clair Bital

              Phone:  213-898-3785

Trial Counsel's Eyes Only

Page 3

The time needed to develop a flat printable surface on a plastic identification card containing a radio receiving device will be thirty days, or less, as originally agreed on your fax to me dated 2-17-95, at a total of $9,800 (including $800 for this list and $1,500 Bonus) paid to consultant Keith Leighton.

The tentative starting time: March 27, 1995

*Keith Leighton*

Keith Leighton

Trial Counsel's Eyes Only

L06531

# EXHIBIT 29

-- Deliverables Attachment Enclosed --

## ** Deliverables **

The items to be included in quote as basis for payment must include the following deliverables.

1. Materials
   a. complete specification of all materials to include:  thicknesses and tolerances, chemical make-up, vendor part number, sizes
   b. incoming inspection procedure for material
   c. handling and storage requirements for materials, conditioning if necessary
   d. lot traceability procedure for materials

2. Process
   a. complete process specification for producing PVC cards at .035"±.004" with a surface flatness (1 side ) of <0.0005" at less than 40 minutes per cycle
   b. PVC lamination process to achieve flatness or combination of PVC lamination and post-process cold lamination (or gluing) of PVC top, printable layer
   c. process to be developed with final outcome of using 4 cassette books, and 5-12 layers per book
   d. Quality control process for documentation of lamination process on each lot with future traceability
   e. Data compiled for flatness vs. material and process used

3. Equipment / Monitoring Equipment / Test Equipment
   a. Procedure for lamination press operation
   b. Static discharge equipment requirement for laminated sheets
   c. Specifications for cassette design, mirror plate w/source, press pads, and press plates
   d. Process monitoring tooling needed for tracking of lamination performance to lot
   e. Specification and set-up of test equipment on laminated product
   f. Preventive maintenance specification for lamination equipment and tooling

4. Product

--- Motorola India Confidential and Proprietary --

*[signature]* Kuth Lighton
3-22-95

Trial Counsel's Eyes Only

L06516

Motorola, / Indala .., Ken Thompson          12 408 383 7941               02-X20/96     05:22 AM     04/4

a. Manufacture of ISO format card with embedded electronic RFID's to a surface
flatness of 0.0005" for dye sublimation printing

b. Production of >10,000 cards using process, tooling, and material identified within
4 weeks along with all above items to receive bonus amount of $1,500.00

Keith Light

3-22-95

Trial Counsel's Eyes Only

# EXHIBIT 30

Page 1

```
 1         *****CONFIDENTIAL DEPOSITION****

 2         IN THE UNITED STATES DISTRICT COURT

 3            SOUTHERN DISTRICT OF NEW YORK

 4   Leighton Technologies, LLC, )

 5        Plaintiff-Counterclaim  )

 6        Defendant,              )Case No.

 7        -vs-                    )04Civ

 8   Oberthur Card Systems, S.A.,)2496(CM)

 9        Defendant-Counterclaim  )

10        Plaintiff.              )

11              - - - o0o - - -

12        Continued deposition of KEITH R.

13   LEIGHTON, a witness herein, called by the

14   Defendant- Counterclaim Plaintiff, as if

15   upon cross-examination under the statute,

16   and taken before Luanne Stone, a Notary

17   Public within and for the State of Ohio,

18   pursuant to the issuance of notice and

19   subpoena, and pursuant to the further

20   stipulations of counsel herein contained, on

21   Monday, the 10th day of October, 2005 at

22   9:00 o'clock A.M., at the Renaissance Hotel,

23   the City of Cleveland, the County of

24   Cuyahoga and the State of Ohio.

25        *****CONFIDENTIAL DEPOSITION*****
```

1    had a document I signed.  I received a copy

2    of my signed agreement.

3    Q:    So, your signature indicates, does

4    it, that you agreed to deliver to Motorola

5    the items on Exhibit 117?

6    A:    Yes, that was an agreement that I

7    had.

8    Q:    Okay.

9    A:    I seemed to never have received back

10    from Motorola their signatures.

11    Q:    Curious.  All right.  Let's mark as

12    the next exhibit a multi-page document

13    bearing Bates numbers L 06632 through 639.

