# EXHIBIT 37

1            *****CONFIDENTIAL DEPOSITION****

2        IN THE UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    Leighton Technologies, LLC, )

5        Plaintiff-Counterclaim   )

6        Defendant,               )Case No.

7        -vs-                     )04Civ

8    Oberthur Card Systems, S.A.,)2496(CM)

9        Defendant-Counterclaim   )

10        Plaintiff.              )

11              - - - oOo - - -

12        Continued deposition of KEITH R.

13    LEIGHTON, a witness herein, called by the

14    Defendant- Counterclaim Plaintiff, as if

15    upon cross-examination under the statute,

16    and taken before Luanne Stone, a Notary

17    Public within and for the State of Ohio,

18    pursuant to the issuance of notice and

19    subpoena, and pursuant to the further

20    stipulations of counsel herein contained, on

21    Monday, the 10th day of October, 2005 at

22    9:00 o'clock A.M., at the Renaissance Hotel,

23    the City of Cleveland, the County of

24    Cuyahoga and the State of Ohio.

25    *****CONFIDENTIAL DEPOSITION*****

1    Q:    "At the meeting, I revealed my idea

2    which impressed them enough to hire me as a

3    consultant."

4    A:    Correct.

5    Q:    What idea did you tell them at the

6    meeting?

7    A:    I told them to scrap their idea that

8    they had.  Everything that they were doing

9    was wrong.  They were cutting holes in the

10   plastic and putting in the radio that had

11   been encapsulated by a gel and placed in

12   there to have a different thermal melting

13   point which was not at the same melting

14   point as their PVC that they were trying to

15   laminate, and I told them that I would be

16   using different -- entirely different

17   temperatures and plastics than they were

18   using.  I would be changing the plastics,

19   and they liked the idea and concept that

20   they had a new way to attack this plan in

21   being able to come up with a smooth card.

22   Q:    Was that the entirety of your idea

23   that you told them?

24   A:    Yes.

25   Q:    Were you more specific as to what

TACKLA & ASSOCIATES

# EXHIBIT 38

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

             plaintiff,     )

vs.                ) Case No.

                 ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP.,      )

            defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Tackla & Associates

ded6f7f6-daef-4705-a581-eb03c1d19420

Page 619

1    A    That's correct.

2    Q    Was the antenna and coil enclosed in a gel?

3    A    No.

4    Q    All right.  What was the antenna and coil

5    placed on?

6    A    We affixed it to the bottom sheet with a

7    glue stick.

8    Q    To the bottom core sheet --

9    A    That's correct.

10    Q    -- that you labeled?

11         So were there any other changes made

12    to the structure of the card that you made for

13    Motorola?

14    A    Actually, after making a pre-lam with no

15    cutouts we then laminated that first with two

16    sheets, being a pre-lam, cooled down, squared

17    the sheet up again, put their printed sheet on

18    top of it and over-laminate film and went back

19    into the laminator.

20    Q    Okay.  All right.  Let me -- let me break

21    it down, make sure I understand, okay?

22         You've drawn in Exhibit A, the bottom

23    half, the layers of the card that Motorola had

24    when you first arrived.  Do you see that?

25    A    Right.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

1    Q    And you made some changes to those layers

2    in the card that you redesigned for them; is

3    that true?

4    A    Right.

5    Q    And one of the changes that you made was

6    you eliminated the holes or the recesses or the

7    cutouts that were in the core sheet with the

8    inlay; is that right?

9    A    That's correct.

10   Q    And you placed the electronic element

11   directly on the core sheet?

12   A    That's correct.

13   Q    Is that right?  You got rid of the gel.

14   A    Got rid of the gel, got rid of the holes.

15   Q    Okay.  Did you change the layers of the

16   card in any other way other than what you just

17   described?

18   A    I made a two-piece pre-lam first and

19   laminated it.

20   Q    Okay.  And the two-piece pre-lam included

21   the core sheet with the electronic element glued

22   on top?

23   A    That's correct.

24   Q    And another core sheet on top of that?

25   A    That's correct.  Two core sheets.

Tackla & Associates

ded8f7f6-daef-4705-a501-eb03c1d19420

Page 621

1    Q    All right.  That was the pre-lam you made?

2    A    That was the pre-lam.

3    Q    And to make a final card you put --

4    A    Went back into the laminator again with a

5    printed sheet on top of that along with a

6    over-laminate film.  So we had four additional

7    sheets, two over-laminate film and one printed

8    core and one blank core.

9    Q    Could you just draw that and label those

10   for us --

11   A    Okay.

12   Q    -- for a minute?

13   A    I'm going to illustrate --

14   Q    And if you could label --

15   A    -- the bottom sheet.

16   Q    Go ahead.

17        MR. DeFRANCO:    We'll take a short

18   break while the witness is drawing that.

19             - - - - -

20        (Recess had.)

21             - - - - -

22        MR. DeFRANCO:    If you would mark

23   this as Exhibit C, just put a sticker down

24   toward the bottom, because we're probably going

25   to draw some more on that.

Page 622

1              - - - - -

2              (Defendant's Exhibit C

3          marked for identification.)

4              - - - - -

5    BY MR. DeFRANCO:

6    Q    Mr. Leighton, what you've drawn as

7    Exhibit C is the first card that you made for

8    Motorola?

9    A    That's an illustration of a buildup of a

10   core sheet containing their dime size

11   electronics or inlays affixed to a bottom core

12   sheet and overlaid with a top core sheet, making

13   a sandwich of two core sheets with inlays in

14   between.

15   Q    Okay.  And this was a card structure that

16   you came up with for Motorola; is that right?

17   A    Yes.

18   Q    You changed the structure that they had

19   used for their cards prior to that time?

20   A    Correct.

21   Q    And in addition to what you've shown there,

22   you've added four other layers?

23   A    Yes, I used their preprinted core sheet and

24   over-laminate film.

25   Q    All right.  So you had two preprinted core

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 623

1    sheets that you put on the outside of this and

2    then two over-laminate films?

3    A    That's correct.

4    Q    Could you just note that somehow on this,

5    just maybe put down here two additional printed

6    core sheets, two --

7    A    Okay.  I'll make another drawing on the

8    same sheet --

9    Q    Sure.  That would be great.

10   A    -- illustrating.  Okay.  I'm just going to

11   make a flat drawing.

12                         - - - - -

13         (Discussion had off the record.)

14                         - - - - -

15   A    I spelled sandwich wrong, but --

16   Q    That's okay.

17   A    -- that's an illustration.

18   Q    Okay.  All right.  So just to summarize,

19   Exhibit C shows the changes that you made to the

20   inlay that Motorola had made before you arrived?

21   A    I didn't change their inlay.

22   Q    I'm sorry.  You changed the way the inlay

23   was interfaced with the core sheet.

24   A    That's correct.

25   Q    Instead of placing the inlay in a hole or

ded6f7f8-daef-4705-a501-eb03c1d19420

# EXHIBIT 39



# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,    )

vs.               ) Case No.

                ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,      )

        defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Page 648

1  A   So on your hot side -- we tried to maintain

2  the temperature of the laminator on the hot

3  side.  As soon as you put a book into it, the

4  book starts to absorb the heat from the platen

5  and it turns the electronic heating elements

6  back on again, so you have a fluctuation in

7  temperature.

8  Q   Okay.

9  A   So as soon as it goes in, you try to do

10 your process as fast as possible.

11 Q   It's like -- it's like baking cookies, it

12 sounds like, right?  You're supposed to preheat

13 the oven, right?

14 A   That's correct.

15 Q   You open the door, you slide the tray in,

16 you close it, you lose some heat, it's got to

17 get back up to where it was supposed to be.

18 A   It's got to get back up.

19 Q   Okay.  But the goal and the process used at

20 Motorola for the dime-sized electronics was to

21 have the press at the heating phase temperature

22 from the get-go?

23 A   Correct.

24 Q   And that might drop a little bit when the

25 pre-lams absorbed some of the heat.

Page 649

1    A    Right.

2    Q    But not a huge amount.

3    A    Right.

4    Q    And then you'd get back up to temperature.

5    A    Right.

6    Q    And you maintained that temperature

7    throughout the heating phase?

8    A    We tried to, yes.

9    Q    Okay.  So there was no intended increase or

10   decrease during the heating phase?

11   A    No.

12   Q    And is that true also for the silver dollar

13   sized --

14   A    Correct.

15   Q    -- electronic elements you made?

16   A    Correct.

17   Q    No temperature change during the heating

18   phase?

