# EXHIBIT 55

# EXHIBIT 55

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff, )

vs. ) Case No.

           ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP., )

        defendants. )

- - - - -
{Volume III - pages 522 through 875}
- - - - -

    Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

1   goal, make this card smooth, and I succeeded in

2   doing it.  They were happy with what I had

3   accomplished, because within a couple days I

4   come up with a smooth pre-lam inlay.  They

5   wanted me to use their laminator that had four

6   daylight openings in the laminator to produce

7   these cards.  They wanted me in our first

8   agreement to be able to get into production

9   using all four daylight openings, and after

10  producing this first card they stopped me from

11  working on that card and said, we want you to do

12  the larger card.

13  Q    Okay.  And, I'm sorry, why --

14  A    Here was a week that had already gone by.

15  Q    Right.  But "unfair" is an interesting

16  word.  I'm trying to understand.  You were a

17  consultant, right?

18  A    Right.

19  Q    They were paying you for your time and

20  effort?

21  A    That's correct.

22  Q    And they were paying you to consult with

23  them on the issues that --

24  A    In a 30 day period, produce 10,000 cards.

25  Q    Okay.  And did they want you to produce

Tackla & Associates

ded07R ded 4785 e591 eb93e1d19420

# EXHIBIT 56



INVOICE NO. 09751

Keith Leighton
2817 Fulmer Rd
Lorain, OH 44053
Phone 216 960 1697

SOLD TO
Motorola Indala Corp
STREET & NO. 3041 Orchard Parkway
CITY San Jose, CA  STATE 95734 ZIP

INVOICE

Consulting Fee for April 17-21 1995

DATE 4-12-95

$1,875.00

Trial Counsel's Eyes Only

L06602

# EXHIBIT 57

Ⓜ MOTOROLA    3041 ORCHARD PARKWAY • SAN JOSE, CA 95134-2017    No. 206436

| VOUCHER NUMBER | VENDER INVOICE | | | DISCOUNT | PAYMENT AMOUNT |
| | DATE | NUMBER | AMOUNT | | |
|---|---|---|---|---|---|
| 136400 | 4/7/95 | S950747 | 1875.00 | | 1875.00 |
| | | | | TOTAL AMOUNT PAID ▶ | 1875.00 |

Trial Counsel's Eyes Only

L06618

# EXHIBIT 58

1

Keith Leighton
2817 Palmer
Lorain, OH  44053

May 19, 1995

MOTOROLA INDALA CORPORATION
3041 Orchard Parkway
San Jose, CA  94134-2017

ATTENTION:  KEN THOMPSON

Dear Ken:

It was a pleasure working at Motorola Indala to promote
the manufacture of the ISO format card with embedded
electronic RFID's to a surface flatness of 0.0005" for
dye sublimation printing.

The production of 10,000 cards was delayed one week be-
cause of the following reasons:

*   After I perfected the process on the small coil,
    you requested me to do the same on a large coil,
    which was not originally agreed to.

*   You did not have the large coils available for me
    to test, which slowed testing time.

*   The laminator had deficiencies which caused break-
    downs, slowing testing time and spoiling work in
    process.

*   Laminating plates requested my first week at Motorola
    were not ordered until the end of my third week at
    Motorola, which slowed testing.

*   You requested me to produce 10,000 coils, but the
    coils were not available to produce.

If the above problems, which were no fault of mine, had
not been encountered, the production of 10,000 cards
would have been completed in less than 30 working days,
as originally planned.

Let me know when I can be of further help to you.

Best regards,

Keith Leighton

KL:1
Enclosure: Invoice #09755
Copy to:  Jean-Marc Delbecq
          Noel Eberhard

Trial Counsel's Eyes Only

L04427

# EXHIBIT 59



**•• Deliverables, Keith Leighton to Motorola Indala for Services (re-send 3/21/95) ••**

The items to be included in quote as basis for payment must include the following deliverables.

1. Materials
   a. complete specification of all materials to include: thicknesses and tolerances, chemical make-up, vendor part number, sizes
   *No documented report of all of Material, print or chemical specifications supplied by Keith.*
   b. incoming inspection procedure for material
   *No documented procedure supplied by Keith.*
   c. handling and storage requirements for materials, conditioning if necessary
   *N/A.*
   d. lot traceability procedure for materials
   *N/A.*

2. Process
   a. complete processes specification for producing PVC cards at .038" ± .004" with a surface flatness (1 side ) of <0.0005" at less than 40 minutes per cycle.
   *Process supplied yielded 0.046" to 0.048" at less than 50% yield for electrical and cosmetic quality.*
   b. PVC lamination process to achieve flatness or combination of PVC lamination and post-process cold lamination (or gluing) of PVC top printable layer
   *Not Attempted.*
   c. process to be developed with final outcome of using 4 cassette books and 5-12 layers per book
   *Done.*
   d. Quality control process for documentation of lamination process on each lot with future traceability
   *N/A.*
   e. Data compiled for flatness vs. material and process used
   *Not Done.*

3. Equipment / Monitoring equipment / Test Equipment
   a. Procedure for lamination press operation
   *No written procedure supplied by Keith.*
   b. Static discharge equipment requirement for laminated sheets
   *No requirements document supplied for Keith.*
   c. Specifications for cassette design, mirror plate, w/source, press pads, and press plates
   *Some specifications supplied but process was a moving target, MI could not source over $10,000 worth of tooling for an unstable process.*
   d. Process monitoring tooling needed for tracking of lamination performance to lot
   *N/A.*
   e. Specification and set up of test equipment on laminated product
   *Not Done.*
   f. Preventive maintenance specification for lamination equipment and tooling
   *Not Done.*

4. Product

DEFENDANT'S
EXHIBIT
# 116
Leighton
1/10/06/05

Motorola / Indala   Ken Thompson          408 395 7941          07/12/95   5:39 PM   244

a. Manufacture of ISO format card with embedded electronic RFID's to a surface
flatness of 0.0005" for dye sublimation printing
*Process given to Motorola Indala after 5 weeks of development yielded below 24% on
runs of over 4,000 card sites. Evolving process, materials, and tooling did not allow
sufficient time within the 4 weeks to produce a stable, or acceptable process.*
b. Production of > 10,000 cards using process, tooling, and material identified within
4 weeks along with all above items to receive bonus amount of $1,500.00

*Process given to Motorola Indala after 5 weeks of development yielded below 24% on runs
of over 4,000 card sites. Evolving process, materials, and tooling did not allow sufficient
time within the 4 weeks to produce a stable, or acceptable process. Motorola Indala does
not consider the 24% yield to be a "production process". Due to unstable process
development, MI would not commit to >$10,000 worth of tooling until a "production
process" was identified.*
*During those 4 weeks, the laminating press was inoperable for 3 days and Keith missed a
total of 2.5 days of work. $1,500 was issued to Kieth for the 5th week of work. $375
was issued to Keith on P.O.#950747 dated 6/22.*

Signed: Keith Leighton _____  Date: _____

Ken Thompson _____  Date: _____

Trial Counsel's Eyes Only                                    L06522

# EXHIBIT 60

1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - - - - - -

4   LEIGHTON TECHNOLOGIES, LLC,           )     Case No.

5               Plaintiff and             )     04 Civ. 02496

6               Counterclaim Defendant,   )

7     v.                                  )

8   OBERTHUR CARD SYSTEMS, S.A., AND      )

9   OBERTHUR CARD SYSTEMS OF              )

10  AMERICA CORPORATION,                  )

11              Defendants and            )

12              Counterclaim Plaintiffs   )

13    - - - - - - - - - - - - - - - - - -

14                    CONFIDENTIAL

15         DEPOSITION OF JEAN-MARC DELBECQ

16            WEDNESDAY, MARCH 22, 2006

17           PAGES 151 - 308; VOLUME 2

18

19

20

21

22         BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23

24

25

1          Number two, do you recall whether Leighton

2    ever provided Indala any of the items listed under

3    number two?

4          (The witness reviews the document.)

5          THE WITNESS:  I recall that Keith Leighton

6    did not deliver the items listed in item two or that

7    if -- if he claimed to have, the results were not

8    reproducible in a sufficiently -- in a -- of a

9    sufficient quality to be called a -- a deliverable.

10   BY MR. J. JACOBS:

11       Q.   How about items under number three, did he

12   provide Indala with the items under number three?

13          (The witness reviews the document.)

14          THE WITNESS:  I do not recall Keith Leighton

15   providing Indala the items in number three except the

16   specifications for cassette design, mirror plate,

17   source press pads and press plates.

18          I do recall getting some contacts from Keith

19   Leighton and -- and buying some plates or deciding that

20   his -- actually, probably what I really remember is

21   that, after talking to his contacts, we decided that

22   there really wasn't a lot of value and we went and we

23   sourced them in other places.

24          But one of the things I think that Keith

25   Leighton as, you know, he presented him -- represented

1    himself to Indala as a laminating expert had, we think,

2    were contacts in the industry.  And so part of -- part

3    of three was really, you know, who can we talk to to

4    get certain stuff.

5              But I am sure that there was no static

6    discharge from Keith, 3B.

7              I'm fairly sure that I can say he did not

8    give us 3A, a procedure for running the press.

9              I -- I can say with some confidence he didn't

10   give us any preventive maintenance specifications -- I

11   don't even remember Keith Leighton giving us any

12   documentation.  In fact, what you've shown me, which

13   are things that I've drawn, is the way that we got the

14   documentation.

