UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEIGHTON TECHNOLOGIES LLC,

    Plaintiff,

        vs.

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

    Defendants.

---

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

    Counterclaim Plaintiffs,

        vs.

LEIGHTON TECHNOLOGIES LLC,
GENERAL PATENT CORPORATION
INTERNATIONAL, GENERAL PATENT
CORPORATION, and IP HOLDINGS LLC,

    Counterclaim Defendants.

---

Case No: 04 CV 02496 (CM) (LMS)

**DEFENDANTS' MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO
DISMISS FOR LACK OF STANDING**

**MEMORANDUM OF POINTS AND
AUTHORITIES**

Hon. Coleen McMahon

Magistrate Judge Lisa M. Smith

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
  Edward DeFranco (ED-6524)
  Robert C. Juman (RJ-6350)
  Mark Baker (MB-0302)
  51 Madison Avenue, 22nd Floor
  New York, New York 10010-1601
  (212) 849-7000

  Kevin P.B. Johnson (KJ-8689)
  555 Twin Dolphin Drive, Suite 560
  Redwood Shores, CA 94065
  (650) 801-5000

*Attorneys for Defendants Oberthur Card
Systems, S.A. and Oberthur Card Systems of
America Corporation*

November 29, 2006

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 4

    A.    Leighton Tech Claims Ownership of the Leighton Patents.......................... 4

    B.    The First Time Mr. Leighton Ever Laminated an Electronic Element in an RFID Card Was When Motorola Hired Him as a Consultant ........................ 4

    C.    Mr. Leighton Signed an Agreement That Assigned to Motorola All Inventions Conceived During His Consulting Work for Motorola ................... 5

    D.    While at Motorola, Mr. Leighton Conceived a Process to Laminate an Unprotected Electronic Element Directly Between Two Plastic Core Sheets Using Process Steps Later Claimed in His Patents ......................... 7

    E.    Immediately After Motorola Refused to Pay Him a $1,500 Bonus, Mr. Leighton Described His "Invention" to Third Parties ......................... 11

    F.    Mr. Leighton's Patented Process Is for Laminating an Unprotected Electronic Element Directly Between Two Plastic Core Sheets Using Specific Process Steps ..................................................................... 13

III.  PLAINTIFF LEIGHTON TECH HAS THE BURDEN TO PROVE IT MEETS THE CONSTITUTIONAL REQUIREMENTS FOR STANDING ........................... 14

IV.   ARGUMENT ...................................................................................................... 15

    A.    Motorola Owns the Leighton Patents ...................................................... 15

        1.    Mr. Leighton Validly Assigned to Motorola All Inventions Conceived During His Employment at Motorola ......................... 15

        2.    Because the Leighton Patents Were Conceived During Mr. Leighton's Employment at Motorola, They Are Motorola's Property ......................................................................................... 19

    B.    Leighton Tech Lacks Standing Because Motorola Is the True Owner of the Leighton Patents ........................................................................... 24

V.    CONCLUSION .................................................................................................. 25

## TABLE OF AUTHORITIES

**Page**

### Cases

Angell v. Rowlands,
149 Cal. Rptr. 574 (Cal. Ct. App. 1978)................................................................17

Beech Aircraft Corp. v. EDO Corp.,
990 F.2d 1237 (Fed. Cir. 1993)............................................................................4

Clancy v. Troy Belting & Supply Co.,
152 F. 188 (N.D.N.Y 1907), *rev'd on other grounds*, 157 F. 554 ....................16

Crown Die & Tool Co. v. Nye Tool & Mach. Works,
261 U.S. 24, 43 S. Ct. 254 ...................................................................................25

Filmtec Corp. v. Allied-Signal Inc.,
939 F.2d 1568 (Fed. Cir. 1991)...................................................................*Passim*

Filmtec Corp. v. Hydranautics,
982 F.2d 1546 (Fed. Cir. 1992)...................................................................*Passim*

GAIA Techs., Inc. v. Reconversion Techs., Inc.,
93 F.3d 774 (Fed. Cir. 1996), *amended on other grounds by*,
104 F.3d 1296 (Fed. Cir. 1996).............................................................................14

Hobson v. Eaton,
399 F.2d 781 (6th Cir. 1968)................................................................................18

J. C. Peacock, Inc. v. Hasko,
196 Cal. App. 2d 353 (Cal. Dist. Ct. App. 1961)................................................18

Leighton Techs. LLC v. Oberthur Card Sys., S.A.,
358 F. Supp. 2d 361 (S.D.N.Y. 2005)........................................................*Passim*

M.J. Oldenstedt Plumbing Co., Inc. v. K mart Corp.,
629 N.E.2d 214 (Ill. App. Ct. 1994)....................................................................17

Martin v. City of O'Fallon,
670 N.E.2d 1238 (Ill. App. Ct. 1996)..................................................................16

McCown v. Spencer,
8 Cal. App. 3d 216 (Cal. Ct. App. 1970).............................................................17

Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,
2004 WL 2754653 (S.D.N.Y. 2004)....................................................................16

Neisendorf v. Levi Strauss & Co.,
49 Cal. Rptr. 3d 216 (Cal. Ct. App. 2006)..........................................................18

Phillips Petroleum Co. v. Shutts,
   472 U.S. 797, 105 S. Ct. 2965 (1985) ........................................................................ 15

Roselawn Chiropractic Center, Inc. v. Allstate Ins. Co.,
   827 N.E.2d 331 (Ohio Ct. App. 2005) ...................................................................... 16

Ross v. Bridgewater Construction, Inc.,
   2003 WL. 22736578 (Ohio Ct. App. 2003) .............................................................. 17

Schwarze v. Solo Cup Co.,
   445 N.E.2d 872 (Ill. App. Ct. 1983) ......................................................................... 18

Specht v. Netscape Commc'ns Corp.,
   150 F. Supp. 2d 585 (S.D.N.Y. 2001) ...................................................................... 15

TM Patents, L.P. v. International Bus. Machs. Corp.,
   121 F. Supp. 2d 349 (S.D.N.Y. 2000) ............................................................... *Passim*

Walmsley v. Holcomb,
   143 P.2d 398 (Cal. Dist. Ct. App. 1943) .................................................................. 16

Welcome Co., Ltd. v. Harriet Carter Gifts, Inc.,
   1998 WL. 1770584 (C.D. Cal. 1998) ......................................................................... 16

## Statutes

35 U.S.C. § 261 ................................................................................................................. 14

Oberthur Card Systems, S.A. and Oberthur Card Systems of American Corporation ("Oberthur") respectfully submit this memorandum in support of their motion for an Order dismissing this case for lack of subject matter jurisdiction. Plaintiff Leighton Technologies LLC ("Leighton Tech") cannot meet its burden to establish standing.[1]

Leighton Tech claims ownership of the two patents-in-suit through an assignment from Keith Leighton, the sole named inventor on the patents. This Court lacks subject matter jurisdiction because the true owner of the patents is Motorola, Inc. ("Motorola"), the company to which Mr. Leighton assigned his patent rights in 1995.[2]

