**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LEIGHTON TECHNOLOGIES LLC,

    Plaintiff,

          vs.

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

    Defendants.

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

    Counterclaim Plaintiffs,

          vs.

LEIGHTON TECHNOLOGIES LLC,
GENERAL PATENT CORPORATION
INTERNATIONAL, GENERAL PATENT
CORPORATION, and IP HOLDINGS LLC,

    Counterclaim Defendants.

Case No: 04 CV 02496 (CM) (LMS)

**DEFENDANTS' STATEMENT OF
MATERIAL FACTS PURSUANT TO
LOCAL CIVIL RULE 56.1 IN
SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT OF
NONINFRINGEMENT**

Hon. Coleen McMahon

Magistrate Judge Lisa M. Smith

QUINN EMANUEL URQUHART OLIVER &
  HEDGES, LLP
  Edward DeFranco (ED-6524)
  Robert C. Juman (RJ-6350)
  51 Madison Avenue, 22nd Floor
  New York, New York 10010-1601
  (212) 849-7000

  Kevin Johnson (KJ-8689)
  555 Twin Dolphin Drive, Suite 560
  Redwood Shores, CA 94065
  (650) 801-5000

  *Attorneys for Defendants Oberthur Card*
  *Systems, S.A. and Oberthur Card Systems of*
  *America Corporation*

November 29, 2006

Pursuant to Local Civil Rule 56.1, Defendants, Oberthur Card Systems, S.A. and Oberthur Card Systems of America Corporation (collectively "Oberthur"), respectfully submit this statement of undisputed material facts in support of their motion for summary judgment that Oberthur does not infringe any of the patent claims asserted by Plaintiff Leighton Technologies LLC ("Leighton Tech").

1.    Leighton Technologies LLC ("Leighton Tech") is asserting ten claims of two patents in this case:  claims 1, 4, 6-7, and 16 of the '207 patent, and claims 1, 4, 6-7, and 15 of the '155 patent.  Pursuant to the Stipulation and Order dated July 25, 2006, Leighton Tech agreed to dismiss, without prejudice, two of the four patents it originally asserted in this case. (Ex. 3.)

2.    The Leighton Patents relate to the manufacture of plastic "smart cards," which include an electronic element that communicates with a card reader using radio frequency identification ("RFID") technology.  *Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361, 369 (S.D.N.Y. 2005) (Ex. 4.)

3.    Leighton Tech does not contend that it was the first to manufacture a smart card, nor does it contend that it owns the design or structure of any particular electronic element, such as a chip and antenna assembly.  (*See* Ex. 1, 3:53-54; Ex. 5, *Markman* Tr. 6:7-16.)

4.    Leighton Tech asserts that the patents claim an improved lamination process over the prior art because the claimed process steps allow for a simplified card structure.  This simplified card structure has two key features:  (1) there is no need to protect the electronic element using any of the "non-electronic carriers" (including a recess) set forth in the prior art; and (2) the "electronic element" is positioned "directly between . . . first and second plastic core sheets to form a core."

5.      The structure of Oberthur's cards is different from that required by   the patent claims because:  (1) the electronic element, a chip and associated antenna, *is not placed directly between the core sheets*, and (2) *they contain a recess* – a non-electronic carrier.

6.      In all of Oberthur's cards, the chip is positioned directly below a recess or hole that is cut out of an adjacent plastic sheet.  Oberthur's recess creates a barrier around the electronic element, which protects the element from damage during lamination.

7.      In the report of its technical expert, Leighton Tech does not dispute that the recess in Oberthur's cards is a non-electronic carrier that protects the chip during lamination.

8.      In asserting infringement, Leighton Tech separates the chip and antenna assembly in Oberthur's cards into "separate" electronic elements, and contends that because there is allegedly no recess or protection for the antenna, Oberthur's cards are covered by the claims.

9.      Six of the asserted dependant claims specifically refer to a chip and antenna combination.  The claims refer to a "micro-chip and associated wire antenna" as "one electronic element."  For example, claim 12, which depends from claim 1, states that the phrase "one electronic element" used in claim 1 "is a micro-chip and an associated circuit board antenna."

10.      Leighton Tech's position treats the two Oberthur card types at issue in this case, called the "Amex" and "Xenon" cards, identically for infringement purposes.

