**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LEIGHTON TECHNOLOGIES LLC,

     Plaintiff,

           vs.

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

     Defendants.

---

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

     Counterclaim Plaintiffs,

           vs.

LEIGHTON TECHNOLOGIES LLC,
GENERAL PATENT CORPORATION
INTERNATIONAL, GENERAL PATENT
CORPORATION, and IP HOLDINGS LLC,

     Counterclaim Defendants.

---

Case No: 04 CV 02496 (CM) (LMS)

**DEFENDANTS' STATEMENT OF
MATERIAL FACTS PURSUANT TO
LOCAL CIVIL RULE 56.1 IN
SUPPORT OF THEIR MOTION TO
DISMISS BASED ON LACK OF
STANDING**

Hon. Coleen McMahon

Magistrate Judge Lisa M. Smith

QUINN EMANUEL URQUHART OLIVER &
  HEDGES, LLP
  Edward DeFranco (ED-6524)
  Robert C. Juman (RJ-6350)
  Mark Baker (MB-0302)
  51 Madison Avenue, 22nd Floor
  New York, New York 10010-1601
  (212) 849-7000

  Kevin P.B. Johnson (KJ-8689)
  555 Twin Dolphin Drive, Suite 560
  Redwood Shores, CA 94065
  (650) 801-5000

  *Attorneys for Defendants Oberthur Card
  Systems, S.A. and Oberthur Card Systems of
  America Corporation*

November 29, 2006

Pursuant to Local Civil Rule 56.1, Defendants, Oberthur Card Systems, S.A. and Oberthur Card Systems of America Corporation (collectively "Oberthur"), respectfully submit this statement of undisputed material facts in support of their motion to dismiss the claims of Plaintiff Leighton Technologies LLC ("Leighton Tech") for lack of standing.

**The Allegations In This Case**

1.      Leighton Tech asserts that Oberthur infringes claims 1, 4, 6-7, and 16 of U.S. Patent No. 5,817,207 (the "'207 patent"), and claims 1, 4, 6-7, and 15 of U.S. Patent No. 6,214,155 (the "'155 patent") (collectively the "Leighton Patents").

2.      Keith Leighton is the sole named inventor on the Leighton Patents.  (Exhs. 2 and 3.)[1]

3.      The first Leighton patent application was U.S. Provisional Patent Application No. 60/005,685 (the "'685 application").  The Leighton Patents claim priority from the '685 application.  The '155 patent "is a continuation of the '207 patent and duplicates in all substantive respects the '207 patent specification."  *Leighton*, 358 F. Supp. 2d at 368.

4.      The Leighton patents "claim the use of a 'highly coordinated' lamination process involving heat, cooling and the application of pressure to encapsulate an electronic element. . . ." *Leighton*, 358 F. Supp. 2d at 364.  "The Patents allegedly improve over prior art by eliminating the need to create a protective barrier around the embedded electronic element, thereby uncomplicating the manufacturing process."  (*Id.*)

5.      To that end, Claim 1 requires that at least one electronic element be placed directly between two plastic core sheets.  (Ex. 2; Ex. 3.)  The Court "likened this 'core' to a

---

[1]   "Ex." refers to an Exhibit to the Declaration of Edward DeFranco submitted in support of Oberthur's motion to dismiss for lack of standing.

sandwich, in which the plastic sheets were the pieces of bread and the electronic element was the filing." *Leighton*, 358 F. Supp. 2d at 361. The claims in the Leighton patents require that "there is nothing - no container, no recess and no physical buffer of any sort - that protects the embedded electronic element during lamination." *Id.* at 369.

6.    "Once created, the plastic core 'sandwich' is then placed in a laminator, which "heats, cools and applies hydraulic pressure to the core." *Id.* at 368. The broadest claims in the Leighton patents covers require that the lamination cycle include the following steps: (i) heating the core for a first period of time; (ii) applying a first pressure to the core for a second period of time such that the electronic element is encapsulated by the core; and (iii) cooling the core while applying a second pressure to it. (*See e.g.*, Ex. 2, claim 1.)

7.    After the Leighton Patents issued, Mr. Leighton assigned interests in the patents to individuals who invested in his patents. (Ex. 13, Leighton 10/23/06 Tr. 768:12-770:17.)

