IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEIGHTON TECHNOLOGIES LLC,<br><br>      Plaintiff,<br><br>          vs.<br><br>OBERTHUR CARD SYSTEMS, S.A. and<br>OBERTHUR CARD SYSTEMS OF<br>AMERICA CORPORATION,<br><br>      Defendants. | 04 Civ. 02496 (CM) (LMS)<br><br>**PLAINTIFF LEIGHTON<br>TECHNOLOGIES LLC'S<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN OPPOSITION TO<br>DEFENDANTS' MOTION TO<br>DISMISS FOR STANDING** |
| OBERTHUR CARD SYSTEMS, S.A. and<br>OBERTHUR CARD SYSTEMS OF<br>AMERICA CORPORATION,<br><br>      Counterclaim Plaintiffs,<br><br>          vs.<br><br>LEIGHTON TECHNOLOGIES LLC,<br>GENERAL PATENT CORPORATION<br>INTERNATIONAL, GENERAL PATENT<br>CORPORATION, and IP HOLDINGS LLC,<br><br>      Counterclaim Defendants. | **Hon. Colleen McMahon**<br><br>**Magistrate Judge Lisa M. Smith** |

**SUTHERLAND ASBILL & BRENNAN LLP**
Robert A. Gutkin, Esq. (Pro hac vice)
Blair M. Jacobs, Esq. (Pro hac vice)
1275 Pennsylvania Avenue, N.W.
Washington, DC 20004-2415
Tel: 202-383-0100
Fax: 202-637-3593

*Attorneys for Plaintiff*
*Leighton Technologies LLC*

January 26, 2007

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................. 3

   A.  Background ................................................................................................ 3

      1.  Motorola .......................................................................................... 4

      2.  Post-Motorola ............................................................................... 12

      3.  Leighton Technologies LLC ......................................................... 14

III.  THE STANDING CASES ................................................................................ 14

IV.  ARGUMENT ................................................................................................... 17

   A.  Any Rights That Motorola May Have Had In The Leighton Patents, Were
       Cut Off by Its Failure To Record Any Written Assignment ............................... 17

   B.  Any Obligation of Mr. Leighton to Assign Inventions to Motorola Applied
       Only to Inventions Conceived During His Engagement at Motorola ............... 18

   C.  Mr. Leighton Did Not Conceive of Any Inventions During His Employment
       at Motorola ................................................................................................ 20

   D.  Motorola's Refusal To Provide Mr. Leighton with Sufficient Electronics to
       Make 10,000 Cards Was A Material Breach of the Consulting Agreement,
       And Rendered Any Assignment Unenforceable ............................................. 22

   E.  A Court Should Not Resolve Genuinely Disputed Facts Where The Question
       Of Jurisdiction Is Dependent Upon The Resolution Of Factual Issues Going
       To The Merits ............................................................................................. 23

V.  CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,*
    436 F.3d 82 (2d Cir. 2006)............................................................................. 16, 23

*Barrows v. Maco, Inc.,*
    419 N.E. 2d 634 (Ill. App. Ct. 1981) ................................................................... 23

*Brown v. Barbacid,*
    276 F.3d 1327 (Fed. Cir. 2002)................................................................ 1, 18, 21

*Chicago Title & Trust Co. v. Hedges Mfg. Co.,*
    414 N.E. 2d 232 (Ill. App. Ct. 1980) ................................................................... 23

*Dorr-Oliver, Inc. v. United States,*
    432 F.2d 447 (Ct. Cl. 1970) ............................................................................. 3, 16

*Filmtec Corp. v. Allied-Signal Inc.,*
    939 F.2d 1568 (Fed. Cir. 1991) ....................................................................... 16, 17

*Filmtec Corp. v. Hydranautics,*
    982 F.2d 1546 (Fed. Cir. 1992).......................................................................... 3, 16

*Foreman State Trust & Savings Bank v. Tauber,*
    180 N.E. 827 (Ill. 1932) ........................................................................................ 23

*Hansen v. Johnston,*
    249 N.E.2d 133 (Ill. App. Ct. 1969) ..................................................................... 23

*In re Jolley,*
    308 F.3d 1317 (Fed. Cir. 2002)................................................................ 2, 18, 21

*Leighton Techs. LLC v. Oberthur Card Sys., S.A.,*
    358 F. Supp. 2d 361 (S.D.N.Y. 2005).................................................................. 21

*Silva v. Kinsho Int'l Corp.,*
    229 F.3d 358 (2d Cir. 2000)............................................................................ 16, 23

*Stern v. Trustees of Columbia Univ.,*
    434 F.3d 1375 (Fed. Cir. 2006)................................................................ 1, 18, 21

*TM Patents, L.P. v. Int'l Bus. Mach. Corp.,*
    121 F. Supp. 2d 349 (S.D.N.Y. 2000)...................................................... 2, 14, 15

**Statutes**

35 U.S.C. §261 ................................................................................................................. 1, 17

I.    **INTRODUCTION**

Plaintiff Leighton Technologies LLC ("Leighton") submits this Memorandum of Points and Authorities in Opposition to Defendant Oberthur's Motion to Dismiss for Lack of Standing. Oberthur seeks to establish that non-party Motorola is the true owner of the patents-in-suit, and therefore Leighton does not have standing to maintain the present action. Oberthur does not claim that Mr. Leighton is not the true inventor on the patents at issue, but instead claims that by virtue of a consulting agreement between Motorola and Mr. Leighton, Motorola owns the patents by assignment. (Oberthur's Memorandum of Points and Authorities ("Oberthur Memo") p. 1). Oberthur's Motion is fatally flawed. The Motion is not supported by law; fails to comport with the written agreements governing the relationship between Mr. Leighton and Motorola; and, is completely inconsistent with facts that have been testified to not only by Mr. Leighton, but by Motorola as well.

Regardless of whether the Motion is couched as a Motion to Dismiss under Federal Rule 12(b)(1), 12(b)(6), or a Motion for Summary Judgment, the Motion should be denied because even if Mr. Leighton had invented something at Motorola, Motorola's failure to record the alleged written assignment with the United States Patent Office under 35 U.S.C. §261, renders the assignment void against subsequent assignees for value without notice (Leighton Technologies LLC). The Motion can be resolved on that basis alone, without examining further facts.

