IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEIGHTON TECHNOLOGIES LLC, <br><br> Plaintiff, <br><br> vs. <br><br> OBERTHUR CARD SYSTEMS, S.A. and OBERTHUR CARD SYSTEMS OF AMERICA CORPORATION, <br><br> Defendants. | 04 Civ. 02496 (CM) (LMS) <br><br> **PLAINTIFF LEIGHTON TECHNOLOGIES LLC'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS FOR THEIR MOTION TO DISMISS FOR LACK OF STANDING** |
| OBERTHUR CARD SYSTEMS, S.A. and OBERTHUR CARD SYSTEMS OF AMERICA CORPORATION, <br><br> Counterclaim Plaintiffs, <br><br> vs. <br><br> LEIGHTON TECHNOLOGIES LLC, GENERAL PATENT CORPORATION INTERNATIONAL, GENERAL PATENT CORPORATION, and IP HOLDINGS LLC, <br><br> Counterclaim Defendants. | **Hon. Colleen McMahon** <br><br> **Magistrate Judge Lisa M. Smith** |

January 26, 2007

WO 684949.1

Pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiff Leighton Technologies LLC ("Leighton") submits this Response to Defendant's Statement of Material Facts for their Motion to Dismiss For Lack of Standing:

1.      **Oberthur's Statement:**  Leighton Tech asserts that Oberthur infringes claims 1, 4, 6-7, and 16 of U.S. Patent No. 5,817,207 (the "'207 patent"), and claims 1, 4, 6-7, and 15 of U.S. Patent No. 6,214,155 (the "'155 patent") (collectively the "Leighton Patents").

**Leighton's Response:**

Agree.

2.      **Oberthur's Statement:**  Keith Leighton is the sole named inventor on the Leighton Patents. (Exs. 2 and 3.)[1]

**Leighton's Response:**

Agree.

3.      **Oberthur's Statement:**  The first Leighton Patent application was U.S. Provisional Patent Application No. 60/005,685 (the " '685 application").  The Leighton Patents claim priority from the '685 application.  The '155 patent "is a continuation of the '207 patent and duplicates in all substantive respects the '207 patent specification."  *Leighton*, 358 F. Supp. 2d at 368.

---

[1] "Ex." Refers to an Exhibit to the Declaration of Edward DeFranco submitted in support of Oberthur's motion to dismiss for lack of standing.

1

**Leighton's Response:**

Agree, subject to the following:

The '155 patent is a continuation of the application that resulted in the '207 patent. "The '155

patent application is a continuation of the '207 patent application and duplicates in all

substantive respects the '207 patent specification." *Leighton*, 358 F. Supp. 2d at 368.


4.    **Oberthur's Statement:**  The Leighton patents "claim the use of a 'highly

coordinated' lamination process involving heat, cooling and the application of pressure to

encapsulate an electronic element. . . ." *Leighton*, 358 F. Supp. 2d at 364.  "The Patents

allegedly improve over prior art by eliminating the need to create a protective barrier around the

embedded electronic element, thereby uncomplicating the manufacturing process."

**Leighton's Response:**

Agree that the quotes accurately state part of the Court's language from its *Markman* decision.

Disagree that eliminating the protective barrier around the encapsulated electronic elements is

the only benefit or goal of the invention.  As set forth in the Field of Invention, Background of

Invention and Summary of Invention, the invention relates to "RFID cards that conform to

industry size and performance standards and conventions and that have a superior outer surface

to known RFID cards such that card may receive dye sublimation printing or the like."  (Gutkin

Dec. Exs. 1 and 2 ('207 and '155 patents: 1:14-17)).


5.    **Oberthur's Statement:**  To that end, Claim 1 requires that at least one electronic

element be placed directly between two plastic core sheet.  (Ex. 2; Ex. 3.).  The Court "likened

this 'core' to a sandwich, in which the plastic sheets were the pieces of bread and the electronic

element was the filing." *Leighton*, 358 F. Supp. 2d at 361.  The claims in the Leighton patents require that "there is nothing – no container, no recess and no physical buffer of any sort – that protects the embedded electronic element during lamination." *Id.* at 369.

**Leighton's Response:**

Subject to the response to No. 4 above, agree that the quotes accurately reflect the Court's language from the *Markman* decision.


6.     **Oberthur's Statement:**  "Once created, the plastic core 'sandwich' is then placed in a laminator, which "heats, cools and applies hydraulic pressure to the core." *Id.* at 369.  The broadest claims in the Leighton patents covers require that the lamination cycle include the following steps:  (i) heating the core for a first period of time; (ii) applying a first pressure to the core for a second period of time such that the electronic element is encapsulated by the core; and (iii) cooling the core while applying a second pressure to it.  (*See e.g.*, Ex. 2, claim 1.)

**Leighton's Response:**

Agree that the quote accurately reflects the Court's language from the *Markman* decision. Disagree with Oberthur's attempts to re-characterize the claims so as to change the language that sets forth the "metes" and "bounds" of the invention.  For example, Oberthur continues to attempt to misconstrue the claim language to support its single "electronic element" argument: Oberthur's quote from above: "(ii) applying a first pressure to the core for a second period of time such that ***the electronic element*** is encapsulated by the core"

Claim language: "(ii) applying a first pressure to said core for a second period of time such that ***said at least one electronic element*** is encapsulated by said core."  (Gutkin Dec. Exs. 1 and 2 ('207 patent and '155 patent: 6:32-34)).

The independent claims (1, and 16 the '207 patent and claims 1 and 15 of the '155 patent) are the broadest claims.

7.    **Oberthur's Statement:**  After the Leighton Patents issued, Mr. Leighton assigned interests in the patents to individuals who invested in his patents.  (Ex. 13, Leighton 10/23/06 Tr. 768:12-770:17.)

**Leighton's Response:**

Disagree.  It is unclear from the cited testimony whether Mr. Leighton assigned interests before or after the patents issued.  (Gutkin Dec. Ex. 49 (Leighton 10/23/06 Tr. 768:12-770:17)).

