**EXHIBIT 31**

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5   LEIGHTON TECHNOLOGIES,                :

6                Plaintiffs,              :
                                          :
7                vs.                      :    No. 04-CV-02496
                                          :
8                                         :
    OBERTHUR CARD SYSTEMS, S.A.,          :
9   OBERTHUR CARD SYSTEMS OF              :
    AMERICA CORPORATION,                  :
10                                        :
                 Defendants.              :

11

12                      --oOo--

13

14            VIDEOTAPE DEPOSITION OF

15                 KEN THOMPSON

16                  VOLUME I

17        _____

18                 May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24             New York, New York 10022
                   212-750-6434
25                 REF: 80728

THOMPSON

did not satisfy the deliverables as agreed upon that

you signed and signed up to.

        And we're not prepared to give you the

$1,500 bonus.  And then I recall -- I recall that I

had a document that for him and send it to him,

something like that.

        Q.    During the expiration conference, what was

his tone?

        A.    I think his tone and general attitude was,

you know, we just need to try some more, we just

need to build some more.  You know, he went, let's

try some other variations, let's do this, we need

more time, and we need to do this.  And the other

tone was -- you know, you should -- you should hire

me for a longer period of time because we can do

better, and we'll get -- we'll try new processes,

and -- and I've done a great job, and the reason I

haven't been as successful at this is because you

prevented me because you didn't have tooling, or you

didn't have parts, or you didn't have something

else.

        So that was the tone.  It was a -- it was

a -- his tone was, I can't believe that you don't

think that I did a great job and deserve the $1,500

130

THOMPSON

1

2  bonus.

3      Q.    Was -- did he speak in a raised tone of

4  voice?

5      A.    I don't recall.  I know that Keith would

6  sometimes get agitated and in an agitated manner say

7  something, but I don't -- I don't particularly

8  recall --

9      Q.    Mm-hmm.

10     A.    -- whether the raised tone or agitated

11 tone.

12     Q.    You mentioned that he would come back to

13 you and come back to you.  Was that by phone call?

14     A.    By phone call, and...

15     MR. J. D. JACOBS:  Let's mark the next

16 document, a letter dated May 19 from Mr. Leighton to

17 Mr. Thompson bearing Bates number L04427.  And that

18 will be the next exhibit, 2,676.

19                  - - -

20              (Whereupon the document was marked,

21              for identification purposes, as Exhibit

22              Number Two Thousand Six Hundred

23              Seventy-Six.)

24                  - - -

25 BY MR. J. D. JACOBS:

**EXHIBIT 32**

Confidential

Page 151

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -

LEIGHTON TECHNOLOGIES, LLC,     )     Case No.

       Plaintiff and        )     04 Civ. 02496

       Counterclaim Defendant,  )

 v.                         )

OBERTHUR CARD SYSTEMS, S.A., AND  )

OBERTHUR CARD SYSTEMS OF       )

AMERICA CORPORATION,         )

       Defendants and       )

       Counterclaim Plaintiffs )

- - - - - - - - - - - - - - - - - --

CONFIDENTIAL

DEPOSITION OF JEAN-MARC DELBECQ

WEDNESDAY, MARCH 22, 2006

PAGES 151 - 308; VOLUME 2

BY:  CHRISTINE L. JORDAN, CSR NO. 12262

a3505f8b-4bda-4ca4-8025-643532a72575

Confidential

1          Number two, do you recall whether Leighton

2   ever provided Indala any of the items listed under

3   number two?

4              (The witness reviews the document.)

5          THE WITNESS:  I recall that Keith Leighton

6   did not deliver the items listed in item two or that

7   if -- if he claimed to have, the results were not

8   reproducible in a sufficiently -- in a -- of a

9   sufficient quality to be called a -- a deliverable.

10  BY MR. J. JACOBS:

11      Q.   How about items under number three, did he

12  provide Indala with the items under number three?

13             (The witness reviews the document.)

14         THE WITNESS:  I do not recall Keith Leighton

15  providing Indala the items in number three except the

16  specifications for cassette design, mirror plate,

17  source press pads and press plates.

18          I do recall getting some contacts from Keith

19  Leighton and -- and buying some plates or deciding that

20  his -- actually, probably what I really remember is

21  that, after talking to his contacts, we decided that

22  there really wasn't a lot of value and we went and we

23  sourced them in other places.

