**EXHIBIT 46**

\*\*\*\*\*CONFIDENTIAL DEPOSITION\*\*\*\*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Leighton Technologies, LLC, )

   Plaintiff-Counterclaim  )

   Defendant,           )Case No.

   -vs-          )04Civ

Oberthur Card Systems, S.A.,)2496(CM)

   Defendant-Counterclaim  )

   Plaintiff.       )

- - - oOo - - -

Deposition of KEITH R. LEIGHTON, a witness herein, called by the Defendant-Counterclaim Plaintiff, as if upon cross-examination under the statute, and taken before Luanne Stone, a Notary Public within and for the State of Ohio, pursuant to the issuance of notice and subpoena, and pursuant to the further stipulations of counsel herein contained, on Sunday, the 9th day of October, 2005 at 9:00 o'clock A.M., at the Renaissance Hotel, the City of Cleveland, the County of Cuyahoga and the State of Ohio.

\*\*\*\*\*CONFIDENTIAL DEPOSITION\*\*\*\*\*

**Tackla & Associates**
Court Reporting & Videotaping

Tackla & Associates Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 ● Fax 216-241-3935

1  A    Before they developed their contact/

2  contactless smart card.

3  Q    That's not the question.  Did you

4  develop your invention prior to going to

5  Motorola in 1990 -- in the first half of

6  1995?

7  A    No.

8  Q    You developed your invention after

9  leaving Motorola in 1995, correct?

10  A    That's correct.

11  Q    So, what is different in your invention

12  than what -- what you saw at Motorola?

13      MR. GUTKIN:    Vague and ambiguous.

14  Lacks foundation.

15      THE WITNESS:  Do you want me to answer

16  that?

17      MR. GUTKIN:    Yeah, yeah.  Unless I

18  instruct you not to answer, he's entitled to

19  an answer.

20      THE WITNESS:    Okay.  My invention

21  could not have been practiced at Motorola.

22  BY MR. JACOBS:

23  Q    I'm asking you why.

24  A    Because they did not have control of

25  their ram to give zero pressures on the

```
 1   surface of the plastic before heating it.
 2   They had a -- I believe a four-window,
 3   daylight window laminator that you cannot
 4   control the platens individually.  The
 5   bottom platen, if you put electronics in,
 6   would pick up about 450 pounds on that
 7   delicate chip, and each time the ram would
 8   come up, it would pick up an additional 450
 9   pounds, and you do that four times, you've
10   got a lot of weight on that chip.  You
11   couldn't do my process on there without
12   having a counterbalance platen that weighed
13   absolutely nothing.
14   Q   So, you view your invention using a
15   counter -- for your invention, do you -- do
16   you -- is it -- let me strike that.  Sorry.
17        Does your invention require the use of
18   a counterbalance platen?
19        MR. GUTKIN:   Calls for a legal
20   conclusion.  You can answer.
21        THE WITNESS:  By using the top platen
22   of the laminator and controlling the ram to
23   where I can raise it to -- raise the
24   temperature in the laminator without making
25   contact to the top of the platen, I can heat
```

the plastic and liquefy the plastic before

applying ram pressure to encapsulate the

electronics.

BY MR. JACOBS:

Q    Is there anything else in your invention

that you did differently than what you saw

at Motorola?

A    All of it.

Q    Well, tell me what else.

A    Motorola didn't have a printing press

when I worked there.

        THE VIDEOGRAPHER: Two minutes of tape.

        THE WITNESS:   I -- in my invention, I

had -- on my first patent, I facilitated or

printed on a -- the core that I made in the

first lamination process.

        MR. JACOBS:    Why don't we change the

tape.

        THE VIDEOGRAPHER: Off the record.

        (At this time a short recess was had.)

        THE VIDEOGRAPHER:    Back on the record.

BY MR. JACOBS:

Q    Before we went off the record,

Mr. Leighton, we were discussing what you

considered to be the differences between

1    your invention and that which you saw at

2    Motorola, and what I'm talking about what

3    you saw at Motorola, I'm also talking about

4    what the things you contributed to Motorola,

5    and you so far, I think, mentioned the fact

6    of a counterbalance platen and printing.

7    A    Yes, Motorola didn't have those

8    capabilities.

9    Q    Right.  What else did you consider

10   different that you saw at Motorola than what

11   you considered to be in your invention?

