IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LEIGHTON TECHNOLOGIES LLC,

     Plaintiff,

          vs.

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

     Defendants.

OBERTHUR CARD SYSTEMS, S.A. and
OBERTHUR CARD SYSTEMS OF
AMERICA CORPORATION,

     Counterclaim Plaintiffs,

          vs.

LEIGHTON TECHNOLOGIES LLC,
GENERAL PATENT CORPORATION
INTERNATIONAL, GENERAL PATENT
CORPORATION, and IP HOLDINGS LLC,

     Counterclaim Defendants.

04 Civ. 02496 (CM) (LMS)

**PLAINTIFF LEIGHTON
TECHNOLOGIES LLC'S RESPONSE
TO DEFENDANTS' STATEMENT OF
MATERIAL FACTS FOR THEIR
MOTION FOR SUMMARY
JUDGMENT OF NON-
INFRINGEMENT**

**Hon. Colleen McMahon**

**Magistrate Judge Lisa M. Smith**

January 26, 2007

WO 684997.1

Pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiff Leighton Technologies LLC ("Leighton") submits this Response to Defendant's Statement of Material Facts in support of their Motion for Summary Judgment of Non-infringement:

1.    **Oberthur Statement:**  Leighton Technologies LLC ("Leighton Tech") is asserting ten claims of two patents in this case: claims 1, 4, 6-7, and 16 of the '207 patent, and claims 1, 4, 6-7, and 15 of the '155 patent. Pursuant to the Stipulation and Order dated July 25, 2006, Leighton Tech agreed to dismiss, without prejudice, two of the four patents it originally asserted in this case. (Ex. 3.)

**Leighton Response:**

Agree.   Leighton agreed to dismiss, without prejudice, two of the four patents it originally asserted in this case, and Oberthur agreed to keep Leighton apprised of sales of cards that had been accused of infringement under those patents.  Docket Entry No. 128 (July 25, 2006 Stipulation and Order).

2.    **Oberthur Statement:**  The Leighton Patents relate to the manufacture of plastic "smart cards," which include an electronic element that communicates with a card reader using radio frequency identification ("RFID") technology.  *Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361, 369 (S.D.N.Y. 2005) (Ex. 4.)

**Leighton Response:**

Disagree.  The Leighton Patents relate to the manufacture of plastic "smart cards," which include electronic *elements* that communicate with a card reader using radio frequency identification ("RFID") technology.  (Gutkin Dec. Exs. 1 and 2 ('207 patent; '155 patent); *Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361, 370-376 (S.D.N.Y. 2005)).

1

3.      **Oberthur Statement:**  Leighton Tech does not contend that it was the first to manufacture a smart card, nor does it contend that it owns the design or structure of any particular electronic element, such as a chip and antenna assembly. (See Ex. 1, 3:53-54; Ex. 5, *Markman* Tr. 6:7-16.)

**Leighton Response:**

Disagree in part.  Leighton does not contend that it was the first to manufacture a smart card. Leighton claims a process.  It does not contend that it has patent rights in the electronic elements themselves.   (Declaration of Robert Gutkin In Opposition To Oberthur's Motion For Non-infringement ("Gutkin Dec.") Ex. 30, (*Markman* Tr. 6:5-20); *Leighton Techs. LLC, supra,* 358 F. Supp. 2d at 370-376).

4.      **Oberthur Statement:**  Leighton Tech asserts that the patents claim an improved lamination process over the prior art because the claimed process steps allow for a simplified card structure. This simplified card structure has two key features: (1) there is no need to protect the electronic element using any of the "non-electronic carriers" (including a recess) set forth in the prior art; and (2) the "electronic element" is positioned "directly between . . . first and second plastic core sheets to form a core."

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. Leighton claims the full breadth and scope of what the patent claims provide.  The goals of the inventions are to obtain an ISO standard card that has a flat smooth finish suitable for printing. The process steps for achieving those goals are set forth in the patents and include a highly coordinated card structure and lamination process.  A limitation in the patents includes

WO 684997.1

"positioning said at least one electronic element in the absence of a non-electronic carrier directly between…plastic core sheets."  (Gutkin Dec. Exs. 1 and 2, ('207 and '155 patents)).

5.    **Oberthur Statement:**  The structure of Oberthur's cards is different from that required by the patent claims because: (1) the electronic element, a chip and associated antenna, *is not placed directly between the core sheets,* and (2) *they contain a recess* – a non-electronic carrier.

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. Oberthur's cards contains "at least one electronic element", the antenna and/or antenna bridge, that are placed "directly" between the core sheets "in the absence of a non-electronic carrier". (Declaration of Dr. David Everett ("Everett Dec.") ¶¶ 12-19 and 21-23).

6.    **Oberthur Statement:**  In all of Oberthur's cards, the chip is positioned directly below a recess or hole that is cut out of an adjacent plastic sheet. Oberthur's recess creates a barrier around the electronic element, which protects the element from damage during lamination.

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. Leighton agrees that in each of the Oberthur cards a hole is cut directly above the chip, and that in the course of lamination that hole protects the chip.  (Gutkin Dec. Ex. 3 (Stipulation Regarding Accused Products, hereinafter "Stipulation," pp. 2-8)).

7.     **Oberthur Statement:** In the report of its technical expert, Leighton Tech does not dispute that the recess in Oberthur's cards is a non-electronic carrier that protects the chip during lamination.

**Leighton Response:**

Disagree in part. Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact.

Leighton is not asserting that the chip in the Oberthur cards is the "*said at least one electronic element*". (Everett Dec. ¶ 14).

8.     **Oberthur Statement:** In asserting infringement, Leighton Tech separates the chip and antenna assembly in Oberthur's cards into "separate" electronic elements, and contends that because there is allegedly no recess or protection for the antenna, Oberthur's cards are covered by the claims.

**Leighton Response:**

Disagree. Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. The chip and antenna and/or the bridge are separate electronic elements. The antenna and/or bridge are positioned "in the absence of a non-electronic carrier directly between …plastic core sheets". (Everett Dec. ¶ 15). The other limitations of the asserted claims are also present and therefore the patents are infringed, but those other limitations are not the subject of the present motion by Oberthur. (Everett Dec. ¶ 11).

9.     **Oberthur Statement:** Six of the asserted dependant claims specifically refer to a chip and antenna combination. The claims refer to a "micro-chip and associated wire antenna" as

"one electronic element." For example, claim 12, which depends from claim 1, states that the phrase "one electronic element" used in claim 1 "is a micro-chip and an associated circuit board antenna."

**Leighton Response:**

Disagree. Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. None of the asserted claims (claims 1, 4, 6-7, and 16 of the '207 patent, and claims 1, 4, 6-7, and 15 of the '155 patent) specifically refer to a chip antenna combination as a single electronic element. (Gutkin Dec. Exs. 1 and 2 ('207 and '155 patents)).

