**EXHIBIT 11 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 12 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 13 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 14 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 15**

english

Contact   Glossary





„ SMARTRAC:
The best choic
for securi

### Home
### Company
#### Management
#### Corporate Structure
#### Certifications
#### History
#### Career
### Products
### Solutions & Applications
### Technology
### Press Contact
### Investor Relations

**SMARTRAC** is a leading supplier of **high security RFID inlays** for ePassports and contactless credit cards. In a fast-growing market we have been able to achieve this position through the effective use of advanced technology and cost-efficient production methods.

**SMARTRAC** N.V. is a company incorporated under Dutch law, and has its head office in Amsterdam. Our company has a European sales office in Stuttgart (Germany), core production and R&D facilities in Bangkok (Thailand) and a sales office in Singapore. We also have exclusive access to proprietary manufacturing equipment for our production through an agreement with Xytec Solutions in Kulim/Malaysia.

We operate very close to our markets and are always striving to set standards in our industry. For this reason we cooperate closely with both our suppliers and customers, including major chip manufacturers and card manufacturers, secure printing houses and public authorities. We are actively involved in RFID research and development. We are also in close contact with organisations such as the ICAO (International Civil Aviation Organisation).

We conduct our business in two segments:

Our **High Security** segment includes our **ePassport** and **ePayment** product lines. Our **Standard** segment encompasses



RFID value chain

**EXHIBIT 16**



Security Technology



Welcome the website of Aontec. Professional number 1 source for RFID inlays and cards in the 13.56 Mhz operating frequency.



**PRODUCTS**

**TECHNOLOGY**

**DOWNLOADS**





Our production facilities include two state-of-the-art factory units located near Galway city on the west coast of Ireland. We have been manufacturing RFID inlays and cards at this location since 1997 and have shipped in excess of 60 million units worldwide. Our inlay manufacturing processes utilise highly automated production machinery and equipment incorporating a patented wire implanting technology.

Aontec is proud of the fact that our facility is the oldest inlay production plant in the world and thereby offers our clients an unmatched level of experience and quality. We offer our customers a complete service that includes product development, design and test, prototyping and full volume manufacturing.

Our experience to date in the development of inlay products includes a wide knowledge for the selection of the most appropriate thermoplastic materials to suit our customer's specific applications. The focus for Aontec is to maintain and grow our worldwide reputation as the best inlay supplier, offering consistency and quality in our products and services.

I am personally very proud to lead such a tremendous and dedicated group of employees at Aontec and invite you to explore this site which I hope you will find to be informative and interesting.

Seamus O'Keeffe


Managing Director

**EXHIBIT 17 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 18 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 19 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 20 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 21 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**

**EXHIBIT 22**

1

529bleih

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------------------x

3    LEIGHTON TECHNOLOGIES, LLC,

4          Plaintiff-Counterclaim Defendant,

5
                                            04 Civ. 2496(CM)
6            v.
                                            MARKMAN HEARING
7
     OBERTHUR CARD SYSTEMS, S.A.,
8
           Defendant-Counterclaim Plaintiff.
9
     -------------------------------------------x
10
                                            White Plains, N.Y.
11                                          February 9, 2005
                                            10:00 a.m.
12

13   Before:

14                   THE HONORABLE COLLEEN McMAHON,

15                                          District Judge

16                        APPEARANCES

17

18   SUTHERLAND, ASBILL & BRENNAN, LLP
          Attorneys for Plaintiff-Counterclaim Defendant
19   ROBERT A. GUTKIN
     BLAIR M. JACOBS
20   NEIL G. COHEN
     CHRISTINE ONDRICK
21

22   BAKER & McKENZIE
          Attorneys for Defendant-Counterclaim Plaintiff
23   JAMES DAVID JACOBS
     FRANK M. GASPARO
24

25   Also present:  MIREILLE CLAPIER, Oberthur inhouse counsel

529bleih

1    with the nail clipper, I understand why it's being proposed.

2        MR. B. JACOBS:  We believe, again, that it's a

3    noninfringement argument.

