UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEIGHTON TECHNOLOGIES LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>OBERTHUR CARD SYSTEMS, S.A. and OBERTHUR CARD SYSTEMS OF AMERICA CORPORATION,<br><br>    Defendants. | 04 Civ. 02496 (CM) (LMS)<br><br>**DECLARATION OF KEITH LEIGHTON IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT** |
| OBERTHUR CARD SYSTEMS, S.A. and OBERTHUR CARD SYSTEMS OF AMERICA CORPORATION,<br><br>    Counterclaim Plaintiffs,<br><br>vs.<br><br>LEIGHTON TECHNOLOGIES LLC, GENERAL PATENT CORPORATION INTERNATIONAL, GENERAL PATENT CORPORATION, and IP HOLDINGS LLC,<br><br>    Counterclaim Defendants. | **Hon. Colleen McMahon**<br><br>**Magistrate Judge Lisa M. Smith**<br><br>**Exhibits 19 and 20 Contain Confidential Information Subject To The Protective Order In This Case** |

I, Keith Leighton, hereby declare under penalty of perjury, as follows:

1. This declaration is submitted in Opposition to Defendants' Motion to Dismiss for Lack of Standing and in Opposition to Defendants' Motion for Summary Judgment of Non-Infringement. The information set forth herein is based upon my own personal knowledge, and if called as a witness I would testify thereto.

2. I am the inventor of US Patent Nos. 5,817,207; 6,036,099; 6,514,367; and 6,214,155. I have attached true and correct copies of the '207 and '155 patents, which I understand are the patents at issue in this matter, as Exhibits "1" and "2".

3. I was deposed for over three days in this matter, on November 9, 2005, November 10, 2005, and November 23, 2006.

4. I am 74 years old and I have a high school diploma from Berkley High School in Berkley, Michigan, which I received in 1952. I live in Sheffield Lake, Ohio, a suburb that is approximately 25 miles outside of Cleveland. I am currently employed by Invacare in Elyria, Ohio. Invacare manufactures healthcare products. I currently work the night shift at Invacare on a computer controlled machine that trims foam seat cushions for custom wheel chairs.

5. I started employment in the color printing industry in 1953, when I first began working for General Motors as a Plate Maker/Engraver. I remained with General Motors until 1970. My responsibilities included printing, color proofing and production on sheet fed and web press machines. From 1970 –2000, I worked for various other companies in the printing and plastic card manufacturing business. Beginning in approximately 1990, I began working as a consultant in the printing and plastic card manufacturing field. Over the course of my career I developed expertise in both the printing and lamination processes for plastic cards. I have designed cards, manufactured cards, as well as supervised others in the manufacture of cards. I have also been responsible for the total operation and maintenance of card manufacturing plants. A copy of my resume is attached as Exhibit "3".

6. As background, for many years standard plastic cards, and more recently contactless smart cards, have been made using the process of lamination. Generally, the lamination of smart cards involves sandwiching electronic elements between layers of plastic and sealing them with heat and pressure.

7. The first step in the manufacture of a contactless smart card, or any plastic card for that matter that will be laminated involves building "books" made of layers of plastic, electronic elements (in the case of contactless cards), pads, and metal plates all of which sit in a lamination tray. A book may be made up of many layers of cards, similar to the single card layer illustrated at 135 from page 1 of my '155 patent.



8. The following pictures illustrate the actual assembly of a book being built in a lamination tray. I took the pictures at a card manufacturing plant in the Cleveland area. The book contains multiple layers of cards that are separated by pads and plates:















a. The lamination tray containing the book is then placed into the daylight, or opening, in lamination machines similar to the ones set forth below.





SINGLE STACK LAMINATOR



DUAL STACK LAMINATOR

    b. Over a set period of time, varying temperatures and pressures are applied to the book in order to laminate the materials and make a finished contactless smart card.

9. Prior to ever visiting Motorola, I had experimented with different methods for laminating foreign objects into plastic. This process was far more difficult then it sounds, because of the problems in trying to get the various layers of plastic to properly adhere to each other in the presence of a foreign object. Additionally, it is difficult to make a card containing a foreign object that is visually appealing and suitable for printing. This is in part due to pooling and laking that appears on the surface on the card, and results in the card having an uneven surface. Also, if the card already has a printed layer in it, that printing can appear to be distorted. If the card is to receive printing after lamination, a card with an uneven surface will not look appealing after printing. I laminated thin metallic foil and also butterfly wings into plastic. I did not use any cut outs or protective devices for the foreign objects. In the past, I had used adhesive on standard cards to get the layers of plastic to stick together, particularly when those layers had substantial printing, since it is difficult to get plastic to adhere to ink. I do not recall any specific lamination cycles that I used to make these cards, and I do not recall whether or not I used adhesive on the butterfly wings and the metallic foil, but I do recall that it was not easy to make a nice looking card with a foreign object inside.

