UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

LEIGHTON TECHNOLOGIES LLC,

      Plaintiff,

04 Civ. 2496 (CM)

      - against -

OBERTHUR CARD SYSTEMS, S.A., et al.

      Defendant.

———————————————————————————x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

## MEMORANDUM AND ORDER SETTING EVIDENTIARY HEARING ON THE ISSUE OF PLAINTIFF'S STANDING TO SUE

McMahon, J.:

The plaintiff, Leighton Technologies LLC ("Leighton Tech") brings this action alleging

that defendants Oberthur Card Systems, S.A. and Oberthur Card Systems of America

Corporation (collectively "Oberthur") have infringed a series of patents describing a hot

lamination process for manufacturing contactless "smart cards." Before the court is defendant

Oberthur's motion to dismiss the complaint for lack of standing.[1] Oberthur argues that plaintiff

Leighton Technologies LLC ("Leighton Tech") did not have legal title to the patents- in-suit[2] at

---

[1] Familiarity with the facts set forth in the court's Markman decision, Leighton Technologies, LLC v. Oberthur Card Systems, S.A., 358 F.Supp.2d 361 (2005) is presumed.

[2] Pursuant to the Stipulation and Order dated July 25, 2006, Leighton Tech agreed to dismiss, without prejudice, claims for infringement of two of the four patents it originally sued on in this case. The two remaining patents-in-suit are U.S. Patent Nos. 5,817,207 (the '207

1

the time of the alleged infringement. Keith Leighton, the sole named inventor on the patents, had signed a Confidentiality Agreement with a third-party – Motorola – in 1995, pursuant to which Mr. Leighton assigned to his employer the entire right, title and interest in "all inventions, innovations and ideas developed or conceived . . . during the entire period of [his] engagement with Motorola." Oberthur contends that the inventions that are the subject of the patents-in-suit were developed or conceived by Mr. Leighton during his engagement with Motorola, and so are now owned by the successor-in-interest to Motorola's radio frequency identification ("RFID") access control business, HID Corp. ("HID"). As a result, Oberthur argues, Mr. Leighton had no rights in the patents to assign to plaintiff, Leighton Tech, and the plaintiff has no rights to vindicate in this lawsuit.

Plaintiff asserts that Mr. Leighton did not develop or conceive of the patented invention while he was employed at Motorola. In the alternative, plaintiff contends that Motorola deliberately breached its consulting agreement with Mr. Leighton, which relieved him of his contractual obligation to assign any inventions to Motorola. Finally, plaintiff argues that, even if Mr. Leighton did assign his rights in the patented invention to Motorola, Motorola's failure to record the written assignment with the United States Patent Office under 35 U.S.C. §261 renders the assignment void against Leighton Tech, as a subsequent assignee for value and without notice.

For the reasons discussed below, the court concludes that a live hearing will be necessary to resolve issues of fact relating to the question of who owns the patents in suit – the issue that lies at the heart of Oberthur's motion to dismiss for lack of standing, which cannot be resolved

---

patent) and 6,214,155 (the '155 patent)(collectively, the "Leighton Patents.")

until the issue of ownership is decided. Since the merits of this action cannot be reached until the jurisdictional challenge is resolved, the court severs the ownership issue for an evidentiary hearing, to be held September 10, 2007, or as soon thereafter as counsel can be heard.

### Standard

Before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue. See Whitmore v. Arkansas, 495 U.S. 149, 154 (1990). The United States Court of Appeals for the Federal Circuit has stated that, "The question of standing to sue is a jurisdictional one." Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1551 (Fed. Cir. 1995), and while that characterization has been disputed (see Rent Stabilization Ass'n, 5 F.3d 591, 594, n. 2 (2d Cir. 1993). it seems clear that, "Whether a claimant has standing is 'the threshold question in every federal case determining the power of the court to entertain the suit.'" In re Gucci, 126 F.3d 380, 387-88 (2d Cir. 1997)(quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)); Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006)("Although lack of Article III standing and subject matter jurisdiction are distinct concepts [citing Rent Stabilization Ass'n, 5 F.3d 594 n.2], Article III standing remains, as we have noted, a limitation on the authority of a federal court to exercise jurisdiction.")

Because it is they who seek to invoke federal jurisdiction, the plaintiffs bear the burden of establishing the constitutional requirements of standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); see also Jaghory v. New York State Dept. of Educ., 131 F.3d 326, 329 (2nd Cir. 1997) ("The party seeking to invoke the jurisdiction of the court bears the burden of establishing that he has met the requirements of standing.");

3

Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1032-33 (Fed.Cir.1995).

To establish standing under Article III, the plaintiff must satisfy three elements. First, the plaintiff must allege that it has suffered an "'injury in fact' – an invasion of a legally protected interest." Lujan, 504 U.S. at 560. Second, "there must be a causal connection between the injury and the conduct complained of." Id. And third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' Id. at 561.

With respect to the first of these elements, the Patent Act defines the class of persons who have a "legally protected interest" in a patent. It provides that, "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. 281 (2000); Mentor H/S/ Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1018 (Fed. Cir. 2001); see generally Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d 1304 (Fed. Cir. 2003). In keeping with this directive, courts have held that, with irrelevant exceptions, only the owner of a patent has constitutional standing to sue for infringement of the patent. See Rite-Hite, 56 F.3d at 1551 ("Generally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement."); see also Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1579 (Fed.Cir.1991); See e.g. Intellectual Property Dev't, Inc. v. TCI Cablevision of California, Inc. 248 F.3d 1333 (Fed Cir. 2001)(title in a patent confers constitutional standing to sue for infringement). Conversely, one who does not hold legal title to the patent-in-suit at the time of the alleged infringement cannot establish Article III standing because he suffers no injury to a legally cognizable interest. Paradise Creations, Inc. 315 F.3d at 1310. ("[T]he appellant in this case held no enforceable rights whatsoever in the patent at the time it filed suit, and therefore lacked a cognizable injury necessary to assert standing under Article III of the Constitution.")

4

Thus, to meet the requirements of Article III standing, the plaintiff must establish that it owned or held legal title to the patents-in-suit at the time of the alleged infringement.

Leighton Tech claims that it owns the patents by virtue of an assignment from the inventor, Mr. Leighton. Oberthur argues that Leighton Tech does not have legal title to the patents-in-suit because Mr. Leighton had contractually assigned all rights in the patented invention to Motorola and therefore had no patent rights left to assign to the plaintiff. The question of who owns the patents must be answered before the court can rule on the question of standing, because once an inventor has assigned the rights in a future invention to a third party, neither the inventor nor a subsequent assignee who takes through the inventor has standing to sue for infringement of a patent arising from the assigned invention. The present assignment of a future invention divests the inventor-assignor of ownership of the invention and automatically vests ownership of the invention, when invented, in the assignee. See FilmTec Corp. v. Allied-Signal, Inc., 939 F.2d 1568, 1573 (Fed.Cir.1991) (where contract grants rights in any future inventions to assignee, "Ordinarily, no further act would be required once an invention came into being" because "the transfer of title would occur by operation of law"); cf. Arachnid, 939 F.2d at 1580-81 (distinguishing between present assignment of expectant interest in future invention and mere promise to assign rights in future invention).

