**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEIGHTON TECHNOLOGIES LLC,<br><br>    Plaintiff,<br><br>        vs.<br><br>OBERTHUR CARD SYSTEMS, S.A. and<br>OBERTHUR CARD SYSTEMS OF<br>AMERICA CORPORATION,<br><br>    Defendants. | Case No: 04 CV 02496 (CM) (LMS)<br><br>**DECLARATION OF EDWARD J.<br>DEFRANCO SUBMITTED IN<br>OPPOSITION TO PLAINTIFF'S<br>MOTION FOR LEAVE TO FILE AN<br>AMENDED ANSWER** |
| OBERTHUR CARD SYSTEMS, S.A. and<br>OBERTHUR CARD SYSTEMS OF<br>AMERICA CORPORATION,<br><br>    Counterclaim Plaintiffs,<br><br>        vs.<br><br>LEIGHTON TECHNOLOGIES LLC,<br>GENERAL PATENT CORPORATION<br>INTERNATIONAL, GENERAL PATENT<br>CORPORATION, and IP HOLDINGS LLC,<br><br>    Counterclaim Defendants. | |

I, Edward J. DeFranco, under penalty of perjury, declare as follows:

I am a partner at Quinn Emanuel Urquhart Oliver & Hedges, LLP, and I represent

Oberthur Card Systems, S.A. and Oberthur Card Systems of America Corporation in this case.  I

submit this Declaration in opposition to Leighton's Motion for Leave to File an Amended

Answer to Oberthur's Counterclaims.

    1.      Attached to this Declaration as Exhibit 1 is a true copy and correct copy of

ROBERT A. MATTHEWS, JR., ANNOTATED PATENT DIGEST § 26:127 (2008).

2.      Attached to this Declaration as Exhibit 2 is a true copy and correct copy of pages 180-182 from the March 22, 2006 deposition of Jean-Marc Delbecq.

3.      Attached to this Declaration as Exhibit 3 is a true copy and correct copy of pages 15-17 from the November 6, 2007 hearing before the Court.

4.      Attached to this Declaration as Exhibit 4 is a true and correct copy of a letter from the Court to counsel dated December 3, 2007.

5.      Attached to this Declaration as Exhibit 5 is a true and correct copy of *Monsanto Co. v. Bayer Bioscience N.V.*, 2005 WL 5989796 (E.D. Mo. Oct. 28, 2005).

I swear under penalty of perjury that the foregoing is true and correct.

Dated:  April 16, 2008

Edward J. DeFranco (ED-6524)

2

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any, on this 16th day of April, 2008.

/s/ Edward J. DeFranco (ED-6524)

# Exhibit 1

Annotated Patent Digest (Matthews)
Database updated March 2008

Robert A. Matthews, Jr.

Chapter 26. Inventorship & Priority of Invention
VIII. Correcting Named Inventorship
A. § 256 — Correcting Inventorship in an Issued Patent

<u>References</u>

§ 26:127. **Laches or equitable estoppel may defeat action**

**West's Key Number Digest**

West's Key Number Digest, <u>Patents</u> ☞97, 126

While the diligence is not statutorily required, in certain circumstances laches or equitable estoppel can defeat an action to correct inventorship.

*See*

<u>Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1573, 31 U.S.P.Q.2d (BNA) 1290, 1295 (Fed. Cir. 1994)</u> (noting that "the defenses of laches and estoppel have been applied in actions under <u>§ 256</u>" — vacating summary judgment dismissing omitted inventor's <u>§ 256</u> claim to correct inventorship on grounds of laches because disputed fact issues regarding when the omitted inventor should have known of the patents and his omission existed).

<u>Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc., 988 F.2d 1157, 1162–63, 26 U.S.P.Q.2d (BNA) 1038 (Fed. Cir. 1993)</u> (noting that "a delay of more than six years after the omitted inventor knew or should have known of the issuance of the patent will produce a rebuttable presumption of laches" — vacating Rule 12(b)(6) dismissal of claim to correct inventorship under <u>§ 256</u> based on laches because measuring period of delay from the date of issuance of the patent was improper without a showing that the omitted inventor knew or should have known of the issuance and the omission of his name on that date).

<u>MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568, 1572, 10 U.S.P.Q.2d (BNA) 1287 (Fed. Cir. 1989)</u> (affirming summary judgment dismissing omitted inventor's <u>§ 256</u> claim based on equitable estoppel where the alleged omitted inventor waited for over four years after he knew he was omitted from the patent to challenge the named inventorship and had previously stated to the patentee that possessing rights to the patent were unimportant to him, as he only cared about

securing rights to market the patented invention, the court finding that this
demonstrated an acquiescence to being omitted).

Serdarevic v. Advanced Medical Optics, Inc., 2007 WL 2774177, *6-*8 (S.D. N.Y.
2007) (granting defendants' motion for summary judgment that laches barred
plaintiff's omitted inventorship claim where plaintiff waited for over eight
years upon learning of the patents to file her suit, and therefore the
presumption of laches applied, further in that interim three witnesses who
plaintiff allegedly worked with had died, therefore the defendants suffered
evidentiary prejudice for the delay, further finding the delay was unexcusable
where in 1999 the plaintiff had promised to provide the defendants with
documentary evidence substantiating her inventorship claim, but never did, and
ceased any further discussions with the defendants until she filed suit in 2006,
further rejecting plaintiff's argument that the presumption of laches should not
apply because she did not have formal discovery), on subsequent proceedings,
2007 WL 4481438, *1 (S.D.N.Y. Dec. 20, 2007) (after granting defendants summary
judgment dismissing plaintiff's omitted inventor claim for being time barred,
denying defendants' request for attorneys fees - "This motion rests on the
theory that the plaintiff should have understood that her claims were frivolous
because of the affirmative defenses on which the defendants would prevail. While
there may be circumstances in which an award fees because of the strength of an
affirmative defense is appropriate, in an exercise of discretion, this Court
declines to enter such an award here. Among other things, this case was
dismissed within roughly one year of its filing, without the defendants having
to participate in any discovery. The financial burdens on the defendants have
therefore been relatively limited.")

Cf.

Board of Trustees of Leland Stanford Junior University v. Roche Molecular
Systems, Inc., 2007 WL 608009, *8-*11 (N.D. Cal. 2007) (applying state law
statute of limitations and laches in granting plaintiff summary judgment that
defendant's ownership claims to disputed patents were time-barred under the
California four-year statute of limitation and laches, where the ownership
claims were based on alleged contractual agreements and the defendant's
acquisition of the business entity whose employee was the named inventor of the
disputed patent—further ruling that since the invention was conceived as part of
a federal grant, the Bayh-Dole Act applied to automatically vest the ownership
rights in the patent for the invention with the federal government rather than
the inventor's employer, by which path the plaintiff had acquired the ownership
rights in the patent from the government despite the defendant's acquisition of
the employer, further ruling that any nonexclusive license enjoyed by the
employer did not transfer to the defendant as a result of the defendant's
acquisition of the employer and rejecting the notion that a nonexclusive license
automatically transferred with the total sale of a business, also ruling that no
shop right attached to the invention since under the Bayh-Dole Act the invention
was immediately assigned to the federal government)

Should the named inventors or assignee engage in acts to conceal the patent or
patent application from an omitted inventor, that activity may show that the named
inventors or assignee have unclean hands that can negate a laches defense.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ANPATDIG § 26:127                                                                Page 3
4 Annotated Patent Digest § 26:127

Yeda Research And Development Co. Ltd. v. Imclone Systems Inc., 443 F. Supp. 2d 570 (S.D. N.Y. 2006) ("Because we find that defendants' hands are unclean, *i.e.,* they are responsible for plaintiff not finding out about their patent applications, the laches defense is unavailable to defendants. The conclusion of the *Cyanamid* court that the laches defense is barred where the delay in discovering a patent application 'was the result of the very conduct for which relief is sought' is equally applicable here. University of Colorado Foundation, Inc. v. American Cyanamid Co., 974 F. Supp. 1339, 1355, 121 Ed. Law Rep. 204, 44 U.S.P.Q.2d 1231 (D. Colo. 1997), aff'd in part, vacated in part on other grounds, remanded, 196 F.3d 1366, 140 Ed. Law Rep. 59, 52 U.S.P.Q.2d 1801 (Fed. Cir. 1999). Here, the defendants began seeking a patent in 1988, but plaintiff did not become aware that defendants were seeking a patent until 2000, the '866 patent did not issue until 2001, and plaintiff did not locate the patent until 2002. Between the time Yeda located the issued patent and brought suit, they engaged in a series of discussions with defendants in an attempt to settle this matter out of court. after those efforts failed, Yeda filed suit in late 2003. We will not reiterate the extraordinary lengths defendants undertook to prevent the named inventors from discovering their actions. These are fully set forth in the facts section. Rather, we simply note that defendants could have contacted Yeda and discussed the inventorship issue at *any* time in the period from 1988 to 2000. Instead, they engaged in a series of actions designed to keep Yeda and the Weizmann scientists in the dark. Put simply, in light of their own misconduct, defendants may not complain now of plaintiff's failure to bring suit earlier. We do not doubt that if Yeda had become aware of the patent application earlier, they would not have hesitated to assert their legal rights. … [W]e note [further] that any prejudice suffered by defendants is of their own doing, and is thus not a valid reason to permit the laches defense. As discussed in the fact section, ImClone spent the vast majority of its funds investing in Erbitux *after* it became aware of the inventorship dispute. Had the defendants simply put Yeda on notice of its intention to file a patent in 1988, there would have been absolutely no risk of prejudice. We now decline to employ an equitable tool to prevent plaintiff from obtaining those legal rights that defendants attempted to conceal from Yeda for over a decade."—emphasis in original, citation omitted—ruling that alleged omitted inventors were in fact the sole inventors of the patents at issue since the evidence showed that the omitted inventors solely conceived the claimed invention, further ruling that named inventors were not joint inventors since supply unpatented antibodies, while possibly being a "but for" causation to the claimed invention of using the antibodies to treat a type of cancer, the mere supplying of antibodies did not form part of the conception of the invention, nor did the named inventors collaborate with the omitted inventors, further denying named inventors contention that laches barred the omitted inventors' claim to correct inventorship where the court found that because of the defendants unclean hands in hiding the fact that they filed a patent application from the plaintiffs, the plaintiffs' delay in seeking the correction of inventorship was not unreasonable—citation omitted)

It seems debatable that if a patentee succeeds in defeating a claim of an alleged omitted inventor on the basis of laches or equitable estoppel, rather than on the merits, the patentee may later find that it "won the battle, but lost the war." While the patentee may have foreclosed the alleged omitted inventor from raising future challenges to the inventorship, accused infringers not in privity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with the omitted inventor would not be bound by the judgment in the patentee's favor on the omitted-inventor issue. An accused infringer could litigate the inventorship issue under a § 102(f) invalidity defense for incorrect inventorship. If an accused infringer meets its burden to prove that the omitted inventor was a true inventor, the patentee may find itself judicially estopped to ask a court to correct the patent under § 256 to add the omitted inventor.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ANPATDIG § 26:127

END OF DOCUMENT

Exhibit 2

Confidential

Page 151

1           UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3      - - - - - - - - - - - - - - - - - -

4   LEIGHTON TECHNOLOGIES, LLC,        )      Case No.

5              Plaintiff and           )      04 Civ. 02496

6           Counterclaim Defendant,    )

7    v.                                )      COPY

8   OBERTHUR CARD SYSTEMS, S.A., AND   )

9   OBERTHUR CARD SYSTEMS OF           )

10  AMERICA CORPORATION,               )

11             Defendants and          )

12          Counterclaim Plaintiffs    )

13     - - - - - - - - - - - - - - - - - -

14               CONFIDENTIAL

15     DEPOSITION OF JEAN-MARC DELBECQ

16         WEDNESDAY, MARCH 22, 2006

17        PAGES 151 - 308; VOLUME 2

18

19

20

21

22        BY:  CHRISTINE L. JORDAN, CSR NO. 12262

23

24

25

Confidential

Page 180

1      Q.    Do you see an AVC 132 in front of you?

2      A.    You want that?

3            (Witness reviews the cards.)

4            THE WITNESS:  I do not.

5  BY MR. J. JACOBS:

6      Q.    The design of the AVC 132, when was the first

7  date when the design of the AVC 132 was shown in

8  Exhibit 2017 A arrived at?

9            MR. B. JACOBS:  Calls for speculation.

10            THE WITNESS:  I don't know.

11            MR. J. JACOBS:  You don't know.

12  BY MR. J. JACOBS:

13      Q.    Was the -- was the design as shown -- as

14  shown on Exhibit 2017 of AVC 132 settled prior to

15  January 1, 1995?

16            MR. B. JACOBS:  Lacks foundation.

17            THE WITNESS:  I think that -- this is my --

18  what I think.  I think that we had a pretty clear

19  notion of what we wanted to do to produce the AVC 132.