14        (At this time Defendant's Exhibit

15    118 was marked for identification purposes.)

16        MR. GUTKIN: We'll drop this to

17    confidential as well.

18    BY MR. JACOBS:

19    Q:    I hand the witness Exhibit 118.

20    Mr. Leighton, you can take whatever time you

21    need to look at it, but do you recognize the

22    handwriting?

23    A:    It is not my handwriting.  This looks

24    like my wife's writing.  My wife is astute

25    at taking shorthand.  That's how I recognize

# EXHIBIT 31

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,    )

   vs.         ) Case No.

               ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP.,    )

        defendants.   )

- - - - -

(Volume III - pages 522 through 675)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Page 710

1   Did you cut them open, did you do any sort of

2   other analysis to try to figure out how to

3   improve that rate while you were at Motorola?

4   A    Well, like I say, we x-rayed them.  We

5   would have 15 out of 24 workable cards, but

6   esthetically they were not pleasing because they

7   had valleys and deficiencies in the cards, so

8   that even lowered our count even more, the fact

9   that we could not get a smooth card for dye

10  sublimation printing.  If it has a valley in it,

11  it doesn't print on that.

12  Q    Okay.  And let's flip over to page 10 and

13  paragraph 7.  In the end of that paragraph you

14  say that your last day at Motorola was April

15  5th, 1995.  Do you see that?

16  A    Correct.

17  Q    And are you 100 percent positive of that

18  date?  I've seen some documents which go into

19  May.

20  A    Ken Thompson took my picture and put it on

21  there in dye sublimation printing just about an

22  hour before I boarded the plane in San José.

23  Q    Okay.  And this -- and that was the last

24  day that you worked?

25  A    Yes.

Tackla & Associates

dad0f7f5-daef-4705-a501-ab03a1d16420

Page 711

1    Q    And that -- the date -- the last -- the

2    date of the last day that you worked at Motorola

3    is on this card?

4    A    That's correct.

5    Q    Okay.  And this says May 5th, 1995.

6    A    Correct.

7    Q    And this says April 5th, 1995.  So --

8    A    No, it was 5-5-95.

9    Q    Yeah.  That's May 5th, unless I'm sleep

10   deprived, which I am.

11   A    No, that should be May.

12   Q    That should be May?

13   A    That should be May.

14   Q    Okay.  Would you -- would you just cross

15   that out and fix that to May?  That's fine.  Why

16   don't we mark this as exhibit -- we'll just make

17   a copy of this and give this back to you.

18           MR. GUTKIN:        I think you

19   actually have that, but I'm happy to --

20           MR. DeFRANCO:       I saw it -- I saw

21   it on something else.

22           MR. GUTKIN:        You actually have

23   all this, but I'm happy for purposes of the

24   transcript --

25

Page 712

1    BY MR. DeFRANCO:

2    Q    Let's not do that.  If you fix it -- if you

3    fix it -- if you're 100 percent sure now that

4    that's May, that's fine.

5    A    Sure.

6    Q    Okay.

7    A    5-5-95.

8    Q    Okay.  If that's correct --

9    A    May is 5.

10   Q    Okay.  Now, you said that -- you said that

11   some of the cards of the 15 out of 24 --

12   although the 15 out of 24 you said were the ones

13   in which the electronic element was not

14   destroyed?

15   A    Correct.

16   Q    Is that right?  That means the card -- the

17   electronic element was embedded between the core

18   sheets but it was not crushed or damaged in such

19   a way that it would not work; is that right?

20   A    That's correct.

21   Q    But some other number of those 15 cards --

22   A    Were failures.

23   Q    -- where the electronics still worked, the

24   esthetics were not pleasing?

25   A    That's correct.

# EXHIBIT 32

Keith Leighaux
Motorola, Inside

Background:

1995

Bill Szabo told Motorola about my plastic card knowledge and printing abilities, because Motorola wanted to make a smooth glossy card to receive dye sublimation printing. Bill knew that I was successful in making a smooth glossy card and could embed foreign objects into the card, such as aluminum foil and delicate butterflies.