19   A    Correct.

20   Q    And then once the heating phase was over,

21   was the switch flipped and the temperature

22   turned off immediately or was there --

23   A    No.

24   Q    What happened?

25   A    The hot side stays hot all the time.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 650

1    Q    Okay.

2    A    We tried to maintain that.

3    Q    So you take the sheets out.

4    A    You transfer, another set of books goes in
5    the hot side and the set of books that you have
6    on the hot side goes to the cold side.

7    Q    Okay.  Let's finish --

8    A    And then you close the laminator again, you
9    have a new set on the hot side and you have a
10   set on the cold side, and you try to close at
11   the same time.

12   Q    Got it.  Okay.

13        Let's -- all right.  Let's go back to
14   the -- let's finish with the hot side, okay?

15        You're up to temperature.

16   A    Correct.

17   Q    330 degrees or so, you're ready to go, and
18   when -- for the dime-sized cards that you
19   laminated for Motorola, was the pressure applied
20   immediately when the platens were closed?

21   A    As soon as the cassette of cards comes into
22   the hot side and they're in place, then you shut
23   the laminator --

24   Q    Okay.

25   A    -- activating the heat cycle.  It has to be

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 651

1    shut to activate the heat.  Once open, it's not

2    heating.  When you close it, it's heating.

3    Q    Okay.  And how long would it take for the

4    pre-lams, in general terms, to feel the heat

5    once the platens closed?  Was it immediate?

6    A    You close the platens and then you have a

7    heat soak time so that you can equalize the heat

8    through the entire book.

9    Q    How long would it take for the -- for the

10   inlays to feel any heat?

11   A    Oh, 10 to 15 minutes.

12   Q    Before they felt any heat or before they --

13   A    No, before they equalized.

14   Q    Okay.

15   A    It's a heat soak, so you got the --

16   Q    All right.

17   A    -- top of the book --

18   Q    Right.

19   A    -- the same temperature as the bottom of

20   the book.

21   Q    Okay.  So --

22   A    All the way through.

23   Q    So they would feel heat pretty quickly and

24   it would take 15 minutes for it to equalize?

25   A    Correct.

Tackla & Associates

1   Q    And how long were they heated totally?

2   A    Your total heat cycle, I would say, would

3   be about 20 to 25 minutes on the heat side.

4   Q    Is that after the heat soak time was

5   equalized?

6   A    Right.

7   Q    So 15 minutes to equalize and then another

8   20 to 25 --

9   A    Correct.

10  Q    -- to finish the heat process?

11  A    Correct.

12  Q    And that's the same for the dime size as

13  the silver sized --

14  A    Right.

15  Q    -- electronic element?

16  A    I'm going to have to take a break here at

17  this time.

18  Q    Oh, please.  Yeah.  Absolutely.

19              - - - - -

20            (Recess had.)

21              - - - - -

22  BY MR. DeFRANCO:

23  Q    All right.  We were talking about the

24  heating phase in the process you used at

25  Motorola, the first process you used; do you

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 653

1    remember that?

2    A    Yes.  I was wondering, can he read back

3    through where we left off at?

4    Q    Let me -- let me just pick up.

5    A    I have to get my chain of thought here.

6    Q    Yeah, let me just pick up with it, okay?

7    A    Okay.

8    Q    We were talking about the heat soak time,

9    do you remember that, some period of time --

10   A    Right.

11   Q    -- that it takes?

12   A    Right.

13   Q    And you said 15 minutes or so.

14   A    Right.

15   Q    Okay.  And then there is an additional time

16   once the temperature is equalized across all the

17   inlays of the heating cycle; is that right?

18   A    Right.  That's correct.

19   Q    Okay.  Do -- do the inlays -- in the

20   process you used at Motorola, would the inlays

21   see heat pretty immediately or would it take

22   some amount of time before they would feel any

23   heat?

24   A    Well, to -- for the heat to go through the

25   book entirely from top and bottom, we had to

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

# EXHIBIT 41

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

            plaintiff,    )

vs.               ) Case No.

               ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS   )

OF AMERICA CORP.,       )

            defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 679

1    Q    And what was the -- okay.  And then what

2    was --

3    A    This is just roughly.

4    Q    I know.  I know.  Very roughly.

5         And then what was the initial pressure

6    compared to the maximum?

7    A    I don't know what the initial pressure, but

8    there was enough pressure to close the

9    laminator.

10   Q    Right.  And it's the weight of all the

11   platens?

12   A    The weight of all the platens and --

13   Q    And some -- and some pressure, it can go up

14   at least to 1,000 pounds, we said, right, the

15   press?

16   A    Correct.

17   Q    Right?

18   A    Right.  On the pump pressure.

19   Q    Okay.  So what --

20   A    It's 1,000 pounds.

21   Q    How would you best approximate the range of

22   pressures that a square inch of the lamination

23   sandwich would see when the -- when the press

24   was first closed?

25   A    I can't answer that.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 680

1  Q    Okay.  If you had to give a range, like one
2  pound to 50 pounds?  I mean, what's -- what's
3  the --
4  A    Minimal, I'd try to hold it to 50 pounds
5  minimal --
6  Q    And maximum?
7  A    -- just to close it.
8  Q    The maximum -- that's 50 pounds per square
9  inch?
10  A    Yeah.  You get -- to even hold you'd have
11  to bring it up that far.
12  Q    "To even hold" meaning what?
13  A    To even hold the pressure you'd have to
14  bring it up that far, otherwise it's going to
15  fluctuate in pressure.
16  Q    Across the --
17  A    Right.
18  Q    -- sandwich?
19  A    Across the sandwich.  Because you're
20  melting the plastic, in the meantime it's going
21  to start to soften.
22  Q    Okay.  So you would see 50 pounds per
23  square inch from the start?
24  A    Right.
25  Q    And at -- and at some point when the heat

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 681

1  sync soak time was achieved you would increase

2  the pressure, but not more than 180?

3  A    Correct.   Try to maintain that in normal

4  lamination.

5  Q    Okay.   And the pressure was increased at

6  the end of the heat soak time to somewhere

7  between 50 pounds and 180 pounds per square

8  inch?

9  A    Correct.   Don't -- you know, this is going

10  to be hard for me to try to remember what I'm

11  telling you here right now before -- in a jury

12  trial.

13  Q    Well, we're going to --

14  A    I mean, we're going -- we're pulling

15  figures out and approximate figures and

16  guessing.   I'm doing a guessing game here.

17  Q    I understand that you're doing --

18  A    And to try to guess it again a year from

19  now, that's going to be very difficult.

20  Q    Well, let me -- let me put it to you this

21  way.   We're going to show this to you again a

22  year from now, if necessary.

23  A    Okay.

24  Q    If for some reason your memory changes or

25  you believe that this is incorrect, you'll

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 682

1    certainly have the opportunity to change it.

2    All we can do here is get your best memory,

3    that's what --

4    A    Um-hum.

5    Q    -- I'm asking you to do.  Is that fair?

6    A    I've got my life into this, and I want to

7    be accurate, I want to be truthful above all

8    things.

9    Q    Absolutely.  And I want you to tell us as

10   much as you can today.

11   A    I don't get in trouble telling the truth.

12   Q    None of us do hopefully.

13   A    And I'm not going to try to cover up.

14   Q    Absolutely.  Okay.

15   A    I want you to understand that.

16   Q    All right.  I understand perfectly.

17   A    Your questions I want clear to me so that I

18   can give them back clear to you.

19   Q    Absolutely.  I appreciate you doing the

20   best you can to give us your best memory today,

21   okay?

22   A    Okay.

23   Q    Because if you say I have absolutely no

24   idea today what the pressures were and then at

25   trial, of course, I'm going to ask you, you told

ded6f7f6-daef-4705-a601-eb03c1d19420

Page 683

1    me a year ago you have no idea, now you remember

2    every detail; that's not going to seem

3    reasonable.

4    A    No, that doesn't sync.

5    Q    Okay.  So let's go back to finishing up

6    with the -- with the pressures that were

7    applied, your best memory of the pressures that

8    you applied during the process at Motorola,

9    okay?  We've covered the pressure generally

10   during the heating phase, right?

11   A    Um-hum.

12   Q    In this down time, the transfer, there's

13   zero pressure, right?