15             We sat down and we said, Look, you know, what

16   do you know?  And then we put it up on the white board.

17   That was more how we got anything of documentation from

18   Keith.

19   BY MR. J. JACOBS:

20        Q.   How about on number four, did Indala receive

21   those deliverables listed under four?

22             (The witness reviews the document.)

23             THE WITNESS:  We did not receive that from

24   Keith Leighton.

25             MR. J. JACOBS:  Let's mark as the next

# EXHIBIT 61

Keith Leighton
2817 Fulmer Rd
Lorain, Oh  44053

July 17, 1995

Plastag Corporation
5990 North Norwest Highway
Chicago, Illinois  60631

Dear Dave:

We made an agreement that I would give you my proven technology to produce a full bleed laminated plastic card for a consultant fee of $8000. I did not agree to work by the hour because I have already invested many hours in research and development to produce my technology.  I decided to give this technology to any plastic card manufacturer who requested it for a consultant fee of $8000.

The $8000 fee is justified because I saved you thousands of dollars by giving you proven technology in four days that took me weeks of research and development paid for by other plastic card companies - and they are successfully using this same technology today.

You said you had the same ink that I brought in; however, the technology I gave you involved more than just ink!  It involved increased time in the laminator and also an alcohol free process. I used more than just ink and **GAVE YOU THE TECHNOLOGY I PROMISED YOU.** Mitch said, in our presence, that my results exceeded ISO standards and was better than anything Plastag previously developed.  **I DID GIVE YOU THE RESULTS I PROMISED YOU!** Please send me the $4000 you promised to pay me.

Before I left Plastag I gave you a formula without using alcohol, not including an alcohol substitute.  This formula produced **SUCCESSFUL RESULTS** - check your sample sheets.  This formula, contrary to what Frank Schneider said, worked on all U.V. colors. However, you wanted the PMS 185 to be a stronger red color, so you ordered a stronger PMS 185 to be tested after I left.

On Friday, June 2nd, my last day at Plastag, you said that you would test the PMS 185 within two weeks and if the results proved successful you would pay me the balance of $4000 within the two weeks.  You said --"These people here are my witness, I will pay you within two weeks, I am a man of my word." According to Bill Kraft, the test on the PMS 185 wasn't made until  July 14th, one and one-half months later.  It proved to be successful because all PMS colors (except metallic) work using my proven formula.

Frank Schneider said the alcohol free substitute doesn't work that well.  How could he know when in fact (according to Bill Kraft) you haven't even tested an alcohol free substitute yet?  On July 13th Bill Kraft told me he was having the ROSO people come in to work with him to formulate an alcohol free substitute.

Trial Counsel's Eyes Only

L07684

Page 2                                July 17, 1995

I have provided you with the same technology that I gave to Rainbow Printing and other companies.  They tell me that they are happy with the results.

I have other plastic card innovations  I would like to share with you because I believe you would be interested.  One is a RF-ID card with a thickness of .032" which I am planning to have patented.

Best Regards,

*Keith Leighton*

Keith Leighton


P.S.   **CONSIDER THIS**:

I showed you and Frank that it is not necessary to applyadhesive on split core stock.  Frank told me that by eliminating the adhesive the money saved would pay for a family of six to live for one year. I did not charge you for this valuable recommendation.

Trial Counsel's Eyes Only

# EXHIBIT 62

ISSUE CLASSIFICATION

Class | Subclass

PROVISIONAL
APPLICATION
NUMBER 60/005,685

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 60/005,685 | 10/17/95 | | | | |
| PROVISIONAL | | | | | |

APPLICANTS

KEITH R. LEIGHTON, LORAIN, OH.

**CONTINUING DATA***********************
  VERIFIED


**FOREIGN/PCT APPLICATIONS************
  VERIFIED


FOREIGN FILING LICENSE GRANTED 12/14/95      ***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☐ no 35 USC 119 conditions met ☐ yes ☐ no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| Verified and Acknowledged    Examiner's Initials | → | OH | 6 | | | $75.00 | 6014-GEN |

ADDRESS

STEVEN M HAAS
1225 WEST MARKET STREET
AKRON OH 44313-7188

TITLE

PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS

U.S. DEPT. OF COMM./ PAT. & TM—PTO-436L (Rev.12-94)

Form PTO-1625
(Rev. 8/95)

(FACE)

PATENT APPLICATION

60005685

APPROVED FOR LICENSE

INITIALS ___ DEC 12 9 5 4 5

Date
Entered
or
Counted

Date
Received
or
Mailed

# CONTENTS

1. Application _____ papers _____
   _____ 5/28/03
4. _____
5. _____
6. _____
7. _____
8. _____
9. _____
10. _____

15. _____
16. _____
17. _____
18. _____
19. _____
20. _____
21. _____
22. _____
23. _____
24. _____
25. _____
26. _____
27. _____
28. _____
29. _____
30. _____
31. _____
32. _____

(FRONT)

| POSITION | | ID NO. | DATE |
|---|---|---|---|
| CLASSIFIER | | *13* | *1/1/13* |
| EXAMINER | | *E42* | *12/3-95* |
| TYPIST | | *386* | *12/14* |
| VERIFIER | | *22C* | *2-9* |
| CORPS CORR. | | | |
| SPEC. HAND | | | |
| FILE MAINT | | | |
| DRAFTING | | | |

(LEFT INSIDE)

(RIGHT OUTSIDE)

01/005685

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

PTO-1556
(5/87)

| BAR CODE LABEL | U.S. PATENT APPLICATION | | |
|---|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT |
|---|---|---|---|
| 60/005,685 PROVISIONAL | 10/17/95 | | |

APPLICANT    KEITH R. LEIGHTON, LORAIN, OH.

**CONTINUING DATA**********************
VERIFIED

**FOREIGN/PCT APPLICATIONS************
VERIFIED

FOREIGN FILING LICENSE GRANTED 12/14/95     ***** SMALL ENTITY *****

| STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS | FILING FEE RECEIVED | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| OH | 6 | | | $75.00 | 6014-GBN |

ADDRESS    STEVEN K HAAS
1225 WEST MARKET STREET
AKRON OH 44313-7188

TITLE    PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS

This is to certify that annexed hereto is a true copy from the records of the United States
Patent and Trademark Office of the application which is identified above.

By authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

Date                    Certifying Officer

Attorney's Docket No. _____ 1-GEN _____ 75. 2'14 **PATENT**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

application of: Keith R. Leighton

For: PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS

Box Provisional Patent Application
Commissioner of Patents and Trademarks
Washington, D.C. 20231

## COVER SHEET FOR FILING PROVISIONAL APPLICATION
### (37 C.F.R. § 1.51(2)(i))

WARNING: "A provisional application must also include a cover sheet identifying the application as a provisional application. Otherwise, the application will be treated as an application filed under § 1.53(b)(1)." 37 C.F.R. § 1.53(b)(2)(ii).

NOTE: "A complete provisional application does not require claims since no examination on the merits will be given to a provisional application. However, provisional applications may be filed with one or more claims as part of the application. Nevertheless, no additional claim fee or multiple dependent claims fee will be required in a provisional application." Notice of December 5, 1994, 59 FR 63951, at 63953.
"Any claim filed with a provisional application will, of course, be considered part of the original provisional application disclosure." Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,209.

NOTE: "A provisional application shall not be entitled to the right of priority under § 1.55 or 35 U.S.C. 119 or 365(a) or to the benefit of an earlier filing date under § 1.78 or 35 U.S.C. 120, 121 or 365(c) of any other application." 37 C.F.R. § 1.53(b)(2)(ii).

NOTE: "No information disclosure statement may be filed in a provisional application." 37 C.F.R. § 1.51(2)(b).
"Any information disclosure statements filed in a provisional application would either be returned or disposed of at the convenience of the Office." Notice of December 5, 1994, 59 FR 63591, at 63594.

NOTE: "No amendment other than to make the provisional application comply with all applicable regulations, may be made to the provisional application after the filing date of the provisional application." 37 C.F.R. § 1.53(b)(2).

### CERTIFICATION UNDER 37 CFR 1.10

I hereby certify that this correspondence and the documents referred to as attached therein are being deposited with the United States Postal Service on OCTOBER 17, 1995 (date), in an envelope as "EXPRESS MAIL POST OFFICE TO ADDRESSEE" service under 37 C.F.R. 1.10, Mailing Label Number EM222520082US addressed to the: Commissioner of Patents and Trademarks, Washington, D.C. 20231.