## I.    INTRODUCTION

In the Spring of 1995, prior to the filing of the application for the patents-in-suit, Motorola hired Mr. Leighton to improve its process for laminating an electronic element into a plastic card. There is no dispute that: (1) as of that time, Mr. Leighton had never before laminated an electronic element into a plastic card, and (2) prior to starting his work for Motorola, Mr. Leighton executed an Agreement in which he assigned to Motorola all rights in "all inventions, innovations and ideas" which he "developed *or* conceived" during his work for the company. (Ex. 5, 10/23/06 Tr. 568:21-569:4; Ex. 6 (emphasis added).) In fact, Mr. Leighton testified at deposition that he "understood"

---

[1]    As this Court has noted, if a patent plaintiff fails to establish standing to sue by virtue of either having legal title or being the exclusive licensee, it does not matter whether this Court treats an ownership challenge as a motion under Rule 12(b)(1) for lack of subject matter jurisdiction, under 12(b)(6) for failure to state a claim, or as a motion for summary judgment. *TM Patents, L.P. v. International Bus. Machs. Corp.*, 121 F. Supp. 2d 349, 358-59 (S.D.N.Y. 2000). (Exhibit 1 to the Declaration of Edward DeFranco (hereinafter, "Ex. __").)

[2]    Pursuant to the Stipulation and Order dated July 25, 2006, Leighton Tech agreed to dismiss, without prejudice, two of the four patents it originally asserted in this case. (Ex. 4.) The two remaining patents-in-suit are U.S. Patent Nos. 5,817,207 (the "'207 patent") and 6,214,155 (the "'155 patent") (collectively, the "Leighton Patents"). (Exhs. 2 and 3.)

and "accepted" that any inventions he developed at Motorola "would be the property of Motorola." (Ex. 7, 10/23/06 Leighton Tr. 547:25-548:10.)

As the Court is well aware, the Leighton Patents claim processes for making RFID cards that contain an embedded electronic element and are laminated using specific process steps. Based on Mr. Leighton's testimony and contemporaneous documents, the undisputed facts establish as a matter of law that Mr. Leighton "developed [and] conceived" the key and distinctive limitations of his patent claims while consulting for Motorola. Specifically, Mr. Leighton has testified that while consulting for Motorola he conceived of the following allegedly inventive changes to Motorola's RFID card structure and lamination process:

- **Card structure**: Mr. Leighton suggested to Motorola that the electronic element be placed directly between core sheets, in the absence of a non-electronic carrier – "the critical improvement of [the Leighton patents] over [the] prior art." (Ex. 8, Leighton 10/23/06 Tr. 619:10-620:14.); *Leighton Techs. LLC v. Oberthur Card Sys., S.A.,* 358 F. Supp. 2d 361, 369 (S.D.N.Y. 2005) (Ex. 15.).

- **Lamination process**: Mr. Leighton also improved the Motorola process steps. He heated the cards for a first period of time, and then "increased the pressure for the remainder of the heat cycle" to "facilitate encapsulating the electronics in the plastic." (Ex. 9, Leighton 10/23/06 Tr. 668:21-670:11.) Moreover, during the cooling phase he attempted to obtain a higher pressure than any pressure used during the heating phase. (Ex. 10, Leighton 10/10/05 Tr. 49:5-25.)

These modifications to the Motorola process match the fundamental limitations in the claims of the Leighton Patents. The Federal Circuit has found that in such circumstances, the patents belong to the entity (here, Motorola) to which the rights were assigned. *Filmtec Corp. v.*

*Hydranautics*, 982 F.2d 1546, 1552-53 (Fed. Cir. 1992) (assignee of rights under a development contract is the true owner when "key limitations" of the invention were "conceived" during the contract, even if the invention is later "refined").

Mr. Leighton did make some RFID cards successfully for Motorola – in fact, he sent samples of the cards he made for Motorola to other companies in an attempt to solicit further work. (Ex. 11.) He was unsuccessful, however, in making the full quantity of RFID cards Motorola required. Motorola refused to pay Mr. Leighton a bonus because he was unsuccessful, and also because he failed to provide the written specifications and documents describing the process he promised to provide for the Motorola lamination process he modified. (Ex. 12.)

Not only did Mr. Leighton develop and conceive the key limitations of his patent claims while at Motorola, he also admitted that he had *no access to any lamination or test equipment* in between working for Motorola and filing his first patent application. Yet, *only one month after* unsuccessfully attempting to convince Motorola to pay him a bonus, Mr. Leighton disclosed his invention to a patent attorney. His first patent application was filed soon thereafter.

When asked at deposition how he was able to come up with the combination of structural and process limitations in his patent claims – including precise temperature and pressure limitations of his dependent claims – Mr. Leighton could not provide a substantive explanation. (Ex. 72, Leighton 10/23/06 Tr. 726:1-727:5.) The substantive answer is plain: Mr. Leighton patented the work he previously developed and conceived while working for Motorola, the rights to which he assigned to Motorola. Based on the record in this case, there is no other answer. As a result, Leighton Tech does not own the Leighton Patents, and therefore lacks standing to sue.

## II.    STATEMENT OF FACTS

### A.    Leighton Tech Claims Ownership of the Leighton Patents

Keith Leighton is the sole named inventor on the Leighton Patents. (Exhs. 2 and 3.) Because the Leighton Patents were not assigned to any person or entity at the time of issuance, ownership was presumed to reside with Mr. Leighton. *See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). After the patents issued, Mr. Leighton assigned interests in the patents to individuals who invested in his patents. (Ex. 13, Leighton 10/23/06 Tr. 768:12-770:17.)

On May 31, 2003 Mr. Leighton contracted with General Patent Corporation International ("GPCI"), a "patent enforcement firm [which] help[s] independent inventors and small businesses to defend their patents against infringement." (Ex. 14.) Leighton Technologies LLC was then formed, an entity to which ownership of the Leighton Patents was assigned. (Exhs. 14, 16.)

### B.    The First Time Mr. Leighton Ever Laminated an Electronic Element in an RFID Card Was When Motorola Hired Him as a Consultant

Mr. Leighton's first experience with RFID cards came when he consulted for Motorola in 1995. (Ex. 17; Ex. 5, Leighton 10/23/06 Tr. 568:21-569:4; *see also* Ex. 18, Thompson Tr. 73:15-74:22.) At the encouragement of a business acquaintance and friend of Mr. Leighton, Motorola asked Leighton "to come visit [Motorola's] facility in San Jose, California to assist them in their production of an employee identification card to be used by Microsoft employees." (Ex. 19, Leighton 12/6/05 Decl. ¶¶ 8, 10.) Although Motorola had its own RFID experts and had already made RFID cards, they wanted to utilize Mr. Leighton's card lamination expertise to improve Motorola's process and solve yield and quality issues to make a card with a flat surface (Ex. 20, Delbecq 2/3/06 Tr. 69:1-17, 93:2-94:15; Ex. 21, Thompson 5/4/06 Tr. 52:13-54:14.)