11.      In the Xenon cards, the antenna is without question protected by a non-electronic carrier – it is embedded into a plastic sheet by an ultrasonic process prior to lamination.

12.      In the Amex cards, the antenna is thin and flat and there is no need for a protective non-electronic carrier.

**The Leighton Patents**

13.     The Leighton Patents describe processes for making smart cards, and claim the use of a "highly coordinated" lamination process involving heat, cooling and the application of pressure to encapsulate an electronic component essential to signal transmission. *Leighton*, 358 F. Supp. 2d at 364.

14.     The patents allegedly are an improvement over the prior art by eliminating the need to create a protective barrier around the embedded electronic element, thereby simplifying the manufacturing process. (*Id.*; *see also* Ex. 11, Leighton 10/23/06 Tr. 793:3-794:7.)

**The Patent Specification**

15.     The two patents-in-suit share a common specification. The "Background of the Invention" section of the specification explains that "[o]ne of the biggest obstacles to the wide spread manufacture and use of RFID cards has been the inability of card manufacturers" to make cards that are "sufficiently aesthetically pleasing," and "have a sufficiently regular or flat surface," which can receive "dye sublimation" printing. (Ex. 1, 1:61-2:14.) In other words, the presence of an electronic element complicates the card manufacturing process.

16.     In the section titled "Detailed Description of the Invention," the specification describes the various forms that the electronic elements can take. The section begins by depicting Figure 1 (set forth below), and states: "Referring now to FIG. 1, there can be seen a plastic RFID card 10 manufactured in accordance with the present invention and including an *electronic element* 20 embedded therein." (*Id.* at 3:42-45.) (emphasis added). In this Figure, the electronic element is the chip and antenna combination are shown by the dotted line.



FIG.-I

17.     The specification then explains that the electronic element "may take a wide variety of forms and perform a wide variety of functions."  It then describes three figures that depict specific electronic element consisting of chip and antenna combination:

> As shown in Fig. 3A-3C respectively, electronic element 20, 20', 20" may be provided by a micro-chip 22 including a wire antenna 24 connected thereto, a micro-chip 22' and a circuit board antenna 24', a read/write micro-chip 22" and a wire coil antenna 24", or any other suitable electronic element.

(*Id.* at 3:48-52.)  Figures 3A, 3B, and 3C are set forth in the specification as follows:



FIG.-3A
Micro-chip 22 including a wire antenna 24 connected thereto

FIG.-3B
Micro-chip 22' and a circuit board antenna 24'

FIG.-3C
Read/write micro-chip 22" and a wire coil antenna 24"

18.     The specification explains in the next sentence that "[t]hese electronic elements 20, 20', and 20" and their insertion into plastic cards is not new . . ." and that Leighton provides a "new hot lamination process for manufacturing plastic cards 10 with these electronic elements 20, 20', and 20" embedded therein such that the cards 10 are of a superior quality . . . ."  (*Id.* at 3:53-58.)

19.    The specification goes on to describe one procedure for making cards with embedded electronic elements.  It explains that "a plurality of electronic elements 20 are positioned between the first and second sheets of plastic core stock 30, 32 . . . ."  (*Id.* at 4:4-6.) This is shown in Figure 5:



FIG. – 5

20.    The specification shows in Figure 6 a side view of the sandwich of core sheets and multiple electronic elements:



FIG. – 6

21.    At this point in the process, just after the sandwich of electronic elements and core sheets has been formed, there is not yet any encapsulation of the electronic elements (the patents depict encapsulated electronic elements using a dashed line (*see* Figs. 8-10) and non-encapsulated elements, such as shown in Figure 6, using a solid line).

22.    The specification explains that "[w]hen a plurality of electronic elements 20 are positioned between first and second sheets [of] plastic core stock 30, 32, electronic elements 20 are properly positioned relative to one another such that a plurality [of] cards may be cut from the resulting card stock . . . ."  (*Id.* at 4:7-11.)

23.    The steps of the lamination process are then performed, as set forth in the patent specification, and as described in the Court's *Markman* ruling. *Leighton*, 358 F. Supp. 2d at 367-68.