8.    On May 31, 2003 Mr. Leighton contracted with General Patent Corporation International ("GPCI"), a "patent enforcement firm [which] help[s] independent inventors and small businesses to defend their patents against infringement." (Ex. 14.)

9.    Leighton Technologies LLC was then formed, an entity to which ownership of the Leighton Patents was then assigned. (Exhs. 14, 16.)

**The First Time Mr. Leighton Ever Laminated an Electronic Element in an RFID Card Was When Motorola Hired Him As A Consultant**

10.    Mr. Leighton's first experience with RFID cards came when he consulted for Motorola in 1995. (Ex. 17; Ex. 5, Leighton 10/23/06 Tr. 568:21-569:4; *see also* Ex. 18, Thompson Tr. 73:15-74:22.)

11.    At the encouragement of a business acquaintance and friend of Mr. Leighton, Motorola asked Leighton "to come visit [Motorola's] facility in San Jose, California to assist

them in their production of an employee identification card to be used by Microsoft employees."
(Ex. 19, Leighton 12/6/05 Decl. ¶¶ 8, 10.)

12.    Although Motorola had its own RFID experts and had made some RFID cards, they wanted to utilize Mr. Leighton's card lamination expertise to improve Motorola's process and solve yield and quality issues to make a card with a flat surface (Ex. 20, Delbecq 2/3/06 Tr. 69:1-17, 93:2-94:15; Ex. 21, Thompson 5/4/06 Tr. 52:13-54:14.)

13.    On February 17, 2005, Mr. Leighton met with at least two Motorola employees, Ken Thompson and Jean-Marc Delbecq, at Motorola's San Jose facility.  (*See* Ex. 22, 2/17/95 handwritten notes.)

14.    Mr. Leighton admitted that before consulting for Motorola, he had never seen an electronic element laminated in a card.  (Ex. 5, Leighton 10/23/06 Tr. 568:21-569:4.)

15.    In fact, prior to consulting for Motorola, the only things Mr. Leighton had laminated into a plastic card were decorative items – a butterfly and a very thin layer of metallic foil. (Ex. 23, Leighton 10/23/06 Tr. 571:18-572:5.)

**Mr. Leighton Signed An Agreement That Assigned To Motorola All Inventions Conceived During His Consulting Work for Motorola**

16.    During the initial meeting in San Jose on February 17, 1995, the attendees took notes on the agreed terms of Mr. Leighton's consultancy, and at the close of the meeting the notes were signed by the attendees, Mr. Leighton and the Motorola employees Messrs. Thomson and Delbecq.  (Ex. 22.)

17.    The notes state that the parties reached an "agreement in principle" that Mr. Leighton would serve as a consultant to Motorola  for four weeks.  (*Id.*)

18.    In addition to being paid $7,500 for four weeks of consulting (at $1,875 per week), Mr. Leighton was to receive a $1,500 bonus for the successful production of 10,000 cards.  (*Id.*)

19.    In a letter dated February 22, 1995 sent to Mr. Leighton, Motorola's Ken Thompson expressed "confidence" in Mr. Leighton's abilities and "outline[d] the result of our discussions along with the next steps."  (Ex. 25.)

20.    The letter requested that Mr. Leighton provide a quote for his services that "should contain previously discussed terms," and requested that Mr. Leighton provide other items, such as the "signed Motorola Consultant Agreement," the "signed Non Disclosure Agreement," and "deliverables."  (*Id.*)

21.    Mr. Thompson stated that "[w]ith all agreements signed, Motorola will issue [a] purchase order to you once [the] requisition is approved."  (*Id.*)

22.    Notes discussed at the meeting also state "Increase Cold Side Ram."  *(Id.)*  At deposition, Mr. Leighton testified that the goal was to increase the pressure during cooling. (Ex. 24, Leighton 10/10/05 Tr. 153:18-22.)  Mr. Leighton qualified this testimony by stating "I'm not sure of the pressures that I had, but I told [Motorola] wanted I wanted to do."  (*Id.* at 153:14-17.)