However, other reasons that the Motion should be denied include:

- Mr. Leighton did not conceive of the patented invention while he was employed as a consultant at Motorola. Conception must encompass all limitations of the claimed invention.[1] Also, as to the portion of the invention that Oberthur claims was conceived at Motorola, Mr. Leighton told Motorola to scrap what they had been

---

[1] See *infra* discussion; *Stern v. Trustees of Columbia University*, 434 F.3d 1375, 1378 (Fed. Cir. 2006); *Brown v. Barbacid*, 276 F.3d 1327, 1336 (Fed. Cir. 2002).

doing and laminate the electronics directly between two plastic sheets on his very first visit to Motorola.  This happened ***before he was hired as a consultant and before the execution of any purported assignment agreement***.  According to both Mr. Leighton and Motorola, there was no subsequent progress made on how those materials should be laminated.

- Both Motorola and Mr. Leighton have testified that Mr. Leighton did not come up with any inventions at Motorola, and did not provide any lamination processes in writing, or otherwise.  Under these undisputed facts, there cannot be conception of any invention by Mr. Leighton at Motorola. [2]

- Motorola deliberately breached its consulting agreement with Mr. Leighton by rendering his performance under the agreement impossible.  Motorola's breach voided any requirement of assignment.

The relevant documents and testimony all show that Motorola is not the owner of the Leighton patents at issue in this case, and that Oberthur cannot avoid infringement by claiming otherwise.  Oberthur's inferences about Mr. Leighton's attempts to find employment after he left Motorola, do not begin to controvert the undisputed facts that both Mr. Leighton and Motorola agree that Mr. Leighton did not invent anything while he was employed there as a consultant.  Moreover, the case law cited by Oberthur, including one of this Court's prior decisions, *TM Patents, L.P. v. Int'l Bus. Machs. Corp.,* 121 F. Supp. 2d 349 (S.D.N.Y. 2000) does not support Oberthur's arguments.  Instead, those cases directly call into question Oberthur's ability to even assert this type of challenge, in light of the fact that Motorola never recorded any claim to title and is not a party to this suit. [3]  For the reasons set forth herein, Oberthur's Motion should be denied.

---

[2] As discussed below, conception requires disclosure, such that one of ordinary skill can reproduce the results.  *In re Jolley*, 308 F.3d 1317, 1321-23 (Fed. Cir. 2002).  Again, Motorola's own witnesses denied that any disclosure of an "invention" was made, let alone any disclosure that could be reproduced.

[3] Mr. Leighton, as the patentee, has presumptive "legal title" to the patents.  (Declaration of Robert A. Gutkin ("Gutkin Dec.") Exs. 1 and 2 (U.S. Patent No. 5,817,207 (the "'207 patent) and U.S. Patent No. 6,214,155 (the "'155 patent")).  "In patent litigation between private parties

## II.     STATEMENT OF FACTS

### A.     Background[4]

Keith Leighton is 74 years old.  He has a high school diploma from Berkley High School in Berkley, Michigan, which he received in 1952.  He started employment in the color printing industry in 1953, when he first began working for General Motors as a Plate Maker/Engraver. He remained with General Motors until 1970, and his responsibilities there included printing, color proofing and production on sheet fed and web press machines.  From 1970 – 2000, he worked for various companies in the printing and plastic card manufacturing business. Beginning in approximately 1990, Mr. Leighton began working as a consultant in the printing and plastic card manufacturing field.  (Declaration of Keith Leighton in Opposition to Defendant's Motions ("Leighton Dec.") ¶¶ 4 and 5).

Over the course of his career, Mr. Leighton developed expertise in both the printing and lamination processes for plastic cards.  (Leighton Dec. ¶ 5, Ex. 3).  Years before he ever visited Motorola, Mr. Leighton first began experimenting with different methods for laminating foreign objects into plastic.  This process is far more difficult then it sounds, because of problems in getting the various layers of plastic to properly adhere to each other in the presence of a foreign object; without damaging the foreign object; and, still making a card that is visually appealing. Lamination problems can lead to pooling and laking that appears on the surface of the card, and

[Leighton and Oberthur], equitable rights of ownership of strangers to the suit [Motorola] cannot be raised as defenses against the legal titleholder of a patent".  *Dorr-Oliver, Inc. v. United States*, 432 F.2d 447, 451 (Ct. Cl. 1970); *see also Filmtec Corp. v. Hydranautics*, 982 F. 2d 1546, 1550 (Fed. Cir. 1992).

[4] Although Leighton believes that the controlling case law clearly indicates that Oberthur cannot maintain the present action in light of Motorola's failure to record any assignment of title and status as a stranger to this suit, Leighton provides a detailed statement of the facts to demonstrate to the Court that Mr. Leighton's invention was not conceived at Motorola, or assigned to Motorola.

results in the card having an uneven surface.  If the card already has a printed layer in it, that printing can appear to be distorted.  If the card is to receive printing after lamination, a card with an uneven surface will not look appealing after printing.  (Leighton Dec. ¶ 9).

Mr. Leighton had spent years in the card industry before he successfully laminated metallic foils and butterfly wings into plastic.  He did his experiments without placing any type of protective device, protective filler, or protective buffer between the plastic sheets and the foreign object.  (Leighton Dec. ¶ 9).  Apparently, Mr. Leighton's skill in the card industry had led Motorola to seek Mr. Leighton's assistance with problems that it was having making a smart card.  (Leighton Dec. ¶ 10; Gutkin Dec. Ex. 3 (May 4, 2006 Deposition of Ken Thompson ("Thompson 5/4/06 Tr.") 52:13–53:10; 55:3-23)).

### 1.    Motorola

Prior to contacting Mr. Leighton, Motorola had tried unsuccessfully to make the identification cards on their own.  (Gutkin Dec. Ex. 4 (February 3, 2006 Deposition of Jean-Marc Delbecq ("Delbecq 2/3/06 Tr.") 69:1-70:23)).  Motorola was unhappy with the low yield of acceptable cards, and the fact that the card's surface was not smooth and uniform.  (*Id.*).  Therefore, Motorola had another company make the card for them.  (Gutkin Dec. Exs. 3 and 4 (Thompson 5/4/06 Tr. 55:3-23; Delbecq 2/3/06 Tr. 69:1-70:13)).  For reasons unknown to Mr. Leighton, Motorola decided that they once again wanted to try to make the identification cards on their own.  (Gutkin Dec. Ex. 3 (Thompson 5/4/06 Tr. 55:3-23)).  In order to do this, Motorola purchased a used lamination machine made by a company called Burkle.  (Gutkin Dec. Ex. 5 (Thompson 5/4/06 Tr. 43:9-44:2)).  The machine was a dual stack laminator, which meant that it had a ram for applying pressure during heating, and a separate ram for applying pressure during cooling.  (Gutkin Dec. Ex. 6 (Thompson 5/4/06 Tr. 44:20-45:17)).