8.    **Oberthur's Statement:**  On May 31, 2003 Mr. Leighton contracted with General Patent Corporation International ("GPCI"), a "patent enforcement firm [which] help[s] independent inventors and small businesses to defend their patents against infringement."  (Ex. 14.)

**Leighton's Response:**

Disagree in part.  The attached documents represent the formation of Leighton Technologies LLC, and were signed by Mr. Leighton and the others with interests in the patents, as well as by General Patent Corporation International ("GPCI") and IP Holdings LLC.  The stated purpose of Leighton Technologies was to acquire and enforce the assigned patents, by license or otherwise. GPCI was to serve as the initial Manager of the Company.  (Declaration of Keith Leighton In Opposition To Defendant's Motions ("Leighton Dec.") Exs. 19 and 20 (Assignment and Operating Agreement of Leighton Technologies LLC)).

4

9.      **Oberthur's Statement:**  Leighton Technologies LLC was then formed, an entity

to which ownership of the Leighton Patents was then assigned.  (Exhs. 14, 16.)

**Leighton's Response:**

Subject to the response to No. 8, agree.


10.      **Oberthur's Statement:**  Mr. Leighton's first experience with RFID cards came

when he consulted for Motorola in 1995.  (Ex. 17; Ex. 5, Leighton 10/23/06 Tr. 568:21-569:4;

*see also* Ex. 18, Thompson Tr. 73:15-74:22.)

**Leighton's Response:**

Disagree in part.  The first time Mr. Leighton made an RFID card was when he consulted for

Motorola in 1995.  (Gutkin Dec. Ex. 38 (Leighton 10/23/06 Tr. 568:21-569:4)).


11.      **Oberthur's Statement:**  At the encouragement of a business acquaintance and

friend for Mr. Leighton, Motorola asked Leighton "to come visit [Motorola's] facility in San

Jose, California to assist them in their production of an employee identification card to be used

by Microsoft employees."  (Ex. 19, Leighton 12/6/05 Decl. ¶¶ 8, 10.)

**Leighton's Response:**

Disagree in part.  Mr. Leighton stated that "I was told that Bill Sanko, a business acquaintance

and friend of mine, had been in touch with Motorola and suggested that I might be able to help

them make such a card.  (Gutkin Dec. Ex. 50 (Leighton 12/6/05 Dec. ¶ 4)).


12.      **Oberthur's Statement:**  Although Motorola had its own RFID experts and had

made some RFID cards, they wanted to utilize Mr. Leighton's card lamination expertise to

improve Motorola's process and solve yield and quality issues to make a card with a flat surface (Ex. 20, Delbecq 2/3/06 Tr. 69:1-17, 93:2-94:15; Ex. 21, Thompson 5/4/06 Tr. 52:13-54:14.)

**Leighton's Response:**

Disagree.  Motorola was unable to make a satisfactory card, so they contracted out the responsibility to a company named Caulistics.  (Gutkin Dec. Ex. 4 (Delbecq 2/3/06 Tr. 69:1 – 70:23)).  No one in Motorola's facility had experience in high volume manufacturing of cards. (Gutkin Dec. Ex. 51 (Thompson 5/4/06 Tr. 55:3-23)).  Motorola wanted Mr. Leighton to lead their efforts in making the cards.  (Leighton Dec. Ex. 5 (Thompson February 22, 1995 letter)).


13.     **Oberthur's Statement:**  On February 17, 2005, Mr. Leighton met with at least two Motorola employees, Ken Thompson and Jean-Marc Delbecq, at Motorola's San Jose facility.  (*See* Ex. 22, 2/17/95 handwritten notes.)

**Leighton's Response:**

Agree.


14.     **Oberthur's Statement:**  Mr. Leighton admitted that before consulting for Motorola, he had never seen an electronic element laminated in a card.  (Ex. 5, Leighton 10/23/06 Tr. 568:21-569:4.)

**Leighton's Response:**

Agree.

15. **Oberthur's Statement:** In fact, prior to consulting for Motorola, the only things Mr. Leighton had laminated into a plastic card were decorative items – a butterfly and a very thin layer of metallic foil. (Ex. 23, Leighton 10/23/06 Tr. 571:18-572:5.)

<u>**Leighton's Response:**</u>

Disagree in part. Mr. Leighton did testify that prior to Motorola, the only foreign objects that he had laminated into plastic were butterfly wings and a very thin layer of metallic foil. The thin layer of metallic foil was in fact similar in many ways to some of todays modern antennas. The thin layer of foil was an integral part of the card, although it was not an RFID card. (Gutkin Dec. Ex. 39 (Leighton 10/23/06 Tr. 572:12-574:19)).

16. **Oberthur's Statement:** During the initial meeting in San Jose on February 17, 1995, the attendees took notes on the agreed terms of Mr. Leighton's consultancy, and at the close of the meeting the notes were signed by the attendees, Mr. Leighton and the Motorola employees Messrs. Thomson and Delbecq. (Ex. 22.)