24          But one of the things I think that Keith

25  Leighton as, you know, he presented him -- represented

a3505f8b-4bda-4ca4-8025-643532a72575



•• Deliverables: Keith Leighton to Motorola Indala for Services (re-send 3/21/95) ••

The items to be included in quote as basis for payment must include the following deliverables.

1. Materials
   a. complete specification of all materials to include thicknesses and tolerances, chemical make-up, vendor part number sizes
   *No documented report, Bill of Material, print or chemical specifications supplied by Keith.*
   b. incoming inspection procedure for material
   *No documented procedure supplied by Keith.*
   c. handling and storage requirements for materials, conditioning if necessary
   *N/A*
   d. lot traceability procedure for materials
   *N/A*

2. Process
   a. complete processes specification for producing PVC cards at .038" ± .004" with a surface flatness (1 side) of <0.0005" at less than 40 minutes per cycle.
   *Process supplied yielded 0.046" to 0.048" at less than 20% yield for electrical and cosmetic quality.*
   b. PVC lamination process to achieve flatness or combination of PVC lamination and post process cold lamination (or gluing) of PVC top printable layer
   *Not Attempted*
   c. process to be developed with final outcome of using 4 cassette books, and 5-12 layers per book
   *Done*
   d. Quality control process for documentation of lamination process on each lot with future traceability
   *N/A*
   e. Data compiled for flatness vs. material and process used
   *Not Done*

3. Equipment / Monitoring Equipment / Test Equipment
   a. Procedure for lamination press operation
   *No written procedure supplied by Keith*
   b. Static discharge equipment requirement for laminated sheets
   *No requirements document supplied for Keith*
   c. Specifications for cassette design, mirror plate, w/source, press pads, and press plates
   *Some specifications supplied but process was a moving target, MI could not source over $10,000 worth of tooling for an unstable process.*
   d. Process monitoring tooling needed for tracking of lamination performance to lot
   *N/A*
   e. Specification and setup of test equipment on laminated product
   *Not Done*
   f. Preventive maintenance specification for lamination equipment and tooling
   *Not Done*

4. Product

Trial Counsel's Eyes Only

EXHIBIT 2019
WITNESS DeLacq
CONSISTING OF 2 PAGES
DATE 3/23/2006
BEHMKE REPORTING & VIDEO SERVICES
PLTF.
DEFT.

Motorola / Indala   Ken Thompson          ☎ 408 383 7941          7/12/95     3:5:39 PM

a. Manufacture of ISO format card with embedded electronic RfID's to a surface
flatness of 0.0005" for dye sublimation printing
*Process given to Motorola Indala after 5 weeks of development yielded below 24% on
runs of over 4,000 card sites. Evolving process, materials, and tooling did not allow
sufficient time within the 4 weeks to produce a stable, or acceptable process.*
b. Production of >10,000 cards using process, tooling, and material identified within
4 weeks along with all above items to receive bonus amount of $1,500.00

*Process given to Motorola Indala after 5 weeks of development yielded below 24% on runs
of over 4,000 card sites. Evolving process, materials, and tooling did not allow sufficient
time within the 4 weeks to produce a stable, or acceptable process. Motorola Indala does
not consider the 24% yield to be a "production process". Due to unstable process
development, MI would not commit to >$10,000 worth of tooling until a "production
process" was identified.*
*During those 4 weeks, the laminating press was inoperable for 3 days and Keith missed a
total of 2.5 days of work. $1,500 was issued to Kieth for the 5th week of work.  $375
was issued to Keith on P.O.#950747 dated 6/22.*

Signed: Keith Leighton _____     Date: _____

Ken Thompson _____     Date: _____

Trial Counsel's Eyes Only                                              L06522

**EXHIBIT 33**

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5    LEIGHTON TECHNOLOGIES,              :

6              Plaintiffs,               :
                                         :
7              vs.                       :    No. 04-CV-02496
                                         :
8                                        :
     OBERTHUR CARD SYSTEMS, S.A.,        :
9    OBERTHUR CARD SYSTEMS OF            :
     AMERICA CORPORATION,               :
10                                       :
               Defendants.               :
11

12                 --oOo--

13

14         VIDEOTAPE DEPOSITION OF

15             KEN THOMPSON

16              VOLUME I

17    _____

18           May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
24         New York, New York 10022
              212-750-6434
25            REF: 80728

THOMPSON

2  increase the yields, improve the yields?

3        And I think Jean-Marc and my response was

4  we don't think so, based upon his performance and

5  documentation efforts, and style of working, his

6  deduction abilities, is just inadequate and sub par

7  from what we need it to be.  And I think our general

8  manager, or my boss then said, or I said, I'll --

9  I'll dedicate a lot of my time to -- to -- to

10  improving this and making it better.