12       MR. GUTKIN:    By "your invention,"

13   we're still talking about Exhibit 101,

14   correct?

15       MR. JACOBS:    Well, actually, I was

16   talking about all his inventions, but --

17       MR. GUTKIN:    Well, then I'm going to

18   object.  Vague and ambiguous, compound.

19       MR. JACOBS:    That's okay.

20   BY MR. JACOBS:

21   Q    You can answer.

22   A    What I did that's different than

23   Motorola?

24   Q    Yeah.

25   A    Well, step one, I had zero pressure

1    tolerance on the surface of my sheets.

2    Q    Uh-huh.

3    A    That wasn't done at Motorola.  I can

4    illustrate that Motorola had a wide radio

5    antenna which absorbed the pressure, and you

6    could go ahead and close the laminator and

7    heat it up.  What I did was entirely

8    different.  I did not give pressures to the

9    surface of my substrate before liquefying

10   it.  At Motorola, they did.

11   Q    So, in other words, you did not apply

12   any pressure to your substrate until after

13   you raised the heating temperature; is that

14   correct?

15   A    That's correct.

16   Q    Anything else?

17   A    At Motorola, they did not print on the

18   first lamination core sheets, or a prelam as

19   we call it in the industry.  I did.  By

20   printing on that prelam, you eliminate

21   thicknesses of plastic core stock.

22   Q    Anything else?

23   A    The difference was in the chip that we

24   had.  The design of the inlay and chip is

25   much different than what Motorola had.

1    Q    Anything else?

2    A    It would be much easier.  No, I would

3    say that would cover it.

4    Q    Are the pressures and temperatures you

5    use in your invention different than that

6    that were used at Motorola?

7         MR. GUTKIN:   Vague and ambiguous.

8    Lacks foundation, compound.

9         THE WITNESS:   I don't recall all the

10   temperatures that I used at Motorola,

11   because I was in there using many different

12   temperatures at Motorola.  When I left, I

13   don't know what they did.

14   BY MR. JACOBS:

15   Q    I'm not asking what they did while --

16   after you left.  I'm asking solely while you

17   were there.  You can't testify to what you

18   don't know.

19   A    Yeah.

20   Q    Well, Motorola did use a heating phase

21   and followed by a cooling phase, correct?

22   A    Right, that's correct.

23   Q    Did -- at Motorola, the pressures during

24   the cooling phase were greater than the

25   pressures during the heating phase?

1    A    I don't know about the surface pressure.

2    Their ram pressure might have been greater,

3    but what the surface pressure of the plastic

4    core sheet, I'm not certain what that was.

5    Q    Did you ever know what the surface

6    pressure at the core sheet was at Motorola?

7    A    No, I don't think I ever got that broken

8    down mathematically.

9    Q    And you don't have any documents that

10    would refresh your recollection --

11    A    No.

12    Q    -- as to that?

13    A    No.  Everything I did at Motorola stayed

14    at Motorola as far as information is

15    concerned.  The documentation that I made

16    was in a scrapbook log that was kept at

17    Motorola.

18    Q    Do you know where that log is today?

19    A    No, I don't.

20    Q    Did you make entries in that log?

21    A    Only what I was doing there.  Yes, I

22    made entries in that log, but those entries

23    that I made in the log would only be good

24    for that type of laminator.  It would not

25    work on any other laminator.

**EXHIBIT 47**

*****CONFIDENTIAL DEPOSITION****

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Leighton Technologies, LLC, )

   Plaintiff-Counterclaim  )

   Defendant,         )Case No.

   -vs-           )04Civ

Oberthur Card Systems, S.A.,)2496(CM)

   Defendant-Counterclaim  )

   Plaintiff.       )

- - - oOo - - -

Continued deposition of KEITH R. LEIGHTON, a witness herein, called by the Defendant- Counterclaim Plaintiff, as if upon cross-examination under the statute, and taken before Luanne Stone, a Notary Public within and for the State of Ohio, pursuant to the issuance of notice and subpoena, and pursuant to the further stipulations of counsel herein contained, on Monday, the 10th day of October, 2005 at 9:00 o'clock A.M., at the Renaissance Hotel, the City of Cleveland, the County of Cuyahoga and the State of Ohio.