10.    **Oberthur Statement:** Leighton Tech's position treats the two Oberthur card types at issue in this case, called the "Amex" and "Xenon" cards, identically for infringement purposes.

**Leighton Response:**

Unclear. Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. Because Oberthur fails to provide and cite evidence, Leighton has absolutely no idea what Oberthur is maintaining by this statement. Leighton's position regarding the presence of the limitation at issue in each of Oberthur's cards, is set forth in greater detail in Leighton's Memorandum in Opposition, and in the Everett Declaration. (Everett Dec. ¶¶ 12-19 and 21-23).

11.    **Oberthur Statement:** In the Xenon cards, the antenna is without question protected by a non-electronic carrier – it is embedded into a plastic sheet by an ultrasonic process prior to lamination.

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact.  The antenna and/or the bridge are not protected by a non-electronic carrier.  The ultrasonic process is used merely to hold or tack the antenna in place, much like glue.  (Everett Dec. ¶ 19).  A portion of the antenna sits above the surface, and the antenna is "directly" in contact with both core plastic sheets prior to lamination.  The bridge connecting the antenna is on the surface of the bottom plastic core sheet and is "directly" in contact with the plastic core sheets.  (Everett Dec. ¶ 19).

12.    **Oberthur Statement:**  In the Amex cards, the antenna is thin and flat and there is no need for a protective non-electronic carrier.

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact.  The antenna is thin and flat, and may or may not need protection in the course of lamination.  Oberthur presents no evidence one way or the other.  However, whether or not the antenna needs protection, Oberthur still infringes the claims setting forth the steps of the Leighton process, which are likely practiced to achieve other goals of the invention such as a flat, printable, ISO standard smart card.  (Everett Dec. ¶ 19).

13.    **Oberthur Statement:**  The Leighton Patents describe processes for making smart cards, and claim the use of a "highly coordinated" lamination process involving heat, cooling and the application of pressure to encapsulate an electronic component essential to signal transmission. *Leighton*, 358 F. Supp. 2d at 364.

WO 684997.1

**Leighton Response:**

Leighton agrees that the statement is an accurate quote from the Court's Markman decision, and only adds that more than one "electronic element" can be encapsulated in a single card. *Leighton*, *supra*, 358 F. Supp. 2d at 370-76.

14.    **Oberthur Statement:**  The patents allegedly are an improvement over the prior art by eliminating the need to create a protective barrier around the embedded electronic element, thereby simplifying the manufacturing process. (*Id.*; *see also* Ex. 11, Leighton 10/23/06 Tr. 793:3-794:7.)

**Leighton Response:**

Leighton disagrees that the above is the sole improvement of the Leighton inventions over the prior art.  Leighton agrees that one of the novel aspects of the inventions is the "absence of a non-electronic carrier" with regard to "said at least one electronic element".  This can result in simplifying the manufacturing process, as well as facilitate obtaining a flat, printable, ISO standard smart card.  (Gutkin Dec. Ex. 1 and 2 ('207 and '155 patents)).

15.    **Oberthur Statement:**  The two patents-in-suit share a common specification. The "Background of the Invention" section of the specification explains that "[o]ne of the biggest obstacles to the wide spread manufacture and use of RFID cards has been the inability of card manufacturers" to make cards that are "sufficiently aesthetically pleasing," and "have a sufficiently regular or flat surface," which can receive "dye sublimation" printing. (Ex. 1, 1:61-2:14.) In other words, the presence of an electronic element complicates the card manufacturing process.

**Leighton Response:**

Leighton generally agrees with the accuracy of the partial quotes from the two patents at issue. Moreover, Leighton agrees that the presence of foreign objects, be it one or more electronic elements, makes the manufacturing process for achieving a flat, printable, ISO standard smart card more difficult.  (Everett Dec. ¶9, p. 12).

16.     **Oberthur Statement:**  In the section titled "Detailed Description of the Invention," the specification describes the various forms that the electronic elements can take. The section begins by depicting Figure 1 (set forth below), and states: "Referring now to FIG. 1, there can be seen a plastic RFID card 10 manufactured in accordance with the present invention and including an electronic element 20 embedded therein." (*Id*. at 3:42-45.) (emphasis added). In this Figure, the ***electronic element*** is the chip and antenna combination are shown by the dotted line.



FIG.-1

**Leighton Response:**

Leighton generally agrees with the accuracy of the partial quotes from the specifications. Leighton disagrees with Oberthur's mischaracterization of "electronic element", to the extent that it is contrary to the Court's claim construction , and for example ignores the language defining element 20 which states that it "may take a wide variety of forms and perform a wide variety of functions".  (Gutkin Dec. Exs. 1 and 2 ('155 patent, 3:46-47; '207 patent, 3:46-47); *Leighton Techs. LLC,* 358 F. Supp. 2d at 370-76).

8

17.     **Oberthur Statement:**  The specification then explains that the electronic element "may

take a wide variety of forms and perform a wide variety of functions." It then describes

three figures that depict specific electronic element consisting of chip and antenna

combination:

> As shown in Fig. 3A-3C respectively, electronic element 20, 20', 20" may be
> provided by a micro-chip 22 including a wire antenna 24 connected thereto, a
> micro-chip 22' and a circuit board antenna 24', a read/write micro-chip 22" and a
> wire coil antenna 24", or any other suitable electronic element.

(*Id*. at 3:48-52.) Figures 3A, 3B, and 3C are set forth in the specification as follows:



**Leighton Response:**

Leighton generally agrees with the accuracy of the partial quotes from the specifications, and

that FIGS 3A-3C "are top plain views of various electronic elements that may be embedded in a

card in accordance with the present invention."  (Gutkin Dec. Exs. 1 and 2 ('207 patent; 3:1-3;

'155 patent; 3:1-3)).  Other types of electronic elements are set forth in the related '099 and '367

patents, as well as discussed in the Everett Decl., including specific types of microchips with an

integrated antenna.  (Everett Dec. ¶ 9, p. 14 and ¶14, p. 18).

18.     **Oberthur Statement:**  The specification explains in the next sentence that

"[t]hese electronic elements 20, 20', and 20" and their insertion into plastic cards is not new . . ."

9

and that Leighton provides a "new hot lamination process for manufacturing plastic cards 10 with these electronic elements 20, 20', and 20" embedded therein such that the cards 10 are of a superior quality . . . ." (*Id.* at 3:53-58.)

**Leighton Response:**

Leighton generally agrees with the accuracy of the partial quotes from the specifications.

19.     **Oberthur Statement:**  The specification goes on to describe one procedure for making cards with embedded electronic elements. It explains that "a plurality of electronic elements 20 are positioned between the first and second sheets of plastic core stock 30, 32 . . . ." (*Id.* at 4:4-6.)