4        THE COURT:  It's a noninfringement argument.

5        MR. B. JACOBS:  We say that at the bottom.

6        We ask your Honor to give this its plain and ordinary

7    meaning.  There is no reason whatsoever to add all this

8    unnecessary baggage to the term.

9        Thank you, your Honor.

10       MR. J. JACOBS:  Your Honor, I didn't exactly

11   understand Leighton's definition being the plain and ordinary

12   meaning of the term.

13       THE COURT:  Okay.

14       MR. J. JACOBS:  As I recall it, your Honor, you made a

15   comment.  You knew where you were coming from.  But I will say

16   it even plainer, if I can, because we're not trying to hide it

17   from the Court or from Leighton, because he's already seen our

18   devices once when we entered into this case, when we tried to

19   settle it, and then in limited discovery, we permitted it.  So

20   there is really few secrets here.

21       Defendant Oberthur does put encasings around its chips

22   prior to encapsulating them in the plastic sheets.  Plain and

23   simple.  We want to just ensure that someplace along the line,

24   a definition would say that's a noninfringing construction.

25       THE COURT:  I understand that, but I'm just interested

**EXHIBIT 23**



#4a
V. Day
2/7/98

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant: | Keith Leighton | Examiner: | Lorin, F. |
| Serial No. | 08/727,789 | Art Unit: | 1301 |
| Filed: | 10/07/96 | Date: | January 8, 1998 |

Title:   RADIO FREQUENCY IDENTIFICATION CARD AND HOT LAMINATION
PROCESS FOR THE MANUFACTURE OF RADIO FREQUENCY
IDENTIFICATION CARDS

Commissioner of Patents and Trademarks
Washington, D.C. 20231

**AMENDMENT**

Dear Sir:

In response to the Patent and Trademark Office Action dated September 8, 1997, please
amend the above-identified application as follows:

In the claims:

Please delete the following claims: 6, 9, 10, and 19.

Please amend the following claims:

1.(Amended)   A [hot lamination] process for incorporating at least one electronic element in the
manufacture of a plastic card, [said process] comprising the steps of:

    (a) providing first and second plastic core sheets;

    (b) positioning said at least one electronic element in the absence of a non-electronic
carrier directly between said first and second plastic core sheets to form a [layered] core, said
plastic core sheets defining a pair of inner and outer surfaces of said core;

    (c) positioning said core in a laminator apparatus, and subjecting said core to a heat and
pressure cycle, said heat and pressure cycle comprising the steps of:

        (i) heating said core [in said laminator,] for a first period of time;



2

(ii) [thereafter] applying [ram] a first pressure to said core for a second period of time such that said at least one electronic element is encapsulated [in] by said core[,];

(iii) [and thereafter] cooling said core [in conjunction with laminator ram] while applying a second pressure [being applied] to said core [, said core including an upper and lower surfaces].

(d) [printing on] coating at least one of said [upper and lower] outer surfaces of said core [such that] with a layer of ink [is applied to said at least one upper and lower surface of said core]; and

(e) [positioning said core in a laminator apparatus with a layer of overlaminate film on at least one of said upper and lower surfaces of said core and laminating said] applying a layer of overlaminate film to at least one of said outer surfaces of said core [in said laminator to thereby form a sheet of plastic card stock; and,

(f) cutting at least one card from said sheet of plastic card stock].



2. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein said [step (c) of positioning said core in a] laminator apparatus [is carried out by positioning said core between] has first and second laminating plates, at least one of said first and second laminating plates having a matte finish [to provide at least one of said upper and lower core surfaces with a corresponding] for creating a textured surface on at least one of said outer surfaces of said core.

3. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 2, wherein each of said first and second laminating plates [includes] has a matte finish [to provide both of said upper and lower surfaces of said core with a correspondingly] for creating said textured surface on both of said outer surfaces of said core.

4. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein said first and second plastic core

3

sheets are made from a material selected from the group consisting of polyvinyl chloride, polyester, and acrylonitrile-butadiene-styrene, [wherein] each of said sheets [has] having a thickness in the range of 0.007 [inches] to 0.024 [inches] inch.

5. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 4, wherein said first and second plastic core sheets have a thickness of approximately 0.0125 inch [inches].

7. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein [said step (c5) is carried out with a ram] said second pressure [that] is greater than [the ram] said first pressure [utilized in step (c4)].

8. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 7, wherein [the laminator] said second pressure [utilized in step (c5)] is at least approximately 25% greater than [the ram] said first pressure [utilized in step (c4)].

11. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim [6] 1, wherein said [step (c3) is carried out by heating said] core is heated in step (c)(i) to a temperature in the range of [300] 275°F to [370] 400°F and said first period of time is [for] at least five (5) [5 to 10] minutes.

12. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim [11] 1, wherein said [step (c4) is carried out by increasing said laminator ram] first pressure [to a pressure] is approximately [in the range of 700 p.s.i. to] 1000 p.s.i. and said second period of time is [for] at least 10 minutes.

13. (Amended) [A hot lamination] The process for incorporating at least one electronic element in the manufacture of a plastic card as recited in claim 1, wherein said step (d) is carried out



4

utilizing a printing press.

*11*
~~11.~~ (Amended) [A hot lamination] ~~The process for incorporating at least one electronic element~~ ~~in the manufacture of a plastic card~~ as recited in claim 1, wherein said step (d) is carried out utilizing a coating technique [techniques] selected form the group consisting of silk screen printing, offset printing, letterpress printing, screen printing, roller coating, spray printing, and litho-printing.

*12*
~~5.~~ (Amended) [A hot lamination] ~~The process for incorporating at least one electronic element~~ ~~in the manufacture of a plastic card~~ as recited in claim 1, wherein said step (e) [is carried out by positioning said core between first and second sheets of overlaminate film such that a layer of overlaminate film is laminated to both said upper and lower surfaces of said core] ~~of applying a~~ ~~layer of overlaminate film comprises the further steps of:~~



~~(a) positioning an overlaminate film on at least one ink coated surface of said core;~~
~~(b) subjecting said core to a second heat and pressure cycle comprising the steps of:~~
~~(i) heating said core to a temperature between approximately 175⁰F to 300⁰F for~~
~~approximately 10 to 25 minutes;~~
~~(ii) applying approximately 1000 p.s.i. pressure to said core; and~~
~~(iii) cooling said core to a temperature in the range of approximately 40⁰F to 65⁰F~~
~~for approximately 10 to 25 minutes.~~

*13*
~~16.~~ (Amended) [A hot lamination] ~~The process for incorporating at least one electronic element~~ ~~in the manufacture of a plastic card~~ as recited in claim 1, wherein said at least one electronic element is a micro-chip and an associated wire antenna.

*14*
~~17.~~ (Amended) [A hot lamination] ~~The process for incorporating at least one electronic element~~ ~~in the manufacture of a plastic card~~ as recited in claim 1, wherein said at least one electronic element is a micro-chip and an associated circuit board antenna.

*15*
~~18.~~ (Amended) [A hot lamination] ~~The process for incorporating at least one electronic element~~

OCS_C_045598

5

in the manufacture of a plastic card as recited in claim 1, wherein said at least one electronic element is a read/write integrated chip and an associated antenna.

Kindly add the following new claims:



23. A hot lamination process for the manufacture of plastic cards, said process comprising the steps of:

(a) providing first and second plastic core sheets;

(b) positioning at least one electronic element in the absence of a non-electronic carrier directly between said first and second plastic core sheets to form a layered core;

(c) positioning said core in a laminator apparatus, and subjecting said core to a heat and pressure cycle, said heat and pressure cycle comprising the steps of:

(i) heating said core in said laminator , in the presence of a minimal first ram pressure, to a temperature which causes controlled flow of said plastic which makes up said first and second plastic core sheets;

(ii) applying a second pressure uniformly across said core for encapsulating said at least one electronic element within said controlled flow plastic;

(iii) subsequently cooling said core in conjunction with the concurrent application of a third pressure uniformly across said core, said core including and upper and lower surfaces;

(d) printing on at least one of said upper and lower surfaces of said core such that a layer of ink is applied to at least a portion of said at least one upper and lower surface of said core.