10. In early 1995, I was contacted by Motorola and asked to come visit their facility in San Jose, California to assist them in their production of an employee identification card to be used by Microsoft employees. I was told that Bill Sanko, a business

acquaintance and friend of mine, had been in touch with Motorola and had suggested that I might be able to help them make such a card.

11. I visited the Motorola facility on February 17, 1995, and I was shown the Burkle laminating machine that they wanted to use to make their identification cards. At the time, I did not know it but the laminator was actually designed to make printed circuit boards and not plastic cards. The laminator was a dual stack laminator. It had a separate ram (press) for the heating phase and one for the cooling phase. I was also shown the structure for the card that they wanted to make. Motorola was using, or wanted to use, a cut out around the electronics in the card, as well as a gel pack around the electronics to protect it during lamination. I did not think that this structure would allow Motorola to make a good card, and I told them to scrap their idea of using a cut out and a gel pack. Both Mr. Ken Thompson and Mr. Jean Marc Delbecq of Motorola seemed to be so impressed with my idea and my qualifications that they said they wanted to hire me. Later that day I went to a conference room with Mr. Thompson and Mr. Delbecq, where they wrote some proposed terms on a presentation board, as well as made some notes of what we had discussed for making the card. We each signed the board and they were able to make a copy, which they handed to me. A true and correct copy of the notes are attached as Exhibit "4".

12. A few days later after I had returned home, I received a letter from Mr. Thompson. A true and correct copy is attached as Exhibit "5". I recall that there was a list of deliverables that was also attached to the letter. The only copy that I have of the list, is the signed copy that I later returned. A true and correct copy of the deliverable list is attached as Exhibit "6". I do not believe that there was any Confidentiality

Agreement enclosed with the letter or the list. In fact, I recall that towards the end of my engagement with Motorola, I was given a copy of a Confidentiality Agreement and asked to backdate the Agreement. I also recall that Motorola seemed embarrassed that this Agreement had not been signed earlier. I signed the Agreement and backdated it to February 23, 1995, per Motorola's request. I was not given a copy of the Agreement signed by Motorola. A true and correct copy of the Confidentiality Agreement is attached as Exhibit "7".

13. I later received a Purchase Order dated March 2, 1995 from Motorola, that offered to employ me as a consultant. A true and correct copy of the Purchase Order is attached as Exhibit "8". I was excited about the opportunity to start with Motorola, but unfortunately my wife Lois was not feeling well at the time. She had just been diagnosed with breast cancer and was undergoing treatment. It took me awhile to respond to Motorola, and when I finally did start working at Motorola, I was unable to work for four consecutive weeks. Over the course of my engagement at Motorola, I needed to return to Cleveland to assist my wife.

14. In a letter dated March 20, 1995, I provided Motorola with a list of "up front items" that were necessary to the project. A true and correct copy of the letter is attached as Exhibit "9" Many of these necessary items were not provided to me at Motorola, and I believe that this prevented me from achieving more favorable results. I also signed and returned the deliverables list that I had received earlier. A true and correct signed copy was attached earlier as Exhibit "6".

15. Beginning in late March or early April, I went to Motorola to begin my consulting engagement. My last day at Motorola was May 5, 1995. I worked on a daily basis at

Motorola with a gentleman named Kiet. He assisted me in making cards. Over the course of working at Motorola, I also spoke with both Mr. Delbecq and Mr. Thomson about my efforts. I spent much of my time dealing with equipment problems and I did not receive sufficient material from Motorola to make any real headway on the deliverables. The laminating machine was in disrepair the entire time that I was at Motorola, and I was unable to accurately control or determine what the pressure was on both the hot and cold side of the laminator. The pressure for both the hot side and the cold side of the laminator was generated by a pump. You could obtain a pump pressure reading, however due to the modifications made by Motorola to the machine, that reading was meaningless. It was not possible to obtain the pressure at the ram, which determined what pressure was actually being applied to the materials in the laminator. Moreover, you could not control the pressure as needed. In fact, during the course of my work at Motorola, the repair person from Burkle suggested that Motorola scrap the machine and purchase a different one that was designed to manufacture plastic cards.

16. As I came to better understand, once I was at the Motorola facility, the rams on their printed circuit board laminator are designed to exert more pressure during the heating phase of the lamination cycle than during the cooling phase of the cycle. Also, because of the weight of the platens (about 450 pounds), substantial weight or pressure was exerted on the cards by merely closing the laminator, before the material could be heated. The platens were also warped. By closing each of the daylights or openings from the bottom of the laminator to the top, which was necessary in order to heat up the machine, additional weight was added for each of the platens onto the

cards. The cards on the bottom daylight or opening had the greatest amount of weight or pressure exerted upon them before the lamination process could even be started. The weight on the card materials was so substantial, that at times the electronics between the plastic sheets were squeezed so hard that they embossed the solid steel laminating plates with their outline. There was also a delay or dwell time between the two cycles. This meant that after the cards came out of the heating phase of the laminator, they had to sit with no heat and no pressure before they were able to go into the cooling phase of the machine. This caused cards to warp.