The mere fact that Mr. Leighton recorded an assignment of his patents rights to Leighton Tech with the Patent and Trademark Office does not establish that he validly assigned anything to Leighton Tech. GAIA Techs. Inc. v. Reconversion Techs, Inc., 93 F.3d 774, 778 n.3 (Fed. Cir. 1996) amended on other grounds by 104 F.3d 1296 (Fed Cir. 1996). The patent recording statute, 35 U.S.C. §261 "governs the rights of competing assignees" but "does not address the validity of

the rights purportedly transferred by an assignment." TM Patents, L.P. v. International Business Machines Corp. 121 F. Supp. 2d 349, 365 (S.D.N.Y. 2000)(emphasis in original). The statute "does not grant an assignee any title better than the assignor had." Id. If defendant is correct that Mr. Leighton's assignment of his patent rights to the plaintiff was invalid because he no longer had title to the patents-in-suit when he made it, this action will have to be dismissed.

The FilmTec case is instructive on this point. In FilmTec, the plaintiff, who was suing for patent infringement, had been assigned the rights in the patent by the inventor. The inventor had, however, been employed by a third party at or near the time of the invention. It was, on the record before the court, unclear whether the inventor had already assigned the rights in his invention to his employer, prior to his invention (and prior to his assignment of his rights therein to the plaintiff). Although the case was remanded for further fact-finding, the court held that "if [the employee-inventor] granted [the employer] rights in inventions made during his employ, and if the subject matter of the [patent-in-suit] was invented by [the employee-inventor] during his employ with [the employer], then [the employee-inventor] had nothing to give to [the plaintiff] and his purported assignment to [the plaintiff] is a nullity." See FilmTec, 939 F.2d at 1572. Were that the case, the court concluded, the plaintiff "would lack both title to the [patent-in-suit] and standing to bring the present action." Id.

Neither the language nor the substance of FilmTec lends any support to defendant's argument that the issues of standing and ownership should be treated as distinct and separable from one another. Oberthur relies for this counterintuitive proposition on the FilmTec court's statement to the effect that "The issue here is not whether title lies in the Government or some other third party; it is rather whether FilmTec has made a sufficient showing to establish

reasonable likelihood of success on the merits, which includes a showing that title to the patent and the rights thereunder are in FilmTec." Id. at 1573. Defendant apparently mistakes the court's reminder that a different standard obtains on a motion for a preliminary injunction (the context in which the standing question arose in FilmTec) as an assertion that ownership and standing are independent legal inquiries. To the contrary, FilmTec holds, in keeping with established precedent, that the question of legal title is inextricably intertwined with a plaintiff's standing to maintain an infringement action.

In Alliance for Environmental Renewal, Inc., the Second Circuit underscored that, while Article III standing challenges have sometimes been brought under Rule 12(b)(6) as well as 12(b)(1), "the proper procedural route is a motion under Rule 12(b)(1)." 436 F.3d at 88 n.6 (citing Valentin v. Hospital Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). The distinction is important, the Alliance court instructed, because a typical dismissal under Rule 12(b)(6) (for failure to state a claim) is an adjudication on the merits with preclusive effect. Id. Presenting and considering a challenge to lack of Article III standing under Rule 12(b)(1) avoids the need to fashion a modified approach to a Rule 12(b)(6) motion that concerns standing.

Similarly, the Alliance court emphasized that the submission of affidavits in connection with a motion under Rule 12(b)(1) does not convert it into a motion for summary judgment under Rule 56, Id. n.8 (citing Kamen v. A T & T Co. 791 F.2d 1006, 1010-11 (2d Cir. 1986).

The court therefore rejects Oberthur's contention that the precise characterization of its motion to dismiss the action for lack of constitutional standing is irrelevant. I will consider the defendant's jurisdictional challenge under Rule 12(b)(1).

In general, a district court must accept the allegations contained in the complaint as true

for purposes of deciding a motion to dismiss. See Cohen v. Koenig, 25 F.3d 1168, 1172-73 (2d Cir.1994). When a motion to dismiss challenges the court's jurisdiction under Rule 12(b)(1), however, a district court may look beyond the allegations of the complaint. "Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged." Moyer v. United States, 190 F.3d 1314, 1318 (Fed.Cir.1999); See also Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed.Cir.1988) ("If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute."); LeBlanc v. Cleveland, 198 F.3d 353, 355 (2d Cir.1999)("Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.") This is a corollary of the general rule that a court always has the power (i.e. has jurisdiction) to determine whether it has jurisdiction.

Thus, in a motion to dismiss on the basis of standing, the district court may engage in fact-finding to determine whether jurisdiction exists and "may dismiss a facially sufficient complaint for lack of subject-matter jurisdiction if the court finds, based on affidavits or other evidence outside the complaint, that the asserted basis for federal jurisdiction is not sufficent." RAD Data Communications, Inc. v. Patton Elecs, Co., 882 F.Supp 351, 352 (S.D.N.Y. 1995)(dismissing patent infringement actions on the ground that plaintiff did not have legal title to patents-in-suit at the time of the alleged infringement.); see also Kahn v. General Motors, 77 F.3d 457, 459 (Fed. Cir. 1996)(Patent ownership for standing purposes is a question of law that may require resolution of factual disputes by the district court.) There is no need for a jury to address the question of ownership of the patents; courts have uniformly treated the inquiry as a

purely jurisdictional matter that does not touch upon the merits of an infringement claim but rather addresses the issue of injury in fact. Id.; Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090 (Fed. Cir. 1998).

As in any case requiring determination of Article III standing, once the defendants' motion put the plaintiff's Article III standing in issue, the court has discretion to fashion the appropriate method for determining the question of standing. See Alliance For Environmental Renewal, Inc., 436 F.3d at 87 -88. If the issue cannot be resolved on motion supported by affidavits, the court may conduct a hearing limited to Article III standing. Id. Indeed, there is authority for the proposition that a district court is required to hold an evidentiary hearing if decision on a Rule 12(b)(1) motion to dismiss requires the court to "resolve disputed issues of credibility or material facts." Bord v. Rubin, 1998 WL 420777, at *6 (S.D.N.Y. July 27, 1998)(citing Kime v. United States Postal Serv., 1996 WL 590545, at *1 (N.D.Cal. Oct.7, 1996)). Plaintiff, as the party invoking the court's jurisdiction, bears the burden of proof at an evidentiary hearing on the issue of standing. Id.