20            The AVC 131 had some problems.  I think I had

21  already mentioned that.  It had some reliability

22  problems.  It had some cost problems.  It had read

23  range limitations.  We were very interested in --

24            (Phone rings.)

25            THE WITNESS:  In addition to those

Confidential

Page 181

1    limitations --

2              MR. LIEB:  Go off the record.

3              MR. J. JACOBS:  Let's go off the record.

4              THE VIDEOGRAPHER:  Stand by, please.  Going

5    off the record.  The time is 9:17 a.m.

6              (Off the record.)

7              THE VIDEOGRAPHER:  We are back on the record.

8    The time is 9:18 a.m.

9              (Record read as follows:

10             "QUESTION:  Was the design as shown -- as

11             shown on Exhibit 2017 of AVC 132 settled

12             prior to January 1, 1995?")

13             MR. B. JACOBS:  Same objection.

14             THE WITNESS:  I think that it was.

15             MR. J. JACOBS:  All right.

16   BY MR. J. JACOBS:

17       Q.    And who designed the AVC 132?

18       A.    Who designed the AVC 132?

19       Q.    The structure of the AVC 132 as we see it in

20   Exhibit 2017 A.

21       A.    I -- it was -- most likely, the very first

22   documentation of the design were done -- was done

23   either by myself or Noel Eberhardt.

24       Q.    Did you participate in the design of the AVC

25   132 as shown in Exhibit 2017 A?

Confidential

Page 182

1    A.    I did.

2    Q.    And it's based upon your participation in the

3    design of the Exhibit 2017 A, the AVC as shown in

4    Exhibit 2017 A, that you've concluded that that design

5    was arrived at prior to January 1, 1995?

6         MR. B. JACOBS:    Object to form; lacks

7    foundation, calls for speculation.

8         MR. J. JACOBS:    What's speculation about it?

9         MR. B. JACOBS:    Well, he answered the

10   question before and said he had no idea when this was

11   arrived at.   And now you keep asking him if it was

12   before January 1 of 1995.   He can't know that if he

13   didn't know when it was arrived at.   So therefore it

14   lacks foundation.   He has no personal knowledge to

15   testify to that fact.

16        MR. J. JACOBS:    All right.

17        MR. B. JACOBS:    Calls for speculation.

18   BY MR. J. JACOBS:

19   Q.    Do you recall testifying previously that you

20   had -- that you did not know when the design of the

21   AVC 132 as shown in Exhibit 2017 A was made?

22   A.    My opinion is that the construction, the

23   design principles, the general method of constructing

24   the AVC 132, was first documented, slash, designed by

25   myself and Noel Eberhardt prior to January 2005 (sic).

Confidential

Page 307

1        (At 3:33 p.m., the deposition proceedings

2        concluded.)

3

4

5    ------------------------------------

6            JEAN-MARC DELBECQ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 3

7B6VLEIH                          Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEIGHTON TECHNOLOGIES LLC,

4                    Plaintiff,

5          v.                              04 CV 02496 (CM)

6   OBERTHUR CARD SYSTEMS, S.A.,
    et al,
7
                     Defendant.
8
    ------------------------------x
9                                          New York, N.Y.
                                           November 6, 2007
10                                         2:15 p.m.

11  Before:

12                   HON. COLLEEN MCMAHON,

13                                         District Judge

14                   APPEARANCES

15  SUTHERLAND ASBILL & BRENNAN, LLP
         Attorneys for Plaintiff
16  BY:  CHUCK HAWKINS
         BLAIR M. JACOBS
17       ROBERT A. GUTKIN

18  QUINN EMANUEL
         Attorneys for Defendant
19  BY:  KEVIN P. B. JOHNSON
         EDWARD J. DeFRANCO
20       MARK D. BAKER

21

22          (In open court)

23          THE COURT:  Good afternoon, everyone.

24          MR. GUTKIN:  Good afternoon, your Honor.

25          MR. JOHNSON:  Good afternoon, your Honor.

7B6VLEIH                    Hearing

1    plastic in, they wouldn't use a lot of pressure, and the stuff

2    would, like Mr. DeFranco was saying, like chewing gum, would

3    get soft.

4            And so at that point, then once it was soft, they

5    would crank up the pressure on the heating side.  And

6    Mr. Thompson actually did say that.  He was asked, "Do you

7    remember what the pressures were generally and the temperatures

8    that were used to make those cards while Mr. Leighton was

9    there?

10   "A.  Yes, I do."  And he went on for a while.

11           (Reading) So once you go into the machine,

12   everything's automatic.  The product will go into the machine,

13   the hot press would rise, and we'd make it rise so we had bare

14   contact or gentle contact or kiss pressure, if you will,

15   between the platens and the sheets and the electronics.  We'd

16   hold that for a certain amount of time until we knew that the

17   plastic was very warm and very soft.  We'd increase the hot

18   pressure, the hot press pressure or force, and then after a

19   certain time it would be exhausted into the cold press where

20   we'd squeeze it again at very high pressures until it cooled

21   down to an acceptable temperature.

22           That's at page 135, lines 8 to 136, line 17 of the

23   transcript.

24           THE COURT:  What's the exhibit number, anybody's

25   exhibit number, for the logs, the ones that you didn't have any

7B6VLEIH                          Hearing

1   logs for the time when Mr. Leighton was there?

2          MR. JOHNSON:  This was 2675.

3          MR. GUTKIN:  We'll find it.

4          THE COURT:  Yeah, that's it.  Thanks.

5          MR. JOHNSON:  Can we pull that up, Charles, 2675.  Or

6   if you have it in front of your Honor.

7          THE COURT:  Yeah, I do.

8          MR. JOHNSON:  Okay.  So L1, which was the process that

9   was done on May 1st, 1995, the initial pressure there talks

10  about a bar, 10 bar, and heating temperature of about 132

11  degrees Celsius.  Then on the hot side the pressure is

12  dramatically increased to 180 bar, and the time is 20 minutes

13  at that point.

14         THE COURT:  The temperature isn't increased though.

15  Just the pressure.

16         MR. JOHNSON:  Just the pressure in that particular

17  instance, yeah.  And then later on the cooling pressure is

18  changed, as well.

19         THE COURT:  Right.

20         MR. JOHNSON:  Okay.  Slide 15, please.  Mr. Huynh also

21  testified that he cranked it up on the heating side.  He was

22  asked, Okay.  So you said the first pressure is just touch.

23         THE COURT:  No, no, I understand that.

24         MR. JOHNSON:  Okay.  Next slide.  Mr. Leighton

25  basically conferred -- you know, also said it was increased.

7B6VLEIH                    Hearing

1    He testified like that in his deposition.  He was asked, And

2    when did that occur?  Again, we're talking about the process

3    you did at Motorola.

4            It occurs -- that's when the plastic becomes soft.

5    And you increase the pressure --

6            THE COURT:  There was no inconsistency; everybody said

7    the same thing.

8            MR. JOHNSON:  Right.  And that is, in fact --

9            THE COURT:  That was light pressure, and the plastic

10   got soft.  There was more pressure for a longer cycle, and then

11   there was even more pressure at a lower temperature.  They all

12   said the same thing.  Step 1, Step 2, Step 3.

13           MR. JOHNSON:  I guess, your Honor, if I could, then,

14   does your Honor have a belief that that particular process is

15   not covered by Mr. Leighton's claims?  In order to basically

16   figure out how best I can explain this.

17           THE COURT:  No.  I harbor no such belief.

18           MR. JOHNSON:  Okay.  All right.  Next slide, please.

19   And I don't think there's any dispute about the last process

20   step.

21           Finally, a chill cycle in which the pressure is

22   increased until the platens have cooled.  Mr. Leighton

23   testified that while he was at Motorola, he tried to increase

24   the pressure on the cold side when he was making his cards

25   there.

Exhibit 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### UNITED STATES COURTHOUSE
### 500 PEARL STREET
### NEW YORK, NEW YORK 10007-1581
### (212) 805-6325

CHAMBERS OF
**COLLEEN McMAHON**
UNITED STATES DISTRICT JUDGE

TO ALL COUNSEL IN:          Leighton v. Oberthur  – 04 Civ. 2496 (CM)(LMS)

FROM:                       Judge McMahon

DATE:                       December 3, 2007

---

Counsel:

Having worked my way through the hearing record, it seems to me that it is possible to conclude from the evidence that Mr. Leighton did not conceive of "his" invention at all. Would anyone care to comment on that, or to suggest how it would impact on the precise motion I am trying to decide?

_(signature)_

U.S.D.J.

BY FAX AND ECF TO:

The Hon. Lisa Margaret Smith, Chief United States Magistrate Judge
All Counsel

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/3/07

Exhibit 5

Westlaw.

Slip Copy                                                                                                      Page 1
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

H Monsanto Co. v. Bayer Bioscience N.V.
E.D.Mo.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Missouri,Eastern
Division.
MONSANTO COMPANY, Plaintiff,
v.
BAYER BIOSCIENCE N.V., Defendant.
No. 4:00CV01915 ERW.

Oct. 28, 2005.

Named Expert: Russell Parr, Drs. Hickle &
Quemada, Jan Leemans & Harry Manbeck, Richard
S. Cahoon, Dr. Richard T. De Rose, Mr. Richard
Cahoon

Daniel T. Shvodian, Howrey and Simon, Menlo Park,
CA, Greg G. Gutzler, Jeanine R. Bermel, Joseph P.
Conran, Dutro E. Campbell, II, Husch and
Eppenberger, LLC, St. Louis, MO, John F. Lynch,
Michael E. Lee, Howrey and Simon, Jon R. Pierce,
Michelle C. Replogle, Steven G. Spears, Susan K.
Knoll, Howrey, LLP, Houston, TX, for Plaintiff.
Francis Digiovanni, Oleh V. Bilynsky, Connolly and
Bove, LLP, George Pazuniak, Womble, Carlyle,
Sandridge & Rice, PLLC, James Michael Lennon,
Connolly, Bove, Lodge & Hutz, LLP, Wilmington,
DE, John F. Morrow, Jr., Womble, Carlyle,
Sandridge & Rice, PLLC, Winston-Salem, NC, K.
Matthew Miller, Timothy G. Barber, Womble and
Carlyle, Charlotte, NC, Lisa A. Pake, Haar and
Woods, LLP, St. Louis, MO, Thomas F. Poche,
Connolly and Bove, L.L.P., Washington, DC, for
Defendant.
Robert Schultz, Ronald J. Eisenberg, Schultz and
Little, L.L.P., Chesterfield, MO, for Movant Dow
Agroscience, LLC.
C. David Goerisch, Lewis and Rice, St. Louis, MO,
for Movant Pioneer Hi-Bred International, Inc.

### ORDER

E. RICHARD WEBBER, District Judge.
*1 This matter comes before the Court upon
Monsanto Company's ("Monsanto") Motions in
Limine [docs. # 638, 639, 603, 640, 641, 605, 607,

609, 642, 643, 644, 611, 645]; Bayer Bioscience
N.V.'s ("Bayer") Motions in Limine [docs. # 619,
621, 622, 623, 624, 625, 626, 628, 629, 651, 630];
Bayer's Motion for Leave to Add Jozef Seurinck to
its Witness List [doc. # 616]; Bayer's Motion to
Present the Deposition Testimony of Ronald
Meeusen in Two Parts [in Court]; and Bayer's Motion
to Set Order of Proof [in Court]. The parties
presented oral arguments on the various motions at a
pretrial conference on October 17, 2005. The Court
heard additional arguments on October 26, 2005 at
the continuation of the October 17, 2005 pretrial
conference.

### 1. MONSANTO'S MOTION IN LIMINE TO EXCLUDE THE OPINIONS OF RUSSELL PARR

Monsanto argues that the Court should exclude the
testimony of Bayer's damages expert, Mr. Parr,
because his testimony will not be relevant or reliable
as required under Federal Rule of Evidence ("FRE")
702. Rule 702 provides that:

[i]f scientific, technical, or other specialized
knowledge will assist the trier of fact to understand
the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill,
experience, training, or education, may testify thereto
in the form of an opinion or otherwise, if (1) the
testimony is based upon sufficient facts or data, (2)
the testimony is the product of reliable principles and
methods, and (3) the witness has applied the
principles and methods reliably to the facts of the
case.