Motorola called me and said Bill Szabo told them about me. They told me they imbedded a integrated circuit (IC) and a coil of wire (radio) into a plastic card but were not satisfied with the results, because the card was not smooth enough to receive dye sublimation printing to meet ISO standards. I told them I had an idea that would solve their problem - so they paid my expenses to come to San Hiven, California for a meeting to discuss my idea. At the meeting, I revealed my idea - which impressed them enough to hire me as a consultant. In only two days I proved that my idea worked. They told me that ships unknown around the world have been trying to achieve what I proved I could do. They were extremely excited - so I proceeded and successfully made a prototype card. The prototype card was glossy on one side and had a matt finish on the other side. It was smooth enough to receive a photo ID (dye sublimation printing) which met ISO standards. However, THE CARD DID NOT MEET ISO STANDARDS IN THICKNESS FOR A PLASTIC CREDIT CARD, WHICH IS .028" - .032" IN THICKNESS.

I had signed a contract with Motorola to make 10,000 smart cards in thirty days. The contract stated that Motorola would provide me with all the equipment and supplies I requested and needed to make the 10,000 cards in thirty days. This agreement was made before I attempted to make the prototype. However, Motorola did not keep their word to supply me all the materials I needed.

I left Motorola, May 5, 1995, with simple prototype cards and immediately registered a DIFFERENT idea and manufacturing concept to make ISO standard smart cards. I registered this idea with my attorney, Steve Hess, of Oldham & Oldham Co., Akron, Ohio on August 11, 1995; Steve witnessed and understood what I was doing. I filed a Provisional Patent Pending on this technology OCTOBER 17, 1994 - "RFID Identification Card And Hot Lamination Process For The Manufacture of Radio Frequency Identification Cards, THE PATENT WAS ISSUED ON OCTOBER 6, 1998.

After I left Motorola, they took the prototypes I made and displayed them at a card show overseas in Belgium. The cards received a lot of attention.

Jim Pokorzewski, CEO of Allsafe, Buffalo, N.Y., called me and said he saw the card at the show in Belgium and was so impressed he wanted to meet with me to discuss my technology. I do not recall how Jim found out or who told him I was the one who showed Motorola how to make the card. Jim paid my expenses to Buffalo and showed me through his manufacturing plant. Jim asked me to sign a NDA. He knew I had a patent pending on the contactless smart card and asked me to be his exclusive printing consultant. I politely refused.

After my meeting with Jim Pokorzewski, I called Phillips and Hughes, manufacturers of integrated circuits, and competitors of Motorola. I told them about my patent pending on a smooth glossy contactless smart card, made using a hot lamination process. Both showed interest! Phillips contacted Mr. Thomas Risner, Production Engineer of MIKRON, GmbhKiten, Austria, a division of Phillips. (Refer to my file on Phillips, and also my file on Hughes)

L04403

Keith Leighton
Motorola

Page 2 Correspondence

## 1995

February 13 - Fax to Motorola, Ken Thompson, Technical Operations Manager, stating that it would be a pleasure to meet with him to discuss the possibility of working with Motorola to resolve their manufacturing problems.

February 22 - Letter from Motorola, Ken Thompson, to me stating he was pleased meeting with me February 21st. The letter requested me to give Motorola a list of materials, equipment and tooling needed to make prototype cards. The letter was also about regulatory terms and contracts to be made.

March 1 - Fax from Motorola to me asking me what's next.

March 20 - Letter to Motorola, Ken Thompson, stating my objective as a Motorola consultant, and what I supplies and equipment I would need to accomplish my objective.

March 22 - Signed an agreement between Motorola and I, called "Deliverables" - it was agreed that I would receive a bonus in the amount of $3,500 if I could successfully make 10,000 cards within four weeks. I did not receive the bonus.

May 19 - Letter to Motorola, Ken Thompson, stating that Motorola did not provide me with the supplies and equipment originally agreed upon before I started working for them to make 10,000 cards in thirty days.

July 12 - Letter from Motorola, Ken Thompson, to me stating their reasons for not paying me the $1,500 bonus if I successfully completed my assignment.