14   A    That's correct, because it opens up --

15   Q    Right.

16   A    -- on the hot side, enabling the tray to be

17   pushed out into the cold side.

18   Q    And there's zero temperature because

19   there's no heat, right?

20   A    No, the heat stays on.

21   Q    Okay.

22   A    The heat stays on always.  You preheat the

23   laminator, you're not preheating the books --

24   Q    Okay.

25   A    -- until you go through the soak time.

Tackla & Associates

ded8f7f6-daef-4705-a501-eb03c1d19420

Page 684

1    Q    All right.  Well, then you move to the cold

2    phase, right?

3    A    Correct.

4    Q    Then the heat is shut off.

5    A    The heat stays on the hot side, the cold

6    side remains cold, and the temperature is

7    dropped by closing the cold side, extracting the

8    heat out of the book.

9    Q    Okay.  And what pressure generally would

10   you apply when you were -- had the success rate

11   of 15 out of 24 for Motorola in the cards with

12   the electronic element, how did the pressure in

13   the cold phase compare to the pressure in the

14   heating phase?

15   A    I don't know what the pressure was on the

16   cold side.  All I can say is I would estimate it

17   to be under the pressure of the hot side.

18   Q    And what do you base that on?

19   A    The size of the ram.

20   Q    Did anybody work with you at Motorola to

21   figure out or to apply the pressures that were

22   being used in the Burkle laminator?  Did you

23   have a technician or operator that would --

24   A    They had an operator, his name was Kiet.

25   I'm not sure of his nationality.  I think it was

# EXHIBIT 42

Page 1

1        *****CONFIDENTIAL DEPOSITION****

2          IN THE UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    Leighton Technologies, LLC, )

5        Plaintiff-Counterclaim   )

6        Defendant,               )Case No.

7        -vs-                     )04Civ

8    Oberthur Card Systems, S.A.,)2496(CM)

9        Defendant-Counterclaim   )

10       Plaintiff.               )

11                - - - o0o - - -

12       Continued deposition of KEITH R.

13   LEIGHTON, a witness herein, called by the

14   Defendant- Counterclaim Plaintiff, as if

15   upon cross-examination under the statute,

16   and taken before Luanne Stone, a Notary

17   Public within and for the State of Ohio,

18   pursuant to the issuance of notice and

19   subpoena, and pursuant to the further

20   stipulations of counsel herein contained, on

21   Monday, the 10th day of October, 2005 at

22   9:00 o'clock A.M., at the Renaissance Hotel,

23   the City of Cleveland, the County of

24   Cuyahoga and the State of Ohio.

25   *****CONFIDENTIAL DEPOSITION*****

```
 1   were giving him quick talks.  I had just a
 2   few minutes to write this agreement.  He
 3   wrote it out on this electronic board, and
 4   they were about to put me on the airplane to
 5   come back to Ohio.
 6   Q:    All right.
 7   A:    So, we had a quick agreement, quick
 8   sketches, and signed an agreement within a
 9   period of, oh, 20 minutes.
10   Q:    The top line of handwriting says,
11   "increase cold side ram." What does that
12   mean?
13   A:    We increased the cold side.
14   Q:    What does that mean?
15   A:    When they made a transfer, I -- I'm
16   not sure of the pressures that I had, but I
17   told him what I wanted to do.
18   Q:    And you wanted a higher pressure on
19   the cold side?  Is that correct?  Is that
20   what you told him?
21   A:    I wanted to increase the pressure,
22   yes.
23   Q:    On the cold side?  You wanted to
24   increase the pressure on the cold side; is
25   that what you told Mr. --
```

Page 154

1   A:      Yes.

2   Q:      -- Thompson?

3   A:      Because they had this single pump

4   doing both, and I let them know that you

5   must increase the pressure on the cold side,

6   which is standard in all plastic card

7   manufacturing.

8   Q:      Okay.  Then, the second line is,

9   "mold longer." What does that mean?

10  A:      "Hold longer."

11  Q:      Oh, thank you.  What does it mean?

12  Help me.  "Hold longer," what does that

13  mean, please?

14  A:      You had to chill this thing down to

15  bring it down to the temperatures, and they

16  come down to room temperatures, because when

17  you're in a hot cycle, you have to cool this

18  down, so you have to hold it there in order

19  to release the pressures of the book;

20  otherwise, if you don't, you get sheets

21  (motioning).  So, you had to hold.

22  Q:      Okay.

23  A:      We don't have any time cycles.  We do

24  not have any temperature cycles in this, but

25  we did -- I did a quick explanation out

# EXHIBIT 43

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

       plaintiff,     )

vs.              ) Case No.

               ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS   )

OF AMERICA CORP.,       )

       defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

    Continued videotaped deposition of
KEITH LEIGHTON, a witness herein, called by the
defendants as if upon cross-examination, and
taken before David J. Collier, RPR, Notary
Public within and for the State of Ohio,
pursuant to Notice of Deposition and pursuant to
the further stipulations of counsel herein
contained, on Monday, the 23rd day of October,
2006 at 8:02 a.m., at the offices of Tackla &
Associates, 1020 Ohio Savings Plaza, City of
Cleveland, County of Cuyahoga and the State of
Ohio.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 598

1    Q    Do you believe you did?

2    A    No.

3    Q    How close do you think you came?

4    A    I come -- oh, if I had a card that looked

5    good, the failure rate was very bad, I was

6    crushing chips and breaking chips.

7    Q    So if you -- if you got good results, then

8    you thought that you had increased the pressure

9    on the cooling side sufficiently so that you

10    weren't damaging chips as much?

11    A    If I was damaging chips, it showed on the

12    stainless steel laminating plates, because it

13    embossed them.

14    Q    Right, but that's not exactly what I asked.

15          I'm trying to figure out how much

16    pressure you put on the cooling side when you

17    were working at Motorola.  Are you with me?

18    A    Yes, but I don't know what it was.

19    Q    Right.  That's -- that's what I'm trying to

20    explore.

21    A    Um-hum.

22    Q    You said that based on the equipment, it

23    was not -- it was not possible for you to tell

24    exactly what the pressures were.

25    A    That's correct.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

1  Q    Right?  But you knew you wanted to increase

2  the pressure on the cooling side from what had

3  existed in the Motorola Burkle laminator at the

4  time; is that right?

5  A    That's what I was trying to do --

6  Q    Okay.

7  A    -- because that's what I had foreknowledge

8  of before I even started.

9  Q    And although you couldn't measure it, you

10  knew that you increased the pressure

11  sufficiently in the cooling phase when you made

12  cards in which the electronic element was not

13  crushed; is that fair?

14  A    Repeat that one.

15  Q    In other words, whatever pressure you were

16  able to achieve in the cooling phase, even

17  though you couldn't measure it, you knew it was

18  sufficient when the chips weren't crushed?

19        MR. GUTKIN:       Object to form.

20  A    I'm not fully understanding what you're

21  saying here.

22  Q    Think about it.

23  A    In the lamination process that I had at

24  Motorola --

25  Q    There was no gauge on the machine for you

ded6f7f6-daef-4705-a501-eb03c1d19420

# EXHIBIT 44

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,     )

vs.                ) Case No.

                   ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,        )

        defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 684

1    Q    All right.  Well, then you move to the cold

2    phase, right?

3    A    Correct.

4    Q    Then the heat is shut off.

5    A    The heat stays on the hot side, the cold

6    side remains cold, and the temperature is

7    dropped by closing the cold side, extracting the

8    heat out of the book.

9    Q    Okay.  And what pressure generally would

10   you apply when you were -- had the success rate

11   of 15 out of 24 for Motorola in the cards with

12   the electronic element, how did the pressure in

13   the cold phase compare to the pressure in the

14   heating phase?

15   A    I don't know what the pressure was on the

16   cold side.  All I can say is I would estimate it

17   to be under the pressure of the hot side.

18   Q    And what do you base that on?

19   A    The size of the ram.

20   Q    Did anybody work with you at Motorola to

21   figure out or to apply the pressures that were

22   being used in the Burkle laminator?  Did you

23   have a technician or operator that would --

24   A    They had an operator, his name was Kiet.

25   I'm not sure of his nationality.  I think it was

Tackla & Associates

ded6f7f9-daef-4705-a501-eb03c1d19420

# EXHIBIT 45

Kiet, Keith, J-mD                                                    4/4/95

⇒ Use Smaller Size for u-soft
⇒ Plates ½ Larger than Sheet all around
2 mil overlaminate  ⇒ most Over Lams are Tin Based

1). J-m→ order 1000 sheets  Sumitomo from
          Silcox  (1.45/lb  10 sheets/lb   ...../....