_____
Signature

Kathryn E. Palguta
(type or print name of person certifying)

NOTE: Each paper or fee filed by "Express Mail" must have the number of the "Express Mail" mailing label placed thereon prior to mailing. (37 C.F.R. 1.10(b))

WARNING: Certificate of mailing (first class) or facsimile transmission procedures of 37 CFR 1.8(a) cannot be used to obtain a date of mailing or transmission for this correspondence. 37 C.F.R. 1.8(a)(ii)(A)

(Cover Sheet for Filing Provisional Application [23-1]—page 1 of 5)

**WARNING:** *A provisional applica____ ___ay be abandoned by operation of 35 U.S.C. ___ )(5) on a Saturday, Sunday, or Federal holiday within the District of Columbia, in which case, a nonprovisional application claiming benefit of the provisional application under 35 U.S.C. 119(e) must be filed no later than the preceding day that is not a Saturday, Sunday, or Federal holiday within the District of Columbia. Notice of April 14, 1995, 60 Fed. Reg. 20,195 at 20,202.*

1.  The accompanying application is a provisional application. (37 C.F.R. § 1.51(a)(2)(i)(A))

2.  The name(s) of the inventor(s) is/are (37 C.F.R. § 1.51(a)(2)(i)(B)):

> **NOTE:** *While the name or names of the inventors are required in order to accord a provisional application a filing date, a provisional application is not required to be signed by the inventor or the assignee. No oath or declaration is required. Presumably, most provisional applications will be filed by a registered practitioner without a power of attorney being filed. Notice of December 5, 1994, 59 FR 63591, at 63594.*

> **NOTE:** *"The naming of inventors for obtaining a filing date for a provisional application is the same as for other applications. A provisional application filed with the inventors identified as 'Jones et al.' will not be accorded a filing date earlier than the date upon which the name of each inventor is supplied unless a petition with the fee set forth in § 1.17(i) is filed which sets forth the reasons the delay in supplying the names should be excused. Administrative oversight is an acceptable reason. It should be noted that for a 35 U.S.C. 111(a) application to be entitled to claim the benefit of the filing date of a provisional application the 35 U.S.C. 111(a)[,] application must have at least one inventor in common with the provisional application." Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,209.*

> *The term "invention" is typically used to refer to subject matter which applicant is claiming in his/her application. Because claims are not required in a provisional application, it would not be appropriate to reference joint inventors as those who have made a contribution to the "invention" disclosed in the provisional application. If the "invention" has not been determined in the provisional application because no claims have been presented, then the name(s) of those person(s) who have made a contribution to the subject matter disclosed in the provisional application should be submitted. Section 1.45(c) states that "if multiple inventors are named in a provisional application, each named inventor must have made a contribution, individually or jointly, to the subject matter disclosed in the provisional application." All that § 1.45(c) requires is that if someone is named as an inventor, that person must have made a contribution to the subject matter disclosed in the provisional application. When applicant has determined what the invention is by the filing of the 35 U.S.C. 111(a) application, that is the time when the correct inventors must be named. The 35 U.S.C. 111(a) application must have an inventor in common with the provisional application in order for the 35 U.S.C. 111(a) application to be entitled to claim the benefit of the provisional application under 35 U.S.C. 119(e). Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,208.*

> *"If all the names of the actual inventor or inventors are not supplied when the specification and any required drawings are filed, the provisional application will not be given a filing date earlier than the date upon which the names are supplied unless a petition, with the fee set forth in § 1.17(q), is filed, which sets forth that the reasons for the delay in supplying the names should be excused." 37 C.F.R. § 1.53(b)(2).*

1. __Keith_____ __R._____ __Leighton_____
   (GIVEN NAME)                 (MIDDLE INITIAL OR NAME)           (FAMILY (OR LAST) NAME)

2. _____ _____ _____
   (GIVEN NAME)                 (MIDDLE INITIAL OR NAME)           (FAMILY (OR LAST) NAME)

3. _____ _____ _____
   (GIVEN NAME)                 (MIDDLE INITIAL OR NAME)           (FAMILY (OR LAST) NAME)

(Cover Sheet for Filing Provisional Application [23-1]—page 2 of 5)

3. Address(es) of the inven    , as numbered above (37 C.F.R. §    (a)(2)(i)(C)):

   1.  2817 Fulmer Road, Lorain, Ohio 44053 *OH*

   2. _____

   3. _____

4. The title of the invention is (37 C.F.R. § 1.51(a)(2)(i)(D)):

   PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS

5. The name, registration, and telephone number of the attorney (*if applicable*) is (37 C.F.R. § 1.51(a)(2)(i)(E)):

   Name of attorney: Steven M. Haas

   Reg. No. 37,841 _____ Tel. ( 216 ) 864-5550

            (complete the following, if applicable)

     ☐ A power of attorney accompanies this cover sheet.

6. The docket number used to identify this application is (37 C.F.R. § 1.51(a)(2)(i)(F)):

   Docket No.: 6014-GEN

7. The correspondence address for this application is (37 C.F.R. § 1.51(a)(2)(i)(G)):

   1225 West Market Street

   Akron, Ohio 44313-7188

8. Statement as to whether invention was made by an agency of the U.S. Government or under contract with an agency of the U.S. Government. (37 C.F.R. § 1.51(a)(2)(i)(H)).

This invention was made by an agency of the United States Government or under contract with an agency of the United States Government.

    ☒ No.

    ☐ Yes.

    The name of the U.S. Government agency and the Government contract number are:

   _____

   _____

(Cover Sheet for Filing Provisional Application [23-1]—page 3 of 5)

9. Identification of documen    :companying this cover sheet:

   A. Documents required by 37 C.F.R. §§ (a)(2)(i)–(iii):

      Specification:                                No. of pages   <u>13</u>

      Drawings:                                      No. of sheets   <u>6</u>

   B. Additional documents:

      ☐ Claims:                                No. of claims   <u>0</u>

    *Note: A complete provisional application does not require claims. 37 C.F.R. § 1.51(a)(2).*

      ☐ Power of attorney

      ☒ Small entity statement

      ☐ Assignment

      ☐ Other

    *NOTE: Provisional applications may be filed in a language other than English as set forth in existing § 1.52(d). However, an English language translation is necessary for security screening purposes. Therefore, the PTO will require the English language translation and payment of the fee mandated in § 1.52(d) in the provisional application. Failure to timely submit the translation in response to a PTO requirement will result in the abandonment of the provisional application. If a 35 U.S.C. 111(a) application is filed without providing the English language translation in the provisional application, the English language translation will be required to be supplied in every 34 U.S.C. 111(a) application claiming priority of the non-English language provisional application. Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,203.*

**10. Fee**

   The filing fee for this provisional application, as set in 37 C.F.R. § 1.16(k), is $150.00, for other than a small entity, and $75.00 for a small entity.

      ☒ Applicant is a small entity.

    *NOTE: "A verified statement in compliance with existing § 1.27 is required to be filed in each provisional application in which it is desired to pay reduced fees." Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,197.*

**11. Small entity statement**

      ☒ The verified statement(s) that this is a filing by a small entity under 37 C.F.R. §§ 1.9 and 1.27 is(are) attached.

**12. Fee payment being made at this time**

      ☐ Not enclosed

         ☐ No filing fee is to be paid at this time
            (This and the surcharge required by 37 C.F.R.
            § 1.16(f) can be paid subsequently).

      ☒ Enclosed

         **Total fee enclosed**   $ <u>75.00</u>

*(Cover Sheet For Filing Provisional Application [23-1]—page 4 of 5)*

13. Method of fee payment

    ☒ Check in the amount of $ 75.00

    ☐ Charge Account No. _____
        in the amount of $ _____

A duplicate of this Cover Sheet is attached.

Please charge Account No. _15-0450_____ for any fee deficiency.

Date: _10/17/95_

Tel.: (216) 864-5550

Signature of submitter

_____
OR
**Steven M. Haas**
Signature of attorney

Date: _10/17/95_

Reg. No.: _37,841_

Tel.: (216) 864-5550

_Steven M. Haas_____
(type or print name of attorney)

_1225 West Market Street_____
P.O. Address

_Akron, Ohio 44313-7188_____

(Cover Sheet For Filing Provisional Application [23-1]—page 5 of 5)



BC7005685

## ABSTRACT

This invention is a Hot Lamination Method used to make/manufacture
a unique plastic Radio Frequency Identification (RF/ID) card
.028"–.032" thick with a smooth glossy surface flatness of
.0005", capable to receive dye sublimation printing on both
sides, to meet the International Standards Organization (ISO
format having a contactless read/write silicone computer chip
and a wire or circuit board antenna capsulized for the
purpose of identifying the individual user and to stop crime
due to fraud and counterfeiting. Polyvinyl chloride, or other
plastic substrates, is used in this Hot Lamination Method.

## SUMMARY OF THE INVENTION

The main object of the invention of a Hot Lamination Method of making plastic cards is to meet the plastic card industry's need/demand for a method to make/manufacture a unique Radio Frequency Identification (RF/ID) card .028"-.032" thick, with a smooth glossy flatness of .0005" to receive dye sublimation printing on both sides of the card capsulizing a contactless read/write silicone computer chip and a wire or circuit board antenna for identification and security of its user and to stop counterfeiting and crime. The Hot Lamination Method will meet the plastic card industry's need/demand. It also meets the standards of the International Standards Organization (ISO).

Another object of this invention is to enable transactions to be made using all of the electronic equipment already implemented throughout the world, such as automatic teller machines (ATM), electronic point of sale machines (POS), electronic telephone systems and unlocking the internet banking computer systems. Also to unlock and lock all kinds of doors (including personal and government security doors) and to lock and unlock all kinds of ignitions of vehicles and electronic equipment.

Another object of this invention is that it will be used in many ways such as financial transactions, telephone cards, passports, student identification, bus passes, airline tickets, drivers license, government security passes, prisioner identification, etc.

DESCRIPTION OF INVENTION

This invention is a Hot Laminating Method used to make/manufacture
a unique plastic Radio Frequency Identification (RF/ID) card
.028"-.032" thick with a smooth glossy surface flatness of .0005"
having a contactless read/write silicone computer chip and a wire
or circuit board antenna capsulized for the purpose of identifying
the individual user and to stop fraud and counterfeiting.