On February 17, 2005, Mr. Leighton met with at least two Motorola employees, Ken Thompson and Jean-Marc Delbecq, at Motorola's San Jose facility. (*See* Ex. 22, 2/17/95

handwritten notes.) Mr. Leighton admitted that before consulting for Motorola, he had never seen an electronic element laminated in a card. (Ex. 5, Leighton 10/23/06 Tr. 568:21-569:4.) In fact, prior to consulting for Motorola, the only things Mr. Leighton had laminated into a plastic card were decorative items – a butterfly and a very thin layer of metallic foil. (Ex. 23, Leighton 10/23/06 Tr. 571:18-572:5.)

### C.    Mr. Leighton Signed an Agreement That Assigned to Motorola All Inventions Conceived During His Consulting Work for Motorola

During the initial meeting in San Jose on February 17, 1995, the attendees, Mr. Leighton and the Motorola employees Messrs. Thomson and Delbecq, took notes on the agreed terms of Mr. Leighton's consultancy, and at the close of the meeting the attendees all signed these notes. (Ex. 22.) The notes state that the parties reached an "agreement in principle" that Mr. Leighton would serve as a consultant to Motorola for four weeks. (*Id.*) In addition to being paid $7,500 for four weeks of consulting (at $1,875 per week), Mr. Leighton was to receive a $1,500 bonus for the successful production of 10,000 cards.[3] (*Id.*)

In a letter dated February 22, 1995 sent to Mr. Leighton, Motorola's Ken Thompson expressed "confidence" in Mr. Leighton's abilities and "outline[d] the result of our discussions along with the next steps." (Ex. 25.) The letter requested that Mr. Leighton provide a quote for his services that "should contain previously discussed terms," and requested that Mr. Leighton provide other items, such as the "signed Motorola Consultant Agreement," the "signed Non Disclosure Agreement," and "deliverables." (*Id.*) Mr. Thompson stated that "[w]ith all agreements signed, Motorola will issue [a] purchase order to you once [the] requisition is approved." (*Id.*)

---

[3]    Notes discussed at the meeting also state "Increase Cold Side Ram." (*Id.*) At deposition, Mr. Leighton testified that the goal was to increase the pressure during cooling. (Ex. 24, Leighton 10/10/05 Tr. 153:18-22.) Mr. Leighton qualified this testimony by stating "I'm not sure of the pressures that I had, but I told [Motorola] what I wanted to do." (*Id.* at 153:14-17.)

Mr. Leighton signed the requested Non Disclosure Agreement, titled "Confidentiality Agreement," and dated it February 23, 1995 – the same day Mr. Thompson's February 22nd letter was sent by fax.[4] (Ex. 6.)  In that Agreement, Mr. Leighton assigned to Motorola "all inventions, innovations and ideas" that he "developed or conceived" "that result from, or are suggested by, work [done for] Motorola":

```
        In  consideration  of  my  engagement  by  Motorola, Inc.
("Motorola"), as Consultant/Contractor for programs or products
as directed by Motorola, and in consideration of the compensation
paid to me for my services in the course of such engagement. I
understand and agree to the following provisions for the protection
of the property rights of Motorola:

1.  I will promptly and fully communicate in writing to an
    Executive Officer of Motorola or its nominees, all inventions,
    innovations and ideas developed or conceived by me, whether
    solely or jointly with others at any time during the entire
    period of my engagement with Motorola, and which inventions,
    innovations and ideas relate to the actual and anticipated
    business activities of Motorola, or result from, or are
    suggested by, work which I do for Motorola.  I agree to
    assign and hereby assign to Motorola as its exclusive
    property the entire right, title and interest in all such
    inventions, innovations and ideas. . . .
```

(Ex. 5.)  In addition to the signature line for Mr. Leighton as the party assigning his rights, the Confidentiality Agreement contained a signature line for a "Motorola witness." (*Id.*) The only copy of the Agreement that the parties have located contains only Mr. Leighton's signature, and no witness signature.  (*Id.*) As discussed below, this is irrelevant to the validity and enforceability of the Agreement.

Motorola issued to Mr. Leighton a Purchase Order dated March 3, 1995 for four weeks of consulting services (at the agreed rate of $1,875 per week and a bonus of $1,500 "upon meeting the

---

[4]  Motorola, Inc., the parent company of Indala Corporation, an entity referenced as "Motorola Indala Corp." in other documents, was the assignee of Mr. Leighton's rights in inventions.  (Ex. 26.)

terms of [the] agreement dated 2/22/95"). (Ex. 27.) The Purchase Order also noted that a "signed Confidentiality Agreement and D.O.D. [were] received and attached as part of this P.O."[5] (*Id.*) In a March 20, 1995 letter, Mr. Leighton stated that he could tentatively begin at Motorola on March 27, 1995, and he would need "thirty days, or less, as originally agreed" to "develop a flat printable surface in a plastic identification card containing a radio frequency device." (Ex. 28.)

On March 22, 1995, Mr. Leighton signed the list of deliverables Motorola's Thompson previously sent to him. (Ex. 29.) Mr. Leighton testified that he agreed to deliver the listed items to Motorola. (Ex. 30, Leighton 10/10/05 Tr. 146:3-7.) Several of these deliverables required that Mr. Leighton provide Motorola with "specifications," "processes," and "procedures." (Ex. 29.)

Leighton then began consulting for Motorola. He spent a total of five weeks at Motorola, and his last day was May 5, 1995.[6] (Ex. 31, Leighton 10/23/06 Tr. 710:12-712-9; Ex. 32.)

D.    **While at Motorola, Mr. Leighton Conceived a Process to Laminate an Unprotected Electronic Element Directly Between Two Plastic Core Sheets Using Process Steps Later Claimed in His Patents**

During his first visit to Motorola in February 1995, Motorola showed Mr. Leighton the RFID card it wanted him to improve. (Ex. 33, Leighton 10/23/06 Tr. 587:13-589:12; *see also* Ex. 34, Thompson 5/4/06 Tr. 55:3-58:15; Ex. 35, Delbecq 3/22/06 Tr. 93-96.) Mr. Leighton testified that Motorola's card contained a recess (or hole) that protected the electronic element – the chip and antenna combination – during lamination. (Ex. 36, Leighton 10/23/06 Tr. 554:6-555:7.)

---

[5] The Purchase Order set forth Motorola's standard terms and conditions for transactions. It stated that "Seller's commencement of work or shipment of the goods, whichever occurs first, shall constitute acceptance of this purchase order and all of its terms and conditions." (*Id.*)

[6] Mr. Leighton's December 5, 2005 Declaration stated that his last day at Motorola was April 4, 1995. (Ex. 17, ¶ 7.) At deposition, Mr. Leighton corrected his Declaration and confirmed that his last day was one month later, May 5, 1995. (Ex. 31, Leighton 10/23/06 Tr. 710:12-712:19.)