**The Leighton Patent Claims**

24.    Of the ten claims asserted by Leighton Tech, four are independent – claims 1 and 16 of the '207 patent, and claims 1 and 15 of the '155 patent. These pairs of independent claims in the two patents are nearly identical.

25.    The only difference is that each of claims 1 and 15 of the '207 patent contain an additional limitation relating to printing. All four of the independent claims require that "at least one electronic element" be positioned directly between two plastic core sheets. Claim 1 of the '207 is set forth by example (Ex. 1, emphasis added):

1.    A process for incorporating <u>at least one electronic element</u> in the manufacture of a plastic card, comprising the steps of:

(a)    providing first and second plastic core sheets;

(b)    positioning said <u>at least one electronic element</u> in the absence of a non-electronic carrier  directly between said first and second plastic core sheets to form a core, said plastic core sheets defining a pair of inner and outer surfaces of said core;

(c)    positioning said core in a laminator apparatus, and subjecting said core to a heat and pressure cycle, said heat and pressure cycle comprising the steps of:

(i)    heating said core for a first period of time;

(ii)    applying a first pressure to said core for a second period of time such that said <u>at least one electronic element</u> is encapsulated by said core;

(iii)    cooling said core while applying a second pressure to said core,

(d)    coating at least one of said outer surfaces of said core with a layer of ink; and

(e)    applying a layer of overlaminate film to at least on of said outer surfaces of said core.

26.     Six dependent claims in the '207 and '155 patents specifically define the phrase

"at least one electronic element" to consist of a chip *and* an antenna associated with that chip.

Dependent claims 13, 14, and 15 in the '207 patent state as follows (Ex. 1, emphasis added.):

> 13.     The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein *said at least one electronic element is a micro-chip and an associated wire antenna*.

> 14.     The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein *said at least one electronic element is a micro-chip and an associated circuit board antenna*.

> 15.     The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein *said at least one electronic element is a read/write integrated chip and an associated antenna*.

27.     The comparable dependent claims in the '155 patent, claims 11-13, are identical –

they define the "at least one electronic element" in exactly the same way: as a ***"micro-chip and***

***an associated wire antenna"*** (claim 11), a ***"micro-chip and an associated circuit board***

***antenna"*** (claim 12), and a ***"read/write integrated chip and an associated antenna"*** (claim 13).

None of the other claims of either patent defines the "at least one electronic element" in any

other way.

**The Prosecution History of the Leighton Patents**

28.     The absence of a non-electronic carrier "is the critical improvement of these

patents over [the] prior art, specifically over U.S. Patent No. 4,450,024 [the "'024 patent"], which

required protection for the electronic element during lamination."  *Leighton*, 358 F. Supp. 2d at

369.

29.     As shown below in Figures 1 (a finished identification card) and 2a (a cross-

section of the card before lamination), the '024 patent disclosed that an "IC module" (item 5 in

Figure) was placed in a "carrier element" (item 6) to protect it from damage during lamination

(Ex. 25.):



30.    The '024 patent also "describe[d]" a "process for lamination" that is "similar" to that described in the Leighton Patents. *Leighton Tech  v. Oberthur*, 423 F. Supp. 2d 425, 427 (S.D.N.Y. 2006) (Ex. 26.)

31.    To overcome the prior art '024 patent, Leighton amended his claims to specifically include a claim limitation requiring the absence of a non-electronic carrier. *Leighton*, 358 F. Supp. 2d at 369.  For example, Claim 1 was amended as follows (new matter underlined, and deleted matter in brackets):

> 1.  A [hot lamination] process for <u>incorporating at least one electronic element in</u> the manufacture of a plastic card, [said process] comprising the steps of:
> (a)  providing first and second plastic core sheets;
> (b)  positioning <u>said</u> at least one electronic element **<u>in the absence of a non-electronic carrier directly</u>** between said first and second plastic core sheets to form a [layered] core, <u>said plastic core sheets defining a pair of inner and outer surfaces of said core</u> . . . .