23.    Mr. Leighton signed the requested Non Disclosure Agreement, titled "Confidentiality Agreement," and dated it February 23, 1995 – the same day Mr. Thompson's February 22nd letter was sent by fax.  (Ex. 5.)  In that Agreement, Mr. Leighton assigned to Motorola "all inventions, innovations and ideas" that he "developed or conceived" "that result from, or are suggested by, work [done for] Motorola" (*Id.*):

> In consideration of my engagement by Motorola, Inc. ("Motorola"), as Consultant/Contractor for programs or products as directed by Motorola, and in consideration of the compensation

```
paid to me for my services in the course of such engagement. I
understand and agree to the following provisions for the protection
of the property rights of Motorola:

1.  I will promptly and fully communicate in writing to an
    Executive Officer of Motorola or its nominees, all inventions,
    innovations and ideas developed or conceived by me, whether
    solely or jointly with others at any time during the entire
    period of my engagement with Motorola, and which inventions,
    innovations and ideas relate to the actual and anticipated
    business activities of Motorola, or result from, or are
    suggested by, work which I do for Motorola.  I agree to
    assign and hereby assign to Motorola as its exclusive
    property the entire right, title and interest in all such
    inventions. innovations and ideas. . . .
```

24.     In addition to the signature line for Mr. Leighton as the party assigning his rights, the Confidentiality Agreement contained a signature line for a "Motorola witness." (*Id.*)  The only copy of the Agreement that the parties have located contains only Mr. Leighton's signature, and no witness signature. (*Id.*)  As discussed below, this is irrelevant to the validity and enforceability of the Agreement.

25.     Motorola issued to Mr. Leighton a Purchase Order dated March 3, 1995 for four weeks of consulting services (at the agreed rate of $1,875/week and a bonus of $1,500 "upon meeting the terms of [the] agreement dated 2/22/95"). (Ex. 27.)  The Purchase Order also noted that a "signed Confidentiality Agreement and D.O.D. [were] received and attached as part of this P.O." (*Id.*)  The Purchase Order set forth Motorola's standard terms and conditions for transactions.  It stated that "Seller's commencement of work or shipment of the goods, whichever occurs first, shall constitute acceptance of this purchase order and all of its terms and conditions." (*Id.*)

26.     In a March 20, 1995 letter, Mr. Leighton stated that he could tentatively begin at Motorola on March 27, 1995, and he would need "thirty days, or less, as originally agreed" to

"develop a flat printable surface in a plastic identification card containing a radio frequency device."  (Ex. 28.)

27.     On March 22, 1995, Mr. Leighton signed the list of deliverables Motorola's Thompson previously sent to him.  (Ex. 29.)

28.     Mr. Leighton testified that he agreed to deliver the listed items to Motorola. (Ex. 30, Leighton 10/10/05 Tr. 146:3-7.)  Several of these deliverables required that Mr. Leighton provide Motorola with "specifications," "processes," and "procedures."  (Ex. 29.)

29.     Leighton then began consulting for Motorola.  When his work was completed, he spent a total of five weeks at Motorola, and his last day there was May 5, 1995. (Ex. 31, Leighton 10/23/06 Tr. 710:12-712-9; Ex. 32.)

30.     Mr. Leighton's December 5, 2005 Declaration stated that his last day at Motorola was April 4, 1995.  (Ex. 17, ¶ 7.)  At deposition, Mr. Leighton corrected his Declaration and confirmed that his last day was one month later, May 5, 1995.  (Ex. 31, Leighton 10/23/06 Tr. 710:12-712:19.)

**While At Motorola, Mr. Leighton Conceived a Process to Laminate An Unprotected Electronic Element Directly Between Two Plastic Core Sheets Using Process Steps Later Claimed in His Patents**

31.     During his first visit to Motorola in February 1995, Motorola showed Mr. Leighton the RFID card it wanted to improve.  (Ex. 33, Leighton 10/23/06 Tr. 587:13-589:12; *see also* Ex. 34, Thompson 5/4/06 Tr. 55:3-58:15; Ex. 35, Delbecq 3/22/06 Tr. 93-96.)

32.     Mr. Leighton testified that Motorola's card contained a recess (or hole) that protected the electronic element – the chip and antenna combination – during lamination. (Ex. 36, Leighton 10/23/06 Tr. 554:6-555:7.)

33.    Mr. Leighton also testified that he suggested to Motorola that the protective recess in the card be removed:

Q.    And you made some changes to those layers in the card that you redesigned for them; is that true?

A.    Right.

Q.    And one of the changes that you made was you eliminated the holes or the recesses or the cutouts that were in the core sheet with the inlay; is that right?

A.    That's correct.

(Ex. 8 at 620:1-9; *see also* Ex. 37, Leighton 10/10/05 Tr. 31:5-24.)