The Burkle machine had a number of operational problems including broken pressure gauges, bent laminating plates, the transfer mechanism between the hot and cold sides of the machine was defective, and apparently the machine was designed to make printed circuit boards, and not plastic cards. (Leighton Dec. ¶¶ 11, 15-16). As Mr. Leighton later discovered once he was at Motorola, this last deficiency meant that the laminating machine applied the greatest pressure to the material to be laminated in the heat cycle, since the heat side had the largest ram.[5] (Leighton Dec. ¶ 16).

Mr. Leighton first visited Motorola on February 17, 1995. He met with Ken Thompson (Technical Operations Manager) and Jean Marc Delbecq (Advanced Technology Group Manager) of Motorola. (Leighton Dec. ¶ 11, Ex. 4; Gutkin Dec. Exs. 7 and 8 (Thompson 5/4/06 Tr. 11:5-17; Delbecq 2/3/06 Tr. 19:16-20:20)). Mr. Leighton received a brief tour of the facility where Motorola wanted to make the cards. He was shown the Burkle laminating machine, although he was not told that the machine was a printed circuit board laminator, or that much of the machine was in a state of disrepair. (Leighton Dec. ¶¶ 11, 15).

As Oberthur states on page 7 of its Memo, during that first visit on February 17, 1995, Motorola showed Mr. Leighton the RFID card and manufacturing process that it wanted him to improve. (Leighton Dec. ¶ 11). Mr. Leighton had not yet been hired as a consultant. (Leighton Dec. ¶¶ 11-13). Apparently, Mr. Thompson was not concerned about showing the Motorola card and process to Mr. Leighton prior to engaging him. Motorola did not feel that what they were

---

[5] When Mr. Leighton commenced his consulting engagement at Motorola, his day to day assistant was Kiet Huynh. (Leighton Decl. ¶ 15; Gutkin Dec. Ex. 9 (February 2, 2006 Deposition of Kiet Huynh ("Huynh 2/2/06 Tr.") 29:6-20)). Mr. Huynh testified that he operated the Burkle machine for Mr. Leighton while he was at Motorola. (*Id.*). Mr. Huynh also testified that the Burkle lamination machine was electric, and that in order to get the books of plastic in the machine to heat up you needed to close the laminator, which applied pressure to the books. (Gutkin Dec. Ex. 10 (Huynh 2/2/06 Tr. 52:21-53:7)).

doing regarding smart cards was "that novel". (Gutkin Dec. Exs. 11 and 12 (Thompson 5/4/06

Tr. 157:3-158:4; Leighton 10/10/05 Tr.15:22-16:1)). Motorola's RFID card contained a recess

or hole, as well as a gel filler or silicone pack. (Oberthur Memo at 7; Gutkin Dec. Ex. 13

(Leighton 10/23/06 Tr. 554:6-555:7)). Then, as Mr. Leighton testified at his deposition:

> (Oberthur's Attorney) Q : "At the meeting, I revealed my idea which impressed them enough to hire me as a consultant."

> (Mr. Leighton) A:  Correct

> (Oberthur's Attorney) Q :  What idea did you tell them at the meeting?

> (Mr. Leighton) A:  I told them to scrap their idea that they had. Everything that they were doing was wrong. They were cutting holes in the plastic and putting in the radio that had been encapsulated by a gel and placed in there to have a different thermal melting point which was not at the same melting point as their PVC that they were trying to laminate, and I told them that I would be using different – entirely different temperatures and plastics than they were using. I would be changing the plastics, and they liked the idea and concept that they had a new way to attack this plan in being able to come up with a smooth card. (Gutkin Dec. Ex. 14 (Leighton 10/10/05 Tr. 31:1-21))

At that very first meeting, Mr. Leighton told Motorola to put the radio directly between

the plastic sheets, without any cutout or gel pack. (Leighton Dec. ¶11; Gutkin Dec. Ex. 15

(Leighton 10/23/06 Tr. 590:2-23)).[6]  At that same first meeting, notes were also taken by

Motorola that indicate how the electronics were to be placed directly between the plastic sheets,

and that the cold side ram needed to be larger. (Leighton Dec. ¶11, Ex. 4; Gutkin Dec. Ex. 16

(Leighton 10/10/05 Tr. 151:24 – 152:22)).

During that first visit, the basic terms of a four week consulting agreement were

discussed, and preliminary terms were written on a presentation board and signed by all parties.

---

[6] In a much later December, 1997 paper authored by Mr. Delbecq and others at Motorola, Motorola described the difficulties in laminating electronics into plastic cards, and stated that their solution had involved using a molding compound to protect the electronics. They further stated that merely reducing lamination pressure created other problems. (Gutkin Dec. Ex. 17 (Delbecq 3/22/06 Tr. 264:2-24, Ex. 2021)).

(Leighton Dec. ¶11, Ex. 4).  A copy was provided to each party.  The terms included the

payment to Mr. Leighton of $ 7,500 for four weeks (a weekly rate of $ 1,875 per week) $ 500 for

a list of deliverables and, $ 1,500 as a bonus for making 10,000 cards.  (*Id.*).  The terms did not

mention any requirement that Mr. Leighton assign any ideas that he had just disclosed (*i.e.*

placing the electronics directly between the plastic sheets) to Motorola.  (Leighton Dec. Ex. 4).

According to Motorola, these preliminary terms did not constitute Mr. Leighton's engagement by

Motorola.  This was made clear in a subsequent February 22, 1995 letter from Motorola to Mr.

Leighton, as well as in a March 2, 1995 Purchase Order from Motorola.  (Leighton Dec. ¶¶12

and 13, Exs. 5 and 8).