<u>**Leighton's Response:**</u>

Disagree. During the first meeting on February 17, 1995, Motorola did prepare notes of proposed terms that it would consider for hiring Mr. Leighton. Those notes were signed by all present. (Leighton Dec. Ex. 4 (February 17, 1995 Notes)). Those notes refer to a number of steps to be taken before Mr. Leighton could be hired by Motorola. The notes do not mention or refer to any requirement for assigning inventions, and there was no agreement at that time that any inventions were to be assigned. Mr. Leighton and Motorola were both free to walk away from the terms set forth at the February 17, 1995 meeting. This fact was made clear by Motorola in a subsequent February 22, 1995 letter that stated in part:

"We have confidence that you can lead our efforts in making flat printable cards. Jean Marc and I both were impressed with your background, material knowledge, process control applications, design of experiments, machine knowledge, and industry familiarity. ___We would like to hire your services in San Jose pending approval of a purchase requisition which we will submit after we have received your proposal.___" (emphasis added)

The letter also provided for a payment to Mr. Leighton of $ 500, upon receipt by

Motorola of a list of "up front items" required by Mr. Leighton for his work at Motorola. The

letter further provided:

> "3.    Keith provide Motorola (Ken Thompson) a quote for services. The quote should
>        contain previously discussed terms:
>        -$1875/wk for 4 weeks
>        -$1500 bonus for completed process after 4 weeks which produces>10k cards
>        prior to end of 4th week
>        -deliverables (see below list of desired deliverables)
>        -Motorola reserves the right for services cancellation with 1 week notice
>        -signed Motorola Consultant Agreement
>        -signed Non Disclosure Agreement
>        -Keith's disclosures to Motorola

> **4.    With all agreements signed, Motorola will issue purchase order to you once
>        requisition is approved.  PO will be based on your quote."**

(Leighton Dec. Ex. 5 (February 22, 1995 letter)).

A subsequent purchase order, also drafted and issued by Motorola confirmed the terms of what

constituted Mr. Leighton's engagement by Motorola, and stated in part:

> "1.  ACCEPTANCE-AGREEMENT.  ***Seller's commencement of work*** or shipment of
> the goods, whichever occurs first, ***shall constitute acceptance of this purchase order*** and
> all of its terms and conditions.
>
> …
>
> 22. GENERAL.  ***This purchase order and any documents attached to or referred to on
> this order constitute the entire agreement between the parties and can only be modified
> in writing signed by authorized representatives of both parties***…"

(Leighton Dec. Ex. 8 (Purchase Order dated 3/2/95)).

8

It is clear, based on documents by Motorola, that Mr. Leighton was not "engaged" by Motorola as of February 17, 1995.

17.    **Oberthur's Statement:**  The notes state that the parties reached an "agreement in principle" that Mr. Leighton would serve as a consultant to Motorola for four weeks.  (*Id.*)

**Leighton's Response:**

Disagree.  Motorola drafted the notes, the February 22, 1995 letter, and the purchase order.  As set forth above in response to No. 16, Motorola was very clear in its writings that Mr. Leighton could not be "engaged" until after the purchase order was accepted.  Mr. Thompson stated in his February 22, 1995 letter: "We would like to hire your services in San Jose pending approval of a purchase requisition which we will submit after we have received your proposal."  (Leighton Dec. Ex. 5 (February 22, 1995 letter)).  The February 17, 1995 notes were never made a part of the engagement between Mr. Leighton and Motorola, and by the existence of  Paragraph 22 in the purchase order (an incorporation provision), were specifically excluded from the "engagement".

   "1.  ACCEPTANCE-AGREEMENT.  *Seller's commencement of work* or shipment of the goods, whichever occurs first, *shall constitute acceptance of this purchase order* and all of its terms and conditions.

   …

   22. GENERAL.  *This purchase order and any documents attached to or referred to on this order constitute the entire agreement between the parties and can only be modified in writing signed by authorized representatives of both parties*…"

(Leighton Dec. Ex. 8 (Purchase Order dated 3/2/95)).

By Motorola's own writings, the February 17, 1995 notes were little more than an outline of the terms, not yet offered or accepted.

9

18.    **Oberthur's Statement:**  In addition to being paid $7,500 for four weeks of consulting (at $1,785 per week), Mr. Leighton was to receive a $1,500 bonus for the successful production of 10,000 cards.  (*Id.*)

**Leighton's Response:**

Disagree in part.  The terms set forth in the February 22, 1995 letter, which was incorporated as part of the engagement, per the purchase order, state:

"$1500 bonus for completed process after 4 weeks which produces >10K cards prior to the end of 4th week."

(Leighton Dec. Exs. 5 and 8 (February 22, 1995 letter and Purchase Order dated 3/22/05)).

Mr. Thompson later confirmed that the requirement that Mr. Leighton produce 10,000 cards was not dependent upon yield results.  (Gutkin Dec. Ex. 36 (Thompson 5/4/06 Tr. 132:5-12; 164:5-14; 166:23-167:11)).

19.    **Oberthur's Statement:**  In a letter dated February 22, 1995 sent to Mr. Leighton, Motorola's Ken Thompson expressed "confidence" in Mr. Leighton's abilities and "outlined[d] the result of our discussions along with the next steps."  (Ex. 25.)

**Leighton's Response:**

Agree.

20.    **Oberthur's Statement:**  The letter requested that Mr. Leighton provide a quote for his services that "should contain previously discussed terms," and requested that Mr. Leighton provide other items, such as the "signed Motorola Consultant Agreement," the "signed Non Disclosure Agreement," and "deliverables."  (*Id.*)

10

**Leighton's Response:**

Agree.

21.     **Oberthur's Statement:**  Mr. Thompson stated that "[w]ith all agreements signed,

Motorola will issue [a] purchase order to you once [the] requisition is approved."  (*Id.*)

**Leighton's Response:**

Agree in part. In that same letter Mr. Thompson stated:

"We would like to hire your services in San Jose pending approval of a purchase requisition
which we will submit after we have received your proposal."  (Leighton Dec. Ex. 5 (February 22,
1995 letter)).

22.     **Oberthur's Statement:**  Notes discussed at the meeting also state "Increase Cold

Side Ram."  (*Id.*)  At deposition, Mr. Leighton testified that the goal was to increase the pressure

during cooling.  (Ex. 24, Leighton 10/10/05 Tr. 153:18-22.)  Mr. Leighton qualified this

testimony by stating "I'm not sure of the pressures that I had, but I told [Motorola] wanted I

wanted to do."  (*Id*. at 153:14-17.)

**Leighton's Response:**

Agree.