11        And, in fact, that's why I have the

12  process logs that started on May 1st.

13  Mr. Leighton didn't produce any quality

14  documentation at all about the processes and

15  parameters he was using.

16        He would run things, make decisions and

17  run something different.  And Mr. Delbecq and I

18  would talk to him and say, well, why did you do

19  this, and how did you draw the conclusion that you

20  should be doing this particular variation of process

21  next?  And -- and he was not following what we

22  considered to be good, logical -- or making good

23  decisions, I should say.

24     Q.   What happened after the termination

25  conference with Mr. Leighton?

```
1                          THOMPSON
2        Q.   Yeah.
3        A.   He wasn't there the whole time, but
4    approximately five weeks.
5        Q.   Five weeks of working time is what I
6    really was referring to.
7        A.   Yes.  Yes.
8        Q.   Can you identify what contributions, if
9    any, Leighton made to the process that existed at
10   Indala on the day he walked into Indala?
11       A.   Yeah, sure.
12       Q.   Let me rephrase the question, because it
13   doesn't make sense.
14            Can you identify what contributions
15   Leighton's -- Leighton made to the process he found
16   at Indala on the day he walked in?
17            MR. B. JACOBS:  From the time he started
18   to the time he ended, basically?
19            MR. J. D. JACOBS:  Exactly.
20            MR. B. JACOBS:  Okay.
21            THE WITNESS:  When it comes to the process
22   of lamination, I -- I can't readily identify any
23   contribution, other than solidifying some things
24   that we were pretty sure about but weren't
25   completely sure about.
```

THOMPSON

So from a process standpoint, there's nothing that I can hang my hat on that says, yep, this is a thing that he contributed to from a process standpoint.  He did have other contributions other than process.

BY MR. J. D. JACOBS:

Q.    And what were they?

A.    Just a general handling of sheets, how you handle sheets, for print sheets, the care you have to take to not contaminate them.  Some of the tricks for -- to reduce the static electricity, to reduce the scratching in handling for sheets.  Tooling suppliers for lamination plates, for material suppliers who can make us PVC at the thicknesses we desired.

He -- he verified a lot of lamination processes that didn't work, so we knew not to try them again.  So there were a lot of process -- a lot of contributions other than the process knowledge that he contributed towards.

Q.    Did he, in any way contribute to or change the structure of the product itself?

A.    He recommended some material changes, but we didn't necessarily see those material changes

**EXHIBIT 34**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - -

LEIGHTON TECHNOLOGIES, LLC, )

               plaintiff,     )

      vs.               ) Case No.

                    ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,         )

            defendants.   )

- - - -

(Volume III - pages 522 through 875)

- - - -

Continued videotaped deposition of
KEITH LEIGHTON, a witness herein, called by the
defendants as if upon cross-examination, and
taken before David J. Collier, RPR, Notary
Public within and for the State of Ohio,
pursuant to Notice of Deposition and pursuant to
the further stipulations of counsel herein
contained, on Monday, the 23rd day of October,
2006 at 8:02 a.m., at the offices of Tackla &
Associates, 1020 Ohio Savings Plaza, City of
Cleveland, County of Cuyahoga and the State of
Ohio.



**Tackla**
**& Associates**
Court Reporting & Videotaping

1020 Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 • Fax 216-241-3935

1  A    No.  No.

2  Q    Did they have any presses?

3  A    Printing presses, that's strictly it.

4  Q    That's not a laminating press?

5  A    No.

6  Q    Did you -- did you have a -- you didn't

7  have a laminating press at home, did you?

8  A    No.

9  Q    Okay.  Did you have access to a lamination

10 press from May 5th of '95, when you stopped

11 working for Motorola, to when the -- your

12 provisional patent application was filed?

13 A    No, I wasn't doing any card work at all.

14 Q    You weren't doing any experiments or tests?

15 A    No, until I went to -- back to 2B System to

16 make the Mifare and Hitag cards.

17 Q    But that was after October of '95, right?

18 A    Yes.

19 Q    That was in -- sometime in '96.

20 A    Correct.

21 Q    Okay.  So it's fair to say that after you

22 left Motorola and continuing over the next

23 couple of months to think about the problems and

24 issues that arose, you came up with the idea

25 that led to your patents?