*****CONFIDENTIAL DEPOSITION*****

**Tackla & Associates**
Court Reporting & Videotaping

Tackla & Associates Ohio Savings Plaza
1801 E. Ninth Street
Cleveland, Ohio 44114
216-241-3918 • Fax 216-241-3935

```
1    A:      Yes.

2    Q:      Why -- on what facts do you reach

3    that conclusion?

4    A:      If I had a contactless laminator

5    where I had zero pressures of the platens, I

6    could produce a card as that reads in my

7    patent.  The bottom platen here, before even

8    going into a heating cycle when the sheets

9    are rigid and hard, are already receiving

10   close to 2000 pounds pressure of the

11   weight -- dead weight of the platens before

12   it's even into operation.  That's not

13   acceptable in contactless smart cards.

14   Q:      While you were at Motorola, you were

15   never able to test whether, in fact, a

16   process that used zero pressure at the

17   beginning would produce an acceptable --

18   acceptable yield; is that correct?

19   A:      That's correct.

20   Q:      Did there ever come a time when you

21   were able to test to see if your process

22   which started with a zero pressure would

23   produce an acceptable yield?

24   A:      Not at Motorola.

25   Q:      Did there come a time anyplace where
```

                                    TACKLA & ASSOCIATES

**EXHIBIT 48**

1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5    LEIGHTON TECHNOLOGIES,              :
                                         :
6               Plaintiffs,              :
                                         :
7          vs.                           :   No. 04-CV-02496
                                         :
8                                        :
     OBERTHUR CARD SYSTEMS, S.A.,        :
9    OBERTHUR CARD SYSTEMS OF            :
     AMERICA CORPORATION,                :
10                                       :
               Defendants.               :
11

12                  --oOo--

13

14           VIDEOTAPE DEPOSITION OF

15                KEN THOMPSON

16                 VOLUME I

17    _____

18              May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24             New York, New York 10022
                  212-750-6434
25                REF: 80728

137

                                THOMPSON

1  
2    the status of the deliverables that the basic simple

3    things that we asked for, he did not do, did not

4    document in the processes.  Did not have any

5    coherent requirements documents, did not produce a

6    process traveler.  It was well below our

7    expectations.

8              MR. J. D. JACOBS:  Let's mark as the next

9    Exhibit a document bearing Bates stamp L06532.  It's

10   a fax on Motorola letterhead from Grace O'Malley.

11   That will be Exhibit 2,679.

12                        - - -

13              (Whereupon the document was marked,

14              for identification purposes, as Exhibit

15              Number Two Thousand Six Hundred

16              Seventy-Nine.)

17                        - - -

18   BY MR. J. D. JACOBS:

19        Q.   Do you recognize Exhibit 2,679?

20        A.   I don't recognize seeing it before, but I

21   do recognize -- I know who Grace O'Malley is, I know

22   who Keith Leighton is, and I know the circumstances

23   that led up to Grace's response to Mr. Leighton.

24        Q.   What were the circumstances that led up to

25   Grace's response to Mr. Leighton?

138

THOMPSON

A.   At some point in time, which I believe to

be in 1995, approximately, Motorola had created a

smart card, or was thinking to create a smart card

group overall.  Semiconductor products were -- were

producing smart card modules.  Motorola new ventures

business development was in a corporate function and

they were incubating a business idea in case to set

up a new Motorola business to make smart cards.  And

in particular they wanted to make combi cards, dual

interface cards, which is a smart card module,

embedded in a card which is also attached to an

internal antenna.  We also -- they also wanted to

develop just a pure contactless card.

         So in 1995 that was being kicked around by

our business development and marketing geniuses,

professionals, and -- in our corporate.  And then

they -- the corporate people had went to their

sister corporate department, called Corporate

Manufacturing Research Center, who was run by Bill

Beckenbau (ph) at that time.  And Grace O'Malley was

a Ph.D. materials, engineer group leader type

person, who -- and CMRC had established two or three

people to study the smart cards, how to make the

combi cards.