This is shown in Figure 5:



**Leighton Response:**

Leighton generally agrees with the accuracy of the partial quotes from the specifications.  Fig. 5-10 illustrate the manufacture of  "a plurality of cards".  (Gutkin Dec. Exs. 1 and 2 ('207 and '155 patents 4:3-6)).

20.     **Oberthur Statement:**  The specification shows in Figure 6 a side view of the sandwich of core sheets and multiple electronic elements:



10

**Leighton Response:**

Agree.

21.     **Oberthur Statement:**  At this point in the process, just after the sandwich of electronic elements and core sheets has been formed, there is not yet any encapsulation of the electronic elements (the patents depict encapsulated electronic elements using a dashed line (*see* Figs. 8-10) and non-encapsulated elements, such as shown in Figure 6, using a solid line).

**Leighton Response:**

Disagree with Oberthur's characterization.  Figure 6 is a cross sectional view of electronic elements positioned between sheets of plastic core stock prior to lamination.  Figures 8-10 illustrate the core being printed on after lamination; the application of an overlaminate film; and, the placement of the core and the overlaminate film in the laminator for final processing. (Gutkin Dec. Exs. 1 and 2 ('207 and '155 patents 3:11-25).  Electronic elements are represented by dotted lines and solid lines in the various Figures.

22.     **Oberthur Statement:**  The specification explains that "[w]hen a plurality of electronic elements 20 are positioned between first and second sheets [of] plastic core stock 30, 32, electronic elements 20 are properly positioned relative to one another such that a plurality [of] cards may be cut from the resulting card stock . . . ." (*Id*. at 4:7-11.)

**Leighton Response:**

Leighton agrees that this is an accurate partial quote from the specifications.

23.     **Oberthur Statement:**  The steps of the lamination process are then performed, as set forth in the patent specification, and as described in the Court's *Markman* ruling. *Leighton*, 358 F. Supp. 2d at 367-68.

**Leighton Response:**

Disagree.  The scope of Leighton's inventions, and the steps for the processes, are set forth by the claims.  The specifications contain descriptions and illustrations of certain embodiments, but as the Court stated in its claim construction, "it is hornbook law that a patent is not limited to its disclosed embodiments."  *Leighton*, 358 F. Supp. 2d at 373.  Certain words, terms, and phrases in those claims have been construed by the Court.  *Leighton*, *supra*, 358 F. Supp. 2d  361.

24.    **Oberthur Statement:**  Of the ten claims asserted by Leighton Tech, four are independent – claims 1 and 16 of the '207 patent, and claims 1 and 15 of the '155 patent. These pairs of independent claims in the two patents are nearly identical.

**Leighton Response:**

Leighton agrees that claims 1 and 16 of the '207 patent and claims 1 and 15 of the '155 patent are independent claims.  Leighton disagrees with Oberthur's characterization of the claims, there are similarities between the claims and differences between the claims.  (Gutkin Dec. Exs. 1 and 2 ('207 and '155 patents)).

25.    **Oberthur Statement:**  The only difference is that each of claims 1 and 15 of the '207 patent contain an additional limitation relating to printing. All four of the independent claims require that "at least one electronic element" be positioned directly between two plastic core sheets. Claim 1 of the '207 is set forth by example (Ex. 1, emphasis added):

1.    A process for incorporating <u>at least one electronic element</u> in the manufacture of a plastic card, comprising the steps of:

(a)    providing first and second plastic core sheets;

(b)    positioning said <u>at least one electronic element</u> in the absence of a non-electronic carrier directly between said first and second plastic core sheets to form a core, said plastic core sheets defining a pair of inner and outer surfaces of said core;

      (c)      positioning said core in a laminator apparatus, and subjecting said core to a heat and pressure cycle, said heat and pressure cycle comprising the steps of:

            (i)      heating said core for a first period of time;

            (ii)      applying a first pressure to said core for a second period of time such that said <u>at least one electronic element</u> is encapsulated by said core;

            (iii)      cooling said core while applying a second pressure to said core,

      (d)      coating at least one of said outer surfaces of said core with a layer of ink; and

      (e)      applying a layer of overlaminate film to at least on of said outer surfaces of said core.

**Leighton Response:**

Leighton agrees that claim 1 of the '207 patent differs from claim 1 of the '155 patent, by the existence of a printing step. Leighton also agrees that claim 16 of the '207 patent differs from claim 15 of the '155 patent, by the existence of a printing step. Leighton also agrees that Oberthur has accurately quoted claim 1 of the '207 patent, with the addition of new emphasis.

      26.    **Oberthur Statement:** Six dependent claims in the '207 and '155 patents specifically define the phrase "at least one electronic element" to consist of a chip ***and*** an antenna associated with that chip. Dependent claims 13, 14, and 15 in the '207 patent state as follows (Ex. 1, emphasis added.):

      13.    The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein *said at least one electronic element is a micro-chip and an associated wire antenna*.

      14.    The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein *said at least one electronic element is a micro-chip and an associated circuit board antenna*.

      15.    The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein *said at least one electronic element is a read/write integrated chip and an associated antenna*.

**Leighton Response:**

Leighton has not asserted any of the dependent claims that are cited. The electronic element "may take a wide variety of forms and perform a wide variety of functions". (Gutkin Dec. Exs. 1 and 2 ('155 and '207 patents, 3:46-47)). Other types of electronic elements are set forth in the related '099 and '367 patents, as well as discussed in the Everett Declaration, including specific types of microchips with an integrated antenna. (Everett Dec. ¶ 9, p. 14 and ¶14, p. 18). The cited language is an accurate quote, with new added emphasis, of unasserted dependent claims 13, 14, and 15 in the '207 patent.

27.    **Oberthur Statement:**  The comparable dependent claims in the '155 patent, claims 11-13, are identical – they define the "at least one electronic element" in exactly the same way: as a "***micro-chip and an associated wire antenna***" (claim 11), a "***micro-chip and an associated circuit board antenna***" (claim 12), and a "***read/write integrated chip and an associated antenna***" (claim 13). None of the other claims of either patent defines the "at least one electronic element" in any other way.

**Leighton Response:**

Disagree with Oberthur's mischaracterization of the term "electronic element". The specifications contain descriptions and illustrations of certain embodiments, but as the Court stated in its ruling on claim construction, "it is hornbook law that a patent is not limited to its disclosed embodiments." *Leighton*, 358 F. Supp. 2d at 373. Certain words, terms, and phrases in those claims, including "electronic element", have already been construed by the Court. *Leighton*, 358 F. Supp. 2d at 369-87. The electronic element "may take a wide variety of forms and perform a wide variety of functions". (Gutkin Dec. Exs. 1 and 2 ('155 and '207 patents, 3:46-47)). Other types of electronic elements are set forth in the related '099 and '367 patents,

as well as discussed in the Everett Declaration, including specific types of microchips with an integrated antenna. (Everett Dec. ¶ 9, p. 14 and ¶14, p. 18). The quoted language in unasserted claims 11, 12 and 13 of the '155 patent, with new added emphasis, corresponds to the language in unasserted claims 13, 14, and 15 in the '207 patent.