24. The method as recited in claim 23 wherein said first and second core layers are devoid of any appreciable cutouts.

## REMARKS

The Examiner has rejected each of the pending claims, 1-19, under 35 U.S.C. 103(a) as being unpatentable over U.S. Pat. No. 4,450,024 ("the '024 patent) to Haghiri-Tehrani. This rejection is respectfully traversed.

From the Examiner's rejection, it is apparent that the Examiner claims to have found each

6

of the elements of applicant's claimed invention anticipated by the '024 patent with the exception of the printing step, which the Examiner finds obvious under section 103(a). Applicant maintains that the '024 patent does not teach the process of the present application even in the absence of the printing step.

The '024 patent claims a lamination process for making an electronic card which protects the electronic element of the card by first placing it in a recess formed within a card layer so as to avoid damage to the electronic element from localized pressure applied in the lamination process. The patent then requires that a "buffer zone" be present within the recess. Even the broadest of claims of the '024 patent require a recess and a buffer zone, for and protecting the electronic element. These are required by the '024 invention in order to enable the card assembly to be subjected to a full laminating pressure.

No such protective elements are desired or necessary to the invention of the present application. Further, the invention taught by the '024 patent requires that the electronic element also be placed in a protective carrier disk (6), which is subsequently located within the recess.

The controlled use of a heat and pressure cycle of the present invention eliminates the requirement of both a protective carrier disk for the electronic element and/or a recess or other buffer zone formed in one or more of the card layers for carrying and protecting the electronic element. The process of the present invention allows the electronics-containing core to be subjected to the full laminating pressure without use of a recess in a card layer. Unlike anything shown in the prior art, the electronic unit is placed directly between two (2) plastic sheets. Admittedly, the '024 patent does make reference to card forming processes which vary pressure with temperature. *'024 Patent, col.6, ln. 30-46.* However, there is nothing in the '024 patent which suggests the heat and pressure cycle of the present invention. The '024 patent merely discusses the variation of pressure with temperature, it does not suggest a sequence of steps or the duration of steps which might be used to encapsulate an electronic element by a plastic card. The '024 patent does not discuss a cooling step, nor does it propose a solution to the relative pressures to be applied in the steps of the cycle.

The Examiner correctly notes that it is well within the purview of one of ordinary skill in the art to vary temperature with the type of material being laminated. However, the present invention involves more than controlling pressure as a function of temperature; the present

7

invention claims a coordinated heat and pressure cycle which uses multiple temperatures, pressures and time periods for a single material. The dependent claims include limitations on the ratio of pressures to be applied at various stages of the process as well as specific temperature ranges and time periods for each step. Claim 15 includes a further heat and pressure cycle to be used in the overlamination step, a step which doesn't involve protecting the electronic element.

The amendments made to the claims have not been made to avoid the 103(a) rejection. It is believed that the claims as originally submitted are unobvious over the '024 patent. The amendments were made to clarify claim language and to insure consistent language throughout both the specification and the claims.

It is believed that this application as amended is in condition for allowance. Such action is respectfully requested.

Respectfully submitted,
OLDHAM & OLDHAM CO., LPA

Mark A. Watkins, Esq.
Registration No. 33, 813

Twin Oaks Estate
1225 West Market Street
Akron, Ohio 44313-7188
(330)864-5550

Attorney Docket No. 6014-1

OCS_C_045601

**EXHIBIT 24**

1

529bleih

1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
2     -------------------------------------------x

3     LEIGHTON TECHNOLOGIES, LLC,

4          Plaintiff-Counterclaim Defendant,

5
                v.                              04 Civ. 2496(CM)
6
                                               MARKMAN HEARING
7
      OBERTHUR CARD SYSTEMS, S.A.,