17. The problems with the Burkle laminator ultimately made it difficult for me to provide Motorola with a satisfactory yield of cards that worked. There were physical differences in the finished cards based upon which daylight or opening had been used to make the cards, and part of what Motorola insisted was that I use all of the daylights. In the end, I was not satisfied that I had made as much headway on the project as I had hoped. While I believed that given the right resources I could have done better, I was still disappointed.

18. While I was at Motorola, they were not trying to make an ISO standard card. This would not have been possible given the thickness of the electronics. ISO is an international standards organization. Certain types of plastic cards must meet ISO standards in order to be accepted. For example, a card must be a certain thickness in order to go into an ATM machine and to properly read the magnetic stripe that is on the card. The antenna that Motorola provided was much thicker than the ISO standards, as well as being thicker than the chip that sat inside the antenna. Ultimately, I did make a number of cards at Motorola, but Motorola was unhappy

with the yield that I obtained using their components and laminator. Motorola did not pay me the bonus provided by our consulting agreement, because they maintained that I did not satisfy the criteria for receiving a bonus. My last day at Motorola was May 5, 1995.

19. I did have some ideas as to why things had not worked, such as the inability to control the pressure. In fact, I told Mr. Thompson upon leaving that we should try to continue to work on making a better card. However, Mr. Thompson indicated that Motorola was not interested in any further work from me.

20. After leaving Motorola, I did exchange correspondence with Motorola about my belief that they had breached their obligations to me. True and correct copies of that correspondence are attached as Exhibits "10" and "11". However, given my wife's health situation, and my need to find new employment, I instead turned to locating a new job.

21. After I left Motorola I continued to think about the problems I had encountered there, which had resulted in my inability to make a contactless smart card that satisfied their demands. Over the course of the next several months I came up with a new and different method that I believed would enable me to produce a contactless smart card that was smooth enough to accept dye sublimation printing, but also thin enough to satisfy ISO thickness standards. Because of the sequence of temperature and pressure that I used in my method, I believed I would be able to safely embed the sensitive electronics into the card without the use of any protective device around the electronics.

22. In October of 1995 my attorney at the time, Steve Haas, filed a provisional patent application on my method of manufacturing smart cards. I understand that the provisional application subsequently led to the patents that are the basis of this lawsuit. In the course of prosecuting the patents I needed additional money to help pay for the legal bills. I gave interests in my patents to a number of individuals, in exchange for money to pay the bills.

23. In early 1996, I made a number of cards at a company that I had worked at for approximately 11 years, CSI (Card Systems Inc.) (which was formerly known as 2B Systems) using the method that had been described in my provisional application. I made the cards on the single stack laminator that was at CSI. The cards were smooth enough to accept dye sublimation printing, but also thin enough to satisfy ISO thickness standards. Also, I did not use any protective device for the sensitive electronics, inlays of Phillips electronics, inserted into the card.

24. I tried unsuccessfully over the next few years to license my patents. I approached Motorola again on a number of occasions to see if they would be interested in working with me. I told them about my pending patents, and I sent them a copy of my issued patents. Motorola did not express any interest in working with me again. True and correct copies of that correspondence with Motorola, along with Motorola's responses are attached as Exhibits "12," "13," "14," "15," "16" and "17". While on one occasion Motorola did express some interest, I came to learn that shortly after that point in time they got out of the card making business. A True and correct copy of their response is attached as Exhibit "18". At no time after I had

finished working with Motorola, did Motorola ever claim that they owned any of my inventions or any of my patents.

25. Around 2002 or 2003, I learned of a company named General Patent Corporation that was in the business of helping small inventors like myself license technology. In the course of my discussions with General Patent Corporation, I told them about my experience at Motorola and that I had not invented anything while I was employed there. Eventually in 2003, I agreed, along with the other individuals with interests in my patents, to assign our interest to a new company called Leighton Technologies LLC, to see if the new company could be more successful in obtaining licenses. As assignors, we each received a membership interest in the new company. True and correct copies of the formation and assignment documents for Leighton Technologies LLC are attached as Exhibits "19" and "20".

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 24 day of January, 2007, at Sheffield Lake, Ohio.

_____
Keith R. Leighton

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing DECLARATION OF KEITH LEIGHTON IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT, was served on the following on January 26, 2007 by e-mail and overnight mail:

>Edward DeFranco
>Kevin Johnson
>Mark Baker
>Quinn Emanuel Urquhart Oliver & Hedges, LLP
>51 Madison Avenue, 22nd Floor
>New York, NY 10010

>/s/ Robert A. Gutkin