### Facts

## I. Background

Except as noted, the following facts are undisputed.

Keith Leighton, the sole named inventor on the Leighton Patents, began his employment in the color printing industry in 1953 as a Plate Maker/Engraver for General Motors, where his responsibilities included printing, color proofing and production on sheet fed and web press machines. From 1970-2000, he worked for various other companies in the printing and plastic card manufacturing business. In approximately 1990, he began working as a consultant in the

9

printing and plastic card manufacturing field. (Leighton Dec. 4-5, Ex. 1 and 2). Over the course of his career Mr. Leighton had occasion to design plastic cards, manufacture them, and supervise others in the manufacture of such cards. Before his arrival at Motorola, Mr. Leighton had experimented with different methods of laminating metallic foil and butterfly wings into plastic without using any cut outs or protective devices for those foreign objects. (Leighton Dec. at 9). However, prior to his arrival at Motorola, Mr. Leighton had never seen an electronic element laminated into a card. (Leighton Dep. 10/23/06 568:21-569:4).

Prior to contacting Mr. Leighton, Motorola had tried to make identification cards on its own, but enjoyed only limited success. (February 3, 2006 Jean-Marc Delbecq Dep. 69:1-70:23). Motorola was dissatisfied with the low yield of acceptable cards, and the fact that the cards' surface was not smooth and uniform. (Id.) At the time, no one in Motorola's facility had experience in high volume manufacting of plastic cards. (May 4, 2006 Ken Thompson Dep. 55:3-23). Although Motorola was able to contract  with at least one supplier to manufacture cards, it was in discussions with Microsoft about launching a new laminated product with a completely flat surface. Motorola was therefore looking for assistance from a person with expertise in the card lamination and card manufacturing arena. (Id. at 53:13-55:23; February 3, 2006 Delbecq Dep. 12-13).

As part of its efforts to develop the new product, Motorola also purchased a used lamination machine by a company called Burkle. (May 4, 2006 Thompson Dep. 43:9-44:2). The machine was a dual stack laminator, which meant that it had a ram for applying pressure during heating, and a separate ram for applying pressure during cooling. (Id. at 44:20-45:17). The Burkle machine had a number of operational problems, including broken pressure gauges, bent

laminating platens, and a defective transfer mechanism between the hot and cold sides of the machine. (Leighton Dec. 11, 15-16.) The Burkle machine had also been designed to make printed circuit boards rather than plastic cards, which meant that it applied the greatest pressure to the material to be laminated during the heat cycle, since the heat side had the largest ram. (May 4, 2006 Thompson Dep 45:12-17). Motorola employee Kiet Huyhn testified that the Burkle lamination machine was electric, and that in order to get the books of plastic in the machine to heat up, the laminator needed to be closed, which applied additional pressure to the books. (February 2, 2006 Kiet Huyhn Dep. 52:21-53:7).

Mr. Leighton first visited Motorola's San Jose facility on February 17, 1995. He met with Ken Thompson (Technical Operations Manager) and Jean Marc Delbecq (Advanced Technology Group Manager) of Motorola. (Leighton Dec. 11, Ex. 4; May 4, 2006 Thompson Dep. 11:5-17; February 3, 2006 Delbecq Dep. 19:16-20:20). During the visit, Mr. Leighton was shown the RFID card manufacturing process that Motorola wanted him to help improve. (Leighton Dec. 11). Motorola's RFID card contained a recess or hole, as well as a gel filler or silicone pack, surrounding the electronic element – the chip and antenna combination – during lamination. (October 23, 2006 Leighton Dep. 554:6-555:7). Thompson and Delbecq were impressed by Mr. Leighton's suggestion, at that very first meeting, that they "scrap" their existing process and put the radio directly between the plastic sheets, without any cutout or gel pack. (Leighton Dec. 11; October 10, 2005 Leighton Dep. 31:1-21); October 23, 2006 Leighton Dep. 590:2-23). Mr. Leighton also told them that he would intend to use "entirely different temperatures and plastics" than the ones that Motorola had been using. (October 10, 2005 Leighton Dep. 31:1-21). Delbecq and Thompson took notes at the meeting that indicated how the electronics were to be placed

directly between the plastic sheets, and that the cold side ram needed to be larger. (Leighton Dec. 11, Ex. 4; October 10, 2005 Leighton Dep. 151:24-152:22).

During the same visit, the basic terms of a four week consulting agreement were discussed, and preliminary terms were written on a presentation board and signed by all parties. (Leighton Dec. 11, Ex. 4). A copy was provided to each party. The terms included the payment to Mr. Leighton of $7500 for four weeks, $500 for a list of up-front items required, and $1,500 as a bonus for making 10,000 cards. (Id.)

On February 22, 1995, Ken Thompson sent a letter to Mr. Leighton, outlining the results of the February 17, 1995 meeting. (Leighton Dec. Ex. 5). The letter stated in relevant part:

> We have confidence that you can lead our efforts in making flat printable cards. Jean Marc and I both were impressed with your background, material knowledge, process control applications, design of experiments, machine knowledge, and industry familiarity. We would like to hire your services in San Jose pending approval of a purchase requisition which we will submit after we have received your proposal.

Id. The letter proceeded to outline the "steps to completing this process," which included Mr. Leighton's submission of an "up front" list of items required, a quote for his services as well as, inter alia, a signed Motorola Consultant Agreement and a signed Non-Disclosure Agreement. According to the letter, a purchase order was to be issued once the requisition was approved and all agreements were signed. Id.

As part of his engagement with Motorola, Mr. Leighton signed the requested Non-Disclosure Agreement, titled the "Confidentiality Agreement," which provides in relevant part:

> In consideration of my engagement by Motorola, Inc. ("Motorola"), as a Consultant/Contractor for programs or products as directed by Motorola, and in consideration of the compensation paid to me for my services in the course of such engagement, I understand and agree to the following provisions for the protection of the property rights of Motorola:

> 1. I will promptly and fully communicate in writing to an Executive Officer of Motorola or its nominees, all inventions, innovations and ideas developed or conceived by me, whether solely or jointly with others at any time during the entire period of my engagement with Motorola, and which inventions, innovations and ideas relate to the actual and anticipated business activities of Motorola, or result from, or are suggested by, work which I do for Motorola. I agree to assign and hereby assign to Motorola as its exclusive property the entire right, title and interest in all such inventions, innovations and ideas . . ."