Fed.R.Evid. 702 (2005). Monsanto argues that Mr.
Parr did not apply "the principles and methods
reliably to the facts of the case."

In his expert report, Mr. Parr analyzes the factors set
forth in Georgia-Pacific Corporation v. U.S.
Plywood Corporation, 318 F.Supp. 1116
(D.C.N.Y.1970)[FN1] in order to determine the
reasonable royalty Bayer is entitled to if a jury should
find Bayer's patent '565 valid and infringed.[FN2]
Monsanto claims, inter alia, that Mr. Parr misapplied

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 2
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
**(Cite as: Slip Copy, 2005 WL 5989796)**

the *Georgia-Pacific* factors in his analysis. Specifically, Monsanto argues that: (1) Mr. Parr analyzed licenses not related to the '565 patent to determine a reasonable royalty rate; (2) Mr. Parr based his opinion on the value of the Bt corn product as a whole instead of apportioning the value of the patent against the value added by Monsanto's technology and marketing; (3) the hypothetical license fee he suggests is in excess of what Monsanto earned from the tech fee related to the MON810 corn; (4) Mr. Parr failed to consider the custom industry royalty rate; (5) Mr. Parr offers disparate per unit damage royalties and provides no guidance for the jury on which option to choose; and (6) Mr. Parr does not offer any analysis of *Georgia-Pacific* factors on the new alternative royalty rates.

> FN1. Clearly the methodology used was reliable. Courts have "endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer as a means for determining a reasonable royalty. Factors relevant in a reasonable royalty determination using this method include those set out in Georgia-Pacific."*Micro Chemical, Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1393 (Fed.Cir.2003) (internal citations and quotations omitted).

> FN2. The factors are:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to

preserve that monopoly.

> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

> 7. The duration of the patent and the term of the license.

> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

> 9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

> 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

> 11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

> 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

> 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 3
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention-would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

_Georgia-Pacific Corp._, 318 F.Supp. 1116, 1120 (D.C.N.Y.1970)

Mr. Parr analyzed _Georgia-Pacific_ factor one and two together, so it is understandable, and not improper, that he analyzed both the '565 patent and patents not in-suit. Monsanto's remaining claims relating to factors one and two are based on Monsanto's disagreement with Mr. Parr's interpretation of the facts. "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." _Micro Chemical_, 317 F.3d at 1392. Furthermore, "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." _Id._ Thus, this Court finds that Mr. Parr's opinions based on factors one and two will not be excluded.

*2 Monsanto takes umbrage at the fact that Mr. Parr found that _Georgia-Pacific_ factor 13 was not relevant in this case, and that none of the royalty rate should be apportioned to Monsanto to credit Monsanto's contributions to the MON810 product. In Mr. Parr's supplemental report, he provides royalty rates that take into account a scenario of giving credit to Monsanto for its alleged contribution to the final product. This Court finds that it is not the role of the

court to evaluate the correctness of Mr. Parr's interpretation of the underlying facts.

Monsanto argues that Mr. Parr's opinion is not reliable because his proposed royalty rate would not allow Monsanto a reasonable profit. However, there is no requirement that an infringer is entitled to a profit in all circumstances. _Monsanto Co. v. Ralph,_ 382 F.3d 1374, 1384 (Fed.Cir.2004). Thus, this Court will not exclude Mr. Parr's opinion that Monsanto is not entitled to a profit in this case. It is also unclear at this time, based on the facts, that the proposed $30 fee would cause Monsanto to lose money on each unit of corn sold. Furthermore, this Court is satisfied that Mr. Parr did consider comparable inventions in his determination of the reasonable royalty.

Finally, this Court finds that Mr. Parr did consider the _Georgia-Pacific_ factors when applying the 25% Rule of Thumb to his original proposed rate. Specifically, he premised this alternative discounted rate on the original rate which he arrived at based on his analysis of the _Georgia-Pacific_ factors. Furthermore, the Court does not believe that Mr. Parr was necessarily equivocating because he offered an alternative to his original reasonable royalty rate; it is for the jury to decide the facts underlying the question of whether Monsanto should be entitled to share in profits under the hypothetical license agreement.

## 2. MONSANTO'S MOTION IN LIMINE REGARDING PRIOR TRIAL TESTIMONY BY NON-TESTIFYING EXPERTS DRS. HICKLE AND QUEMADAA

Both Drs. Hickle and Quemada were testifying experts in _Dekalb Genetics Corporation v. Pioneer Hi-Bred International,_ which was brought in the U.S. District Court for the Northern District of Illinois. Dr. Hickle was an expert acting on behalf of Pioneer. Dr. Quemada was an expert testifying on behalf of Dekalb, a subsidiary of Monsanto. During that trial, both witnesses testified regarding the size of the Bt protein present in MON810. Monsanto argues that Bayer is attempting to take the expert's statements out-of-context. Specifically, Monsanto claims that Drs. Hickle and Quemada relied on the protein size that was already written on a Pioneer demonstrative exhibit, doing no independent molecular analysis of the protein to verify that the weight on the exhibit was indeed the correct weight.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

Monsanto is seeking an Order precluding Bayer's expert, Dr. Leemans, from relying on those statements as evidence. Specifically, Monsanto argues that: (1) the statements do not meet standards of FRE 702, (2) the circumstances of this case are different than in the *Dekalb* case and so the statements relating to the size of the MON810 protein are unreliable, (3) neither Dr. Hickle nor Dr. Quemada have been retained as testifying experts in this case, and (4) the statements are hearsay.

*3 Dr. Hickle's testimony is hearsay. Bayer is offering an out of court statement to prove the truth of the matter asserted. Furthermore, no exceptions to the hearsay rule apply. Dr. Hickle's statements are not party opponent admissions because she is not a party. Similarly, assuming *arguendo* that Dr. Hickle is "unavailable" to testify, the statement does not qualify as former testimony because it did not have "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" since the size of the Bt protein encoded by MON810 was not an issue in that case. *See*Fed.R.Evid. 804(b)(1).

On the other hand, the testimony of Dr. Quemada is arguably not hearsay since he was an expert for one of Monsanto's subsidiary companies. However, his testimony regarding the molecular weight of the protein in MON810 corn was based entirely on a demonstrative exhibit prepared by Pioneer's lawyers, and the reliability of its accuracy is questionable at best. In fact, Dr. Hickle testified that she did not examine the amino acid sequence of the protein in arriving at the 80kD weight used on the demonstrative exhibit. Mr. Quemada's testimony relating to the size of the protein encoded by MON810 was not based on sufficient facts and data. *See*Fed.R.Evid. 702. Therefore, the statements made by Drs. Hickle and Quemada during the *Dekalb* litigation will be precluded.

Bayer argues that if the Court excludes the statements of Drs. Hickle and Quemada, the Court should also preclude Monsanto's use of the DeBeuckeleer and Meulemans' memorandums. Courts determine the admissibility of proffered evidence in isolation, and will not base its rulings on the admissibility of other evidence. The DeBeuckeleer and Meulemans' memorandums have been stipulated to as being

authentic and admissible, provided that Monsanto show the documents are relevant. Bayer has not provided the Court with evidence that the documents are irrelevant. For that reason, the DeBeuckeleer and Meulemans' memorandums will not be excluded.

**3. MONSANTO'S MOTION IN LIMINE REGARDING UNRELATED MONSANTO LITIGATION**

Monsanto seeks an Order precluding Bayer from introducing any evidence relating to the: (1) Delaware litigation; (2) Greensboro litigation; (3) Alabama series of cases; and (4) cases brought by Monsanto against farmers for growing crops containing its patented technology without a license. Bayer does not intend to introduce any evidence regarding this litigation. Therefore, this Motion will be granted.

**4. MONSANTO'S MOTION IN LIMINE REGARDING CERTAIN TESTIMONY FROM BAYER EXPERTS JAN LEEMANS AND HARRY MANBECK**

Monsanto seeks an Order prohibiting Dr. Leemans from testifying regarding validity and infringement under the doctrine of equivalents. Monsanto argues that his opinions, with respect to these two issues, was not disclosed in his report. Monsanto also asks that the Court prohibit any testimony that the conception date for the invention contained in the '565 patent was any earlier than April 18, 1985. Finally, Monsanto requests an Order prohibiting Harry Manbeck from testifying on the issue of the reasonableness of Monsanto's reliance on its advice of counsel.

*4 Bayer does not intend to solicit opinions regarding invalidity from Dr. Leemans. Testimony regarding the doctrine of equivalents will be permitted to the extent that he has disclosed his opinions on the issue (*see* Monsanto's Motion in Limine # 13 infra).

In its response to interrogatories, Bayer indicated that the conception date related to the invention was April 18, 1985. Monsanto argues that Bayer should be prohibited from introducing evidence that the conception date was any earlier than the date disclosed in Bayer's response. Bayer disagrees, claiming that its belief was that knowledge of the

Slip Copy                                                                                                      Page 5
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

entire amino acid sequence was necessary for conception, and that it was only in the Court's May 10, 2005 Order relating to prior inventorship that it realized that its own conception of the invention in the '565 patent, as defined by the Court, may have been earlier in time.

First, the Court does not find Bayer's response persuasive. The standard recited by the Court in its order, that an inventor has conception when he has "knowledge of the chemical structure of the Bt gene fragment to such an extent that the fragment could adequately be distinguished from other chemical compounds," was set forth by the Federal Circuit in 1991. *See Amgen, Inc. v. Chugai Pharm. Co., Ltd., 927 F.2d 1200, 1206 (Fed.Cir.1991).* Second, even after the Court's Order, Bayer did not attempt to supplement its interrogatory response. Third, a response to a motion in limine is not the proper vehicle to withdraw an admission pursuant to Rule 36(b) of the Federal Rules of Civil Procedure.

Next, Bayer argues that the response the request for an admission was not an admission because (1) objections preceded the response and (2) the response only indicates that Bayer had conception on or about April 18, 1985, not that Bayer did not have conception before that date. If a party has an objection to a request for an admission, but nevertheless responds to the request, the party's objection is waived. *Pleasant Hill Bank v. U.S., 60 F.R.D. 1, 4 n. 1 (W.D.Mo.1973).*

The request for an admission stated, "Aventis did not have a conception in the United States of claim 2 of the '565 patent before April 24, 1985." Rule 36 requires that "when good faith requires that a party deny only a part or qualify certain matter of which an admission is requested, such qualification or part denial must be clear." *Havenfield Corp. v. H & R Block, Inc., 67 F.R.D. 93, 97 (W.D.Mo.1973).* In this case, Bayer's response was "Aventis had conception in the United States of claim 2 of the '565 patent on or about April 18, 1985." Bayer did not deny Monsanto's request and did not qualify its admission clearly in its response. Reasonably, Monsanto relied on Bayer's response as an admission. Thus, Bayer's response will be deemed an unqualified admission that it did not have conception until on or about April 18, 1985.

Monsanto argues that Dr. Manbeck's testimony should be excluded because he does not have the expertise to testify regarding technical issues, and because the topic of whether or not Monsanto's advice of counsel was competent is not a proper topic for expert testimony. Dr. Manbeck is an expert in the area of patent practice and procedures. Bayer admits that he has no expertise in the area of the biological sciences; however, Bayer does not intend to offer any opinions of Dr. Manbeck regarding the underlying technology. Bayer only intends to offer Dr. Manbeck's opinions relating to the competency of Monsanto's opinions of counsel. Monsanto believes that Dr. Manbeck did not thoroughly investigate the facts supporting his conclusion that Monsanto's advice of counsel was not competent. This Court disagrees, finding that Monsanto's concerns about Dr. Manbeck's level of investigation should be addressed during cross-examination. Thus, Monsanto's Motion will be denied.

## 5. MONSANTO'S MOTION IN LIMINE REGARDING HEARSAY DOCUMENTS

**\*5** Monsanto argues that the Court should prohibit the introduction of: (1) the book *Lords of the Harvest* by Daniel Charles; (2) a July 23, 1993 memorandum prepared by Dekalb Plant Genetics titled "Insect Resistance Update"; and (3) a September 1, 1995 document entitled "Corn Strategy 1995 YieldGard/Roundup Ready Corn Licensing Decision."

Monsanto argues that the text of *Lords of the Harvest* is inadmissible hearsay, and the prejudice substantially outweighs the probative value in certain inflammatory passages. Bayer argues that the book contains quotes from witnesses that will be testifying. Further, Bayer points out that Monsanto has only drawn the Court's attention to a couple of short passages in the book that can be described as inflammatory.