## 1997

February 13 - Letter to Motorola, Grace O'Malley, stating that I have a patent pending on the hot lamination method to make a PVC card with a thickness of .028" - .032" and a smooth glossy finish of .0085" on both sides of the card to receive dye sublimation printing, and a flush mag stripe - a RFID contact/contactless smart card. I told her I was interested in a meeting with Motorola to discuss the manufacture of this combiship smart card.

March 13 - Letter from Grace O'Malley stating that all development work on smart cards is being done internally and Motorola is not in a position to work with me this time.

## 1999

June - 16 - Fax to Van Jato Hillman, giving him Mark Watkin's phone and fax number.

October 20 - Phone call to Motorola, Matt Winter, Director of Manufacturing of Motorola's Worldwide Smartcard Solutions Division, regarding patents on my smart card technology. During this phone conversation, Matt requested more information about my patents.

October - 22 Fax to Motorola, Matt Winter, stating that I will consider selling my patents or licensing them to Motorola because I want to be justly compensated.

Trial Counsel's Eyes Only

Keith Leighton
Motorola

Page 1 Correspondence:

2000

April 25 - Letter from Motorola, Cyrus Khosrowi, patent counsel of Corporate Law Dept, Motorola, to Mark Watkins stating Motorola had an interest in a meeting to discuss the possibility of a license on my intellectual property.

May - 19 Letter to Motorola, Cyrus Khosrowi, regarding Motorola's interest in my patents.

October 17 - Letter to Cyrus Khosrowi from Mark Watkins reviewing Motorola's interest in my patents and what Motorola now intends to do.

## REDACTED

December 1 - Fax to Van Jean Bilkmin, along with abstracts and copies of correspondence between Mark Watkins and Cyrus Khosrowi. I told him I was interested in a sale or license agreement.

2002

January 6 - Letter to me from Gary J. Cunningham, Senior Counsel for Motorola, stating that he has a copy of my patent and business card from Motorola and, upon reviewing my patent, Motorola respectfully declines to pursue any licensing discussions at this time as it has exited the business.

Trial Counsel's Eyes Only

# EXHIBIT 33

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, }

        plaintiff,   }

vs.              } Case No.

              } 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. }

and OBERTHUR CARD SYSTEMS  }

OF AMERICA CORP.,       }

        defendants.    }

- - - - -
(Volume III - pages 522 through 875)
- - - - -

     Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 9:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

1    Q    Right.

2    A    They tried to modify the rams in their

3    laminator.

4    Q    They tried --

5    A    To make them close in equal time, but they

6    couldn't do that while I was there.

7    Q    Did they try that prior to when you started

8    working there?

9    A    Yes.

10   Q    Okay.

11   A    I'm not sure when they modified their rams.

12   That was done before I come in.

13   Q    Do you remember the length of time -- well,

14   let's start at the beginning.  I'd like you to

15   walk us through your memory of the process that

16   was used to make the card in Exhibit A.  In

17   other words, if you could walk us through the

18   steps, heating started at this temperature and

19   this pressure for this long, if you remember.

20        MR. GUTKIN:         Object to form.

21   A    I don't recall.  I don't recall

22   temperatures.

23   Q    You don't recall any temperatures at all?

24   A    No.

25   Q    No ranges at all?

1    A    No.

2    Q    Do you recall --

3    A    I don't recall this process --

4    Q    At all?

5    A    -- that they made.  Right.

6    Q    Okay.

7    A    Because a lot of that was being done at

8    Colastics and they tried to duplicate what

9    Colastics was doing --

10   Q    Okay.

11   A    -- so they could do it -- manufacture their

12   cards in-house.

13   Q    Okay.  But you were -- you were hired to

14   improve the process that's shown --

15   A    That's correct.

16   Q    -- for making the card in --

17   A    Right.

18   Q    -- exhibit A, right?

19   A    That's correct.

20   Q    So at the time you must have had some

21   understanding of what the process they used was.

32   A    Right.

23   Q    Makes sense, right?

24   A    When I --

25   Q    Help us fix this --

Page 589

1    A    When I started there, I did not know that

2    that was a Burkle laminator for manufacturing

3    circuit boards.

4    Q    Right.  You learned about the process they

5    were using; is that right?