2). Keith has Samples of coated and
          non-coated coming in 4/6

3). J-m ⇒ Order 1000 Sheets  of Whatever
          Other over lams  Silcox has


7 mil Printed    12.625 X 21.25
        logo

PUT u-soft 1). J-m → Order 24-up u-soft art plus
          Louda marks, 200 Sheets
          * Reverse Print coil locations ←

2). Keith → Sent 200 Sheets to be printed
          @ caulastics

3). Kiet → Order 2200 7 mil Arlington
          Mills Plastic, Tin Based

4). Don't worry about inks for now ‖

5). Kiet → Give PVC data sheets to J-m
20 mil
          12.625 X 21.25

7). Kiet → Order 1000 Sheets Arlington
          mills

Polishing Plates ⇒ ½" Larger than Sheet Size

1). Keith → Order 280 mirror & 280 matte
          Plates. Stainless Steel

Press Pads ⇒ ½" Large than Sheets  16 72

2). Keith → order 42 press Pads

Trial Counsel's Eyes Only

DEFENDANT'S
EXHIBIT
#112
Leighton
10/10/05

<u>Steel Trays</u> (plates) ⇒ ½" Larger th. sheets

    1). Kiet ⇒ order 42 plates from
                Rogers Source

<u>CASSETTES</u> ⇒ Takes 16 cassette to keep operating
             ⇒ We have 4 Cassette in house
             ⇒ We have 2  "  in Process

    1). Kiet ⇒ Take 2 Cassetts To RmD
          tomorrow to enlarge - When
          back, will take next two.

    2). Ken T. ⇒ Order more Cassettes.

    3). Keith/Kiet ⇒ Draw up a print
          of Cassettes.

<u>Documer-ation</u> ⇒ Keith out next week!

    1). Keith ⇒ Create Process/Development
         Docs for Kiet to use
<u>Resources</u>    next week.

    1). J-m ⇒ Talk to Jorge about Person?

Trial Counsel's Eyes Only



# Laminating Process

Lay Down Core

→

Adhesive TBD To hold

PLACE COIL/IC

→

Lay up Books

↓

40 minute cycle for Lamination @ 320°F Pressure #3 (just close), 15 minutes. Increase Pressure to 125 bars for 20 minutes. X for cold @ 135 bars for 7 minutes

↓

Punch out

↓

Test

\* make some clear cards

\* Try Glue Stick

\*

Trial Counsel's Eyes Only

L06587

# EXHIBIT 46

1                   UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3        - - - - - - - - - - - - - - - -

4    LEIGHTON TECHNOLOGIES, LLC,          )        Case No.

5                 Plaintiff and           )        04 Civ. 02496

6                 Counterclaim Defendant, )

7        v.                               )

8    OBERTHUR CARD SYSTEMS, S.A., AND     )

9    OBERTHUR CARD SYSTEMS OF             )

10   AMERICA CORPORATION,                 )

11                 Defendants and         )

12                 Counterclaim Plaintiffs )

13       - - - - - - - - - - - - - - - --

14                       CONFIDENTIAL

15            DEPOSITION OF JEAN-MARC DELBECQ

16              WEDNESDAY, MARCH 22, 2006

17              PAGES 151 - 308; VOLUME 2

18

19

20

21

22            BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23

24

25

Page 232

```
 1    exhibit a three-page document bearing Bates Nos. L06585
 2    through 6587.
 3              THE REPORTER:  This will be 2020.
 4              (Defendants' Exhibit No. 2020 was marked for
 5              identification.)
 6    BY MR. J. JACOBS:
 7         Q.   Do you recognize this document, sir?
 8         A.   I do not recognize this document.  I
 9    recognize the sort of organization of the document.
10         Q.   And what do you mean by that?
11         A.   These are my notes.
12         Q.   This is your handwriting?
13         A.   Yes.
14         Q.   But you don't recall handwriting it?
15         A.   No.
16         Q.   All right.  Well, let's spend a little bit of
17    time with it, then, since you're the author.  Maybe you
18    can help us understand what it means.
19              Have you had time to review it?
20              (The witness reviews the document.)
21              THE WITNESS:  Hold on just a second.
22              (The witness reviews the document.)
23              THE WITNESS:  Okay.
24    BY MR. J. JACOBS:
25         Q.   Having reviewed it, does it refresh your
```

Page 233

1    recollection as to having seen this document?

2         A.    Literally, I mean, I don't remember seeing

3    this document.

4         Q.    Okay.

5         A.    But the other documents I looked at also --

6    you know, I mean that -- clearly it's my handwriting.

7               I understand what this document is about.

8         Q.    Would you tell us what this document is

9    about.

10        A.    So this document dated April 4th, 1995 is a

11   document that describes some things that need to happen

12   in order to go to a next step of lamination.

13              So maybe it -- from the -- from the top of

14   the document, it's a -- it's an action list.  "Use

15   smaller size for Microsoft."  That's a knew -- I don't

16   know what smaller size is.  It was a meeting myself,

17   Kiet and Keith.

18              "Plates should be one-half inch larger than

19   the sheet all around."

20        Q.    What kind of plates are those?

21        A.    Those are probably the plates that give the

22   finish.  They're press plates.  They give the finish to

23   the PVC during lamination.

24              So, "2 mil overlaminate film," there's a --

25   "Jean-Marc is going to order 1,000 sheets of Sumitomo

# EXHIBIT 47

Page 1

```
 1              *****CONFIDENTIAL DEPOSITION****

 2          IN THE UNITED STATES DISTRICT COURT

 3            SOUTHERN DISTRICT OF NEW YORK

 4    Leighton Technologies, LLC, )

 5        Plaintiff-Counterclaim  )

 6        Defendant,              )Case No.

 7        -vs-                    )04Civ

 8    Oberthur Card Systems, S.A.,)2496(CM)

 9        Defendant-Counterclaim  )

10        Plaintiff.             )

11                  - - - oOo - - -

12        Continued deposition of KEITH R.

13    LEIGHTON, a witness herein, called by the

14    Defendant- Counterclaim Plaintiff, as if

15    upon cross-examination under the statute,

16    and taken before Luanne Stone, a Notary

17    Public within and for the State of Ohio,

18    pursuant to the issuance of notice and

19    subpoena, and pursuant to the further

20    stipulations of counsel herein contained, on

21    Monday, the 10th day of October, 2005 at

22    9:00 o'clock A.M., at the Renaissance Hotel,

23    the City of Cleveland, the County of

24    Cuyahoga and the State of Ohio.

25        *****CONFIDENTIAL DEPOSITION*****
```

102

1   Q:      All right.   The point five says,
2   "Kist, give PVC data sheets to JM." Do you
3   have any understanding of what that means?
4   A:      Yes.   All materials coming into the
5   plant require an MSDS sheet.   That's called
6   a data sheet, and they have to record all
7   materials that come into the plant.   All
8   manufacturing facilities by OSHA
9   requirements have to identify the products
10  that come into the plant.
11  Q:      That data sheet would not contain --
12  did that -- strike that.
13          Did that data sheet -- do those data
14  sheets contain recommended laminating
15  temperatures?
16  A:      No.  It tells of the chemicals that
17  are used in the products.
18  Q:      Let's look at the last page.  Do you
19  see what I would call a flow -- flow -- flow
20  diagram on the last page?  That's page
21  L 06587.
22  A:      Yes.
23  Q:      Do you recognize that chart, the flow
24  chart?
25  A:      Yes, yes.

TACKLA & ASSOCIATES

1   Q:      Is that in your handwriting?

2   A:      No.

3   Q:      When was the first time you saw this

4   chart?

5   A:      This must have been while I was out

6   there working there, trying to come up with

7   a formula for their own purpose.

8   Q:      You think this chart has a date other

9   than April 4, 1995?

10  A:      No.

11  Q:      You think the chart was created on

12  April --

13  A:      Yes, yes, correct.

14  Q:      Were you present when the chart was

15  created, the flow chart?