The card is made of poly vinyl chloride, or other plastic
substrates, and can receive dye sublimation printing.  Dye sub-
limation printing is a method of printing on the surface of in-
dividual plastic cards (one card at a time) using a computer
printer and a video camera.

The Hot Lamination Method is used to make a proximity card or
plastic RF/ID card.

This invention is not the capsulized electronics (silicone
computer chips and wires or circuit board antennas) but is the
Hot Lamination Method of capsulizing the electronics in a thin
(.028"-.032" thick) smooth glossy (.0005" surface flatness)
plastic card that meets the International Stnadards Organization
format.

The contactless read/write silicone computer and antenna, re-
ferred to as the elcctronics capsulized in the card, can receive
a radio message that can change information inside the computer
silicone chip and antenna, then rebroadcast that information
back to the computerized transmitter.  These electronics are
called RFID, or Radio Frequency Identification Device.  RFID
technology is not new, but my Hot Lamination Method of making
a  thin smooth plastic card capsulizing the RFID is new.

## PURPOSE OF THE INVENTION

The main purpose of this invention is to meet the plastic card industry's need/demand for a method of making a plastic card that will have the following characteristics and capabilities:

1. A thickness of .028"-.032" which is needed to fit all the electronic equipment already implemented throughout the world, such as Automatic Teller Machines (ATM), Point of Sale Machines (POS), electric telephone systems and the internet banking computer systems.

2. Has a smooth glossy surface flatness of .0005" capable of receiving dye sublimation printing on both sides of the card.

3. Has capsulized a read/write silicone computer chip and a wire or circuit board antenna, Radio Frequency Identification (RF/ID), giving it the capability to give proper identification and security to its user for trans-actions using passports, student identification, drivers license, airline tickets, bus passes, government security passes etc.

4. Has the capability, because of the capsulized RF/ID, to stop the crime of counterfeiting and fraud, thus saving the banking industry and taxpayers billions of dollars annually.

5. Has the necessary approval of the International Standards Organization.

BACKGROUND OF INVENTION

Field of the invention

A Radio Frequency Identification Device (RF/ID) is not a new technology, bu my unique Hot Lamination method of making a thin (.028"-.032" thick) smooth glossy (.0005" surface flatness) plastic card capsulizing the Radio Frequency Identification Device is new technology.

Researchers in the plastic card industry have beem trying for many years to devise a method to stop the fraud and counterfeiting which has amounted to the loss of billions of dollars annually to the banking industry and eventually to the taxpayers. They could not produce a plastic card that capsulized both a silicone computer chip and a wire or circuit board antenna thin (.028"-.032" thick) and smooth enough (.0005" surface flatness) to meet International Standards Organization (ISO) format and to receive dye sublimation printing.

Among the plastic card manufacturers that worked to develop this card and failed are Colastics in Daily, California and Casi-Rusco in Boca Roton, Florida. For several years silicone computer chip manufacturers, such as Hughes in Tustin, California and Mikron (now a Division of Philips) in Gratakorn, Austria have been looking for a plastic card manufacturer to capsulize their silicone computer chips and antennas into a plastic card at least .032" thick and a flatness of .0005" which is the standard for ISO to receive dye sublimation printing.

After twenty years of research and development, I found that the method to stop fraud and counterfeiting has evolved through electronics and radio frequencies. By applying the new electronics and radio frequencies, I invented a unique Hot Lamination Method of capsulizing the electronics into a plastic card .028"-.032" thick, with a smooth glossy flatness of .0005", to receive dye sublimation printing. Dye sublimation printing is a method of

BACKGROUND OF INVENTION (Continued)

printing on the surface of individual plastic cards, using a computer printer and a video camera. The computer and video camera is not part of my invention. Because my Hot Lamination Method can produce a card thin enough and smooth enough to receive dye sublimation printing and capsulize RF/ID's, the manufacture of plastic RF/ID cards can soon begin.

Leading plastic card magazines and publications, such as the following, advertised in the July/August 1995 issues the need/demand of the plastic card industries for the .028"-.032" thick and .0005" surface flatness plastic RF/ID card to receive dye sublimation printing:

* PIN PERSONAL IDENTIFICATION NEWS
* CARD MANUFACTURING (The Official Publications of the International Card Manufacturing Associations)
* WORLD CARD TECHNOLOGY MAGAZINE (The Magazine for Advanced Card Technology and Applications)
* CARD WORLD INDEPENDENT (International Journal for the Plastic Card, Financial and Retail Industries)

DESCRIPTION OF PRIOR ART

United States Patent No. 5,412,192

Dated:        May 2, 1995

Title:        Radio Frequency Activated Charge Card

Inventor:     Robert J. Haas

Abstract:     Radio frequency activated charge card
              a system for changing the activation status of a
              selected data card such as a charge card by
              broadcasting an appropriate RP signal.  An
              antenna embedded in the card detects and
              decodes the signal, and operates a transducer
              which changes the card appearance, alters
              magnetic stripe information, or alters the
              information contained within the card.

The above prior art is very different from my invention of a Hot
Laminated  Method to make a unique plastic identification card
which is .028"-.032" thick, with a smooth glossy surface flat-
ness of .0005" having a Contactless read/write silicone com-
puter chip and a wire or circuit board antenna capsulized for
the main purpose of identifying the individual user and to
stop counterfeiting and fraud.

The differences in the above prior art from my invention:

1.  It is too thick and does not meet the International
    Standards Organization format for a thickness of .028"-.032".
    My card is .028"-.032" thick and meets the ISO format.

2.  It has a heat sensing device that will blow a fuse at a
    certain temperature and, therefore, would not stand the
    heat of a laminator.  My card withstands the heat of the
    laminator up to 370 F.

3.  It has a battery implanted in it that would not stand the
    heat or pressure of the laminator.  My card does not need
    a battery.

DESCRIPTION OF THE PRIOR ART (Continued)

4.  It has a photocell which cannot withstand the heat or
    pressures of the laminator.  My card does not need a
    photocell.

5.  It has a liquid crystal display that would be destroyed
    by the heat and pressure of the laminator.  My card
    does not need a liquid crystal display.

6.  It is manufactured by a cold lamination process which
    does not give a smooth enough surface to receive dye
    sublimation printing and, therefore, would not fit in
    the computer printers.  My card is made with a unique
    Hot Lamination Method which gives a smooth glossy
    surface of .0005" and will fit into computer printers.

7.  It cannot pass the International Standards Organization
    stress test for flexing and bending without destroying
    the internal electronics, which are battery, fuses,
    crystal display and photocell.  My card passes the ISO
    stress test for flexing and bending without destroying
    the internal electronics which are the wire coil
    antenna and micro chip.

8.  It cannot be competitive in the manufacturing price
    range because it has too many electronics for a charge
    card.  My card can be competitive in the manufacturing
    price range.

DESCRIPTION OF PRIOR ART

United States Patent No. 5,268,699

Dated:          December 7, 1993

Title:          Data Communication Receiver Utilizing a Loop
                Antenna Having a Hinged Connection

Inventor:       Peter K. Laute and T. Eaton

Abstract:       A substantially card shaped data communication re-
                ceiver (100) for receiving radio frequency (RF)
                signals comprises receiver circuitry for recover-
                ing information included in the RF signals, an
                insulative frame (210), a first conductive panel
                (215) disposed over a first side of the frame
                (210), and a second conductive panel (220) dis-
                posed over a second side of the frame (210) such
                that the receiver circuitry is enclosed within the
                space defind by the frame (210) and the first and
                second panels (215,220). The first and second
                panels (215,220) have coupling members formed
                thereon for electrically coupling the first panel
                (215) to the second (220).  The data communication
                receiver (100) further comprises a first conductor
                (510) for elctrically coupling the first panel (215)
                and the receiver circuitry and a second conductor
                (505) for electrically coupling the second panel
                (220) to the receiver circuitry such that the
                first and second panels (215,220) function as an RF
                antenna when disposed over the first and second
                sides, respectively, of the frame (210).

The above prior art is very different from my invention of a Hot
Laminated Method to make a unique plastic identification card
which is .028"-.032" thick, with a smooth glossy surface
flatness of .0005" capable of receiving dye sublimation printing
on both sides, having a contactless read/write silicone com-
puter chip and a wire or circuit board antenna capsulized for
the main purpose of identifying the individual user and to
stop counterfeiting and fraud.

DESCRIPTION OF PRIOR ART

United States Patent No. 5,268,699 (Continued)

The differences in the above prior art from my invention:

1.  The above prior art is made of plastic and metal which is
    held together with screws.  My card is made with four sheets
    of plastic only, molded together by my Hot Lamination Method
    capsulizing a Radio Frequency Indentification Device (RFID).

2.  The above prior art is not used for financial transactions.
    It is not a credit card or financial card.  My Hot Lamina-
    tion Method can produce a plastic RF identification
    card that can used for financial transactions because it
    meets the International Standards Organizaiton format and
    fits into the Automatic Tell Mac ines (ATM) and Point of
    Sale Machines (POS).

3.  The above prior art is not tamper proof because it can be
    disassembled for repair.  It is not a financial credit
    card; it is a  communication receiver shaped like an
    identification card to receive radio frequency messages.
    My invention produces a plastic identification card that
    can be used to stop counterfeiting and fraud because of its
    tamper proof construction; it cannot be disassembled.