Mr. Leighton also testified that he suggested to Motorola that the protective recess in the card be removed:

> Q.    And you made some changes to those layers in the card that you redesigned for them; is that true?
> A.    Right.
> Q.    And one of the changes that you made was you eliminated the holes or the recesses or the cutouts that were in the core sheet with the inlay; is that right?
> A.    That's correct.

(Ex. 8 at 620:1-9; *see also* Ex. 37, Leighton 10/10/05 Tr. 31:5-24.)

Mr. Leighton proceeded to make RFID cards at Motorola in which the electronic element was positioned directly between two plastic sheets (and was not protected by a recess). (Ex. 8, Leighton 10/23/06 Tr. 620:10-25.) In making these cards for Motorola, Mr. Leighton first made a subassembly, called a "prelam," which contained the circular electronic element positioned directly between two plastic "core sheets." (Ex. 38, Leighton 10/23/06 Tr. 619:11-620:23; Ex. 39, Leighton 10/23/06 Dep. Ex. C.) At his deposition, Mr. Leighton drew a figure of the prelam he made:



(Ex. 39, Leighton 10/23/06 Dep. Ex. C.) Next, to produce the finished card, Mr. Leighton laminated an additional core sheet and an overlaminate film to the top and bottom of the prelam. Again, at his deposition, he drew the structure he provided to Motorola as well:



(*Id.*; Ex. 38 at Tr. 621.)

There is also no dispute with respect to the key limitations of the three-step process Mr. Leighton developed and used to laminate these cards at Motorola: (1) first, he applied heat and a pressure to "just close" the laminator (Ex. 40, Leighton 10/23/06 Dep. Tr. 650:13-651:2; Ex. 41 Leighton 10/23/06 Tr. 679:21-680:24.); (2) second, once the plastic was softened, he increased the pressure to "facilitate encapsulating the electronics," and maintained the heating temperature (Ex. 9, Leighton 10/23/06 Tr. 668:5-670:11.)[7]; and (3) third, he intended to apply the highest pressure during cooling:

> Q. Did you use a different pressure during the cooling than you did during the heating?
> A. Yes.
> Q. Did you use a higher pressure during the cooling than you used in the heating?
> A. I don't recall all of that, because they had an antique circuit board, single function pump, and they changed the plumbing on their rams, so what the actual pressures were, I'm not sure.
> Q. Well, based on your experience and knowledge, was the pressure higher in the cooling than the pressure in the heating?
> A. I tried to obtain that, yes.

---

[7]     At deposition, Mr. Leighton's best approximation of the specific pressures he used at Motorola was an initial pressure during heating of 50 pounds per square inch ("psi"), and a second higher pressure during heating between 50 and 180 psi for the remainder of the heating cycle. (Ex. 41, Leighton 10/23/06 Tr. 679:21-681:12.)

(Ex. 10, Leighton 10/10/05 Tr. 49:16-25; *see also* Ex. 42, Leighton 10/10/05 Tr. 153:10-154:7;

Ex. 43, Leighton 10/23/06 Tr. 598:15-599:6.)[8]

Motorola's Jean Marc Delbecq's contemporaneous notes, dated April 4, 1995 (one month

prior to the conclusion of Mr. Leighton's consultancy), confirm the key limitations in the process

testified to by Mr. Leighton:



"40 minute cycle for lamination @

320 °F, pressure #3 (just close), 15

minutes increase pressure to 125

bars for 20 minutes, xfer [transfer]

cold @ 135 bars for 7 minutes".

(Ex. 45, 4/4/95 Notes; Ex. 46, Delbecq Tr. 232:7-233:17; Ex. 47, Leighton 10/10/05 Tr. 102:18-

103:21.) The steps (as confirmed by deposition testimony, including that of Mr. Leighton) were:

(1) during the first 15 minutes, the card is heated at 320°F and a pressure that is "just" enough to

"close" the laminator is applied (Ex. 48, Delbecq 3/22/06 Tr. 240:20-241:3.); (2) second, the

pressure is increased to 125 bars for the next 20 minutes of the heating cycle[9] (Ex. 49, Leighton

10/10/05 Tr. at 105:10-106:3.); and (3) third, after completion of the heating cycle, the plastic sheets

are transferred to a cold stack, and cooled at a higher pressure (135 bars) for 7 minutes. (Ex. 48,

Delbecq 3/22/06 Tr. 240:20-241:20.)

---

[8]    Mr. Leighton estimated that the pressure during cooling was less than that used during
heating based on physical limitations of the Motorola equipment. (Ex. 44, Leighton 10/23/06 Tr.
684:9-19.)

[9]    A "bar" is a unit of pressure. The greater the number of bars, the more pressure that is
being applied to an object.

It is irrelevant that Mr. Leighton could not at deposition remember the specific temperatures and pressures of the lamination process that Motorola used before his arrival.[10] (Ex. 33, Leighton 10/23/06 Tr. 587:13-588:5.) Although it is not a material fact for this motion, two Motorola employees familiar with that process testified that it used "less pressure at the beginning" of the heating cycle, a "higher pressure" during the rest of heating, and "increased . . . pressure" during cooling. (Ex. 51, Delbecq 3/22/06 Tr. 203:19-204:15, 218:11-219:9; Ex. 52, Thompson 5/4/06 Tr. 29:11-33:19, 44:3-19.)

Mr. Leighton testified that deficiencies in the Motorola laminator prevented him from achieving a minimal initial pressure and a higher cooling pressure. (Ex. 53, Leighton 10/9/05 Tr. 141:11-147:8.) Nevertheless, Mr. Leighton testified that the process would have given acceptable commercial yields, as opposed to the low rate of acceptable cards that were produced:

> Q.   If you had a better press and sufficient electronics, would the process you developed during the period while you were at Motorola produce acceptable commercial yield?
> A.   Yes.
> Q.   Why -- on what facts do you reach that conclusion?
> A.   If I had a contactless laminator where I had zero pressure of [sic] the platens, I could produce a card as that reads in my patent. . . .

(Ex. 54, Leighton 10/10/05 Tr. 127:21-128:7.)

### E.   Immediately After Motorola Refused to Pay Him a $1,500 Bonus, Mr. Leighton Described His "Invention" to Third Parties

Motorola compensated Mr. Leighton for all of his consulting time, but refused to pay him a $1,500 bonus the parties had discussed. (Ex. 55, Leighton 10/23/06 Tr. 552:19-21; Ex. 56; Ex. 57.)

---

[10]   It should be noted that even though the pressure in the cooling phase was higher than during heating, another Motorola witness, Mr. Thompson, testified that he did not believe the process set forth above would work "because the cooling pressure was too low, and the temperature was too hot." (Ex. 50, Thompson Tr. 116:20-118:25.) As discussed below, this is irrelevant because the conceived pressures as set forth are within the scope of the Leighton Patent claims.