(Ex. 9, at 1.) (emphasis added)

32.    After making these amendments, Leighton then argued that the amended claims of the application were patentable over the '024 patent because they lacked the "protective elements," such as a recess, used in the '024 patent (*Id.* at 6.):

The '024 patent claims a lamination process for making
an electronic card which protects the electronic element of
the card by first placing it in a recess formed within a card
layer so as to avoid damage to the electronic element from
localized pressure applied in the lamination process.  The
patent then requires that a "buffer zone" be present within
the recess.  Even the broadest of claims of the '024 patent
require a recess and a buffer zone, for and protecting the
electronic element.  These are required by the '024 patent
invention in order to enable the card assembly to be subjected
to a full laminating pressure.

No such protective elements are desired or necessary to
the invention of the present application . . . .

. . . The process of the present invention allows the
electronics-containing core to be subjected to the full
laminating pressure without use of a recess in a card layer.
Unlike anything shown in the prior art, the electronic unit is
placed directly between two (2) plastic sheets .  . . . .

33.     The Examiner allowed the claims to issue after receiving Leighton's amendment

and argument explaining why its process eliminated the need for nonelectronic carriers to protect

electronic elements, such as the chip and antenna combination disclosed in the specification and

claims.

**This Court's *Markman* Ruling**

34.     Leighton Tech confirmed during the *Markman* hearing that the elimination of this

protective element was "novel and something new" and "the main reason why the first patent, the

'207 patent, issued."  (Ex. 12, *Markman* Tr. 59:16-60:21.)

35.     The Court's construction of three claim terms relevant to this motion are set forth

in the following table (the other construed terms relate to limitations not at issue on this motion):

| Claim Term | The *Markman* Ruling |
|---|---|
| at least one "***electronic element***" | "A device or thing that has distinct characteristics related to electricity, and that also has terminals at which it may be connected to other distinctly electrical devices or things in order to form a circuit, in which electrons move through devices called semiconductors."  *Leighton*, 358 F. Supp. 2d at 370. |

| in the absence of a "***non-electronic carrier***" | "A device that holds an electronic element to protect it from physical damage during lamination, where the device is not part of a circuit that utilizes a semiconductor device."  *Id.* at 376. |
|---|---|
| "***directly*** between said first and second plastic core sheets" | "In immediate physical contact."  *Id.* at 377. |

## The Oberthur Cards Accused of Infringement

36.    The accused Oberthur cards fall into two categories: (1) cards manufactured for American Express (the "Amex cards"), and (2) cards manufactured for others, such as the Xenon Cards.

37.    To simplify the issues in this case, the parties executed a stipulation regarding the structure and manufacturing processes used to make the accused Oberthur cards.  (Ex. 27.) Although different in some respects, both cards share a common structural feature that goes to the central issue in this case: they both contain a recess or hole in the plastic layer above the electronic element that protects this element during lamination.

38.    ***The American Express Cards:***  The American Express cards manufactured by Oberthur contain six plastic layers from top to bottom:  (i) a top overlaminate layer; (ii) a top printed layer; (iii) an inlay layer with an embedded antenna and a chip module that extends downward; (iv) an IR blocker layer; (iv) a bottom printed layer; and (vi) a bottom overlaminate layer.  (Ex. 27, at 2-3.)

39.    This structure is set forth in the following figure, and is also evident from the sample unlaminated Amex cards attached as Exhibit 13 to the Johnson Declaration:



40.     To make a unique aesthetically pleasing card, the top and bottom printed layers in the Amex cards are transparent.   Because these layers are transparent, an IR Blocker is used so that infrared sensors can detect the presence of Amex cards.  (Ex. 14, at OCS_F_070469.)

41.     As a result, early development versions of the Amex cards did not contain a hole or recess in the IR blocker layer, and many of them did not work after lamination because the electronic element had been damaged.  (*See* Ex. 15, at OCS_A_ 039725, 039729.)

42.     In an attempt to solve this problem, Oberthur and its co-developers decided to punch a hole in the IR blocker "into which the chip is nestled during tacking to eliminate stress on the chip during lamination."  (Ex. 16, at OCS_A_039754.)  The Amex card developers concluded that they "need [a] hole in the IR blocker to avoid broken die and get a reliable card."  (*See* Ex. 15, at OCS_A_039729.)  Accordingly, before lamination Oberthur punches this hole in the IR blocker layer to "match the position of the chip in the finished card."  (Ex. 17, at OCS_A_009388.)