34.    Mr. Leighton proceeded to make RFID cards at Motorola in which the electronic element was positioned directly between two plastic sheets (and was not protected by a recess). (Ex. 8, Leighton 10/23/06 Tr. 620:10-25.)

35.    In making these cards for Motorola, Mr. Leighton first made a subassembly, called a "prelam," which contained the circular electronic element positioned directly between two plastic "core sheets."  (Ex. 38, Leighton 10/23/06 Tr. 619:11-620:23; Ex. 39, Leighton 10/23/06 Dep. Ex. C.)

36.    At his deposition, Mr. Leighton drew a figure of the prelam he made:



(Ex. 39, Leighton 10/23/06 Dep. Ex. C.)

37.    Next, to produce the finished card, Mr. Leighton laminated an additional core sheet and an overlaminate film to the top and bottom of the prelam.  Again, at his deposition, he drew the structure he provided to Motorola as well:



(*Id.*; Ex. 38 at Tr. 621.)

38.    There is also no dispute with respect to the three-step process Mr. Leighton developed and used to laminate these cards at Motorola: (1) first, he applied heat and a pressure to "just close" the laminator (Ex. 40, Leighton 10/23/06 Dep. Tr. 650:13-651:2; Ex. 41 Leighton 10/23/06 Tr. 679:21-680:24.); (2) second, once the plastic was softened, he increased the pressure to "facilitate encapsulating the electronics," and maintained the heating temperature (Ex. 9, Leighton 10/23/06 Tr. 668:5-670:11.); and (3) third, he intended to apply the highest pressure during cooling:

> Q.    Did you use a different pressure during the cooling than you did during the heating?
> A.    Yes.
> Q.    Did you use a higher pressure during the cooling than you used in the heating?
> A.    I don't recall all of that, because they had an antique circuit board, single function pump, and they changed the plumbing on their rams, so what the actual pressures were, I'm not sure.
> Q.    Well, based on your experience and knowledge, was the pressure higher in the cooling than the pressure in the heating?
> A.    I tried to obtain that, yes.

(Ex. 10, Leighton 10/10/05 Tr. 49:16-25; *see also* Ex. 42, Leighton 10/10/05 Tr. 153:10-154:7; Ex. 43, Leighton 10/23/06 Tr. 598:15-599:6.)

39.   Mr. Leighton estimated that the pressure during cooling was less than that used during heating.  (Ex. 44, Leighton 10/23/06 Tr. 684:9-19.)

40.   At deposition, Mr. Leighton's best approximation of the specific pressures he used at Motorola was an initial pressure during heating of 50 pounds per square inch ("psi"), and a second higher pressure during heating between 50 and 180 psi for the remainder of the heating cycle.  (Ex. 41, Leighton 10/23/06 Tr. 679:21-681:12.)

41.   Motorola's Jean Marc Delbecq's contemporaneous notes, dated April 4, 1995 (one month prior to the conclusion of Mr. Leighton's consultancy), confirm the key limitations in the process testified to by Mr. Leighton:



"40 minute cycle for lamination @320 ºF, pressure #3 (just close), 15 minutes increase pressure to 125 bars for 20 minutes, xfer [transfer] cold @135 bars for 7 minutes"

(Ex. 45, 4/4/95 Notes; Ex. 46, Delbecq Tr. 232:7-233:17; Ex. 47, Leighton 10/10/05 Tr. 102:18-103:21.)

42.   The steps of the process set forth in Mr. Delberg's April 4th notes (as confirmed by deposition testimony, including that of Mr. Leighton) were: (1) during the first 15 minutes, the card is heated at 320ºF and a pressure that is "just" enough to "close" the laminator is applied (Ex. 48, Delbecq 3/22/06 Tr. 240:20-241:3.); (2) second, the pressure is increased to 125 bars for the next 20 minutes of the heating cycle (Ex. 49, Leighton 10/10/05 Tr. at 105:10-106:3.); and (3) third, after completion of the heating cycle, the plastic sheets are transferred to a cold stack,

and cooled at a higher pressure (135 bars) for 7 minutes. (Ex. 48, Delbecq 3/22/06 Tr. 240:20-241:20.)

43.    A "bar" is a unit of pressure. The greater the number of bars, the more pressure that is being applied to an object.