On February 22, 1995, Ken Thompson sent a letter to Mr. Leighton, outlining the results

of the February 17, 1995 meeting.  (Leighton Dec. Ex. 5).  It stated in part:

> "We have confidence that you can lead our efforts in making flat printable cards.  Jean
> Marc and I both were impressed with your background, material knowledge, process
> control applications, design of experiments, machine knowledge, and industry familiarity.
> *We would like to hire your services in San Jose pending approval of a purchase
> requisition which we will submit after we have received your proposal.*"  (emphasis
> added).

The letter also provided for a payment to Mr. Leighton of $500, upon receipt by Motorola of a

list of "up front items" required by Mr. Leighton for his work at Motorola.  The letter further

provided:

> "3.    Keith provide Motorola (Ken Thompson) a quote for services. The quote should
>        contain previously discussed terms:
>        -$1875/wk for 4 weeks
>        -$1500 bonus for completed process after 4 weeks which produces>10k cards
>        prior to end of 4th week
>        -deliverables (see below list of desired deliverables)[7]
>        -Motorola reserves the right for services cancellation with 1 week notice

---

[7]  The list of deliverables appears to have been separated from the February 22, 2005 letter.
(Leighton Dec. ¶12, Ex. 6).

> -signed Motorola Consultant Agreement
> -signed Non Disclosure Agreement
> -Keith's disclosures to Motorola

4. *With all agreements signed, Motorola will issue purchase order to you once requisition is approved. PO will be based on your quote."*

Mr. Leighton signed and dated to February 23, 1995, a Confidentiality Agreement prepared by Motorola. (Leighton Dec. ¶ 12, Ex. 7). Mr. Leighton recalls that the Confidentiality Agreement was provided to him towards the end of his 4 weeks at Motorola, and that he was asked to backdate the Agreement. (*Id.*). The relevant parts of the Confidentiality Agreement are as follows:

> "In consideration of my engagement by Motorola, Inc. ("Motorola"), as a Consultant/Contractor for programs or products as directed by Motorola, and in consideration of the compensation paid to me for my services in the course of such engagement, I understand and agree to the following provisions for the protection of the property rights of Motorola:
>
>> 1. I will promptly and fully communicate in writing to an Executive Officer of Motorola or its nominees, all inventions, innovations and ideas developed or conceived by me, whether solely or jointly with others at any time *during the entire period of my engagement with Motorola* … I agree to assign and hereby assign to Motorola as its exclusive property the entire right, title and interest in all such inventions, innovations and ideas…" (emphasis added).

A Purchase Order was issued by Motorola, dated March 2, 1995. (Leighton Dec. ¶ 13, Ex. 8). The Purchase Order referenced the February 22, 1995 letter and the Confidentiality Agreement. The Purchase Order does not appear to have been signed by Mr. Leighton.

By letter dated March 20, 1995, Mr. Leighton provided his list of "up front items" that were necessary for the project. (Leighton Dec. ¶14, Ex. 9). Mr. Leighton maintains that many of these necessary items were not provided to him at Motorola, and that the equipment was problematic, therefore much of his consulting time was spent trying to locate and obtain the necessary items. (Leighton Dec. ¶¶ 14-17).

The deliverables attachment to the February 22, 1995 Letter, was signed by Mr. Leighton and dated March 22, 1995. (Leighton Dec. ¶14, Ex. 6).

Between late March or early April of 1995 and May 5, 1995, Mr. Leighton provided consulting services to Motorola.[8] Mr. Leighton spent much of his time dealing with equipment problems and did not receive sufficient material from Motorola to make any real headway on the deliverables. The laminating machine was in disrepair the entire time that he was at Motorola, and Mr. Leighton was unable to accurately control or determine what the pressure was on either the hot or cold side of the laminator. (Leighton Dec. ¶¶15-17).[9] Therefore, Mr. Leighton could only guess as to the specific details for any lamination cycles. (*Id)*. Once Mr. Leighton closed the laminator by pushing a button, the pump then took over and closed the ram. (Gutkin Dec. Ex. 18 (Leighton 10/23/06 Tr. 609:9-15)). In fact, during the course of Mr. Leighton's work at Motorola, the repair person from Burkle suggested that Motorola scrap the machine and purchase a different one that was designed to manufacture plastic cards. (Leighton Dec. ¶15; Gutkin Dec. Ex. 43 (Leighton 10/23/06 Tr. 594:22-595:5)).

Initially when he arrived at Motorola, Mr. Leighton was given dime sized electronics to laminate into the plastic. (Gutkin Dec. Ex. 44 (Leighton 10/23/06 Tr. 559:9-560:18)). As Mr. Leighton had advised Motorola at his first meeting in February, he did not cut any holes in the plastic or use any protective gel to laminate the electronics into the plastic. (Gutkin Dec. Ex. 44

---

[8] Mr. Leighton was unable to work for four consecutive weeks at Motorola's facility in San Jose because of the need to travel back to Cleveland to be with his wife while she received treatments for breast cancer. (Leighton Dec. ¶ 13).

[9] Oberthur attempts to claim that pressure could be accurately determined while Mr. Leighton was at Motorola. Nothing could be further from the truth. Over three days of deposition, Mr. Leighton explained approximately 20 times, that he could not control or determine the pressure used to laminate materials at Motorola. (Gutkin Dec. Ex. 19A-T (Relevant pages of Leighton's 10/9/05; 10/10/05 and 10/23/06 depositions)). Eventually, Oberthur's counsel encouraged Mr. Leighton to guess what the pressure was. Oberthur now offers that guess as a definitive statement of the pressure. (Gutkin Dec. Ex. 20 (Leighton 10/23/06 Tr. 681:14-16; 860:11-24)).

(Leighton 10/23/06 Tr. 561:16-563:23)).  Even with the equipment problems that he faced at Motorola, Mr. Leighton was able to make smooth cards using the dime sized electronics. (Gutkin Dec. Ex. 21 (Leighton 10/23/06 Tr. 626:11-18)).  However, he did not know if the dime sized electronics inside the card still worked, or if they had been crushed.  (*Id.*).  Motorola did not test the cards Mr. Leighton made with the dime sized electronics for functionality.  Instead, as soon as they were satisfied that he could make a smooth card, they changed the electronics that were to be made to larger silver dollar sized electronics.  (Gutkin Dec. Ex. 22 (Leighton 10/23/06 Tr. 630:8-631:4)).