23.     **Oberthur's Statement:**  Mr. Leighton signed the requested Non Disclosure

Agreement, titled "Confidentiality Agreement," and dated it February 23, 1995 – the same day

Mr. Thompson's February 22nd letter was sent by fax.  (Ex. 5.)  In that Agreement, Mr. Leighton

assigned to Motorola "all inventions, innovations and ideas" that he "developed or conceived"

"that result from, or are suggested by, work [done for] Motorola" (*Id.*):

```
        In consideration of my engagement by Motorola, Inc.
        ("Motorola"), as Consultant/Contractor for programs or
```

11

```
products as directed by Motorola, and in consideration of
the compensation paid to me for my services in the course
of such engagement.  I understand and agree to the
following provisions for the protection of the property
rights of Motorola:
1.    I will promptly and fully communicate in writing to an
      Executive Officer of Motorola or its nominees, all
      inventions, innovations and ideas developed or conceived by
      me, whether solely or jointly with others at any time
      during the entire period of my engagement with Motorola,
      and which inventions, innovations and ideas relate to the
      actual and anticipated business activities of Motorola, or
      result from, or are suggested by, work which I do for
      Motorola. I agree to assign and hereby assign to Motorola
      as its exclusive property the entire right, title and
      interest in all such inventions. innovations and ideas. . .
```

**Leighton's Response:**

Disagree in part.  Mr. Leighton recalls that he signed the Confidentiality Agreement towards the

end of his "engagement" at Motorola and was asked to backdate the Confidentiality Agreement

to February 23, 1995.  (Leighton Dec. Ex. 7 (Confidentiality Agreement)).  Although the

documents speak for themselves, Mr. Leighton's obligations, if any, under the Confidentiality

Agreement were to: 1) "communicate [inventions] in writing to an Executive Officer of

Motorola or its nominees"; and, 2) "to assign and hereby assign to Motorola … all such

inventions", "during the entire period of my engagement with Motorola".  (Leighton Dec. Ex. 7

(Confidentiality Agreement)).

    24.    **Oberthur's Statement:**  In addition to the signature line for Mr. Leighton as the

party assigning his rights, the Confidentiality Agreement contained a signature line for a

"Motorola witness." (*Id.*) The only copy of the Agreement that the parties have located contains

only Mr. Leighton's signature, and no witness signature. (*Id.*) As discussed below, this is

irrelevant to the validity and enforceability of the Agreement.

**Leighton's Response:**

Agree with everything other than Oberthur's last sentence. That last sentence is not a statement of fact, but is instead a conclusion of law, and therefore improper in this document.

25.    **Oberthur's Statement:**  Motorola issued to Mr. Leighton a Purchase Order dated March 3, 1995 for four weeks of consulting services (at the agreed rate of $1,875/week and a bonus of $1,500 "upon meeting the terms of [the] agreement dated 2/22/95"). (Ex. 27.) The Purchase Order also noted that a "signed Confidentiality Agreement and D.O.D. [were] received and attached as part of this P.O." (*Id.*) The Purchase Order set forth Motorola's standard terms and conditions for transactions. It stated that "Seller's commencement of work or shipment of the goods, whichever occurs first, shall constitute acceptance of this purchase order and all of its terms and conditions." (*Id.*)

**Leighton's Response:**

Disagree in part. Although the purchase order states that a Confidentiality Agreement had been received, Mr. Leighton testified that he recalled Motorola had forgotten to give it to him; gave it to him at a later date; and asked him to backdate the Confidentiality Agreement. (Gutkin Dec. Ex. 40 (Leighton 10/23/06 Tr. 531:4-532:8)).

26.    **Oberthur's Statement:**  In a March 20, 1995 letter, Mr. Leighton stated that he could tentatively begin at Motorola on March 27, 1995, and he would need "thirty days, or less, as originally agreed" to "develop a flat printable surface in a plastic identification card containing a radio frequency device." (Ex. 28.)

**Leighton's Response:**

Agree.


27.     **Oberthur's Statement:**  On March 22, 1995, Mr. Leighton signed the list of deliverables Motorola's Thompson previously sent to him. (Ex. 29.)

**Leighton's Response:**

Agree.


28.     **Oberthur's Statement:**  Mr. Leighton testified that he agreed to deliver the listed items to Motorola. (Ex. 30, Leighton 10/10/05 Tr. 146:3-7.) Several of these deliverables required that Mr. Leighton provide Motorola with "specifications," "processes," and "procedures." (Ex. 29.)

**Leighton's Response:**

Agree in part.  Mr. Leighton agreed to provide Motorola with certain receivables, after having sent Motorola a list of up front items that would be needed in a March 20, 1995 letter.  (Leighton Dec. Ex. 9 (March 20, 1995 letter)).


29.     **Oberthur's Statement:**  Leighton then began consulting for Motorola. When his work was completed, he spent a total of five weeks at Motorola, and his last day there was May 5, 1995. (Ex. 31, Leighton 10/23/06 Tr. 710:12-712-9; Ex. 32.)

**Leighton's Response:**

Agree.

30.    **Oberthur's Statement:**  Mr. Leighton's December 5, 2005 Declaration stated that his last day at Motorola was April 4, 1995. (Ex. 17, ¶ 7.) At deposition, Mr. Leighton corrected his Declaration and confirmed that his last day was one month later, May 5, 1995. (Ex. 31, Leighton 10/23/06 Tr. 710:12-712:19.)

**Leighton's Response:**

Agree.

31.    **Oberthur's Statement:**  During his first visit to Motorola in February 1995, Motorola showed Mr. Leighton the RFID card it wanted him to improve. (Ex. 33, Leighton 10/23/06 Tr. 587:13-589:12; *see also* Ex. 34, Thompson 5/4/06 Tr. 55:3-58:15; Ex. 35, Delbecq 3/22/06 Tr. 93-96.)

**Leighton's Response:**

Agree.

32.    **Oberthur's Statement:**  Mr. Leighton testified that Motorola's card contained a recess (or hole) that protected the electronic element – the chip and antenna combination – during lamination. (Ex. 36, Leighton 10/23/06 Tr. 554:6-555:7.)