1    A      Yes.

2    Q      And that --

3    A      That's correct.

4    Q      And that was for a process and a method for

5    making a laminated card with an embedded

6    electronic element --

7    A      Correct.

8    Q      -- that wouldn't be damaged during the

9    lamination process.

10   A      Correct.

11   Q      Thin enough to meet ISO standards.

12   A      Yes.

13   Q      Okay.  And how did you come up with the

14   temperatures and pressures that would be used

15   during that process?

16   A      After I left Motorola, there's a company

17   out in Newcomerstown, Ohio that had PVC extended

18   life plastic, it was a homopolymer and

19   copolymer.  By using that type of PVC, I could

20   come up to higher temperatures without yellowing

21   the plastic, and I was able to go to

22   temperatures that I couldn't go at Motorola, and

23   I made some tests there at CSI to make this

24   card.

25                  Let me back up here.  I made some

1    tests there of lamination.  At the same time I

2    received some electronics from Micron, both

3    Mifare and Hitag.  I manufactured both Hitag and

4    Mifare on the same sheets, same core sheets.

5    Q    Okay.  But -- but everything you're talking

6    about occurred after the beginning of '96,

7    right?

8    A    Correct.

9    Q    Okay.

10   A    The first part of '96 --

11   Q    Okay.

12   A    -- I was out there.

13   Q    Yeah.  I want to -- I want to talk about as

14   of the time you filed your provisional patent

15   application.

16   A    Um-hum.

17   Q    What did you have in mind in terms of

18   temperatures and pressures at which the

19   operation -- process would occur?  Did you have

20   any temperatures or pressures in mind?

21   A    I knew I had to flow the plastic.  I didn't

22   know the temperatures that I would be going to

23   because I didn't have the plastic core sheets

24   set yet.

25   Q    Okay.  How about the pressures, did you

1    know what pressures you would use?

2    A    I knew I would use a zero pressure.

3    Q    Zero pressure when?

4    A    In the heat cycle.

5    Q    Okay.  Zero pressure throughout the heat

6    cycle?

7    A    No.

8    Q    When in the heat cycle?

9    A    I would bring it up to a first period of

10   time of heating the core before pressure.  After

11   the first period of time then I would increase

12   the pressure on that cycle.  That's something I

13   couldn't do at Motorola.

14   Q    What else in terms of process steps did you

15   think of?

16   A    I made a core pre-lam containing the

17   electronics.

18   Q    I'm sorry.  I'm trying to -- I'm trying to

19   cover what you did from the time you left

20   Motorola to when your provisional patent

21   application was filed, just that window of time.

22   A    Oh, okay.  Then I'm not in manufacturing of

23   cards.

24   Q    Okay.

25   A    You asked me what was the next step.

```
1   Q    Okay.  No, I understand.  I'm sorry for the
2   confusion.
3            At the time you filed your provisional
4   application, okay, back in 1995 --
5   A    Correct.
6   Q    -- what in your mind was the state of your
7   invention?
8            MR. GUTKIN:        Object to form.
9   A    It was --
10           MR. GUTKIN:        You can answer.
11  A    It was strictly a provisional in writing
12  only.
13  Q    Okay.  And what at that point in time in
14  your mind had you fixed in terms of what the
15  invention was?  I'm not trying to hold you to a
16  legal definition, I just want to know what your
17  memory was at the time of what your invention
18  was when you filed your provisional patent
19  application.
20  A    I had in mind of making a thin ISO standard
21  card, and to achieve that and put printing on
22  it, I printed on the pre-lam, thus eliminating
23  14 thousandths of plastic.
24  Q    Okay.  And anything else come to mind at
25  the time that you filed your provisional
```

Tackla & Associates

1    application as to how you would achieve that?

2    A    By making a -- the pre-lam, I went to a

3    place where I was familiar with the laminator

4    because I did a lot of modifications on that

5    laminator.

6    Q    Right.

7    A    CSI happened to be formerly 2B Systems.

8    Q    Okay.

9    A    I was familiar with the equipment.  And by

10   making my first test, I used the top platen of

11   that laminator where I knew I could -- I could

12   bring it to a touch with the pads in it not

13   crushing but touching the plates, where I could

14   have heat from the top and heat from the bottom

15   with zero pressure --

16   Q    Okay.

17   A    -- on the chip.

18   Q    And is that -- is that something that

19   occurred to you before you filed your

20   provisional application, of course, that

21   applying heat with no pressure?

22   A    Yes.

23   Q    And that was after you left Motorola?

24   A    Yes.

25   Q    And that just came into your head without

1    any experimental work?