THOMPSON

1
2          So they had been in contact with me in the
3     past at some point, but in 1990 -- in late 1996,
4     Motorola had decided to formally move this business
5     incubation, new ventures from a corporate function
6     to a new business unit, so that created a smart card
7     solutions division.
8          And the smart card solutions division had
9     contracted with a CMRC personnel to help further
10    develop -- or to continue the work that they had
11    been doing on combi cards.  And by this date of
12    March 27th, 1997, I was working full-time on smart
13    card solution division products, combi cards and
14    contactless 13.56 megahertz cards, and I was working
15    practically zero amount for the Motorola Indala
16    product.
17         So I was working very closely with Grace
18    O'Malley, Kearon Gore (ph), a couple of other
19    people.  And I think what prompted this, there is
20    maybe a CardTech SecureTech, some kind of trade
21    industry meeting in Chicago area, or somewhere in
22    the Midwest which Grace O'Malley and a couple of
23    other people from Motorola attended who were working
24    on developing these combi cards, the lamination
25    process, the antenna structure, the interconnect

THOMPSON

methods, et cetera, and the contactless smart cards.

I was also at that show.  It just so happened that Mr. Leighton was also at that show. He recognized some people's names on their badges as being from Motorola, and engaged Grace O'Malley in conversation, and others in conversation, essentially stating, I developed the RFID card lamination product and process for Motorola.  But since I left there, I perfected it, and now I've got it -- it's even working better.  I've done process development work.  It's wonderful.  You know, I know how to do it for the combi card too, you know, hire me, hire me, hire me.

In fact, Grace O'Malley, and I think another individual CMRC came to me same day or a couple days later, and says, wow, we found this guy that knows how to make combi cards, knows how to make this, that -- contactless cards.  And he says he's worked for you in the past.

And I asked them who it was.  They told me it was Keith Leighton, and I go, I'm very surprised Mr. Leighton is even telling you that.  And it was -- it was somewhat shocking to me to hear that Keith was telling people that -- in fact, he was

THOMPSON

2 telling everyone, not just people from Motorola,

3 other people -- other from that Motorola show came

4 up to me and says, there's this guy going around

5 saying he developed a product for Motorola, and he's

6 got a patents on it.  And I'd never heard of this,

7 and I just couldn't believe that Keith Leighton

8 would say that he's got patents on something that we

9 were doing.

10       So -- because the reason that Motorola

11 didn't patent things at Motorola Indala is it was

12 more trade secret, and it was process patents.  And

13 enforceability of process patents in our experience

14 has been very difficult.  I should say a

15 process/method patent.

16       And so I suppose, from my understanding

17 from Grace, Grace says, well, I've got to give this

18 guy a response, and I want to give him a formal

19 response, instead of just over the phone.  And I'm

20 not sure if she consulted their attorneys in

21 Chicago, Motorola's attorneys in Chicago to

22 determine what kind of response to send him, but

23 Grace did eventually send this response to Mr. Keith

24 Leighton.

25       Q.  Have you seen Mr. Keith Leighton since

EXHIBIT 49

Page 522

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

LEIGHTON TECHNOLOGIES, LLC, )

        plaintiff,     )

vs.               ) Case No.

                 ) 04 Civ. 02496 (CM)

OBERTHUR CARD SYSTEMS, S.A. )

and OBERTHUR CARD SYSTEMS  )

OF AMERICA CORP.,       )

        defendants.   )

- - - - -

(Volume III - pages 522 through 875)

- - - - -

Continued videotaped deposition of

KEITH LEIGHTON, a witness herein, called by the

defendants as if upon cross-examination, and

taken before David J. Collier, RPR, Notary

Public within and for the State of Ohio,

pursuant to Notice of Deposition and pursuant to

the further stipulations of counsel herein

contained, on Monday, the 23rd day of October,

2006 at 8:02 a.m., at the offices of Tackla &

Associates, 1020 Ohio Savings Plaza, City of

Cleveland, County of Cuyahoga and the State of

Ohio.

ded6f7f6-daef-4705-a501-eb03c1d19420

1    patent-related application work?

2    A    On this first one, yes.

3    Q    All right.  On the first provisional that

4    was filed?

5    A    Yes.

6    Q    At some point did somebody else begin to

7    pay the attorney's fees?

8    A    Not at that time.

9    Q    At some point did somebody -- somebody did?

10    A    I had to borrow money in order to complete

11    it.

12    Q    Okay.  How much did you personally pay to

13    have the patents filed, for the patent work?