28.     **Oberthur Statement:** The absence of a non-electronic carrier "is the critical improvement of these patents over [the] prior art, specifically over U.S. Patent No. 4,450,024 [the "'024 patent"], which required protection for the electronic element during lamination." *Leighton*, 358 F. Supp. 2d at 369.

**Leighton Response:**

The actual quote from the Court's decision is " the absence of a 'buffer' or 'buffer zone' is the critical improvement of these patents over [the] prior art, specifically over U.S. Patent No. 4,450,024 [the "'024 patent"], which required protection for the electronic element during lamination." *Leighton*, 358 F. Supp. 2d at 369.

29.     **Oberthur Statement:** As shown below in Figures 1 (a finished identification card) and 2a (a cross-section of the card before lamination), the '024 patent disclosed that an "IC module" (item 5 in Figure) was placed in a "carrier element" (item 6) to protect it from damage during lamination (Ex. 25.):



15

**Leighton Response:**

Disagree in part.  Agree that embodiment 2a in the '024 patent shows an IC module in a carrier element, but it also shows a cavity 14, all of which serves to protect the IC module from lamination pressures.  (Gutkin Dec. Ex. 31 (U.S. Patent No. 4,450,024 ("the'024 patent")).

     30.    **Oberthur Statement:**  The '024 patent also "describe[d]" a "process for lamination" that is "similar" to that described in the Leighton Patents. *Leighton Tech v. Oberthur*, 423 F. Supp. 2d 425, 427 (S.D.N.Y. 2006) (Ex. 26.)

**Leighton Response:**

Disagree in part.  In the course of prosecution of the application that led to the '207 patent, the examiner found that certain aspects of the '024 patent were similar to the pending application. (*Leighton*, 358 F. Supp. 2d at 369; Gutkin Dec. Ex. 31 ('024 patent)).

     31.    **Oberthur Statement:**  To overcome the prior art '024 patent, Leighton amended his claims to specifically include a claim limitation requiring the absence of a non-electronic carrier. *Leighton*, 358 F. Supp. 2d at 369. For example, Claim 1 was amended as follows (new matter underlined, and deleted matter in brackets):

```
1.    A [hot lamination] process for incorporating at least one
      electronic element in the manufacture of a plastic card,
      [said process] comprising the steps of:
      (a)   providing first and second plastic core sheets;
      (b)   positioning said at least one electronic element in
      the absence of a non-electronic carrier directly between
      said first and second plastic core sheets to form a
      [layered] core, said plastic core sheets defining a pair of
      inner and outer surfaces of said core . . . .
```

(Ex. 9, at 1.) (emphasis added)

**Leighton Response:**

Agree.

WO 684997.1

32.    **Oberthur Statement:**  After making these amendments, Leighton then argued that the amended claims of the application were patentable over the '024 patent because they lacked the "protective elements," such as a recess, used in the '024 patent (*Id*. at 6.):

> The '024 patent claims a lamination process for making an electronic card which protects the electronic element of the card by first placing it in a recess formed within a card layer so as to avoid damage to the electronic element from localized pressure applied in the lamination process. The patent then requires that a "buffer zone" be present within the recess. Even the broadest of claims of the '024 patent require a recess and a buffer zone, for and protecting the electronic element. These are required by the '024 patent invention in order to enable the card assembly to be subjected to a full laminating pressure.
>
>     No such protective elements are desired or necessary to the invention of the present application . . . .
>
>     . . . The process of the present invention allows the electronics-containing core to be subjected to the full laminating pressure without use of a recess in a card layer. Unlike anything shown in the prior art, the electronic unit is placed directly between two (2) plastic sheets . . . .

**<u>Leighton Response:</u>**

Disagree in part.  Mr. Leighton's attorney raised a number of points in his remarks to the office action rejection.  He did state in part that "No such protective elements are desired or necessary to the invention of the present application".  (Gutkin Dec. Ex. 23 (Amendment dated Jan. 8, 1998 for Appn. No. 08/727,789, p.6, OCS_C_045600)).  Oberthur has provided a partial quote of the prosecuting attorney's comments.  Additional statements are set forth below in *italics and* ***bold***.

> The '024 patent claims a lamination process for making an electronic card which protects the electronic element of the card by first placing it in a recess formed within a card layer so as to avoid damage to the electronic element from localized pressure applied in the lamination process. The patent then requires that a "buffer zone" be present within the recess. Even the broadest of claims of the '024 patent require a recess and a buffer zone, for and protecting the electronic element. These are required by the '024 patent invention in

17

order to enable the card assembly to be subjected to a full laminating
pressure.

No such protective elements are desired or necessary to the
invention of the present application. ***Further the invention taught by
the '024 patent requires that the electronic element also be placed in
a protective carrier disk (6), which is subsequently located within
the recess.***

***The controlled use of a heat and pressure cycle of the present
invention eliminates the requirement of both a protective carrier disk
for the electronic element and/or a recess or other buffer zone formed
in one or more of the card layers for carrying and protecting the
electronic element.*** The process of the present invention allows the
electronics-containing core to be subjected to the full laminating
pressure without use of a recess in a card layer. Unlike anything
shown in the prior art, the electronic unit is placed directly between
two (2) plastic sheets . . . .

33.     **Oberthur Statement:**  The Examiner allowed the claims to issue after receiving

Leighton's amendment and argument explaining why its process eliminated the need for non-

electronic carriers to protect electronic elements, such as the chip and antenna combination

disclosed in the specification and claims.

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide

the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact.

The comments speak for themselves.  (Gutkin Dec. Ex. 23 (Amendment dated Jan. 8, 1998 for

Appn. No. 08/727,789, p.6, OCS_C_045600)).

34.     **Oberthur Statement:**  Leighton Tech confirmed during the *Markman* hearing

that the elimination of this protective element was "novel and something new" and "the main

reason why the first patent, the '207 patent, issued." (Ex. 12, *Markman* Tr. 59:16-60:21.)

**Leighton Response:**

Agree in part.  Leighton's attorneys made these statements in the course of the Markman

Hearing, along with:

> "We eliminated that and, in eliminating that, came up with something novel and
> something new.  That is the main reason why the first patent, the '207 patent, issued. The
> '024 that's correct.
>
>      So what we did was we amended the claims in the absence of a non-electronic
> carrier. We took out that protective holder, that disk shaped holder that was essentially
> shown in the prior art, and we explained that that's one of the benefits, one of the many
> benefits of this process, that we're able to –"

(Gutkin Dec. Ex. 32 (Markman Tr. 60:12 –21)).