8          Defendant-Counterclaim Plaintiff.

9     -------------------------------------------x

10
                                               White Plains, N.Y.
11                                             February 9, 2005
                                               10:00 a.m.
12

13    Before:

14                   THE HONORABLE COLLEEN McMAHON,

15                                             District Judge

16                             APPEARANCES

17

18    SUTHERLAND, ASBILL & BRENNAN, LLP
           Attorneys for Plaintiff-Counterclaim Defendant
19    ROBERT A. GUTKIN
      BLAIR M. JACOBS
20    NEIL G. COHEN
      CHRISTINE ONDRICK
21

22    BAKER & McKENZIE
           Attorneys for Defendant-Counterclaim Plaintiff
23    JAMES DAVID JACOBS
      FRANK M. GASPARO
24

25    Also present:  MIREILLE CLAPIER, Oberthur inhouse counsel

529bleih

1   points up that patent has a -- it protects the electronic

2   element.  And this, of course, is another point which really

3   goes back to the other point that electronic element has to be

4   subject to damage.  But anyway, he protects the electronic

5   element.  And what does he use?  He uses a recess.

6          Now, Mr. Jacobs talked about a recess not being a

7   structure.  It's like a hole not being a structure.  I mean, to

8   me, it's a structure.

9          THE COURT:  It's a structure.  I agree with you.  It's

10  a structure.

11         MR. J. JACOBS:  Thank you, your Honor.

12         I was going to suggest another word.  Feature, item.

13  But, to me, it's a structure.

14         Formed within a card layer so as to avoid damage to

15  the electronic chip.  What does it do?  If you recall

16  Mr. Jacobs's slide, it's air.  So there's room to compress.

17         THE COURT:  Right.

18         MR. J. JACOBS:  Exactly.  Be present within -- and a

19  buffer zone be present within the recess.  A buffer.  To me,

20  that's a structure.

21         THE COURT:  No.  A buffer zone is not a structure.

22  But that's okay.

23         MR. J. JACOBS:  It's a feature.

24         THE COURT:  That's okay.  I think I understand what

25  the '024 patent did.  As I conceptualize it, it put the

529bleih

1    electronic element in a little pouch to keep it safe.

2         MR. J. JACOBS:  And then put air around it to keep it

3    safer.

4         THE COURT:  Well, no.  There could be air inside the

5    little pouch.  I mean, my little pouch that I put my lipstick

6    in when I go out has air inside of it.  Yes, there is air

7    outside of it, too, but that's not what's pertinent.  That's

8    not what's pertinent.  What it's protecting is what's inside

9    the pouch, the nonelectronic carrier.

10        MR. J. JACOBS:  Yes, but, also, the recess is

11   protecting it, your Honor.

12        Here we have a slide of the figure.

13        THE COURT:  No, no.  The recess is the nonelectronic

14   carrier.

15        MR. J. JACOBS:  Your Honor, I beg to differ.  And we

16   have the '024 patent here to show you exactly what the

17   structure is in the '024 patent.

18        We have colored in red air.  That's item number 14.

19   That is the buffer zone.  Or 18.  I'm not sure what it is.  But

20   you see it colored in red.

21        THE COURT:  There can't be any air here because their

22   invention puts the electronic element directly, physically

23   touching.  There is no air here between the two plastic sheets.