(Leighton Dep, Ex. 7.) Although the Agreement is dated February 23, 1995, Mr. Leighton recalls

that the Agreement was first provided to him toward the end of his four weeks at Motorola, that

he was asked to backdate the Agreement, and that he never discussed the Agreement with any

Motorola employees either before he received it or after he signed it. (Leighton Dec. 12, Ex. 7-8;

October 23, 2006 Leighton Dep. 547:2-548:25). Nevertheless, Mr. Leighton testified

unequivocally that he "understood by reading the contract, while being employed at Motorola if I

come up with any inventions, that those would be the property of Motorola," and he had no

problem with agreeing to honor this obligation from the date that appears on the Agreement,

February 23, 1995. (Id.)

In addition to the signature line for Mr. Leighton, the Confidentiality Agreement

contained a signature line for a "Motorola witness." (Leighton Dec. Ex. 7). The copy of the

Agreement that the parties have located bears only Mr. Leighton's signature. Mr. Leighton does

not contest that he signed the Agreement.

A Purchase Order authorizing Mr. Leighton's consultancy was issued by Motorola, dated

March 2, 1995. (Leighton Dec. 13, Ex. 8). The Purchase Order indicated that a signed

Confidentiality Agreement had been received and was attached as part of the Order. (Id.) The

13

copy of the Purchase Order before the court does not contain a signed Confidentiality Agreement.

The above irregularities nothwithstanding, the parties do not dispute that, barring a finding that Motorola breached its obligations to Mr. Leighton, the Confidentiality Agreement was effective to confer on Mr. Leighton an obligation to assign to Motorola any inventions "conceived or developed" during the period of his engagement with Motorola.

By letter dated March 20, 1995, Mr. Leighton provided his list of "up front items" that were necessary for the project. (Leighton Dec. 14, Ex. 9). Mr. Leighton maintains that many of these items were not provided to him at Motorola. (Leighton Dec. 14). In the same letter, Mr. Leighton stated that he could tentatively begin at Motorola on March 27, 1995, and he would need "thirty days, or less, as originally agreed" to "develop a flat printable surface in a plastic identification card containing a radio frequency device." (Leighton Dec., Ex. 9). On March 22, 1995, Mr. Leighton signed the list of deliverables attached to the February 22, 1995 letter. (Leighton Dec. 14, Ex. 6). Several of these deliverables required that Mr. Leighton provide Motorola with "specifications," "processes," and "procedures." (Id.)

## II. Mr. Leighton's Consultancy at Motorola

Between late March or early April of 1995 and May 5, 1995, Mr. Leighton provided consulting services to Motorola, with a view toward producing a commercially acceptable yield of flat printable RFID cards.[3] (October 23, 2006 Leighton Dep. 710:12-712:9). Since ownership of the patents-in-suit is likely to depend on whether or not Mr. Leighton "developed or conceived" the invention claimed in the patents-in-suit while engaged by Motorola, it is

---

[3] Due to family reasons, Mr. Leighton was unable to work for four consecutive weeks at Motorola's San Jose facility. (Leighton Dec. 13).

unsurprising that the nature and import of the experiments he conducted during this brief period lies at the heart of the parties' dispute.

The parties agree that, during his time at Motorola, Mr. Leighton made RFID cards in which the electronic element was positioned directly between two plastic sheets and was not protected by a recess or gel. (October 23, 2006 Leighton Dep. 620:10-25). In making the cards, he would first prepare a subassembly, called a "prelam," which contained the circular electronic element positioned directly between two plastic "core sheets." (Id. at 619:11-620:23; October 23, 2006 Leighton Dep., Ex. C). Next, to produce the finished card, Mr. Leighton would laminate an additional core sheet and an overlaminate film to the top and bottom of the prelam. (Id; October 23, 2006 Leighton Dep. at 621). Although this structure does not correspond in every respect to the one described in the Leighton patents, it does incorporate the patents' principal alleged improvement over prior art, namely, the positioning of the electronic element directly between two plastic sheets without the need for a protective barrier. Leighton, 358 F. Supp. 2d at 364.

The crux of the parties' factual dispute concerns the extent to which Mr. Leighton, during his time at Motorola, was able to determine the proper sequence of heat and pressure application to be used during the card lamination process in order to produce a card in which the electronic element survives intact while leaving a surface smooth enough to receive dye sublimation printing. Oberthur contends that Mr. Leighton developed and used a three-step process to laminate cards at Motorola that corresponds to the key limitations of the patents-in-suit. First, Mr. Leighton applied heat and a pressure to "just close" the laminator. (October 23, 2006 Leighton Deposition 650:13-651:2, 679:21-680:24). Second, once the plastic was softened, he increased the pressure to "facilitate encapsulating the electronics," and maintained the heating

temperature. (Id. at 668:5-670:11). Third, he "tried to obtain" the highest pressure during the
cooling phase. (October 10, 2005 Leighton Dep. 49:16-25, 153:10-154:7; October 23, 2006
Leighton Dep. 598:15-599:6).

Oberthur dismisses as irrelevant Mr. Leighton's testimony that he was unable to obtain a
higher pressure during the cooling phase due to the physical limitations of the Motorola
equipment. (October 23, 2006 Leighton Dep, 684:9-19). As long as Mr. Leighton *sought* to
implement a card lamination process that falls within the scope of the patents-in-suit, Oberthur
argues, it makes no difference that the defects or limitations of the equipment used prevented him
from reducing the invention to practice.

Oberthur further argues that the contemporaneous notes of Jean Marc Delbecq, dated
April 4, 1995, set out the key limitations in the process Mr. Leighton used at Motorola. The notes
outline the following steps, which comprise a 40-minute lamination cycle: (1) during the first 15
minutes, the card is heated at 320 degrees and a pressure that is just enough to close the laminator
is applied; (2) next, the pressure is increased to 125 bars for the next 20 minutes of the heating
cycle; (3) finally, after completion of the heating cycle, the plastic sheets are transferred to a cold
stack, and cooled at a higher pressure (135 bars) for 7 minutes. (DeFranco Dec., Ex. 45; March
22, 2006 Delbecq Dep. 240:20-241:20). At his deposition, Mr. Delbecq recognized his
handwriting, although he did not recall the note itself. He speculated that the note might have
been about an experiment that he wanted Kiet Huyhn to run while Mr. Leighton was visiting his
wife in Ohio. (March 22, 2006 Delbecq Dep. 232:7-15; 242:10-24), but had no idea if Kiet ever
tried the settings. (Id.) When he was presented with the notes, Mr. Thompson testified that those
were not the settings Motorola had been using, and that they would not have worked "because

16

the cooling pressure was too low, and the temperature was too hot." (May 4, 2006 Thompson Dep. 100:6-101:21; 116:21-118:25).