The Court notes that even if an out-of-court statement is made by a person that is testifying, the out-of-court statement is still hearsay if it is offered for the truth of the matter asserted and does not fall under one of the exceptions or exclusions to the rule. In this case, Bayer has not demonstrated that the quotations in the book would fall under any exception or exemption to the rule. However, assuming *arguendo*, that Bayer is able to demonstrate that an exception or exemption

Slip Copy                                                          Page 6
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

applies to a particular passage it seeks to introduce, the passages brought to the attention of the Court by Monsanto (pp. 50 and 204) are highly prejudicial and do not appear to have much probative value. Thus, this Court finds that passages from *Lords of the Harvest* will not be admitted as evidence unless Bayer is able to make an adequate showing *in camera* that a particular passage is relevant, not overly prejudicial, and not excludable as hearsay.

Monsanto seeks an Order excluding a July 23, 1993 memorandum prepared by Michael Stephens. Stephens memorialized a conversation that took place between Catherine Mackey and William Ziegler. Stephen and Ziegler were Monsanto employees, and Mackey was a Dekalb employee prior to Dekalb being acquired by Monsanto. Stephens summarized the conversation according to what Mackey told him she discussed with Ziegler. Monsanto argues the memorandum is inadmissible as triple hearsay. Bayer argues that the document is an admission of a party opponent contained in a business record. The Court disagrees. Mackey was not an employee of Monsanto at the time, and thus, could not make admissions on its behalf. Bayer cites *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1019-20 (9th Cir.2004) in support of its argument that documents produced by a later acquired entity, such as a subsidiary, can be attributable to the parent corporation. The Court finds that *Hangarter* does not apply in this case. In *Hangarter,* the court made specific factual findings that the subsidiary's practices were continued after the two companies merged. *Id.* at 1019.In this case, there is no such evidence. Thus, this Court will not bind Monsanto to statements made by a Dekalb employee prior to Dekalb being acquired by Monsanto.

*6 Finally, Monsanto seeks an Order prohibiting Bayer from admitting a September 1, 1995 document entitled "Corn Strategy 1995 YieldGard/Roundup Ready Corn Licensing Decision."The document purports to recommend partnering with PGS, Bayer's predecessor, on Bt technology in corn "at any price up to giving PGS 40% of the combined Bt corn business."Monsanto has represented to the Court that the document has no named (or otherwise identified) author, and the document's contents have not been adopted by Monsanto. Thus, Monsanto argues that the document is hearsay and cannot be authenticated. The Court agrees. Until Bayer is able to attribute the

document to Monsanto or authenticate it as a business record, the document is hearsay if Bayer attempts to introduce it for the truth of the matter. However, at this time, Bayer has indicated that it only intends to introduce the document to show that Dr. Fraley viewed the presentation and considered the proposed courses of action set forth therein. So long as Bayer is able to lay the foundation that Dr. Fraley in fact viewed this document when considering the proposed courses of action, the document may be admissible for that purpose. However, no mention of this document should be made to the jury until a proper foundation has been laid.

**6. MONSANTO'S MOTION IN LIMINE TO PRECLUDE BAYER FROM RELYING ON MONSANTO'S PATENT PROSECUTION AND BIOTECHNOLOGY PAPER AS A DEFENSE TO MONSANTO'S PRIOR INVENTION ALLEGATIONS.**

Monsanto seeks an Order prohibiting Bayer from introducing, in opposition to Monsanto's prior inventorship defense, (1) Monsanto's failure to provoke an interference and (2) Monsanto's Biotechnology Paper. During the prosecution of a patent relating to truncating Bt genes, the United States Patent and Trademark Office ("PTO") rejected Monsanto's application based on prior work, including a publication of an article written by a PGS scientist. Monsanto never provoked an interference in order to overcome the PTO's rejection. Bayer has indicated that it intends to introduce evidence that Monsanto failed to provoke an inference because Monsanto did not truly believe it was the prior inventor. Monsanto argues that the argument is irrelevant and will confuse the jury. Specifically, Monsanto claims that a company could decline to provoke an interference for several strategic reasons. This Court finds that the possible reasons behind Monsanto's decision to not provoke an interference are relevant to its belief as to whether it was the first inventor of the gene, and the evidence will not further confuse the jury as alleged by Monsanto.

In August 1997, Monsanto scientists published a biotechnology paper relating to Monsanto's success in creating insect resistant tomato plants. Monsanto did not publish in the paper the results of other negative experiments involving Bt expression. Monsanto is seeking an Order from the Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 7
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

prohibiting Bayer from introducing evidence that negative results relating to tomato plants 344 and 337, which were contrary to the general thesis of the paper, were not included in the paper. Monsanto argues that the results of the other tests are irrelevant. The Court disagrees. If Monsanto intends to introduce a document that suggests Monsanto was a prior inventor of the technology at issue in this case, then Bayer will have the opportunity to challenge the veracity and completeness of the document.

## 7. MONSANTO'S MOTION IN LIMINE PRECLUDING EVIDENCE OR ARGUMENT THAT MONSANTO NEEDED TO KNOW THE BT2 SEQUENCE FOR A CONCEPTION

*7 This Court held, in it's May 10, 2005 Order denying Bayer's Motion for Summary Judgment to Dismiss Monsanto's Prior Inventorship Defense [doc. # 544], that the standard applicable to determine if a party has conception pursuant to 35 U.S.C. § 102(g)(2) is whether the party has "knowledge of the chemical structure of the Bt gene fragment to such an extent that the fragment could adequately be distinguished from other chemical compounds."Knowledge of the complete Bt2 sequence is not necessarily required so long as the party knows enough about the chemical structure to be able to adequately distinguish it from other chemical compounds. Thus, Bayer will be prohibited from arguing that knowing the full Bt2 sequence was the only way for Monsanto to have had conception of the invention.

## 8. MONSANTO'S MOTION IN LIMINE TO PRECLUDE DR. RICHARD T. DEROSE FROM OFFERING OPINION TESTIMONY AT TRIAL BEYOND PROVIDING A TUTORIAL ON THE UNDERLYING TECHNOLOGY

Due to the illness of Bayer's expert Dr. Meulemans, this Court issued an Order allowing Bayer to call Dr. DeRose as an expert witness to explain the underlying technology in this case. Monsanto seeks an Order prohibiting Dr. DeRose from providing opinions beyond those relating to his tutorial. Bayer has represented to the Court that it does not intend to solicit extraneous opinions with the exception of those relating to RNA splicing in response to Monsanto's claim that a gene can only express one protein. Monsanto admits that its position that a gene

can only express one protein is the general rule and that RNA splicing is the exception to that rule. However, Monsanto argues that (1) it is too late for Bayer to make new arguments in opposition to Monsanto's position which has been consistent throughout the case and (2) Bayer has not presented any evidence that the existence of RNA splicing is relevant in MON810. Bayer admits that neither party has evidence that RNA splicing occurs in MON810. However, Bayer asserts that it raised the possibility of RNA splicing only in response to Monsanto adopting a new position in the claim construction briefing that a gene can only express one protein. This Court finds that Monsanto has continually premised its proposed claim construction on the fact that a gene only expresses one protein, and Bayer's claim that the argument is new is disingenuous. Furthermore, it is unfair to *both* parties to introduce confusing concepts, such as RNA splicing, when the concept quite possibly may not be relevant to MON810.

Next, Monsanto seeks an Order prohibiting Dr. DeRose from testifying regarding Bt toxins, the description of a dalton, and the process of determining molecular mass by SDS Page and western analysis. Monsanto argues that Dr. DeRose is not an expert in the field of Bt genes, and that Dr. DeRose's proposed testimony will be different than his testimony in prior cases.

The Court recognizes that Dr. DeRose is not an expert in the area of Bt technology; in fact, Bayer admits this is not his area of expertise. However, it does not appear, from the deposition excerpts provided to the Court and from representations made by Bayer's counsel during the pretrial conference that his planned testimony will draw distinctions between Bt genes and other genes. Instead, it appears that Dr. DeRose only labeled his images as Bt genes in order conform to the circumstances of this particular case, even though his planned testimony regarding the Bt gene would be applicable to *any gene.*However, if Dr. DeRose's testimony strays from testimony *applicable to all genes,* the Court will entertain objections from Monsanto at that time. At this time, the Court is not convinced that his planned testimony exceeds the boundaries of his expertise.

*8 Next, Monsanto argues that Dr. DeRose should be limited to the tutorial he provided in prior cases.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 8
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

Monsanto bases this argument on representations by Bayer's Counsel during the hearing regarding whether the Court should allow Dr. DeRose to provide a tutorial in the stead of Dr. Meulemans. During that hearing, Counsel for Bayer intimated that the tutorial would be the same as the tutorials provided by Dr. DeRose in other cases in which Monsanto is involved. While this is true, the Court did not limit Dr. DeRose to using the exact same tutorial in its August 24, 2005 Order. Since Bayer's reliance on these western analysis is not new, Dr. DeRose will be permitted to testify regarding these topics. To the extent that Monsanto believes that Dr. DeRose's definitions and explanations are unreliable because they were garnered, in part, by "Googling" the subject, Monsanto is free to cross-examine Dr. DeRose. Thus, Dr. DeRose will not be precluded from testifying regarding Bt toxins so long as his explanations do not go beyond what can be said of all genes, the description of a dalton, and the process of determining molecular mass by SDS Page and western analysis.

**9. MONSANTO'S MOTION IN LIMINE TO EXCLUDE U.S. PATENT NO. 5,994,526 AND TESTIMONY ABOUT THE ACE PROJECT**

The '526 patent is based on work conducted by PGS. Internally, the work on the patent was referred to as the ACE project. The patent application, disclosing a truncated native Cry9c gene that was able to kill at least some corn pests, was originally filed on June 21, 1996. Monsanto argues that Bayer should be prohibited from relying on the '526 patent, and the corresponding ACE project to prove enablement because (1) technology developed ten years after the '565 patent was filed is not relevant to enablement of the '565 patent and (2) Bayer failed to produce discovery regarding the ACE project. Bayer has represented, in its briefing to the Court, that it does not intend to introduce evidence in support of its enablement arguments relating to the '526 patent or ACE project that was not known at the time the '565 patent was filed. Further, Bayer claims that it produced documents relating to the ACE project and the '526 patent during discovery. From the briefing, it does not appear that Bayer has produced all the documents relating to the ACE project, specifically those relating to the alleged ultimate failure of the project. Thus, it would not be fair to permit Bayer to rely on only those selective documents relating to the

ACE project that Bayer chose to produce during discovery. This Court holds that the '526 patent and testimony regarding the technology described in the ACE project that was developed post-filing of the '565 patent will not be permitted to prove enablement. However, Bayer will be permitted to rely on any technology described therein that was known at the time of the '565 patent filing *if, and only if, all* information and corresponding documents relating the alleged failure of the ACE project have already been produced to Monsanto. However, if *any* information and corresponding documents relating to the ACE project was not produced, Bayer may not rely on the technology described therein.

**10. MONSANTO'S MOTION IN LIMINE TO PRECLUDE BAYER FROM OFFERING ANY EVIDENCE REGARDING RNA SPLICING AS A BASIS FOR INFRINGEMENT.**

*\*9* As discussed *supra*, this Court holds that it is unfair to *both* parties to introduce confusing concepts, such as RNA splicing, when the concept quite possibly may not be relevant to MON810. Furthermore, although Bayer has argued that its reliance on RNA splicing is not a new basis for infringement, but a response to Monsanto's new argument that a gene can only express one protein, this Court finds that Monsanto has consistently relied on this premise in support of its proposed claim construction. Thus, Bayer will not be permitted to introduce any evidence regarding RNA splicing.