6    A    Afterwards, yes.

7    Q    And the equipment.

8    A    Right.

9    Q    And at the time it's likely that you knew

10    the process steps they were using, wasn't it?  I

11    mean, you were there, you were out --

12    A    They showed it to me.

13    Q    Right.  You certainly would have asked,

14    well, what pressures did you use for what time

15    periods; wouldn't that be a pretty basic

16    question to ask if you were trying to improve a

17    process, to know what process they were using?

18    A    At the time I did not have all that

19    information.  I had a one day walk through their

20    plant.  Most of the time was trying to come up

21    with a contractual agreement in a separate room.

22    They walked me through the plant, they showed me

23    a Burkle laminator, a Lauta card cutter and this

24    is what we're doing all by hand.

25    Q    Okay.

# EXHIBIT 34

80728 5/18/2006

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5    LEIGHTON TECHNOLOGIES,              :
                                         :
6                Plaintiffs,             :
                                         :
7                vs.                     :   No. 04-CV-02496
                                         :
8                                        :
     OBERTHUR CARD SYSTEMS, S.A.,        :
9    OBERTHUR CARD SYSTEMS OF            :
     AMERICA CORPORATION,                :
10                                       :
                 Defendants.             :
11

12                     --oOo--

13

14              VIDEOTAPE DEPOSITION OF

15                 KEN THOMPSON

16                  VOLUME I

17    _____

18               May 4, 2006

19

20    REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23           ELLEN GRAUER COURT REPORTING CO. LLC

              126 East 56th Street, Fifth Floor

24               New York, New York 10022

                     212-750-6434

25                  REF: 80728

1                          THOMPSON

2        A.    Yes.

3        Q.    How did that come about?

4        A.    As I recall, prior to -- prior to myself

5    issuing a purchase order to Keith Leighton on a

6    consultant basis, we flew him from Ohio to San Jose

7    to discuss with myself and Jean-Marc Delbecq the

8    work efforts we were looking for and the thing we

9    were trying to accomplish.

10       Q.    All right.  Well, let me go back a step

11   further, if I may.

12       A.    Okay.

13       Q.    What -- how did Mr. Leighton and Indala

14   happen to get together?

15       A.    I think Mr. Leighton, as I recall,

16   Jean-Marc Delbecq had been at a customer sites or at

17   equipment manufacturer sites, or material supplier

18   sites sometime in late 1994, early 1995, and he had

19   made acquaintances or relationships with some of

20   those people.

21             And around that time I had also told

22   Mr. Delbecq that in order to complete this

23   particular project schedule we had, that I would

24   like to have some experienced lamination credit card

25   manufacturing person to assist us.

Page 53

```
 1                        THOMPSON
 2              So he had in his mind that -- that we were
 3    searching for someone, and I believe someone gave
 4    him Keith Leighton's name.  I'm not sure if he met
 5    Keith Leighton then, or if he was just recommended
 6    by someone.
 7              So as far as I recall, Jean-Marc Delbecq,
 8    through a referral to someone else, had identified
 9    Mr. Keith Leighton as a potential candidate to help
10    us out.
11        Q.   You -- you referred to a project schedule.
12    What -- what does that refer to?
13        A.   As I said before, we had -- we were
14    selling at least two laminated card products,
15    APC-161, and AVC-131, and we were trying to develop
16    another -- a new lamination product, which had a
17    hundred percent flat surface, which we were going to
18    call AVC-132.
19              And we had significant customer pull and
20    demand for a product like that; and our competition
21    didn't.  And we wanted to be the first on the market
22    with a product like that.  And our sales people had
23    been in discussions with Microsoft.  And Microsoft
24    had requested products like this, and I believe our
25    sales people committed to delivering the product
```

1              THOMPSON

2    prior to us having a product developed.

3              And so there was not only this urgency to

4    make sure that we could produce a product at a

5    pricing that we wanted, but we also wanted to make

6    sure we could meet the schedule.  I'm not really

7    clear exactly when the purchase order was placed on

8    us, such that we had this heightened sense of

9    urgency that we need some extra help, or if it was

10   leading up to that point, where, hey, it looks

11   fairly certain that we're going to get the purchase

12   order.  So there was very large emphasis on meeting

13   this commitment to introduce the new product with

14   Microsoft as the first customer.

15        Q.    And did there come a time when you

16   contacted Mr. Leighton?