16  A:      What's that?  Yes, it's possible

17  somebody else drew up this flow chart from

18  the information that I give to them from the

19  deliverables that they were still working

20  on.  It mentions the name of Arlington Mills

21  on this chart --

22  Q:      Uh-huh.

23  A:      -- which was now changed the name to

24  Empire Plastics.  They changed the name of

25  the plastics manufacturer from Arlington

                        TACKLA & ASSOCIATES

# EXHIBIT 48

1           UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - -

4   LEIGHTON TECHNOLOGIES, LLC,        )     Case No.

5                Plaintiff and         )     04 Civ. 02496

6                Counterclaim Defendant, )

7   v.                                 )

8   OBERTHUR CARD SYSTEMS, S.A., AND   )

9   OBERTHUR CARD SYSTEMS OF           )

10  AMERICA CORPORATION,               )

11               Defendants and        )

12               Counterclaim Plaintiffs )

13  - - - - - - - - - - - - - - - - --

14                  CONFIDENTIAL

15        DEPOSITION OF JEAN-MARC DELBECQ

16          WEDNESDAY, MARCH 22, 2006

17          PAGES 151 - 308; VOLUME 2

18

19

20

21

22        BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23

24

25

1    those documents or that process and that's what's here.

2        Q.    And could you explain what the process is?

3        A.    Lay down the core, place the coil, slash, IC

4    onto the core, some adhesive to be determined to hold

5    it in place.

6        Q.    To hold the coil in place?

7        A.    Yes.  So that -- so you -- yeah, so that it

8    wouldn't shift locations when you moved it from the

9    assembly area to the lamination platens.

10           "Lay up books."  So a book is -- a book is

11   the assemblage of all of the laminating parts.  So it's

12   the core sheets, the stuff in the cores, the outer

13   layers.  All of that is one book.  And then you put

14   your steel plate on top of that, your polishing plate,

15   and then you assemble the next book.

16           And I -- I don't recall, but there were some

17   number of books high you could go per cassette per

18   opening in the Burkle press.  So that's what lay up

19   books means.

20           Then it says "40-minute cycle," so 40 minutes

21   end to end for lamination, "at 32 degrees Farenheit.

22   Pressure No. 3 just" --

23        Q.    Is that 3200 -- 32 degrees or --

24        A.    320 degrees Farenheit.

25           "Pressure No. 3 just closed."

1      Q.    What does that mean?

2      A.    That's a small pressure.  That's just enough

3    to hold the parts in place for 15 minutes.

4              "Increase the pressure to 125 bars for 20

5    minutes, then transfer to the cold side."

6              So it was -- I think it was four openings.

7    So after your hot cycle, you'd open the platens.  This

8    is the stack, I guess they called it.  And you would

9    mechanically transfer the cassettes.  The main purpose

10   of the cassettes was the transfer mechanism into the

11   cold side.  And then you'd close it.

12             So we'd go from 125 bars of pressure for 20

13   minutes at 320 degrees; then we'd obviously open it.

14   That's not stated here.

15             "Transfer to the cold side, increase the

16   pressure to 135 bars for seven minutes."  Now, this

17   is -- this is -- there's probably a few steps not

18   stated here about removing them from the platen, et

19   cetera.  But then to punch out the cards using the

20   Louda press and test them.

21             There's a sketch in the upper right-hand

22   corner that shows one column of the 3 by 8 matrix.

23   It's to communicate where I wanted the IC to be.  I

24   wanted the IC to be at the 2:00 o'clock position.

25             There was a note, "Make some clear cards."

# EXHIBIT 49

1  *****CONFIDENTIAL DEPOSITION*****
2  IN THE UNITED STATES DISTRICT COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  Leighton Technologies, LLC, )
5  Plaintiff-Counterclaim )
6  Defendant, )(Case No.
7  -vs- )04civ
8  Oberthur Card Systems, S.A.,)2496(CM)
9  Defendant-Counterclaim )
10  Plaintiff. )
11  - - - oOo - - -
12  Continued deposition of KEITH R.
13  LEIGHTON, a witness herein, called by the
14  Defendant- Counterclaim Plaintiff, as if
15  upon cross-examination under the statute,
16  and taken before Luanne Stone, a Notary
17  Public within and for the State of Ohio,
18  pursuant to the issuance of notice and
19  subpoena, and pursuant to the further
20  stipulations of counsel herein contained, on
21  Monday, the 10th day of October, 2005 at
22  9:00 o'clock A.M., at the Renaissance Hotel,
23  the City of Cleveland, the County of
24  Cuyahoga and the State of Ohio.
25  *****CONFIDENTIAL DEPOSITION*****

Page 1

```
 1   says "Place coils/IC." That's in the second
 2   box down, correct?
 3   A:   Yes.
 4   Q:   And, then, the next step is in a box
 5   called "Lay-up books." What does that mean?
 6   A:   They were placing the electronics on
 7   a plastic core sheet. They were building up
 8   layers of these, preparing them to be built
 9   up into books, is what I'm reading here.
10   Q:   The next step is, '40-minute cycle
11   for lamination at 300 degrees Fahrenheit.
12   Pressure number three (just close)', 15
13   minutes."
14   A:   That's correct.
15   Q:   What is your understanding of that
16   phrase?
17   A:   They were closing the openings of a
18   laminator to put under compression to
19   activate the temperatures, and they settled
20   in for a period of time of 15 minutes.
21   Q:   So --
22   A:   And then they increased the pressure
23   to 125 bars for 20 minutes. That is what
24   they call the ram pressure, the bar
25   pressure. They're calling the ram a bar in
```

TACKLA & ASSOCIATES

```
 1   this illustration, for 20 minutes.  "Xfer
 2   cold."  I'm not sure what that stands for,
 3   at 135 bars for seven minutes.
 4   Q:   Okay.
 5   A:   I'm not understanding the language
 6   they have there.
 7   Q:   May I suggest that "xfer" means
 8   transfer?
 9   A:   Possible, yes, transfer to cold.
10   That would be a good illustration.
11   Q:   All right.  So, let me understand
12   if I've got this correct.  What happens
13   here -- what this box that we've just been
14   discussing is describing is the lamination
15   of -- what we've been terming the lamination
16   cycle?
17   A:   Correct.
18   Q:   And in this lamination cycle, what
19   they do is they heat the hot platens, the
20   heating -- in the heating press up to 320
21   degrees.
22   A:   Correct.
23   Q:   Then they close the press upon the
24   books.
25   A:   Correct.
```

# EXHIBIT 50

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5   LEIGHTON TECHNOLOGIES,          :

                                    :

6            Plaintiffs,            :

                                    :

7            vs.                    :   No. 04-CV-02496

                                    :

8                                   :

    OBERTHUR CARD SYSTEMS, S.A.,    :

9   OBERTHUR CARD SYSTEMS OF        :

    AMERICA CORPORATION,            :

10                                  :

             Defendants.            :

11

12              --oOo--

13

14        VIDEOTAPE DEPOSITION OF

15            KEN THOMPSON

16             VOLUME I

17   _____

18            May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC

         126 East 56th Street, Fifth Floor

24            New York, New York 10022

               212-750-6434

25             REF: 80728

1                         THOMPSON

2              At about the time Mr. Leighton came to --

3         A.    Yeah.

4         Q.    -- Indala -- let me ask the question --

5    were you running the cold side of the Bnrkle press

6    at full -- full pressure?

7         A.    We were squeezing just about every ounce

8    of pressure we could out of the cold side, because

9    we knew that in very short fashion, we're actually

10   going to be increasing the ram size on the cold

11   side.

12             We know we needed the extra higher

13   pressure on the cold side to get a higher pressure

14   on cold than hot lamination, which is what we've

15   been told by industry people is somewhat of an

16   accepted thing we have to do.  In fact, Mr. Leighton

17   also agreed with that, that we had to have higher

18   pressure, much higher pressure on the cold side as

19   well.

20        Q.    All right.

21        A.    I will say that in Exhibit 2,673, on the

22   third page, LO6587, that this laminating process,

23   when I look at it, does not describe the process

24   that we were using.  This describes to me either one

25   of -- one or two things.  It describes a single step

```
 1                      THOMPSON

 2   process for laminating and making a card, because

 3   there is no core lamination, and then final

 4   lamination.  Or it refers to, hey, let's punch --

 5   let's make a core and then punch it out and test

 6   prior to going to the final lamination.

 7       Q.    Right.

 8       A.    So that's -- this seems to be maybe an

 9   experiment variation that either Mr. Leighton wanted

10   to try, and Jean-Marc Delbecq captured it, or

11   Jean-Marc Delbecq, Kiet and Mr. Leighton said, hey,

12   let's try this.  So it's certainly not a -- a viable

13   card -- finish card process.

14       Q.    What you're talking about now is that this

15   is a one-step process -- strike that.

16             Are you now talking about this being a one

17   stop process versus the two -- the two lamination

18   process that you drew before for us on exhibit -- I

19   don't have the exhibit in front of me.  Can you help

20   us with that, help me with that?

21       A.    2,664.  Yes, it appears to be either a

22   one-step process for -- for making a card, or

23   describing making a core lamination sheet, which is

24   then punched out and electrically tested.

25       Q.    Do you have any reason to believe that the
```

1                         THOMPSON

2      cycle parameters set forth are not those that were

3      being used to make a core?