DESCRIPTION OF THE DRAWINGS

FIGURE 1, 2 and 3 are representative of RF/ID assemblies to be embodied in a plastic card by a Hot Lamination Method.

FIGURE 1 shows a wire coil antenna (1) and a micro chip (2).

FIGURE 2 shows a circuit board antenna (3) and chip (2).

FIGURE 3 shows a wire coil (1) and a read/write chip (4).

FIGURE 4 shows a wire coil (1) and a chip (2) placed on a plastic core sheet (5) overlayed with another plastic core sheet (5), as shown in the SIDE VIEW of FIGURE 5.

FIGURE 5 is the SIDE VIEW showing the embodiment of the RF/ID assembly layered between sheets (5).

FIGURE 6 is an END VIEW showing the same layering as FIGURE 5.

FIGURE 6 is an illustration of an assembly ready to be placed into the laminator, as illustrated in FIGURE 10.

FIGURE 7 shows wire core antennas (1) and chips (2) placed on a plastic sheet (5).

FIGURE 8 shows a wire coil antenna (1) and a micro chip (2) placed between two plastic core sheets (5). The two plastic core sheets have a thickness of .0125" each.

FIGURE 9 is an END VIEW showing the same layering as FIGURE 8.

FIGURE 10 shows the core sheets (5) and RF/ID's (1) and (2) placed within the laminator, as illustrated in FIGURE 8.

FIGURE 11 shows either a printing press or silk screen press (11) applying printing ink (6) on surface of plastic sheet (5).

FIGURE 12 shows a layer of clear plastic overlaminate film (7) placed on the printing surface (6).

DESCRIPTION OF THE DRAWINGS (Continued)

FIGURE 13 shows a laminator containing FIGURE 12 ready to go
through the laminating cycle - as follows:

The first laminating process in building up the core sheets (5)
begins with the two core sheets (5) containing the RFID's (1)
and (2) being placed into the laminator on a matte finished
laminating plate (8). The laminating plate (8) is placed on
a laminating pad (9). The laminating pad (9) is placed on a
steel plate or tray (10). This layering is the same on the
top and bottom, making up a book to be inserted into the
laminator as illustrated in FIGURE 10. The laminator begins
its first heat cycle bb merely closing the laminator without
applying any pressure to the core sheets (5). The heat is
then applied and brought up to a temperature between 300 F -
370 F for a period of 7 - 10 minutes. After this first cycle,
the ram pressure is increased according to the sheet size to
permit the flow of the plastic core sheets (5) to capsulize the
RFID's (1) and (2). This cycle will continue for approximately
10 - 15 minutes. The laminating pressure is determined by the
sheet size used and the number of coils placed upon the surface
of the sheets. After the heat cycle is complete it starts
into a chill cycle. The ramp pressure of the laminator is
increased by 25% until the embodiment is cooled down approxi-
mately 45 F - 60 F for approximately 12 - 15 minutes under the
ram pressure. After ram pressure has been lowered or the
laminatory opened, this completes the cycle of the laminating
process to manufacture the core sheets J5) containing the RFID's
(1) and (2) embodied into one core sheet (5) with the thickness
approximately .025"-.026". The core sheets are removed from
the matte finish laminating plates, the sheets are then ready with
a matte finish prepared for a printing application FIGURE 11.
This printing application will cover any exposed wire or micro
chips that have discolored or flowed through the plastic.

DESCRIPTION OF THE DRAWINGS (Continued)

FIGURE 13 (continued)

After printing, the lamination process is followed up by placing a steel plate on the platen of the laminator (12) and then the laminating pad (9). Then place a mirror-finish stainless steel laminating plate (13) is placed on the laminating pad (10). The RFID assembly embedded in the plastic core sheets (5) with printing area (6) are placed on overlaminate film (7) with a thickness of .0015". Then a laminating mirror-finish stainless plate (13) is placed on the overlaminate film (7) and covered with a laminating pad (9) and then covered with a steel plate (10) and is then placed inside of the laminator. The laminator is then closed to a normal laminating plastic lamination at a heat range of 180F- 212 F for approximately 15 - 20 minutes and then the laminator is brought to the cooling cycle with a 25% in ram pressure with a chill cycle of 45 F - 60 F for a period of 12 - 15 minutes. This will complete the laminating cycle. The sheets can be removed from the mirror-finish plate (13). The cards can be cut from the sheets giveing individual plastic cards containing RFID's for identification cards or credit cards.

MAIL ROOM
OCT
17
1995
PAT. & TRADEMARK

Attorney's Docket No. 6014-GEN _____     **PATENT**

Applicant or Patentee: Leighton, Keith R. _____

Application or Patent No.: ___/_____

Filed or Issued: _____

For: PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS

## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY
## STATUS (37 CFR 1.9(f) and 1.27(b))—INDEPENDENT INVENTOR

As a below named inventor, I hereby declare that I qualify as an independent inventor, as defined in 37 CFR 1.9(c), for purposes of paying reduced fees under Sections 41(a) and (b) of Title 35, United States Code, to the Patent and Trademark Office with regard to the invention entitled PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS described in

    ☒ the specification filed herewith.

    ☐ application no. ___/_____ , filed _____ .

    ☐ patent no. _____ , issued _____

I have not assigned, granted, conveyed or licensed, and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who could not be classified as an independent inventor under 37 CFR 1.9(c), if that person had made the invention, or to any concern that would not qualify as a small business concern under 37 CFR 1.9(d), or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

    ☒ no such person, concern, or organization.

    ☐ persons, concerns or organizations listed below *

*NOTE: Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

FULL NAME _____

ADDRESS _____

☐ INDIVIDUAL    ☐ SMALL BUSINESS CONCERN    ☐ NONPROFIT ORGANIZATION

FULL NAME _____

ADDRESS _____

☐ INDIVIDUAL    ☐ SMALL BUSINESS CONCERN    ☐ NONPROFIT ORGANIZATION

FULL NAME _____

ADDRESS _____

☐ INDIVIDUAL    ☐ SMALL BUSINESS CONCERN    ☐ NONPROFIT ORGANIZATION

Small Entity—Independent Inventor [7-1]—page 1 of 2)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

Keith R. Leighton
Name of Inventor

X  Signature of Inventor                                    X Date 10-16-95

_____
Name of Inventor

_____                  Date _____
Signature of Inventor

_____
Name of Inventor

_____                  Date _____
Signature of Inventor

Small Entity--Independent Inventor [7-1]--page 2 of 2)

01 005685

FIG.1



FIG.2



FIG.3



00/005685

FIG. 4



FIG.5



FIG.6



M 005685

FIG.7



FIG.8



FIG.9



NY005685

FIG.10



00/005685

FIG.11



FIG.12



W/005685

FIG.13



PTO/SB/68 (04-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR ACCESS TO AN APPLICATION UNDER 37 CFR 1.14(e)

In re Application of

| Application Number | | Filed |
|---|---|---|
| 60/005685 | | 10-17-95 |
| Art Unit | Examiner | |

RECEIVED

MAY 2 9 2003

File Information Unit

Paper No. 2

Assistant Commissioner for Patents
Washington, DC 20231

1. ☑ I hereby request access under 37 CFR 1.14(e)(2) to the application file record of the above-identified ABANDONED Application, which is not within the file jacket of a pending Continued Prosecution Application (CPA) (37 CFR 1.53(d)) and is: (CHECK ONE)

    ☑ (A) referred to in:

      United States Patent Application Publication No. _____, page _____, line_____.

      United States Patent Number 5817207, column _____, line _____, or

      an International Application which was filed on or after November 29, 2000 and which

      designates the United States, WIPO Pub. No. _____, page _____, line_____.

    ☐ (B) referred to in an application that is open to public inspection as set forth in 37 CFR 1.11(b) or

      1.14(e)(2)(i), i.e., Application No._____, paper No. _____, page _____,line_____.

2. ☐ I hereby request access under 37 CFR 1.14(e)(1) to an application in which the applicant
has filed an authorization to lay open the complete application to the public.

| | |
|---|---|
| _Signature_ | 5-25-03 |
| | _Date_ |
| HENRY Duca | |
| Typed or printed name | |

| FOR PTO USE ONLY |
|---|
| Approved by: _____ (Initials) |
| Unit: |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

Form PTO 1130
(REV 2-84)

# PACE DATA ENTRY CODING SHEET

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

| 1ST EXAMINER | $EVD$ | DATE $12/13/9$ |
|---|---|---|
| 2ND EXAMINER | | DATE |

**APPLICATION NUMBER** 60/005285

**TOTAL CLAIMS**

**INDEPENDENT CLAIMS**

**TYPE APPL.**

**SMALL ENTITY?**

**FILING DATE** MONTH 10 DAY 17 YEAR 95

**FILING FEE** 1095

**SPECIAL HANDLING**

**FOREIGN LICENSE** V

**GROUP ART UNIT**

**CLASS**

**ATTORNEY DOCKET NUMBER** 6014-GEN

**SHEETS OF DRAWING** 6

## CONTINUITY DATA

**CONT STATUS CODE**

**PARENT APPLICATION SERIAL NUMBER**

**PCT APPLICATION SERIAL NUMBER**

P. C. T. /
P. C. T. /
P. C. T. /
P. C. T. /
P. C. T. /

**PARENT PATENT NUMBER**

**PARENT FILING DATE** MONTH DAY YEAR

## PCT/FOREIGN APPLICATION DATA

**FOREIGN PRIORITY CLAIMED**

**COUNTRY CODE**

**PCT/FOREIGN APPLICATION SERIAL NUMBER**

**FOREIGN FILING DATE** MONTH DAY YEAR

* U.S.G.P.O. : 1994 - 564-481

# EXHIBIT 63

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,     )

  vs.            ) Case No.

              ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP., )

       defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

1    A    No.  No.

2    Q    Did they have any presses?

3    A    Printing presses, that's strictly it.

4    Q    That's not a laminating press?

5    A    No.

6    Q    Did you -- did you have a -- you didn't

7    have a laminating press at home, did you?

8    A    No.

9    Q    Okay.  Did you have access to a lamination

10   press from May 5th of '95, when you stopped

11   working for Motorola, to when the -- your

12   provisional patent application was filed?

13   A    No, I wasn't doing any card work at all.

14   Q    You weren't doing any experiments or tests?

15   A    No, until I went to -- back to 2B System to

16   make the Mifare and Hitag cards.

17   Q    But that was after October of '95, right?

18   A    Yes.

19   Q    That was in -- sometime in '96.

20   A    Correct.

21   Q    Okay.  So it's fair to say that after you

22   left Motorola and continuing over the next

23   couple of months to think about the problems and

24   issues that arose, you came up with the idea

25   that led to your patents?

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 722

1    A    Yes.

2    Q    And that --

3    A    That's correct.

4    Q    And that was for a process and a method for

5    making a laminated card with an embedded

6    electronic element --

7    A    Correct.

8    Q    -- that wouldn't be damaged during the

9    lamination process.

10   A    Correct.

11   Q    Thin enough to meet ISO standards.

12   A    Yes.

13   Q    Okay.  And how did you come up with the

14   temperatures and pressures that would be used

15   during that process?

16   A    After I left Motorola, there's a company

17   out in Newcomerstown, Ohio that had PVC extended

18   life plastic, it was a homopolymer and

19   copolymer.  By using that type of PVC, I could

20   come up to higher temperatures without yellowing

21   the plastic, and I was able to go to

22   temperatures that I couldn't go at Motorola, and

23   I made some tests there at CSI to make this

24   card.

25        Let me back up here.  I made some

ded6f7f6-daef-4705-a501-eb03c1d19420

1    tests there of lamination.  At the same time I

2    received some electronics from Micron, both

3    Mifare and Hitag.  I manufactured both Hitag and

4    Mifare on the same sheets, same core sheets.

5    Q    Okay.  But -- but everything you're talking

6    about occurred after the beginning of '96,

7    right?

8    A    Correct.

9    Q    Okay.

10   A    The first part of '96 --

11   Q    Okay.

12   A    -- I was out there.

13   Q    Yeah.  I want to -- I want to talk about as

14   of the time you filed your provisional patent

15   application.

16   A    Um-hum.

17   Q    What did you have in mind in terms of

18   temperatures and pressures at which the

19   operation -- process would occur?  Did you have

20   any temperatures or pressures in mind?

21   A    I knew I had to flow the plastic.  I didn't

22   know the temperatures that I would be going to

23   because I didn't have the plastic core sheets

24   set yet.

25   Q    Okay.  How about the pressures, did you

ded6f7f6-daef-4705-a501-eb03c1d19420

# EXHIBIT 64

October 22, 1999

TO:     Matt Winter
       Director of Manufacturing
       Motorola's Worldwide Smartcard Solutions Division

FROM:   Keith Leighton
       President
       Leighton's Smart Cards and Systems, Inc.

SUBJECT: **PHONE CONVERSATION OCTOBER 20, 1999 REGARDING
         PATENTS ON SMART CARD TECHNOLOGY**

Dear Matt:

Thank you for your interest in my smart card technology and your
request for more information about my patents.

CONTACTLESS RFID CARD AND HOT LAMINATION PROCESS FOR
THE MANUFACTURE OF RADIO FREQUENCY IDENTIFICATION CARDS

I am faxing you today the abstract on this patent, number
5,817,207. This patent was issued 10-17-98. My
Provisional Patent Application is dated 10-17-95. I
would like a license agreement with Motorola to
manufacture this card in U.S.

HOT LAMINATION METHOD TO MANUFACTURE THE COMBINATION
CONTACT/CONTACTLESS SMART CARD MEETING ISO STANDARDS
AND CAPABLE OF RECEIVING DYE SUBLIMATION PRINTING

This patent has been allowed by the U.S. Patent Office
and is a continuation of patent number 5,817,207. It
is for sale.

ULTRA-THIN FLEXIBLE DURABLE RADIO FREQUENCY IDENTIFICATION
DEVICE AND HOT LAMINATION PROCESS FOR THE MANUFACTURE OF
ULTRA-THIN FLEXIBLE DURABLE RADIO FREQUENCY IDENTIFICATION
DEVICE

I have a patent pending for the manufacture of this device,
and I have successfully made a beautiful prototype. This
RFID is very thin and can be made in many shapes and sizes
and has a superior outer surface (matte or glossy) so that
it may receive all types of printing. I am ready to
give a license agreement to manufacture this RFID.

OTHER PATENTS PENDING

I have other patents pending. I am reluctant to discuss
them at this time.

Trial Counsel's Eyes Only

L06536

Page 2    October 22, 1999

TO:    Matt Winter

FROM:   Keith Leighton


September's **CARD TECHNOLOGY** magazine is very informative, especially the great story **"Transit Smart Cards Are Ready To Roll"** about the ERG-Motorola alliance and their success. I am very impressed.

Very soon the North American smart card boom will hit. Therefore, I am anxious to give license agreements to card manufacturers so that they may use my patented contactless and contact/contactless smart card technology.  My contact/contactless smart card patent is for sale; however, I will consider a license agreement to manufacturers.  I expect to be justly compensated by those using my patented technology. A lot of time, effort and money was invested in these patents.

If you would like more information regarding the above, you may contact my patent attorney, Mark Watkins, who is with OLDHAM & OLDHAM CO., L.P.A.  His phone number is 330-864-5550.  Also, a bilateral NDA should be signed.

I look forward to hearing from you.

Cordially,

Keith Leighton
Phone:     440-960-1697
Fax:       440-960-0013


KL:1

Trial Counsel's Eyes Only

# EXHIBIT 65

 **MOTOROLA**

January 8, 2002

Mr. Keith R. Leighton
Printing Technical Consultant
2817 Fulmer Road
Lorain, OH 44053

Re:    Licensing Opportunity
       US Patent No.: 6,036,099

Dear Mr. Leighton:

A copy of your patent and business card received by Motorola has been forwarded to me for processing.

Upon review of your patent, Motorola respectfully declines to pursue any licensing discussions at this time as it has exited the business.

Thank you for thinking of Motorola in connection with this opportunity.

Sincerely,

Gary J. Cunningham
Senior Counsel
Motorola, Inc.

Law Department
1301 East Algonquin Road, Schaumburg, Illinois  60196
Tel: (847) 576-1974  Fax: (847)576-0721

Trial Counsel's Eyes Only

L06501

# EXHIBIT 66

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,    )

vs.               ) Case No.

               ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,       )

        defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 529

1    A    Yes.  Um-hum.

2    Q    That was back in the 1999 time frame --

3    1995 time frame?

4    A    Yes.

5    Q    Now, correct me if I'm wrong, just to get a

6    little background, in 1995 you had done some

7    consulting work for Motorola; is that correct?

8    A    That's correct.

9    Q    You were never an employee at Motorola?

10   A    No, strictly on a consulting basis.

11   Q    You signed a contract with Motorola on a

12   consulting basis?

13   A    Yes, I did.

14   Q    And you understand that as a -- pursuant to

15   that consulting contract Motorola paid you some

16   money for you to provide some consulting

17   information to them; is that true?

18   A    That's correct.

19   Q    And the consulting that you provided to

20   Motorola in 1995 was in the contactless card

21   area; is that fair?

22   A    Yes.  They had a proximity card that they

23   wanted to use for identifi -- identifying an

24   employee.

25   Q    Okay.  Was the proximity card a card

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

# EXHIBIT 67

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,     )

vs.                 ) Case No.

                 ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,        )

        defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

    Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Page 648

1    A    So on your hot side -- we tried to maintain

2    the temperature of the laminator on the hot

3    side.  As soon as you put a book into it, the

4    book starts to absorb the heat from the platen

5    and it turns the electronic heating elements

6    back on again, so you have a fluctuation in

7    temperature.

8    Q    Okay.

9    A    So as soon as it goes in, you try to do

10   your process as fast as possible.

11   Q    It's like -- it's like baking cookies, it

12   sounds like, right?  You're supposed to preheat

13   the oven, right?

14   A    That's correct.

15   Q    You open the door, you slide the tray in,

16   you close it, you lose some heat, it's got to

17   get back up to where it was supposed to be.

18   A    It's got to get back up.

19   Q    Okay.  But the goal and the process used at

20   Motorola for the dime-sized electronics was to

21   have the press at the heating phase temperature

22   from the get-go?

23   A    Correct.

24   Q    And that might drop a little bit when the

25   pre-lams absorbed some of the heat.

Page 649

1    A    Right.

2    Q    But not a huge amount.

3    A    Right.

4    Q    And then you'd get back up to temperature.

5    A    Right.

6    Q    And you maintained that temperature

7    throughout the heating phase?