On May 19, 1995, two weeks after his last day of consulting, Mr. Leighton sent Motorola an invoice and a cover letter explaining why he was entitled to a $1,500 bonus. (Ex. 58.) Motorola responded in a July 12, 1995 letter, in which the company explained why Mr. Leighton did not earn a bonus. First, Motorola said that the process developed by Mr. Leighton resulted in poor yields of card quantities. (Ex. 11.) Second, Motorola said that Mr. Leighton failed to provide many of the promised "deliverables," such as documentation of the specifications of the process he developed for Motorola. (Id.; see also Ex. 59, [L06749]; Ex. 60 Delbecq 3/22/06 Tr. 230:11-231:18.)

Mr. Leighton never replied to Motorola's July 12th letter. Instead, on July 17, 1995, just five days after Motorola refused to pay him the $1,500 bonus, Mr. Leighton wrote a letter to another company (Plastag Corporation) and described his "invention" for the first time. (Ex. 61.) Mr. Leighton wrote: "I have other plastic card innovations that I would like to share with you because I believe you would be interested. One is a RFID card with a thickness of .032" which I am planning to have patented." (Id.)

The next day, Mr. Leighton described his "invention" to another company, Hughes Identification Devices. (Ex. 11.) In a letter to Hughes, Mr. Leighton referenced the RFID card he made at Motorola: "I talked to you last week on the phone about RF-ID cards that has a surface flatness of .00005" and have enclosed samples for you to examine." (Id.) Mr. Leighton explained that he could make a thinner version of the Motorola card: "[I] will be able to produce these cards with a thickness of .032" of PVC." (Id.)

The first Leighton RFID card patent application was filed on October 17, 1995.[1] (Ex. 62.) Mr. Leighton testified that prior to filing he had not made any cards according to the claimed

_____

[1]    The first Leighton patent application was U.S. Provisional Patent Application No. 60/005,685 (the "'685 application"). The Leighton Patents claim priority from the '685 (footnote continued)

processes. (Ex. 63, Leighton 10/23/06 Tr. 721:9-723:12.) Rather, Mr. Leighton asserted that he did

not make cards using his claimed processes until one year later in October 1996.[12]  (*Id.*)

### F.  Mr. Leighton's Patented Process Is for Laminating an Unprotected Electronic Element Directly Between Two Plastic Core Sheets Using Specific Process Steps

The Leighton patents "claim the use of a 'highly coordinated' lamination process involving

heat, cooling and the application of pressure to encapsulate an electronic element. . . ." *Leighton,*

358 F. Supp. 2d at 364.  "The Patents allegedly improve over prior art by eliminating the need to

create a protective barrier around the embedded electronic element, thereby uncomplicating the

manufacturing process."  (*Id.*)

To that end, Claim 1 requires that at least one electronic element be placed directly between

two plastic core sheets.  (Ex. 2; Ex. 3.)  The Court "likened this 'core' to a sandwich, in which the

plastic sheets were the pieces of bread and the electronic element was the filling." *Leighton,*

358 F. Supp. 2d at 361.  The claims in the Leighton patents require that "there is nothing – no

container, no recess and no physical buffer of any sort – that protects the embedded electronic

element during lamination." *Id.* at 369.

"Once created, the plastic core 'sandwich' is then placed in a laminator, which heats, cools

and applies hydraulic pressure to the core." *Id.* at 368.  The broadest claims in the Leighton patents

require that the lamination cycle include the following steps:  (i) heating the core for a first period of

time; (ii) applying a first pressure to the core for a second period of time such that the electronic

---

application.  The '155 patent "is a continuation of the '207 patent and duplicates in all substantive
respects the '207 patent specification." *Leighton,* 358 F. Supp. 2d at 368.

[12]  Mr. Leighton offered to give Motorola a license to the Leighton patents in 1999. (Ex. 64)
Motorola ultimately declined, apparently because it had exited the business. (Ex. 65.)

element is encapsulated by the core; and (iii) cooling the core while applying a second pressure to it.

(*See e.g.,* Ex. 2, claim 1.)

## III.  PLAINTIFF LEIGHTON TECH HAS THE BURDEN TO PROVE IT MEETS THE CONSTITUTIONAL REQUIREMENTS FOR STANDING

This Court set forth the law pertinent to this motion in its Decision and Order in the *TM*

*Patents* case:

"Before a federal court can consider the merits of a legal claim, the person seeking to invoke

the jurisdiction of the court must establish the requisite standing to sue," an issue which remains

open for review "at all stages of the litigation." *TM Patents*, 121 F. Supp. 2d at 358.  In order for a

party who brings a suit for patent infringement to have standing, it "must have legal title to or be the

exclusive licensee of the patent in suit." *Id.*  Dismissal of infringement claims is warranted on

summary judgment if the alleged owner "fail[s] to adduce any evidence raising a disputed issue of

material fact on the question of ownership/standing." *Id.* at 371.

"If an assignment of rights in an invention is made prior to the existence of the invention, this

may be viewed as an assignment of an expectant interest," which "can be a valid assignment."

*Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991).  After making such an

assignment, "[o]nce the invention is made and an application for patent is filed . . . , legal title to the

rights accruing thereunder would be in the assignee . . . , and the assignor-inventor would have

nothing remaining to assign." *Id.*

The "mere fact that an assignment was recorded in the PTO does not, without more, prove

that a valid assignment actually took place." *GAIA Techs., Inc. v. Reconversion Techs., Inc.*, 93

F.3d 774, 778 n.3 (Fed. Cir. 1996), *amended on other grounds by*, 104 F.3d 1296 (Fed. Cir. 1996).

The patent recording statute, 35 U.S.C. § 261, "governs the rights of competing assignees," and

"does not address the *validity* of the rights purportedly transferred by an assignment." *TM Patents,*

121 F. Supp. 2d at 365 (emphasis in original). That statute "[c]learly . . . does not grant an assignee any title better than the assignor had." *Id.*

## IV.    ARGUMENT

### A.    Motorola Owns the Leighton Patents

#### 1.    Mr. Leighton Validly Assigned to Motorola All Inventions Conceived During His Employment at Motorola

In the Confidentiality Agreement, Mr. Leighton assigned to Motorola "the entire right, title and interest in all . . . inventions, innovations and ideas" that (i) he "developed or conceived" "at any time during [his] engagement with Motorola"; and which (ii) "relate to the actual and anticipated business activities of Motorola, or result from, or be suggested by, work which [he does] for Motorola." (Ex. 6, p. 1.) As the Federal Circuit has explained, to "resolv[e] the issue of title to the" Leighton Patents, this Court should look to Mr. Leighton's contractual assignment of inventions, and not to the patent itself. *See Filmtec*, 982 F.2d at 1552. As described below, Mr. Leighton's assignment is a binding and enforceable contractual obligation, which was supported by consideration that was in fact provided.