43.    Finally, Oberthur laminates the plastic layers of the Amex cards set forth above into a finished card.  (Ex. 18, Mosteller 2/24/06 Tr. 96:1-7.)

44.    ***The Cards for Project Xenon***:  The Xenon cards are made in two phases.  First, a plastic "prelam" sandwich is laminated that houses an embedded electronic element – the chip and antenna.  (Ex. 27, at 4-7.)  From top to bottom, the Xenon prelams contain at least four layers:  a top overlaminate layer; a top layer having a recess that is positioned directly above the chip module; an inlay layer with an antenna and a chip module that extends upwards; and a bottom overlaminate layer.  (*Id.*)

45.    Like the IR blocker layer in the Amex card, the top layer in the prelam contains a recess directly above the chip to protect the chip during lamination.  (*Id.* at 5, 7.)  As shown by the unlaminated prelams attached to the Johnson Declaration, before lamination the top of the chip does not contact the top overlaminate layer.  (Exhs. 19 and 20.)

46.    Oberthur then assembles and laminates the prelams into finished Xenon cards after adding additional layers.  (*See id.* at 7-8.)  From top to bottom, the finished Xenon cards consist of five layers: (i) a top overlaminate layer; (ii) a top printed layer; (iii) the prelam; (iv) a bottom printed layer; and (v) a bottom overlaminate layer.  (*Id.*)  This structure is set forth in the figure below, and is also evident from examination of the unlaminated Xenon cards attached as Exhibit 21 to the Johnson Declaration:



47.    Oberthur has laminated the Xenon cards using two laminators – a laminator manufactured by Lauffer, and the same Burkle laminator used for laminating the Amex cards. (*Id.* at 8.)

**Leighton Tech's Infringement Contentions**

48.    On November 21, 2006, Leighton Tech submitted its infringement contentions in the report of its technical expert Dr. David Everett.  (Ex. 10.)  In this report, Leighton Tech does not claim that the Amex and Xenon cards infringe because the chip is positioned in the absence of a non-electronic carrier.  (*See, e.g.*, *id.* at 8-9, 22-24.)  Instead, it contends that these cards infringe because they allegedly have other unprotected "electronic elements," such as the antenna and the antenna bridge that connects the antenna to the chip. (*Id.*)

49.    Leighton Tech contends that the Amex cards infringe five claims in each of the Leighton Patents because the Amex cards contain "several electronic elements . . . including a chip, antenna, bridge connecting chip and antenna, antenna pads, and aluminum mounting pads for the chip."  (*Id.* at 7.)  Of these elements, Dr. Everett believes that only the "antenna, antenna bridge, and mounting pads are positioned directly between plastic core sheets . . . ."  (*Id.* at 8-9.)

50.     With respect to the Xenon cards, Leighton Tech contends that those cards infringe five claims in the '155 patent.  Dr. Everett stated that the Xenon cards and prelams "incorporate at least one electronic element . . . including a chip, antenna, antenna bridge, [and] chip lead frame."  (*Id.* at 21.)  He further stated that the "antenna and antenna bridge are positioned directly between plastic core sheets," in the absence of a non-electronic carrier.  (*Id.* at 22-24.)

51.     With respect to the '207 patent, Dr. Everett did not address the potential equivalence of any claim limitation.  (*Id.* at 6.)

52.     Similarly, with respect to the '155 patent, Dr. Everett merely stated that "[i]n the event that it is determined that any element or limitation [in the '155 patent] does not literally exist in Oberthur's process, I believe that such feature or limitation may exist under the Doctrine of Equivalents . . . because Oberthur's process ***may*** perform the same function, in substantially the same way, to achieve substantially same result as the process disclosed in the '155 patent."  (*Id.* at 20 (emphasis added).)

**The Prior Art**

53.     The prior art discloses the use of a non-electronic carrier to protect an electronic element (a chip and associated antenna).  The non-electronic carrier disclosed in the prior art, a recess, only protects the chip, and does not protect the antenna.

54.     The limitation in the claims of the Leighton Patents that a non-electronic carrier be absent "is the critical improvement of [the Leighton] patents over [the] prior art . . . which required protection for the electronic element during lamination."  *Leighton*, 358 F. Supp. 2d at 369.