44.    Mr. Leighton testified that deficiencies in the Motorola laminator prevented him from achieving a minimal initial pressure and a higher cooling pressure. (Ex. 53, Leighton 10/9/05 Tr. 141:11-147:8.)

45.    Nevertheless, Mr. Leighton testified that the process would have given acceptable commercial yields, as opposed to the low rate of acceptable cards that were produced:

> Q.    If you had a better press and sufficient electronics, would the process you
>        developed during the period while you were at Motorola produce acceptable
>        commercial yield?
> A.    Yes.
> Q.    Why -- on what facts do you reach that conclusion?
> A.    If I had a contactless laminator where I had zero pressure of [sic] the platens, I
>        could produce a card as that reads in my patent. . . .

(Ex. 54, Leighton 10/10/05 Tr. 127:21-128:7.)

46.    Motorola compensated Mr. Leighton for all of his consulting time, but refused to pay him a $1,500 bonus the parties discussed. (Ex. 55, Leighton 10/23/06 Tr. 552:19-21; Ex. 56; Ex. 57.)

**Immediately After Motorola Refused To Pay Him a $1,500 Bonus, Mr. Leighton Described His "Invention" To Third Parties**

47.    On May 19, 1995, two weeks after his last day of consulting, Mr. Leighton sent Motorola an invoice and a cover letter explaining why he was entitled to a $1,500 bonus. (Ex. 58.)

48.    Motorola responded in a July 12, 1995 letter, in which the company explained why Mr. Leighton did not earn a bonus. First, Motorola said that the process developed by

Mr. Leighton resulted in poor yields of card quantities. (Ex. 11.) Second, Motorola said that

Mr. Leighton failed to provide many of the promised "deliverables," such as documentation of

the specifications of the process he developed for Motorola. (*Id.*; *see also* Ex. 59; Ex. 60

Delbecq 3/22/06 Tr. 230:11-231:18.)

49.    Mr. Leighton never replied to Motorola's July 12th letter. Instead, on July 17,

1995, just five days after Motorola refused to pay him the $1,500 bonus, Mr. Leighton wrote a

letter to another company (Plastag Corporation) and described his "invention" for the first time.

(Ex. 61.) Mr. Leighton wrote: "I have other plastic card innovations that I would like to share

with you because I believe you would be interested. One is a RFID card with a thickness of

.032" which I am planning to have patented." (*Id.*)

50.    The next day, Mr. Leighton described his "invention" to another company,

Hughes Identification Devices. (Ex. 11.) In a letter to Hughes, Mr. Leighton referenced the

RFID card he made a Motorola: "I talked to you last week on the phone about RF-ID cards that

has a surface flatness of .00005" and have enclosed samples for you to examine." (*Id.*)

Mr. Leighton explained that he could make a thinner version of the Motorola card: "[I] will be

able to produce these cards with a thickness of .032" of PVC." (*Id.*)

51.    The first Leighton RFID card patent application was filed on October 17, 1995.

(Ex. 62.) Mr. Leighton testified prior to filing, he had not made cards according to the claimed

processes. (Ex. 63, Leighton 10/23/06 Tr. 721:9-723:12.) Rather, Mr. Leighton asserts that he

did not make cards using his claimed processes until one year later, October 1996. (*Id.*)

52.    Mr. Leighton offered to give Motorola a license to the Leighton patents in 1999.

(Ex. 64) Motorola ultimately declined, apparently because it had exited the business. (Ex. 65.)

DATED:    November 29, 2006                 QUINN EMANUEL URQUHART OLIVER &
                                                              HEDGES, LLP


                                                              By:  ___/s/ Edward J. DeFranco_____
                                                                    Edward DeFranco (ED-6524)
                                                                    Robert C. Juman (RJ-6350)
                                                                    Mark Baker (MB-0302)
                                                                    51 Madison Avenue, 22nd Floor
                                                                    New York, New York  10010-1601
                                                                    (212) 849-7000

                                                                    Kevin P.B. Johnson (KJ-8689)
                                                                    555 Twin Dolphin Drive, Suite 560
                                                                    Redwood Shores, CA 94065
                                                                    (650) 801-5000

                                                              *Attorneys for Defendants Oberthur Card
                                                              Systems, S.A. and Oberthur Card Systems of
                                                              America Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any, on this 29th day of November, 2006.

<u>/s/ Edward J. DeFranco (ED-6524)</u>

51094/2006331.1