As stated above, the laminator at Motorola was an electric laminator.  It had to be shut to activate the heat.  (Leighton Dec. ¶16; Gutkin Dec. Ex. 23 (Leighton 10/23/06 Tr. 650:17-651:2)).  Also, both sides of the laminator needed to be closed together, the hot and the cold, in order to keep the cards that had just been in the hot side from warping.  (Leighton Dec. ¶16).  Because the hot and cold rams were reversed, in order to shut the cold side ram, too much pressure was applied to the hot side, and thus many of the electronics were crushed.  (Leighton Dec. ¶16; Gutkin Dec. Ex. 24 (Leighton 10/23/06 Tr. 686:9-687:2)).  As soon as the laminator shut, the materials inside received substantial pressure on the hot side, whatever that hot side pressure was.  (Gutkin Dec. Exs. 10 and 25 (Huynh 2/2/06 Tr. 52:21-53:7; Leighton 10/23/06 Tr. 653:19-654:5)).  Mr. Leighton estimated that the cold side pressure was less than the hot side, due to the smaller size of the cold side ram.  (Gutkin Dec. Ex. 26 (Leighton 10/23/06 Tr. 684:9-19)).

While Mr. Leighton was consulting for Motorola, efforts by Motorola to refine its manufacturing processes continued even during the time that Mr. Leighton needed to return to Ohio for his wife's medical treatment.  During one such period of absence, Mr. Delbecq prepared

some notes of lamination settings that he wanted Kiet to run while Mr. Leighton was gone.

(Gutkin Dec. Ex. 27 (Delbecq 3/22/06 Tr. 232:7-15; 242:10-24, Ex. 2020)).  At his deposition,

Mr. Delbecq recognized his handwriting, but he did not recall the note:



Mr. Delbecq speculated that it might have been an experiment that he wanted Kiet to try while

Mr. Leighton was out.  (*Id.*).  Mr. Delbecq had no idea if Kiet ever tried these settings.  (*Id.*).[10]

Furthermore, Mr. Thompson testified that even if Kiet had tried these settings, they would not

have worked, and that they were not the settings Motorola had been using on its machine.

(Gutkin Dec. Ex. 28 (Thompson 5/4/06 Tr. 100:6-101:21; 116:21-118:25)).

While in hindsight, problems with Motorola's process can now be identified, at the time

both identifying the problems and solving them were not simple matters, particularly without

knowing the pressure that was actually being applied to the materials by the rams.  (Gutkin Dec.

Ex. 29 (Leighton 10/23/06 Tr. 708:8-709:7)).[11]  Both Motorola and Mr. Leighton were

---

[10] When asked at his deposition, Mr. Delbecq stated that he does not believe that he should be
named as an inventor on Mr. Leighton's patents.  (Gutkin Dec. Ex. 30 (Delbecq 3/22/06 Tr.
250:6-8)).

[11] *See supra* footnote 6, the 1997 publication by Motorola concerning the difficulties laminating
sensitive electronics into plastic.

disappointed with the results of his efforts at Motorola.  Mr. Leighton asked Motorola to consider extending the term of his agreement so that further work could be done, and new processes could be tried.  (Gutkin Dec. Ex. 31 (Thompson 5/4/06 Tr. 129:8-130:2)).  However, Motorola declined.  (Leighton Dec. ¶ 19).

At deposition, Motorola testified that while Mr. Leighton was at their facility in San Jose, he did not provide information about the processes and parameters that he was using.  "[T]he results were not reproduceable in a sufficiently –in a –of a sufficient quality to be called a – a deliverable."  (Gutkin Dec. Exs. 32 and 33 (Delbecq 3/22/06 Tr. 230:1-9, Ex. 2019; Thompson 5/4/06 Tr. 127:11-22; 145:12-146:21)).  In light of the disclosure requirement for conception, as well as the condition precedent of disclosure under the Confidentiality Agreement for assignment to Motorola, it is difficult to understand how while Motorola claims that they received nothing from Mr. Leighton, Oberthur simultaneously claims that Mr. Leighton both conceived and disclosed the invention.  The facts simply do not support Oberthur's assertions.

## 2.    Post-Motorola

After he left Motorola, Mr. Leighton continued to seek consulting employment.  His wife was sick and undergoing cancer treatment, and Mr. Leighton needed money to pay the bills.  (Leighton Dec. ¶ 20).  Mr. Leighton did approach Motorola on a number of occasions after he had completed his work to ask if Motorola was interested in new methods that he had come up with for smart cards.  On each occasion, Motorola eventually declined.  (Leighton Dec. ¶24, Exs. 12-17).

Mr. Leighton thought about the problems that he had encountered at Motorola, and over time came up with some general ideas of what he would need to do.[12]  (Leighton Dec. ¶ 21; Gutkin Dec. Ex. 34 (Leighton 10/23/06 Tr. 721:21-727:2)).  At a high level, he knew he would need to come up with a method that would make a smooth card and that would not destroy the electronics.  Mr. Leighton also believed that this type of process would have the greatest use for bank cards, which needed to be of a limited thickness.  (Leighton Dec. ¶ 21).  Motorola was not trying to make such a bank card, instead their identity card was much thicker.  (Leighton Dec. ¶ 18).  Eventually Mr. Leighton realized that he would need to flow the plastic around the electronics, and he also realized that he would need to use very little pressure to avoid crushing the electronics.  (Leighton Dec. ¶ 21; Gutkin Dec. Ex. 35 (Leighton 10/23/06 Tr. 725:24-726:22)).

After leaving Motorola, Mr. Leighton and Motorola exchanged correspondence about whether or not Mr. Leighton should have received the $ 1,500 bonus component of his compensation.  Mr. Leighton acknowledged that he did not make 10,000 cards during the course of his engagement.  Mr. Leighton pointed out that Motorola never gave him 10,000 of the necessary electronics.  (Leighton Dec. ¶ 20, Exs. 10 and 11).  Motorola disagreed with Mr. Leighton, but at deposition, Mr. Thompson admitted that Motorola had the electronics available, but decided not to give them to Mr. Leighton because they were unhappy with his services.  (Gutkin Dec. Ex. 36 (Thompson 5/4/06 Tr. 132:5-12; 164:5-14; 166:23-167:11)).  Mr. Thompson further admitted that the yields they obtained prior to Mr. Leighton's arrival were the

---

[12] Oberthur sarcastically refers to the fact that Mr. Leighton, a deeply religious man, attributes the origin of his idea for the invention to God.  (Oberthur's Memo p. 24).  Mr. Leighton testified that he continued to think about the problems at Motorola after he left, until he wrote down his invention and filed his provisional application.  Oberthur's sarcastic comment merits no further response.

same as the yields he obtained while he was there, and that there were no yield requirements in Mr. Leighton's Agreement, just a volume number of 10,000 cards. (*Id.*).