**Leighton's Response:**

Disagree in part.  Mr. Leighton testified that there was a recess or hole and soft gel used with the electronics.  He did not testify that the recess and the gel were used to protect the electronics. (Gutkin Dec. Ex. 13 (Leighton 10/23/06 Tr. 554:6-555:7)).  He did however testify that at that first meeting on February 17, 1995:

(Mr. Leighton) A:  I told them to scrap their idea that they had. Everything that they were doing was wrong. They were cutting holes in the plastic and putting in the radio that had been encapsulated by a gel and placed in there to have a different thermal melting point which was not

15

at the same melting point as their PVC that they were trying to laminate, and I told them that I would be using different – entirely different temperatures and plastics than they were using. I would be changing the plastics, and they liked the idea and concept that they had a new way to attack this plan in being able to come up with a smooth card. (Gutkin Dec. Ex. 14 (Leighton 10/10/05 Tr. 31:7-21)).

33.    **Oberthur's Statement:**  Mr. Leighton also testified that he suggested to Motorola that the protective recess in the card be removed:

Q.    And you made some changes to those layers in the card that you redesigned for

them; is that true?

A.    Right.

Q.    And one of the changes that you made was you eliminated the holes or the

recesses or the cutouts that were in the core sheet with the inlay; is that right?

A.    That's correct.

(Ex. 8 at 620:1-9; *see also* Ex. 37, Leighton 10/10/05 Tr. 31:5-24.)

**<u>Leighton's Response:</u>**

Agree.  Mr. Leighton told them to do this at the first meeting on February 17, 1995.  *See also* response to No. 32.

34.    **Oberthur's Statement:**  Mr. Leighton proceeded to make RFID cards at Motorola in which the electronic element was positioned directly between two plastic sheets (and was not protected by a recess). (Ex. 8, Leighton 10/23/06 Tr. 620:10-25.)

**<u>Leighton's Response:</u>**

Agree that Mr. Leighton made cards at Motorola in which the electronics were positioned directly between the two plastic sheets.

35.     **Oberthur's Statement:**  In making these cards for Motorola, Mr. Leighton first made a subassembly, called a "prelam," which contained the circular electronic element positioned directly between two plastic "core sheets." (Ex. 38, Leighton 10/23/06 Tr. 619:11-620:23; Ex. 39, Leighton 10/23/06 Dep. Ex. C.)

**Leighton's Response:**

Agree that Mr. Leighton made cards at Motorola in which the electronics were positioned directly between the two plastic sheets.

36.     **Oberthur's Statement:**  At his deposition, Mr. Leighton drew a figure of the prelam he made:



(Ex. 39, Leighton 10/23/06 Dep. Ex. C.)

**Leighton's Response:**

Agree that Mr. Leighton drew this exhibit at his deposition.

37.     **Oberthur's Statement:**  Next, to produce the finished card, Mr. Leighton laminated an additional core sheet and an overlaminate film to the top and bottom of the prelam. Again, at his deposition, he drew the structure he provided to Motorola as well:

17



(*Id.*; Ex. 38 at Tr. 621.)

**Leighton's Response:**

Agree that Mr. Leighton drew this exhibit at his deposition.

38.     **Oberthur's Statement:**  There is also no dispute with respect to the three-step

process Mr. Leighton developed and used to laminate these cards at Motorola: (1) first, he

applied heat and a pressure to "just close" the laminator (Ex. 40, Leighton 10/23/06 Dep. Tr.

650:13-651:2; Ex. 41 Leighton 10/23/06 Tr. 679:21-680:24.); (2) second, once the plastic was

softened, he increased the pressure to "facilitate encapsulating the electronics," and maintained

the heating temperature (Ex. 9, Leighton 10/23/06 Tr. 668:5-670:11.); and (3) third, he intended

to apply the highest pressure during cooling:

Q.     Did you use a different pressure during the cooling than you did during the heating?

A.     Yes.


Q.     Did you use a higher pressure during the cooling than you used in the heating?


A.     I don't recall all of that, because they had an antique circuit board, single function pump, and they changed the plumbing on their rams, so what the actual pressures were, I'm not sure.

18

Q.     Well, based on your experience and knowledge, was the pressure higher in the cooling than the pressure in the heating?

A.     I tried to obtain that, yes.

(Ex. 10, Leighton 10/10/05 Tr. 49:16-25; *see also* Ex. 42, Leighton 10/10/05 Tr. 153:10-154:7; Ex. 43, Leighton 10/23/06 Tr. 598:15-599:6.)

**Leighton's Response:**

Disagree. Over the course of his three days of deposition Mr. Leighton repeatedly testified about the problems encountered in laminating the electronics at Motorola. The pages and testimony cited by Oberthur does not support their statements.  Instead, a more accurate description of Mr. Leighton's time at Motorola is set forth below.

Between late March or early April of 1995 and May 5, 1995, Mr. Leighton provided consulting services to Motorola.  Mr. Leighton spent much of his time dealing with equipment problems and did not receive sufficient material from Motorola to make any real headway on the deliverables.  The laminating machine was in disrepair the entire time that he was at Motorola, and Mr. Leighton was unable to accurately control or determine what the pressure was on both the hot and cold side of the laminator.  (Leighton Dec. ¶¶ 15-17; Gutkin Dec. Ex. 19 (relevant pages from Leighton's 10/9/05, 10/10/05 and 10/23/06 depositions)).[2]  The pressure for both the hot side and the cold side of the laminator was generated by a pump.  You could obtain a pump pressure reading, however due to the modifications made by Motorola to the machine, that reading as meaningless.  It was not possible to obtain the pressure at the ram, which determined