2    A    I had help.  God was with me.

3    Q    Okay.  And what else --

4    A    This idea come from the Lord, I'll tell

5    you.

6    Q    What other -- what other process steps did

7    you come up with prior to when your provisional

8    patent application was filed?  Did you think

9    about applying an increased pressure during the

10   cooling phase?

11   A    I wrote it all out on two pages in

12   ballpoint ink and then I didn't vary from

13   that --

14   Q    Okay.

15   A    -- in making my --

16   Q    Okay.

17   A    -- card.  I stuck to that.

18   Q    Let's take -- let's take a break for lunch

19   and then we'll talk about that.

20   BY MR. DeFRANCO:

21   Q    Okay.  Mr. Leighton, before we took a lunch

22   break you mentioned a two page document that you

23   had jotted down on a pad some of your

24   thoughts --

25   A    Right.

**EXHIBIT 35**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC,    )

          plaintiff,    )

   vs.    ) Case No.

                           ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A.  )

and OBERTHUR CARD SYSTEMS    )

OF AMERICA CORP.,    )

         defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.



**Tackla**
**& Associates**
Court Reporting & Videotaping

1020 Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 • Fax 216-241-3935

1    Q    Okay.  No, I understand.  I'm sorry for the

2    confusion.

3              At the time you filed your provisional

4    application, okay, back in 1995 --

5    A    Correct.

6    Q    -- what in your mind was the state of your

7    invention?

8              MR. GUTKIN:        Object to form.

9    A    It was --

10             MR. GUTKIN:        You can answer.

11   A    It was strictly a provisional in writing

12   only.

13   Q    Okay.  And what at that point in time in

14   your mind had you fixed in terms of what the

15   invention was?  I'm not trying to hold you to a

16   legal definition, I just want to know what your

17   memory was at the time of what your invention

18   was when you filed your provisional patent

19   application.

20   A    I had in mind of making a thin ISO standard

21   card, and to achieve that and put printing on

22   it, I printed on the pre-lam, thus eliminating

23   14 thousandths of plastic.

24   Q    Okay.  And anything else come to mind at

25   the time that you filed your provisional

1    application as to how you would achieve that?

2    A    By making a -- the pre-lam, I went to a

3    place where I was familiar with the laminator

4    because I did a lot of modifications on that

5    laminator.

6    Q    Right.

7    A    CSI happened to be formerly 2B Systems.

8    Q    Okay.

9    A    I was familiar with the equipment.  And by

10   making my first test, I used the top platen of

11   that laminator where I knew I could -- I could

12   bring it to a touch with the pads in it not

13   crushing but touching the plates, where I could

14   have heat from the top and heat from the bottom

15   with zero pressure --

16   Q    Okay.

17   A    -- on the chip.

18   Q    And is that -- is that something that

19   occurred to you before you filed your

20   provisional application, of course, that

21   applying heat with no pressure?

22   A    Yes.

23   Q    And that was after you left Motorola?

24   A    Yes.

25   Q    And that just came into your head without

**EXHIBIT 36**

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5   LEIGHTON TECHNOLOGIES,              :

6                    Plaintiffs,        :
                                        :
7                    vs.                :   No. 04-CV-02496
                                        :
8                                       :
    OBERTHUR CARD SYSTEMS, S.A.,        :
9   OBERTHUR CARD SYSTEMS OF            :
    AMERICA CORPORATION,                :
10                                      :
                     Defendants.        :
11

12                    --oOo--

13

14          VIDEOTAPE DEPOSITION OF

15               KEN THOMPSON

16               VOLUME I

17   _____

18               May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                REF: 80728

THOMPSON

1

2    A.   Yes.

3    Q.   Were the coils, in fact, there?

4    A.   Yeah, yeah.

5    Q.   You did have the coils?

6    A.   Yes, but I wasn't going to give them to

7  him, because they were cost -- the coils and

8  module -- when he says coils, he really means the

9  coils and modules.  They cost about maybe $2 apiece.

10  And at 20 percent yield, I couldn't be giving him

11  50,000 -- a hundred thousand dollars worth of

12  materials to produce 10,000 good cards.

13    Q.   Was it -- was the fact that he did not

14  produce ten thousand cards the only reason why he

15  did not get the bonus?

16    A.   No.

17    Q.   There were other reasons also?

18    A.   Oh, yes.  And I believe those other

19  reasons were -- were in the deliverables document

20  which you gave me before.