14    A    I don't recall that.

15    Q    Do you remember if it was 1,000 or 10,000?

16    A    I don't recall that.

17    Q    You have no idea --

18    A    No.

19    Q    -- how much it was?

20    A    No.

21    Q    Not significant enough to stick in your

22    mind in any way?

23              MR. GUTKIN:        Object to form.

24    A    No.

25    Q    Okay.  And at some point someone else came

1    in and started to pay for the patent application

2    work?

3    A    I had my son help me.

4    Q    Okay.

5    A    It was within the family.

6    Q    Okay.  And did anybody outside the family

7    ever pay for any of your patent applications for

8    patents?

9    A    I don't know if it was to deal with this

10    one --

11    Q    Okay.

12    A    -- but I did borrow money and give up a

13    portion of my patent rights.

14    Q    Okay.  And who did you give up a portion of

15    your patent rights to?

16    A    I had three investors that come in --

17    Q    Okay.

18    A    -- not just for this patent but for the

19    other ones also.

20    Q    All in the same area, right?

21    A    Right.

22    Q    There's a group of patents here.

23    A    Right.

24    Q    These are all RFID process patents, right?

25    A    Correct.

ded6f7f6-daef-4705-a501-eb03c1d19420

Page 770

1    Q    And who were the investors?

2    A    There was three investors.  One of them --

3    or two of them worked with my son at Ford Motor.

4    Q    Okay.

5    A    And one was a friend that owns a shoe

6    store.

7    Q    Okay.  And they still have interest in the

8    patents?

9    A    Each.  Yes, they do.

10   Q    And at any point did anyone else take an

11   interest in the patents?

12   A    These investors were assigned and it was

13   recorded at the Patent Office.

14   Q    Okay.  They were assigned a percentage of

15   the --

16   A    Right.

17   Q    -- patents.  Okay.

18        And did anyone else, anybody else in

19   the world ever contribute to the funds that went

20   into the patent application process and your

21   patents?

22   A    No.

23   Q    At some point did somebody else take an

24   interest, a financial interest in your patents?

25   A    That's when we joined with General Patent

Tackla & Associates

ded6f7f6-daef-4705-a501-eb03c1d19420

EXHIBIT 50

Robert A. Gutkin, Esq. (Pro hac vice)
Blair M. Jacobs, Esq. (Pro hac vice)
Christina A. Ondrick (Pro hac vice)
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC  20004-2415
Tel:  202-383-0100
Fax:  202-637-3593

Attorneys for Plaintiff
LEIGHTON TECHNOLOGIES LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEIGHTON TECHNOLOGIES LLC, | 04 Civ. 02496 (CM) |
| Plaintiff and Counterclaim Defendant, | **DECLARATION OF KEITH R. LEIGHTON** |
| v. | |
| OBERTHUR CARD SYSTEMS, S.A., and OBERTHUR CARD SYSTEMS OF AMERICA CORP. | |
| Defendants. | |

I, Keith Leighton, hereby declare under penalty of perjury, as follows:

1.    I am the inventor of US Patent Nos. 5,817,207; 6,036,099; 6,514,367; and 6,214,155. This declaration is submitted in support of Leighton Technologies Opposition to the Defendant's Summary Judgment Motion for Invalidity.  The information set forth herein is based upon my own personal knowledge, and if called as a witness I would testify thereto.

2.    I am 73 years old and I have a high school diploma from Berkley High School in Berkley, Michigan, which I received in 1952.  I have been involved in the color printing industry since 1953, when I first began working for General Motors as a

Plate Maker/Engraver. From 1970 –2000 I continued to work in the field of color printing, as well as working for a number of companies that manufactured plastic cards. Over the course of my career I have developed substantial hands on experience in the lamination of plastic cards, and I have served as a consultant for both the lamination and printing processes used to make such cards. I currently work as a machine operator at Invacare, a company that makes wheelchairs in Elyria, Ohio.

3.  For many years standard plastic cards, and more recently contactless smart cards, have been made using the process of lamination. In general, the lamination of smart cards involves sandwiching electronic elements between layers of plastic and sealing them with heat and pressure.

a.  The first step in the manufacture of a contactless smart card, or any plastic card for that matter that will be laminated involves building "books" made of layers of plastic, electronic elements (in the case of contactless cards), pads, and metal plates all of which sit in a lamination tray. A book may be made up of many layers of cards, similar to the single card layer illustrated at 135 from page 1 of my '155 patent.