35.    **Oberthur Statement:**  The Court's construction of three claim terms relevant to

this motion are set forth in the following table (the other construed terms relate to limitations not

at issue on this motion):

| Claim Term | The Markman Ruling |
|---|---|
| at least one "*electronic element*" | "A device or thing that has distinct characteristics related to electricity, and that also has terminals at which it may be connected to other distinctly electrical devices or things in order to form a circuit, in which electrons move through devices called semiconductors." *Leighton*, 358 F. Supp. 2d at 370. |
| in the absence of a "*non-electronic carrier*" | "A device that holds an electronic element to protect it from physical damage during lamination, where the device is not part of a circuit that utilizes a semiconductor device." *Id*. at 376. |
| "*directly* between said first and second plastic core sheets" | "In immediate physical contact." *Id*. at 377. |

**Leighton Response:**

Agree in part that the construed terms and phrases reflect the Court's decision, subject to certain

typos corrected below.  However the relevant limitation is:

19

> *"positioning said at least one electronic element in the absence of a non-electronic carrier directly between said first and second plastic core sheets."* (Gutkin Dec. Ex. __ (Claims 1 and 16 of the '207 patent, and claims 1 and 15 of the '155 patent).

"electronic element" is defined as "A device or thing that has *1)* distinct characteristics related to electricity; *together with 2)* terminals at which it may be connected to other distinctly electrical devices or things in order to form a circuit, *3)* in which electrons move through devices called semiconductors." *Leighton*, 358 F. Supp. 2d at 370.

36.    **Oberthur Statement:**  The accused Oberthur cards fall into two categories: (1) cards manufactured for American Express (the "Amex cards"), and (2) cards manufactured for others, such as the Xenon Cards.

**Leighton Response:**

Agree.

37.    **Oberthur Statement:**  To simplify the issues in this case, the parties executed a stipulation regarding the structure and manufacturing processes used to make the accused Oberthur cards. (Ex. 27.) Although different in some respects, both cards share a common structural feature that goes to the central issue in this case: they both contain a recess or hole in the plastic layer above the electronic element that protects this element during lamination.

**Leighton Response:**

Disagree.  Oberthur continues to improperly characterize multiple "electronic elements" as a single "electronic element".  Oberthur's characterization is a reargument of its *Markman* position, with far less support.  In the AmEx cards and the Xenon cards a chip fits into the hole of sheet directly above it.  (Gutkin Dec. Ex. 3 (Stipulation pp. 2-8).  There are no additional holes, cut outs, or protective devices of any sort for any of the other electronic elements in the cards.  (Everett Dec. ¶¶18-19).

38.     **Oberthur Statement:** *The American Express Cards*: The American Express cards manufactured by Oberthur contain six plastic layers from top to bottom: (i) a top overlaminate layer; (ii) a top printed layer; (iii) an inlay layer with an embedded antenna and a chip module that extends downward; (iv) an IR blocker layer; (iv) a bottom printed layer; and (vi) a bottom overlaminate layer. (Ex. 27, at 2-3.)

**Leighton Response:**

Disagree that the inlay layer has an embedded antenna.  The layers of the AmEx card, as described on pages 2 and 3 of the Stipulation are:

1.     **Amex Card Structure**: Mosteller Deposition Exhibit 3061 (Exhibit 1, hereto) and the laminated and unlaminated Amex cards produced by Oberthur as OCS_Z_096802 accurately represent the structure of the Amex cards.  Starting at the top of the Amex card and proceeding to the bottom, the layers of the Amex card are:

- PVC Overlaminate (.0018 inches) with adhesive covering the bottom of the layer (No. 5 in Mosteller Exh. 3061);

- top printed PVC layer (.009 inches) with adhesive (.001 inches, applied by Oberthur) covering the bottom of the layer (No. 3 in Mosteller Exh. 3061);

- Texas Instrument inlay made of polyethylene terephthalate (PET) (43.6 microns +/- 3.5) with a chip (up to 10 mil, or .010 inches) mounted on the bottom, an aluminum die coverage pad (20 microns +/- 1.5) and an aluminum crimp junction on the top, and an aluminum antenna etched on the bottom (30 microns +/- 1.5) (No. 1 in Mosteller Exh. 3061, TI Exh. 2 (TI 0000020) Shawn Rodgers Deposition);

- IR blocker layer composed primarily of PET and of PVC with adhesive (.001 inches, applied by Oberthur) covering the top of the layer (.0115 inches), with a hole cut out for the chip (No. 2 in Mosteller Exh. 3061);

- bottom printed PVC layer (.005 inches) with adhesive (.001 inches, applied by Oberthur) covering the top of the layer (No. 4 in Mosteller Exh. 3061);

- PVC Overlaminate (.0018 inches) with adhesive covering the top of the layer (No. 6 in Mosteller Exh. 3061).

(Gutkin Dec. Ex. 3  (Stipulation pp. 2 and 3)).

39.     **Oberthur Statement:**  This structure is set forth in the following figure, and is also evident from the sample unlaminated Amex cards attached as Exhibit 13 to the Johnson Declaration:



**Leighton Response:**

Agree that the above figure shows certain parts of the AmEx card structure. With respect to the inlay in particular, it is difficult to make out the detail.

40.    **Oberthur Statement:** To make a unique aesthetically pleasing card, the top and bottom printed layers in the Amex cards are transparent. Because these layers are transparent, an IR Blocker is used so that infrared sensors can detect the presence of Amex cards. (Ex. 14, at OCS_F_070469.)

**Leighton Response:**

Leighton agrees that the AmEx card is a clear card, and that according to OCS_F_070469 the IR Blocker is used so that infrared sensors can detect the presence of Amex cards. Oberthur provides no support for why AmEx chose to make a clear card, and whether AmEx feels a clear card is a more aesthetically pleasing card.

41.    **Oberthur Statement:** As a result, early development versions of the Amex cards did not contain a hole or recess in the IR blocker layer, and many of them did not work after lamination because the electronic element had been damaged. (See Ex. 15, at OCS_A_ 039725, 039729.)

**Leighton Response:**

Oberthur fails to provide any explanation or supporting testimony for the documents referenced. According to OCS_A_ 039729 it does appear there was discussion about adding a hole above the chip to avoid ***"stress on the chip"***.

42.    **Oberthur Statement:** In an attempt to solve this problem, Oberthur and its co-developers decided to punch a hole in the IR blocker "into which the chip is nestled during tacking to eliminate stress on the chip during lamination." (Ex. 16, at OCS_A_039754.) The

23

Amex card developers concluded that they "need [a] hole in the IR blocker to avoid broken die and get a reliable card." (See Ex. 15, at OCS_A_039729.) Accordingly, before lamination Oberthur punches this hole in the IR blocker layer to "match the position of the chip in the finished card." (Ex. 17, at OCS_A_009388.)