24        Believe me, I'm going to define these terms in such a

25   way that there cannot possibly be any air between the plastic

EXHIBIT 25 IS BEING FILED UNDER SEAL PURSUANT TO

THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004

BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION

**EXHIBIT 26**

```
                        0644LEIms.txt
                                                                    1
      0644LEIms
1     UNITED STATES DISTRICT COURT
1     SOUTHERN DISTRICT OF NEW YORK
2     ----------------------------x
2
3     LEIGHTON TECHNOLOGIES, LLC,
3
4                     Plaintiff,
4
5            v.                            04 Civ. 2496(CM)
5
6     OBERTHUR CARD SYSTEMS, S.A.,
6
7                     Defendant.
7
8     ----------------------------x
8                                         White Plains, N.Y.
9                                         April 4, 2006
9                                         11:20 a.m.
10
10    Before:
11
11                    THE HONORABLE COLLEEN MCMAHON,
12
12                                        District Judge
13
13                          APPEARANCES
14
14
15    SUTHERLAND, ASBILL & BRENNAN
15        Attorneys for Plaintiff
16    ROBERT A. GUTKIN
16    BLAIR M. JACOBS
17
17
18    BAKER & MCKENZIE
18        Attorneys for Defendant
19    JAMES DAVID JACOBS
19    FRANK M. GASPARO
20
20    Also Present:  MIREILLE CLAPIER, Oberthur In-house Counsel
21                   JEAN-CLAUDE HUOT, Oberthur In-house Patent
21                                      Patent Counsel
22
23
24
25
                    MARY M. STATEN, CSR, RPR, RMR
                        (914) 390-4027
```

```
                                                                    2
      0644LEIms
1             THE DEPUTY CLERK:  This is 04 2496, Leighton
2     Technologies versus Oberthur Card Systems, S.A.
3             Your appearances, please.
4             MR. J. JACOBS:  Your Honor, James David Jacobs for
5     Defendant Oberthur.
6             MR. B. JACOBS:  Your Honor, Blair Jacobs for Plaintiff
7     Leighton Technologies.  And Robert Gutkin will also be
8     presenting this morning.
9             THE COURT:  Okay.  Have a seat.
10            Interesting briefs.
11            Let me get the chart out.
                        Page 1
```

0644LEIms.txt

5  claims -- Claim 18, for example -- the claims that recite
6  minimal. They could have written into Claim 20 a pressure such
7  that less than would crack the chip. They didn't do it. This
8  is a lot of hand-waving, your Honor. There is no limitation,
9  as this Court held, against pressure during Step (c)(i) in
10 Claim 20, plain and simple. Any pressure equal to
11 encapsulation, greater than encapsulation, or no pressure at
12 all, no limits on pressure in Step (c)(i).
13        Your Honor, Mr. Gutkin talked about how there was no
14 testimony about what the card was, what the card was made of,
15 how you put the card together. I think your Honor picked out
16 the page in the Oakwood brochure, the Series 6 brochure,
17 looking at the Smith declaration, which discusses in quite a
18 bit of detail of what the cards are made of and what they're
19 used for. And indeed, your Honor, one of the principal uses
20 today of these kinds of cards, these contactless cards, in
21 fact, the very use they claim is the commercial success in
22 their brief, the Leighton claim, is as a credit card.
23        Your Honor, Leighton's invention, alleged invention, I
24 should say, was a new lamination cycle. I would submit whether
25 it had an electronic element, which is the antenna, which is
                  MARY M. STATEN, CSR, RPR, RMR
                       (914) 390-4027
                                                              38

0644LEIms
1  really unsusceptible to pressure, or a chip which is more
2  susceptible, or a piece of metal, really doesn't make much
3  difference. But we show here in the Oakwood reference
4  inductive coils which are specified on the page, if you look
5  under "machine reading applications" on the page where it says,
6  "Cards" -- halfway down the first paragraph -- "Cards for
7  making many applications have already been designed by Oakwood.
8  Those include application for varying types," and then it goes
9  on.
10        THE COURT: And then we go to the next paragraph,
11 which talks about packaging and the most sophisticated
12 microchips.
13        MR. J. JACOBS: Exactly, your Honor.
14        The fact of the matter is, the cycle that we disclose
15 here is Claim 20. Now they talk about these other limitations,
16 minimal pressure. They do have claims going to that, and I'm
17 prepared to show you why those claims are obvious.
18        THE COURT: That was Step 2 of this argument.
19        MR. J. JACOBS: That's Step 2 of the argument.
20 Exactly, your Honor.
21        In the meantime, I think to a person of ordinary skill
22 in the art -- and this Court is in the position to judge, and
23 you can say a lot of things it's not, but it's not hard to say
24 what it is. You're looking at the chart. It's not at all hard
25 to imagine what this is to a lay person. And this is supposed
                  MARY M. STATEN, CSR, RPR, RMR
                       (914) 390-4027
                                                              39