Leighton Tech contends that, due to the deficiencies in Motorola's equipment, Mr. Leighton could not obtain accurate readings of the pressure being applied to the materials in the laminator, or to control the pressure as needed. (October 23, 2006 Leighton Dep. 586:14-25); Leighton Dec. 15-16). Indeed, Mr. Leighton testified that, once he closed the laminator, the machine's pump "took over the controls." (October 23, 2006 Leighton Dep. 609:9-15). As a result, Mr. Leighton could only speculate about the specific settings that were in place for any given lamination cycle. During his deposition, Mr. Leighton ventured one such guess, approximating that he used an initial pressure of 50 pounds per square inch ("psi") during the heating phase, and a second higher pressure between 50 and 180 psi for the remainder of the heating cycle. (Id. at 679:21-681:12). When measured against Mr. Leighton's consistent testimony over three days of deposition that he was unable to determine the pressures used during the lamination cycles at Motorola, this number appears to be – as Mr. Leighton said – "a guessing game." (Id. at 681:14-16; 680:11-24). Although Mr. Leighton testified that his goal was to obtain a higher pressure during the cooling cycle, he was unable to determine whether he had even been able to equalize the pressure between the hot and cold phases of the lamination process. (Id. at 595:23-596:24).

Mr. Leighton was also unable to determine whether the electronics embedded in the cards he was able to laminate at Motorola were being destroyed. (Id. at 687:8-689:3). This was a particularly serious concern given some of the structural peculiarities of the Burkle machine. As Mr. Leighton discovered at Motorola, the rams on a printed circuit board laminator are designed

17

to exert more pressure during the heating phase of the lamination cycle than during the cooling phase. (Leighton Dec. at 16). As an electric laminator, the machine also had to be shut simply to activate the heat. (October 23, 2006 Leighton Dep. 650:17-651:2). Due to the weight of the platens (450 pounds), the moment the laminator was shut, substantial pressure would be exerted on the cards. (Leighton Dec. at 16). Moreover, the laminator would not heat up unless each of the daylights or openings from the bottom of the laminator to the top were closed, further increasing the weight and pressure on the cards during the heating phase. (Id.) Mr. Leighton testified that the weight on the electronic materials was so substantial that, at times, the electronics between between the plastic sheets embossed the solid steel laminating plates with their outline. (Leighton Dec. at 16). As a result of the excess pressure in the heating phase, many of the electronic elements embedded in the plastic were crushed. (October 23, 2006 Leighton Dep. 686:9-687:2).

Although Mr. Leighton was able to make smooth cards using dime-sized electronics and the lamination cycles Motorola had been using, he did not know if the electronics embedded in the card still worked or if they had been crushed. (Id. at 626:11-18). Motorola did not test the cards Mr. Leighton produced for functionality. Instead, according to Mr. Leighton's testimony, as soon as they were satisfied that he was able to manufacture a card smooth enough to receive dye sublimation printing, they increased the size of the electronics to be laminated. (Id. at 630:8-631:4).

To try to improve his yields at Motorola, Mr. Leighton increased the thickness of the plastics to protect the electronics as well as the temperature on the hot side of the laminator. While these modifications helped him obtain a smoother card, he still did not know if the electronics were being destroyed during the lamination process. (Id. at 687:8-689:3).

18

Both Motorola and Mr. Leighton were disappointed with the results of his efforts at Motorola. Mr. Leighton asked Motorola to consider extending the term of his agreement so that further work could be done, and new processes could be tried, but Motorola declined. (May 4, 2006 129:8-130:2; Leighton Dec. 19). At deposition, Motorola's employees testified that, while Mr. Leighton was at their facility in San Jose, he did not provide the company with information about the processes and parameters that he was using and did not make a significant contribution to their pre-existing processes. (March 22, 2006 Delbecq Dep 230:1-9, Ex. 2019; May 4, 2006 Dep 127:11-22; 145:12-146:21).

### III. Post-Motorola

Motorola compensated Mr. Leighton for all of his consulting time but refused to pay him the $1,500 bonus the parties had discussed. (October 23, 2006 Leighton Dep. 552:19-21). On May 19, 1995, Mr. Leighton sent Motorola an invoice and a cover letter explaining why he was entitled to the bonus, in which he pointed out that he was unable to make 10,000 cards, in part, because Motorola never gave him the requisite number of electronics. (Leighton Dec. 20, Exs. 10 and 11). The company responded on July 12, 1995 that Mr. Leighton was not entitled to a bonus because the process he developed resulted in poor yields of card quantities and because he failed to provide many of the promised "deliverables," including documentation about the specifications of the process he developed for Motorola. (Leighton Dec. Ex. 11; March 22, 2006 Delbecq Dep. 230:11-231:18). Mr. Thompson further testified at his deposition that Motorola had decided not to give requisite number of electronics to Mr. Leighton because they were unhappy with his services. (May 4, 2006 Thompson Dep. 132:5-12; 164:5-14; 166:23-167:11). Mr. Leighton never responded to the July 12 letter.

19

After he left Motorola, Mr. Leighton continued to seek consulting employment. On July 17, 1995 – a little over two months after he left Motorola – Mr. Leighton wrote a letter to Plastag Corporation, in which he offered to share one of his innovations: an "RFID card with a thickness of .032" that [he] was planning to have patented." (Defranco Dec., Ex. 61). The following day, Mr. Leighton wrote to another company, Hughes Identification Devices, in which he offered to produce RFID cards with a surface flatness of .00005" and a thickness of .032." (Id. Ex. 11).

Mr. Leighton testified that he had no access to any laminating equipment and was not doing any card manufacturing work at all between the time he left Motorola and the filing of his provisional patent application in October of 1995. (Leighton Dec. 21; October 23, 2006 Leighton Dep. 721:21-727:2). By the same token, he did not have the benefit of any notes he made while he was conducting experiments at Motorola, because the scrapbook log that contained his notes remained at Motorola. (October 10, 2005 Leighton Dep. 147:13-17). Nevertheless, Mr. Leighton testified that he continued to think about the problems he had encountered at Motorola – in particular, the need to develop a manufacturing process that would produce a smooth card without destroying the electronics – and over time came up with the idea that led to his patents. ((Leighton Dec. 21; October 23, 2006 Leighton Dep. 721:21-727:2.) According to his testimony, between the time he left Motorola and the filing of his provisional patent application, he realized that he would need to flow the plastic around the electronics before any pressure was applied, and that the lamination process should therefore begin with the application of heat from the top and bottom platens, but with no pressure being applied to the electronics. (Id.) Mr. Leighton's testimony on this issue was unambiguous: he stated that the idea of applying heat without any pressure at the beginning of the lamination cycle did not occur to him until after he left Motorola.

(October 23, 2006 Leighton Dep. at 726:9- 24.) Mr. Leighton attributed his inspiration during

this period to God's help. Although Mr. Leighton testified the he wrote the entire process down

once the idea occurred to him after he left Motorola – and that he followed it thereafter – the first

cards were not manufactured using the process until early 1996, well after he filed the provisional

application. ( Id.)