**11. MONSANTO'S MOTION IN LIMINE REGARDING EVIDENCE OF SECONDARY CONSIDERATIONS SUPPORTING NON-OBVIOUSNESS**

On October 19, 2001, Monsanto served Bayer an interrogatory requesting that Bayer identify any secondary considerations which support its claim of non-obviousness. Bayer responded that Monsanto's request was premature, but added that Bayer reserved the right to supplement its response should information become available. Bayer never supplemented its interrogatory. Now, Monsanto seeks an Order from this Court prohibiting Bayer from introducing evidence of secondary considerations because of Bayer's failure to disclose the identity of any secondary considerations in response to Monsanto's interrogatory. Bayer has asserted that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                    Page 9
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

Federal Rules of Civil Procedure ("FRCP") are not intended to prohibit Bayer from introducing documents that were provided to them by Monsanto during discovery. Furthermore, Bayer argues that even if its failure to supplement its interrogatory is in violation of FRCP 26(e)(2),[FN3] the failure is harmless, and thus, the Court should allow it to introduce such evidence. *See*FRCP 37(c).[FN4] This Court finds that Bayer's failure was improper and not harmless. Under the Rules, Bayer had a duty to amend its interrogatory response if it decided that it would be relying on secondary considerations. The fact that Monsanto has knowledge of the existence of the documents which Bayer now wishes to rely on does not obviate Bayer's failure to identify which secondary factors, if any, that it intended to rely on in defense of Monsanto's claim of obviousness. Furthermore, this failure is not harmless. "The purpose of our modern discovery procedure is to narrow the issues, to eliminate surprise, and to achieve substantial justice."*Greyhound Lines, Inc. v. Miller, 402 F.2d 134, 143 (8th Cir.1968)*. This interrogatory narrowed the issues relating to Bayer's non-obviousness defenses. Based on Bayer's response, Monsanto likely believed it did not need to concentrate its efforts on discovery regarding issues related to secondary considerations. Thus, less than two weeks before trial, Bayer cannot add new theories of non-obviousness that were not disclosed in response to Monsanto's interrogatory.

> FN3.Rule 26(e) provides that "[a] party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

> FN4.Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial[.]"

**12. MONSANTO'S MOTION IN LIMINE TO**

**PRECLUDE BAYER FROM INTRODUCING ARGUMENT OR EVIDENCE REGARDING AN ALLEGED ETHICAL VIOLATION BY MR. GOOLKASIAN**

*10 One of Monsanto's expert witnesses, John Goolkasian, is a former Examiner-in-Chief and Administrative Patent Judge for the U.S. PTO's Board of Patent Appeals and Interferences. During his tenure at the Board of Patent Appeals, Mr. Goolkasian was part of the Board that rejected the claims of Dr. Fischhoff and others at Monsanto based on the teachings of the European counterpart to the '565 patent. Now, in this case, Monsanto is advancing a prior inventorship defense based on the work of Dr. Fischhoff and the other scientists at Monsanto.

Monsanto seeks an Order from this Court precluding Bayer from arguing that Mr. Goolkasian's testimony violates 37 C.F.R. § 10.111(b).37 C.F.R. § 10.111(b) prohibits a "practitioner" from accepting "private employment in a matter in which he or she had personal responsibility while a public employee."The Court finds that Monsanto's request is premature. At this time, it is unclear whether Monsanto will elicit testimony from Mr. Goolkasian that relates to a matter in which he had personal responsibility. The Court will address this issue at such a time as it becomes necessary.

**13. MONSANTO'S MOTION IN LIMINE TO PRECLUDE BAYER FROM INTRODUCING ARGUMENT OR EVIDENCE REGARDING INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS.**

Monsanto seeks an Order precluding Bayer from relying on the theory of infringement under the doctrine of equivalents ("DOE"). Monsanto argues, *inter alia,* that Bayer failed to disclose that it would be relying on the DOE in response to Monsanto's interrogatory seeking Bayer's bases for infringement. The interrogatory asked Bayer to:

State all facts and circumstances that Bayer intends to rely upon to support any contention that Monsanto directly or contributorily infringes or induces infringement of the Patents-in-Suit, identifying each claim so infringed and stating in detail how each accused method, plant, cell or DNA coding sequence is alleged to meet each of the limitations of such

Slip Copy                                                                                                    Page 10
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

claims.

Direct infringement can be either literal infringement or infringement under DOE. Monsanto alleges that Bayer's response only implicated literal infringement of the claims at issue. Specifically, Bayer's response alleged that Monsanto "directly and contributorily infringed" by "making, using, offering to sell, selling and/or importation of MON810 corn."After that general introduction, Bayer included a claim chart for each patent-in-suit.[FN5] With respect to the '565 patent claims, Bayer alleged that "[t]he *cry1A(b)* DNA fragment of that chimeric gene encodes an about 60 to about 80 kD insecticidal *Bacillus thuringiensis* Bt2 protein ... "There was no allegation of infringement under the DOE. Rule 26(e)(2) provides that a party must amend its interrogatory responses if they are incomplete unless the "additional or corrective information has not otherwise been made known to the other parties during the discovery process ..." Bayer argues that Monsanto did learn that Bayer planned to rely on the DOE during discovery because Dr. Leemans' report includes his opinion that each limitation in the '565 patent claims has a substantial equivalent in MON810 corn. *See* Monsanto Exhibit 2, ¶ 32. Dr. Leemans explains that "a protein with a calculated molecular weight of 91,956 or even 92,298 could and in fact is found to be an about 80 kD protein by Western blot analysis on SDS-PAGE. Thus, although this theory of infringement was not addressed in Bayer's response, it was addressed by Dr. Leemans in his expert report.

> FN5. Apparently, Bayer's response was completed prior to it narrowing the case to include only the claims of the '565 patent.

**\*11** Monsanto also argues legal limitations preclude Bayer's reliance on the DOE theory, including (1) prosecution history estoppel and (2) the all elements rule. Bayer argues that Monsanto's arguments are disguised motions for partial summary judgment, and thus, are not timely under the Case Management Order and are procedurally deficient. Renewed motions for summary judgment were filed in this case over a year ago. Now, only days before trial, Monsanto seeks an Order from the Court that, as a matter of law, Bayer is precluded from presenting a particular theory of infringement. In response, Monsanto relies on a case holding that the Court may exclude impermissible facts by ruling on motions in

limine. However, as Monsanto later points out, "the Supreme Court has clearly defined this as a legal issue for the Court to decide ..." This Court holds that Monsanto's motion in limine is truly a motion for partial summary judgment, and thus, is untimely and will not be addressed by the Court. Thus, the Court will not preclude Bayer from introducing evidence relating to infringement under the DOE.

**14. BAYER'S MOTION IN LIMINE TO PRECLUDE MONSANTO FROM ARGUING PROSECUTION DEFICIENCIES OR IRREGULARITIES TO THE JURY.**

Bayer seeks an Order prohibiting Monsanto from arguing that there were irregularities during the prosecution of the '565 patent. Bayer asks that the Court exclude the entire prosecution history, arguing that it is irrelevant to invalidity and infringement. Bayer reasons that because the Court will hear evidence relating to inequitable conduct in the hearing following the jury trial,[FN6] any evidence or argument relating to misconduct or fraud is irrelevant and will prejudice Bayer. The Court recognizes that:

> FN6. The Court notes that there was some confusion relating to the Court's August 24, 2005 Order directing that "any inequitable conduct hearing shall be scheduled four (4) business days after the trial in this matter has concluded."This hearing is being held separate from the jury portion of the trial because "[t]he defense of inequitable conduct in a patent suit, being entirely equitable in nature, is not an issue for a jury to decide."*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993). To be clear, *all* issues relating to possible inequitable will be heard during that post-trial hearing. The jury will have no part in deciding issues or hearing evidence relevant only to the issue of inequitable conduct.

[e]vidence tending to show fraud on the part of the inventor is so likely to prejudice the jury on other issues that the fraud issue should be tried separately. Certainly, the parties will present evidence which bears on both a jury issue and the issue of inequitable conduct. There may be no way to keep that type of overlapping evidence from the jury. But such a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
**(Cite as: Slip Copy, 2005 WL 5989796)**

situation does not prevent the Court from keeping from the jury all evidence bearing exclusively on inequitable conduct. Separation of issues is warranted. *THK Amer. v. NSK, Ltd.,* 1996 WL 33398071, at *2 (N.D.Ill.1996). Monsanto argues that evidence that Bayer failed to disclose information and made misrepresentations to the PTO is relevant to inequitable conduct, willful infringement and validity. As noted *supra,* evidence and arguments relating to inequitable conduct will be heard during the post-trial hearing; thus, any evidence relating only to instances of inequitable conduct is not relevant.

That being said, the Court will not exclude the entire prosecution history. So long as the portion Monsanto seeks to introduce is relevant to some issue in the case other than inequitable conduct, whether it be willful infringement or validity, the Court will not exclude the evidence. However, the Federal Circuit has held that evidence of prosecution deficiencies or irregularities is irrelevant to validity. *See Magnivision, Inc. v. Bonneau Co.,* 115 F.3d 956, 960 (Fed.Cir.1997).[FN7] Thus, Monsanto will not be permitted to introduce those portions of the prosecution history relating to prosecution irregularities to prove invalidity. However, prior to introducing any evidence of inequitable conduct as it relates to willful infringement, Counsel must first approach the bench and raise the issue with the Court.

> FN7. Monsanto argues that the procedural posture in *Magnivision* was different than the posture in this case. In that case, the Court had already ruled on a Motion for Summary Judgment regarding inequitable conduct prior to the trial. Monsanto argues that was the reason that the court found evidence of irregularities to be irrelevant. This Court finds that the circumstances in this case are not that different since the Court has exclusively reserved the issue of inequitable conduct for the scheduled post-trial hearing.

**15. BAYER'S MOTION IN LIMINE TO PRECLUDE MONSANTO FROM INTRODUCING PATENT 5,959,091 TO WATRUD.**

*12 Dr. Carlton, one of Monsanto's expert witnesses, relies on U.S. Patent 5,959,091 to Watrub ("Watrub patent") stating it had a filing date of December 10, 1984. The face of the Watrub patent states it is a continuation-in-part patent filed on October 10, 1986. The October filing date was ten months after the '565 patent was filed. Bayer argues that Monsanto should not be permitted to use new matter as prior art. Bayer reasons that asking the jury to determine what parts of the Watrub patent are new would be confusing for them. Instead, Bayer proposes that Monsanto introduce Ser. No. 06/679,849 (1984 patent application) as prior art.

Monsanto has represented that it only intends to rely on only those portions of the Watrub patent that were contained in the 1984 filing as prior art. Monsanto argues that a continuation-in-part application is entitled to the filing date of the prior application for all subject matter carried over from the prior parent application. Specifically, Monsanto argues that it cannot rely upon the '849 application because the unpublished application does not constitute § 102(e) prior art, and that is the reason Monsanto must rely on the prior art portions of the '091 patent. This Court finds that it is not necessary to determine whether the '849 application constitutes prior art. The portions of the Watrub patent that were carried over from the '849 application will be considered to have a filing date of December 10, 1984.

It is also well settled that where a patent purports on its face to be a 'continuation-in-part' of a prior application, the continuation-in-part application is entitled to the filing date of the parent application as to all subject matter carried over into it from the parent application, whether for purposes of obtaining a patent or subsequently utilizing the patent disclosure as evidence to defeat another's right to a patent.

*Application of Klesper,* 55 C.C.P.A. 1264, 397 F.2d 882, 885 (C.C.P.A.1968). Because Monsanto intends to rely only on those portions carried over from the 1984 application, the portions of the Watrub patent relied on by Dr. Carlton are prior art. Thus, Monsanto will not be precluded from relying on the Watrub patent.

**16. BAYER'S MOTION IN LIMINE TO**

Slip Copy                                                                    Page 12
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

PRECLUDE MONSANTO FROM PROFFERING TO THE JURY ANY "EXPERT TESTIMONY" ON ITS DEFENSE OF PRIOR INVENTION.

Bayer seeks an Order precluding Monsanto from offering expert testimony on the issue of prior invention. Bayer argues that the expected testimony of Dr. Messing is nothing more than him telling the jury how they should decide the case in light of the fats they heard and in contemplation of the jury instructions that the Court will give at the end of the case; thus, the testimony will not assist the jury because the jury is capable of judging credibility and drawing its own inferences and conclusions. Monsanto argues that courts regularly permit expert testimony on prior inventorship because it will assist the jury. This Court finds that Dr. Messing's testimony will assist the jurors in understanding the technical issues related to prior invention, and thus will not be excluded.

### 17. BAYER'S MOTION IN LIMINE TO PRECLUDE MONSANTO FROM PRESENTING EXPERT TESTIMONY REGARDING MON810 PROTEIN DEGRADATION DURING WESTERN BLOT ANALYSIS

*13 Bayer seeks an Order precluding Monsanto from introducing evidence that the Western Blot analysis of MON810 is inaccurate at measuring the full length of the protein due to the degradation of the protein by enzymes. Bayer argues that the Western Blot tests have demonstrated that MON810 demonstrates a signal for an 80 kD molecular weight band, but no demonstrable signal for the 92 kD molecular band. Monsanto argues in response that the ' 565 patent itself teaches the susceptibility of Bt proteins to degradation. Monsanto claims that the Western Blots do not show strong bands around 92kD because the species of proteins is not stable to proteases.