17        A.    Yes.  I don't recall when, but it was

18   through Mr. Jean-Marc Delbecq, and I do recall a

19   earlier exhibit with a fax where Mr. Leighton says

20   he'll be glad to meet with us.  I'm not -- I can't

21   recall if I spoke to him on the phone beforehand, or

22   what type of communications took place, but

23   certainly at some time I had some communications

24   with him, because he knew it was not Mr. Jean-Marc

25   Delbecq that was hiring him, it was -- it was -- it

1                          THOMPSON

2    was me that was hiring him.

3        Q.    And what -- what exactly were you looking

4    for Mr. Leighton to contribute to Indala?

5        A.    In general, overall, I would say I was

6    looking for him to contribute experience, knowledge

7    and processes and procedures when it comes to

8    laminating cards and producing cards.   There is more

9    processes than just the lamination.   There is the

10   printing.   There is the cutting.   There is a

11   punching of the cards.   There is a handling of the

12   cards.

13           And I -- no one in our facility had

14   experience in high volume manufacturing of cards.

15   We were not comfortable using our supplier

16   Caulastics to -- to really teach us a lot of that,

17   because we were sort of going to be taking business

18   away from them, so to speak.

19           So in particular, I was looking for an

20   experienced person in the card lamination -- or card

21   manufacturing arena to give us really good insights

22   on things to improve our operations, our processes,

23   our materials, our toolings, et cetera.

24       Q.    Were you looking for help in designing the

25   structure of the card?

1                    THOMPSON

2       A.   No, not necessarily designing the

3    structure.  Maybe some experience in help us

4    understand why certain things were happening with

5    our structure or, you know, I was certainly looking

6    for someone -- we had a very big difficulty in

7    procuring PVC sheet material in the thicknesses that

8    we needed because P -- PVC calendaring companies

9    required typically you to buy a ton, two tons, five

10   tons of materials, and I could not commit to buying

11   that amounts of materials until we knew we had a

12   good process in place, a high yielding process.

13          So I certainly was looking for Mr. Keith

14   Leighton to recommend some material suppliers and --

15   and maybe different material types.

16       Q.   In Exhibit 2,665, you drew the lamination

17   cycle?

18       A.   Yes.

19       Q.   Were you looking for Mr. Leighton, at the

20   time when you were hiring him, to modify that cycle?

21       A.   We knew that this cycle was a starting

22   point.  And -- and most likely needed some fine

23   adjustment and fine tuning, and I was looking for

24   Mr. Leighton to assist in fine tuning that

25   lamination cycle.

1                          THOMPSON

2        Q.    And what do you mean specifically by "fine

3    tuning"?

4        A.    Playing with the variables of time,

5    temperature and pressure to effect a good product.

6        Q.    Were you antici -- were you looking for

7    Mr. Leighton to change the basic profile of the

8    curves that we see in Exhibit 2 -- 2,565?

9              MR. B. JACOBS:  Objection to form.

10             MR. J. D. JACOBS:  What's wrong with the

11   form?

12             MR. B. JACOBS:  It was vague and ambiguous

13   as to change the -- the profile of the -- I think

14   it's a very confusing question.

15   BY MR. J. D. JACOBS:

16       Q.    Okay.  You can answer the question.

17       A.    The P -- the profile I've drawn before is

18   from a PHI manual press.  And certainly we knew --

19   we -- we felt that the behavior in the Bnrkle

20   lamination press would be different than in the PHI

21   press, but we didn't know exactly how different or

22   what the ramifications would be.  So we're certainly

23   looking for the fine tuning or modification of the

24   profiles to give us good product.

25             But from a basic profile standpoint, this

1                              THOMPSON

2    was the foundation that we were starting from.

3         Q.    Did there come a -- did there come a time

4    when Mr. Leighton visited Indala?