4          A.    No.   They were not.   It doesn't -- it

5      doesn't look to be, from my knowledge, of what has

6      worked in their lamination with this machine.   Those

7      are not parameters that would -- that would work, or

8      would be -- have shown to work.

9               I believe that this was someone's -- an

10     experimentation cycle.   Someone says, I think

11     something like this will work, let's try this.

12     Okay.   Let's document what it is.   And it could be a

13     documentation of what Kiet was supposed to the week

14     when Mr. Leighton was out.

15         Q.    What about the cycle here do you think

16     makes it inoperative?

17         A.    The cycle or parameters in lamination?

18         Q.    Yeah, the lamination parameters, the cycle

19     parameters.

20         A.    The pressure on the cold side is too low,

21     so it's only ten bars higher than the hot side,

22     that's too low.   The temperature is 320 F, which is

23     approximately 145 C, 150 C, I think that's too hot.

24     Pressure number three, just close, I don't

25     understand that.

# EXHIBIT 51

Page 151

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - - -

 4    LEIGHTON TECHNOLOGIES, LLC,        )      Case No.

 5              Plaintiff and           )      04 Civ. 02496

 6              Counterclaim Defendant,  )

 7     v.                                )

 8    OBERTHUR CARD SYSTEMS, S.A., AND   )

 9    OBERTHUR CARD SYSTEMS OF           )

10    AMERICA CORPORATION,               )

11              Defendants and          )

12              Counterclaim Plaintiffs )

13    - - - - - - - - - - - - - - - --

14                   CONFIDENTIAL

15         DEPOSITION OF JEAN-MARC DELBECQ

16            WEDNESDAY, MARCH 22, 2006

17            PAGES 151 - 308; VOLUME 2

18

19

20

21

22         BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23

24

25
```

Page 203

```
 1                    "ANSWER:  Yes.
 2                    "At what point in the heating did you
 3                    increase the pressure?
 4                    "ANSWER:  I don't know how we knew.  We --
 5                    I think from experimentation, probably,
 6                    but when the plastic was soft.
 7                    "QUESTION:  When the plastic was soft, you
 8                    did what, sir?
 9                    "ANSWER:  We would increase the pressure.
10                    "QUESTION:  And how much would you
11                    increase the pressure?  Functionally, I
12                    mean.  Can you describe functionally how
13                    much you put --
14                    "ANSWER:  A lot."
15      BY MR. J. JACOBS:
16           Q.    Do you recall testifying to that?
17           A.    Okay.  Yes, I do.
18           Q.    Okay.
19                    With regard to the AVC 132, would the
20      description I just read regarding the pressures during
21      the heating cycle apply equally to the AVC 132?
22           A.    That's a good question.
23                    It would still be true that there would be
24      less pressure at the beginning of the lamination cycle
25      for an AVC 132.  It is still true that we would raise
```

1    the pressure.  We would desire a higher pressure after

2    the plastic was softened.  The method of increasing the

3    pressure before cooling or during cooling was somewhat

4    dependent on which lamination press we were using.

5          In our lab it was possible to increase the

6    pressure before cooling.  There's a single platen.  In

7    our production machine, I'm not sure that it was

8    possible.  It may have been possible, but also we had

9    to transfer from the hot side to the cold side for the

10   production machine.

11         So I think I would answer your question this

12   way, that would have been a process that we would have

13   used for the lab press.  I'm fairly sure of that.  The

14   process for the Burkle press would have been different

15   because of the constraints of the Burkle press.

16         Q.    What was the constraint of the Burkle press

17   that required it to be different?

18         A.    You had to transfer the loads -- I'll call

19   them loads -- but you had to transfer the items being

20   laminated from opening to -- from one side of a press

21   to the other side of a press.  In the lab press, you

22   didn't have to do that.

23         Q.    Did the Burkle press have the possibility of

24   having more than one pressure on in the heating cycle?

25         A.    I think that it did.

Page 218

1      A.   They can -- they -- when plastic is soft, the

2   plastic can form itself, can -- it -- it's a -- it's

3   moveable and it can flow around the components of the

4   electronics.

5      Q.   Do you recall testifying in sum and substance

6   that prior to January of 1995, the design of the

7   AVC 132 as shown in what has now been marked as

8   Exhibit 2017 A and B was made ... period -- question

9   mark?

10          MR. B. JACOBS:  Objection, mischaracterizes

11  testimony.

12          MR. J. JACOBS:  Okay.

13  BY MR. J. JACOBS:

14     Q.   You can answer it.

15     A.   Could you repeat the question?

16     Q.   I'd be happy to.

17          Do you recall testifying in sum and substance

18  that prior to January 1995, the design in the AVC 132

19  as shown in what has now been marked as Exhibit 217 A

20  and B (sic) was made?

21          MR. B. JACOBS:  Same objection.

22          THE WITNESS:  I -- I did say that, and I did

23  say that there might have been some characteristics of

24  the AVC 132 manufacturing process that hadn't been

25  completely figured out by January of 2000 -- 1995.

1            Specif- -- not the construction of the

2    contents of the card but the -- the how big of a sheet

3    to use, the markings that might have been there to

4    register the various pieces to the next sequence of the

5    manufacturing process.

6            Sorry.

7            But I think the -- the electronics, the

8    antenna, the basic lamination process were well defined

9    prior to January of 1995.

10   BY MR. J. JACOBS:

11       Q.   Were there any changes made to the design or

12   the process to make the AVC 132 during the period from

13   January 1995 through the beginning of May 1995?

14   Essentially, the period where Mr. Leighton was at

15   Motorola.

16       A.   I think that there -- so the question was,

17   Were there any changes to the processes?

18       Q.   Or the structure.

19       A.   Or the structure.

20            Or materials?  Would you include material?

21       Q.   If you want to include that, sure, I have no

22   problem with that.

23       A.   During the time that Keith Leighton was

24   there, there were -- there was some experimentation

25   done and there were a variety of process variations

1    explored.  I think I might have testified before that

2    there were cassettes which were carriers of the

3    lamination assemblies and there were press plates and

4    there were pads and there were different materials,

5    different vendors of PVC that were being experimented

6    with at that time.  The basic design, the basic design,

7    the intent of the design, didn't fundamentally change.

8             Okay.

9        Q.   Okay?

10       A.   Yeah.

11       Q.   At the close of the last deposition, we were

12   looking at the last exhibit in there and we had gotten

13   through -- well, before we do that, let's -- before we

14   look at the last exhibit, let's look at --

15            May I have the exhibit book, please,

16   Mr. Delbecq.

17            (Counsel reviewing exhibit book.)

18            MR. J. JACOBS:  Oh, this is the wrong exhibit

19   book.

20            (Counsel reviewing exhibit book.)

21   BY MR. J. JACOBS:

22       Q.   Mr. Delbecq, I'm going to hand you the

23   exhibit book from the last session, and I direct your

24   attention to the second page of Exhibit 2011.

25            (The witness reviews the document.)

# EXHIBIT 52

80728 5/18/2006

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                 FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5     LEIGHTON TECHNOLOGIES,              :

                                          :

6                    Plaintiffs,          :

                                          :

7               vs.                       :    No. 04-CV-02496

                                          :

8                                         :

      OBERTHUR CARD SYSTEMS, S.A.,        :

9     OBERTHUR CARD SYSTEMS OF            :

      AMERICA CORPORATION,                :

10                                        :

                     Defendants.          :

11

12                          --oOo--

13

14               VIDEOTAPE DEPOSITION OF

15                    KEN THOMPSON

16                     VOLUME I

17    ─────────────────────────────────────

18                   May 4, 2006

19

20    REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23         ELLEN GRAUER COURT REPORTING CO. LLC

            126 East 56th Street, Fifth Floor

24              New York, New York 10022

                      212-750-6434

25                   REF: 80728

80728 5/18/2006

```
 1                         THOMPSON

 2        A.    Sure.

 3                       - - -

 4               (Whereupon the document was marked,

 5          for identification purposes, as Exhibit

 6          Number Two Thousand Six Hundred

 7          Sixty-Four and Two Thousand Six Hundred

 8          Sixty-Four A.)

 9                       - - -

10   BY MR. J. D. JACOBS:

11        Q.    Mr. Thompson, would you also hand them to

12   me for a second, so I may also look at them.