8    A    We tried to, yes.

9    Q    Okay.  So there was no intended increase or

10   decrease during the heating phase?

11   A    No.

12   Q    And is that true also for the silver dollar

13   sized --

14   A    Correct.

15   Q    -- electronic elements you made?

16   A    Correct.

17   Q    No temperature change during the heating

18   phase?

19   A    Correct.

20   Q    And then once the heating phase was over,

21   was the switch flipped and the temperature

22   turned off immediately or was there --

23   A    No.

24   Q    What happened?

25   A    The hot side stays hot all the time.

Tackla & Associates

ded6f7f6-daef-4706-a501-eb03c1d19420

Page 650

1   Q    Okay.

2   A    We tried to maintain that.

3   Q    So you take the sheets out.

4   A    You transfer, another set of books goes in

5   the hot side and the set of books that you have

6   on the hot side goes to the cold side.

7   Q    Okay.  Let's finish --

8   A    And then you close the laminator again, you

9   have a new set on the hot side and you have a

10  set on the cold side, and you try to close at

11  the same time.

12  Q    Got it.  Okay.

13       Let's -- all right.  Let's go back to

14  the -- let's finish with the hot side, okay?

15       You're up to temperature.

16  A    Correct.

17  Q    330 degrees or so, you're ready to go, and

18  when -- for the dime-sized cards that you

19  laminated for Motorola, was the pressure applied

20  immediately when the platens were closed?

21  A    As soon as the cassette of cards comes into

22  the hot side and they're in place, then you shut

23  the laminator --

24  Q    Okay.

25  A    -- activating the heat cycle.  It has to be

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 651

1   shut to activate the heat.  Once open, it's not
2   heating.  When you close it, it's heating.
3       Q    Okay.  And how long would it take for the
4   pre-lams, in general terms, to feel the heat
5   once the platens closed?  Was it immediate?
6       A    You close the platens and then you have a
7   heat soak time so that you can equalize the heat
8   through the entire book.
9       Q    How long would it take for the -- for the
10  inlays to feel any heat?
11      A    Oh, 10 to 15 minutes.
12      Q    Before they felt any heat or before they --
13      A    No, before they equalized.
14      Q    Okay.
15      A    It's a heat soak, so you got the --
16      Q    All right.
17      A    -- top of the book --
18      Q    Right.
19      A    -- the same temperature as the bottom of
20  the book.
21      Q    Okay.  So --
22      A    All the way through.
23      Q    So they would feel heat pretty quickly and
24  it would take 15 minutes for it to equalize?
25      A    Correct.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 652

1   Q    And how long were they heated totally?

2   A    Your total heat cycle, I would say, would

3   be about 20 to 25 minutes on the heat side.

4   Q    Is that after the heat soak time was

5   equalized?

6   A    Right.

7   Q    So 15 minutes to equalize and then another

8   20 to 25 --

9   A    Correct.

10  Q    -- to finish the heat process?

11  A    Correct.

12  Q    And that's the same for the dime size as

13  the silver sized --

14  A    Right.

15  Q    -- electronic element?

16  A    I'm going to have to take a break here at

17  this time.

18  Q    Oh, please.  Yeah.  Absolutely.

19              - - - - -

20              (Recess had.)

21              - - - - -

22  BY MR. DeFRANCO:

23  Q    All right.  We were talking about the

24  heating phase in the process you used at

25  Motorola, the first process you used; do you

ded6f7f6-daef-4706-a501-eb03c1d19420

Page 653

1  remember that?

2  A    Yes.  I was wondering, can he read back

3  through where we left off at?

4  Q    Let me -- let me just pick up.

5  A    I have to get my chain of thought here.

6  Q    Yeah, let me just pick up with it, okay?

7  A    Okay.

8  Q    We were talking about the heat soak time,

9  do you remember that, some period of time --

10  A    Right.

11  Q    -- that it takes?

12  A    Right.

13  Q    And you said 15 minutes or so.

14  A    Right.

15  Q    Okay.  And then there is an additional time

16  once the temperature is equalized across all the

17  inlays of the heating cycle; is that right?

18  A    Right.  That's correct.

19  Q    Okay.  Do -- do the inlays -- in the

20  process you used at Motorola, would the inlays

21  see heat pretty immediately or would it take

22  some amount of time before they would feel any

23  heat?

24  A    Well, to -- for the heat to go through the

25  book entirely from top and bottom, we had to

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

# EXHIBIT 68

Page 1

1            *****CONFIDENTIAL DEPOSITION****

2         IN THE UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    Leighton Technologies, LLC, )

5        Plaintiff-Counterclaim  )

6        Defendant,              )Case No.

7        -vs-                    )04Civ

8    Oberthur Card Systems, S.A.,)2496(CM)

9        Defendant-Counterclaim  )

10       Plaintiff.              )

11              - - - oOo - - -

12       Continued deposition of KEITH R.

13   LEIGHTON, a witness herein, called by the

14   Defendant- Counterclaim Plaintiff, as if

15   upon cross-examination under the statute,

16   and taken before Luanne Stone, a Notary

17   Public within and for the State of Ohio,

18   pursuant to the issuance of notice and

19   subpoena, and pursuant to the further

20   stipulations of counsel herein contained, on

21   Monday, the 10th day of October, 2005 at

22   9:00 o'clock A.M., at the Renaissance Hotel,

23   the City of Cleveland, the County of

24   Cuyahoga and the State of Ohio.

25   *****CONFIDENTIAL DEPOSITION*****

147

1 half of the sentences are in shorthand which

2 I can't read, half in writing, so --

3 Q: Do you recognize the document?

4 A: Yes.  This is my wife's handwriting.

5 As to its full content, a lot of it I can't

6 read.  I can't read shorthand.

7 Q: Do you know what the -- what the

8 purpose of this document is?

9 A: Oh, we -- we were writing

10 correspondence back to Ken Thompson, telling

11 him his responsibilities that they didn't

12 keep, along with the responsibilities that I

13 did keep, but I -- fulfillment of our

14 contract agreement that I was doing was

15 impossible because I could only do what I

16 have to work with.

17 Q: Did you ever, in fact, write a letter

18 to Mr. Thompson that included some or all

19 the points that are made in Exhibit 118?

20 A: I don't know whether some were

21 excluded or put in there additional.  I

22 don't know for sure.

23 Q: Did -- did you write a response back

24 to Mr.  --

25 A: Yes, we did.

TACKLA & ASSOCIATES

# EXHIBIT 69

Page 1

```
 1        *****CONFIDENTIAL DEPOSITION****
 2        IN THE UNITED STATES DISTRICT COURT
 3          SOUTHERN DISTRICT OF NEW YORK
 4    Leighton Technologies, LLC, )
 5        Plaintiff-Counterclaim  )
 6        Defendant,            )Case No.
 7        -vs-                  )04Civ
 8    Oberthur Card Systems, S.A.,)2496(CM)
 9        Defendant-Counterclaim )
10        Plaintiff.             )
11                  - - - oOo - - -
12        Continued deposition of KEITH R.
13    LEIGHTON, a witness herein, called by the
14    Defendant- Counterclaim Plaintiff, as if
15    upon cross-examination under the statute,
16    and taken before Luanne Stone, a Notary
17    Public within and for the State of Ohio,
18    pursuant to the issuance of notice and
19    subpoena, and pursuant to the further
20    stipulations of counsel herein contained, on
21    Monday, the 10th day of October, 2005 at
22    9:00 o'clock A.M., at the Renaissance Hotel,
23    the City of Cleveland, the County of
24    Cuyahoga and the State of Ohio.
25    *****CONFIDENTIAL DEPOSITION*****
```



*Deliver*

# Answers Only!

1.) Materials

a. The placement report is by the shipper containing a Bill of Material & no charge and a description of the material & size, thickness and number of sheets. There was a M.S.D.A. document supplied upon arrival of the material. I personally handed to Ken Thompson.

b. All shipping report if I do was look at the material as it arrived to see if it was damaged and if I matched (shipper).

c. As applicable – it must stored in dry condition and lie flat.

d. As indicated on shipper.

DEFENDANT'S EXHIBIT #118

Trial Counsel's Eyes Only

L06632

2.

2.   your figures are in error

a)   We produced a card .038
     to .042. Anything
     larger — thru a printer
     I had more — a 25% yield
     improved it if
     Ben + Humps G —
     trays and laminated plates
     & match size, but Ken did
     not cooperate. This is no fault
     of mine

b)   This is not attempted in because
     Jean + Mark — I dealt c
     melting points of the steel
     during temperatures. —
     & compatible — & I
     achieve a thickness I desired.

c)   Wrong. This I done in
     my presence. I only
     cassettes for test. I ges
     enough materials to
     the do it. No fault of mine.
     load every cassette book. No
     fault of mine. Ken
     did not cooperate.

Trial Counsel's Eyes Only

3

d.) Yes it is applicable!
a hand written log sheet (
Ken Thar and some
documentes each load of
lamination process. Jog back

e.) Yes it was done! The
test was (We measured
each of the sheet and
tested coils as they
came off the press
and identified each sheet.
This was not a log
book in that Ned.
Thaury failed to check
his own record (the log
book) and was at an us
fault of mine.

3
a. Wrong — it I agreed to p
Motorola / C a monetary
system of lamination (
Ken Thaurp failed
apply C monular
was lamming of D
requested P to this
I came from g
San Jose — see my letter
dated March 20, 1985.