Mr. Leighton entered into at least two valid and enforceable contracts in which he assigned to Motorola all inventions that he conceived while consulting for the company. Mr. Leighton's assignment is valid and enforceable under both federal law, and the laws of Illinois and California, the states with the strongest connections to this case.[13] *See Phillips Petroleum Co. v. Shutts*, 472

---

[13] Illinois is the most appropriate choice of law because the Confidentiality Agreement was "attached as part of" the March 3, 1995 Purchase Order. That Purchase Order, and its terms and conditions, were accepted by Mr. Leighton upon his commencement of work. The terms and conditions of that order state that "[t]his order shall be governed by the laws of the state of Illinois." (Ex. 27, section 22.)

If the parties' selection of Illinois law is for some reason not applicable to Mr. Leighton's assignment, then California law is the most appropriate choice because California was the place of (footnote continued)

U.S. 797, 816, 105 S.Ct. 2965, 2976 (1985); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2004 WL 2754653, at *12 (S.D.N.Y. 2004).

The face of the Confidentiality Agreement makes plain that only Mr. Leighton was to execute this agreement – the Motorola signature was only for a "witness." (Ex. 6 p.2.) The Confidentiality Agreement was validly formed because the only party who needed to sign it, Mr. Leighton, did so. (*Id.*) There is no requirement under federal law that a patent assignment be acknowledged by a witness. *Welcome Co., Ltd. v. Harriet Carter Gifts, Inc.*, 1998 WL 1770584, at *3-4 (C.D. Cal. 1998) (rejecting argument "that a claimant must provide an acknowledgement in the manner provided for in U.S.C. § 261 [of the patent statute] for a valid assignment to occur"); *Clancy v. Troy Belting & Supply Co.*, 152 F. 188, 191 (N.D.N.Y 1907), *rev'd on other grounds*, 157 F. 554. There is also no such requirement under California, Illinois, or even Ohio law. *See Walmsley v. Holcomb*, 143 P.2d 398, 401 (Cal. Dist. Ct. App. 1943); *Martin v. City of O'Fallon*, 670 N.E.2d 1238, 1241 (Ill. App. Ct. 1996); *Roselawn Chiropractic Center, Inc. v. Allstate Ins. Co.*, 827 N.E. 2d 331, 332 (Ohio Ct. App. 2005).

To create a valid assignment, the law requires proof that Mr. Leighton intended to transfer his patent rights, and that Motorola desired to receive those rights and provided consideration in exchange. *See Roselawn*, 827 N.E.2d at 332 ("'[a]ny word or transaction which shows an intention on the one side to assign and on the other to receive, if there is valuable consideration, will operate [to create an assignment].") (citation omitted); *Martin*, 670 N.E.2d at 1241 (Ill. App. 1996) (similar);

---

contracting and performance, and it therefore has "the strongest connection to [this] litigation." *See Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590-91 (S.D.N.Y. 2001) (Under New York's choice of law rules, "when determining which state's law to apply to a contract dispute, 'the court evaluates the 'center of gravity' or 'grouping of contacts,' with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties.'") (citations {footnote continued)

*McCown v. Spencer*, 8 Cal. App. 3d 216, 225 (Cal. Ct. App. 1970) (similar).  Mr. Leighton's

execution of the Confidentiality Agreement shows he intended to transfer to Motorola the ownership

of any inventions that he conceived while working there.  Indeed, he testified that he "understood"

and "accepted" that any inventions he developed or conceived at Motorola "would be the property of

Motorola." (Ex. 7, 10/23/06 Leighton Tr. 548:5-25.)  Accordingly, Mr. Leighton's assignment is

valid.[14]

     Moreover, the parties also entered into a bilateral contract regarding Mr. Leighton's

consultancy, and Mr. Leighton's assignment of inventions to Motorola was a condition of that

contract as well.  Mr. Leighton accepted the terms and conditions of the March 3, 1995 Purchase

Order when he began working for Motorola.  (Ex. 27, p. 2 (section 1).)  The Confidentiality

Agreement was "attached as part of" the Purchase Order.  (*Id.* at p. 1.)  Mr. Leighton therefore

accepted the terms and conditions in the Confidentiality Agreement, including the assignment

therein, when he began working for Motorola.  (*Id.*)

     Given the parties' bilateral contract, the fact that the parties have been unable to locate a copy

of the Confidentiality Agreement which is signed by a "Motorola witness" is irrelevant.  Neither

Illinois, California, nor Ohio law require that both parties sign the Confidentiality Agreement for it

to be enforceable.  *See, e.g., Ross v. Bridgewater Construction, Inc.*, 2003 WL 22736578, at *2

(Ohio Ct. App. 2003); *M.J. Oldenstedt Plumbing Co., Inc. v. K mart Corp.*, 629 N.E.2d 214, 219 (Ill.

App. Ct. 1994); *Angell v. Rowlands*, 149 Cal. Rptr. 574, 577 (Cal. Ct. App. 1978).  Again, both

omitted).  Although Mr. Leighton is a resident of Ohio and corresponded with Motorola while there,
Ohio does not have nearly as strong a connection to this litigation as California does.

   [14] During the parties' initial discussions, Motorola repeatedly indicated that Mr. Leighton
would be required  to execute the Confidentiality Agreement before starting any work.  (*See, e.g.*
Ex. 22, p. 1; Ex. 25, p.1.).  In light of all these facts, Mr. Leighton plainly understood that his
(footnote continued)

parties understood and accepted that an assignment of inventions was a critical component of their bilateral contractual relationship.

Both contracts here were also supported by adequate consideration. Mr. Leighton entered into the Confidentiality Agreement "in consideration of [his] engagement by [Motorola] as a Consultant/Contractor . . . and in consideration of the compensation paid to [him] for [his] services in the course of such engagement. . . . " (Ex. 6, p. 1.) For both contracts, Motorola performed its obligations to "engage" Mr. Leighton as a "consultant," and "compensate" him for his services "in the course of such engagement." And there is no dispute that Mr. Leighton was compensated for the time that he spent at Motorola. (*See* Ex. 66, 10/23/06 Leighton Tr. 529:9-18; Ex. 56; Ex. 57.)

The weekly "compensation" of $1,875 Motorola paid to Mr. Leighton was adequate consideration. Motorola's refusal to pay Mr. Leighton the $1,500 bonus is irrelevant – it was to be provided in addition to the agreed compensation. *Hobson v. Eaton*, 399 F.2d 781, 785 (6th Cir. 1968); *Schwarze v. Solo Cup Co.*, 445 N.E.2d 872, 877 (Ill. App. Ct. 1983); *J. C. Peacock, Inc. v. Hasko*, 196 Cal. App. 2d 353, 359 (Cal. Dist. Ct. App. 1961). Moreover, Mr. Leighton's bonus was contingent upon the delivery of several documented processes, which he did not provide. (See Ex. 25; Ex. 29.)[15] The validity of a contract is not affected simply because it provides for a contingent bonus that is not paid because the contingency does not come to pass. *See, e.g., Neisendorf v. Levi Strauss & Co.*, 49 Cal. Rptr. 3d 216, 226-27 (Cal. Ct. App. 2006).

---

unilateral assignment of inventions and execution of the Confidentiality Agreement was a condition of his employment by Motorola, which he unilaterally accepted when he signed the Agreement.