55.     Oberthur's cards have the same type of protective structure as that disclosed in the prior art.  For example, U.S. Patent No. 5,880,934 (the "'934 patent") discloses a contactless card

wherein the antenna "coil 7 is disposed on inner layer 11" that "has suitable opening 3 for receiving [chip] module 6." (Ex. 6, 3:58-60.)

56.    As shown below, just as in Oberthur's cards, the cards disclosed in the '934 patent have an opening (item 3, below) for the chip module (item 6):



FIG. 4

57.    This reference also discloses that the antenna coil (number 7 in the above figure) is located directly between two plastic sheets without any protection. The overall location of the antenna is depicted in Figure 3 of the '934 patent:



FIG. 3

58.    Similarly, International Patent Application Publication Number WO 88/08592 (the "'592 application") discloses a laminated contactless card wherein the chip is protected by a recess. Specifically, it "contemplate[s] the existence of a hole [12] in a core layer [14] or at least in an opposing relatively thick layer [18] into which the circuit die [10, the micro-chip] is inserted":



(Ex. 7, 24:6-9.)

59.    The '592 application also discloses that the antenna (item 16) is placed directly between two plastic sheets (items 14 and 18) without any protection. (*See id.* at 14:24-15:13.) Plainly the Oberthur structure Leighton accuses of infringement was well known in the art.

60.    **The Antenna in the Xenon Cards is Also Protected By a Non-Electric Carrier.** The embedded antenna in the Xenon prelams is also protected by a non-electronic carrier. Before lamination of the prelams, the wire antenna is embedded into the inlay sheet using an ultrasonic device which rapidly rubs the wire antenna against the inlay. (Ex. 27, at 5, 6.) The rapid vibration of the antenna melts the inlay and embeds the antenna into the inlay sheet, as shown below (*Id.*):



61.     The embedded antenna receives less pressure during lamination, and is also held and protected by the sheet in which it is embedded.

62.     **The Antenna in the Amex Cards Needs No Protection.**   The aluminum antenna in the Amex card does not require protection.  As shown by the following depiction, the antenna in the Amex card is a flat, solid strip of aluminum that, unlike the chip, contains no delicate circuitry.



63.     As a result the antenna can withstand greater pressures during lamination without being damaged.  There is no need for any non-electronic carrier protection.

64.     Before lamination, the chips in Oberthur's cards are positioned directly below a recess.  (Ex. 10, at 3, 5, 7.)  As a result, the top portion of the electronic element in Oberthur's cards is not in immediate physical contact with any plastic layer.  (*Id.*)  Instead, a buffer zone of air exists above it.  Oberthur positions the electronic element in its cards in exactly the same manner as the prior art '934 patent and '592 application.

65.     In Oberthur's Amex cards the top printed  layer and the IR blocker layer, which are located on either side of the inlay layer with the electronic element, each contain an adhesive

layer that is .001 inches thick.  (Ex. 10, at 2-3.)  As set forth in the parties' stipulation, this adhesive is located between these layers and the inlay layer.  (*Id.*)

66.    Accordingly, with the exception of the top portion of the electronic element, which before lamination does not touch anything, the other portions of the electronic element in the Amex card would contact only the adhesive prior to lamination, and so could not be in immediate physical contact with the two plastic core sheets.

67.    The chips in the Xenon cards are surrounded by an epoxy resin that fills the gaps created by the recesses in the top layer and in the inlay layer.  (*Id.* at 6-7.)  Like the adhesive in the Amex cards, this epoxy prevents the electronic element in the Xenon cards from directly contacting the top and bottom overlaminate layers.

DATED:    November 29, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


By:    /s/ Edward J. DeFranco
    Edward DeFranco (ED-6524)
    Robert C. Juman (RJ-6350)
    Mark Baker (MB-0302)
    51 Madison Avenue, 22nd Floor
    New York, New York  10010-1601
    (212) 849-7000

    Kevin P.B. Johnson (KJ-8689)
    555 Twin Dolphin Drive, Suite 560
    Redwood Shores, CA 94065
    (650) 801-5000

*Attorneys for Defendants Oberthur Card Systems, S.A. and Oberthur Card Systems of America Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any, on this 29th day of November, 2006.

<u>/s/ Edward J. DeFranco (ED-6524)</u>