Mr. Leighton contacted Motorola a number of times after his engagement at Motorola had ended to see if Motorola would be interested in licensing his technology. He advised them that he had patents pending on processes for making smart cards, and also he advised them of his issued patents. (Leighton Dec. ¶ 24, Exs. 12-17). At no time did Motorola ever make a claim to any part of Mr. Leighton's inventions. In fact, in 2000, Motorola did show some initial interest in licensing or purchasing the technology, but they eventually declined. (Leighton Dec. ¶ 24, Exs. 15-17).

### 3.    Leighton Technologies LLC

Prior to forming Leighton Technologies, LLC, General Patent had a number of discussions with Mr. Leighton. (Leighton Dec. ¶ 25). In going over his background during one such discussion, Mr. Leighton explained what he had done at Motorola. (*Id.*). Mr. Leighton repeated that he had not made any inventions at Motorola. (*Id.*). On or about 2003, Leighton Technologies LLC was formed. (Leighton Dec. ¶ 25, Exs. 19 and 20). Mr. Leighton, and the other individuals with interests in Mr. Leighton's patents, transferred their interests in accordance with the Company's formation documents, and became members of the company. The documents provided for each member to receive a membership interest. (*Id.*).

## III.    THE STANDING CASES

Oberthur relies extensively upon this Court's decision in *TM Patents v. IBM*, 121 F. Supp 2d 349 (S.D.N.Y. 2000) to support its Memo. In *TM Patents*, the Court found that there were no disputed issues of material fact that precluded granting the motion to dismiss/summary judgment. *Id.* at 371. In fact, the *TM Patents* case is highly instructive, but not for the similarities to the present matter, instead for the differences that lead to the opposite case result.

Oberthur states in its brief that it does not matter for purposes of deciding this Motion whether the Court views the Motion as one brought pursuant Rule 12(b)(1) for lack of subject matter jurisdiction, 12(b)(6) for failure to state a claim, or as a motion for summary judgment. (Oberthur Memo p. 1). Oberthur further states that the appropriate standard, set forth in *TM Patents,* is that summary judgment or dismissal is warranted, if the alleged patent owner "fail[s] to adduce any evidence raising a disputed issue of material fact on the question of ownership/standing." (Oberthur Memo p. 14). Leighton agrees that the proper standard is set forth the *TM Patents* case.

In *TM Patents*, it was *undisputed* that the inventions were developed and reduced to practice while the patentee was at MIT; and, that those inventions were assigned to the Government by statute. *TM Patents*, 121 F. Supp. 2d at 368. Because of the statute vesting ownership of invention in the Government, the Court overcame the presumptive title of a patentee to an invention. *Id.* It was *undisputed* that the patentee did not take the necessary steps to obtain title back from the Government. *Id.* at 368-69. Because the facts were *undisputed*, and the patentee failed to provide any evidence in support of their position, the Court did not feel the need to address whether the Motion was brought pursuant to FRCP 12(b)(1), 12(b)(6), or as a motion for summary judgment, since under any of the scenarios, the patentee failed in their burden of proof. *Id.* at 371.

In this case, under any set of circumstances, Oberthur's Motion fails because there are overwhelming facts supporting the presumption that Leighton has title to the patents. By contrast to *TM Patents*, there are no *undisputed* facts that establish that Motorola has title to the patents. Instead, Oberthur's case is built upon inferences drawn by Mr. Leighton's efforts to find

employment after his position at Motorola ended.  Mr. Leighton's wife was sick.  He needed to find another job.  (Leighton Dec. ¶ 20).  Those are the undisputed facts.

Oberthur also relies upon *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991).  (Oberthur Memo p. 14).  Such reliance however is misplaced.  *Filmtec* states that Section 261 of Title 35 may cut off not only equitable encumbrances against title to an invention, but prior legal interests as well, providing the subsequent assignee is a bona fide purchaser for value.  *Id.* at 1573 and 1574.  Leighton is such a bona fide purchaser for value.

In equitable title situations, the Court has been very clear that "equitable rights of ownership of strangers to the suit [Motorola] cannot be raised as defenses against the legal titleholder of a patent".  *Dorr-Oliver, Inc.*, 432 F.2d at 451; *see also Filmtec Corp. v. Hydranautics*, 982 F.2d 1546, 1550 (Fed. Cir. 1992).

Even if the facts did not support Leighton, which they do, but were instead merely disputed, the facts are so intertwined with the substantive merits of the case, that they are inappropriate for summary determination.  *See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co*., 436 F.3d 82, 88 (2d Cir. 2006) (vacating dismissal of complaint for lack of standing and noting that, if the overlap in evidence is such that finding on jurisdictional issue will go to merits of case, then issue should go to trial); *Silva v. Kinsho Int'l Corp*., 229 F.3d 358, 366 (2d Cir. 2000) (taking a narrow view on jurisdictional review to exclude a substantive analysis of merits of a non-frivolous claim).

IV.    **ARGUMENT**

      A.    **Any Rights That Motorola May Have Had In The Leighton Patents, Were Cut Off by Its Failure To Record Any Written Assignment**

35 U.S.C. §261 provides in part:

> "Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.
>
> …
>
> An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage." (Gutkin Dec. Ex. 37).

In *Filmtec Corp.,* the Federal Circuit stated: "If an assignment of rights in an invention is made prior to the existence of the invention, this may be viewed as an assignment of an expectant interest. An assignment of an expectant interest can be a valid assignment. In such a situation the assignee at most holds an equitable title. Once the invention is made and an application for patent is filed, however, legal title to the rights accruing thereunder would be in the assignee (***subject to the rights of a subsequent purchaser under §261***), and the assignor-inventor would have nothing remaining to assign." *Filmtec Corp.,* 939 F.2d at 1572 at 1572 (citations omitted, emphasis added). The Court then went on to recognize that §261 goes beyond common law: ***"Although the statute does not expressly so say, it is clear that the statute is intended to cut off prior legal interests, which the common law rule did not."*** *Id.* at 1573 and 1574.