_____

[2]  Oberthur attempts to claim that pressure could be accurately determined while Mr. Leighton was at Motorola.  Nothing could be further from the truth.  Over three days of deposition, Mr. Leighton explained approximately 20 times, that he could not control or determine the pressure used to laminate materials at Motorola.  (Gutkin Dec. Ex. 19A-T (relevant pages of Leighton's 10/9/05; 10/10/05 and 10/23/06 depositions)).  Eventually, Oberthur's counsel encouraged Mr. Leighton to guess what the pressure was.  Oberthur now offers that guess as a definitive statement of the pressure.  (Gutkin Dec. Ex. 20 (Leighton 10/23/06 Tr. 681:14-16; 860:11-24)).

what pressure was actually being applied to the materials in the laminator. (Gutkin Dec. Ex. 41 (Leighton 10/23/06 Tr. 586:14-25); Leighton Decl. ¶¶ 15-16). Moreover, you could not control the pressure as needed. (Gutkin Dec. Ex.42 (Leighton 10/23/06 Tr. 605:3-15; 685:16-686:8)). Therefore, Mr. Leighton could only guess as to the specific details for any lamination cycles. (Gutkin Dec. Ex. 19 (relevant pages of Leighton's 10/9/05, 10/10/05 and 10/23/06 depositions)). All Mr. Leighton could do was to close the laminator by pushing a button, the pump then took over and closed the ram. (Gutkin Dec. Ex. 18 (Leighton 10/23/06 Tr. 609:9-15). In fact, during the course of Mr. Leighton's work at Motorola, the repair person from Burkle suggested that Motorola scrap the machine and purchase a different one that was designed to manufacture plastic cards. (Gutkin Dec. Ex. 43 (Leighton 10/23/06 Tr. 594:22-595:5). The entire time he was at Motorola, Mr. Leighton was never able to tell whether he even been able to at least equalize the pressure on both the hot and cold sides of the laminator. (Gutkin Dec. Ex. 19H (Leighton 10/23/06 Tr. 595:23-596:24).

Initially when he arrived at Motorola, Mr. Leighton was given dime size electronics to laminate into the cards. (Gutkin Dec. Ex. 44 (Leighton 10/23/06 Tr. at 559:9-56:18)). As Mr. Leighton had advised Motorola at his first meeting in February, he did not cut any holes in the plastic or use any protective gel to laminate the cards. (*Id.*). Even with the equipment problems that he faced at Motorola, Mr. Leighton was able to make smooth cards using the dime sized electronics and the lamination cycles that Motorola had been using. (Gutkin Dec. Ex. 21 (Leighton 10/23/06 Tr. 626:11-18)). However, he did not know if the dime sized electronics inside the card still worked, or if they had been crushed. (*Id.*). Motorola did not test the cards Mr. Leighton made with the dime sized electronics for functionality. Instead, as soon as they were satisfied that he could make a smooth card, they changed the electronics that were to be

made to larger silver dollar sized electronics.  (Gutkin Dec. Ex. 22 (Leighton 10/23/06 Tr. 630:8-631:4)).

As stated above, the laminator at Motorola was an electric laminator.  It had to be shut to activate the heat.  (Gutkin Dec. Ex. 23 (Leighton 10/23/06 Tr. 650:17-651:2).  Also, both sides needed to be closed together, the hot and the cold, in order to keep the cards that had just been in the hot side from warping.  (Leighton Dec. ¶ 16).  The plastic card material placed on the hot side of the laminator needed to soak for 15 minutes for the heat to equalize through the product.  (Gutkin Dec. Ex. 23 (Leighton 10/23/06 Tr. 651:3-11)).  Because the hot and cold rams were reversed, in order to shut the cold side ram, too much pressure was applied to the hot side, and thus many of the electronics were crushed.  (Gutkin Dec. Ex. 24 (Leighton 10/23/06 Tr. 686:9-687:2; Leighton Dec. ¶¶ 15-17; Leighton 10/23/06 Ex. E).  As soon as the laminator shut, the materials inside received substantial pressure on the hot side, whatever that hot side pressure was.  (Gutkin Dec. Ex. 25 (Leighton 10/23/06 Tr. 653:19-654:5)).  Mr. Leighton estimated that the cold side pressure was less than the hot side, due to the smaller size of the cold side ram.  (Gutkin Dec. Ex. 26 (Leighton 10/23/06 Tr. 684:9-19)).

To try to improve his yields at Motorola, Mr. Leighton increased the thickness of the plastic to protect the electronics, and he also increased the temperature of the hot side of the laminator.  However, while this helped to get a smoother card, he had no idea if the electronics were being destroyed.  (Gutkin Dec. Ex. 45 (Leighton 10/23/06 Tr. 687:8–689:3)).

39.     **Oberthur's Statement:**  Mr. Leighton estimated that the pressure during cooling was less than that used during heating. (Ex. 44, Leighton 10/23/06 Tr. 684:9-19.)

21

**Leighton's Response:**

Agree in part, but this estimate was speculation based merely on the size of the ram on the cold size. Mr. Leighton stated repeatedly that he could not tell what the pressure was because of the state of Motorola's equipment. (Gutkin Dec. Ex. 19 (relevant pages from Leighton's 10/9/05, 10/10/05 and 10/23/06 depositions)).

40. **Oberthur's Statement:** At deposition, Mr. Leighton's best approximation of the specific pressures he used at Motorola was an initial pressure during heating of 50 pounds per square inch ("psi"), and a second higher pressure during heating between 50 and 180 psi for the remainder of the heating cycle. (Ex. 41, Leighton 10/23/06 Tr. 679:21-681:12.)

**Leighton's Response:**

Disagree that this number is anything other than speculation. Oberthur attempts to claim that pressure could be accurately determined while Mr. Leighton was at Motorola. Nothing could be further from the truth. Over three days of deposition, Mr. Leighton repeatedly told Oberthur, more than 20 times, that he could not control or determine the pressure used to laminate materials at Motorola. (Gutkin Dec. Ex. 19 (relevant pages of Leighton's 10/9/05; 10/10/05 and 10/23/06 depositions)). Eventually, Oberthur's counsel just asked Mr. Leighton to guess what the pressure was. Oberthur now offers that guess as a definitive statement of the pressure. (Gutkin Dec. Ex. 20 (Leighton 10/23/06 Tr. 681:14-16; 860:11-24)).