21       MR. J. D. JACOBS:  Let's mark as the next

22  document, to move this along -- and in fact as the

23  next two documents, as Exhibit 2,677, a document

24  bearing Bates number L04428, a letter from

25  Mr. Thompson to Mr. Leighton.

THOMPSON

1
2  assistance, being extra body and hands, a technical
3  expert, so to speak, or -- that's more skilled in
4  card lamination.
5      Q.   Were there any manufacturing problems at
6  that point in time, relating to your work?
7      A.   Yields, yields were the largest issue.
8      Q.   What were your yields before Mr. Leighton
9  came on, approximately?
10     A.   About 20 percent.
11     Q.   So he really didn't change in one
12 direction or another the yields during his time
13 there?
14     A.   Unh-unh.
15          THE COURT REPORTER:  I'm sorry?
16          THE WITNESS:  No.  No, he didn't.
17 BY MR. B. JACOBS:
18     Q.   Let's take a look at 2,668, which is the
19 letter that you sent to Mr. Leighton in February and
20 then resent to him in March.
21     A.   Okay.
22     Q.   You say in the -- in the first sentence of
23 the second paragraph, "We have confidence that you
24 can lead our efforts in making flat printable
25 cards."

166

THOMPSON

1

2    justifiable need to be greater than 95 percent.

3        Q.    But in this instance, because of the

4    complexity of laminating the cards, something in the

5    30 to 40 percent range, at least in that timeframe?

6        A.    The business --

7            MR. J. D. JACOBS:  Objection.  No, you can

8    answer.

9            THE WITNESS:  Okay.  The business need to

10   deliver product to -- a commitment to a customer was

11   the most important thing.  So we were willing to

12   sacrifice to -- to meet that very important customer

13   deliverable.

14           The 95 percent was, I put on there,

15   typical, is I was very concerned that Mr. Leighton,

16   we would get into a discussion of what is an

17   acceptable yield.

18   BY MR. B. JACOBS:

19       Q.    And if he had asked you that, you would

20   have told him 35 to 40 percent in this instance?

21           MR. J. D. JACOBS:  Objection.

22   BY MR. B. JACOBS:

23       Q.    Do you recall?

24       A.    I recall us speaking about that, and I

25   believe the yields that we had in our AVC-131s were

1                        THOMPSON

2    about 70 percent, 60, 70 percent.  So it wasn't real

3    high, you know, none of the --

4        Q.    Mm-hmm.

5        A.    -- processes were that refined.  I

6    specifically did not put yield targets in the

7    deliverables, because I wanted to make sure that he

8    could achieve, you know, the deliverables.

9        Q.    But you put volume targets?

10       A.    I put a volume target along with other

11   things for a bonus, not for the deliverables.

12       Q.    But you would agree that in order to -- to

13   meet the volume target, you would have to do so with

14   acceptable yield, or else it just wouldn't make

15   business sense; right?

16           MR. J. D. JACOBS:  Objection.

17           THE WITNESS:  Could you re -- say that

18   again, please.

19   BY MR. B. JACOBS:

20       Q.    Sure.  I think that the target was ten

21   thousand cards.  Say the --

22       A.    Yes.

23       Q.    -- target was ten thousand cards.  Okay?

24   In order to achieve that goal, you're going to have

25   to do so with an acceptable yield, or else it makes

**EXHIBIT 37**

LEXSTAT 35 U.S.C. SECTION 261

UNITED STATES CODE SERVICE
Copyright © 2006 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 109-481, APPROVED 1/12/2007 ***
*** WITH GAPS OF 109-476 THROUGH 109-480 ***

TITLE 35. PATENTS
PART III. PATENTS AND PROTECTION OF PATENT RIGHTS
CHAPTER 26. OWNERSHIP AND ASSIGNMENT

**Go to Code Archive Directory for this Jurisdiction**

*35 USCS § 261*

§ 261.  Ownership; assignment

Subject to the provisions of this *title [35 USCS § § 1* et seq.], patents shall have the attributes of personal property.

Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.  The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

A certificate of acknowledgment under the hand and official seal of a person authorized to administer oaths within the United States, or, in a foreign country, of a diplomatic or consular officer of the United States or an officer authorized to administer oaths whose authority is proved by a certificate of a diplomatic or consular officer of the United States, or apostille of an official designated by a foreign country which, by treaty or convention, accords like effect to apostilles of designated officials in the United States, shall be prima facie evidence of the execution of an assignment, grant or conveyance of a patent or application for patent.