The following pictures illustrate the actual assembly of a book being built in a lamination tray. The book contains multiple layers of cards that are separated by pads and plates:











b.  The lamination tray containing the book is then placed into the daylight, or

opening, in lamination machines similar to the ones set forth below.





SINGLE STACK LAMINATOR



DUAL STACK LAMINATOR

c.  Over a set period of time, varying temperatures and pressures are applied to the book in order to laminate the materials and make a finished contactless smart card. In my method, I make sure that the plastic in the book is heated so that when any substantial pressure is applied to the sensitive electronics contained within each card, they can be safely encapsulated within the plastic. The electronics at the center of a contactless card can be extremely fragile.

4.  As background, the following explains how I came to appreciate the problems that are faced in laminating sensitive electronics into a plastic card using temperature and pressure. In early 1995, I was contacted by Motorola and asked to come visit their facility in San Jose, California to assist them in their production of an employee identification card to be used by Microsoft employees. I was told that Bill Sanko, a business acquaintance and friend of mine, had been in touch with Motorola and had suggested that I might be able to help them make such a card.

5.  I visited the Motorola facility and was shown the laminating machine that they were using to make their identification cards. The laminator was actually designed to make printed circuit boards and not plastic cards. The laminator was a dual stack laminator. It had a separate ram (press) for the heating phase and one for the cooling phase.

6.  As I came to learn once I was at the Motorola facility, the rams on their machine were designed to exert more pressure during the heating phase of the lamination cycle than during the cooling phase of the cycle. Also, because of the weight of the platens (about 450 pounds), substantial weight or pressure was exerted on the cards by merely closing the laminator, before the cards could be heated and the plastic softened. By closing each of the daylights or openings from the bottom of the

laminator to the top, additional weight was added for each of the platens onto the cards. The cards on the bottom daylight or opening had the greatest amount of weight or pressure exerted upon them before the lamination process could even be started. There was also a delay or dwell time between the two cycles. This meant that after the cards came out of the heating phase of the laminator, they had to sit with no heat and no pressure before they were able to go into the cooling phase of the machine.

7.    These features of the Motorola laminator ultimately made it difficult for me to provide Motorola with a satisfactory yield of cards that worked. In order to activate the heat and subsequently maintain the heat on the platens, and ultimately the card material, the daylights or openings would have to be shut. The application of too much pressure from merely closing the laminator on the material in the bottom daylights or openings, and too much pressure during the heating phase of the lamination cycle did not enable me to obtain the yields that Motorola wanted. There were physical differences in the finished cards based upon which daylight or opening had been used to make the cards. The platens were warped, and there were differences in temperature and pressure between platens and between different lamination cycles. Also, Motorola provided me with electronics to laminate into the plastic cards that were thicker than the ISO card standards. ISO is an international standards organization. Certain types of plastic cards must meet ISO standards in order to be accepted. For example, a card must be a certain thickness in order to go into an ATM machine and to properly read the magnetic stripe that is on the card. The antenna that Motorola provided was much thicker than the ISO standards, as well as being thicker than the chip that sat inside the antenna. The antenna did to some extent act as a

buffer and provide the chip with some protection from the pressure being exerted upon the card when the platens were closed and additional pressure was applied during the heating cycle. Ultimately, I did make a number of cards at Motorola, but Motorola was unhappy with the yield that I obtained using their components and laminator. Motorola did not pay me the bonus provided by our consulting agreement, because they maintained that I did not satisfy the criteria for receiving a bonus. My last day at Motorola was April 5, 1995.

8.    I continued to think about the problems I had encountered at Motorola, which had resulted in my inability to make a contactless smart card that satisfied their demands. Over the course of the next several months I came up with a new and different method that I believed would enable me to produce a contactless smart card that was smooth enough to accept dye sublimation printing, but also thin enough to satisfy ISO thickness standards. Because of the sequence of temperature and pressure that I used in my method, I was able to safely embed the sensitive electronics into the card without the use of any protective device around the electronics.

9.    In October of 1995 my attorney at the time, Steve Haas, filed a provisional patent application on my method of manufacturing smart cards. I understand that the provisional application subsequently led to the patents that are the basis of this lawsuit.