**Leighton Response:**

Oberthur fails to provide any explanation or supporting testimony for the documents referenced. According to OCS_A_ 039729 it does appear there was discussion about adding a hole above the chip to avoid **"*stress on the chip*"**. However, according to page 3 of the Stipulation:

- IR blocker layer composed primarily of PET and of PVC with adhesive (.001 inches, applied by Oberthur) covering the top of the layer (.0115 inches), with a hole cut out for the chip (No. 2 in Mosteller Exh. 3061);

(Gutkin Dec. Ex. 3 (Stipulation p. 3)).

43.    **Oberthur Statement:** Finally, Oberthur laminates the plastic layers of the Amex cards set forth above into a finished card. (Ex. 18, Mosteller 2/24/06 Tr. 96:1-7.)

**Leighton Response:**

Leighton agrees that the Amex card is a laminated card. (Gutkin Dec. Ex. 3 (Stipulation pp. 3 and 4)).

44.    **Oberthur Statement:** *The Cards for Project Xenon*: The Xenon cards are made in two phases. First, a plastic "prelam" sandwich is laminated that houses an embedded electronic element – the chip and antenna. (Ex. 27, at 4-7.) From top to bottom, the Xenon prelams contain at least four layers: a top overlaminate layer; a top layer having a recess that is positioned directly above the chip module; an inlay layer with an antenna and a chip module that extends upwards; and a bottom overlaminate layer. (*Id.*)

**Leighton Response:**

Disagree.  Oberthur continues to improperly characterize multiple "electronic elements" as a single "electronic element".  Oberthur's characterization is a reargument of its *Markman* position, with far less support.  As set forth in the Stipulation, the structure of the Xenon cards:

1.  **Structure of Aontec Prelams**:  O'Keeffe Deposition Exhibit 3030 (OCS_P_094479-80) (Exhibit 3) along with the related deposition testimony of Mr. O'Keeffe, and the unlaminated Aontec prelam produced by Oberthur to Leighton, accurately represent the structure of the Aontec prelams, described below:

    - the bottom layer of the prelam is a transparent PVC overlay (.0018 inches);
    - the next layer towards the top is a white PVC layer (.004 inches), known as the inlay layer, into which a hole is punched that is the same size as the lead frame profile of the chip module (consisting of the chip and the lead frame);
    - the bottom layer and inlay layer are then tacked together;
    - a small dot of resin is then placed in the hole, on top of the bottom layer, where the chip module is to be inserted;
    - the chip module is then placed into the hole on top of the resin dot and the bottom layer (Aontec used chips made by Infineon and Philips);

25

- the copper wire antenna is then spooled out on top of the inlay layer, and partially melted by vibration into the inlay layer, such that part of the wire sits in the layer and part of the wire sits above the layer;

- the antenna wire and the module chip lead frame are connected using a thermode bonding device;

- a white PVC layer (.012 inches) known as the top layer is then placed on top of the wire antenna, with a hole cut out for the chip that is approximately the same size as the chip (but not including the chip lead frame);

- a dot of resin is placed on the top of each chip module; and

- a transparent PVC overlay (.0018 inches) is then placed on top of the top layer. (O'Keeffe Dep. Exh. 3030.)

3. **Structure of Smartrac Prelams**: The unlaminated Smartrac prelams Oberthur produced to Leighton and the documents numbered OCS_Z_098632-40 (Exhibit 5) accurately represent the structures of the Smartrac prelams, described below:

- the bottom layer of the prelam is a transparent PVC overlay (.0016 inches);

- the next layer towards the top is a white PVC layer (.0039 inches) known as the inlay layer, into which a hole is punched that is the same size as the lead frame profile of the chip module (consisting of the chip and the lead frame);[4]

- the chip module is placed into the hole in the inlay layer. The chips used are: (1) Infineon chip with MCC8 module and Smartrac inlay; (2) Philips chip with Nedcard module and Smartrac inlay; and (3) Atmel chip with Nedcard module and Smartrac inlay;

- a copper wire antenna is then spooled out on top of the inlay layer, and partially melted by vibration into the inlay layer, such that part of the wire sits in the layer and part of the wire sits above the layer;

26

- the antenna wire and the module chip lead frame are connected using a thermode bonding device;

- a white PVC layer (0.00118-0.0094 inches) known as the top layer is then placed on top of the wire antenna, with a hole cut out for the chip that is approximately the same size of the chip (but not including the chip lead frame);

- the bottom layer described above is then placed below the inlay layer, and an epoxy adhesive is applied in the cavity formed by the punched hole in the inlay; and

- a transparent PVC overlay layer (.0016 inches) is then placed above the top layer, and an epoxy adhesive is applied in the cavity formed by the punched hole in the top layer.

45.     **Oberthur Statement:**  Like the IR blocker layer in the Amex card, the top layer in the prelam contains a recess directly above the chip to protect the chip during lamination. (*Id.* at 5, 7.) As shown by the unlaminated prelams attached to the Johnson Declaration, before lamination the top of the chip does not contact the top overlaminate layer. (Exhs. 19 and 20.)

**Leighton Response:**

Agree.  The recess is the **"*to protect the chip*"** during lamination.

46.     **Oberthur Statement:**  Oberthur then assembles and laminates the prelams into finished Xenon cards after adding additional layers. (*See id.* at 7-8.) From top to bottom, the finished Xenon cards consist of five layers: (i) a top overlaminate layer; (ii) a top printed layer; (iii) the prelam; (iv) a bottom printed layer; and (v) a bottom overlaminate layer. (*Id.*) This

structure is set forth in the figure below, and is also evident from examination of the unlaminated Xenon cards attached as Exhibit 21 to the Johnson Declaration:



**Leighton Response:**

Leighton agrees that the Xenon card is a laminated card, and that the structure of the card is set forth at pages 4-7 of the Stipulation.  (Gutkin Dec. Ex. 3 (Stipulation pp. 4 -7)).  Leighton also agrees the above drawing shows various parts of the Xenon card.

47.     **Oberthur Statement:**  Oberthur has laminated the Xenon cards using two laminators – a laminator manufactured by Lauffer, and the same Burkle laminator used for laminating the Amex cards. (*Id*. at 8.)

**Leighton Response:**

Leighton agrees that the Xenon card is a laminated card, and that the lamination cycles for the card are set forth in the Stipulation at pages 5, 7, 8 and 9.  (Gutkin Dec. Ex. 3 (Stipulation pp. 5, 7, 8, 9)).  Leighton agrees that the finished cards were made on Oberthur's laminators.  Leighton disagrees that the prelams  were made on either of the above laminators, the prelams were made by Aontec and Smartrac on their laminators.  (*Id.*).