0644LEIms
1  to be a person who is skilled in the art of making plastic
2  laminated cards.
3        This brochure, the Oakwood brochure, is distributed to
4  people who manufacture plastic laminated cards. These aren't
5  neophytes. To say they don't know how this goes together for a
6  person who has been making plastic laminated cards for two,
7  three or four or five years, to even say that proposition makes
8  no sense. And here they have the cycle. This is Claim 20,
9  your Honor. May not be Claim 18. May not be the other claims.
                           Page 18

0644LEIms.txt
10   But this is claim 20 of the '367 patent.
11          Another thing, your Honor, I think, is implicit
12   in our argument -- and we covered this in our brief -- there is
13   a question of yield. Any manufacturing process, when you do
14   mass manufacturing, has certain bad apples you make. Even with
15   the Leighton process, you're going to have -- the best Oberthur
16   can do with its commercial production is .8 percent waste.
17   When they make 100 cards, about .8 are bad. That's the best
18   they do. Even with a process totally refined, it will be
19   worse.
20          There is no allegation by Leighton here that the
21   process that is shown here in Oakwood would totally fail. Yes,
22   it might crack a few chips, it may crack 90 percent of the
23   chips. I'm not saying it would. I'm saying hypothetically it
24   might. The point is, your Honor, there is no yield limitation
25   in these claims. And the fact that Oakwood has a high waste
                    MARY M. STATEN, CSR, RPR, RMR
                         (914) 390-4027
                                                                    40
     0644LEIms
1    factor does not count against the fact that it's anticipatory.
2           We cite a number of cases in our brief, very strong
3    cases, on this very point, where the Federal Circuit said that
4    there is no manufacturing requirement if you teach a process
5    that can produce a card. It might produce a hundred bad ones,
6    it's still enabling, it's still good prior art.
7           Their whole argument is based upon -- to read into
8    these limitations, the whole argument is based upon a silent
9    proposition that without doing it, you're going to have a high
10   waste factor. So even the fact that you can't read it in
11   because of the general claim construction, there is no reason
12   to read it in based upon the reasoning of their argument.
13          THE COURT: Okay. Let's go on to obviousness.
14          MR. GUTKIN: May I have a chance to respond to that?
15          THE COURT: One minute.
16          (Pause)
17          MR. GUTKIN: Our argument is not based on waste. It's
18   based on the claim construction. It's got a first, second,
19   third step. There are other claims. We are interpreting the
20   claim that's at issue consistent with the claim construction.
21          The only other point I want to make is that Mr. Jacobs
22   says this is obvious to anybody. We lodged a transcript from a
23   deposition about two weeks ago from Mr. Gruen that was taken in
24   Munich. He is the president of the International Card
25   Manufacturers Association. It was Mr. Jacobs's witness, but we
                    MARY M. STATEN, CSR, RPR, RMR
                         (914) 390-4027
                                                                    41
     0644LEIms
1    got an opportunity to cross-examine him. He's been active in
2    the plastics card industry since 1979.
3           On Page 68 of his deposition, Mr. Gruen testifies that
4    there was no fixed technology for manufacturing cards with
5    electronic elements in them at the time of the invention.
6    Answer, quote, "Before 1994, there was no fixed technology.
7    There were a lot of experimental stages. The manufacturers did
8    not know where they end up, so everything was being tested and
9    experimented." That's Pages 68 and 69.
10          Again, is it fair? That's prior to '93, the
11   technology for putting in electronics. These cards were
12   changing. It was a process from the early Eighties into the
13   Nineties, over that quite long time.
14          So while Mr. Gruen may say it's clear, and I may say
                              Page 19

**EXHIBIT 27 IS BEING FILED UNDER SEAL PURSUANT TO**

**THE PROTECTIVE ORDER ENTERED IN THIS CASE ON AUGUST 20, 2004**

**BECAUSE IT CONTAINS CONFIDENTIAL INFORMATION**