At his deposition, Mr. Leighton testified that, due to the state of Motorola's equipment,

his "invention could not have been practiced at Motorola." (October 10, 2005 Leighton Dep.

141:20-21) Mr. Leighton proceeded to identify a number of differences between the process he

used at Motorola and the one he subsequently patented. In contrast to Mr. Leighton's patented

process, Motorola did not print on the first lamination core sheets, or the "prelam;" printing

directly on the prelam, as indicated in claim 1 of Mr. Leighton's '207 patent, eliminates some of

the thickness of plastic core stock. (Id. at 145:17-21). Mr. Leighton likewise identified

differences in the design of the inlay and the chip that comprises part of the electronic element.

(Id. at 145:23-25).

Critically, Mr. Leighton testified that it was not possible to apply zero pressure to the

contents of the laminator during the first heating phase. (Id. at. 144:25-145:10). In comparing the

process described in the patents-in-suit to the process he implemented at Motorola, Mr. Leighton

explained as follows: "I can illustrate that Motorola had a wide ratio antenna which absorbed the

pressure, and you could go ahead and close the laminator and heat it up. What I did was entirely

different. I did not give pressures to the surface of my substrate before liequefying it. At

Motorola they did." (Id.) Motorola's equipment further lacked the counterbalance platens that

would have been necessary to manufacture laminated cards according to Mr. Leighton's patented

21

process on the Motorola machine. (Id. at 142:10-13).

After his engagement was over, Mr. Leighton contacted Motorola a number of times to ask if the company was interested in new methods that he had developed for smart cards. He advised Motorola that he had patents pending on processes for making smart cards, as well as issued patents. (Leighton Dec. 24, Exs. 12-17). On one occasion in 2000, Motorola showed some initial interest in licensing or purchasing the technology, but eventually declined, as it ultimately did on every other occasion. (Leighton Dec. 24). (Leighton Dec. 24, Exs. 12-17). Motorola never asserted ownership of Mr. Leighton's patents.

Prior to forming Leighton Technologies, LLC, General Patent had a number of discussions with Mr. Leighton, during which he offered assurances that he had not invented anything at Motorola. (Leighton Dec. 25). On or about 2003, Leighton Technologies LLC was formed. (Id., Exs. 19 and 20). Mr. Leighton, and the other individuals with interests in Mr. Leighton's patents, transferred their interests and became members of the company, in accordance with its formation documents. Id.

On May 27, 2005, HID Corp., the successor-in-interest to Motorola's RFID card business, filed suit against Leighton Tech in the Central District of California, seeking declaratory relief and asserting a claim of unfair competition under California law. HID, et al. v. Leighton Technologies, LLC, et al., 05-civ-00513. In the complaint, HID alleges that it was contacted by Leighton in August of 2003 concerning HID's alleged infringement of the Leighton Patents. (Complaint 12). Subsequent licensing discussions between the parties took place, but no agreement was reached. (Id.) HID apparently commenced its declaratory judgment action in California shortly after being contacted again about the Leighton Patents in May of 2005.

Although HID did not raise any issues regarding ownership of the patents in its complaint, it asserted ownership of the Leighton Patents in its Answer to Leighton Tech's counterclaims, dated April 28, 2006.

## Discussion

Before turning to the key issue of the invention's conception, the court must briefly dispense with two arguments that, according to plaintiff, render any such inquiry unnecessary. Neither is persuasive.

First, the plaintiff argues that, regardless of whether Mr. Leighton conceived of his invention while at Motorola, any obligation he might have had to assign inventions to Motorola was discharged when Motorola breached the parties' contract by purposefully failing to provide Mr. Leighton with sufficient electronics to make 10,000 cards, thereby making it impossible for him to earn the $1,500 bonus contemplated by the parties. I reject the argument.

Contrary to the plaintiff's contention, Motorola did not breach the parties' contract by failing to provide Mr. Leighton with the number of electronic elements that would enable him to meet the 10,000-card target for a bonus. Although the parties agree that Mr. Leighton's bonus was not dependent on the yield of acceptable cards, it was contingent on manufacturing 10,000 cards pursuant to a "process" that complies with the entirety of the parties' agreement. (DeFranco Exs. 25, 27, 29). The target number thus cannot be viewed in isolation from the process-based results for which Motorola contracted. If the company was dissatisfied with the process Mr. Leighton was using to manufacture laminated cards during his engagement – including his inability to document that process so that its results could be reproduced – it had no obligation under the parties' agreement to provide him with 10,000 electronic elements. Its failure to do so

does not constitute a breach of the parties' agreement that discharges Mr. Leighton's obligation to assign any inventions developed or conceived during his engagement with Motorola to the company.

Plaintiff also argues that Mr. Leighton's assignment of the patents-in-suit to Leighton Tech cut off any interest that Motorola may have had in the patents because Motorola never recorded any assignment interest in the patents with the Patent and Trademark Office. 35 U.S.C. §261. But by its terms, §261 only applies to subsequent purchasers for value and without notice of the prior unrecorded assignment. The notice requirement of §261 "is broader than actual notice, and includes constructive and inquiry notice." Katz v. Lear Siegler, Inc. 1993 WL 262564, at *4 (Fed. Cir. July 12, 1993). Constructive notice "may be based on any fact within the knowledge or means of knowledge, of the purchaser of the unrecorded assignment, and which fact should logically lead him, upon inquiry to a knowledge of the existence and purport of that assignment itself." (Id.)

Where a party is experienced in the business of acquiring and enforcing patents, it is especially appropriate to find that it had constructive knowledge of another's potential rights in the patents. Katz, 1993 WL 262564, at *4. In this case, Mr. Leighton and the General Patent Corporation, among others, entered into an agreement to enforce the Leighton Patents. As part of that agreement, they formed Leighton Tech, of which they are the principal members. Despite Mr. Leighton's assurances to the contrary, the General Patent Corporation had at least constructive notice that Mr. Leighton might have assigned his rights in the patents-in-suit to Motorola, because Mr. Leighton described the experiments he conducted at Motorola and then offered assurances (which may or may not have been accurate) about what he did or did not

24

invent during his consultancy at Motorola. Moreover, Mr. Leighton himself knew that he had assigned any invention conceived at Motorola to Motorola, which means that Leighton Tech had actual, not constructive, notice. If Mr. Leighton did, in fact, contractually assign his patented invention to Motorola, §261 does not relieve the plaintiff of the consequences of that assignment.

Beyond these two preliminary matters, the parties do not dispute that the Confidentiality Agreement imposed a valid and enforceable obligation on Mr. Leighton to assign any inventions "developed or conceived" during the course of his engagement with Motorola to the company. The question to be answered is whether the patented invention was developed or conceived in the brief period while Mr. Leighton worked for Motorola.