As noted by the Court above, the role of the Court is not to evaluate the underlying facts of an expert's opinion. *Micro Chemical,* 317 F.3d at 1392. It is understandable that experts will arrive at different conclusions when relying on different facts. Bayer's arguments are quite persuasive, but are not for this Court to decide. Instead, Bayer's arguments may be appropriately raised during the cross examination of the Monsanto expert witnesses that rely on the degradation theory as a basis for their opinion of noninfringement.

### 18. BAYER'S MOTION IN LIMINE TO PRECLUDE CERTAIN EXPERT TESTIMONY OF RICHARD S. CAHOON

Bayer seeks an Order precluding the expert testimony of Richard Cahoon. Bayer argues that Mr. Cahoon's analysis of a reasonable royalty is flawed because

(1) his injection of certain "real world factors" undermines his assumption that the '565 is assumed valid and infringed;

(2) his testimony also ignores, and contradicts, the key principle that during the hypothetical negotiations Monsanto would be facing an injunction against the sale and distribution of MON810 corn absent a license from Bayer;

(3) he mistakenly assumes that the infringer would only obtain a license if he was able to make a reasonable profit;

(4) he asserts, without any supporting evidence, that Monsanto had two non-infringing alternatives to MON810;

(5) he assumed that the calculated reasonable royalty rate should be reduced by 60% because of Monsanto's contributions of technology, testing and product selection, regulatory approval, and marketing/sales/stewardship; and

(6) he limits Monsanto's liability to only a small fraction of the revenue it received from inducing infringement by Pioneer and Dow.

In response, Monsanto contends that:
(1) Mr. Cahoon's analysis does assume the Bayer patent was valid and infringed; however, his opinions do not assume that the '565 patent covered Bt corn products and technologies not accused by Bayer of infringement in this case;

(2) it is unable to find anything in Mr. Cahoon's statement that indicates he ignored Bayer's right to an injunction;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 13
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

(3) a reasonable profit is permitted;

(4) it did have knowledge of non-infringing substitutes;

(5) Mr. Cahoon is not making assumptions but using his experience in the field to apportion the values of the Tech Fee to *GA Pacific* factor # 13; and

**\*14** (6) Mr. Cahoon does not need to cite legal bases for his third party royalty analysis beyond the *GA Pacific* factors so long as he applies this methodology correctly to the facts of the case. Furthermore, as Monsanto represented to the Court, the numbers used in his expert report are based on they royalty rate for Monsanto's other licensees.

Mr. Cahoon's report relies on the *Georgia-Pacific* factors as required in a reasonably royalty analysis. First, Mr. Cahoon's report "facially" assumes the '565 patent valid and infringed. However, injected into his analysis are "real world factors" such as: (1) that PGS appreciated the weakness of its negotiating position in licensing its Bt technology to third parties and acknowledged that other companies had doubts about PGS's patent position, and (2) that PGS management acknowledged that securing any license income on its Bt patents would be difficult and that its position was weak relative to alternatives to truncated Bt genes. These factors significantly affect Mr. Cahoon's analysis. However, it is clear to the Court that including these factors undermines the very important assumption underlying the hypothetical negotiation, that the patent is valid and infringed. Thus, although at first glance it appears that Mr. Cahoon assumes the patent is valid and infringed, [FN8] Mr. Cahoon's improper infusion of "real world factors" undermines this basic assumption.

> [FN8]. It appears so only because Mr. Cahoon states that he made that assumption.

Second, the Court does not find that his report ignores or contradicts the fact that Monsanto would be facing an injunction against the sale and distribution of MON810 corn absent receiving a license from Bayer. If Bayer believes that Mr. Cahoon did not place enough weight on the potential outcome that Monsanto would be enjoined unless it

received a license, this is an issue appropriate for cross-examination.

Third, although there is no requirement that an infringer make a profit, there is no requirement that an infringer cannot make a profit. Indeed, the purpose of expert testimony on the issue of a reasonable royalty is for the expert to analyze the *Georgia-Pacific* factors to aid the jury in determining what rate would be appropriate in a particular case.

Fourth, as mentioned *infra,* in the Court's discussion of Bayer's Tenth Motion in Limine, Monsanto is precluded from relying on its research and pipeline activities at trial unless Monsanto produced *all* discovery to Bayer relating to that MON810 alternative. Thus, Mr. Cahoon's analysis of the strength of Monsanto's bargaining position based on the belief that Monsanto possessed knowledge of non-infringing alternatives is improper, unless the evidence is permitted as described above.

Fifth, the Court does not find Mr. Cahoon's apportionment so unreliable it should be excluded. If, as Monsanto claims, the percentage rate provided by Mr. Cahoon in his report is based on his experience in the field, this is a subject reserved for cross-examination of the witness.

**\*15** Sixth, the Court does not find Mr. Cahoon's third party royalty analysis so unreliable it should be excluded. Furthermore, the Court will not interpret and determine disputed facts relating to other licenses which underlie Mr. Cahoon's opinion.

Based on the foregoing analysis, this Court holds that Mr. Cahoon's testimony will not be precluded to the extent that he is able to remove the influence on his hypothetical negotiation of (1) the aforementioned "real world factors" undermining the assumption that the patent was valid and infringed and (2) the assumption that Monsanto possessed knowledge of non-infringing alternatives. [FN9] If these two factors are intertwined with his analysis of the hypothetical negotiation to such an extent that they cannot be removed from that analysis, the testimony of Mr. Cahoon will be excluded.

> [FN9]. unless all discovery on said alternative was fully disclosed to Bayer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

## 19. BAYER'S MOTION IN LIMINE TO PRECLUDE MONSANTO FROM PRESENTING OPINIONS OF COUNSEL.

Bayer seeks an Order from the Court prohibiting Monsanto from introducing into evidence 1997 and 2000 opinions of counsel and a 2002 letter to show that Monsanto did not willfully infringe the '565 patent. The 2002 letter is a factual supplement to the 2000 opinion of counsel. It points out that in another lawsuit, a competitor of Monsanto's claimed that Monsanto was the prior inventor of the technology patented in the '565 patent. The letter goes further to add that the lawyers arguing that Monsanto was the prior inventor in the other lawsuit now represent Bayer in this action. Bayer argues that the 2002 letter was manufactured after the litigation had already begun in an effort to protect itself and embarrass counsel for Bayer. Bayer argues the letter and opinions are (1) irrelevant, (2) such that the prejudice substantially outweighs the probative value; and (3) inadmissible pursuant to FRCP 37(b)(2) because Monsanto failed to produce documents reflecting counsel's opinion pursuant to the Court's July 18, 2002 Order.

The Court finds that the 2002 letter is clearly relevant. It demonstrates that Monsanto was looking to other biotechnology companies to see those companies' strategies and arguments during litigation. The fact that competitors of Monsanto were arguing that Monsanto was the prior inventor lends credence to Monsanto's belief that it was not infringing the '565 patent. The opinions are relevant; however, the probative value of certain portions is substantially outweighed by the prejudice. The Court finds that a jury would be incredibly confused if Monsanto was permitted to disclose that an attorney at Womble Carlyle Sandridge & Rice argued in a previous case that Monsanto was the prior inventor of the technology and that now an attorney at Womble Carlyle now represents Bayer who is arguing that Monsanto was not the prior inventor. Although trained attorneys understand that "[a] lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities," non-trained jury members would likely be confused if an attorney represented different interests in a different lawsuit. Thus, this Court finds

that the portion of the letter discussing Womble Carlyle's representation of Ciba-Geigy is unduly prejudicial. Finally, after reviewing this Court's July 18, 2002 Order, this Court finds that Monsanto produced the documents consistent with the Court's Order, and thus, sanctions will not be imposed.

## 20. BAYER'S MOTION IN LIMINE TO EXCLUDE ANY POST-FILING DATE EVIDENCE RELATED TO WHETHER OR NOT THE CLAIMS OF THE PATENT-IN-SUIT ARE ENABLED.

*16 Bayer seeks an Order from the Court precluding Monsanto from presenting any evidence of post-filing-date advances in the art to support its claim that the '565 patent was not enabled. Specifically, Bayer wants the Court to prohibit Monsanto from arguing that because "codon modification" was not discovered for many years after the 1986 filing date, the '565 patent was not enabled. Bayer argues that In re Hogan, 559 F.2d 595, 605 (C.C.P.A.1977), the court held that a party cannot rely on "later knowledge about later art-related facts ... which did not exist on the filing date" to prove lack of enablement. Monsanto agrees, but points out a nuance in the law that allows failures by an inventor to practice the full scope of the claimed invention after the patent's filing date to evidence that the inventor could not practice the full scope of the invention on or before the patent's filing date. See Plant Geetic Sys., N.V. v. DEKALB Genetics Corp., 315 F.3d 1335, 1344 (Fed.Cir.2003). Both parties accurately state the law relating to the type of evidence that is admissible to prove non-enablement. However, the parties seem to continue to disagree on what constitutes enablement in this particular case. As noted in this Court's May 10, 2005 Memorandum and Order granting in part, and deny in part, Bayer's Motion for Partial Summary Judgment Dismissing Monsanto's Defenses Under 35 U.S.C. § 112,

it is not necessary that a patent applicant test all the embodiments of his invention; what is necessary is that he provide a disclosure sufficient to enable one skilled in the art to carry out the invention commensurate with the scope of his claims. For DNA sequences, that means disclosing how to make and use enough sequences to justify grant of the claims sought.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 15
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

*Amgen, Inc. v. Chugai Pharm. Co., LTD.,* 927 F.2d 1200, 1212 (Fed.Cir.1991). This Court held that "[I]f the number of inoperative nucleotide combinations was significant due to the DNA fragment failing to encode an insecticidal Bt toxin, the '565 patent claims were not enabled."Thus, Monsanto will not be precluded from introducing post-filing date evidence so long as the evidence is not "later knowledge about later art-related facts ... which did not exist on the filing date."

## 21. BAYER'S MOTION IN LIMINE TO EXCLUDE ANY EVIDENCE RELATED TO THE DEFENSE OF REVERSE DOCTRINE OF EQUIVALENTS.

Bayer seeks an Order prohibiting Monsanto from relying on the reverse doctrine of equivalents defense. Bayer argues that Monsanto did not include the reverse doctrine of equivalents in (1) its Complaint or (2) in response to Bayer's interrogatories.

Monsanto did not need to plead the defense in its Complaint because it is not an affirmative defense. *See* Robert A. Matthews, Jr., 6 Annotated Patent Digest § 39:14 (2005). Monsanto admits that the defense was not clearly raised in its responses to interrogatories, but instead claims that the defense was raised implicitly when Monsanto denied Bayer's claims of infringement. However, "[o]ne does not make a reverse doctrine of equivalents argument simply by mounting a defense to literal or doctrine of equivalents infringement."*Texas Instruments Inc. v. U.S. Intern. Trade Com'n.,* 988 F.2d 1165, 1176 (Fed.Cir.1993). Thus, Monsanto did not properly disclose its reliance on the defense.

*17 Monsanto argues that to the extent that the Court finds that Monsanto should have been more particular in disclosing its intent to use the defense at trial, circumstances would justify the Court's refusal to exclude the evidence. Specifically, (1) the failure of the party seeking exclusion to make any attempt to cure surprise or prejudice by seeking disclosure of the information or a continuance to allow preparation of a response; (2) the absence of any significant prejudice to the party seeking exclusion by admission of the evidence; (3) notice to the opposing party of the new matter, rendering prejudicial surprise minimal or nonexistent; (4) the existence of an opportunity to cure the effect of any prejudicial surprise by additional discovery before trial or during a trial recess; and (5) the absence of any evidence that the failure to supplement or amend a discovery response resulted from bad faith or willful noncompliance with a court order.

Monsanto had a duty to supplement its interrogatory response relating to its bases for the contention that MON810 corn does not infringe the '565 patent if the information disclosed was incomplete. *See*FRCP 26(e)(2). In its response to Bayer's interrogatory, Monsanto did not include its intent to rely on the reverse doctrine of equivalents as a defense to infringement. Pursuant to FRCP 37(c)(1), unless Monsanto's failure to disclose its reliance on the reverse doctrine of equivalents was substantially justified, it will not be permitted to introduce evidence related to the defense at trial.

After reviewing the circumstances relating to Monsanto's nondisclosure in this case, this Court finds that although it does not appear that Monsanto withheld its plan to rely on this defense in bad faith, Bayer will be severely prejudiced if Monsanto is permitted to argue the reverse doctrine of equivalents. Bayer lacked notice that it was necessary to pursue discovery to controvert Monsanto's theory. Thus, this Court holds that Monsanto may not rely on the reverse doctrine of equivalents.