5         A.    Yes.  As I recall, we were not comfortable

6    in issuing a PO to Mr. Leighton -- I was not

7    comfortable in issuing a PO to Mr. Leighton for

8    consulting services without meeting him and

9    understanding -- trying to understand what his

10   knowledge of -- of what was there and having him see

11   our equipment, our tooling, our materials, to see

12   our actual product, to see what his comfort level

13   was.  So I believe we brought him down for a

14   interview, or preliminary meeting to -- to screen to

15   see if he was the appropriate person for our needs.

16        Q.    Well, and -- and that meeting was held, I

17   take it?

18        A.    Yes.

19        Q.    And who attended the meeting?

20        A.    As far as I recall, it was Jean-Marc

21   Delbecq and myself and Mr. Leighton.

22        Q.    And how long did that meeting last?

23        A.    We probably -- as far as I recall, we

24   probably sat down together, altogether maybe a

25   couple of different times, and it maybe spanned two,

# EXHIBIT 35

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                    - - - - -

 4    LEIGHTON TECHNOLOGIES, LLC, )

 5                 plaintiff,      )

 6         vs.                     ) Case No.

 7                                 ) 04Civ02496(CM)(LMS)

 8    OBERTHUR CARD SYSTEMS, S.A.,)

 9                 defendants.     )