13               Let me hand exhibit -- what's now been

14   marked 2,664 and Exhibit 2,664-A back to you,

15   Mr. Thompson, and ask you to describe for the record

16   what you have drawn.

17        A.    What I have drawn is the components in the

18   construction pictorial of how the prototype cards

19   were made on our PHI press, and the first sequence

20   in the drawing is the electronic load, RFID, which

21   is a coil and a module, along with two PVC sheets,

22   one on top, one on bottom.  And we called this the

23   core, the components which went into the core

24   assembly, or the core sheets.

25        Q.    Mr. -- as we go along, I might interrupt
```

80728 5/18/2006

1                          THOMPSON

2    you, if it's -- with your permission, Mr. Thompson,

3    so we don't have to go back over the whole thing.

4    And I think it will be more logical to do it step by

5    step.

6              Let me know when you've finished what

7    you've labeled step one.

8         A.    I've finished.

9         Q.    In step one, you described two PVC sheets

10   and a coil and a module; is that correct?

11        A.    That's correct.

12        Q.    Would you label the coil and the module

13   separately.

14        A.    (Witness complied with request).

15              Okay.

16        Q.    Was there any substance, material,

17   anything between the coil and either of the PVC

18   sheets?

19        A.    To my recollection, no.

20        Q.    Was there anything between the module and

21   either of the PVC sheets?

22        A.    No.

23        Q.    Would it be fair to say that when in the

24   press, but not yet laminated, the PVC sheets touched

25   the coil and touched the module?

Page 31

1                          THOMPSON

2        A.    Yes, I think that would be -- that would

3    be correct.

4        Q.    Can you now describe what you've labeled

5    as step two?

6        A.    So step two is the lamination of the PVC

7    sheets together such that it surrounds and entombs

8    the coil and the module.

9        Q.    And how is step two, the lamination,

10   carried out?

11       A.    Heat with very little -- typically is heat

12   with very little pressure, and then the same heat

13   with more pressure.  And then followed by a cooling

14   with pressure.  With more pressure or pressure,

15   there's -- they're essentially -- and that PHI press

16   was a manual press, so it was -- as I recall, it had

17   a manual timer that they would say, okay, well,

18   press at this pressure for so many minutes, and then

19   the buzzer goes off.

20       Q.    And they would change?

21       A.    Press, change -- change the pressure, and

22   press it this many minutes, and --

23       Q.    Could you -- and I'll call it Exhibit

24   2,665, graph the temperature pressure time cycle?

25       A.    For the PHI press?

```
 1                         THOMPSON
 2        Q.    For the PHI press.
 3        A.    I'm not certain of the times or exact
 4   pressures or temperatures, but in general I could
 5   show -- depict that, is that --
 6             MR. B. JACOBS:  That's fair.
 7   BY MR. J. D. JACOBS:
 8        Q.    Yes, the -- can do, and --
 9        A.    Okay.
10        Q.    -- either I or Mr. Jacobs will clarify, if
11   necessary, for the record what the details are.
12        A.    (Witness draws diagram.)
13             MR. J. D. JACOBS:  Can you hand it to the
14   reporter, and have him mark as Exhibit 2,665,
15   please.
16                         - - -
17             (Whereupon the document was marked,
18             for identification purposes, as Exhibit
19             Number Two Thousand Six Hundred
20             Sixty-Five.)
21                         - - -
22             THE WITNESS:  Do I keep this?
23             MR. B. JACOBS:  You can maintain
24   possession of those.
25   BY MR. J. D. JACOBS:
```

```
1                        THOMPSON
2        Q.    Now, Mr. Thompson, in your graph, you show
3    a low pressure applied for a period of time with a
4    high temperature.
5        A.    Yes.
6        Q.    What was the purpose of applying a low
7    pressure and a high temperature at the beginning of
8    the lamination cycle?
9        A.    With sensitive electronics we were
10   concerned to damage the electronics with too much
11   pressure, too much force, if you will.  So the
12   purpose is to heat the material, the plastic
13   material to a sufficient temperature that it becomes
14   soft or softer such that the plastic material would
15   support the modular electronics around the side,
16   instead of having all the force focused on the
17   module, in particular, we're mainly concerned about
18   the module, because the module was thicker than the
19   coil.
20       Q.    The module stood higher than the coil?
21       A.    The module stood higher than the coil.
22       Q.    The -- and that meant, because -- did that
23   mean because the module was higher, that it would
24   take the force of the press?
25       A.    That's correct.  Instead, as an example,
```

80728 5/18/2006

```
 1                        THOMPSON
 2     trying to develop the product during that time.
 3          Q.   Now, did the process or the product
 4     structure -- let me rephrase the question.
 5               Was the structure of the product any
 6     different when you were -- started using the Bnrkle
 7     press than what you've drawn on Exhibit 2,664?
 8          A.   The structure, as I recall, was -- was
 9     basically the same.
10          Q.   When you say basically, can you recall any
11     differences?
12          A.   I can't recall any differences.
13          Q.   Was the lamination cycle that you used on
14     the Bnrkle press the same as you have drawn in
15     Exhibit 2,665?
16          A.   It was similar.  So this was our starting
17     point.  We used the parameters, general parameters
18     on the PHI press as a starting point for our
19     lamination experiments on the Bnrkle.
20          Q.   Now, we've -- we've talked about this
21     Bnrkle press.  What kind of press was the Bnrkle
22     press?
23          A.   The Bnrkle press was a -- what they call a
24     twin stack press.  So it had a separate hot press
25     and a separate cold press.  And it was also -- had,
```

# EXHIBIT 53

Page 1