Trial Counsel's Eyes Only

L06634

4



b.) Wrong = I am _struck out_
I scanned Herbert Frady
Inc in my letter dated
March 20, 1995 for
static control. Ken
did ~~and~~ order ~~to~~ use a static
not only
control ~~only~~ _until_ after I left
Motorola. (I did not)
it while I was there.
~~The~~ Again, Ken Thom
didn't cooperate with
the consultant. Motor ~~hire~~
~~got to fire~~ to advise.

c.) Wrong = Ken Thompson
~~Motorola~~ did purchase
laminating plates (the size
& I requested) ~~but~~ they
didn't arrive I after I left
Motorola. I didn't )
available for testing. No
fault of mine. This was
lack of planning ( Ken Thompson

d.) N/A = Because Ken Thom fail't
to put the names of on
( examinators No fault of
mine.

5

It was done!

2.) ~~Using~~ — I used a pen
tester to check the coils —
each shift & ( I used —
( laminar ) get
range so q c a cut — check
on each test, ~~~~~ O had
coils when

3.) ~~~~ — It was done!
While Ben T hours was
present, George Becker + term
manager Buskle, I went
over the laminar,
or out pointer of lubrication
followed. ~~~~ also George
Becker or laminar deficiency
and improvement ( —
produce a good product,
the laminar, — C consulting
fail, so & previously
or out by George Becker + I,
The laminar ~ ( corrected
( e.g. pumps & valves,
and overhauling laminator
platens.

4.) mi,

see

Trial Counsel's Eyes Only

L06636

6

a) Ron Thompson did something after I left because when I was at Malory I had a much higher yield that was high enough to be a successful product. I [illegible] of [illegible] and tooling [illegible]

b) Then I impossible because of lack of material and tooling. I don't have a magic wand, Jean-Marc remember who [illegible] hand-make coils for me because there were none available.

Trial Counsel's Eyes Only

L06637

supply me with the needed
materials and tooling to
produce 10,000 cards in the
4 weeks
which is impossible to
Therefore, it
was no fault of mine
that 10,000 cards a
produced in 4 weeks!

It was OK. Q a H #1500
Bonus if I do produce the
10,000 — 4 weeks.

Because of their failure
to allow me to reach my
goal) I feel I at us simply
not to pay me #1500 bonus.
I was also responsible to
see that necessary million
I feeling were provided
I couldn't make their card
(A role cause to be
tested and without a laminator
designed to
produce plastic cards.
It was our agreement so to
came to material to lamentor
or to shop to see required
precious time from my work, taking

Trial Counsel's Eyes Only



Trial Counsel's Eyes Only

L06639

# EXHIBIT 70

Keith Leighton
2817 Fulmer Rd.
Lorain, Ohio 44053

February 13, 1997

Grace O'Malley
MOTOROLA

Fax 847-576-2131

SUBJECT: UNIQUE HOT LAMINATION MANUFACTURING METHOD TO PRODUCE
PVC CARDS HAVING A THICKNESS OF .028"-.032" AND A
SMOOTH GLOSSY FINISH OF .0005" ON BOTH SIDES OF THE
CARD TO RECEIVE DYE SUBLIMATION PRINTING AND A FLUSH
MAG STRIPE - A RFID CONTACT/CONTACTLESS SMART CARD

Dear Grace:

Thank you for taking time to talk with me about my technology on
the above subject contact/contactless RFID smart card - COMBICHIP.

I am a plastic card consultant - a knowledgeable innovative pro-
fessional with over 40 years of progressive experience. Please
review my resume.

In 1995 I developed a plastic radio frequency identification card for
Motorola in San Jose, California. This proximity card is now being
manufactured by your company. Now I am interested in making the sub-
ject card for you. I have a patent pending on this card and am very
excited about it.

* I would use PVC with up to 30, or more, cards per
  sheet and can use 12 sheets, or more, per opening
  in the laminator.

* The card can have multi color offset printing on
  each side under overlaminate film.

* The card can have a flush mag stripe applied with
  overlaminate sheets multi up or can be applied
  individually.

* I can apply dye sublimation printing on the cards.

Since I left San Jose I have developed a method to make a ISO
RFID smart card and have a "perfect" prototype to show. I
have a patent pending on this card.

I look forward to a meeting to discuss our mutual goal in the
manufacture of subject COMBICHIP smart card.

Sincerely,

Keith Leighton
Fax: 216-960-2335

PS: Per your request, I am sending my resume

Trial Counsel's Eyes Only

# EXHIBIT 71

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

          plaintiff,    )

  vs.              ) Case No.

                  ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,       )

         defendants.  )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

      Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 726

1    application as to how you would achieve that?

2    A    By making a -- the pre-lam, I went to a

3    place where I was familiar with the laminator

4    because I did a lot of modifications on that

5    laminator.

6    Q    Right.

7    A    CSI happened to be formerly 2B Systems.

8    Q    Okay.

9    A    I was familiar with the equipment.  And by

10    making my first test, I used the top platen of

11    that laminator where I knew I could -- I could

12    bring it to a touch with the pads in it not

13    crushing but touching the plates, where I could

14    have heat from the top and heat from the bottom

15    with zero pressure --

16    Q    Okay.

17    A    -- on the chip.

18    Q    And is that -- is that something that

19    occurred to you before you filed your

20    provisional application, of course, that

21    applying heat with no pressure?

22    A    Yes.

23    Q    And that was after you left Motorola?

24    A    Yes.

25    Q    And that just came into your head without

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 727

1    any experimental work?

2    A    I had help.  God was with me.

3    Q    Okay.  And what else --

4    A    This idea come from the Lord, I'll tell

5    you.

6    Q    What other -- what other process steps did

7    you come up with prior to when your provisional

8    patent application was filed?  Did you think

9    about applying an increased pressure during the

10   cooling phase?

11   A    I wrote it all out on two pages in

12   ballpoint ink and then I didn't vary from

13   that --

14   Q    Okay.

15   A    -- in making my --

16   Q    Okay.

17   A    -- card.  I stuck to that.

18   Q    Let's take -- let's take a break for lunch

19   and then we'll talk about that.

20   BY MR. DeFRANCO:

21   Q    Okay.  Mr. Leighton, before we took a lunch

22   break you mentioned a two page document that you

23   had jotted down on a pad some of your

24   thoughts --

25   A    Right.

# EXHIBIT 72

Page 1

1              *****CONFIDENTIAL DEPOSITION****

2          IN THE UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    Leighton Technologies, LLC, )

5        Plaintiff-Counterclaim  )

6        Defendant,              )Case No.

7        -vs-                    )04Civ

8    Oberthur Card Systems, S.A.,)2496(CM)

9        Defendant-Counterclaim  )

10       Plaintiff.              )

11                  - - - o0o - - -

12       Continued deposition of KEITH R.

13   LEIGHTON, a witness herein, called by the

14   Defendant- Counterclaim Plaintiff, as if

15   upon cross-examination under the statute,

16   and taken before Luanne Stone, a Notary

17   Public within and for the State of Ohio,

18   pursuant to the issuance of notice and

19   subpoena, and pursuant to the further

20   stipulations of counsel herein contained, on

21   Monday, the 10th day of October, 2005 at

22   9:00 o'clock A.M., at the Renaissance Hotel,

23   the City of Cleveland, the County of

24   Cuyahoga and the State of Ohio.

25   *****CONFIDENTIAL DEPOSITION*****

8

1    back.)

2              THE WITNESS:    Yes, remembering all

3    of its contents, I don't remember, but I do

4    recall seeing it and signing it.

5    BY MR. JACOBS:

6    Q:    And do you consider yourself bound by

7    the terms of this agreement, Exhibit 110?

8              MR. GUTKIN: It calls for a legal

9    conclusion.  The witness can answer.

10             MR. JACOBS: Thank you.

11             THE WITNESS:    I believe I would be

12   bound to it, yes.

13   BY MR. JACOBS:

14   Q:    Now, prior to going to Motorola, you

15   had no experience, had you, with regard to

16   laminating electronic elements into a

17   plastic laminated card?

18   A:    No, I hadn't done testing, but prior

19   to going there, they were asking me if I

20   would -- would have the knowledge of putting

21   a hard object in a plastic card.

22   Q:    And what was your answer to that

23   question?

24   A:    I believe I could do that.

25   Q:    And had you done that before going to

                        TACKLA & ASSOCIATES

17

1  Q:     Okay.  Now, prior to going to

2  Motorola, had you ever given any thought of

3  laminating any electronic element into a

4  plastic card?

5  A:     I don't even recall that.

6  Q:     You don't recall that?

7  A:     No.  I've been in plastic cards

8  since 1970, and all the things

9  that I've -- I've been in a lot of research

10  and development in plastic cards.

11  Q:     Yeah, but as you sit here today, you

12  cannot recall ever considering laminating an

13  electronic element into a plastic card

14  before your visit to Motorola?

15  A:     I -- I don't believe I did try to put

16  electronic elements in -- these were not at

17  my disposal.

18  Q:     All right, and you not only -- you

19  didn't -- you -- let me rephrase the

20  question.  I'm sorry.  I'm having a little

21  difficulty.  I can understand why you're

22  having difficulty answering.

23       Prior to visiting Motorola, you had

24  never given thought to laminating any

25  electronic element into a plastic card,

TACKLA & ASSOCIATES