[15] Under the terms of the Purchase Order and Thompson's February 22nd letter, Motorola could cancel Mr. Leighton's consultancy at any time on notice. (*See* Ex. 25; Ex. 27, p. 2 (section 5).) This also suggests that the parties did not intend that the "bonus" would be part of Leighton's compensation.

2.    **Because the Leighton Patents Were Conceived During Mr. Leighton's Employment at Motorola, They Are Motorola's Property**

The assignment clause in the Confidentiality Agreement was a valid assignment of Mr. Leighton's interest in all inventions conceived by him at Motorola. Once Mr. Leighton conceived of an invention at Motorola that fell within the scope of this assignment, "legal title to the rights accruing thereunder would be in the assignor [Motorola]. . . . , and the assignor-inventor [Mr. Leighton] would have nothing remaining to assign." *See Filmtec*, 939 F.2d at 1572.

The Leighton Patent claims contain both card structure and lamination process limitations. As shown below, Mr. Leighton conceived of the key and allegedly novel limitations of his patents while at Motorola. It is *where* the critical limitations were developed that determines where the invention was conceived. Any minor refinements Mr. Leighton may have developed after his consultancy ended are legally irrelevant. *See Filmtec*, 982 F.2d at 1552-53. There is no dispute that the Confidentiality Agreement covered anything Leighton conceived for Motorola, nor can there be any dispute that the key limitations were developed while Mr. Leighton was at Motorola.

The Leighton Patent claims cover a process for making RFID cards in which the electronic element is placed directly between two plastic sheets, in the absence of a non-electronic carrier. (*See, e.g.*, Ex. 2, claim 1.) There is no dispute that Mr. Leighton produced cards at Motorola by placing a chip and antenna directly between two plastic sheets. (Ex. 38, Leighton 10/23/06 Tr. at 620:11-621:14.) Nor is there any dispute that the RFID cards Mr. Leighton made at Motorola lacked any protection for the electronic element. (*Id.*) In fact, Mr. Leighton even admits that he suggested to Motorola that it remove such protection.[16] (*Id.*)

---

[16] The independent claims of the Leighton patents contain no limitations concerning the thickness of the core sandwich. (*See* Ex. 2, Claims 1 and 16; Ex. 3, Claims 1 and 15.) Even if this were an important feature of Mr. Leighton's invention, which it is not, the Motorola cards satisfy this requirement. For example, Claim 4 in the Leighton patents covers a card in which the core (footnote continued)

The Leighton Patent claims also set forth a lamination cycle that contains the following steps:
(1) heating for a first period of time, with or without pressure, (2) heating for a second period of time
using a greater pressure, and (3) cooling with the highest pressure. (*See, e.g.,* Ex. 2, Claim 1.) At
Motorola, Mr. Leighton used a process with these same steps to laminate RFID cards:

| Process as Claimed in the Leighton Patent | Process as Conducted at Motorola |
|---|---|
| heating for a first period of time, with or without pressure; | during the first part of the heating cycle, the "heat soak cycle," the plastic is softened by heat and pressure, such as a "just close" pressure; |
| heating for a second period of time using a greater pressure; and | during the remainder of the heating cycle, the pressure is increased to "facilitate[] encapsulat[ion of] the electronics in the plastics"; and |
| cooling with the highest pressure. | cooling with the intended application of the highest pressure. |

(*Cf.* Ex. 2, claim 1, *with* Ex. 67, Leighton 10/23/06 Tr. 648:19-652:11; Ex. 10, Leighton 10/10/05 Tr.
49:5-25; Ex. 41, Leighton 10/23/06 Tr. 679:21-680:24; Ex. 9, Leighton 10/23/06 Tr. 668:2-670:11;
Ex. 45.) There is therefore no doubt that Mr. Leighton conceived a process at Motorola that is
within the scope of the process claimed in his patent. Moreover, Motorola's Thompson and Delbecq
testified that Motorola used Mr. Leighton's "patented" lamination process to laminate RFID cards
before he even started working there. (Ex. 50, 3/22/06 Delbecq Tr. 203:19-204:15, 218:17-219:9;
Ex. 51, 5/4/06 Thompson Tr. at 29:11-31:19, 44:5-19.) Mr. Leighton, of course, could not recall the
specific temperatures and pressures which Motorola was using when he first arrived, even though he

---

sheets "hav[e] a thickness in the range of 0.007 to 0.024 inch." (Ex. 2, Claim 4; Ex. 3, Claim 4.)
Two core sheets that are each .024 inches thick will form a core that is .048 inches thick. The
Motorola cards were .038 inches thick, plus or minus .004 inches. (*See* Ex. 29; Ex. 68, Leighton
10/10/95 Tr. 147:3-16; Ex. 69, Leighton 10/10/95 Dep. Ex. 118, p. 2.)

was hired to improve the process and later patented it. (Ex. 31, 10/23/06 Leighton Tr. 587:13-589:12.)

In an attempt to dismiss the significance of his work for Motorola, Mr. Leighton testified that the process he used at Motorola did not produce commercially acceptable yields of working cards. This was due, in part, to the alleged inability of the Motorola laminator to apply (i) an insubstantial pressure during the initial heating phase, and (ii) the highest pressure during cooling.[17] (See, e.g., Ex. 52, Leighton 10/9/05 Tr. 141:11-147:18.) However, even if the laminator was not capable of achieving these goals, Leighton concedes that he conceived of both concepts while working for Motorola. Moreover, these alleged deficiencies are irrelevant because the independent claims in the Leighton patents, such as claim 1, do not require either of these limitations. (See Ex. 2, Claim 1.)

Even assuming that the broadest claims in the Leighton Patent require an insubstantial initial pressure and a higher cooling pressure, which they do not, the inability of Motorola's laminator to obtain these pressures is also irrelevant because the process Mr. Leighton developed at Motorola intended to utilize these features. The intended use of these pressures is enough to vest Motorola with title to Mr. Leighton's invention. See Filmtec, 982 F.2d 1552-53. In the Confidentiality Agreement, Mr. Leighton assigned to Motorola all inventions "developed or conceived" by him at Motorola. Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention." Filmtec, 982 F.2d at 1551 (citation omitted). As shown above, at Motorola Mr. Leighton conceived of the structure and lamination process described in his patents because while at Motorola he intended to use an initial insubstantial pressure and the highest

---

[17] If Motorola's laminator were fixed, Mr. Leighton said that he could have made cards according to his invention. (Ex. 54, Leighton 10/10/05 Tr. 127:18-128:24.) Of course, Mr. Leighton never discounted his work at Motorola when he described it to others. Instead, he routinely stated that he "developed" the process to make the Motorola cards. (Ex. 68.)

pressure during cooling. (*See* Ex. 67, Leighton 10/23/06 Tr. at 648:19-652:11; Ex. 41, Leighton

10/23/06 Tr. 679:21-680:24; Ex. 10, Leighton 10/10/05 Tr. 49:5-25; Ex. 45.)