It is undisputed that Motorola did not record any assignment interest in the Leighton Patents with the PTO. The agreements by which Mr. Leighton and others transferred their rights to Leighton Technologies LLC are attached to the Leighton Declaration as Exhibits 19 and 20.

The assignors' received membership interests in Leighton Technologies LLC.  (Leighton Dec. ¶ 25).

Mr. Leighton disclosed the details of his work at Motorola to the entity that formed Leighton Technologies LLC.  (Leighton Dec. ¶ 25).  Had Leighton Technologies LLC investigated his work at Motorola further, they would not have found anything to indicate any claims by Motorola to Mr. Leighton's inventions or his patents. (Gutkin Dec. Exs. 32 and 33 (Delbecq 3/22/06 Tr. 230:1-9, Ex. 2019; Thompson 5/4/06 Tr. 127:11-22; 145:12-146:21); Leighton Dec. ¶24, Exs. 12-17; *and see supra* footnote 10).  The assignment of the Leighton Patents to Leighton, cut off any interest that Motorola may have had in the Leighton Patents.

      **B.**      **Any Obligation of Mr. Leighton to Assign Inventions to Motorola Applied Only to Inventions Conceived During His Engagement at Motorola**

Conception is defined as "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."  *Stern v. Trustees of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) (internal quotation marks and citation omitted)).  A conception must encompass all limitations of the claimed invention and is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.  *See Brown v. Barbacid*, 276 F.3d 1327, 1336 (Fed. Cir. 2002).  Conception requires disclosure, such that one of ordinary skill can reproduce the results.  *In re Jolley*, 308 F.3d at 1323 (finding that conception require disclosure).

Based on the facts as set forth above and the law defining conception, there clearly was no conception of Mr. Leighton's patented invention while he was engaged by Motorola.  Instead, Oberthur's case is premised upon conception of parts of the invention.  By the definition of conception, this argument necessarily fails.  However, even if "partial invention" conception did

exist in this case, no partial conception took place while Mr. Leighton was engaged by Motorola. Therefore, Oberthur's Motion fails for that reason as well.

It does not appear that Leighton or Oberthur dispute the fact that if there was any enforceable obligation upon Mr. Leighton to assign inventions to Motorola, it applied only to inventions conceived by Mr. Leighton during his employment at Motorola. (Oberthur Memo p. 15). The operative assignment language is in the Confidentiality Agreement, which is dated February 23, 1995, regardless of whether it was signed on that date or not.

- Confidentiality Agreement:

    "In consideration of my engagement by Motorola, Inc. ("Motorola"), as a Consultant/Contractor for programs or products as directed by Motorola, and in consideration of the compensation paid to me for my services in the course of such engagement, I understand and agree to the following provisions for the protection of the property rights of Motorola:

    1. I will promptly and fully communicate in writing to an Executive Officer of Motorola or its nominees, all inventions, innovations and ideas developed or conceived by me, whether solely or jointly with others at any time *during the entire period of my engagement with Motorola* … I agree to assign and hereby assign to Motorola as its exclusive property the entire right, title and interest in all such inventions, innovations and ideas…" (emphasis added).

    (Leighton Dec. Ex. 7).

Mr. Leighton was not "engaged" by Motorola, until after a purchase order had been issued and accepted, and he commenced working for Motorola. These terms were clearly specified by Motorola in both a February 22, 1995 letter from Ken Thompson to Keith Leighton, and a March 2, 1995, Purchase Order.

- February 22, 1995 Letter:

    "We have confidence that you can lead our efforts in making flat printable cards. Jean Marc and I both were impressed with your background, material knowledge, process control applications, design of experiments, machine knowledge, and industry familiarity. *We would like to hire your services in San Jose pending approval of a purchase requisition which we will submit after we have received your proposal.*"

(Leighton Dec. Ex. 5).

- March 2, 1995 Purchase Order

"1.  ACCEPTANCE-AGREEMENT.  ***Seller's commencement of work*** or shipment of the goods, whichever occurs first, ***shall constitute acceptance of this purchase order*** and all of its terms and conditions.
…

22. GENERAL.  This purchase order and any documents attached to or referred to on this order constitute the entire agreement between the parties and can only be modified in writing signed by authorized representatives of both parties…"

(Leighton Dec. Ex. 8).

It is clear that as of February 17, 1995: when he first met with Motorola at their facility; when he first told Motorola to place their electronics directly between plastic sheets; Mr. Leighton was not employed or engaged by Motorola.  It is also clear that as of that date Mr. Leighton was not obligated to assign anything to Motorola.  It is not disputed that Mr. Leighton's last day of employment at Motorola was May 5, 1995, and that Mr. Leighton had no obligation to assign inventions conceived after that date to Motorola.  (Leighton Dec. ¶ 18).

###  C.    Mr. Leighton Did Not Conceive of Any Inventions During His Employment at Motorola

Since Oberthur was not present during Mr. Leighton's consultancy at Motorola, their inference and speculation about when Mr. Leighton's inventions may have been conceived is not admissible evidence to support their Motion.  Instead, the best evidence of conception is the testimony of the relevant individuals, and any contemporaneous documents.  The testimony and documents do not support Oberthur's inferences and speculation.

Oberthur's argument fails for four additional reasons:

**1)**  Mr. Leighton only fully conceived of the claimed invention after his engagement with Motorola.  Mr. Leighton's invention is a combination of steps that result in a highly coordinated process for making smart cards.  *Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp.

2d 361, 363 (S.D.N.Y. 2005).  In the time that Mr. Leighton was employed at Motorola, he did not form a definite and permanent idea of the completed and operative invention in his mind with respect to all of the limitations of the claimed invention, probably due in part to the faulty Motorola equipment.  (Leighton Dec. ¶¶15-17).  It was only after Mr. Leighton left his engagement with Motorola that he fully conceived of the claimed inventions.  (Leighton Dec. ¶¶ 21and 23).