41. **Oberthur's Statement:** Motorola's Jean Marc Delbecq's contemporaneous notes, dated April 4, 1995 (one month prior to the conclusion of Mr. Leighton's consultancy), confirm the key limitations in the process testified to by Mr. Leighton:



"40 minute cycle for lamination @320

°F, pressure #3 (just close), 15 minutes

increase pressure to 125 bars for 20

minutes, xfer [transfer] cold @135

bars for 7 minutes"

(Ex. 45, 4/4/95 Notes; Ex. 46, Delbecq Tr. 232:7-233:17; Ex. 47, Leighton 10/10/05 Tr. 102:18-103:21.)

**Leighton's Response:**

Disagree.  This is a completely false and unsupported statement.  While Mr. Leighton was consulting for Motorola, efforts by Motorola to refine its manufacturing processes continued even during the time that Mr. Leighton needed to return to Ohio for his wife's medical treatment. During one such period of absence, Mr. Delbecq prepared some notes of lamination settings that he wanted Kiet to run while Mr. Leighton was gone.  (Gutkin Dec. Ex. 27 (Delbecq 3/22/06 Tr. 232:7-15; 242:10-24; Ex. 2020)).  ***At his deposition, Mr. Delbecq recognized his handwriting but did not recall the note:***



***Mr. Delbecq speculated that it might have been an experiment that he wanted Kiet to try while***

***Mr. Leighton was out.  Id.  Mr. Delbecq had no idea if Kiet ever tried these settings.***

Furthermore, Mr. Thompson testified that these were not settings used by Motorola and even if

Kiet had tried these settings, they would not have worked.  (Gutkin Dec. Ex. 28 (Thompson

5/4/06 Tr. 100:6-101:21; 116:21-118:25)).

42.    **Oberthur's Statement:**  The steps of the process set forth in Mr. Delberg's April

4th notes (as confirmed by deposition testimony, including that of Mr. Leighton) were: (1) during

the first 15 minutes, the card is heated at 320ºF and a pressure that is "just" enough to "close" the

laminator is applied (Ex. 48, Delbecq 3/22/06 Tr. 240:20-241:3.); (2) second, the pressure is

increased to 125 bars for the next 20 minutes of the heating cycle (Ex. 49, Leighton 10/10/05 Tr.

at 105:10-106:3.); and (3) third, after completion of the heating cycle, the plastic sheets are

transferred to a cold stack, and cooled at a higher pressure (135 bars) for 7 minutes. (Ex. 48,

Delbecq 3/22/06 Tr. 240:20-241:20.)

**Leighton's Response:**

Disagree.  As set forth above, in response to No. 41, Oberthur's statement is completely false and

unsupported.

43.    **Oberthur's Statement:**  A "bar" is a unit of pressure. The greater the number of

bars, the more pressure that is being applied to an object.

**Leighton's Response:**

Agree.

44.    **Oberthur's Statement:**  Mr. Leighton testified that deficiencies in the Motorola laminator prevented him from achieving a minimal initial pressure and a higher cooling pressure. (Ex. 53, Leighton 10/9/05 Tr. 141:11-147:8.)

**Leighton's Response:**

Agree in part.  Mr. Leighton clearly stated that "My invention could not have been practiced at Motorola", and then proceeded to testify what would not have been possible to practice from his invention at Motorola.  (Gutkin Dec. Ex. 46 (Leighton 10/9/05 Tr. 141:11-147:8)).

45.    **Oberthur's Statement:**  Nevertheless, Mr. Leighton testified that the process would have given acceptable commercial yields, as opposed to the low rate of acceptable cards that were produced:

Q.    If you had a better press and sufficient electronics, would the process you developed during the period while you were at Motorola produce acceptable commercial yield?

A.    Yes.

Q.    Why -- on what facts do you reach that conclusion?

A.    If I had a contactless laminator where I had zero pressure of [sic] the platens, I could produce a card as that reads in my patent. . . .

(Ex. 54, Leighton 10/10/05 Tr. 127:21-128:7.)

**Leighton's Response:**

Disagree.  It is clear from the very excerpt mentioned by Oberthur that Mr. Leighton is testifying about what he would have needed at Motorola to practice his subsequently patented, but not then as yet invented process.

"A.     If I had a contactless laminator where I had zero pressure of [sic] the platens, I could produce a card as that reads in my patent. . . ."  (Gutkin Dec. Ex. 47 (Leighton 10/10/05 Tr. 128:4–7)).

46.     **Oberthur's Statement:**  Motorola compensated Mr. Leighton for all of his consulting time, but refused to pay him a $1,500 bonus the parties discussed. (Ex. 55, Leighton 10/23/06 Tr. 552:19-21; Ex. 56; Ex. 57.)

**<u>Leighton's Response:</u>**

Disagree in part.  Mr. Leighton received some of the compensation that he was entitled to. Motorola admitted that:

1.  The requirement that Mr. Leighton make 10,000 cards was not dependent upon yield.

2.  Motorola's prior yield did not differ from Mr. Leighton's yields at Motorola.

3.  Motorola had sufficient electronics to provide to Mr. Leighton.

4.  Motorola chose not to provide Mr. Leighton with sufficient electronics.  (Gutkin Dec. Ex. 36 (Thompson 5/4/06 Tr. 132:5-12; 164:5-14; 166:23-167:11)).

47.     **Oberthur's Statement:**  On May 19, 1995, two weeks after his last day of consulting, Mr. Leighton sent Motorola an invoice and a cover letter explaining why he was entitled to a $1,500 bonus.  (Ex. 58.)

**<u>Leighton's Response:</u>**

Agree.