An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

**HISTORY:**
   (July 19, 1952, ch 950, §  1, 66 Stat. 810; Jan. 2, 1975, P.L. 93-596, §  1, 88 Stat. 1949; Aug. 27, 1982, P.L. 97-247, § 14(b), 96 Stat. 321.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Prior law and revision:
   Based on 35 U.S.C., 1946 ed., §  47 (R. S. §  4898; Mar. 3, 1897, ch. 391, §  5, 29 Stat 93; Feb. 18, 1922, ch. 58 §  6, 42 Stat. 391; Aug. 18, 1941, ch. 370, 55 Stat. 634).
   The first paragraph is new but is declaratory only. The second paragraph is the same as in the corresponding section of existing statute. The third paragraph is from the existing statute, a specific reference to another statute is omitted. The fourth paragraph is the same as the existing statute but language has been changed.

**EXHIBIT 38**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,      )

  vs.                ) Case No.

                  ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,        )

        defendants.    )

- - - - -
(Volume III - pages 522 through 875)
- - - - -

      Continued videotaped deposition of
KEITH LEIGHTON, a witness herein, called by the
defendants as if upon cross-examination, and
taken before David J. Collier, RPR, Notary
Public within and for the State of Ohio,
pursuant to Notice of Deposition and pursuant to
the further stipulations of counsel herein
contained, on Monday, the 23rd day of October,
2006 at 8:02 a.m., at the offices of Tackla &
Associates, 1020 Ohio Savings Plaza, City of
Cleveland, County of Cuyahoga and the State of
Ohio.



**Tackla**
**& Associates**
Court Reporting & Videotaping

1020 Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 • Fax 216-241-3935

1  gel or some other protective coating, do you

2  call it something else?

3  A    I don't know what they would call it.

4  Q    Okay.

5  A    Every manufacturer has their own process --

6  Q    Okay.

7  A    -- of making cards.

8  Q    So for the Motorola process, you'd call

9  it -- you'd call it the inlay that was enclosed

10  in a gel?

11  A    That's what they were using at the time I

12  went out there.

13  Q    Okay.  At the time that you -- is that the

14  first time, when you saw that Motorola card,

15  that you ever saw an electronic element

16  incorporated in a laminated card?

17          MR. GUTKIN:       Object to form.

18  A    I can't recall if that's the first time.  I

19  might have seen a contact chip, which would be

20  the same type.

21  Q    Okay.  I think at one of your earlier

22  depositions you said you hadn't seen an

23  electronic element laminated in a card before

24  you started working at Motorola.

25  A    That would be correct.  You asked me if I

1    had seen an electronic element before --

2    Q    Okay.

3    A    -- not laminated in a card.

4    Q    Not laminated.  Okay.

5         Other than an electronic element, had

6    you worked with anything that had been laminated

7    in a card prior to your work for Motorola?

8    A    Other than an electronic element?

9    Q    Yes.

10   A    I put a metallic foil --

11   Q    Okay.

12   A    -- in a card.

13   Q    That was a layer of metallic foil?

14   A    Yes.  It was a gold called -- Crown Leaf

15   was the manufacturer, they made material for

16   holograms --

17   Q    Okay.

18   A    -- they make --

19   Q    And what was the purpose of that gold foil

20   layer?

21   A    That was given to me while I worked out at

22   Cardtech --

23   Q    Okay.

24   A    -- now called G & D or Giesecke & Devrient.

25   Q    And what was the purpose of that?

**EXHIBIT 39**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

          plaintiff,     )

  vs.                  ) Case No.

                      ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS )

OF AMERICA CORP., )

          defendants.    )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

      Continued videotaped deposition of
KEITH LEIGHTON, a witness herein, called by the
defendants as if upon cross-examination, and
taken before David J. Collier, RPR, Notary
Public within and for the State of Ohio,
pursuant to Notice of Deposition and pursuant to
the further stipulations of counsel herein
contained, on Monday, the 23rd day of October,
2006 at 8:02 a.m., at the offices of Tackla &
Associates, 1020 Ohio Savings Plaza, City of
Cleveland, County of Cuyahoga and the State of
Ohio.



**Tackla**
**& Associates**
Court Reporting & Videotaping

1020 Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 • Fax 216-241-3935

1    last -- at your other deposition.

2    A    Yes.

3    Q    Anything else, anything else you'd

4    laminated in cards prior to coming to Motorola?

5    A    No.

6    Q    Now, the gold --

7    A    Not to my recollection.  I mean --

8    Q    The gold or metal foil, those didn't have

9    any -- weren't connected to any chips, is that

10   right, the one that you just mentioned?