10.    In early 1996, I made a number of cards at a company that I had worked at for approximately 11 years, CSI (which was formerly known as 2B Systems) using the method that had been described in my provisional application. I made the cards on the single stack laminator that was at CSI. The cards were smooth enough to accept

dye sublimation printing, but also thin enough to satisfy ISO thickness standards. Also, I did not use any protective device for the sensitive electronics, inlays of Phillips electronics, inserted into the card.

11.  As I indicated at my deposition, I had previously heard of the company called Oakwood Design. After I left 2B Systems, a company that I worked at from 1970 – 1981, the owner of 2B Systems (which had then changed its name to CSI), invested in the Oakwood company before it went into bankruptcy. CSI apparently had also purchased an Oakwood Design laminator, which later caught fire. I understand from seeing the document that one of the former principals of Oakwood Design, Richard Smith, has submitted a declaration stating that certain of the Oakwood materials attached to the declaration show the inventions in my patents. I have reviewed the Oakwood materials and I do not see any explanation of how to encapsulate electronics, as per my patent to make a contactless smart card. I also understand from seeing the document that one of Oberthur's employees, Barry Mosteller, has similarly attached Oakwood materials to his declaration, and is also claiming that the Oakwood materials attached show the inventions in my patents. The same problems also apply to the Oakwood materials attached to Mr. Mosteller's declaration. In each of their declarations they talk about one of the graphs from the Oakwood materials. I was asked at my deposition about the graph, and I had a hard time understanding the graph because it does not have any numbers or explain any of the abbreviations that are used. However, if I use the abbreviations and explanation provided by both Mr. Mosteller and Mr. Smith, it does not show my inventions. In fact, the graph shows the type of pressure and temperature that did not work at Motorola. The graph shown

in the Oakwood materials, appears to apply substantial pressure before the plastic is given the chance to heat up.

12.    In my inventions, I heat the card material before applying substantial pressure. I do this in order to soften the plastic before the electronics are pressed into the plastic material. If I understand the way in which Mr. Mosteller and Mr. Smith have explained the Oakwood graph, it shows applying a first pressure (which can be called P1) before the plastic has been heated to a first temperature (T1) for a first time period. I know from my experience at Motorola, where I could not avoid putting substantial pressure on the card material before it had a chance to heat up, that making a card in the manner was problematic in terms of obtaining a satisfactory yield. In fact, my experience with these types of problems led me to come up with the different method that I use in my patents.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this _6_ day of December, 2005, at Cleveland, Ohio.

_Keith R. Leighton_
Keith R. Leighton

**EXHIBIT 51**

1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5   LEIGHTON TECHNOLOGIES,             :

6               Plaintiffs,            :
                                       :
7               vs.                    :   No. 04-CV-02496
                                       :
8                                      :
    OBERTHUR CARD SYSTEMS, S.A.,       :
9   OBERTHUR CARD SYSTEMS OF           :
    AMERICA CORPORATION,               :
10                                     :
                Defendants.            :
11

12               --oOo--

13

14          VIDEOTAPE DEPOSITION OF

15               KEN THOMPSON

16               VOLUME I

17   _____

18          May 4, 2006

19

20   REPORTED BY:  KENNETH T. BRILL, RPR, CSR 12797

21

22

23   ELLEN GRAUER COURT REPORTING CO. LLC
       126 East 56th Street, Fifth Floor
24         New York, New York 10022
              212-750-6434
25             REF: 80728

55

THOMPSON

was me that was hiring him.

Q.    And what -- what exactly were you looking
for Mr. Leighton to contribute to Indala?

A.    In general, overall, I would say I was
looking for him to contribute experience, knowledge
and processes and procedures when it comes to
laminating cards and producing cards.  There is more
processes than just the lamination.  There is the
printing.  There is the cutting.  There is a
punching of the cards.  There is a handling of the
cards.

And I -- no one in our facility had
experience in high volume manufacturing of cards.
We were not comfortable using our supplier
Caulastics to -- to really teach us a lot of that,
because we were sort of going to be taking business
away from them, so to speak.

So in particular, I was looking for an
experienced person in the card lamination -- or card
manufacturing arena to give us really good insights
on things to improve our operations, our processes,
our materials, our toolings, et cetera.

Q.    Were you looking for help in designing the
structure of the card?