48.     **Oberthur Statement:**  On November 21, 2006, Leighton Tech submitted its infringement contentions in the report of its technical expert Dr. David Everett. (Ex. 10.) In this

28

report, Leighton Tech does not claim that the Amex and Xenon cards infringe because the chip is positioned in the absence of a non-electronic carrier. (*See, e.g., id.* at 8-9, 22-24.) Instead, it contends that these cards infringe because they allegedly have other unprotected "electronic elements," such as the antenna and the antenna bridge that connects the antenna to the chip. (*Id.*)

**Leighton Response:**

Disagree in part. Leighton maintains that Oberthur's cards infringe because each element of each asserted claim is present in the accused cards. (Gutkin Dec. Ex. 33 (Everett Expert Report)). Leighton agrees that by the presence of the antenna and/or antenna bridge, Oberthur satisfies the limitation of *"positioning said at least one electronic element in the absence of a non-electronic carrier directly between said first and second plastic core sheets."* (Everett Dec. ¶ 11).

49.    **Oberthur Statement:** Leighton Tech contends that the Amex cards infringe five claims in each of the Leighton Patents because the Amex cards contain "several electronic elements . . . including a chip, antenna, bridge connecting chip and antenna, antenna pads, and aluminum mounting pads for the chip." (*Id.* at 7.) Of these elements, Dr. Everett believes that only the "antenna, antenna bridge, and mounting pads are positioned directly between plastic core sheets . . . ." (*Id.* at 8-9.)

**Leighton Response:**

Disagree in part. Leighton maintains that Oberthur's cards infringe because each element of each asserted claim is present in the accused cards. (Gutkin Dec. Ex. 33 (Everett Expert Report)). Leighton agrees that by the presence of the antenna and/or antenna bridge and mounting pads, Oberthur satisfies the limitation of *"positioning said at least one electronic*

29

*element in the absence of a non-electronic carrier directly between said first and second plastic*

*core sheets."* (Everett Dec. ¶ 11).

      50.    **Oberthur Statement:**  With respect to the Xenon cards, Leighton Tech contends

that those cards infringe five claims in the '155 patent. Dr. Everett stated that the Xenon cards

and prelams "incorporate at least one electronic element . . . including a chip, antenna, antenna

bridge, [and] chip lead frame." (*Id*. at 21.) He further stated that the "antenna and antenna bridge

are positioned directly between plastic core sheets," in the absence of a non-electronic carrier.

(*Id*. at 22-24.)

**<u>Leighton Response:</u>**

Disagree in part.  Leighton maintains that Oberthur's cards infringe because each element of

each asserted claim is present in the accused cards.  (Gutkin Dec. Ex. 33 (Everett Expert

Report)).  Leighton agrees that by the presence of the antenna and/or antenna bridge, Oberthur

satisfies the limitation of *"positioning said at least one electronic element in the absence of a*

*non-electronic carrier directly between said first and second plastic core sheets."*  (Everett Dec.

¶ 11).

      51.    **Oberthur Statement:**  With respect to the '207 patent, Dr. Everett did not address

the potential equivalence of any claim limitation. (*Id*. at 6.)

**<u>Leighton Response:</u>**

Disagree.  Dr, Everett specifically stated in his expert report that he might find it necessary to

expand upon the Doctrine of Equivalents in greater detail in his rebuttal report, after Oberthur

explained its non-infringement position and which limitations Oberthur maintained were missing

from which claims. As background, Oberthur refused to respond to Leighton's written discovery

seeking the basis of Oberthur's non-infringement position.  (Gutkin Dec. Ex. 28  (Oberthur's

Responses to Interrogatory 10)) .  Instead, Oberthur merely filed objections.  (*Id.*).  Oberthur has not supplemented those responses.  It was not until Oberthur filed the present Motion for Summary Judgment, that Oberthur first specified which of the limitations from the patents that it believed were not literally present in the accused cards.  With that information, Dr. Everett has set forth a more detailed Doctrine of Equivalents analysis in his Declaration in Opposition to this Motion.  (Everett Dec. ¶¶ 24-32).  Dr. Everett will also be filing a rebuttal report that addresses the Doctrine of Equivalents.  Expert depositions are set to take place between May and June of 2007.

52.    **Oberthur Statement:**  Similarly, with respect to the '155 patent, Dr. Everett merely stated that "[i]n the event that it is determined that any element or limitation [in the '155 patent] does not literally exist in Oberthur's process, I believe that such feature or limitation may exist under the Doctrine of Equivalents . . . because Oberthur's process ***may*** perform the same function, in substantially the same way, to achieve substantially the same result as the process disclosed in the '155 patent." (*Id*. at 20 (emphasis added).)

**Leighton Response:**

Disagree.  Dr, Everett specifically stated in his expert report that he might find it necessary to expand upon the Doctrine of Equivalents in greater detail in his rebuttal report, after Oberthur explained its non-infringement position and which limitations Oberthur maintained were missing from which claims. As background, Oberthur refused to respond to Leighton's written discovery seeking the basis of Oberthur's non-infringement position.  (Gutkin Dec. Ex. 28 (Oberthur's Responses to Interrogatory 10)) .  Instead, Oberthur merely filed objections.  (*Id.*).  Oberthur has not supplemented those responses.  It was not until Oberthur filed the present Motion for Summary Judgment, that Oberthur first specified which of the limitations from the patents that it

believed were not literally present in the accused cards. With that information, Dr. Everett has set forth a more detailed Doctrine of Equivalents analysis in his Declaration in Opposition to this Motion. (Everett Dec. ¶¶ 24-32). Dr. Everett will also be filing a rebuttal report that addresses the Doctrine of Equivalents. Expert depositions are set to take place between May and June of 2007.

53.     **Oberthur Statement:**  The prior art discloses the use of a non-electronic carrier to protect an electronic element (a chip and associated antenna). The non-electronic carrier disclosed in the prior art, a recess, only protects the chip, and does not protect the antenna.

**Leighton Response:**

Disagree. Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. Oberthur does not specify the prior art that it is referring to, and therefore Leighton cannot properly respond.

54.     **Oberthur Statement:**  The limitation in the claims of the Leighton Patents that a non-electronic carrier be absent "is the critical improvement of [the Leighton] patents over [the] prior art . . . which required protection for the electronic element during lamination." *Leighton*, 358 F. Supp. 2d at 369.

**Leighton Response:**

Oberthur's quote is incomplete. The Court stated "the absence of a 'buffer' or 'buffer zone' is the critical improvement of these patents over prior art, specifically over US Patent No. 4,450,024, which required protection for the electronic element during lamination." *Leighton*, 358 F. Supp. 2d at 369.

WO 684997.1

55.    **Oberthur Statement:**  Oberthur's cards have the same type of protective structure as that disclosed in the prior art. For example, U.S. Patent No. 5,880,934 (the "'934 patent") discloses a contactless card wherein the antenna "coil 7 is disposed on inner layer 11" that "has suitable opening 3 for receiving [chip] module 6." (Ex. 6, 3:58-60.)

**Leighton Response:**

Disagree.  (Everett Dec. ¶ 20.)