When conception took place  is a question of law to be determined by the court based on subsidiary factual findings. Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986). Conception is defined as the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Id.; see also FilmTec, 982 F.2d at 1551. The plaintiff argues that this definition is incomplete, that conception further requires disclosure, and that it must encompass all limitations of the claimed invention. See In re Jolley, 308 F.3d 1317 (Fed. Cir. 2002); Brown v. Barbacid, 276 F.3d 1327 (Fed. Cir. 2002). As the defendant correctly points out, however, this exacting standard hails from a line of cases involving claims in which the plaintiff sought to be added as a co-inventor or from interference proceedings, in which policy concerns about self-serving claims of inventorship require courts to exercise the greatest caution. It is in this context of assessing priority and claims to co-inventorship that courts have hewn to the line of the patents themselves to determine whether and when the complete and operative invention has been

25

conceived.

As the FilmTec court makes clear, a less stringent standard applies when determining whether patent rights were contractually assigned. Indeed, in FilmTec, the Federal Circuit Court of Appeals held that the district court had erred by resolving the issue of title to the patent-in-suit according to the patent claims rather than the terms of the operative contract. 982 F.2d 1546. Critical as it is to the disposition of the case at bar, the FilmTec opinion requires further elaboration.

The patent at issue in FilmTec covered a membrane for desalinizing sea water, which was produced by reacting two compounds – trimesoy chloride (TMC) and metaphenylene diamine (MPD). Id. at 1549. In 1977, the inventor of the patent performed experiments under a federal contract, and conceived of a membrane, which was made using TMC and MPD. (Id.) Under the parties' contract, the inventor's employer assigned to the government all rights to inventions conceived during the performance thereof. Id. at 1548. The inventor subsequently left his employer and started a new company, FilmTec, to commercialize the membrane. Id. at 1549. In 1978, while at FilmTec, the inventor refined the manufacture of the membrane and obtained better performance results. Id. Film Tec then filed a patent application with claims covering the membrane, as well as its improved results and refined manufacturing method. Id. at 1552.

The district court concluded that the claimed membranes were not invented under the government contract because the experiments conducted under the contract did not "embody the [] invention" and did not meet the performance limitations of the patented claims. The district court also cited the inventor's testimony that he did not find the results of those initial experiments particularly encouraging, and that he did not even remember those experiments

when he reacted TMC and MPD again at FilmTec. The Federal Circuit reversed, holding that the

invention had been "conceived" during the government contract. Id. at 1553. The court explained

that the "key limitations of the claimed" invention — the manufacture of a membrane with the

use of TMC and MPD as the reactants – were conceived under the government contract. Id. at

1552. The court noted that the use of TMC was the "key distinction" between the patented

invention and the prior art, and one on which the inventor relied in the prosecution of his patent

application. Id.

The court also rejected FilmTec's argument that, because the membrane developed under

the government contract did not meet the performance limitations of the patented claims, it had

not been conceived under the contract:

> [The inventor] may well have refined the invention when he went to FilmTec, and he
> may have then found the best conditions for making his compositions. The record is clear,
> however, that his work in February 1978 was on the same invention that he conceived in
> November 1977. Were we to find that inclusion of narrow performance limitations in the
> claims could serve to expel the claimed invention from operation of the Contract under
> which the invention was made, we would be defeating the intentions of the parties to the
> Contract, who agreed that inventions made thereunder belong to the United States.

Id. at 1553. It is significant that, while the court held that commercial success was not required

for a finding of conception, it also underscored that the results obtained under the government

contract "went beyond the minimum requirements of operability; they actually worked to

desalinize seawater." Id.

There are striking similarities between the factual scenario the court confronted in

FilmTec and the present case. But there are also two key differences.

First, the key limitations of the patent at issue in FilmTec were fundamentally structural

in nature. As the court found, the invention was defined by the novel use of two particular

27

chemical reactants. Id. at 1552. By contrast, the patents-in-suit claim not only a novel structure –
one in which the electronic element is positioned directly between plastic sheets – but also a new
"highly coordinated" hot lamination process that renders this structure viable in the course of the
card's production. Thus, while this court has found that the absence of a "buffer" or "buffer
zone" is the critical improvement of the Leighton patents over prior art, that improvement would
be meaningless without a lamination process that preserves the structure's integrity. A definite
and permanent idea of Mr. Leighton's complete and operative invention must therefore include
the critical steps in the lamination process that are claimed in the patent: a first lamination cycle
with little or no presure; a heat cycle in which the temperature is raised first and then the pressure
is increased to facilitate the flow of the plastic, but not so greatly as to damage the electronic
element; and finally a chill cyle in which the pressure is increased until the platens have cooled.
Leighton, 358 F. Supp. 2d 361.

Mr. Leighton testified that he attempted to implement some aspects of this process at
Motorola – most notably, he tried to obtain the highest pressure during the cooling phase. It is
less clear to the court whether he conceived any definite and permanent idea of the process as a
whole during his engagement with Motorola. Oberthur attaches great significance to Mr.
Leighton's testimony that he used only as much pressure as was required to "just close"the
laminator in the first heating phase. Yet it is undisputed that the pressure exerted on the
electronics by the 450 pound platens when the Burkle machine was "just closed" was very
substantial and infinitely higher than zero. Mr. Leighton testified that he could not measure the
pressure used during any particular lamination cycle on the Burkle machine. Nevertheless, it
appears that the structure of the equipment made it impossible to achieve zero or minimal

pressure; indeed, at times the pressure was so high that the platens were embossed with the outlines of the electronic element. Mr. Leighton testified that he did not come up with the idea of using "little or no pressure" during the first phase of the card's lamination until after his engagement with Motorola.

The second key difference between FilmTec and the present case lies in the results obtained. While the inventor in FilmTec may have testified, credibly, that he did not find the results of his experiments under the government contract particularly encouraging, the incontrovertible fact remains that the membranes he produced under that contract "actually worked to desalinize seawater" and performed their "intended function beyond a probability of failure." 982 F.2d 1552-53. There is no indication on the record before me that the cards Mr. Leighton produced at Motorola actually worked or performed their intended function. Indeed, it appears that neither Mr. Leighton or anyone else ever tested the cards that emerged from the Burkle machine with a smooth surface to make sure that the electronic elements had not been destroyed. This omission is all the more striking given the admitted structural features of the Burkle machine that greatly increased the probability of damage to the electronics. Thus, ample evidence in the record concerning the state of Motorola's equipment supports Mr. Leighton's contention that he did not conceive the entire invention while at Motorola because his patented invention could not have been practiced at Motorola.