## 22. BAYER'S MOTION IN LIMINE TO BAR EVIDENCE CONCERNING THE FINANCIAL TERMS OF THE 1993 LICENSE AGREEMENT BETWEEN PIONEER AND MONSANTO.

In 1993, Monsanto entered into a license agreement with Pioneer. The terms of the license agreement were replaced as part of a litigation settlement. Bayer seeks an Order from the Court precluding Monsanto from introducing the financial terms of the 1993 license agreement between Pioneer and Monsanto. Bayer argues that it would be unfair for the Court to allow Monsanto to rely on either the old terms that are no longer in existence or the replacement terms since Monsanto has refused to disclose them. Monsanto argues that the original 1993 license is relevant for determining a reasonable royalty since it is a license to sell MON810 that was not a compromise or settlement of litigation. In its October 6, 2004 Order denying Bayer's Motion to Compel the

production of the settlement agreements, this Court held that:

*18 [t]he Documents were reviewed in camera for relevancy. Based on the overwhelming case law on the subject, the settlement agreements are not relevant to the reasonable royalty rate relating to MON810. Courts have warned that "[l]icense fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation."*Studiengesellschaft Kohle v. Dart Indus., Inc.,* 862 F.2d 1564 (Fed.Cir.1988). The royalty rates in the settlement agreements were agreed to when Monsanto was entrenched in litigation with the other parties, at a time when the anticipated cost of additional litigation was at issue.

Furthermore, the Court noted in that Order that "Monsanto has agreed to provide Bayer with the royalty rates relating to MON810 in the form of a written 30(b)(6) statement in lieu of producing the entire agreements, but Bayer has refused the offer."This Court holds that just because the settlement agreements between Pioneer and Monsanto are not relevant in this case does not mean that a prior license agreement between the parties for MON810 is not relevant.

Next, Bayer argues that the 1993 license agreement is not relevant because it was negotiated four years before the hypothetical negotiation and it is atypical when compared to other Monsanto licensing agreements in the time period of the hypothetical negotiation. These are both persuasive arguments that should be raised during cross-examination of Monsanto's expert rather than in a motion in limine.

## 23. BAYER'S MOTION IN LIMINE TO PRECLUDE MONSANTO FROM RELYING ON ITS RESEARCH AND PIPELINE ACTIVITIES AT TRIAL.

Bayer seeks an Order from this Court (1) precluding Monsanto from relying on its research and pipeline activities to argue at trial that there are commercially viable non-infringing full length Bt protein corn product alternatives to the MON810 corn product; (2) instructing the jury that Monsanto may not rely on its research and pipeline activities for any purpose; and (3) excluding from trial the expert opinion of Mr. Cahoon, Monsanto's damages expert.

On July 18, 2002, this Court ordered that Bayer's Motion to Compel was denied. The Court's Order relied in part on Monsanto's representations that discovery of research and pipeline activities relating to products with nontruncated Bt genes was irrelevant to any issue in the case. After this Court issued its Order, Mr. Cahoon, Monsanto's damages expert, submitted his report to Bayer. In his report, he analyzed a hypothetical negotiation of a license between Monsanto and Bayer. In his analysis of Monsanto's bargaining power, he indicated that Monsanto possessed knowledge of non-infringing commercially viable alternatives to the MON810 corn product. These alternatives were full length Bt protein corn product alternatives in its research pipeline at the time of the hypothetical negotiation. The alternatives Mr. Cahoon included in his analysis were the same products that were the subject of Bayer's 2002 Motion to Compel.

*19 Bayer argues that it is unfair to permit Monsanto and its witnesses to rely on evidence that Monsanto withheld, alleging that the evidence was irrelevant to any issue in the case. In response, Monsanto claims that (1) its objection to Bayer's 2002 Motion to Compel was that the Motion was too broad, (2) nevertheless, Monsanto produced discovery pertaining to several MON810 alternatives that contained full length Bt gene, (3) Monsanto only intends to introduce at trial evidence of the commercial alternatives for which Bayer has obtained discovery, and (4) Bayer has not made a renewed request for the information. This Court finds Monsanto's reliance on this evidence it withheld from Bayer to be fundamentally unfair. Based on this Court's Order, relying in part on Monsanto's representations that the evidence was not relevant, discovery on these MON810 alternatives was not produced to Bayer. The fact that Monsanto produced *some* discovery to Bayer relating to MON810 alternatives is insufficient. This Court will not allow Monsanto to cherry-pick the documents relating to full length Bt alternatives to MON810 that it *chooses* to produce during discovery. Furthermore, Bayer renewed its request for discovery after it learned Mr. Cahoon would be relying on the discovery that had been withheld, and Monsanto did not provide discovery in response to Bayer's request. This Court holds that if Monsanto has produced *all* discovery FN10 related to a particular alternative, it will be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

Page 17

permitted to rely on evidence relating to that alternative during the trial. If *all* discovery was not produced on a particular alternative, Monsanto will not be permitted to rely on *any* of the evidence related to that alternative.

> FN10. including, but not limited to, documents, opinions of counsel, efficacy reports, yield-drag studies, laboratory notebooks, e-mail communications, Lotus Notes, and handwritten notes.

**24. BAYER'S MOTION IN LIMINE TO PRECLUDE MONSANTO FROM PRESENTING TESTIMONY OF INHERENCY IN CONNECTION WITH ANY OF ITS OBVIOUSNESS OR PRIOR INVENTION DEFENSES.**

Bayer seeks an Order precluding Monsanto from presenting evidence that the nucleotide sequence in prior art was an inherent feature in the art. Bayer argues that this evidence related to inherency would be improper in connection with Monsanto's obviousness and prior invention defenses.

*Obviousness*

Bayer has represented that Monsanto plans to argue that the claims of the '565 were obvious in light of U.S. Patent No. 6,114,138 ("Adang patent") and U.S. Patent No. 5,959,091 ("Watrub patent"). In support of this argument, Dr. Bruce Carlton, a Monsanto expert, has disclosed that he plans to testify that the claims of the '565 patent are obvious because the "[p]lasmid pMAP10 contains a 2.4 kb segment arising from a Kpn deletion of the Bt toxin gene and expresses an insecticidal truncated toxin of about 80 kD. *E. coli.*" Bayer argues that none of the prior art references disclose the amino acid sequence of SEQ ID No. 1, and thus, Monsanto should not be permitted to argue obviousness based on properties inherent in the prior art but not explicitly disclosed. Monsanto argues that Dr. Carlton's report goes on to state "that the Bt toxin described by Watrud and Perlak is the same toxin as in Monsanto's MON810 corn product (Fischhoff et al, 1987; Linve et al, 1995; Watrud and Perlak, 1986)" and later concludes that "[i]n 1984, Watrud and Perlak disclose a 60-80 kD toxic fragment of a protein which Aventis [FN11] accuses of infringing its claims."

> FN11. Bayer's predecessor.

*20 Bayer argues that "obviousness cannot be predicated on what is unknown."*See In re Rijkaert, 9 F.3d 1531, 1534 (Fed.Cir.1993).* Both parties rely on *In re Napier,* and the Court finds this case instructive. In *Napier,* a patent application for noise reduction technology in aircraft was rejected for obviousness. The patent application claims disclosed a device that reduced noise by "directing a stream of relatively cold air in a separate cold air pipe through the exhaust path of the engine to create essentially parallel flowing stream. Since sound travels faster through denser mediums ... the sound from the [aircraft engine] refracts toward the path of cold air instead of the path it otherwise would take."*Id.* at 612.On appeal, the patent applicant argued his invention was not obvious based on the prior art because the prior art taught "reduction of noise by mixing, whereas his claimed invention is directed to the redirection of noise by refraction."*Id.* at 613.The court held:

> [t]he inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness. The Board found that, although [the] Johnson [prior art] only discloses noise reduction resulting from the mixture of ambient air with the hot combustion gases, sound waves are inherently refracted in Johnson's system. In support, the Board relied on the teaching of the prior art British Patent No. 653,544 (British patent) which explicitly states that sound waves will be refracted from a hot gas to a cold gas due to the difference in densities. In view of this evidence and the deference owed to Board fact findings, we conclude that the Board properly found that Johnson inherently discloses redirection of noise.

*Id.* (internal citations omitted). Bayer argues that although the *Napier* court relied on the inherent feature of a prior art reference, the *inherent feature itself was disclosed elsewhere* in the prior art. Monsanto argues that the *Napier* court did not rely on the disclosure of the inherent feature in its finding of obviousness. This Court disagrees. The court specifically noted, after discussing the British patent, that its holding was "[i]n view of this evidence."Thus, to the extent that Monsanto is unable to present evidence that the inherent feature (the Bt2

Slip Copy
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
**(Cite as: Slip Copy, 2005 WL 5989796)**

protein sequence) was disclosed in the prior art, Monsanto will be precluded from presenting testimony of inherency in connection with its obviousness defense.

*Prior Invention*

Bayer seeks an Order prohibiting Monsanto from arguing that Monsanto had conception of the invention prior to it knowing the entire protein sequence. 35 U.S.C. § 102(g) provides that a person will not be entitled to a patent if another:

invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

*21 "[C]onception ... cannot be established nunc pro tunc. There must be contemporaneous recognition and appreciation of the invention represented by the [claims].*Mycogen Plant Science v. Monsanto Co.*, 243 F.3d 1316, 1335 (Fed.Cir.2001) (quoting *Breen v. Henshaw,* 472 F.2d 1398, 1401 (C.C.P.A.1973)."Conception requires contemporaneous recognition and appreciation of the limitations of the claimed invention, not merely fortuitous inherency."

This Court finds that Bayer is attempting to reargue portions of its prior Motion for Summary Judgment. *See* doc. # 498. As this Court held in its May 10, 2005 Order denying Bayer's Motion for Summary Judgment Dismissing Monsanto's Prior Inventorship Defense, "material facts in dispute relate to the evidence presented by Monsanto that (1) knowledge of the Bt2 sequence was not needed to make the claimed chimeric gene once Monsanto scientists had isolated the gene, identified the toxic fragment, and sequenced the ends of the gene to facilitate manipulation, and (2) sequencing the Bt2 DNA fragment was something that was well within the capability of someone of ordinary skill in the art as of October 1984 once the fragment had been isolated and identified."Thus, Bayer's Motion, as it relates to prior inventorship will be denied.

**25. BAYER'S MOTION FOR LEAVE TO ADD JOZEF ("JEF") SEURINCK TO ITS WITNESS LIST**

Bayer seeks leave to add Jozef Seurinck to its witness list. Mr. Seurinck's name was not disclosed in Rule 26 disclosures, any interrogatory responses, or in Bayer's previous witness list. His name was on documents disclosed early in the case, and he was specifically identified to Monsanto on May 25, 2005 in correspondence and on the 1984 documents disclosed with that correspondence. The correspondence indicated that "[t]he person most knowledgeable about these [documents] is Jozef Seurinck, a current BCS employee in Gent."

At a minimum,[FN12] Bayer plans to have Mr. Seurinck testify (1) as to the authenticity of the documents produced and (2) about the entries he made on those documents relating to sequencing the Bt protein. Bayer argues that Monsanto should not be surprised by Bayer's request because Mr. Seurinck was identified early in the case when his name appeared on various documents and again in May 2005 when Bayer identified Mr. Seurinck as the person most knowledgeable about the documents being produced. Monsanto argues that pursuant to FRCP 37(c)(1), Bayer's motion should be denied because it has provided no valid excuse for withholding the identity of this witness.

> FN12. During the pretrial conference, Bayer seemed to expand that subject-matter upon which Mr. Seurinck would testify if its motion is granted.

This Court has considerable discretion relating to the exclusion of witnesses not disclosed in compliance with the Federal Rules of Civil Procedure. *See Boardman v. Nat'l Med. Enters.,* 106 F.3d 840, 843 (8th Cir.1997) (the power of the court to exclude witnesses "is essential to the judge's control over the case); *Trokmya v. Cleveland Chiropractic Clinic,* 280 F.3d 1200, 1205 (8th Cir.2002) (trial court did not abuse discretion by excluding witness that was not disclosed in initial disclosures or supplements under FRCP 26). This Court finds that Monsanto cannot realistically have been expected to recognize Mr. Seurinck as a potential witness just because his name appeared in some of the thousands of documents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 19
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
**(Cite as: Slip Copy, 2005 WL 5989796)**

produced in this case. Furthermore, after Bayer had identified Mr. Seurinck as being most knowledgeable about certain documents, Monsanto sought more information about him, and Bayer failed to respond to Monsanto's requests for information. Permitting Bayer to add a witness only days before trial would be extremely prejudicial to Monsanto. Thus, Bayer's request to add Mr. Seurinck as a witness will be denied.