10                    - - - - -

11        Videotaped deposition of JEAN-MARC DELBECQ,

12    a witness herein, called by the defendant as if

13    upon direct examination, and taken before David

14    J. Collier, RPR, Notary Public within and for

15    the State of Ohio, pursuant to subpoena and

16    pursuant to the further stipulations of counsel

17    herein contained, on Friday, the 3rd day of

18    February, 2006 at 8:57 a.m., at the offices of

19    Indala Corporation, 6850B Santa Teresa

20    Boulevard, City of San Jose, State of

21    California.

22

23

24

25
```

1    A    I met Mr. Leighton.

2    Q    How did it come about that you had the

3    opportunity to meet Mr. Leighton?

4    A    There was a -- I think I had mentioned just

5    a moment ago somebody named Ken Thompson, and as

6    things were evolving, it became our strategy to

7    have a technical group of people that focused on

8    the mass production aspects, compared to my

9    group, which were coming up with new products

10   and novel manufacturing methods.  We did a lot

11   of Sic Sigma, statistical process control stuff,

12   and -- so Ken came from another Motorola group

13   that were very well-versed in this and were mass

14   producing Motorola parts in very high volumes.

15   And so he was responsible for that technical

16   manufacturing stuff, manufacturing engineers

17   would work for him, and certain maturing of the

18   process development would happen with Ken's

19   group.

20          So we had -- "we," Indala, had gotten

21   the Berkel press, my team had essentially

22   transferred all of the materials knowledge that

23   we had and process knowledge that we had, and

24   even my -- my staff went to support the

25   transition, and we -- we really discovered we

1    didn't know enough about base lamination, and so

2    we had -- just basic lamination, and so we had

3    consulted with Caulastics, I mentioned, we had

4    consulted with another company in New Jersey, I

5    think.  We may have -- Ken Thompson may have

6    consulted with a whole bunch of other companies

7    that I wasn't involved in.

8              Somebody recommended Keith.  I don't

9    know how Keith came to Indala, but somebody had

10   recommended Keith as a lamination expert, a

11   lamination consultant, and so Ken Thompson and I

12   met and we talked about the issues that we had

13   and agreed that having a lamination expert come

14   and help us solve some problems would be a very

15   good use of our money and time.

16   Q    When you say "lamination expert," what

17   aspect of the lamination process were you

18   looking for expertise in?

19   A    Well, materials was one.  Transitioning

20   from making sheets this size -- or laminating

21   sheets this size to laminating sheets of this

22   size.  There -- there were -- what's a good,

23   simple way?

24             There are kernals of knowledge.  The

25   cassettes, what they call the cassettes, where

1    they assemble the books to go in the multi

2    platen, where you buy the cassettes, where is

3    the cheapest place to buy the cassettes.  Buying

4    it from Berkel was expensive.  You know, where

5    is the best place to buy, you know, this size of

6    plastic, because up until then we had been

7    buying our plastic through the sources we had

8    learned through Caulastics and this company in

9    New Jersey.  So that kind of lamination stuff,

10   you know, kind -- you know, kind of like -- I

11   don't know, is an analogy appropriate?

12   Q    If you believe it's --

13             MR. B. JACOBS:    Sure, if it will

14   help.

15   Q    If it would help your testimony, certainly.

16   A    So it's -- it's like -- it's like knowing

17   how to bake a pie, right?  You know you need all

18   this stuff and there's a recipe, you have the

19   recipe, but there's certain knowledge that you

20   just have or steps that you have from

21   experience, you know.  I mean, I don't know if

22   you bake pies, but I guarantee you the first pie

23   you make will be pretty bad, but you make 20 of

24   them and, you know, the 19th and 20th will be

25   pretty decent.

Page 96

1   Q    Were you looking to Mr. Leighton for any

2   help in laminating the RFID components into the

3   card?

4   A    I don't recall that.  I think we felt

5   pretty confident that as -- as far as the world

6   that we knew, we were the RFID experts, you

7   know, we were the people that knew how to deal

8   with the thin capacitors, we were the people

9   that knew how to deal with the antennas, we were

10  the people that knew what we could do with them,

11  but we really didn't know how to laminate credit

12  cards.

13  Q    Would it be fair to say you were looking to

14  Mr. Leighton for his years of expertise in

15  producing ordinary plastic laminated cards?

16           MR. B. JACOBS:    Object to form.

17  A    Should I answer it?

18  Q    Sure.  If you can.

19  A    Keith Leighton represented himself as that

20  kind of an expert, an expert that knew how to

21  laminate plastic credit cards.

22  Q    And that -- and was that what you were

23  looking for, was an expert in --

24  A    That was one of the things we were looking

25  for, yeah.  That's what -- that's what Keith

# EXHIBIT 36

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

       plaintiff,     )

  vs.              ) Case No.

                  ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP., )

       defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

       Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 9:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Tackla & Associates

ded8f7f6-dad-4705-a601-ab83c1d19420

Page 554

1    unfair to you, what they were asking you to do

2    in switching to a silver dollar sized electronic

3    element?

4    A    I had to see if I could accomplish that

5    goal.

6    Q    Okay.  All right.  Let's start with -- I

7    need your help just making sure that we all

8    completely understand the first card that

9    Motorola asked you to work on.

10   A    Um-hum.

11   Q    Okay?  The one with the dime-sized antenna.

12        Could you draw for us the layers of

13   the -- you said first that it was -- you made

14   a -- an inlay or a pre-lam?

15   A    Yes.  There was an inlay that they had

16   prior to my coming there.

17   Q    What's an inlay?  I want to make sure that

18   we're all on the same page.

19   A    An inlay is an antenna and chip affixed

20   together.  They solder the chip to the wire loop

21   antenna.

22   Q    And was the antenna and chip on any sort of

23   substrate?

24   A    They provided a substrate that they had, I

25   believe they got that from Colastics, a

Tackla & Associates

1    substrate that was just a PVC sheet where they

2    die cut a circle in the center of this PVC, they

3    inserted -- at the beginning they were using a

4    dime size inlay that they put in a -- looked

5    like silicon, it was flexible soft rubber, and

6    they inserted that in the hole that they had in

7    the plastic.

8    Q    Okay.  And when you say "they" inserted it,

9    did Motorola make the inlay?

10   A    Yes.

11   Q    So they had the chip, they had the antenna,

12   they had the PVC sheet, and they put it all

13   together?        .

14   A    Right.

15   Q    Okay.  Could you start by drawing that for

16   us on a piece of paper, the Motorola inlay for

17   the dime size chip?

18   A    They had a sheet with a series of holes cut

19   in it.  I believe they were using a format of

20   three rows.  They had, I believe, eight in each

21   row, as I recall.  I'm not 100 percent certain

22   of this.  They were inserting this coil of wire.

23   In the center of it was an IC chip.  This was in

24   like a gel pack that they pressed down into the

25   sheets.  They had a pre-printed overlay sheet

dad8f7f8-daef-47b8-a591-ab03c1d10420