```
 1          *****CONFIDENTIAL DEPOSITION****

 2          IN THE UNITED STATES DISTRICT COURT

 3             SOUTHERN DISTRICT OF NEW YORK

 4     Leighton Technologies, LLC, )

 5        Plaintiff-Counterclaim   )

 6        Defendant,               )Case No.

 7        -vs-                     )04Civ

 8     Oberthur Card Systems, S.A.,)2496(CM)

 9        Defendant-Counterclaim   )

10        Plaintiff.               )

11                 - - - oOo - - -

12        Continued deposition of KEITH R.

13     LEIGHTON, a witness herein, called by the

14     Defendant- Counterclaim Plaintiff, as if

15     upon cross-examination under the statute,

16     and taken before Luanne Stone, a Notary

17     Public within and for the State of Ohio,

18     pursuant to the issuance of notice and

19     subpoena, and pursuant to the further

20     stipulations of counsel herein contained, on

21     Monday, the 10th day of October, 2005 at

22     9:00 o'clock A.M., at the Renaissance Hotel,

23     the City of Cleveland, the County of

24     Cuyahoga and the State of Ohio.

25     *****CONFIDENTIAL DEPOSITION****
```

141

1    A    Before they developed their contact/

2    contactless smart card.

3    Q    That's not the question.  Did you

4    develop your invention prior to going to

5    Motorola in 1990 -- in the first half of

6    1995?

7    A    No.

8    Q    You developed your invention after

9    leaving Motorola in 1995, correct?

10    A    That's correct.

11    Q    So, what is different in your invention

12    than what -- what you saw at Motorola?

13        MR. GUTKIN:    Vague and ambiguous.

14    Lacks foundation.

15        THE WITNESS:  Do you want me to answer

16    that?

17        MR. GUTKIN:    Yeah, yeah.  Unless I

18    instruct you not to answer, he's entitled to

19    an answer.

20        THE WITNESS:    Okay.  My invention

21    could not have been practiced at Motorola.

22    BY MR. JACOBS:

23    Q    I'm asking you why.

24    A    Because they did not have control of

25    their ram to give zero pressures on the

1   surface of the plastic before heating it.

2   They had a -- I believe a four-window,

3   daylight window laminator that you cannot

4   control the platens individually.  The

5   bottom platen, if you put electronics in,

6   would pick up about 450 pounds on that

7   delicate chip, and each time the ram would

8   come up, it would pick up an additional 450

9   pounds, and you do that four times, you've

10  got a lot of weight on that chip.  You

11  couldn't do my process on there without

12  having a counterbalance platen that weighed

13  absolutely nothing.

14  Q   So, you view your invention using a

15  counter -- for your invention, do you -- do

16  you -- is it -- let me strike that.  Sorry.

17      Does your invention require the use of

18  a counterbalance platen?

19      MR. GUTKIN:   Calls for a legal

20  conclusion.  You can answer.

21      THE WITNESS:  By using the top platen

22  of the laminator and controlling the ram to

23  where I can raise it to -- raise the

24  temperature in the laminator without making

25  contact to the top of the platen, I can heat

1   the plastic and liquefy the plastic before
2   applying ram pressure to encapsulate the
3   electronics.
4   BY MR. JACOBS:
5   Q    Is there anything else in your invention
6   that you did differently than what you saw
7   at Motorola?
8   A    All of it.
9   Q    Well, tell me what else.
10  A    Motorola didn't have a printing press
11  when I worked there.
12       THE VIDEOGRAPHER: Two minutes of tape.
13       THE WITNESS:  I -- in my invention, I
14  had -- on my first patent, I facilitated or
15  printed on a -- the core that I made in the
16  first lamination process.
17       MR. JACOBS:   Why don't we change the
18  tape.
19       THE VIDEOGRAPHER: Off the record.
20       (At this time a short recess was had.)
21       THE VIDEOGRAPHER:   Back on the record.
22  BY MR. JACOBS:
23  Q    Before we went off the record,
24  Mr. Leighton, we were discussing what you
25  considered to be the differences between

1    your invention and that which you saw at

2    Motorola, and what I'm talking about what

3    you saw at Motorola, I'm also talking about

4    what the things you contributed to Motorola,

5    and you so far, I think, mentioned the fact

6    of a counterbalance platen and printing.

7    A    Yes, Motorola didn't have those

8    capabilities.

9    Q    Right.  What else did you consider

10    different that you saw at Motorola than what

11    you considered to be in your invention?

12          MR. GUTKIN:    By "your invention,"

13    we're still talking about Exhibit 101,

14    correct?

15          MR. JACOBS:    Well, actually, I was

16    talking about all his inventions, but --

17          MR. GUTKIN:    Well, then I'm going to

18    object.  Vague and ambiguous, compound.

19          MR. JACOBS:    That's okay.

20    BY MR. JACOBS:

21    Q    You can answer.

22    A    What I did that's different than

23    Motorola?

24    Q    Yeah.

25    A    Well, step one, I had zero pressure

1    tolerance on the surface of my sheets.

2    Q    Uh-huh.

3    A    That wasn't done at Motorola.  I can

4    illustrate that Motorola had a wide radio

5    antenna which absorbed the pressure, and you

6    could go ahead and close the laminator and

7    heat it up.  What I did was entirely

8    different.  I did not give pressures to the

9    surface of my substrate before liquefying

10   it.  At Motorola, they did.

11   Q    So, in other words, you did not apply

12   any pressure to your substrate until after

13   you raised the heating temperature; is that

14   correct?

15   A    That's correct.

16   Q    Anything else?

17   A    At Motorola, they did not print on the

18   first lamination core sheets, or a prelam as

19   we call it in the industry.  I did.  By

20   printing on that prelam, you eliminate

21   thicknesses of plastic core stock.

22   Q    Anything else?

23   A    The difference was in the chip that we

24   had.  The design of the inlay and chip is

25   much different than what Motorola had.

146

1    Q    Anything else?

2    A    It would be much easier.  No, I would

3    say that would cover it.

4    Q    Are the pressures and temperatures you

5    use in your invention different than that

6    that were used at Motorola?

7         MR. GUTKIN:    Vague and ambiguous.

8    Lacks foundation, compound.

9         THE WITNESS:    I don't recall all the

10   temperatures that I used at Motorola,

11   because I was in there using many different

12   temperatures at Motorola.  When I left, I

13   don't know what they did.

14   BY MR. JACOBS:

15   Q    I'm not asking what they did while --

16   after you left.  I'm asking solely while you

17   were there.  You can't testify to what you

18   don't know.

19   A    Yeah.

20   Q    Well, Motorola did use a heating phase

21   and followed by a cooling phase, correct?

22   A    Right, that's correct.

23   Q    Did -- at Motorola, the pressures during

24   the cooling phase were greater than the

25   pressures during the heating phase?

147

1    A    I don't know about the surface pressure.

2    Their ram pressure might have been greater,

3    but what the surface pressure of the plastic

4    core sheet, I'm not certain what that was.

5    Q    Did you ever know what the surface

6    pressure at the core sheet was at Motorola?

7    A    No, I don't think I ever got that broken

8    down mathematically.

9    Q    And you don't have any documents that

10   would refresh your recollection --

11   A    No.

12   Q    -- as to that?

13   A    No.  Everything I did at Motorola stayed

14   at Motorola as far as information is

15   concerned.  The documentation that I made

16   was in a scrapbook log that was kept at

17   Motorola.

18   Q    Do you know where that log is today?

19   A    No, I don't.

20   Q    Did you make entries in that log?

21   A    Only what I was doing there.  Yes, I

22   made entries in that log, but those entries

23   that I made in the log would only be good

24   for that type of laminator.  It would not

25   work on any other laminator.

# EXHIBIT 54

Page 1

```
 1            *****CONFIDENTIAL DEPOSITION****

 2           IN THE UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF NEW YORK

 4      Leighton Technologies, LLC, )

 5          Plaintiff-Counterclaim  )

 6          Defendant,              )Case No.

 7          -vs-                    )04Civ

 8      Oberthur Card Systems, S.A.,)2496(CM)

 9          Defendant-Counterclaim  )

10          Plaintiff.             )

11                     - - - oOo - - -

12          Continued deposition of KEITH R.

13      LEIGHTON, a witness herein, called by the

14      Defendant- Counterclaim Plaintiff, as if

15      upon cross-examination under the statute,

16      and taken before Luanne Stone, a Notary

17      Public within and for the State of Ohio,

18      pursuant to the issuance of notice and

19      subpoena, and pursuant to the further

20      stipulations of counsel herein contained, on

21      Monday, the 10th day of October, 2005 at

22      9:00 o'clock A.M., at the Renaissance Hotel,

23      the City of Cleveland, the County of

24      Cuyahoga and the State of Ohio.

25      *****CONFIDENTIAL DEPOSITION*****
```

127

1   percent, sir?

2   A:      They had a poor laminator.  They were

3   going into all their daylight openings in

4   the laminator which were not -- each one of

5   them were different.  The pressures of the

6   platens were different because they were

7   warped.  One end of the plastic sheet would

8   come out as much as 5/1000 difference than

9   the opposite end in 24 cards.  You cannot go

10  into production with that kind of quality.

11  Q:      Okay.  Any other reasons that your

12  yield was only 50 percent?

13  A:      I did not have enough electronics to

14  produce to find an accurate yield that I

15  would have.  They didn't provide me with

16  electronics.

17  Q:      Okay.  Any other reasons,

18  Mr. Leighton, why your yield was only 50

19  percent?

20  A:      It's just equipment failures.

21  Q:      If you had a better press and

22  sufficient electronics, would the process

23  you developed during the period while you

24  were at Motorola produce acceptable

25  commercial yield?

TACKLA & ASSOCIATES

1    A:      Yes.

2    Q:      Why -- on what facts do you reach

3    that conclusion?

4    A:      If I had a contactless laminator

5    where I had zero pressures of the platens, I

6    could produce a card as that reads in my

7    patent.  The bottom platen here, before even

8    going into a heating cycle when the sheets

9    are rigid and hard, are already receiving

10   close to 2000 pounds pressure of the

11   weight -- dead weight of the platens before

12   it's even into operation.  That's not

13   acceptable in contactless smart cards.

14   Q:      While you were at Motorola, you were

15   never able to test whether, in fact, a

16   process that used zero pressure at the

17   beginning would produce an acceptable --

18   acceptable yield; is that correct?

19   A:      That's correct.

20   Q:      Did there ever come a time when you

21   were able to test to see if your process

22   which started with a zero pressure would

23   produce an acceptable yield?

24   A:      Not at Motorola.

25   Q:      Did there come a time anyplace where

TACKLA & ASSOCIATES