Under the Confidentiality Agreement, Mr. Leighton was not required to prove that his

invention actually worked for ownership to vest in Motorola. (*See* Ex. 6.) Indeed, commercial

success "is not required for a conception." *Filmtec*, 982 F.2d at 1552. Therefore, any failure of

Mr. Leighton to produce an acceptable number of working smart cards is irrelevant.

The Federal Circuit's decision in *Filmtec* is directly on point. The patent at issue in *Filmtec*

covered a membrane for removing salt from water, which was produced by reacting two compounds

– trimesoy chloride (TMC) and metaphenylene diamine (MPD). *Id.* at 1549. In 1977, the inventor

of the patent performed experiments under a federal contract, and conceived of a membrane which

was made using TMC and MPD. *Id.* In the contract, the inventor's employer assigned to the

government all rights to inventions "conceived" during the performance thereof. *Id.* at 1548. The

inventor subsequently left his employer and started a new company, FilmTec, to commercialize the

membrane. *Id.* at 1549. In 1978, while at FilmTec, the inventor refined the manufacture of the

membrane, and obtained better performance results. *Id.* FilmTec then filed a patent application with

claims covering the membrane, as well as its improved results and refined manufacturing method.

*Id.* at 1552.

The Federal Circuit ultimately held that FilmTec lacked standing because the invention was

"conceived" during the government contract. *Id.* at 1553. The Court noted that the "key limitations

of the claim[ed]" invention – the manufacture of a membrane from TMC and MPD – were

developed during the government contract. *Id.* at 1552. It further noted that a "key distinction"

between the invention and the prior art was the presence of TMC, which the patent owner relied

upon during prosecution to overcome prior art. *Id.*

The Court also rejected FilmTec's argument that the membrane developed under the government contract did not meet the performance limitations of its patent claims:

> [The inventor] may well have refined the invention when he went to FilmTec, and he may have then found the best conditions for making his compositions. The record is clear, however, that [the inventor's] work in February 1978 was on the same invention that he conceived in November 1977. Were we to find that inclusion of narrow performance limitations in the claims could serve to expel the claimed limitation from operation of the Contract under which the invention was made, we would be defeating the intentions of the Contract, who agreed that inventions thereunder belong to the United States.

*Id.* at 1553.

Here, it is clear that Mr. Leighton "conceived" the "key limitations" of his invention at Motorola. Like the TMC and MPD in *FilmTec*, the key limitations of Mr. Leighton's invention are a specific structure and lamination process – both of which were developed at Motorola. During prosecution of his patents, Mr. Leighton relied on these features to overcome the prior art – thereby confirming just how "key" those features were. For example, "[i]n distinguishing the '207 patent from the '024 [prior art] patent, Leighton noted that the '024 patent required that the 'electronic element . . . be placed in a protective carrier disk,' which protection is not necessary in the '207 patent. . . ." *Leighton*, 358 F. Supp. 2d at 369 (citation omitted).

Even if the Leighton Patents include performance limitations not present in the Motorola cards, this cannot "defeat the intentions" of Mr. Leighton's assignment. These minor limitations concern features (such as printing, the type of electronic element used, and overlamination) that Leighton Tech has not asserted are novel features.

The timing of Mr. Leighton's "invention" further reinforces the conclusion that he conceived of his invention at Motorola. On July 12, 1995, Motorola told Mr. Leighton that he would not receive a bonus because he had failed to provide several deliverables. {Ex. 12.} Mr. Leighton did

not agree with Motorola's assertions, and even dictated a response to Motorola's letter to his wife. (Ex. 68, Leighton 10/10/95 Tr. 147:3-16; Ex. 69, Leighton 10/10/95 Dep. Ex. 118.)

Ultimately, however, instead of responding to Motorola Mr. Leighton decided to write someone else. And so, on July 17, 1995, a mere five days after Motorola refused to pay him a bonus, Mr. Leighton first described his "invention" to a third party. (Ex. 71.) Between that date and Mr. Leighton's departure from Motorola on May 5, 1995, he conducted no research or development activities whatsoever. (Ex. 63, Leighton 10/23/06 Tr. 721:6-723:12.) Mr. Leighton had no access to a laminator during this time. (*Id.*) Before his engagement by Motorola, Mr. Leighton had never laminated, or considered laminating, an electronic element between two plastic sheets. (Ex. 73, Leighton 10/10/05 Tr. 8:14:24, 17:1-17.). When asked how he came up with his invention, he had no technical answer for how he conceived of it: "I had help. God was with me... This idea came from the Lord, I'll tell you." (Ex. 72, Leighton 10/23/06 Tr. 726:1-727:5.) · Therefore the "invention" Mr. Leighton described to third parties could only have been developed at Motorola.

The '685 application and the Leighton Patents are directed to the same invention, and Motorola therefore owns them as well as any future reissue patent. Even if the patents disclosed different inventions, which they do not, Motorola would still own all of them because they are clearly related. *TM Patents*, 121 F. Supp. 2d at 369-70.

### B.  Leighton Tech Lacks Standing Because Motorola Is the True Owner of the Leighton Patents

Because Motorola owns the Leighton patents, Mr. Leighton could not assign the patents to Leighton Tech and therefore it has no standing to sue. *TM Patents*, 121 F. Supp. 2d at 365. This case parallels *TM Patents*. The plaintiff in *TM Patents* based its standing on an assignment from a named inventor, Hillis. Hillis "developed and reduced [the invention] to practice at M.I.T." pursuant to a federally-funded contract. *Id.* at 368. By statute, "the United States has title to all 'subject

inventions' made in performing work under a funding agreement with a research organization such as M.I.T." *Id.* There was no dispute that Hillis never elected to retain title to his invention, as permitted by statute. *Id.* at 369. On these facts, this Court concluded:

> The *FilmTec* cases control here. Hillis admittedly developed the inventions in the '773 patent while he was at M.I.T. If his work was under the Government funding agreement, and if he did not comply with the requirements necessary for him to retain title, title passed to the Government, Hillis did not have anything to transfer to TM Patents, and the subsequent "transfer" to TM Creditors could not be rendered valid by recording it.

*Id.* at 366.

All of Mr. Leighton's inventive activity resulting in the patented technology was performed pursuant to a Confidentiality Agreement with Motorola. This agreement explicitly named Motorola as the owner of any inventions conceived or developed during Mr. Leighton's consultancy for Motorola. (Ex. 6.) Like the named inventor in *TM Patents*, Mr. Leighton could not vest Leighton Tech with rights he did not have. *See FilmTec*, 939 F.2d at 1572; *see also TM Patents*, 121 F. Supp. 2d at 365.

## V.     CONCLUSION

For the foregoing reasons, Oberthur respectfully requests that its motion be granted.


DATED:     November 29, 2006            QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP


                                       By:     /s/ Edward J. DeFranco
                                               Edward DeFranco (ED-6524)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any, on this 29th day of November, 2006.

/s/ Edward J. DeFranco (ED-6524)