**2)**  Mr. Leighton never disclosed any inventions to Motorola during the period of his engagement.  Conception requires disclosure, such that one of ordinary skill can reproduce the results.  *In re Jolley*, 308 F.3d at 1321-23.  Mr. Leighton's obligations, if any, under the Confidentiality Agreement were to: 1) "communicate [inventions] in writing to an Executive Officer of Motorola or its nominees"; and, 2) "to assign and hereby assign to Motorola … all such inventions".  (Leighton Dec. Ex. 7).

There is no evidence offered that Mr. Leighton ever disclosed any inventions in writing to Motorola "Executive Officers" or  "nominees", because Mr. Leighton never conceived of any inventions at Motorola.  Motorola concurs with this fact.  (Gutkin Dec. Exs. 32 and 33 (Delbecq 3/22/06 Tr. 230:1-9, Ex. 2019; Thompson 5/4/06 Tr. 127:11-22; 145:12-146:21)).  Without disclosure and the possibility of replication by one of ordinary skill, there could not be any conception of any invention, partial or in its entirety. *Stern,* supra, 434 F.3d at 1378; *Brown,* supra, 276 F.3d at 1336; and *see In re Jolley*, supra, 308 F.3d at 1321-23.

**3)**  As to Oberthur's "partial invention" conception, Mr. Leighton conceived of that idea prior to his engagement with Motorola.  As Oberthur admits, on his first visit to Motorola on February 17, 1995, Mr. Leighton suggested that Motorola scrap their process of using cutouts and gels to laminate the electronics in their cards, and instead place their electronics directly

between the plastic sheets.  (Oberthur Memo at 7 and 8; Gutkin Dec. Ex. 14 (Leighton 10/10/05

Tr. at 31:5-24)).  According to notes from a meeting later that same day, a picture of placing the

electronics on the plastic sheet was prepared, and there was some discussion about changing the

ram on the cold side of the laminator.  (Leighton Dec. Ex. 4).  All of these discussions and

"ideas" were exchanged ***before*** Mr. Leighton was engaged by Motorola.

    **4)**  Oberthur tries to characterize a single page of notes drafted by Mr. Delbecq as

evidence of conception of the lamination process set forth in the patents.  (Oberthur Memo p.

10).



As set forth above, Mr. Delbecq recognized his handwriting, but did not recall the note.  (Gutkin Dec. Ex. 27 (Delbecq 3/22/06 Tr. 232:7-15; 242:10-24, Ex. 2020)).  Mr. Delbecq speculated that it might have been an experiment that he wanted Kiet to try while Mr. Leighton was out, but that he did not know if Kiet ever tried these settings.  (*Id.*).

Furthermore, Mr. Thompson testified that those were not the parameters that Motorola was using

at the time, and even if Kiet had tried these settings, they would not have worked.  (Gutkin Dec.

Ex. 28 (Thompson 5/4/06 Tr. 100:6- 101:21; 116:21-118:25)).

    Oberthur fails to provide a single piece of evidence to support their claim that Mr.

Leighton conceived of his invention while he was employed at Motorola.

        **D.**     **Motorola's Refusal To Provide Mr. Leighton with Sufficient
Electronics to Make 10,000 Cards Was A Material Breach of the
Consulting Agreement, And Rendered Any Assignment
Unenforceable**

    It is black letter contract law, in any State, that it is a breach of contract to purposefully

render the ability of a party to meet its contract obligations an impossibility.  *Foreman State*

*Trust & Savings Bank v. Tauber,* 180 N.E. 827, 829-30 (Ill. 1932); *Barrows v. Maco, Inc.,* 419

N.E. 2d 634, 639 (Ill. App. Ct. 1981); *Chicago Title & Trust Co. v. Hedges Mfg. Co.*, 414 N.E.

2d 232, 237 (Ill. App. Ct. 1980); *Hansen v. Johnston*, 249 N.E.2d 133, 136 (Ill. App. Ct. 1969).

Motorola admits the following:

1. The requirement that Mr. Leighton make 10,000 cards was not dependent upon yield.

2. Motorola's prior yield did not differ from Mr. Leighton's yields at Motorola.

3. Motorola had sufficient electronics to provide to Mr. Leighton.

4. Motorola chose not to provide Mr. Leighton with sufficient electronics. (Gutkin Dec. Ex. 36 (Thompson 5/4/06 Tr. 132:5-12; 164:5-14; 166:23-167:11)).

Any obligation by Mr. Leighton to assign inventions was based upon the consideration

received from Motorola.  (Leighton Dec. Exs. 7 and 8).  Motorola's failure of consideration

negated any obligation by Mr. Leighton to assign any inventions.

> **E.     A Court Should Not Resolve Genuinely Disputed Facts Where The Question Of Jurisdiction Is Dependent Upon The Resolution Of Factual Issues Going To The Merits**

Even ignoring all of the above points, a court should not resolve genuinely disputed facts

where the question of jurisdiction is dependent upon the resolution of factual issues going to the

merits, i.e. ownership of the patent. *Alliance for Envtl. Renewal,* 436 F.3d at 88 ("If, however, the

overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual

issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave

the jurisdictional issue for the trial."); *Silva,* 229 F.3d at 366 (taking a narrow view on

jurisdictional review to exclude a substantive analysis of merits of a non-frivolous claim).  The

Court previously recognized that this issue existed in the *TM Patents* case, but stated that because

the patentee did not provide any evidence to challenge the government's claim to title, it did not

need to address the issue.

## V.    CONCLUSION

For all of the reasons set forth above, as well as the supporting documents and evidence,

Oberthur's Motion should be denied.


January 26, 2007                          SUTHERLAND ASBILL & BRENNAN LLP

                                          /s/Robert A. Gutkin
                                          By:  Robert A. Gutkin, Esq. (Pro hac vice)
                                               Blair M. Jacobs (Pro hac vice)
                                               1275 Pennsylvania Avenue, N.W.
                                               Washington, DC  20004-2415
                                               Tel:  202-383-0100
                                               Fax: 202-637-3593

                                               *Attorneys for Plaintiff*
                                               *LEIGHTON TECHNOLOGIES LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF LEIGHTON

TECHNOLOGIES LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR STANDING, was served on

the following on January 26, 2007 by e-mail and overnight mail:

Edward DeFranco
Kevin Johnson
Mark Baker
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

/s/ Robert A. Gutkin

WO 684043.1                                                          25