48.     **Oberthur's Statement:**  Motorola responded in a July 12, 1995 letter, in which the company explained why Mr. Leighton did not earn a bonus. First, Motorola said that the process developed by Mr. Leighton resulted in poor yields of card quantities. (Ex. 11.) Second,

WO 684949.1

Motorola said that Mr. Leighton failed to provide many of the promised "deliverables," such as documentation of the specifications of the process he developed for Motorola. (*Id*.; *see also* Ex. 59; Ex. 60 Delbecq 3/22/06 Tr. 230:11-231:18.)

**Leighton's Response:**

Agree that the above reflects Motorola's position. However, disagree that the position was correct.

Motorola admitted that:

The requirement that Mr. Leighton make 10,000 cards was not dependent upon yield.

Motorola's prior yield did not differ from Mr. Leighton's yields at Motorola.

Motorola had sufficient electronics to provide to Mr. Leighton.

Motorola chose not to provide Mr. Leighton with sufficient electronics. (Gutkin Dec. Ex. 36 (Thompson 5/4/06 Tr. 132:5-12; 164:5-14; 166:23-167:11).

49.    **Oberthur's Statement:**  Mr. Leighton never replied to Motorola's July 12th letter. Instead, on July 17, 1995, just five days after Motorola refused to pay him the $1,500 bonus, Mr. Leighton wrote a letter to another company (Plastag Corporation) and described his "invention" for the first time. (Ex. 61.)  Mr. Leighton wrote: "I have other plastic card innovations that I would like to share with you because I believe you would be interested. One is a RFID card with a thickness of .032" which I am planning to have patented." (*Id*.)

**Leighton's Response:**

Disagree.  After leaving Motorola, Mr. Leighton did exchange correspondence with Motorola about his belief that they had breached their obligations.  (Leighton Dec. Exs. 12-17 (correspondence with Motorola)).  However, given his wife's ongoing cancer treatment and his

need to find new employment, he instead turned to locating a new job.  He continued over the course of the months after leaving Motorola, to think about what had gone wrong and try to come up with a process that would make a suitable ISO standard card.  He also continued to think about refinements to this process.  (Leighton Dec. ¶ 21).

50.    **Oberthur's Statement:**  The next day, Mr. Leighton described his "invention" to another company, Hughes Identification Devices. (Ex. 11.) In a letter to Hughes, Mr. Leighton referenced the RFID card he made a Motorola: "I talked to you last week on the phone about RF-ID cards that has a surface flatness of .00005" and have enclosed samples for you to examine." (*Id*.) Mr. Leighton explained that he could make a thinner version of the Motorola card: "[I] will be able to produce these cards with a thickness of .032" of PVC." (*Id.*)

**Leighton's Response:**

Disagree.  The letter cited does not disclose Mr. Leighton's invention.  Mr. Leighton's invention is a process with many steps.

51.    **Oberthur's Statement:**  The first Leighton RFID card patent application was filed on October 17, 1995. (Ex. 62.) Mr. Leighton testified prior to filing, he had not made cards according to the claimed processes. (Ex. 63, Leighton 10/23/06 Tr. 721:9-723:12.) Rather, Mr. Leighton asserts that he did not make cards using his claimed processes until one year later, October 1996. (*Id.*)

**Leighton's Response:**

Disagree in part.  Agree that Mr. Leighton did not make cards according to the claimed processes until after the filing of his provisional application in October of 1995.  However, according to the

quoted testimony Mr. Leighton testified that the cards were made after the first part of 1996, not

"one year later". (Gutkin Dec. Ex. 34 (Leighton 10/23/06 Tr. 721:9-723:12)).


     52.   **Oberthur's Statement:**  Mr. Leighton offered to give Motorola a license to the

Leighton patents in 1999. (Ex. 64) Motorola ultimately declined, apparently because it had exited

the business. (Ex. 65.)

**Leighton's Response:**

     Agree in part. Upon leaving Motorola, Mr. Leighton told Mr. Thompson that they should

try to continue to work on making a better card. However, Mr. Thompson indicated that

Motorola was not interested in any further work from Mr. Leighton. (Gutkin Dec. Ex. 31

(Thompson 5/4/06 Tr. 129:8-130:2; Leighton Dec. ¶ 19)).

     Mr. Leighton contacted Motorola a second time, in February of 1997. (Leighton Dec.

Ex. 12). He advised Motorola that he had a patent pending on his process to make a ISO RFID

smart card. He again indicated that he would like to assist Motorola with their product

development. Mr. Thompson testified that when he found out about this, he did not think that

Mr. Leighton should have obtained patents on what he believed Motorola had been doing.

(Gutkin Dec. Ex. 48 (Thompson 5/4/06 Tr. 137:19–141:24; Leighton Dec. Ex. 13)). However,

Motorola responded, and chose to do nothing. (*Id.*).

     Mr. Leighton contacted Motorola a third time, after his patent had issued. Initially,

Motorola showed interest in proceeding with licensing negotiations with Mr. Leighton.

However, Motorola eventually chose not to pursue negotiations and subsequently exited the

business. (Leighton Dec. ¶ 24, Exs. 15-18).

Dated: January 26, 2007                    SUTHERLAND ASBILL & BRENNAN LLP


        /s/ Robert A. Gutkin
By:  Robert A. Gutkin, Esq. (Pro hac vice)
Blair M. Jacobs, Esq. (Pro hac vice)
1275 Pennsylvania Avenue, N.W.
Washington, DC  20004-2415
Tel:  202-383-0100
Fax: 202-637-3593

*Attorneys for Plaintiff*
*LEIGHTON TECHNOLOGIES LLC*

WO 684949.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing PLAINTIFF LEIGHTON

TECHNOLOGIES LLC'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL

FACTS FOR THEIR MOTION TO DISMISS FOR LACK OF STANDING, was served on the

following on January 26, 2007 by e-mail and overnight mail:

Edward DeFranco
Kevin Johnson
Mark Baker
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

/s/ Robert A. Gutkin

1