11   A    No.  No.

12   Q    There was no electricity running through --

13   A    It was not an electronic thing, although I

14   think it could be, some day be an electronic

15   element.

16   Q    I'm sorry.  That one you're going to have

17   to explain to me.  I thought the layer, the gold

18   or silver layer, was for decorative purposes; is

19   that right?

20   A    That's the purpose that I was using it for,

21   but it could be used as a antenna.

22   Q    Okay.  Was it used as an antenna at the

23   time?

24   A    Not at the time that I made the card.  It

25   was a promotional card.  I could show you that

1    card if you'd like to see it.

2    Q    Yeah, I'd like to see it.  I mean, was

3    it -- do you have it here?

4    A    Yes, I do --

5    Q    Great.

6    A    -- if I can pull it out here.

7            I made this at Cardtech.

8    Q    Okay.  And this has a gold or silver layer

9    in it?

10   A    That has a silver layer.

11   Q    And is it -- is it colored also, the silver

12   layer?  What's the blue color?  Is that --

13   A    The blue color is printing on top of the

14   crown leaf foil --

15   Q    Okay.  And --

16   A    -- after I placed a sandwich of adhesives

17   and --

18   Q    Okay.  About how thin is that silver layer

19   on this card?

20   A    I'm not sure.  I forget that.

21   Q    Okay.  But approximately, you have some

22   idea about how thin it is, right?

23   A    Maybe 2 thousandths, maybe 3 thousandths,

24   I'm not sure.

25   Q    Which is probably thinner than a head of

1    hair?

2    A    Yes.

3    Q    Is that right?

4    A    Right.

5    Q    Okay.  And you said you could envision this

6    being used -- such a layer being used as an

7    antenna some day?

8    A    I envision that now.  At the time I made

9    the card I wasn't thinking of that.

10   Q    Okay.  You weren't thinking of this as an

11   antenna?

12   A    No.

13   Q    All right.  Did you -- did there come a

14   time when you thought of this -- such a layer

15   being used as an antenna?

16   A    Yes.

17   Q    When was that?

18   A    After I started making and doing research

19   on making contactless labels.

20   Q    When was that?

21        MR. TACKLA:       Two minutes of

22   tape.

23   A    I'd say about year 1996 maybe.

24   Q    Okay.  After -- after you filed your first

25   provisional patent application?

**EXHIBIT 40**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

            plaintiff,     )

    vs.               ) Case No.

                    ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS   )

OF AMERICA CORP.,         )

           defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

      Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.



**Tackla**
**& Associates**
Court Reporting & Videotaping

1020 Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 • Fax 216-241-3935

1    improve -- they wanted a list of materials that

2    I could bring to them to help them facilitate

3    the manufacture of their cards.

4    Q    Okay.  But going beyond at the time that

5    you were hired, at some point did you enter into

6    a contract with Motorola where you agreed to

7    assign any inventions that you came up with as a

8    result of your work for them?

9    A    Not at the time.

10    Q    Well, at any point did you sign -- enter

11    into such an agreement?

12    A    I signed a confidentiality agreement after

13    I was there and I was working for a period of

14    time, and I forget how long that period of time

15    was, and they came to me and they said, oops, we

16    were supposed to have you sign this.

17    Q    Okay.  And did you at some point sign the

18    confidentiality agreement?

19    A    Yes, I did.

20    Q    And --

21    A    They didn't sign it.

22    Q    You never saw a signed copy on their part?

23    A    No.

24    Q    You never received a signed copy --

25    A    No.

1    Q      -- from Motorola?

2    A      They just brought it in to me, asked me to

3    sign the document, and I believe they asked me

4    to backdate it because they were supposed to

5    give that to me before I started work.  I copied

6    that document before I handed it back to them,

7    and I never received back a signed copy from

8    them.

9    Q      All right.  Well, let's -- let's break that

10   down a little bit.

11            Once you signed that agreement with

12   Motorola, was it your understanding at the time

13   that as of at least that point you were under an

14   obligation to assign whatever work came

15   afterward to Motorola that you had done based on

16   your consulting relationship with them?

17   A      No, I believe it stated in that contract

18   that I would assign while working for Motorola

19   any ideas that I had that would be a patentable

20   idea --

21   Q      Okay.

22   A      -- during that employment period.

23   Q      Well, explain to us in a little more

24   detail, if you would, what your understanding

25   was exactly.  When you say "while working for