56.    **Oberthur Statement:**  As shown below, just as in Oberthur's cards, the cards disclosed in the '934 patent have an opening (item 3, below) for the chip module (item 6):



**Leighton Response:**

Disagree.  (Everett Dec. ¶ 20.)

57.    **Oberthur Statement:**  This reference also discloses that the antenna coil (number 7 in the above figure) is located directly between two plastic sheets without any protection. The overall location of the antenna is depicted in Figure 3 of the '934 patent:



**Leighton Response:**

Disagree.  (Everett Dec. ¶ 20).

58.     **Oberthur Statement:**  Similarly, International Patent Application Publication Number WO 88/08592 (the "'592 application") discloses a laminated contactless card wherein the chip is protected by a recess. Specifically, it "contemplate[s] the existence of a hole [12] in a core layer [14] or at least in an opposing relatively thick layer [18] into which the circuit die [10, the micro-chip] is inserted":



(Ex. 7, 24:6-9.)

**Leighton Response:**

Disagree.  (Everett Dec. ¶ 20).

59.     **Oberthur Statement:**  The '592 application also discloses that the antenna (item 16) is placed directly between two plastic sheets (items 14 and 18) without any protection. (*See id.* at 14:24-15:13.) Plainly the Oberthur structure Leighton accuses of infringement was well known in the art.

**Leighton Response:**

Disagree.  (Everett Dec. ¶ 20).

60.     **Oberthur Statement:  <u>The Antenna in the Xenon Cards is Also Protected By a Non-Electric Carrier</u>**. The embedded antenna in the Xenon prelams is also protected by a

34

non-electronic carrier. Before lamination of the prelams, the wire antenna is embedded into the inlay sheet using an ultrasonic device which rapidly rubs the wire antenna against the inlay. (Ex. 27, at 5, 6.) The rapid vibration of the antenna melts the inlay and embeds the antenna into the inlay sheet, as shown below (*Id.*):



**Leighton Response:**

Disagree.  (Everett Dec. ¶ 19).

61.     **Oberthur Statement:**  The embedded antenna receives less pressure during lamination, and is also held and protected by the sheet in which it is embedded.

**Leighton Response:**

Disagree.  (Everett Dec. ¶ 19).

62.     **Oberthur Statement:  <u>The Antenna in the Amex Cards Needs No Protection</u>**. The aluminum antenna in the Amex card does not require protection. As shown by the following depiction, the antenna in the Amex card is a flat, solid strip of aluminum that, unlike the chip, contains no delicate circuitry.

35



**Leighton Response:**

Disagree.  (Everett Dec. ¶ 19).

63.    **Oberthur Statement:**  As a result the antenna can withstand greater pressures during lamination without being damaged.  There is no need for any non-electronic carrier protection.

**Leighton Response:**

Disagree.  Oberthur's Statement fails to comply with Local Rule 56.1 (d) by failing to provide the required citation of evidence, and for that reason alone cannot be deemed an undisputed fact. There are other goals for the Leighton inventions besides protection.  (Gutkin Dec. Exs. 1 and 2 ('207 patent and '155 patent)).  Moreover, the test is whether the accused device contains the elements and limitations of a claim, not whether it satisfies some or all of the goals of the inventions.

64.    **Oberthur Statement:**  Before lamination, the chips in Oberthur's cards are positioned directly below a recess. (Ex. 10, at 3, 5, 7.)  As a result, the top portion of the electronic element in Oberthur's cards is not in immediate physical contact with any plastic layer. (*Id.*) Instead, a buffer zone of air exists above it. Oberthur positions the electronic element in its cards in exactly the same manner as the prior art '934 patent and '592 application.

36

**Leighton Response:**

Disagree.  Oberthur continues to improperly characterize multiple "electronic elements" as a single "electronic element".  Oberthur's characterization is a reargument of its *Markman* position, with far less support.  The AmEx cards and the Xenon cards do each have a hole directly above the chip according to the "Stipulation Regarding Accused Products" (the "Stipulation").  (Gutkin Dec. Ex. 3 (Stipulation pp. 2-8).  There are no additional holes, cut outs, or protective devices of any sort for any of the other electronic elements in the cards.  (Everett Dec. ¶ 18).

65.      **Oberthur Statement:**  In Oberthur's Amex cards the top printed layer and the IR blocker layer, which are located on either side of the inlay layer with the electronic element, each contain an adhesive layer that is .001 inches thick. (Ex. 10, at 2-3.) As set forth in the parties' stipulation, this adhesive is located between these layers and the inlay layer. (*Id.*)

**Leighton Response:**

Disagree.  Oberthur continues to improperly characterize multiple "electronic elements" as a single "electronic element".  Oberthur's characterization is a reargument of its *Markman* position, with far less support.  With respect to the fact that adhesive is present, agree.

66.      **Oberthur Statement:**  Accordingly, with the exception of the top portion of the electronic element, which before lamination does not touch anything, the other portions of the electronic element in the Amex card would contact only the adhesive prior to lamination, and so could not be in immediate physical contact with the two plastic core sheets.

**Leighton Response:**

Disagree.  Oberthur continues to improperly characterize multiple "electronic elements" as a single "electronic element".  Oberthur's characterization is a reargument of its *Markman* position, with far less support.  (Everett Dec. ¶¶ 12 and 14).

       67.    **Oberthur Statement:**  The chips in the Xenon cards are surrounded by an epoxy resin that fills the gaps created by the recesses in the top layer and in the inlay layer. (*Id*. at 6-7.) Like the adhesive in the Amex cards, this epoxy prevents the electronic element in the Xenon cards from directly contacting the top and bottom overlaminate layers.

**Leighton Response:**

Disagree.  Oberthur continues to improperly characterize multiple "electronic elements" as a single "electronic element".  Oberthur's characterization is a reargument of its *Markman* position, with far less support.  (Everett Dec. ¶¶ 12 and 14).

Dated: January 26, 2007

                          SUTHERLAND ASBILL & BRENNAN LLP

                                 /s/ Robert A. Gutkin
                          By:  Robert A. Gutkin, Esq. (Pro hac vice)
                          Blair M. Jacobs, Esq. (Pro hac vice)
                          1275 Pennsylvania Avenue, N.W.
                          Washington, DC  20004-2415
                          Tel:  202-383-0100
                          Fax: 202-637-3593

                          *Attorneys for Plaintiff*
                          *LEIGHTON TECHNOLOGIES LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing PLAINTIFF LEIGHTON

TECHNOLOGIES LLC'S RESPONSE TO DEFENDANT OBERTHUR CARD SYSTEMS,

S.A.'S ET AL., STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF

NONINFRINGEMENT, was served on the following on January 26, 2007 by e-mail and

overnight mail:

Edward DeFranco
Kevin Johnson
Mark Baker
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010


/s/ Robert A. Gutkin

1