Oberthur further argues that even if Mr. Leighton's patented process was not "conceived" during the course of his engagement with Motorola, it may still have been "developed" at Motorola. Unfortunately for Oberthur, the law is otherwise.

The term "development" is not defined in the Confidentiality Agreement. Nor does it

29

have a technical meaning in the patent jurisprudence, as "conception" does. Courts have made clear that the touchstone of inventorship in the patent context is conception alone, not development or reduction to practice. See Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1324 (Fed. Cir. 2000).

However, the small number of courts that have construed the meaning of development in the context of an invention's contractual assignment have confirmed the intuitive proposition that an invention must be "conceived" before it can be "developed." In VEC Tech, LLC v. Acrylon Plastics, Inc., 2004 WL 2595894 (D.Minn., Nov. 12, 2004), for instance, the court construed a contract that provided for the assignment of all inventions "conceived of or first reduced to practice" in the course of the consultancy. The court ultimately required assignment of the patent application to VEC because "Evidence in the record reflects that [the defendant] conceived of the RAM technology before entering into the Consulting Agreement, but that the RAM technology was developed while [the defendant] was consulting with VEC." Id. at 6. The court thus viewed the notion of development as part and parcel of the reduction to practice of a previously conceived invention. More analogous still is Voith Hydro, Inc. v. Hydro West Group, 1997 WL 154400 (N.D.Cal. March 26, 1997) in which the court construed an Agreement under which any inventions or ideas "conceived or developed" during the course of the employment were the property of the employer, Allis-Chalmers. The court found that the inventor conceived of the idea for the patented invention – a hydroelectric "potential flow turbine" – prior to executing the Employment Agreements, and that he did not develop the invention while employed at Allis-Chalmers. The court explained its rationale as follows:

Although Gokhman did some work on the potential flow turbine while employed at Allis-

Chalmers, this work does not rise to the level of "development." The capabilities of the potential flow turbine were never brought out during Gokhman's employment at Allis-Chalmers. The prototype wicket gates for the Yacereta project were never refined, nor were they tested. The computer calculations for corresponding runner blades were never translated into a tangible form and were never modeled or tested. The potential flow turbine was never put together into a working, tangible form, much less perfected between 1981 and 1986 or anytime thereafter by Voith or Allis-Chalmers.

Id. at *6.: See also Mosser Industries, Inc. v. Hagar, 200 U.S.P.Q. 608 (Pa.Ct.Com.Pl. 1978)(invention "developed" where the elements were combined into a working prototype, not during prior employment where individual elements were conceived.)

Oberthur does not contend that Mr. Leighton had fully conceived of his invention prior to his engagement with Motorola. Instead, defendant argues that Mr. Leighton conceived key parts of his invention prior to his engagement with Motorola – principally, the notion of embedding the electronic element in plastic without any protective buffer – and "developed" his invention while at Motorola, thereby completing "conception" while he was at Motorola.

Even if Oberthur's "partial invention" concept were legally viable, the court rejects the notion that Mr. Leighton's work on RFID cards at Motorola can constitute development. As the Voith-Hydro and VEC Tech. decisions make clear, the hallmark of development is practical implementation – the testing and technical refinement of ideas. Yet practical implementation of Mr. Leighton's invention is precisely what did not occur at Motorola. If Mr. Leighton did conceive his invention   in whole or in part – prior to starting at Motorola, there is still no way that he could have modeled, tested, or perfected a lamination process that requires zero or little pressure at the beginning of the first lamination phase and greatest pressure during the cooling phase on Motorola's Burkle machine. The same would be true if Mr. Leighton conceived his

31

invention while at Motorola. Conception alone would have triggered Mr. Leighton's obligation under the Confidentiality Agreement to assign his patented invention, but that would not change the fact that nothing he did while at Motorola qualifies as "development."

Finally, Motorola's reaction to Mr. Leighton's efforts provides some guidance with respect to the parties' expectations under the Agreement. Motorola hired Mr. Leighton to provide consulting with respect to and help improve the company's preexisting process for manufacturing smart cards. At the end of his brief tenure, Motorola was dissatisfied with Mr. Leighton's performance, specifically his failure to provide the company with any documented and replicable processes. Mr. Delbecq testified that Mr. Leighton did not contribute meaningfully to the processes already in use at Motorola. Motorola's reaction indicates that, in the company's view, Mr. Leighton failed to accomplish the narrow task for which he had been hired, much less conceive of or develop an invention during his five weeks at Motorola. This is again in striking contrast to the results of the initial experiments in FilmTec, where the goal contemplated, not only by the parties' contract, but also by the Saline Water Conversion Act, was in large measure achieved.

So Oberthur gets no mileage out of the issue of development, and the only issue to be decided is whether Mr. Leighton conceived his patented invention while he was at Motorola or after the fact. Since the core question concerns what went on in Mr. Leighton's mind, it is hard to supply evidence that directly contradicts his testimony that he did not conceive his invention until after he left Motorola. Nevertheless, Oberthur argues that Mr. Leighton's testimony is incredible because he had no access to lamination equipment between the time he left Motorola and the filing of his provisional patent application. Leighton Tech responds that it defies credulity to

think that Mr. Leighton could have conceived the invention while working with Motorola's outdated and defective equipment.

As a layperson, I frankly find it difficult to imagine that an inventor would apply for a patent without conducting any experiments or trials to make sure that his idea works (which is what Mr. Leighton would have me believe). Furthermore, it makes no difference whether the invention was not put into practice because no equipment was available to the inventor or because the equipment that was available was defective. And there is other evidence in the record that suggests that Mr. Leighton's testimony (which is, of course, self-serving) is less than candid.

However, conception does not require reducing the invention to practice, and it is conceivable that an inventor might patent a wholly untried invention. And there is evidence in the record tending to support Mr. Leighton's position as well.

In short, I cannot resolve the ownership issue on the papers alone. I need to hold an evidentiary hearing to hear from several witnesses – most obviously, Mr. Leighton, but also Mr. Delbecq, Mr. Thompson, and Mr. Huyhn.

This case was originally scheduled for trial in September. If counsel are still free, the best course is to use that time to resolve the issue of standing. If the proposed date no longer works, counsel should notify the court of another mutually convenient time for the evidentiary hearing. If the plaintiff prevails, the court can turn its attention to the merits – to the motion for summary judgment on the question of infringement and, if necessary, a trial.

## CONCLUSION

For the foregoing reasons, the court holds that resolution of this motion requires further fact-finding. The parties are directed to correspond with the court to schedule an evidentiary hearing during the week of September 10, 2007 or at another mutually convenient time soon thereafter.

This constitutes the decision and order of the Court.

Dated: July 11, 2007

U.S.D.J.

BY FAX TO ALL COUNSEL