## 26. BAYER'S MOTION TO PRESENT THE DEPOSITION TESTIMONY OF RONALD MEEUSEN IN TWO PARTS

*22 Bayer seeks an Order allowing Bayer to split the testimony of Ronald Meeusen into two parts. Bayer reasons that Mr. Meeusen will be testifying about two different topics, and thus, the foundation for the second topic will not have been properly laid when he testifies about the first topic. Monsanto argues that many of the witnesses will be testifying about multiple topics and to allow Mr. Meeusen's deposition to be presented in two separate portions of the trial will prejudice Monsanto because it will appear that two witnesses are supporting Bayer's position. The Court does not find this argument persuasive. If the number of witnesses is a concern to either party, the parties should propose a jury instruction relating to the number of witnesses not being a measure of the strength of a party's case.

Monsanto next argues that Bayer's proposal would be less efficient than if Bayer presented Mr. Meeusen's testimony in one part. This trial is going to last at least two weeks, probably going into three. In the grand scheme, the few extra minutes that will be necessary if the testimony is fragmented is inconsequential, especially if it will aid Bayer in the logical flow of presenting its case. Thus, the Court will permit the testimony to be presented in two parts.

## 27. BAYER'S MOTION FOR THE COURT TO SET THE ORDER OF PROOF

On May 10, 2005, this Court issued an Order setting the order of proof at trial. In that Order, the Court held that Monsanto will be permitted to present testimony first. For purposes of clarification, this Court will now set forth additional details not contained in the May 10, 2005 Order regarding the

order of proof at trial. Monsanto will present evidence on all issues first in its case-in-chief. Bayer will then have an opportunity to respond in its case-in-chief. Monsanto may then offer any rebuttal testimony if it is necessary. Finally, Bayer may offer rebuttal testimony if it is necessary, but *only* as to those issues upon which Bayer has the burden of proof.

Accordingly,

**IT IS HEREBY ORDERED** that Monsanto's First Motion in Limine to Exclude the Opinions of Russell Parr [doc. # 638] is **DENIED.**

**IT IS FURTHER ORDERED** that Monsanto's Second Motion in Limine Regarding Prior Trial Testimony by Non-Testifying Experts Drs. Hickle and Quemada [doc. # 639] is **GRANTED.**

**IT IS FURTHER ORDERED** that Monsanto's Third Motion in Limine Regarding Unrelated Monsanto Litigations [doc. # 603] is **GRANTED.**

**IT IS FURTHER ORDERED** that Monsanto's Fourth Motion in Limine Regarding Certain Testimony from Bayer Experts Jan Leemans and Harry Manbeck [doc. # 640] is **GRANTED in part and DENIED in part.** Dr. Leemans will not be permitted to testify regarding invalidity. Dr. Leemans will be permitted to testify regarding infringement under the doctrine of equivalents to the extent of his opinions disclosed in his expert report. Bayer will not be permitted to introduce evidence that its conception date was prior to April 18, 1985. Bayer will not be permitted to elicit opinions from Dr. Manbeck regarding technical issues; however, Dr. Manbeck will be permitted to testify regarding Monsanto's advice of counsel defense.

*23 **IT IS FURTHER ORDERED** that Monsanto's Fifth Motion in Limine Regarding Hearsay Documents [doc. # 641] is **GRANTED in part and DENIED in part.** Bayer will be prohibited from introducing pages 50 and 204 of *Lords of Harvest* into evidence. Bayer shall not attempt to introduce any of the remainder of the book unless it is not offering it for the purpose of proving the truth of the matter asserted. The Stephens memorandum is inadmissible hearsay. So long as Bayer can lay the proper foundation, the September 1, 1995 document

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

will be admissible if not offered to prove the truth of the matter asserted.

**IT IS FURTHER ORDERED** that Monsanto's Sixth Motion in Limine to Preclude Bayer from Relying on Monsanto's Patent Prosecution and Biotechnology Paper as a Defense to Monsanto's Prior Invention Allegations [doc. # 605] is **DENIED.**Bayer will be permitted to introduce evidence regarding Monsanto's failure to provoke an interference and the contrary results not included in the August 1997 Monsanto publication regarding success in creating insect resistant plants.

**IT IS FURTHER ORDERED** that Monsanto's Seventh Motion in Limine Precluding Evidence or Argument that Monsanto Needed to Know the Bt2 Sequence for a Conception [doc. # 607] is **GRANTED.**The proper standard is whether the party had "knowledge of the chemical structure of the Bt gene fragment to such an extent that the fragment could adequately be distinguished from other chemical compounds."

**IT IS FURTHER ORDERED** that Monsanto's Eighth Motion in Limine to Preclude Dr. Richard T. DeRose From Offering Opinion Testimony at Trial Beyond Providing a Tutorial on the Underlying Technology [doc. # 609] is **GRANTED in part and DENIED in part.**Dr. DeRose will not be permitted to testify regarding RNA splicing. Dr. DeRose will be permitted to testify regarding (1) Bt toxins so long as his explanations do not go beyond what can be said of all genes, (2) the description of a dalton, and (3) the process of determining molecular mass by SDS Page and western analysis.

**IT IS FURTHER ORDERED** that Monsanto's Ninth Motion in Limine to Exclude U.S. Patent No. 5,994,526 and Testimony about the ACE Project [doc. # 642] is **GRANTED in part and DENIED in part.**Bayer is not permitted to rely on the ' 526 patent or testimony related to the ACE project relating to technology developed after the filing of the '565 patent in support of enablement. Bayer will be permitted to rely on any technology described therein that was known at the time of the '565 patent filing *if, and only if,* all information and corresponding documents relating the alleged failure of the ACE project has already been produced to Monsanto. If Bayer plans to rely on any technology described

therein that was known at the time of the '565 patent filing, an attorney for Bayer shall file with the Court, no later than Monday, October 31, 2005 at 3:00 p.m., a *sworn affidavit* representing that all information and corresponding documents relating the alleged failure of the ACE project were produced.

**\*24**IT IS FURTHER ORDERED** that Monsanto's Tenth Motion in Limine to Preclude Bayer from Offering Any Evidence Regarding RNA Splicing as a Basis for Infringement [doc. # 643] is **GRANTED.**

**IT IS FURTHER ORDERED** that Monsanto's Eleventh Motion in Limine Regarding Evidence of Secondary Considerations Supporting Non-Obviousness [doc. # 644] is **GRANTED.**

**IT IS FURTHER ORDERED** that Monsanto's Twelfth Motion in Limine to Preclude Bayer from Introducing Argument or Evidence Regarding an Alleged Ethical Violation by Mr. Goolkasian [doc. # 611] is **DENIED.**

**IT IS FURTHER ORDERED** that Monsanto's Thirteenth Motion in Limine to Preclude Bayer from Introducing Argument or Evidence Regarding Infringement Under the Doctrine of Equivalents [doc. # 645] is **DENIED.**

**IT IS FURTHER ORDERED** that Bayer's First Motion in Limine to Preclude Monsanto from Arguing Prosecution Deficiencies or Irregularities to the Jury [doc. # 619] is *GRANTED in part and DENIED in part.*Evidence and arguments relevant only to inequitable conduct will be precluded. Only those portions of the prosecution history not relevant to some other issue in the case will be precluded. Evidence of prosecution deficiencies or irregularities introduced for the purpose of proving invalidity will be precluded.

**IT IS FURTHER ORDERED** that Bayer's Second Motion in Limine to Preclude Monsanto from Introducing Patent 5,959,091 to Watrud [doc. # 621] is **DENIED.**

**IT IS FURTHER ORDERED** that Bayer's Third Motion in Limine to Preclude Monsanto from Proffering to the Jury Any "Expert Testimony" on its Defense of Prior Invention [doc. # 622] is **DENIED.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
(Cite as: Slip Copy, 2005 WL 5989796)

Page 21

**IT IS FURTHER ORDERED** that Bayer's Fourth Motion in Limine to Preclude Monsanto from Presenting Expert Testimony Regarding MON810 Protein Degradation during <u>Western Blot Analysis</u> [doc. # 623] is **DENIED.**

**IT IS FURTHER ORDERED** that Bayer's Fifth Motion in Limine to Preclude Certain Expert Testimony of Richard S. Cahoon [doc. # 624] is **GRANTED in part and DENIED in part.**Mr. Cahoon's testimony will not be precluded to the extent that he is able to remove the influence on his hypothetical negotiation of (1) the aforementioned "real world factors" undermining the assumption that the patent was valid and infringed and (2) the assumption that Monsanto possessed knowledge of non-infringing alternatives (unless Bayer was provided *all* discovery on the alternative). If these two factors are intertwined with his analysis of the hypothetical negotiation to such an extent that they cannot be removed from that analysis, the testimony of Mr. Cahoon will be excluded.

**IT IS FURTHER ORDERED** that Bayer's Sixth Motion in Limine to Preclude Monsanto from Presenting Opinions of Counsel [doc. # 625] is **GRANTED in part and DENIED in part.**A redacted version of the March 21, 2002 letter is attached hereto. The 1997 and 2000 opinions of counsel will not be precluded.

**IT IS FURTHER ORDERED** that Bayer's Seventh Motion in Limine to Exclude any Post-Filing Date Evidence Related to Whether or Not the Claims of the Patent-In-Suit Are Enabled [doc. # 626] is **GRANTED in part and DENIED in part.**Monsanto will not be precluded from introducing post-filing date evidence so long as the evidence is not "later knowledge about later art-related facts ... which did not exist on the filing date."

**\*25IT IS FURTHER ORDERED** that Bayer's Eighth Motion in Limine to Exclude any Evidence Related to the Defense of Reverse Doctrine of Equivalents [doc. # 628] is **GRANTED.**

**IT IS FURTHER ORDERED** that Bayer's Ninth Motion in Limine to Bar Evidence Concerning the Financial Terms of the 1993 License Agreement Between Pioneer and Monsanto [doc. # 629] is

**DENIED.**

**IT IS FURTHER ORDERED** that Bayer's Tenth Motion in Limine to Preclude Monsanto from Relying on its Research and Pipeline Activities at Trial [doc. # 651] is **GRANTED in part and DENIED in part.**If Monsanto has produced *all* discovery related to a particular alternative, it will be permitted to rely on evidence relating to that alternative during the trial. If *all* discovery was not produced on a particular alternative, Monsanto will not be permitted to rely on *any* of the evidence related to that alternative. If Monsanto plans to rely on any alternative, an attorney for Monsanto shall file with the Court, no later than Monday, October 31, 2005 at 3:00 p.m., a *sworn affidavit* representing that all information and corresponding documents relating the particular alternative were produced.

**IT IS FURTHER ORDERED** that Bayer's Eleventh Motion in Limine to Preclude Monsanto from Presenting Testimony of Inherency in Connection With Any of Its Obviousness or Prior Invention Defenses [doc. # 630] is **GRANTED in part and DENIED in part.**Bayer's Motion, as it relates to prior inventorship will be **DENIED.**To the extent that Monsanto is unable to present evidence that the inherent feature (the Bt2 protein sequence) was disclosed in the prior art, Monsanto will be precluded from presenting testimony of inherency in connection with its obviousness defense.

**IT IS FURTHER ORDERED** that Bayer's Motion for Leave to Add Jozef Seurinck to Witness List [doc. # 616] is **DENIED.**

**IT IS FURTHER ORDERED** that Bayer's In-Court Motion to Present the Deposition Testimony of Ronald Meeusen in Two Parts is **GRANTED.**

**IT IS FINALLY ORDERED** that Bayer's In-Court Motion for the Court to Set Order of Proof is **GRANTED.**Monsanto will present evidence on all issues first. Bayer will then have an opportunity to respond. Monsanto may then offer any rebuttal testimony if it is necessary. Finally, Bayer may offer rebuttal testimony if it is necessary, but only as to those issues upon which Bayer has the burden of proof.

E.D.Mo.,2005.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 22
Slip Copy, 2005 WL 5989796 (E.D.Mo.)
**(Cite as: Slip Copy, 2005 WL 5989796)**


Monsanto Co. v. Bayer Bioscience N.V.
Slip Copy, 2005 WL 5989796 (E.D.Mo.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.